**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 6-22-2020

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * *
                                  *
UNITED STATES OF AMERICA          *
                                  *   19-cr-251-01-LM
            v.                    *   February 10, 2020
                                  *   1:25 p.m.
   JOHNATHON IRISH                *
                                  *
* * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF JURY TRIAL
DAY TWO - AFTERNOON SESSION
BEFORE THE HONORABLE LANDYA B. MCCAFFERTY

APPEARANCES:


For the Government:      Anna Z. Krasinski, AUSA
                         Kasey A. Weiland, AUSA
                         U.S. Attorney's Office




For the Defendant:       Benjamin L. Falkner, Esq.
                         Krasnoo, Klehm & Falkner, LLP




Court Reporter:          Susan M. Bateman, RPR, CRR
                         Official Court Reporter
                         United States District Court
                         55 Pleasant Street
                         Concord, NH 03301
                         (603) 225-1453

```
                        I N D E X


WITNESSES:          Direct      Cross     Redirect     Recross


PETER DUGUAY

By Ms. Krasinski    4                       30
By Mr. Falkner                  18


VOIR DIRE OF NEIL PRIVE

By Ms. Krasinski   35
By Mr. Falkner                  37



NEIL PRIVE

By Ms. Krasinski   40
By Mr. Falkner                  56


ROSCOE WHITNEY

By Ms. Weiland     70                      108
By Mr. Falkner                  96                      112


EXHIBITS                              FOR ID      IN EVD

  Government's Exhibit 30                           91
```

<pre>
 1                    P R O C E E D I N G S
 2              (IN COURT - NO JURY PRESENT)
 3              THE COURT:  I want to talk to counsel.
 4              I think at one point my mic was off.  One
 5   juror has not spoken to the other jurors but couldn't
 6   hear part of an instruction where I asked them to
 7   disregard something, and I think it was because my mic
 8   was off.  And so what I'm thinking of doing, and I want
 9   to make sure you're okay with it, is simply reiterating
10   that instruction.  I can do it the next time any mention
11   of Mr. Irish being in jail occurs or a mention of jail
12   calls or anything else, or I could simply begin this
13   period of time with that instruction by repeating it.
14              Would you rather, Attorney Falkner, that I
15   repeat it when it comes up in context?
16              MR. FALKNER:  I think so.
17              THE COURT:  You think so, rather than drawing
18   attention to it again?
19              MR. FALKNER:  Right.
20              THE COURT:  Okay.  All right.  So I will do
21   that and if for any reason you want to approach, do so,
22   just let me know.
23              Okay.  I think that was the only issue.
24   Anything else?
25              MS. KRASINSKI:  No.
</pre>

1          THE COURT:  All right.  We'll bring in the

2  jury.

3          (IN COURT - JURY PRESENT)

4          THE COURT:  The government may call its next

5  witness.

6          MS. KRASINSKI:  The United States calls Peter

7  Duguay.

8                    PETER DUGUAY

9      having been duly sworn, testified as follows:

10          THE CLERK:  Please state your full name, spell

11  your last name for the record.

12          THE WITNESS:  Peter Duguay, D-U-G-U-A-Y.

13          THE CLERK:  Thank you very much.  Please be

14  seated.

15                  DIRECT EXAMINATION

16  BY MS. KRASINSKI:

17      Q.   Good afternoon, Mr. Duguay.

18          Mr. Duguay, where are you from?

19      A.   Bethlehem, New Hampshire.

20      Q.   And are you employed?

21      A.   I own my business.

22      Q.   What's that business?

23      A.   Geothermal Heating and Cooling.

24      Q.   And before you owned your business, what did

25  you do?

1    A.    I was in the military for six years.

2    Q.    And can you just give us a little background

3    on that?

4    A.    I joined when I was 18 years old and served

5    overseas for 14 months, and I was medically discharged

6    for combat related injuries.

7    Q.    Because of your prior military service, are

8    you familiar with firearms?

9    A.    Yes.

10   Q.    Did you carry firearms when you were serving?

11   A.    Yes.

12   Q.    Now, I want to switch gears a little bit.

13         Do you know the defendant, Johnathon Irish?

14   A.    I do.

15   Q.    How do you know him?

16   A.    He moved into a home approximately a quarter

17   mile down the road from my house.

18   Q.    In New Hampshire?

19   A.    Correct.

20   Q.    And approximately when was that?

21   A.    I believe it was in the spring of 2019.

22   That's at least when we were first introduced.

23   Q.    Do you see Johnathon Irish here in the

24   courtroom today?

25   A.    I do.

1     Q.    Can you please describe something that he's

2  wearing and where he's sitting?

3     A.    I don't know -- where did he go?  Wearing a

4  suit, has a mustache, no tie.

5          MS. KRASINSKI:  Your Honor, can the record

6  please reflect that the witness has identified the

7  defendant?

8          THE COURT:  Yes.

9     Q.    Now, how did it come to be that you met him

10  when he was your neighbor?

11     A.    My dog ran away one day, and the tag on the

12  dog had my wife's phone number.  He found my dog, and my

13  wife and kids went down and got the dog.  At that point

14  she was under the impression that he was a disabled

15  veteran.

16     Q.    Can I just stop you for a minute?

17     A.    Yep.

18     Q.    So you meet him?

19     A.    Yep.

20     Q.    He gives you that impression?

21     A.    Yep.

22     Q.    And then what?

23     A.    Well, she met him first and suggested that

24  maybe he would be somebody I would want to, you know,

25  introduce myself to, you know, A, because he's a

1   neighbor, and she thought that he was a disabled veteran

2   starting a nonprofit veteran's type group.

3        Q.   So did you meet him?

4        A.   I went down I think, you know, within a week

5   or two I drove by the house, saw him outside, and

6   stopped and introduced myself.

7        Q.   And did you end up giving the defendant a job?

8        A.   He, as I understood, was kind of independent,

9   he was some kind of a mechanic, and I said that, you

10  know, sometimes we need a little bit of help and I

11  figured, you know, if we could help him out, that we

12  would give him some employment.

13       Q.   And so did that happen?

14       A.   It did.

15       Q.   And what would you describe your relationship

16  with the defendant as?  Were you friends, were you

17  acquaintances, boss, I mean how would you describe it?

18       A.   Yeah, I would describe him as a friend.  I

19  mean, he's quite different than me, but he worked really

20  hard.  He showed up when he said he would show up.  He

21  gave 110 percent.  And as a business owner, I

22  appreciated that.

23       Q.   Now, in your interactions with the defendant

24  did he ever talk about a 1911 pistol?

25       A.   Yes.

1     Q.    Can you tell us about that?

2     A.    He was very pro gun, you know, enjoyed talking

3 anything military, anything guns, so he, you know, would

4 share that sort of stuff fairly regularly.

5     Q.    Did he specifically talk about the 1911

6 pistol?

7     A.    He did.  I think it was something maybe he

8 received from, you know, a grandfather or something like

9 that.

10     Q.    I want to --

11     A.    He also would often refer to it as his wife's

12 weapon.

13     Q.    And so he talked about a 1911 and he would

14 refer to it as his wife's?

15     A.    Yes.

16     Q.    I want to talk to you about an incident that

17 occurred in October of 2019 at your camp or cabin.

18     A.    Yep.

19     Q.    Do you have a little camp or cabin?

20     A.    We have a family farm and we have a cabin up

21 on a mountain.  We call it a hunting camp.

22     Q.    And where is this hunting camp?

23     A.    Pike, New Hampshire.

24     Q.    What do you use it for?

25     A.    Mostly we go up in the wintertime.  I bring my

1    kids up there and we do a lot of sledding, skiing,

2    snowmobiling, you know, it's an off-grid type thing.

3        Q.    In October of 2019 did you go to your camp

4    with the defendant?

5        A.    Correct.

6        Q.    How did you get there?

7        A.    We took my truck and towed my tractor up

8    there.

9        Q.    Was there anyone else or was it just you and

10   Mr. Irish?

11       A.    Just me and Johnathon.

12       Q.    When you were driving up there, did he talk to

13   you about firearms at all?

14       A.    When I picked him up, he asked if I brought a

15   firearm.  I think he was just possibly concerned about,

16   you know, animals, things like that.  I hadn't actually

17   been up there in probably three or four months.  We

18   pretty much just use it in the wintertime.

19       Q.    What did you say when he asked you if you had

20   a firearm?

21       A.    I said that I did not.  I didn't feel like I

22   needed a gun.  There's nothing to be afraid of.

23       Q.    And did he respond in any way?

24       A.    I can't remember if he at that point said that

25   he had one or not.  I first kind of noticed when we

1   stopped at a store and he was adjusting his belt over

2   and over again, and I said, you know, do you not know

3   how to work your belt, and he alluded to, you know,

4   basically that he was trying to get the firearm in a

5   better position.

6       Q.   So you said you pick him up, he asks you if

7   you're armed.  You say no?

8       A.   Yep.

9       Q.   At some point during that ride or while you're

10  there does he tell you he's armed?

11      A.   I believe he did say that he brought his at

12  that point, yes.

13      Q.   Did he tell you what it was?

14      A.   I think I just automatically assumed he was

15  talking about his pistol because there was no rifle or

16  anything like that.  In my experience, you know, he

17  loved to talk about his guns and I -- so if he said

18  something to me, I probably didn't pay that much

19  attention to it.  And like I said, then when I got to

20  the store and then the belt thing, and again it didn't

21  really process again that, you know, he actually had the

22  firearm on him.

23      Q.   I just want to back up to something you just

24  said.  You mentioned that he essentially loved to talk

25  about his guns?

1      A.    Correct.

2      Q.    Did he talk about his guns frequently?

3      A.    Yes.  Day in, day out.

4      Q.    And if I understood you correctly, you said

5  sometimes he referred to the 1911 as his wife's?

6      A.    Correct.  That they're legally her firearms.

7      Q.    But did he -- when he would talk about them to

8  you, did he also refer to them as his guns?

9      A.    I believe so, yes.

10     Q.    Now, back to October 2019 and your trip up to

11 the hunting camp.  You see him fidgeting around with his

12 belt.  You ask him if he can't work his belt?

13     A.    Correct.

14     Q.    And he says something to the effect of, I'm

15 armed?

16     A.    Yeah.

17     Q.    And you don't see a rifle?

18     A.    Correct.

19     Q.    Do you see a shotgun?

20     A.    No.

21     Q.    So you assume it must be some sort of a

22 pistol; is that fair?

23     A.    Correct.

24     Q.    Okay.  What happened when you got there?

25     A.    We unloaded my tractor.  You can't actually

1  drive a vehicle up to the camp so we drove the tractor

2  up and started the generator, turned the lights on.

3  Basically the purpose of the trip was to just check on

4  everything and make a list of what I needed to do before

5  wintertime when I actually went up with my kids.

6       Q.   And during that time did you see the defendant

7  carrying a firearm?

8       A.   Not at the camp, no.

9       Q.   And so then did you travel back home?

10       A.   Yes.

11       Q.   Was there anyone else in the car?

12       A.   No.

13       Q.   So I guess I should ask this.  Who traveled

14  back?

15       A.   Johnathon and I traveled back.  We left the

16  tractor at the camp, if I remember correctly, and just

17  towed the trailer back empty.

18       Q.   And were you driving or were you the

19  passenger?

20       A.   I was driving.

21       Q.   Did anything happen on that drive back?

22       A.   Maybe 15, 20 minutes into the ride, I remember

23  because I grew very agitated by the incident, I was

24  driving along, it's dark, it's, you know, kind of a back

25  road, and I heard a magazine ejected and the weapon

1    cocked back as in to remove a round from the chamber.

2         Q.   So you heard a magazine drop?

3         A.   Correct.

4         Q.   And you heard a weapon cocked?

5         A.   Correct.

6         Q.   Did you recognize that sound?

7         A.   Absolutely.

8         Q.   You say absolutely.  Why?

9         A.   That's why I became agitated at the time.  In

10   the military every time, you know, in combat zones when

11   we would enter back onto the base we had a clearing berm

12   and we had to basically discharge our weapons, you know,

13   not discharge as in fire but remove the magazines and

14   then eject the round in the chamber so that the weapon

15   is not live.

16        Q.   So you heard this -- is it a distinct sound?

17        A.   Yes.

18        Q.   What did you do?

19        A.   I immediately became angry, yelled at him,

20   told him to never clear a weapon in my vehicle ever

21   again, explained that in all of my military time the

22   only time I saw firearms discharged was handguns in the

23   clearing berm when people were trying to remove the

24   rounds from the chamber.

25        Q.   What did he say to you?

1    A.   He apologized and stated that he's, you know,

2  just so used to handling weapons and, you know, removing

3  rounds from the chamber or whatever, however he stated

4  it, that he didn't think about it and he wasn't trying

5  to, you know, put me in danger and so on.

6         MS. KRASINSKI:  May I approach, your Honor?

7         THE COURT:  Yes.

8    Q.   I'm holding Government's Exhibit 5.

9         MS. KRASINSKI:  And just for the record, just

10  a reminder that it has been rendered safe.

11         (Attorney Krasinski demonstrates)

12    Q.   Is that the sound you heard?

13    A.   Yes.  Possibly, you know, a little bit slower

14  because if you were to do it that quickly, it would

15  eject the round, you know, five, ten feet, not -- it was

16  essentially, you know, a slower cock to have the round

17  fall out of the chamber and he could place it back in

18  the clip and then the clip goes back into the pistol and

19  there's now not a round in the chamber.

20    Q.   It's a fairly distinctive sound, would you

21  agree?

22    A.   Yes.

23    Q.   Now, I want to talk about something that

24  happened shortly after.  I want to turn your attention

25  to October 25, 2019.  Were you and the defendant on a

1    job site that day?

2        A.    I'm not a hundred percent sure of that

3    specific day.

4        Q.    That's okay.  Was there an incident that

5    occurred with the defendant where the defendant got very

6    upset?

7        A.    Yes.

8        Q.    Can you tell us about that?

9        A.    I don't know exactly what was happening.  We

10   were kind of behind at work.  We took a late lunch and

11   went into town.  After we came out of the gas station

12   getting food he was on the phone with his wife and he

13   was telling her, you know, I'll be home soon, something

14   to that effect.  I said, no, no, you know, we won't be

15   back anytime soon.  We'll be working pretty late

16   tonight.  It will probably 6:00 or 7:00, not 3:00 or

17   4:00.

18       Q.    And what happened?

19       A.    We went back to the job site.  He, as always,

20   was working.  I didn't have to, you know, follow him

21   around or watch him.  He always worked hard.  And at

22   some point I noticed, you know, kind of a commotion.

23   It's a 14,000 square foot house so I'm probably a

24   hundred feet from him and he was, you know, very

25   agitated, upset, calling people on the phone, and then

```
 1  he proceeded to tell me that his wife had been missing
 2  for three hours and he needed to get home.
 3       Q.   So what happened next?
 4       A.   I was a little bit upset because I just wanted
 5  to get done what we needed to get done, but I brought
 6  him back to his home.
 7       Q.   And did you talk to him later?
 8       A.   I'm sure that I corresponded with him, whether
 9  it would be a text message or, you know, a phone call.
10       Q.   At any point after that did he ask you if you
11  could hold anything for him?
12       A.   Yes.  So he texted me one day, and again I
13  don't know the exact day that it was, asking if he could
14  put some stuff at my shop that we use for our business.
15       Q.   What did you say?
16       A.   Absolutely not.
17       Q.   How come you said no?
18       A.   I just -- typically if somebody needs to stash
19  something somewhere, it's not something that I want in
20  my possession or anything to do with.
21       Q.   Now, I know you were saying that you didn't
22  know the exact dates.  Is it fair to say that the
23  incident you just described occurred in October of 2019?
24       A.   Absolutely.
25       Q.   But you're just not sure of the exact date?
```

1        A.    That's correct.  I know that we went to the

2   hunting camp around the third week of October and then

3   things kind of progressed pretty quickly over that next

4   week and a half.

5        Q.    Do you still consider yourself to be friends

6   with the defendant?

7        A.    I was extremely disappointed that he lied to

8   me on several occasions.  You know, I was kind of

9   blindsided when the FBI came to my job site and was

10  questioning me.  They asked me questions, I answered,

11  and then they told me that he was a felon, at which

12  point I kind of felt like, you know, it wasn't somebody

13  that I could trust.

14             MR. FALKNER:  Objection.

15             THE COURT:  Sustained.  Go ahead.

16        Q.    Do you know anyone by the name of Roscoe

17  Whitney?

18        A.    I do not.  Well, I'm sorry, I believe I was

19  visiting with him in the hallway prior to this about --

20  he camps down in North Carolina in the winter and camps

21  up here in the summer, and we talked about Trump I think

22  was, you know, that's my experience with --

23        Q.    Other than meeting a gentleman named Roscoe

24  Whitney today --

25        A.    Correct.

1      Q.   -- have you ever met someone named Roscoe

2 Whitney before?

3      A.   No.

4      Q.   Did you talk about this at all?

5      A.   No.

6      Q.   Do you know anyone by the name of Dylan Roosa?

7      A.   I know of Dylan but --

8      Q.   Have you ever spoken to Dylan?

9      A.   I've never spoken to Dylan, no.

10      Q.   Do you know an individual named Gary Roya?

11      A.   I do not.

12      Q.   Do you know an individual named Neil Prive?

13      A.   I do not.

14      Q.   Do you know an individual named Elizabeth or

15 Libby Millett?

16      A.   No.

17           MS. KRASINSKI:  Nothing further.

18           THE COURT:  Attorney Falkner.

19                    CROSS-EXAMINATION

20 BY MR. FALKNER:

21      Q.   Good afternoon, Mr. Duguay.

22      A.   Good afternoon.

23      Q.   Sir, you described yourself as being friends

24 for some period of time with Johnathon Irish, correct?

25      A.   That is correct.  Johnathon until the FBI came

1   and talked to me had been nothing but a good person to

2   me.  He helped us around our house.  He watched after my

3   chickens when I was not in town.  We traveled to Maine

4   and he looked after things for us.  You know, like I

5   said previously, we're from different worlds, but I

6   could always see the good in Johnathon.

7        Q.   And when you say he talked a lot about

8   firearms, you both talked a lot about firearms; is that

9   fair to say?

10        A.   If somebody is talking to you about something,

11   then yes, I guess we talked about it a lot.

12        Q.   Well, you have some interest in firearms,

13   correct?

14        A.   I own a shotgun for hunting and a small

15   pistol, but I am not a firearms guru by any means.

16        Q.   Well, you're not a guru; it's something that

17   you do talk to people about, though, from time to time,

18   correct?

19        A.   I would say if I have a conversation outside

20   of Johnathon twice a year about firearms, that would be

21   pretty typical.

22        Q.   And whenever you talked to Johnathon about

23   firearms he specifically said that the 1911 pistol

24   belonged to his wife, correct?

25        A.   He very often would say that it belonged to

1    his wife, but he also referred to, you know, that they

2    have a 1911 pistol and some kind of an AR-15 style

3    rifle.

4         Q.   Did he ever specifically claim that any of

5    those weapons were his weapons as opposed to her

6    weapons?

7         A.   Well, I would press him.  Because we're in the

8    Google age, and I Googled his name, I was never able to

9    actually find where there was a conviction for a felony

10   on record.

11              MR. FALKNER:  Let me just ask if I could stop

12   the witness at this point.

13              THE COURT:  Yes.  Just answer his questions.

14              THE WITNESS:  Okay.

15              THE COURT:  Go ahead.

16        A.   So what's the question again?

17        Q.   I'm just going to move on and ask another

18   question, sir.

19        A.   Okay.  Yep.

20        Q.   So -- well, sir, this is just a yes or no

21   question.

22        A.   Okay.

23        Q.   Fair to say that you had some concern that he

24   might have been convicted of a crime punishable by more

25   than a year in prison at some point during your

1    friendship?

2         A.    Do I believe that?

3         Q.    No, did you believe that while you were

4    friends?

5         A.    Absolutely.

6         Q.    Okay.  So when the FBI told you that that was

7    the case, that really didn't surprise you?

8         A.    It did, because on multiple occasions

9    face-to-face I confronted him on that and he told me

10   that he had no felonies and that he was allowed to have

11   firearms.

12        Q.    Okay.  Now, when the FBI came to you, they

13   came to your job site, right?

14        A.    Correct.

15        Q.    And fair to say it was embarrassing to have

16   the FBI come to your job site?

17        A.    Absolutely.

18        Q.    And fair to say it really ticked you off?

19        A.    100 percent.

20        Q.    And --

21        A.    More because the local police called me and

22   said they needed to talk to me about something different

23   and then showed up with the FBI at my job site.

24        Q.    And did they search your job site?

25        A.    They did not.

1      Q.   They searched your shop, though, didn't they?

2      A.   They did not.  They looked around the

3 property, I believe, but I was not there.

4      Q.   Okay.  But that was upsetting to you as well,

5 correct?

6      A.   Absolutely.

7      Q.   And as a result of being upset -- this was on

8 or about October 29th when you spoke to the FBI,

9 correct?

10     A.   It was the last week of October.

11     Q.   And it was shortly after the incident when

12 Johnathon said he needed to go home because he was

13 worried about his wife?

14     A.   Correct.  Within days.

15     Q.   And the way that you described your

16 relationship to the FBI wasn't that you were friendly

17 with Johnathon, correct?

18     A.   No, I was very clear with the FBI that he

19 always worked hard and he, you know, helped us out with,

20 like I said, taking care of our chickens when we were

21 out of town and, you know, in general was, you know, a

22 decent person that I could tell from, you know.

23     Q.   Have you finished your answer?

24     A.   I'm sorry?

25     Q.   Have you finished your answer?

1      A.    Sure.

2      Q.    You specifically told the FBI that your

3  relationship with Mr. Irish was a, quote, keep your

4  enemies close, end quote, kind of relationship; isn't

5  that so?

6      A.    After the FBI came to me and I told him that

7  they came to me and the FBI would provide no protection

8  and the town would provide no protection and the town I

9  lived in would provide no protection, and I moved my

10  family out of my house because the FBI told me that he

11  was dangerous and that he was a felon.

12      Q.    So my question is, when you spoke with the FBI

13  the first time you spoke with them you told them, quote,

14  keep your enemies close, end quote, kind of

15  relationship.  Isn't that what you said to the FBI the

16  first time you spoke with them?

17      A.    Absolutely not.

18      Q.    You deny saying that?

19      A.    Absolutely.  The first time I spoke to the FBI

20  I was furious that they showed up at my job site in

21  front of a contractor that gives me over a million

22  dollars a year worth of work and a homeowner standing

23  right there while they came to the job site flashing

24  badges and pulling me aside.

25      Q.    And you only spoke to the FBI once, correct?

1     A.    In person.

2     Q.    Right.

3     A.    On the phone multiple times.

4     Q.    Well, we'll get back to that.  You only spoke

5   to them in person once, correct?

6     A.    Correct.

7     Q.    And they were interviewing you about your

8   knowledge of Johnathon's possession of firearms,

9   correct?

10     A.    Correct.

11     Q.    And it was during that conversation that you

12   had disclosed to the FBI that the 1911 belonged to

13   Stephanie, correct?

14     A.    I don't know whether I said that or not.  I

15   don't recall saying that.

16     Q.    Do you deny saying to the FBI in your

17   in-person interview that the 1911 belonged to Stephanie

18   for protection?

19     A.    I don't remember saying that to the FBI.

20     Q.    And I should really clarify that you told the

21   FBI that Johnathon said that the 1911 belonged to

22   Stephanie for protection?

23     A.    On multiple occasions Johnathon told me that

24   the 1911 belonged to his wife.

25     Q.    At no point during that -- oh, I'm sorry.  You

1  also had another topic that you discussed with the FBI

2  when they first interviewed you, correct?  Did you talk

3  about your own Walter .380 pistol?

4       A.   Correct.

5       Q.   And what you told the FBI was that Johnathon

6  Irish had made a comment about how he should get one for

7  Stephanie but it was not enough gun for her.  Is that

8  what he said to you?

9       A.   That sounds correct, yes.

10      Q.   And is that what you told the FBI?

11      A.   I don't remember saying it like that, no.  I

12 think that they asked if I had firearms and I said that

13 I had a small pistol and I couldn't even remember the

14 exact name of it and that I had a shotgun for -- like a

15 bird hunting type shotgun.

16      Q.   When you say you couldn't remember the name of

17 it, are you denying that you told the FBI it was a

18 Walter .380 pistol?

19      A.   I think I probably, like, said I believe it's

20 a PK .380 or something like that.

21      Q.   At no point during that conversation in person

22 with the FBI did you say anything at all about the

23 incident at the hunting camp, did you?

24      A.   That day I told them that --

25      Q.   Sir.

1        A.    Yeah.

2        Q.    Listen to my question.

3        A.    Yeah.

4        Q.    At no point during that in-person conversation

5   with the FBI agents did you tell them anything at all

6   about the incident that you described here at the

7   hunting camp; isn't that so?

8        A.    Do you want a one-word answer?

9        Q.    Yes.

10       A.    The first conversation I had I did not tell

11  them about that.

12       Q.    But that had occurred just days before that

13  conversation with the FBI, correct?

14       A.    I was furious that they came to my job site.

15  My mother is a bail commissioner.  I have zero criminal

16  record.  And it was totally unprofessional for them --

17  not the FBI but the local police department to lie to me

18  on the phone and then show up out of jurisdiction with

19  the FBI to question me.

20       Q.    So --

21       A.    I basically told them very minimal in that

22  first interaction.

23       Q.    But you called them back that day, didn't you?

24       A.    Correct.

25       Q.    And the first time you called them back you

1  had a further conversation about Johnathon Irish,

2  correct?

3       A.   Correct.

4       Q.   And you gave them more information about

5  Johnathon Irish and vis-a-vis firearms, correct?

6       A.   Correct.

7       Q.   And at no point during that telephone call did

8  you say anything about the incident at the hunting camp,

9  correct?

10      A.   I told them that I was more than willing to

11 sit down and that I knew he had firearms and that he had

12 handled firearms, and that whenever they wanted to talk

13 about it that, you know, at that point I had talked to

14 my brother who is a public defender and he told me, you

15 know, anything you can think of you need to, you know,

16 tell them because, you know, you don't want to get

17 yourself involved in it.

18      Q.   Well, you did give them some information

19 during that telephone call, though, didn't you?

20      A.   I told them that I knew he had handled

21 firearms.

22      Q.   But that phone call ended and you didn't say

23 anything about the incident in the camp, right?

24      A.   I told them that I was willing to sit down

25 with them and talk to them about everything that I knew.

1      Q.   How long was it from the time of the in-person

2  interview until this telephone call that we've been

3  discussing?

4      A.   With the FBI?

5      Q.   Right.

6      A.   Less than one hour.

7      Q.   How long was the in-person interview?

8      A.   Fifteen minutes.  I wasn't very cooperative.

9      Q.   How long was this telephone call?

10     A.   Fifteen minutes.

11     Q.   At some point you called them back again that

12  day, right?

13     A.   I don't recall.  There was two different

14  agents that I had spoken with.

15     Q.   You don't recall calling the FBI a third

16  time -- well, calling the FBI a second time and having a

17  third conversation that day?

18     A.   I don't.  I'm not saying I didn't or that I

19  did.  I don't recall exactly.

20     Q.   Are you denying then that it was during this

21  third conversation and second phone call that you told

22  the FBI the story that you told the jury here today

23  about the hunting camp?

24     A.   Am I denying it?

25     Q.   Yes.

1      A.    No.

2      Q.    How far away was the drive in your truck?

3      A.    From my home it's about one hour.

4      Q.    And are those all paved roads?

5      A.    The farm is actually on a dirt road but

6   primarily paved roads.

7      Q.    And just so the jury has some frame of

8   reference, what town do you live in?

9      A.    I live in Bethlehem.

10     Q.    And Bethlehem is pretty far up north from

11  here, correct?

12     A.    Correct.

13     Q.    Coos County?

14     A.    I think it's Grafton County.

15     Q.    Okay.  The camp is in Coos County?

16     A.    It's either Coos or Grafton.

17     Q.    The camp is north from where you live,

18  correct?

19     A.    Basically west.

20     Q.    And what portion of the drive is on dirt

21  roads?

22     A.    The last half a mile to a mile.

23     Q.    And the paved roads getting towards the end of

24  that drive are fairly rough, are they not?

25     A.    They're not, no.  It's Route 302, which is a

1    major road, and then I believe Route 10, which again is

2    a major road.

3         Q.    And where were you when you heard this sliding

4    of the pistol?

5         A.    That would have been -- so going from my home

6    to the camp is Route 302 to Route 10 to Route 25.  It

7    was somewhere along Route 25 on the way back from the

8    camp.

9         Q.    On a paved road?

10        A.    Correct.

11             MR. FALKNER:  May I have a moment, your Honor?

12             THE COURT:  Yes.

13             MR. FALKNER:  I have nothing further, your

14   Honor.

15             THE COURT:  Do you have anything further?

16             MS. KRASINSKI:  A few brief questions, your

17   Honor.

18                      REDIRECT EXAMINATION

19   BY MS. KRASINSKI:

20        Q.    You said the FBI and the local PD showed up at

21   your work and you were mad, right?

22        A.    Correct.

23        Q.    So you said you talked to them for about 15

24   minutes; is that fair?

25        A.    Somewhere in that range, yes.

1          Q.    Were you trying to end that conversation while

2     you were at work?

3          A.    Absolutely.  It was incredibly embarrassing

4     and unprofessional, you know, from my perspective to my

5     customers, and I was furious that they were there.

6          Q.    So you had a chance to talk to your mom, talk

7     to your brother, and cool down a bit?

8          A.    Correct.

9          Q.    And then you called them back?

10         A.    Correct.  I also reached out to my

11    father-in-law's friend who is a lawyer in Concord and

12    got a second opinion, at which point he said --

13              THE COURT:  She asked you just a limited

14    question.  When you get into things other people said,

15    it raises issues.

16              THE WITNESS:  It's not what anybody else said;

17    it's what I'm saying.

18              THE COURT:  Just answer her direct question.

19              THE WITNESS:  Yes.

20         Q.    So you had a chance to calm down and you

21    called back and you talked to them?

22         A.    Correct.

23         Q.    Now, I just want to shift gears.  Attorney

24    Falkner asked you a lot about road conditions and dirt

25    roads and paved roads.  How many times do you think

1  you've heard a gun cleared before in your career in the

2  military?

3          MR. FALKNER:  Objection.  This was covered in

4  the direct examination, your Honor.

5          MS. KRASINSKI:  Your Honor, during cross he

6  questioned --

7          THE COURT:  Overruled.  Go ahead.

8      A.    Thousands.

9      Q.    Can you mistake the sound of a gun clearing

10 for a bump in the road?

11     A.    Absolutely not.

12         MS. KRASINSKI:  No further questions, your

13 Honor.

14         THE COURT:  Anything further?

15         MR. FALKNER:  No, your Honor.

16         Can we just briefly be seen at sidebar, your

17 Honor?

18         THE COURT:  Can I excuse the witness?

19         MR. FALKNER:  Yes.

20         THE COURT:  All right.

21         Mr. Duguay, you may be excused, sir.  Thank

22 you.

23         Please approach.

24         (SIDEBAR)

25         MR. FALKNER:  I just want to alert the Court

1    that at this time I intend to recall Agent LeBlanc to

2    rebut several of the statements that he denied making to

3    the FBI.

4              THE COURT:  Okay.  All right.  And he's under

5    your instruction to --

6              MS. KRASINSKI:  Yes.  I'm still not sure that

7    proper foundation has been laid for that, but we can

8    address that at a different time.

9              THE COURT:  All right.  Yeah, I think a fair

10   amount he just didn't remember, but again, I think there

11   were some areas where he had clearly made statements and

12   he would be able to bring in the officer I think to

13   establish the impeachment.

14             If there's a witness like this in the future

15   that is not answering, then just immediately approach or

16   ask, Judge, could you instruct.  I'm actually injecting

17   myself into it because, you know, he's not answering the

18   questions.  There could be other witnesses like this.

19   So if it starts to happen, just indicate to the witness,

20   please just answer my direct question.  And I thought

21   you did a good job trying to say this is a yes or no

22   question and I want a one-word answer, and then he gave

23   you a sentence.  Sometimes there's nothing you can do

24   but ultimately if that happens, let's try to keep that

25   extraneous information from the jury.

1          All right.  Okay.

2          MR. FALKNER:  Thank you, your Honor.

3          MS. KRASINSKI:  Thank you.

4          (CONCLUSION OF SIDEBAR)

5          THE COURT:  The government may call its next

6    witness.

7          MS. KRASINSKI:  The United States calls Neil

8    Prive.

9                    NEIL PRIVE

10      having been duly sworn, testified as follows:

11          THE CLERK:  Please state your full name, spell

12    your last name for the record.

13          THE WITNESS:  Neil Edward Iver Prive,

14    P-R-I-V-E.

15          THE CLERK:  Thank you very much.  Please be

16    seated.

17          MS. KRASINSKI:  Your Honor, can we approach

18    briefly?

19          THE COURT:  Yes.

20          (SIDEBAR)

21          MS. KRASINSKI:  Your Honor may recall that we

22    discussed that this witness had some substance abuse

23    history but that he has been clean and that --

24          THE COURT:  You're going to voir dire him,

25    right, outside of the presence of the jury.  Okay.  All

1   right.  We'll tell them we'll take a ten-minute break.

2   Do you need to use the restroom too?

3               MS. WEILAND:  A comfort break would be

4   appreciated.

5               THE COURT:  We'll take an early break.

6               (CONCLUSION OF SIDEBAR)

7               THE COURT:  All right.  We are going to just

8   take a brief recess, a ten-minute restroom break, and

9   then we'll proceed.  So probably 20 minutes after the

10  hour.

11              (IN COURT - NO JURY PRESENT)

12              THE COURT:  All right.  Is the government

13  going to begin with the voir dire or is it Mr. Falkner?

14              MR. FALKNER:  It doesn't matter to me.

15              THE COURT:  Go ahead.  I'll let you both go.

16                        NEIL PRIVE

17              VOIR DIRE DIRECT EXAMINATION

18  BY MS. KRASINSKI:

19      Q.   Can you tell us your name?

20      A.   Neil Edward Iver Prive.

21      Q.   We're just going to talk about something very

22  limited right now while the jury is excused.

23              Is it fair to say that you have a history of

24  substance abuse?

25      A.   Yes.

1      Q.   Can you generally tell us when that began and

2   when you got sober?

3      A.   I've battled with substance abuse since my

4   teenage years, you know, with various substances.  I got

5   sober on November 4, 2018.

6      Q.   Now, do you know the defendant, Johnathon

7   Irish?

8      A.   Yes.

9      Q.   How do you know him?

10      A.   That is my cousin.

11      Q.   Was there a period of time that you were not

12   in contact?

13      A.   Yes.

14      Q.   When did you get back in contact?

15      A.   A few years ago.

16      Q.   And he came to live with you for a while?

17      A.   Yes.

18      Q.   And then he moved out?

19      A.   Yes.

20      Q.   When he moved out, did you lose contact again

21   for a bit?

22      A.   Yes.

23      Q.   And after that, when did you reconnect again

24   more recently?

25      A.   It was mid summer roughly.  We ran into each

1    other at Dunkin' Donuts in Chichester at the cutoff.

2         Q.   And so the summer of 2019?

3         A.   Yes.

4         Q.   And at that point were you clean and sober?

5         A.   Yes.

6         Q.   And so all of your interactions from the

7    summer of 2019 when you reconnected with the defendant

8    to now, have you been clean and sober that entire time?

9         A.   Yes.

10             MS. KRASINSKI:  Do you have any questions?

11             MR. FALKNER:  Yes.

12                  VOIR DIRE CROSS-EXAMINATION

13   BY MR. FALKNER:

14        Q.   Sir, do you currently remain clean and sober?

15        A.   Yes.

16        Q.   At the time when Johnathon Irish moved out of

17   your house, were you clean and sober at that time?

18        A.   No.

19        Q.   And is the reason you had -- excuse me.

20             You had indicated to the FBI previously that

21   the reason he moved out of the house was because of

22   family disagreements, correct?

23        A.   Yes.

24        Q.   Did those family disagreements have anything

25   to do with your substance use?

1      A.    I would not agree with that.  There were

2  family issues.

3      Q.    Okay.  Did they have anything to do with any

4  arrests having to do with your substance use at the time

5  that you moved out --

6      A.    No.

7      Q.    -- or in or around that time?

8      A.    No.

9      Q.    And finally, has your past use of substances,

10  does that in any way impact on your current ability

11  to -- on your current memory or ability to observe or

12  anything like that?

13      A.    I don't believe so.

14          MR. FALKNER:  Your Honor, I have nothing

15  further.

16          THE COURT:  All right.  Then I think we'll

17  take a short comfort break ourselves, no more than five

18  minutes.  We'll be back here at twenty after.

19          Does that work for everybody?  Okay.

20          (RECESS)

21          (IN COURT - NO JURY PRESENT)

22          (SIDEBAR)

23          THE COURT:  Mr. Duguay testified at one point,

24  and I'm sure it didn't escape your attention, that the

25  FBI told him Mr. Irish was dangerous and he moved his

1    family out of the house.  So it's your decision.  Do you

2    want me to instruct them to strike that from their

3    minds, they are not to consider it in any way, shape or

4    form, or do you not want to draw attention to it?  I got

5    the sense you wanted to move past that quickly.

6              MR. FALKNER:  Yeah.

7              THE COURT:  So I leave that to you.

8              MR. FALKNER:  Yeah, I think that -- may I

9    consult with my client, your Honor?

10             THE COURT:  You can.  And just, you know,

11   basically you need to let me know.  Just tell me that

12   you do want an instruction on that.  I'll give it right

13   away.

14             MR. FALKNER:  If I can just have a brief

15   moment.

16             THE COURT:  Okay.  I haven't heard any

17   testimony about being in jail again, so please remind me

18   to give that instruction before the close of evidence

19   today.

20             MR. FALKNER:  I don't expect it to come up

21   except for when they play the audio, and I'm not sure

22   that's going to happen today.

23             THE COURT:  Well, I could do it in conjunction

24   with this instruction.  Do you have any objection to me

25   giving that instruction?

```
 1                 MS. KRASINSKI:  No.

 2                 MR. FALKNER:  Let me just consult with my

 3   client, if I could.

 4                 THE COURT:  Okay.  All right.

 5                 MR. FALKNER:  Thank you, your Honor.

 6                 (CONCLUSION OF SIDEBAR)

 7                 (Attorney Falkner confers with the defendant)

 8                 MR. FALKNER:  Your Honor, I don't think I want

 9   that instruction.

10                 THE COURT:  All right.

11                 MR. FALKNER:  I'm trying to think about a good

12   time for the jail instruction.  It may not be when the

13   witness has just been called --

14                 THE COURT:  I agree.  So maybe before I send

15   them home I remind them of that.

16                 MR. FALKNER:  Thank you, your Honor.

17                 THE COURT:  All right.  Okay.

18                 (IN COURT - JURY PRESENT)

19                             NEIL PRIVE

20                        DIRECT EXAMINATION

21   BY MS. KRASINSKI:

22        Q.   Would you please tell us your name?

23        A.   Neil Edward Iver Prive.

24        Q.   Mr. Prive, are you employed?

25        A.   Yes.
```

1          Q.   Where do you work?

2          A.   Tri-State Curb.

3          Q.   And what do you do there?

4          A.   I'm a granite curb setter.

5          Q.   And do you know the defendant, Johnathon

6    Irish?

7          A.   Yes.

8          Q.   How do you know him?

9          A.   He's my cousin.

10         Q.   And do you know Nancy Haskell?

11         A.   Yes.

12         Q.   And who is that?

13         A.   Johnathon's mother.

14         Q.   And what is she to you?

15         A.   Ex-aunt, I guess.

16         Q.   And Wendy?

17         A.   That's my aunt.

18         Q.   And is that also the defendant's aunt?

19         A.   Yes.

20         Q.   Now, I want to turn your attention to the

21   summer of 2019.  At some point in the summer of 2019 did

22   you bump into Johnathon?

23         A.   Yes.

24         Q.   And where was that?

25         A.   That was at the Dunkin' Donuts in Chichester,

1    at the gas station.

2         Q.    Now, before you had bumped into him at the

3    Dunkin' Donuts in Chichester, immediately before that,

4    had you sort of lost touch?

5         A.    Yes.

6         Q.    So you bumped into each other at the Dunkin'

7    Donuts in Chichester.  Was anyone else there with

8    Johnathon?

9         A.    No.

10        Q.    And did you talk?

11        A.    Yeah, for a few minutes.

12        Q.    And did you exchange numbers?

13        A.    Yes.

14        Q.    I want to fast forward to October of 2019.  At

15   some point in October of 2019 did you drive over to

16   Johnathon's house?

17        A.    Yes.

18        Q.    Why did you do that?

19        A.    His mother had called me up and wanted me to

20   go up and check on him.  Stephanie had just left with

21   the children and he was a wreck, so I went up there to

22   go check on him.

23        Q.    And so you drove to his house?

24        A.    Yes.

25        Q.    And where's his house?

43

1          A.    Littleton, New Hampshire.

2          Q.    Was Johnathon there when you got there?

3          A.    Yes.

4          Q.    And so what did you do when you got there?

5          A.    We talked for a few hours, you know, I kind of

6    gave him the riot act, you know, cousin stuff, telling

7    him to not have anything to do with her and blah, blah,

8    blah, blah, you know.

9          Q.    And how long did you stay?

10         A.    Two, three hours maybe.

11         Q.    Did anything happen when you were getting

12   ready to leave?

13         A.    Yes.

14         Q.    What happened?

15         A.    He asked me to take that case with me.

16         Q.    When you say "that case," are you pointing to

17   the black case that right now is by my feet that is

18   marked as Government's Exhibit 33?

19         A.    That's correct.

20         Q.    So he asked you to take that case.  What did

21   you say?

22         A.    I said okay.

23         Q.    Did you know what was in it?

24         A.    I did after he opened it.

25         Q.    Tell me about that.

44

1       A.    He pulled the case out of his closet.  He

2   opened it up.  I asked him to open it up.  And he showed

3   me what was a rifle, a handgun.  That's what I saw at

4   that point in time until I got home.

5       Q.    So I want to break it down.  He asks you to

6   take this case?

7       A.    Yes.

8       Q.    This case, you said it was in Johnathon's

9   closet?

10      A.    Their closet.  I mean, they didn't have two

11  closets in the bedroom, not that I recall, so --

12      Q.    In a closet in the bedroom?

13      A.    Yes, yes.

14      Q.    I guess the only closet in the bedroom?

15      A.    Yeah, that would be correct.

16      Q.    Did it have a lock on it when --

17      A.    Yes.

18      Q.    And you asked Johnathon to open the case?

19      A.    Uh-huh.

20      Q.    So did he have the key to it?

21      A.    Yes.

22      Q.    Where was the key?

23      A.    That I don't recall.

24      Q.    So he used the key and opened the box?

25      A.    Yes.

1      Q.   And all of this was occurring in Johnathon's

2   bedroom?

3      A.   Yes.

4      Q.   And you said that he opened the box and what

5   did you see?

6      A.   I saw what looked like a rifle, gun, and a

7   handgun.

8           MS. KRASINSKI:  May I approach, your Honor?

9           THE COURT:  Yes.

10     Q.   I'm holding Government's Exhibit 5.  Does this

11  look like the handgun?

12     A.   Yeah.

13     Q.   Holding Government's Exhibit 6 --

14     A.   Yes.

15     Q.   I'm just going to ask my question first.

16     A.   Sorry.

17     Q.   Does this look like the rifle?

18     A.   Yes.

19     Q.   Now, you say that's all you saw at that time?

20     A.   Yeah.

21     Q.   Did he say anything else about the case or the

22  guns?

23     A.   No.  Nancy had contacted me while I was up

24  there making sure that I was going to be taking that.  I

25  thought I was doing the family a service by taking them

1    because I was worried about his mental safety at that

2    point.

3         Q.   All right.  I'm going to --

4              THE COURT:  Just listen carefully to her

5    question and just answer that question.

6              THE WITNESS:  I'm sorry.

7              THE COURT:  That's all right.

8         Q.   So I'm going to back it up again.  You guys

9    open the case, you see the pistol and the rifle.  What

10   happens?

11        A.   At that point he -- well, the two of us

12   together brought the case outside and he more or less

13   lifted the case into the back of my pickup truck.

14        Q.   Did anyone lock the case back up?

15        A.   Yeah, he put the padlock back on it and handed

16   me the key.

17        Q.   So you guys carry the case out together.  He

18   essentially puts it in your truck?

19        A.   Pretty much, yeah.

20        Q.   And then what happened?

21        A.   I drove -- started driving home.  I called my

22   Aunt Wendy up to let her know what had happened.  I

23   called Nancy up to let Nancy know that I had them in my

24   possession and I was bringing them home to put them in

25   my buddy's safe.

47

1    Q.    So did you take them home?

2    A.    Yes, I did.

3    Q.    And did you take them out of the box?

4    A.    Yes, I did.

5    Q.    You mentioned two firearms that the defendant

6    showed you when you were in the defendant's bedroom.

7    Did you find any other firearms in the case when you

8    opened it?

9    A.    Yes.

10    Q.    And what was that?

11    A.    It appeared to be, I don't know, a rifle,

12    shotgun type thing.  It was in a couple different

13    pieces.

14    Q.    Showing you Government's Exhibit 7 and 7A, are

15    these the pieces?

16    A.    Yes.

17    Q.    So you get home, you open the case, and you

18    see those three firearms, correct?

19    A.    Can I say how it happened?

20    Q.    Please, please.

21    A.    Okay.  On the way home I contacted my buddy

22    that I live with because I knew he had a gun safe and I

23    asked him, I was like, hey, listen, I got a couple guns,

24    can I put them in the safe, and he's, like, sure, you

25    know, because I just don't like having stuff floating

48

1   around.

2           When we got there he opened up the case, you

3   know, we all, all three of us because there's three of

4   us that live together.  All three of us were looking at

5   them, and then there was a blanket and it was kind of

6   folded like three different ways and when I opened the

7   blanket up, that's when I saw the shotgun.  And then we

8   took the blanket all the way out and there was, I don't

9   know, some heavy vest you put on and ammo boxes and

10  magazines and stuff like that.

11          Q.   So all three of these firearms were in that

12  black case when you got it from the defendant?

13          A.   Yes.

14          Q.   Now, you put those guns in the gun safe?

15          A.   I put the two -- well, my buddy put the two,

16  the rifle and the handgun in a safe, and the other one

17  they said didn't work so I just left it in the case.

18          Q.   And after that, after you took the case with

19  these firearms in it, did Johnathon ever call you, text

20  you, talk to you again about the guns?

21          A.   A couple different times he wanted to inquire

22  if I would buy them off of him.

23          Q.   About how many times do you think he asked you

24  if you would buy them off of him?

25          A.   Two or three different occasions.

1          Q.    Did he ever give you a price?

2          A.    It was more of a soft price I guess you could

3    say, like numbers were thrown around.

4          Q.    What were the numbers thrown around?

5          A.    One number that I remember was 1500.

6          Q.    So he asked you for $1500 for those guns?

7          A.    Not really.  It was a potential if, you know,

8    he wanted to sell them if he needed the money to pay his

9    bills or whatnot, to fix his vehicles or whatever.  I

10   was trying to help him out.  And I was going to loan him

11   money, but I was going to need something to hold in

12   collateral.  So that's what we were talking about was

13   holding those in collateral.

14         Q.    So if you were going to hold those firearms in

15   collateral for money, who was it you would have been

16   giving the money to?

17         A.    Johnathon.

18         Q.    And whose firearms did you understand those to

19   be?

20         A.    Johnathon's.

21         Q.    So ultimately did you give him the money or

22   buy the guns from him?

23         A.    No.

24         Q.    What happened?

25         A.    I had to do a tough gut check and with my own

1  past I talked to my sponsor, I talked to the pastor in

2  my church, and it was decided that I just don't need to

3  own any firearms or --

4      Q.    So you decided you don't need firearms?

5      A.    Yeah, I didn't want anything to do with them.

6      Q.    So at some point were arrangements made for

7  those firearms and everything in the case to be

8  transferred to someone else?

9      A.    Yes.

10     Q.    How did that come about?

11     A.    Nancy sent me a message saying that a family

12  friend, I don't know his last name, I just know him by

13  Gary, and then she sent Gary my phone number, Gary

14  messaged me, and then we set up a pickup time or

15  drop-off time, however you want to look at it.

16     Q.    So did you end up communicating with Gary?

17     A.    Yes.

18     Q.    And did you do that by phone?

19     A.    Yes.

20     Q.    What's your phone number?

21     A.    603-455-7219.

22     Q.    I'm showing you what has been marked for

23  identification purposes Government's Exhibit 29B and

24  specifically the page ending in Bates number 37.

25          Can you just take a look at that for a minute

1  and then tell us, is that your phone number that's in

2  that communication?

3      A.   Yes, that is my phone number.

4      Q.   So you got contact information for Gary, and

5  what was the plan?

6      A.   There was talk we were going to meet in

7  Concord and then it got switched up and I was going to

8  drive out towards Rochester I believe to meet up with

9  him, and then I got sick with the flu and I asked for

10 him to do all the driving.

11     Q.   So did you ultimately meet with this Gary?

12     A.   Yes, we met at the McDonald's in Epsom.

13     Q.   Do you recall when that was?

14     A.   Date or time?

15     Q.   Date.

16     A.   Mid November.  November 15th I think,

17 something like that.

18     Q.   Would looking at your communications with Gary

19 help you remember the date that you met?

20     A.   Yes, yes.

21     Q.   I'm just going to ask you to briefly look

22 through Government's Exhibit 29E marked for

23 identification purposes only.  If you could look through

24 those at the dates and times and let me know when you've

25 had a chance to do that.

1          (Witness does so.)

2     A.    So it would have been November 17th.

3     Q.    2019?

4     A.    Yes.

5     Q.    So you meet with Gary in Epsom, New Hampshire,

6  on November 17, 2019.  What happens at this meeting?

7     A.    It really was just short.  I saw his truck, I

8  backed my truck up to his truck, and he actually took

9  the case out of my truck and put it in the back of his

10  truck, we shook hands, and that was the end of it.

11    Q.    Were you still recovering from the flu at this

12  point?

13    A.    Oh, yeah, yeah.

14    Q.    So ready to get back home?

15    A.    Pretty much, yep.  I skipped out on church

16  that day, too, so -- I was definitely sick.

17    Q.    So after -- actually, let me back up.  When

18  you gave the case -- transferred the case from your car

19  and the case went from your truck to Gary's truck, what

20  was in the case?

21    A.    Everything that had come down with me from

22  Johnathon's house.

23    Q.    And so everything that came in it from

24  Johnathon's house, did that include Government's Exhibit

25  5, this pistol?

1          A.   Yes.

2          Q.   And does that include Government's Exhibit 7

3     and 7A?

4          A.   Yes.

5          Q.   After those guns went to Gary, did you ever

6     see them again?

7          A.   No.

8          Q.   After those guns went to Gary, did Johnathon

9     ever talk to you about those guns again?

10          A.   Yes.

11          Q.   Approximately how long after those guns went

12     to Gary do you think Johnathon talked to you about them?

13          A.   It was around Christmastime.

14          Q.   And what did he say?

15          A.   He asked me if I wiped them down.

16          Q.   What did you understand that to mean?

17          A.   I don't know, wipe them down, I guess.   I

18     don't --

19          Q.   Did you ask why?

20          A.   I told him I didn't know that I was supposed

21     to be doing something like that so --

22          Q.   Did he say anything in response to that?

23          A.   Yeah, he said that he had heard that -- I

24     don't mean disrespect, but he said that the Feds were

25     after him.

1     Q.    So he asked you if you wiped down the guns?

2     A.    Uh-huh.

3     Q.    And he told you he was asking you that because

4  he thought the Feds were after him?

5     A.    Uh-huh.

6     Q.    Now, have you communicated with Nancy,

7  Johnathon's mother, since Johnathon's arrest?

8     A.    Once or twice maybe.

9     Q.    And did she ever talk to you about the guns?

10    A.    Yes.

11    Q.    What did she tell you?

12    A.    Sorry.  This is really tough.  I mean, like

13  this is tough.

14          She wanted to make sure that we were going to

15  have the same story, that the guns went from a, one,

16  Roscoe to me to Gary.

17    Q.    When you say she wanted to make sure you had

18  the same story, I want to make sure I'm understanding

19  you correctly.  Was she telling you what to say?

20    A.    You could say that.

21    Q.    Well, how would you describe it?

22    A.    Yes, that's what I would describe.

23    Q.    Did you get the guns from Roscoe Whitney?

24    A.    No.

25    Q.    Do you know Roscoe Whitney?

1      A.    I've met him twice maybe at Nancy's camper

2  last summer.

3      Q.    So you've met him a couple times.  Have you

4  ever met him outside of Nancy's presence?

5      A.    No.

6      Q.    Have you ever talked to him on the phone?

7      A.    No.

8      Q.    Do you spend time with him in any other

9  capacity?

10     A.    No.

11     Q.    So did Nancy ever text you anything about the

12 investigation or the guns?

13     A.    I want to say yes, but I really -- I can't

14 recall.

15     Q.    That's fine.  We talked a bit about that you

16 met Roscoe Whitney once or twice.

17           Gary, did you ever see Gary again?

18     A.    No.

19     Q.    Before the meeting in the parking lot had you

20 ever talked to Gary before?

21     A.    No.

22     Q.    Have you talked in any way or communicated

23 with in any way Gary since you gave the box to him?

24     A.    No.

25     Q.    Do you know anyone named Dylan Roosa?

```
1        A.    No.

2        Q.    Do you know anyone named Peter Duguay?

3        A.    No.

4        Q.    Do you know anyone named Elizabeth Millett?

5        A.    No.

6        Q.    Do you know anyone named David Marcotte?

7        A.    No.

8              MS. KRASINSKI:  Those are all the questions I

9   have, your Honor.

10             THE COURT:  All right.

11             Attorney Falkner.

12                       CROSS-EXAMINATION

13  BY MR. FALKNER:

14       Q.    Good afternoon, Mr. Prive.

15       A.    Good afternoon.

16       Q.    In the summer of '19 is when you reconnected

17  with Johnathon; is that right?

18       A.    That is correct.

19       Q.    You didn't have any conversation about

20  firearms at that time, did you?

21       A.    No.

22       Q.    Were you in touch with him from that meeting

23  in the Dunkin' Donuts up until the end of October?

24       A.    A handful of times.

25       Q.    And did you talk about firearms with him
```

1   during those times?

2        A.    No.

3        Q.    You knew he was married to Stephanie Irish,

4   correct?

5        A.    That is correct.

6        Q.    And you knew that Stephanie had guns, right?

7        A.    No, I did not know that.

8        Q.    Did you know Stephanie?

9        A.    Yep, I knew Stephanie.

10        Q.    How long had you known Stephanie?

11        A.    Just through Johnathon.

12        Q.    You knew Stephanie before you had fallen out

13   of touch with Johnathon, correct?

14        A.    Yeah, they both lived at my house.

15        Q.    Now, who contacted you to tell you to go visit

16   with Johnathon?

17        A.    Nancy.

18        Q.    Nancy also is the one who told you that you

19   needed to take some firearms, correct?

20        A.    She asked me to, yep.

21        Q.    She asked you to do that before you went to

22   see Johnathon, correct?

23        A.    No, it was when I was there visiting

24   Johnathon.

25        Q.    Did you have a call with her while you were

```
 1   visiting with Johnathon?

 2        A.   Yes.

 3        Q.   Did you call her or did she call you?

 4        A.   I called her.

 5        Q.   Where was Johnathon when you made this call?

 6        A.   He was inside.

 7        Q.   Okay.  And where were you?

 8        A.   I had walked outside their trailer.

 9        Q.   What were you doing outside?

10        A.   To call Nancy.

11        Q.   Why were you calling Nancy?

12        A.   Because that's her son and I was concerned

13   about his mental safety.

14        Q.   Is she the first person that raised the issue

15   of your taking the guns?

16        A.   Yes.

17        Q.   During that phone call?

18        A.   Yes.

19        Q.   And was it then that you went back inside and

20   told Johnathon that you wanted to take the guns?

21        A.   No.

22        Q.   Who then raised the issue of the guns between

23   you and Johnathon?

24        A.   Johnathon.

25        Q.   To your knowledge during this visit was
```

1    Johnathon in touch with Nancy?

2         A.   Excuse me?

3         Q.   During this visit to your knowledge was

4    Johnathon in touch with Nancy?

5         A.   During the visit?

6         Q.   Correct.

7         A.   I couldn't -- I don't know.

8         Q.   Let me put it another way.  You drove up there

9    to visit with and comfort Johnathon in his time of need,

10   correct?

11        A.   That is correct.

12        Q.   And was there anybody else home during this

13   visit?

14        A.   No.

15        Q.   Was this Friday, October 25th, to your memory?

16        A.   Around about that time.

17        Q.   And at some point you stepped outside to have

18   a phone call with Nancy, right?

19        A.   That is correct.

20        Q.   Other than the time when you were outside

21   making that phone call were you in Johnathon's presence

22   the whole time?

23        A.   That is correct.

24        Q.   Talking with him?

25        A.   Yeah, pretty much.  I mean, I think he went

1    off to go to the bathroom, you know.

2         Q.   But he wasn't out making phone calls?

3         A.   Not that I saw, no.

4         Q.   And how long before you left was it that he

5    mentioned taking the box?

6         A.   Probably 20 minutes.

7         Q.   Okay.  And had you told him at that point that

8    you were getting ready to go?

9         A.   Yes.

10        Q.   And when he told you he wanted you to take the

11   box, did he lead you over to show you where it was?

12        A.   Yeah.

13        Q.   And that's when you saw it in the bedroom

14   closet?

15        A.   Yes.

16        Q.   And you understood that to be Johnathon and

17   Stephanie's bedroom?

18        A.   That's correct.

19        Q.   And it was locked with a padlock?

20        A.   That's correct.

21        Q.   Was it opened while it was in the closet or

22   was it brought out into the bedroom?

23        A.   It was dragged out to the bedroom.

24        Q.   It had to be dragged?

25        A.   Yes.

1        Q.    Who dragged it?

2        A.    Johnathon.

3        Q.    It was a heavy box, right?

4        A.    Yeah.

5        Q.    And he had to go find the key, right, at some

6   point?

7        A.    Yeah.  He stepped into, I don't know, I think

8   they had a little bathroom there or something, he

9   stepped in there and grabbed the key.

10       Q.    Okay.  So he didn't have the key on his

11   person?

12       A.    No.

13       Q.    And he unlocks it and the pistol and the rifle

14   are on top, correct?

15       A.    That's correct.

16       Q.    You didn't go through the box at that time?

17       A.    No.

18       Q.    Did he tell you what else you would expect, be

19   expected to find in the box?

20       A.    He told me there was ammo in the bottom of the

21   box.  That was pretty much the extent of the

22   conversation so --

23       Q.    Was there a BB gun in the box you found at

24   some point?

25       A.    There was a BB gun in the box, yes.

1       Q.    Did he tell you about the BB gun?

2       A.    No.

3       Q.    Did you ever have any conversations with him

4  about the BB gun?

5       A.    Yeah, jokingly.

6       Q.    When was that?

7       A.    I just -- I couldn't believe he had a BB gun

8  in there, and he said that it was Cheyenne's BB gun.

9       Q.    Did he ask for it back?

10      A.    No.

11      Q.    Now -- and the BB gun, by the way, you

12  delivered to Gary Roya?

13      A.    Yes.

14      Q.    Did you have any conversation with Johnathon

15  about delivering the BB gun to Gary Roya?

16      A.    No, there was nothing specific about the BB

17  gun.

18      Q.    Did the BB gun go in the gun safe?

19      A.    No.

20      Q.    It stayed in the box with the shotgun that you

21  believed to be nonfunctioning?

22      A.    Correct.

23      Q.    The -- where was the gun safe?

24      A.    In my buddy's bedroom.

25      Q.    In your buddy's bedroom at your home?

1          A.    His home.

2          Q.    Were you living in that home?

3          A.    Yes.   I still currently live there.

4          Q.    Were there other guns in that gun safe?

5          A.    I have no idea what he has in his gun safe.

6    It would be safe to assume, yes, but I don't know what

7    he has for firearms.

8          Q.    Did you participate in putting the firearms

9    into the gun safe?

10         A.    No, I did not.

11         Q.    So how do you know they got into the gun safe?

12         A.    It's my pastor's son, so, I mean, it's safe to

13   assume that he put the guns in the gun safe.

14         Q.    Let me ask it a different way.   You know it

15   because he told you that's what he did?

16         A.    Yes.

17         Q.    You didn't see it happen?

18         A.    No.

19         Q.    So when you're making the arrangements with

20   Gary Roya to drop off the firearms, did you get the guns

21   out of the gun safe or did he get them for you?

22         A.    He got them for me.

23         Q.    When did you get them out of the safe compared

24   to when you went to visit Gary Roya?

25         A.    It was the morning of the 17th.   Joe was

1  getting ready to go to church, and before he took off to

2  go to church he pulled them out of the safe and we put

3  them back in that box and --

4      Q.   Now, talking a little bit about the proposed

5  sale of the weapons, there was some talk about you

6  loaning money to Mr. Irish?

7      A.   Yes.

8      Q.   Did you ever loan him any money?

9      A.   No.  No, sorry, I did give him -- I want to

10 say I gave him $100 to help out with food or maybe it

11 was $200 to help out with food.

12     Q.   And that was at the time that you visited with

13 him because Stephanie had left?

14     A.   Yes.

15     Q.   And when he gave you those firearms at the

16 time you were driving away there was no conversation

17 whatsoever about your buying those guns, was there?

18     A.   No.

19     Q.   You didn't have any reason to believe it was a

20 sale.  You were just taking the firearms to make sure

21 everybody stayed safe as far as you knew?

22     A.   Exactly.

23     Q.   And at some point I think you said you had had

24 some kind of moment when you decided that it wasn't for

25 you to keep these guns, right?

1    A.    That's correct.

2    Q.    So fair to say that you were entertaining the

3  prospect of keeping the guns?

4    A.    I was entertaining the prospect of trying to

5  help him out, but seeing as how there was nothing else

6  that I could take to hold, you know, because knowing

7  that if I gave him $1500 most likely I was never going

8  to see it back, you know, I needed to protect my own

9  financial aspects, my own financial interest, and I

10  didn't want anything to do with the guns.

11    Q.    So the guns were more collateral than an

12  actual sale; is that fair to say?

13    A.    If something had transpired, yeah, they would

14  have been collateral.

15    Q.    So it wasn't exactly discussed as a sale then

16  at all, was it?

17    A.    No.

18    Q.    And you said it was Nancy Haskell that told

19  you that the guns should go to Gary Roya, right?

20    A.    Yes.

21    Q.    Now, at some point after you dropped off the

22  guns with Gary Roya, when did you next hear from Nancy

23  Haskell?

24    A.    I mean, I can't recall.  I mean, a week later

25  maybe.  I don't know.

1    Q.    Early December Nancy Haskell is contacting

2    you?

3    A.    Yeah, I mean, we would talk, you know, just

4    general conversation, hey, how you doing, hey, how you

5    doing, blah, blah, blah, blah, nothing --

6    Q.    How often were you talking to Nancy Haskell in

7    and around December of 2019?

8    A.    There was a period of time when I was talking

9    with her, you know, I was trying to rebuild

10   relationships and I was talking with her -- you could

11   say I was talking with her quite frequently.

12   Q.    Did this begin in the summer of 2019?

13   A.    No.  I would probably say May is when I went

14   over to the campground and sat down with Les and her and

15   whatnot so --

16   Q.    So fair to say that the vast majority of

17   communications that you had with Nancy Haskell from May

18   of 2019 up through December had nothing to do with these

19   guns?

20   A.    Yeah.

21   Q.    And had nothing to do with any guns at all?

22   A.    Can you repeat that question again?  I just

23   want to make sure I'm hearing you.  Go ahead.  Sorry.

24   Q.    The vast majority of your conversations with

25   Nancy Haskell had nothing to do with guns at all?

```
1        A.    Correct.

2        Q.    But at some point in early -- late November,

3   early December, she contacts you and says something

4   along the lines of, we need to get our stories straight?

5        A.    No, that would have been late December.

6        Q.    When's the first time after you dropped off

7   the guns that you had a conversation with Nancy Haskell

8   about the guns?

9        A.    Probably a couple days before Johnathon was

10  arrested.

11       Q.    And fair to say that the topic of an

12  investigation by the Feds came up during that first

13  conversation with Nancy Haskell?

14       A.    Yeah, that's fair to say.

15       Q.    And did she make you aware that the guns had

16  been seized from Gary Roya?

17       A.    I'm not quite sure of the time frame that that

18  had happened, you know, when I was notified of that.

19       Q.    Did it make you nervous to find out that the

20  Feds were investigating guns that had been recently in

21  your possession?

22       A.    It made me angry.

23       Q.    Did it make you nervous?

24       A.    It made me angry.

25       Q.    Okay.  Let's try this one more time.  I'm not
```

1    asking whether it made you angry.  I understand that it

2    made you angry.  Did it make you nervous?

3        A.    No.

4        Q.    And in response to the call that you had with

5    Nancy, that's when you got in contact with Johnathon,

6    correct?

7        A.    What time frame are you talking about here?

8        Q.    Well, you had a phone call with Johnathon

9    about the firearms, correct?

10        A.    Yeah, that was before any of this even

11    started.

12        Q.    The phone call you had with Johnathon about

13    the firearms being wiped I'm talking about.

14        A.    Oh, oh, oh, okay, sorry.  I didn't know.

15        Q.    So --

16        A.    Yeah, it was right around that same time

17    frame, yep.

18        Q.    It was right after you spoke with Nancy

19    Haskell, right?

20        A.    I don't know if it was before or after.  I

21    can't answer that question.

22        Q.    Fair to say that the phone call with Nancy

23    Haskell was what prompted you to call Johnathon?

24        A.    No, that's not fair to say, because I can't

25    even recall if I called Johnathon or Johnathon reached

1  out to me.

2      Q.   Okay.  You spoke to Johnathon about the call

3  you had had with Nancy Haskell, right?

4      A.   I can't remember exactly how the conversation

5  entailed.  I just remember him asking me if I had wiped

6  down the guns or not.

7      Q.   Well, you had previously told him that you had

8  wiped down the guns; isn't that so?

9      A.   No.

10          MR. FALKNER:  May I have just one more moment,

11  your Honor?

12          THE COURT:  Yes.

13          (Attorney Falkner confers with the defendant.)

14      Q.   When you say that you were angry that the

15  weapons had been seized, was that because you were angry

16  that you had -- might be under investigation?

17      A.   I wouldn't phrase it like that.

18      Q.   Was it because you were afraid that your

19  prints might be on those guns?

20      A.   No.

21          MR. FALKNER:  I have nothing further, your

22  Honor.

23          THE COURT:  Anything further?

24          MS. KRASINSKI:  No, your Honor.  May the

25  witness be excused?

1          THE COURT:  Yes.  You may be excused.  Thank

2    you, sir.

3          THE WITNESS:  Thank you very much.

4          THE COURT:  You may call your next witness.

5          MS. WEILAND:  The United States calls Roscoe

6    Whitney.

7                    ROSCOE WHITNEY

8       having been duly sworn, testified as follows:

9          THE CLERK:  Thank you.  Please state your full

10   name, spell your last name for the record.

11         THE WITNESS:  Roscoe Whitney, W-H-I-T-N-E-Y.

12         THE CLERK:  Thank you very much.  Please be

13   seated.

14                  DIRECT EXAMINATION

15   BY MS. WEILAND:

16      Q.   Good afternoon, Mr. Whitney.

17      A.   Good afternoon.

18      Q.   Mr. Whitney, are you employed?

19      A.   No, ma'am.  I'm retired.

20      Q.   What did you do before you retired?

21      A.   I was a truck driver, carpenter, whatever.

22      Q.   How old are you, sir, if you don't mind my

23   asking?

24      A.   Eighty.

25      Q.   Where do you live?

 1        A.    Between North Carolina and New Hampshire.

 2        Q.    Can you explain?

 3        A.    Pardon?

 4        Q.    When you say between North Carolina and New

 5   Hampshire, what do you mean?

 6        A.    I live in an RV.

 7        Q.    Okay.

 8        A.    I'm what they call a snowbird.

 9        Q.    Okay.  So if I'm understanding you correctly,

10   you spend part of the year in New Hampshire and part of

11   the year in North Carolina?

12        A.    Yes, ma'am.

13        Q.    Generally speaking, what part of the year do

14   you spend in New Hampshire?

15        A.    During the summer.

16        Q.    Okay.  Generally speaking, when do you leave

17   New Hampshire for North Carolina?

18        A.    Usually, unless it's an election year, in

19   October.

20        Q.    Okay.  Mr. Whitney, I want to get something

21   out of the way right off the bat.

22              You are testifying here today subject to a

23   grant of immunity.  What do you understand that to mean?

24        A.    I mean that up until this moment I have

25   immunity.

1    Q.   What does that mean?

2    A.   When I'm on the stand, as long as I don't lie,

3  I have immunity.

4    Q.   So I just want to make sure I understand.

5  During the course of the FBI's investigation of

6  Johnathon Irish, did the FBI reach out and ask you some

7  questions?

8    A.   Yes, ma'am, they did.

9    Q.   Do you recall how many times you were

10  interviewed by the FBI?

11    A.   Twice.

12    Q.   And during those conversations with the FBI

13  were you completely truthful?

14    A.   The first time, no.

15    Q.   Can you explain?

16    A.   I would say I was coached.

17    Q.   When you say you were coached, who coached

18  you?

19    A.   Nancy Haskell.

20    Q.   And when you say you were coached, are you

21  referring to information that you provided to the FBI

22  specifically in relation to some firearms?

23    A.   Yes, ma'am.

24    Q.   Okay.  As you sit here today, how do you feel

25  about that first conversation with the FBI?

1      A.    Lousy.

2      Q.    Why is that?

3      A.    I felt bad that I did what I did and said what

4  I said.

5      Q.    Did you at any time correct any misinformation

6  that you had provided to the FBI?

7      A.    On the second call, yes.

8      Q.    Okay.  Now, is it your understanding that our

9  office has agreed not to use any prior statements you

10 might have made to the FBI against you in any criminal

11 proceeding?

12     A.    Yes, ma'am.

13     Q.    In other words, to the extent any of those

14 first statements you made were not truthful, our office

15 has agreed not to prosecute you on the basis of those

16 statements?

17     A.    Yes, ma'am.

18     Q.    Is that your understanding of your grant of

19 immunity?

20     A.    Yes, ma'am.

21     Q.    Would that immunity agreement protect you from

22 prosecution if you were to make any knowingly false

23 statements in your testimony here today?

24     A.    No, it wouldn't.

25     Q.    Do you know Johnathon Irish?

74

1      A.    Yes.

2      Q.    How do you know him?

3      A.    Through the campground, Saddleback Campground

4  that I came into I believe it was in 2011.

5      Q.    That was a campground you used to stay at in

6  your RV?

7      A.    Yes, ma'am.

8      Q.    And at the time who owned that campground?

9      A.    At the time Nancy and Les Haskell had it.

10      Q.    Nancy Haskell, do you know what her

11  relationship is to Johnathon?

12      A.    Johnathon's mother.

13      Q.    Okay.  Did you become close with Nancy and

14  Les?

15      A.    Yes, fairly close.

16      Q.    Okay.  And how about with Johnathon?

17      A.    More or less, yes, whenever he came around.

18      Q.    Was he at the campground frequently?

19      A.    Not really, no.  Not to my knowledge.

20      Q.    Okay.  Did he have a nickname for you?

21      A.    Grandpa.

22      Q.    I want to direct your attention to July of

23  2015.

24      A.    Yes, ma'am.

25      Q.    Did you take possession of some firearms

1  belonging to Johnathon Irish around that time?

2      A.   Yes, I did.

3      Q.   How did that come about?

4      A.   He went to court and he was convicted, and

5  they asked if I would take the weapons and hold them.

6      Q.   When you say they asked, who asked you?

7      A.   The Court.  I'm sorry.  The Court.

8      Q.   Did someone from the FBI make arrangements

9  with you to take possession of those guns?

10     A.   Yes, ma'am.

11     Q.   Okay.  Do you remember the name of the FBI

12 agent that you met with?

13     A.   Phil -- I can't pronounce his last name.

14     Q.   Does Phil Christiana ring a bell?

15     A.   Christiana, yes.  Yes.

16     Q.   Okay.  And tell me about receiving the

17 firearms from Special Agent Christiana.  Do you remember

18 where you were when you received them?

19     A.   It was in marketplace which is in Lee, New

20 Hampshire.

21     Q.   Marketplace, is that a --

22     A.   It's the Market Basket plaza.

23     Q.   Okay.  And who was there?

24     A.   There was myself and Mr. Christiana.

25     Q.   Okay.  Did you sign any paperwork the day that

1   you took those firearms?

2       A.   Yes, I did.

3       Q.   And did that include a complete listing of all

4   the property that you were taking possession of?

5       A.   Yes, ma'am.

6       Q.   Okay.

7            MS. WEILAND:  Permission to approach, your

8   Honor.

9            THE COURT:  Yes.

10           MS. WEILAND:  Actually, Ms. Sheff, could you

11  bring up Exhibit 3.

12      Q.   Mr. Whitney, on the screen in front of you is

13  what's been previously admitted as Government's Exhibit

14  3.  Do you recognize that form?

15      A.   Yes, I do.

16      Q.   Now, apart from the black area where some

17  personal information has been redacted, does that form

18  look the way you remember it?  Does it look the way it

19  looked the last time you saw it?

20      A.   Yes, ma'am.

21      Q.   Okay.  And does that form list some firearms

22  that you were taking possession of that day?

23      A.   It does.

24      Q.   Were there any additional pages to this form?

25      A.   Excuse me?

1        Q.    Were there any other pages to that form?

2        A.    Yes, there was.

3        Q.    In addition to the firearms you took that day,

4   was there other property you were taking possession of?

5        A.    Magazines and shells.

6        Q.    Okay.  Do you recall how those items were

7   packaged when you received them that day?

8        A.    The rifle had like a carrying case and the

9   others were in holsters, and the other equipment that I

10  got was in bags.

11       Q.    Okay.

12       A.    Plastic bags, and they were listed on what was

13  in the bag, each bag.

14       Q.    Okay.  Directing your attention to the bottom

15  of the screen there, is that your signature on that

16  form?

17       A.    Yes, ma'am, it is.

18       Q.    Okay.  Now, based on the paperwork that you

19  signed that day -- did you sign any other forms in

20  addition to this form?

21       A.    I believe there was two more.  I'm not sure.

22       Q.    Okay.  Now, based on the paperwork that you

23  signed that day, what was your understanding about

24  whether or not it would be permissible for you to return

25  any of those firearms to Johnathon Irish?

1          A.    I got an e-mail and --

2          Q.    I want to stop you.

3          A.    I'm sorry.

4          Q.    I'm referring specifically now to in July of

5    2015 --

6          A.    Yes.  Ma'am.

7          Q.    -- when you took those firearms.

8                Was there anything that was conveyed to you or

9    did you have any sort of understanding at that time

10   about whether or not it would be appropriate for you to

11   return those firearms to Mr. Irish?

12         A.    Yes, there was.

13         Q.    You do remember having --

14         A.    Yes, ma'am.

15         Q.    And what was your understanding?  Would you be

16   allowed to return those or not allowed to return those

17   to Mr. Irish?

18         A.    It was not really clear to me, but there was

19   one small paragraph which said something about being

20   relinquished to whatever or -- I don't remember the

21   exact wording, and then on the bottom it said do not

22   return the weapons to Mr. Irish.

23         Q.    So you do recall something in some of the

24   paperwork you signed saying that you should not return

25   those firearms to Mr. Irish?

1     A.   Yes, ma'am.

2     Q.   Okay.  What did you do with the firearms after

3  you received them from the FBI in 2015?

4     A.   They were being held in a gun safe at my

5  son-in-law's house.

6     Q.   Did you take them directly to your

7  son-in-law's house?

8     A.   Yes, ma'am.

9     Q.   Would it have been that same day you received

10  them?

11     A.   Yes, ma'am.

12     Q.   And did you actually put the firearms in the

13  safe?

14     A.   I didn't, no, because it was in his bedroom

15  and I let him take them in.

16     Q.   Okay.  What about the other items, the

17  ammunition and the other items you described, did those

18  items also go into the safe?

19     A.   They stayed there, too, yes.

20     Q.   Okay.  Is that where those items remained for

21  the duration of the time that you had them?

22     A.   Yes, ma'am.

23     Q.   Did you ever get them out of the safe at any

24  point during the time that you were holding on to them?

25     A.   No, ma'am.

1      Q.   Okay.  So when you traveled, for instance,

2  between New Hampshire and North Carolina, you didn't

3  take them with you?

4      A.   No, no.

5      Q.   They stayed in New Hampshire?

6      A.   They stayed in New Hampshire.

7      Q.   Okay.  Did there come a time when you gave the

8  firearms back to Mr. Irish?

9      A.   Yes, there was.

10     Q.   Do you remember when that was?

11     A.   I believe it was about the middle of October

12  in 2017.

13     Q.   Prior to -- well, let me just ask you this

14  way.  Why did you do that?

15     A.   I received paperwork showing a criminal record

16  of New Hampshire.

17     Q.   I'm going to stop you right there.  You said

18  you received some paperwork?

19     A.   An e-mail.

20     Q.   Okay.  Who was that e-mail from?

21     A.   Johnathon Irish.

22     Q.   He sent you an e-mail?

23     A.   Yes, ma'am.

24     Q.   It contained some paperwork?

25     A.   Yes, ma'am.

1      Q.   And after reviewing that paperwork, did you

2  have an understanding about whether or not you could

3  give those firearms back to Mr. Irish based on that

4  paperwork?

5      A.   I -- his record -- that record did not show

6  any --

7      Q.   I'm going to stop you right there.  I just

8  want to ask you, what was your understanding after

9  reviewing that paperwork about whether or not Mr. Irish

10 was allowed to possess any firearms?

11     A.   I didn't think his record showed anything, so

12 I didn't realize it would be -- he couldn't do it.

13     Q.   If I'm understanding you correctly --

14     A.   Yes, ma'am.

15     Q.   -- is it your testimony that you believed he

16 was allowed to possess firearms?

17     A.   From the criminal record, yes.

18     Q.   Based on the paperwork that you saw?

19     A.   Yes.  Yes, ma'am.

20     Q.   Okay.  How close in time to receiving that

21 paperwork from Mr. Irish did you return the firearms to

22 him?

23     A.   How long -- I think it was maybe two weeks.

24     Q.   Okay.  So shortly in time after getting that

25 paperwork --

1      A.    Right, yes.

2      Q.    -- you gave the guns back to Johnathon?

3      A.    Yes, ma'am.

4      Q.    Okay.  Now I have to ask you, you indicated

5  just a few moments ago that when you received those

6  firearms from the FBI in 2015 you recalled there being

7  some language in some paperwork that you signed that you

8  should not return those guns to Mr. Irish.

9      A.    Yes, ma'am.

10      Q.    But you did return them to Mr. Irish?

11      A.    Yes, I did.

12      Q.    Did it occur to you perhaps that when you were

13  presented with this paperwork to call the FBI and

14  inquire whether it would be permissible to return those

15  firearms?

16           MR. FALKNER:  Objection, your Honor.

17           THE COURT:  Approach.

18           (SIDEBAR)

19           THE COURT:  What could possibly be

20  objectionable about that question?  I'm not seeing it so

21  that's why I asked you.

22           MR. FALKNER:  She's asking whether it occurred

23  to him at that time.  How is his mindset at the time as

24  to -- it's already been established that he was told not

25  to return them.

1          THE COURT:  Right, but she's asking him did it

2    occur to you that perhaps you shouldn't have returned

3    them.

4          MR. FALKNER:  But how is that relevant to any

5    issue in the case?

6          THE COURT:  It is relevant because it

7    describes the story of how the guns went from him to Mr.

8    Irish per his testimony despite the fact that he had

9    signed a document that indicated he should not do that.

10   So overruled.

11         Go ahead.

12         MS. WEILAND:  Thank you.

13         (CONCLUSION OF SIDEBAR)

14         THE COURT:  Go ahead, Attorney Weiland.

15   Q.   Mr. Whitney.

16   A.   Yes, ma'am.

17   Q.   Did it occur to you that perhaps you should

18   call the FBI, Special Agent Christiana, and inquire

19   whether or not it would be okay for you to return those

20   firearms to Johnathon?

21   A.   I really didn't think of it that way, no.

22   Q.   Okay.  In hindsight would you have done some

23   things differently?

24   A.   I sure would.

25         MR. FALKNER:  Objection.

1           THE COURT:  Overruled.

2      Q.   All right.  I want to talk specifically about

3  the day that you returned those firearms to Mr. Irish.

4      A.   Yes, ma'am.

5      Q.   You said it happened close in time to when you

6  received this e-mail?

7      A.   Yes.

8      Q.   That it was approximately --

9      A.   I'm going to say maybe a couple weeks.

10     Q.   Okay.  And we're talking about the fall of

11 2017?

12     A.   Around October, middle of October.

13     Q.   Okay.  Now, are you still in New Hampshire in

14 the middle of October?

15     A.   Yes, ma'am.  Well, that year I did stay until

16 November.

17     Q.   Okay.  So it would have been shortly in time

18 before you left for North Carolina?

19     A.   Yes.

20     Q.   Okay.  Where were you when you gave the

21 firearms back to Mr. Irish?

22     A.   Epsom Valley Campground.

23     Q.   Okay.  And who was there?

24     A.   We were at Nancy and Les's lot, his mother and

25 father's lot, and myself, and then he showed up with his

1   family.

2        Q.   Okay.  Were Nancy and Les present?

3        A.   I believe -- I'm not sure whether Les was

4   there or not, but I know Nancy was.

5        Q.   Okay.  And you said Mr. Irish arrived with his

6   family?

7        A.   Yes.

8        Q.   Who was there with him?

9        A.   His wife and I believe it was his daughter and

10  his next to oldest -- or his oldest son.

11       Q.   Okay.  And when you arrived at the campsite

12  where did you have the firearms?

13       A.   I had them in my vehicle.

14       Q.   Okay.  Were they in the trunk of your vehicle?

15       A.   No.  I had a crew cab truck and it was in the

16  back.

17       Q.   Okay.  Who removed those items from your

18  vehicle?

19       A.   I took them out of my vehicle and handed them

20  to -- I believe Johnathon took them.

21       Q.   Okay.  And do you recall what he did with them

22  after you handed them to him?

23       A.   He took them and put them in his vehicle as

24  far as I know.

25       Q.   Do you remember what type of vehicle he was

1    driving at the time?

2         A.    I really don't.  I think it was a Bronco, but

3    I'm not sure.

4         Q.    Okay.  Now, after you returned the firearms to

5    Mr. Irish that day, did you ever take them back from

6    him?

7         A.    No.

8         Q.    Did you ever see them again?

9         A.    No, ma'am, I did not.

10        Q.    We talked a few moments ago about your

11   conversations with the FBI and how initially some of the

12   information you gave them about the firearms was not

13   true.

14              Do you remember telling the FBI that Stephanie

15   gave you those guns back in October of 2019?

16        A.    Yes.

17        Q.    Was that true?

18        A.    No, ma'am.  I didn't see the weapons after I

19   gave them back.

20        Q.    Why did you say that?

21        A.    I was again coached on what was going on.

22        Q.    By whom?

23        A.    Well, it came from Nancy Haskell but --

24        Q.    Do you remember telling the FBI that after

25   receiving the firearms back from Stephanie you gave them

1  to somebody named Neil?

2      A.   Neil, yes.

3      Q.   Was that true?

4      A.   No.

5      Q.   And why did you say that?

6      A.   Again, coached on what was going on.

7      Q.   I want to direct your attention now to October

8  of 2019, just this past October.

9      A.   Yes, ma'am.

10      Q.   When did you leave the state of New Hampshire

11  this past October?

12      A.   October 21.

13      Q.   Where did you go?

14      A.   We went to North Carolina.

15      Q.   Okay.  Did you stop anywhere along the way?

16      A.   Oh, yes.  We stopped in, oh, boy, Pennsylvania

17  overnight.

18      Q.   Did you make a trip to Florida?

19      A.   Yes, I did, after we made a stop in North

20  Carolina and dropped my trailer.

21      Q.   Okay.  So you made a stop in North Carolina?

22      A.   Yes, ma'am.

23      Q.   Dropped your trailer.  How long did you remain

24  in North Carolina?

25      A.   Overnight.  Actually, I take it back.  We was

```
 1    in South Carolina when we stopped for that night.
 2         Q.    Okay.  And then you continued on to Florida?
 3         A.    Florida, yes.
 4         Q.    Who were you traveling with?
 5         A.    Nancy and Les Haskell.
 6         Q.    And why were you going to Florida?
 7         A.    They needed a ride to Florida.
 8         Q.    Okay.  Did you plan to stay in Florida?
 9         A.    No, ma'am.
10         Q.    Who did you stay with while you were in
11    Florida?
12         A.    Nancy and Les Haskell.
13         Q.    And how long did you stay there?
14         A.    I believe it was about three weeks.
15         Q.    Okay.  So you wound up staying longer than you
16    anticipated?
17         A.    Yes, ma'am.
18         Q.    Okay.  Now, during your stay in Florida did
19    there come a time when you were asked to sign a document
20    relating to those firearms?
21         A.    Yes, ma'am.
22         Q.    Who presented you with that document?
23         A.    Nancy Haskell.
24         Q.    Where were you when Nancy presented you with
25    that document?
```

1        A.    In her kitchen.

2        Q.    Her kitchen in Florida?

3        A.    In Florida.

4        Q.    Were you staying with Nancy at that time?

5        A.    Yes, ma'am.

6        Q.    Okay.

7              MS. WEILAND:  Permission to approach, your

8    Honor.

9              THE COURT:  Yes.

10        Q.    Mr. Whitney, I'm handing you what's been

11   marked for identification as Government's Exhibit 30.

12        A.    Yes, ma'am.

13        Q.    Would you have a look at that document,

14   please?

15        A.    Yes, ma'am.

16        Q.    Do you recognize that document?

17        A.    Yes, ma'am.

18        Q.    Is that your signature on the document?

19        A.    Yes, it is.

20        Q.    Is that the document that Nancy presented to

21   you in Florida and asked you to sign?

22        A.    Yes.

23        Q.    When you signed that document, was yours the

24   only signature on that form?

25        A.    At the time, yes.

1      Q.    Okay.

2            MS. WEILAND:  Your Honor, at this time I would

3      move to strike the ID from Government's Exhibit 30.

4            THE COURT:  Any objection?

5            MR. FALKNER:  May we approach, your Honor?

6            THE COURT:  Yes.

7            (SIDEBAR)

8            MR. FALKNER:  Your Honor, the document that's

9      before him is a screenshot from Gary Roya's phone of the

10     document.  Gary Roya is going to be testifying.  It may

11     well be admissible, but it's not the actual document

12     that he signed.

13           MS. WEILAND:  Your Honor, it's a copy of the

14     document and a copy is admissible.

15           THE COURT:  As long as you don't have a basis

16     to believe it's fabricated I think is the rule.  Do you

17     have any reason to challenge --

18           MR. FALKNER:  But it's not a copy.  It's a

19     photograph of the document.

20           MS. WEILAND:  It's a reproduction of the

21     document.

22           THE COURT:  What's your objection?

23           MR. FALKNER:  It's at least in part an

24     authenticity objection because it's not actually as it

25     was testified to, and I think that it can certainly be

1   admitted through Gary Roya, but I'm just -- given that

2   it's not -- I think it would be different if it was an

3   actual copy of it as opposed to a picture of it.

4           MS. WEILAND:  Your Honor, I'm not

5   understanding a meaningful distinction between a

6   photocopy and a printed.  It's just the formatting on

7   which the copy was made essentially.

8           THE COURT:  Do you have any basis on which to

9   challenge the accuracy of this as a copy?

10          MR. FALKNER:  No, your Honor.

11          THE COURT:  Okay.

12          MR. FALKNER:  Well, except for there's some

13  handwriting on it that I believe was added by Gary Roya,

14  which is this.

15          THE COURT:  Okay.  And you're going to ask

16  Gary Roya about the exhibit?

17          MS. WEILAND:  Yes.

18          THE COURT:  Overruled.

19          (CONCLUSION OF SIDEBAR)

20          MS. WEILAND:  Your Honor, I would move to

21  strike the ID from Government's Exhibit 30.

22          THE COURT:  The ID is stricken.  Full exhibit.

23          (Government's Exhibit 30 admitted)

24          MS. WEILAND:  Thank you.  Permission to

25  publish, your Honor?

1                    THE COURT:  Yes.

2                    MS. WEILAND:  Ms. Sheff, if you could bring up

3      Exhibit 30, please.

4          Q.    Now, just to be clear, Mr. Whitney, this is

5      not the original document that you put your signature

6      on; is that correct?

7          A.    I believe it is.

8          Q.    I'm directing your attention to the top of the

9      screen there.

10         A.    Yeah.

11         Q.    It appears there's some black space at the

12     top.

13         A.    Right.  Oh, no, no.  It doesn't look like

14     this, no.

15         Q.    Okay.  Does this appear to be a copy or a

16     reproduction of the actual document that you signed?

17         A.    I'd say so, yes.

18         Q.    Okay.  As far as the content of the document,

19     the words that are printed on the page, are those the

20     words of the document that you recall signing?

21         A.    Yes, I do believe so.

22         Q.    All right.  Now, if you would please, sir --

23     at the top of that form it says Transfer of Weapons and

24     underneath there's some writing.  Could you read that

25     aloud, please?

1       A.    I, Roscoe Whitney, 6 Tasker Shore Drive,

2  Northwood, New Hampshire, 03261, do directly transfer to

3  Gerald E. Roya, 41 South Street, Exeter, New Hampshire,

4  03433, the following weapons:

5            1.   One Sig Sauer 1911 .45 caliber handgun

6  serial number -- let me get my glasses -- GS34120.

7            2.   One Sig Sauer 516 5.56 caliber rifle

8  serial number 5 -- I believe that's 53EOO1626.

9            3.   Magazines, miscellaneous, and ammunition.

10      Q.    Okay.  And that is your signature there at the

11 bottom?

12      A.    Yes, ma'am.

13      Q.    What was your understanding of the purpose of

14 this document?

15      A.    I was under the understanding that the

16 transfer would be made to this Gerald.

17      Q.    Okay.  Did you ever give those weapons to

18 Gerald Roya?

19      A.    I did not.

20      Q.    Do you know Gerald Roya?

21      A.    No.

22      Q.    When you signed this paper were you in

23 possession of those firearms?

24      A.    No, ma'am.

25      Q.    Calling your attention first to the date that

1    appears beside your name, could you read that date?

2         A.    October 20, 2019.

3         Q.    Is that the date you signed this document?

4         A.    No, ma'am.

5         Q.    How do you know?

6         A.    Because we were in New Hampshire at that time.

7         Q.    Okay.  So if I'm understanding you correctly,

8    on October 20, 2019, you were still in New Hampshire?

9         A.    Yes.

10        Q.    And where were you when you signed this

11   document?

12        A.    Florida.

13        Q.    And who were you with?

14        A.    Nancy and Les Haskell.

15        Q.    Okay.  Do you recall approximately how long

16   you had been in Florida when Nancy presented you with

17   this document?

18        A.    Maybe about a week or a week and a half.

19        Q.    Okay.  Why did you sign this document?

20        A.    Again, I was asked -- or I was told what they

21   were trying to do.  What was going on, I should say.

22        Q.    Did anyone pressure you to sign that document?

23        A.    No, ma'am.

24        Q.    You've testified that you do not know Gerald

25   Roya.

1        A.    No, I don't.

2        Q.    Do you know somebody named Elizabeth Millett?

3        A.    No, ma'am.

4        Q.    What about Peter Duguay?

5        A.    No, ma'am.

6        Q.    Do you know someone named Dylan Roosa?

7        A.    No, ma'am.

8        Q.    How about David Marcotte?

9        A.    No.

10       Q.    Do you know Neil Prive?

11       A.    I met Neil I think maybe three times.

12       Q.    Where did you meet him?

13       A.    In Epsom Valley Campground.

14       Q.    Do you know what his connection was to Epsom

15  Valley Campground?

16       A.    I believe he was a brother-in-law of Nancy,

17  but I'm not sure.

18       Q.    Okay.  Do you recall approximately when you

19  met him?

20       A.    I think the first time was maybe in July of

21  last year.

22       Q.    Okay.  Did you ever have any interactions with

23  him outside the presence of Nancy?

24       A.    No, ma'am, no.

25       Q.    Have you ever had any phone conversations with

1  him?

2        A.    No, ma'am.

3        Q.    Did you ever discuss these firearms with him?

4        A.    No, ma'am.

5              MS. WEILAND:  May I have just a moment, your

6  Honor?

7              THE COURT:  Yes.

8              MS. WEILAND:  I have nothing further, your

9  Honor.

10             THE COURT:  All right.  Attorney Falkner.

11                     CROSS-EXAMINATION

12  BY MR. FALKNER:

13       Q.    Good afternoon, Mr. Whitney.

14       A.    Good afternoon.

15       Q.    You received these weapons from an FBI agent,

16  correct?

17       A.    Yes, sir.

18       Q.    And they weren't the only weapons you

19  received.  You also received a pistol belonging to

20  Stephanie Irish, correct?

21       A.    Yes, sir.

22       Q.    And at some point Stephanie Irish gave you

23  that pistol in exchange for a debt, correct?

24       A.    Yes.

25       Q.    To forgive a debt?

1      A.   Yes.

2      Q.   You took that in payment for the debt?

3      A.   Yes.

4      Q.   So you knew Johnathon Irish to have possessed

5  firearms, but you also knew Stephanie Irish to have

6  possessed firearms?

7      A.   Yes.   I knew she carried one, but yes.

8      Q.   And at some point you received some

9  information that Johnathon Irish no longer had a

10  criminal record or something to that effect?

11      A.   Yes, sir.

12      Q.   And do you really know whether it came from

13  Nancy Haskell or from Johnathon Irish or from Stephanie

14  Irish?

15           MS. WEILAND:  Objection, your Honor.  May we

16  approach?

17           THE COURT:  Yes.

18           (SIDEBAR)

19           MS. WEILAND:  Your Honor, I'm going to object

20  on two grounds, the first being I believe the witness's

21  testimony was clear on direct that he received an e-mail

22  from Johnathon.

23           THE COURT:  That's what I recall.

24           MS. WEILAND:  And second of all, your Honor,

25  to the extent that -- you know, the witness said what he

1  said on direct as far as the nature of the paperwork

2  that he received.  But given that Mr. Irish has

3  stipulated to the fact that he is a convicted felon and

4  that he knew he was a convicted felon, I would object to

5  any attempt to inject confusion of that issue by drawing

6  out the fact that he reviewed something that appeared to

7  be Johnathon's criminal record that suggested he was not

8  in fact a felon.

9          THE COURT:  But isn't the point that he

10  reviewed this and the implication being Johnathon Irish

11  sent it to him to essentially confuse him on the issue?

12          MS. WEILAND:  That's correct, your Honor, but

13  to the extent that the -- I don't know.  I was trying

14  very hard on direct to keep it general, and I feel that

15  this is getting a little more specific about the nature

16  of the paperwork.

17          THE COURT:  I'll let you obviously on redirect

18  go into that to the extent you need to, but I do recall

19  him saying he got an e-mail and it came from Johnathon.

20  That's what I remember.

21          MR. FALKNER:  That's correct, and that's what

22  I'm -- when I'm cross-examining him I'm permitted to

23  test his memory, am I not?

24          THE COURT:  You are, sir.  So objection noted

25  but overruled.

```
 1                    (CONCLUSION OF SIDEBAR)
 2               THE COURT:  Go ahead, Attorney Falkner.
 3          Q.   Mr. Whitney, you don't remember specifically
 4     who sent you the e-mail, do you?
 5          A.   It had Johnathon's e-mail address on it.
 6          Q.   Okay.  At around that time you were also
 7     having communications with Nancy Haskell, correct?
 8          A.   Yes, sir.
 9          Q.   And Stephanie Irish?
10          A.   Yes, sir.  She called me a couple of times.
11          Q.   Okay.  And you knew that the firearms were
12     going to go back to the Irish household, correct?
13          A.   Yes, sir.
14          Q.   But you didn't know whether they were going to
15     belong to Stephanie Irish or Johnathon Irish, did you?
16          A.   I did not know.
17          Q.   They didn't tell you?
18          A.   No, sir.
19          Q.   And at that point there wasn't any kind of a
20     bill of sale or any kind of record made of the
21     transaction, correct?
22          A.   No.
23          Q.   And from that point up until October of 2019
24     when you began having conversations with Nancy Haskell
25     about these documents, you didn't have any conversations
```

1    with Johnathon Irish or Stephanie Irish about any of

2    these weapons, correct?

3         A.    At that time, no.

4         Q.    You never saw Johnathon Irish with a firearm?

5         A.    No, no.

6         Q.    And you did see him during the time period

7    from after these firearms were returned to his home up

8    until the time that you signed this document, correct?

9         A.    Yes, sir.

10        Q.    Was that at the campground?

11        A.    Yes, it was.

12        Q.    In terms of the date when the firearms were

13   returned, are you sure of that date?

14        A.    As far as I can recollect, yes, because it was

15   about I'm going to say maybe two weeks after I got that

16   e-mail.

17        Q.    Well, when you first spoke with the FBI you

18   told them it was about a year and a half or so prior to

19   your conversation with the FBI, correct?

20        A.    Yes.

21        Q.    And was that accurate?

22        A.    Pretty much, yes.

23        Q.    So you're talking -- your conversation with

24   the FBI was in December of 2019, correct?

25        A.    Yes, it was.  December 20 exactly.

1      Q.   So the firearms were returned in 2018, not

2   2017, correct?

3      A.   I say it was in '17.

4      Q.   Okay.  So going back to the time -- again, I

5   think I asked you this before, but you weren't sure who

6   these firearms were going to belong to, correct?

7      A.   No, I did not.

8      Q.   But you did have some concern to make sure

9   that you had satisfied yourself that Johnathon was

10   allowed to be around them, correct?

11      A.   Yes.

12      Q.   And that was the point of reviewing this

13   document that you had reviewed?

14      A.   Right.  That was a mistake on me.

15      Q.   Now, when Nancy Haskell asked you to sign this

16   document -- I've got a couple of questions about the

17   document, this transfer document.

18           She asked you to sign it and you go ahead and

19   sign it, correct?

20      A.   Yes, sir.

21      Q.   Without asking any questions?

22      A.   I -- no, I didn't.  I didn't.

23      Q.   Was it because you viewed this as a legal

24   transfer to you because you had never transferred the

25   firearms?

1        A.    I'm sorry?

2        Q.    Well, you had never legally transferred the

3   firearms to anybody even if you had given them to the

4   Irishes, correct?

5        A.    I gave them back to them.  I don't know what

6   else.

7        Q.    Okay.  Did you think that you were doing

8   something illegal by transferring the firearms on paper

9   to Gary Roya?

10       A.    I didn't really think of it.  I didn't.  I

11   just thought that -- well, I didn't think.

12       Q.    Let me put it to you another way.  Did you

13   think that you were signing a false document?

14       A.    I really didn't know, to be honest.

15       Q.    Do you regularly sign false documents?

16       A.    No.

17       Q.    Did it concern you that it might be a false

18   document?

19       A.    Again, I didn't really think of it.

20       Q.    Now, you said that you were told what was

21   going on.  Was it Nancy Haskell that told you what was

22   going on?

23       A.    Yes.

24       Q.    And the what was going on was that the

25   firearms were going to go to Gary Roya, correct?

1      A.    Yes.

2      Q.    Was that the entirety of the what's going on?

3      A.    To my knowledge, yes.

4      Q.    Did she tell you that Johnathon and Stephanie

5  had separated?

6      A.    Yes, that -- yes.

7      Q.    And you knew that at the time that you signed

8  the transfer document?

9      A.    Yes.

10      Q.    Did you know why the firearms were coming out

11  of the Irish household?

12      A.    Not really, no.

13      Q.    Did it concern you?

14      A.    Yes.

15      Q.    And -- so you didn't know, it didn't concern

16  you, and then Nancy Haskell coached you on what to say

17  to the FBI, correct?

18      A.    Pretty much so, yes.

19      Q.    And when you spoke with the FBI, the first

20  interview you had was on December 20th of 2019, correct?

21      A.    Yes, sir.

22      Q.    And the FBI agents that you spoke with told

23  you that it was a crime to lie to them, correct?

24      A.    Yes, sir.

25      Q.    So very much like the oath that you've taken

1  in this courtroom, you knew that any lie to that federal

2  agent was a crime?

3       A.   Yes, sir.

4       Q.   And you told them more than one lie in that

5  conversation, right?

6       A.   Yes.  I would say so, yes.

7       Q.   And when you started telling them lies, that

8  was when they admonished you that you needed to tell the

9  truth, correct?

10       A.   Yes, sir.

11       Q.   And you continued to lie to them after they

12  had told you to tell the truth during that conversation,

13  correct?

14       A.   Pretty much so, yes.

15       Q.   And then you had a second conversation with

16  them?

17       A.   Yes, sir.

18       Q.   Did you call them or did they call you?

19       A.   They called me.

20       Q.   And they told you that you lied to them the

21  first time, right?

22       A.   Yes, sir.

23       Q.   And now we're into at least the second time

24  that the FBI has told you that you were lying?

25       A.   Yes.

1    Q.   And at that time you gave them some different

2    information, correct?

3    A.   Yes.

4    Q.   And some of that information was true, right?

5    A.   As far as I know, most of it or all of it was

6    true.

7    Q.   And why did you tell the truth the second time

8    if you didn't tell the truth the first two times?

9    A.   Because I didn't want to get locked up.

10    Q.   Were you told by the FBI if you didn't change

11    your story you were going to get locked up?

12    A.   Well, no, but I didn't want to get in trouble.

13    Q.   So let's put it a different way.  The things

14    that you told the FBI in the second interview you told

15    because you didn't want to get locked up?

16    A.   Well, I didn't want to get in trouble, yes.

17    Q.   And by in trouble, you mean get locked up,

18    right?  That's what you were afraid of, right?

19    A.   Yes.

20    Q.   And so you changed that story and that is what

21    led to your testifying in this courtroom here today,

22    right?

23    A.   As far as I know, yes.

24    Q.   You met with them again this week, right?

25    A.   Yes.

1      Q.    And it was at this point that they told you

2  they would give you immunity from your testimony -- they

3  would give you immunity from the previous lies that you

4  had told; is that right?

5      A.    Yes.

6      Q.    Only you know whether you were telling the

7  truth the first, second, third, or fourth time; isn't

8  that so?

9      A.    There's only three times and I told it twice,

10 the truth.

11     Q.    This is the fourth time, right?

12     A.    Yes.  Now, yes.

13     Q.    Okay.  And only you know whether this time is

14 the truth or the first time or the second or the third,

15 right?

16     A.    Yes.  Right.

17     Q.    And the jury should believe this version of

18 the truth because you're afraid of getting locked up,

19 right?

20     A.    No.  I'm telling the truth.

21     Q.    This time?

22     A.    Yes.

23     Q.    Weren't you afraid of getting locked up when

24 in the middle of the first interview the FBI agents told

25 you you were lying?

1          A.    I didn't really think about it.

2          Q.    Weren't you concerned that you were committing

3     a crime when you knew you were lying and the FBI agents

4     told you you were lying?

5          A.    After I had hung up, yes.

6          Q.    And nonetheless, you continued to lie to them,

7     correct?

8          A.    Not after that call, no, that first call.

9          Q.    During the first call --

10         A.    Right.

11         Q.    -- when in the middle of that call you were

12    told that you were lying and that it was a crime to

13    continue to lie --

14         A.    Yes.

15         Q.    -- you nonetheless continued to lie, right?

16         A.    Yes, yes.

17         Q.    Knowing that you were committing a crime?

18         A.    Yes.

19               MR. FALKNER:  May I have a moment, your Honor?

20               THE COURT:  Yes.

21               (Attorney Falkner confers with the defendant)

22         Q.    One last question.  While you know the name of

23    the e-mail address that sent you some information, you

24    don't know who was in control of that e-mail address, do

25    you?

1          A.    All I know is it had his name on it.

2          Q.    And --

3                MR. FALKNER:  I have nothing further, your

4    Honor.

5                THE COURT:  All right.  Anything further from

6    the government?

7                MS. WEILAND:  Yes, your Honor.  May I have

8    just a moment to consult with my agent?

9                THE COURT:  You may.

10               (Attorney Weiland confers with agent)

11                         REDIRECT EXAMINATION

12   BY MS. WEILAND

13         Q.    Mr. Whitney, just a few follow-up questions.

14               You took possession of three guns from the FBI

15   in 2015, correct?

16         A.    Yes, ma'am.

17         Q.    Two of those were Johnathon's guns?

18         A.    Yes, ma'am.

19         Q.    And one was Stephanie's?

20         A.    Yes, ma'am.

21         Q.    When you returned those firearms, you gave two

22   of them back; is that right?

23         A.    Yes, ma'am.

24         Q.    Those were the two belonging to Johnathon?

25         A.    Yes, ma'am.

1      Q.    And you handed them to Johnathon?

2      A.    Yes.

3      Q.    Okay.  Now, Attorney Falkner asked you some

4  questions about the date of the paperwork that you were

5  sent that appeared to indicate that Mr. Irish was

6  permitted to possess firearms.

7      A.    Uh-huh.

8      Q.    Do you recall whether the paperwork that you

9  were sent had a date on it?

10     A.    Yes.

11     Q.    Was the date on that paperwork a date close in

12  time to the date you received it?

13     A.    Yes, I believe it was, about maybe a couple of

14  days' difference.

15     Q.    And would reviewing that paperwork refresh

16  your recollection as to the date that you received or

17  the time frame that you received that paperwork?

18     A.    I would say right around September the 28th.

19     Q.    So your recollection is it was September the

20  28th of what year?

21     A.    That's when -- I believe I received it at that

22  time.

23     Q.    September the 28th of what year?

24     A.    Oh, I'm sorry.  '17.

25     Q.    2017?

1      A.   Yes, ma'am.

2      Q.   And that's based on the date --

3      A.   The date on the paper, yes.

4      Q.   And you mentioned that you received that

5  paperwork through an e-mail address that you knew to be

6  associated with Mr. Irish?

7      A.   Yes, ma'am.

8      Q.   Apart from receiving that e-mail, were there

9  any discussions about the contents of the e-mail or the

10  paperwork itself with Mr. Irish?

11      A.   No, ma'am.

12      Q.   Well, at some point when you returned the guns

13  to him, the subject of the paperwork didn't come up?

14      A.   No, not really.

15      Q.   Okay.

16      A.   No.

17      Q.   Now, Attorney Falkner asked you with regard to

18  I believe it is Government's Exhibit 30 --

19          MS. WEILAND:   If you wouldn't mind pulling

20  that up, Ms. Sheff.

21      Q.   Attorney Falkner asked you whether it was your

22  understanding that this was a false or fraudulent

23  transfer note.

24      A.   Yes.

25      Q.   And your answer was?

1    A.   Yes.

2    Q.   Did you --

3    A.   Or I -- at the time I didn't believe it was

4  fraudulent.

5    Q.   You didn't believe it was fraudulent?

6    A.   No.

7    Q.   But you acknowledge, do you not, that you did

8  not transfer those weapons to Gerald Roya, correct?

9    A.   I didn't see him, no.

10    Q.   And that's what's reflected in this note?

11    A.   Yes, yes.

12    Q.   And you also acknowledge that you did not sign

13  that paper on October 20, 2019, correct?

14    A.   That's right.

15    Q.   You signed it sometime later in November?

16    A.   Yes.

17    Q.   You signed it in Florida?

18    A.   Yes, ma'am.

19    Q.   Okay.  Now, we've been through sort of ad

20  nauseam at this point the fact that in your initial

21  conversation with the FBI some of the things you told

22  them were not true, and Attorney Falkner also alluded to

23  the fact that you and I have spoken before; is that

24  accurate?

25    A.   Yes, it is.

1       Q.    Did we meet earlier this week?

2       A.    Yes, ma'am.

3       Q.    And in our conversations in talking to you

4    about what to expect today, what instructions, if any,

5    were you given about your testimony here today?

6              MR. FALKNER:  Objection.

7              THE COURT:  Overruled.  Go ahead.  Go ahead.

8       Q.    Mr. Whitney, did anybody tell you what to say

9    here in court today?

10      A.    No, ma'am.  No, ma'am.

11      Q.    What instructions, if any, were you given

12   about your testimony today?

13      A.    Tell the truth.

14      Q.    And have you done that?

15      A.    I've tried my best.

16             MS. WEILAND:  No further questions, your

17   Honor.

18             THE COURT:  Anything further, Attorney

19   Falkner?

20             MR. FALKNER:  Just a moment, your Honor.

21             (Attorney Falkner confers with the defendant)

22                     RECROSS-EXAMINATION

23   BY MR. FALKNER:

24      Q.    During your redirect examination you were

25   asked whether you handed the firearms to Johnathon.  Is

1    that true?

2         A.   Yes.   That's what I said.

3         Q.   Who was there when you supposedly handed the

4    firearms to Johnathon?

5         A.   His wife Stephanie, and I believe his two

6    children, and myself.

7         Q.   And what did you say to Stephanie, what did

8    you say to Johnathon at that time?

9         A.   I don't really remember.

10        Q.   What did they say to you?

11        A.   Nothing really.   It was just regular

12   conversation.

13        Q.   This took place a few years ago now then --

14   this took place a few years ago according to your

15   testimony, correct?

16        A.   Yes, ma'am -- sir.   I'm sorry.

17        Q.   And I just want to make sure.   From that

18   moment you never saw a firearm in Johnathon's possession

19   at all, did you?

20        A.   No, I haven't.

21             MR. FALKNER:   I don't have anything further,

22   your Honor.

23             THE COURT:   All right.   We are going to end

24   our day right now, as I promised, at 4:00 p.m., and

25   tomorrow we're going to start at noon.   For those who

1   want to vote in the primary, we want to give you that

2   opportunity, so we're going to start at noon and go to

3   5 p.m.  So all my instructions hold.  As you go home

4   tonight, you've heard a day full of evidence and

5   testimony, and again you may not talk about it, about

6   the case at all with yourselves, with anyone.  Again,

7   blame it on the judge.  When people ask you about it,

8   just say the judge has ordered me not to speak about it

9   and I cannot violate the law.  So just blame it on me as

10  people ask you the question and refuse to speak about

11  it.

12          So let me also just remind you of an important

13  instruction that happened earlier today.  Earlier today

14  you heard testimony that Mr. Irish was in jail at a

15  point.  You must not use that evidence against Mr.

16  Irish.  You may not consider it in any way to determine

17  whether he is guilty of the charged crime.  I just

18  wanted to remind you of that important instruction.

19          And I don't think we'll take a lunch break per

20  se tomorrow so just eat something before we start at

21  noon, all right?  Follow my instructions and I'll see

22  you at noontime tomorrow.

23          (IN COURT - NO JURY PRESENT)

24          THE COURT:  The witness may be excused.  Thank

25  you, sir.

1           Let me just check with counsel.  Anything you

2    need to bring to my attention before tomorrow?  I can

3    tell you that I would like to hear that call.  Can you

4    play that for me now?  And I just want to make sure the

5    jury can't hear that.  We'll give them a second to

6    depart, but I do want to hear that and begin talking to

7    you a little bit about the unanimity issue.  So maybe we

8    can talk about that before I hear the call.

9           So let me hear from Attorney Falkner on that,

10   because I know the government has asked for a

11   non-unanimity instruction.

12          MR. FALKNER:  Yes, your Honor, and -- just a

13   moment, your Honor.

14          THE COURT:  Take your time.

15          MR. FALKNER:  Your Honor, unfortunately, after

16   having done the brief I was looking closer at some of

17   the notes in the model instructions themselves and in

18   addition to the case law that your Honor had discussed

19   and some of the case law that's discussed in the notes,

20   the comments to the model instructions by the district

21   judge in Maine.  I think that the case law is correct as

22   your Honor had cited it in terms of whether a juror

23   might reasonably believe different things.

24          There's testimony -- well, there isn't any

25   testimony yet in this case about the shotgun itself.

1  There is some testimony about the pistol being out and

2  the pistol being -- for instance, if a jury were to

3  believe the testimony of Peter Duguay, a jury could

4  theoretically convict him based on the testimony that

5  the pistol was in his possession during that drive even

6  if it didn't believe whatsoever that it was in his

7  possession during the time that it was in the box.

8          So that puts it in a different position.

9  Nobody has ever put the shotgun into the personal

10  possession of the defendant.  So even if they were

11  stored together, this pistol, there's already in

12  evidence some evidence that the pistol is being

13  possessed at different times in different locations.  I

14  expect also Elizabeth Millett to be testifying that she

15  claims that she saw him carrying the pistol.

16          I believe that Dylan Roosa may be testifying

17  that the weapons were out at one point, which would be

18  one occasion when the shotgun is alleged to be in the

19  physical possession of the defendant, but that's

20  different from both -- that's different from the pistol,

21  which is the only other weapon that now remains charged

22  in the indictment.

23          And so the concern in some of this case law is

24  that the jury is not unanimous as to the actual act of

25  possession that's being -- that the jury is unanimous as

1   to, and for that reason I think that there does need to

2   be a special verdict as to each of these two firearms.

3              THE COURT:  Go ahead.

4              MS. KRASINSKI:  First, Mr. Prive testified

5   that the defendant gave him this box and that the box

6   contained all three firearms.  So at least on that

7   occasion we know when the defendant gave him that box it

8   had all three firearms, but I think you're also going to

9   hear testimony tomorrow afternoon about the defendant's

10  possession of all three of these items in this case.  So

11  I think the Court has heard evidence that they were all

12  together in the defendant's possession and I think the

13  Court will hear more of it.

14             THE COURT:  Okay.  All right.  With respect to

15  the handgun or pistol, Mr. Duguay testified that he

16  heard a cocking sound, but did he testify and identify

17  Exhibit 5?  I don't believe that he did.

18             MS. KRASINSKI:  (Nods negatively.)

19             THE COURT:  Okay.  So there was testimony

20  about a handgun or a pistol, but it wasn't identified by

21  Mr. Duguay as Exhibit 5.

22             MS. KRASINSKI:  Correct.  I think he said he

23  didn't see it, he just --

24             THE COURT:  Okay.  All right.  And the

25  testimony we've heard so far is Mr. Prive -- I could be

1   wrong on the names, but Mr. Prive going to Mr. Irish, he

2   pulls out the case, gets the key, unlocks it, and then

3   shows him what's in it, and in that Mr. Prive testified

4   to the handgun which he did identify as Exhibit 5, and

5   the shotgun which was in two pieces, Exhibit 7 and 7A;

6   is that right, consistent with your memory of his

7   testimony?  And also I think the -- was the rifle as

8   well?

9           MR. FALKNER:  I'm sorry, your Honor.  I

10  believe that he saw only the rifle and the pistol at

11  that time and then later when he went into the box he

12  found the other weapons.

13          THE COURT:  Correct.

14          MR. FALKNER:  But they were in the box when he

15  opened it.

16          THE COURT:  Okay.  All right.  Okay.  Well,

17  we'll obviously hear more testimony tomorrow.  What

18  is -- what's on for tomorrow?

19          MS. KRASINSKI:  Your Honor, there are four

20  more lay witnesses, the nexus experts, and then the case

21  agent.

22          THE COURT:  Okay.  All right.  So four, five,

23  six more witnesses.  Do you anticipate those will be in

24  from 12:00 to 5:00?  We won't have a lunch break so as I

25  told the jury, make sure you eat something and maybe

1    bring a snack for the mid-afternoon break.  It's hard to

2    anticipate exactly.  Any reason for you to think it

3    would go beyond tomorrow?

4         MS. KRASINSKI:  Your Honor, considering we

5    only got through five witnesses today, I hesitate to say

6    we'll get through six in a half a day tomorrow.  So I

7    don't know, your Honor.

8         THE COURT:  And the lay witnesses are

9    Millett --

10        MS. KRASINSKI:  Yes.  Mr. Marcotte, Dylan

11   Roosa and Gerald Roya.

12        THE COURT:  Okay.  All right then.

13        MS. KRASINSKI:  Two of which should be short

14   but I don't know about the rest, your Honor.

15        THE COURT:  Okay.  And -- all right.  So we'll

16   all of us think about the unanimity issue, and then I'm

17   going to meet with you at 11:00, with Mr. Irish here as

18   well by 11:00, so we can talk about jury instructions,

19   talk further about the unanimity issue, and you'll have

20   another opportunity.

21        I obviously gave you the draft instructions

22   the day we picked the jury.  We have been I think adding

23   things to it along the way as we've learned from you

24   various stipulations, witnesses' testimony under

25   immunity.  Now we know there will also be various other

1  sort of confidential informant type witnesses so we will

2  tweak those again tonight.  I'll have a fresh draft for

3  you in the morning, but I think I gave you I think our

4  latest draft of the central material part, the elements

5  in the case, so obviously look closely at that.  I'll

6  meet with you at 11:00 and have a fresh copy for you.

7          Yes.

8          MR. FALKNER:  I just want to -- I'm not sure

9  that I expressed myself very clearly.  I wasn't able to

10 pull my thoughts together before I had addressed the

11 issue.

12         THE COURT:  The issue of unanimity?

13         MR. FALKNER:  Yes.

14         THE COURT:  Go ahead.

15         MR. FALKNER:  I think the central argument

16 that the defense is making on the issue of unanimity

17 isn't that the firearms were never in the same place at

18 the same location, but that they sometimes were not and

19 that that is what becomes problematic in the sense of

20 due process and the jury being unanimous as to the

21 criminal act by the defendant.  Because if the jury were

22 to base their verdict on the time when the weapons are

23 together, they don't need to be unanimous whatsoever,

24 but we're covering a period from December 2018 through

25 November of 2017 and there are discrete times that

1   potentially could give rise to liability when the

2   weapons are not together and have been introduced into

3   evidence and it's that differentiation that I think is

4   the due process concern.

5           THE COURT:  Okay.  And give me the example of

6   the jury having trouble deciding on a gun, a firearm, as

7   opposed to requiring them to determine both firearms

8   beyond a reasonable doubt, because the pistol, the

9   handgun, that has not been identified yet so that one --

10  there's obviously evidence of a pistol in that case, but

11  so far the only evidence we've heard that Mr. Irish had

12  a pistol was when he went to the camp with Mr. Duguay

13  and we haven't had anybody identify that pistol.

14  Otherwise it's always been -- I think the testimony

15  we've heard thus far is it's always been inside the

16  case?

17          MR. FALKNER:  Well, your Honor, although Mr.

18  Duguay did not identify that pistol, and I'm not

19  necessarily agreeing that it's sufficient as a matter of

20  law, but the concern I have is if you combine the

21  testimony of the firearms being stored at the house,

22  which we know they are, that's undisputed, with the fact

23  that that's the only firearm -- that's the only pistol,

24  with the fact that he hears the racking of the pistol,

25  with the fact that he supposedly if one were to believe

1    that testimony that said, I'm armed with the pistol.

2         THE COURT:  Right, but there could be another

3    pistol.  I mean, that's possible, and as you said, not

4    every gun would be illegal.

5         MR. FALKNER:  Right.  It could be, but the

6    fact of the matter is that a jury could easily find that

7    that incident is what demonstrates his possession, his

8    dominion, custody and control as opposed to the mere

9    fact that they're stored in the bedroom that a jury

10   might -- I'm not saying a jury has to reject that, but a

11   jury -- some jurors could find I don't believe he's

12   possessing all the firearms in this box, but I do think

13   he took the pistol out and drove up to the camp with Mr.

14   Duguay and as a result of that, I'm going to find him

15   guilty based on that testimony, whereas another juror

16   might not believe that testimony whatsoever and may be

17   convicting him just based on what's in the box and

18   that's really the concern.

19        THE COURT:  All right.

20        Attorney Krasinski, anything further on that?

21   Obviously we're going to break and research and think

22   about this, and obviously the First Circuit has warned

23   us and cautioned us to think carefully about these

24   issues which I need your help on, so go ahead.

25        MS. KRASINSKI:  Just one point of

1    clarification, too.  I think Peter Duguay while he

2    didn't see what firearm was racked in the car, he

3    testified that the defendant spoke about a 1911.  So he

4    did --

5             THE COURT:  But there's no dispute in the case

6    that the defendant had a 1911, right?

7             MS. KRASINSKI:  Right.

8             THE COURT:  Right.  He signed that agreement.

9             MS. KRASINSKI:  And that this firearm,

10   Government's Exhibit 5, is a 1911 pistol.

11            But setting that aside, possession is more

12   than just physical possession.  So he could be in

13   physical possession of the pistol at one point and

14   constructive possession of the shotgun at the same time,

15   but I think the Court will hear evidence tomorrow of his

16   possession of both.

17            THE COURT:  At the same time in the same

18   place.

19            MS. KRASINSKI:  At the same time.

20            THE COURT:  Okay.  My point with respect to

21   Duguay and identifying the pistol was essentially I

22   think to say that the government's argument at this

23   point that a unanimity instruction is not required is

24   correct because there hasn't been -- there has certainly

25   been, I think you're right, Attorney Falkner, evidence

1    that could suggest to the jury that that's the case.  So

2    ultimately I think it depends on how the evidence comes

3    in tomorrow, but I think we will talk further about this

4    at 11:00 tomorrow.

5           Anything else?  Yes, go ahead.  Oh, and I do

6    want to hear the tape, but anything else before that?

7           MS. KRASINSKI:  Not on behalf of the

8    government, your Honor.

9           THE COURT:  Anything else, Attorney Falkner?

10           MR. FALKNER:  No, your Honor.

11           THE COURT:  No issues you can foresee tomorrow

12   that we can -- are there any issues that you can bring

13   to my attention now so we can move through them more

14   quickly tomorrow so we don't have to take -- the

15   sidebars I think have been fairly swift and short, but

16   just in an abundance of caution just so that there

17   aren't any major delays tomorrow afternoon?

18           And also, just a question.  Any chance Mr.

19   Whitney would need to be recalled for any reason?

20           MS. KRASINSKI:  No, your Honor.

21           THE COURT:  Anything, Attorney Falkner?

22           MR. FALKNER:  None that I can foresee.

23           THE COURT:  Okay.  Because I'm thinking I

24   would let --

25           Attorney Reis, thank you very much for jumping

1   into this for the Court and for the parties.  I want to

2   just make clear that I think you're going to be in the

3   clear tomorrow.

4             Would everybody agree with me on that?

5             MS. KRASINSKI:  Yes, your Honor.

6             THE COURT:  And we will notify you if

7   something happens and it looks as though perhaps Mr.

8   Whitney is going to be called.  Thank you, Mr. Reis.

9             MR. REIS:  Thank you, your Honor.

10            THE COURT:  Okay.  Anything else?  You were

11  going to say something, Mr. Falkner, and I interrupted

12  you.

13            MR. FALKNER:  I can't think of anything right

14  now.

15            THE COURT:  Okay.  All right.  Anything?

16            MS. KRASINSKI:  It's sort of in conjunction

17  with the call.

18            Officer LeBlanc authenticated government's

19  exhibits, the series of 29, but in particular 29D are

20  communications between Gary Roya and Nancy Haskell.

21            Now, I think that Gary needs to say, yes, this

22  is with Nancy, but once he does that we intend to move

23  to admit them and publish them.

24            I don't know if the defendant intends to

25  object based on that, but if there is an objection I

1    thought we could address that.

2         THE COURT:  That's great, and I appreciate

3    that.  I would rather address these things now.  And if

4    I can't give you a ruling right now, we'll do it at

5    11:00 a.m., but at least you brought it to my attention,

6    so I appreciate that.

7         So what would you be introducing?  What

8    purpose are you introducing them for?

9         MS. KRASINSKI:  So these are Nancy's

10   communications directing the location of the firearms,

11   the transfer from Neil to Gary, and they are done at the

12   defendant's direction.

13        THE COURT:  They're what?

14        MS. KRASINSKI:  They are done at the

15   defendant's direction.  Johnathon directed his mother to

16   make these arrangements.  And so these are non-hearsay

17   statements of either a coconspirator or someone acting

18   within the scope of her agency related to the

19   defendant's constructive possession of these firearms.

20        THE COURT:  Okay.  So the coconspirator

21   exception.  What do you say to that, Attorney Falkner?

22   Do you have any objection to them, 29D.

23        MR. FALKNER:  Well, I've got a couple of

24   issues.

25        THE COURT:  Okay.

1      MR. FALKNER:  One, the government says that

2 they are at the defendant's direction, but at least

3 according to the government's exhibit, he expressly told

4 her not to send these text messages.  So the text

5 messages are not sent according to the government's

6 evidence at his direction.

7      THE COURT:  Is there any evidence independent

8 of these that does suggest that?  The call.

9      MS. KRASINSKI:  This is the jail call.

10 "You're right.  I told you not to text.  I told you to

11 call."

12      So he directed her to make these arrangements.

13 She made have made them by texts rather than by call, by

14 phone, voice communication, but she still was acting at

15 the defendant's direction.

16      THE COURT:  Okay.  So that's the government's

17 theory of that.  And they also argue coconspirator, and

18 so they would be statements that would be made in

19 furtherance of the conspiracy.  I haven't seen them.  So

20 you're telling me that they would fall within that

21 exception?

22      MS. KRASINSKI:  Yes, your Honor.

23      THE COURT:  Okay.  And Attorney Falkner, go

24 ahead.

25      MR. FALKNER:  So I'm not sure that they truly

1    are actually for the truth of the matter asserted.

2              My concern I guess with them is I think that

3    it's not simply that Mr. Roya is able to testify that he

4    made these text messages with this person, but it's got

5    to be something -- just because he has a contact written

6    in his phone that says Nancy and Les, how does he know

7    that that's who he's communicating with on the other end

8    of the text message, and I think there's got to be some

9    authentication.

10             THE COURT:  And will he be able to do that?

11             MS. KRASINSKI:  I agree, and we're happy to do

12   that before we move its admission.

13             THE COURT:  Okay.  So you're conceding then

14   it's not introduced for the truth but ultimately you

15   want to see the foundation laid, but otherwise no

16   objection?

17             MR. FALKNER:  Well, to some extent I do think

18   there's a 403 problem with them to the extent that Nancy

19   Haskell --

20             THE COURT:  Let me ask you something.  If

21   they're not for the truth, what are they for?

22             MS. KRASINSKI:  I'm not sure.  Are you asking

23   me or --

24             THE COURT:  I'm asking both.

25             MS. KRASINSKI:  I'm not sure I concede that

1    they're not offered for the truth of the matter

2    asserted.  Do you have them in front of you, your Honor?

3            THE COURT:  Yes, I do.

4            MS. KRASINSKI:  So, for example, if you look

5    at the text messages captured with the Bates number

6    ending in 75, it's closer to the end.

7            THE COURT:  Okay.

8            MS. KRASINSKI:  It says, "J is waiting for me

9    to send it to him," and that's in reference to the

10   transfer document that Mr. Whitney testified about

11   today.

12           The following page ending in Bates No. 76,

13   "Any clue when you're sending it?  J is waiting."

14   Johnathon is waiting.

15           I think we do intend to offer that for the

16   truth of the matter asserted.  The defendant is

17   orchestrating the coverup of his possession of these

18   firearms.

19           THE COURT:  Okay.  So they are introducing it

20   for its truth.  They are arguing that the exception is

21   the coconspirator exception, I believe.

22           MR. FALKNER:  And there isn't a charged

23   conspiracy --

24           THE COURT:  There doesn't have to be a charged

25   conspiracy.  But I think their position is that she is a

1    coconspirator with your client to essentially create

2    this transfer procedure that would ultimately make it

3    look as though the guns went right from Roscoe Whitney

4    to Roya.

5              MR. FALKNER:  That's correct.  But it's

6    unclear to me whether that's a conspiracy, that's a

7    criminal conspiracy at that time.

8              THE COURT:  I don't think it has to be a --

9              MR. FALKNER:  It's not a conspiracy to possess

10   the firearms, and there's no indication that this is

11   done vis-a-vis federal agents.  So she may be working

12   with him to falsify where the firearms are going, I'm

13   not conceding that, but theoretically that's the

14   government's theory.  But there's no indication of an

15   awareness that -- in these text messages of an awareness

16   that they're covering that up from law enforcement.

17             MS. KRASINSKI:  Your Honor, under the

18   Petrozziello standard that the First Circuit follows in

19   determining whether or not statements should be admitted

20   under the coconspirator exception, the Court doesn't

21   consider the statement in a vacuum.  It considers all of

22   the other statements by the coconspirator.

23             So in determining this the Court can consider,

24   for example, any -- the fact that Mr. Whitney testified

25   that Nancy directed him to say -- if law enforcement

1    asked him, to make sure he said that everything went to

2    Gary.  The Court can consider that Neil Prive testified

3    that Nancy told him to tell anyone who came knocking

4    that he got the guns directly from Roscoe Whitney.

5              So the Court need not consider it in a vacuum.

6    In fact, the Court is directed to consider it in

7    conjunction with all of the other evidence.

8              And the burden is whether or not it's more

9    likely than not that the declarant and the defendant

10   were members of a conspiracy.

11             THE COURT:  And the mom is not testifying, so

12   who is going to provide the evidence that the defendant

13   is directing her behavior, her conduct?

14             MS. KRASINSKI:  The defendant through his

15   recorded communication.

16             THE COURT:  Okay.  So this call is the

17   evidence of that?

18             MS. KRASINSKI:  Yes, your Honor.

19             THE COURT:  And this conversation goes to

20   Exhibit 29D?

21             MS. KRASINSKI:  Yes, your Honor.

22             THE COURT:  Okay.  All right.  Let's listen to

23   this call then.

24             (Call played for the Court)

25             THE COURT:  Okay.  I think what I'll do is

1   think about this and we'll revisit it at 11:00.  Any

2   further argument before we break?  I'm happy to hear

3   from either of you.

4          MS. KRASINSKI:  No, your Honor.

5          MR. FALKNER:  I'm just concerned.  The text

6   messages allegedly, according to the government, suggest

7   a conspiracy.  The defendant says these text messages

8   suggest -- make it look like there's a conspiracy.

9   That's not additional evidence of a conspiracy.  It's a

10  comment on what the text messages look like.  It's just

11  bootstrapping on the text messages themselves.  It's his

12  comment on the evidence, the very evidence that they're

13  claiming is evidence of the conspiracy.

14         THE COURT:  Go ahead.

15         MS. KRASINSKI:  Your Honor, I don't think

16  that's the part of his statement that establishes that

17  she was doing this on his behalf.  He identifies that

18  he's talking about the text messages between Nancy and

19  Gary, and she says, "Well, who told me to send those

20  text messages," and the defendant says, "I told you not

21  to text.  I told you to call."  That's the defendant's

22  statement in that context that demonstrates that this

23  was done in conjunction with him at his direction.

24         THE COURT:  Okay.  And that's the extent of

25  the evidence of this being done at his direction?  I

1   just want to make sure I'm clear on that as I think

2   about this issue tonight.

3           MS. KRASINSKI:  Apart from witness testimony,

4   yes.

5           THE COURT:  Okay.  And the testimony thus far

6   has really been Nancy told me, Nancy told me, Nancy told

7   me.  I haven't heard, correct me if I'm wrong, anyone

8   say anything about Mr. Irish directing Nancy to tell

9   people to do this.

10          Is that accurate so far at least?

11          MS. KRASINSKI:  I think so, your Honor, yes.

12          THE COURT:  Okay.  All right.  Well, then I'll

13   see you at 11:00 a.m.  We'll make sure that you get the

14   latest draft of the jury instructions and we'll go

15   through those and we'll discuss the unanimity issue.

16   I'll give you a ruling on this question of Exhibit I

17   think 29D.

18          Are there any other packets in Exhibit 29 that

19   are going to be objected to?  I think one of them was a

20   set of text messages I think just from Mr. Irish.  Any

21   objection to any of the exhibits?

22          Assuming proper foundation is laid, do you

23   have any objections to those, Mr. Falkner?

24          MR. FALKNER:  May I have a moment, your Honor?

25          THE COURT:  Sure.

1           MR. FALKNER:  In terms of the text messages

2    between Johnathon and Gary Roya subject to --

3           THE COURT:  Foundation and authentication.

4           MR. FALKNER:  -- foundation and

5    authentication.

6           THE COURT:  Okay.  All right.  And who is

7    going to introduce the call, is that your last witness?

8           MS. KRASINSKI:  Yes, your Honor.

9           THE COURT:  Okay.  All right.  Okay.  Well

10   then, I'll see you at 11:00 a.m. tomorrow.  Thank you.

11           (Jury Trial adjourned at 4:30 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3        I, Susan M. Bateman, do hereby certify that the

 4   foregoing transcript is a true and accurate

 5   transcription of the within proceedings, to the best of

 6   my knowledge, skill, ability and belief.

 7

 8   Submitted: 3-24-20      /s/   Susan M. Bateman _____
                             SUSAN M. BATEMAN, RPR, CRR
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```