*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO JUNE 25, 2020

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * *
                                *
UNITED STATES OF AMERICA        *
                                *   1:19-cr-251-LM-1
            v.                  *   February 10, 2020
                                *   8:45 a.m.
JOHNATHON IRISH                 *
                                *
* * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF JURY TRIAL
DAY TWO - MORNING SESSION
BEFORE THE HONORABLE LANDYA B. McCAFFERTY

Appearances:


For the Government:        Anna Z. Krasinski, AUSA
                           Kasey A. Weiland, AUSA
                           United States Attorney's Office




For the Defendant:         Benjamin L. Falkner, Esq.
                           Krasnoo, Klehm & Falkner, LLP




Court Reporter:            Liza W. Dubois, RMR, CRR
                           Official Court Reporter
                           United States District Court
                           55 Pleasant Street
                           Concord, New Hampshire 03301
                           (603)225-1442

```
 1                          I N D E X

 2
                                                       PAGE
 3

 4   CONFERENCE                                           3

 5   CHAMBERS CONFERENCE WITH JUROR                      19

 6   PRELIMINARY INSTRUCTIONS                            26

 7
     OPENING STATEMENTS:
 8
         By Ms. Weiland                                  39
 9
         By Mr. Falkner                                  49
10

11   WITNESS:            Direct    Cross   Redirect   Recross

12
     PHILIP CHRISTIANA     59        81       89        --
13
     KEVIN LEBLANC         91       132      155        --
14

15
     EXHIBITS:                     FOR ID           IN EVD
16
     Government's 1                                    71
17
     Government's 3                                    75
18
     Government's 5                                    58
19
     Government's 6-6A                                 58
20
     Government's 7-7A                                 58
21
     Government's 8                                    58
22
     Government's 9-E                                  58
23
     Government's 10                                   58
24
     Government's 11                                   58
25
```

| EXHIBITS: | FOR ID | IN EVD |
|---|---|---|
| Government's 12 | | 58 |
| Government's 13 | | 58 |
| Government's 14 | | 58 |
| Government's 15 | | 58 |
| Government's 16 | | 58 |
| Government's 17 | | 58 |
| Government's 18 | | 58 |
| Government's 19 | | 58 |
| Government's 20 | | 58 |
| Government's 21 | | 58 |
| Government's 22 | | 58 |
| Government's 23 | | 58 |
| Government's 24 | | 58 |
| Government's 25 | | 58 |
| Government's 26 | | 58 |
| Government's 27 | | 58 |
| Government's 27A-F | | 58 |
| Government's 28A-Q | | 58 |
| Government's 33 | | 58 |
| Government's 35A-K | | 58 |
| Government's 36 | | 58 |
| Government's 37 | | 132 |

```
1                    P R O C E E D I N G S
2              THE CLERK:  The Court has before it for
3   consideration today jury trial -- oh, the defendant's
4   not here.
5              I apologize, your Honor.  Let me get Mr. Irish
6   here.  Let me just finish announcing the case.
7              Jury trial in case number 19-cr-251-LM, United
8   States vs. Johnathon Irish.
9              THE COURT:  Can you hand them the latest and
10  greatest jury instructions?
11              (Jury instructions handed to counsel.)
12              THE COURT:  Since we only have ten minutes
13  before the start of trial, I just want to talk to
14  counsel.  There is a juror, juror number two, who
15  informed Attorney Esposito this morning that her
16  father-in-law, I believe, had a stroke this weekend.
17              And she's here today, I think she's prepared
18  to sit today, but if she were to get a call of some sort
19  that his situation is rapidly deteriorating, she just
20  wanted us to be aware of that.
21              (Defendant entered the courtroom.)
22              THE COURT:  So let me make sure Mr. Irish
23  knows.
24              We were just discussing one issue as you were
25  coming up, sir, and that is that a juror in the case,
```

1  juror number two, her father-in-law had a stroke this

2  weekend.  And she's here today and prepared, I believe,

3  to hear evidence, but I wanted to check in with counsel

4  and see if there's anything you want me to do before the

5  trial starts with respect to that.

6          MR. FALKNER:  Your Honor, given that we do

7  have two alternates and given that the -- I can only

8  imagine the overwhelming concern the juror would have.

9  I would suggest either that she be excused or at least

10  that we have some kind of voir dire with her to ensure

11  that she doesn't --

12          THE COURT:  Okay.  Let me hear from the

13  government.

14          MS. KRASINSKI:  I agree.  I imagine she's

15  going to be very preoccupied.  I would ask that the

16  Court excuse her.

17          THE COURT:  Okay.  So both are asking for her

18  excusal.  You're not asking for any sort of voir dire to

19  confirm --

20          MS. KRASINSKI:  No, your Honor.

21          THE COURT:  -- anything.

22          Okay.  Well, let's do this.  Rather than bring

23  her here, which -- why don't we do it in the smaller

24  room and we'll simply bring her in and explain to her

25  that all parties are in agreement that she should be

1  excused and not have to -- and go take care of her

2  father-in-law.  That's everybody's preference?

3          MR. FALKNER:  I was going to just make clear

4  on the record that if it wasn't clear that my preference

5  would be to just excuse her and only as an alternative

6  that she be voir dired.  So that's fine.

7          THE COURT:  Okay.  All right.  Let's do that

8  before the trial starts, Attorney Esposito.

9          So let's go through a few issues before we

10 begin.  And I know you have something you wanted to

11 bring to my attention.

12         Let me see.  I know the unanimity issue is an

13 issue that we need to deal with and I can tell you both

14 that I have studied the issue somewhat and I want to

15 make sure you both have read -- and particularly the

16 government has read -- the two cases that certainly lay

17 out some concerns with respect to unanimity in a case

18 where the guns are not clearly in one location.

19         I think the language is one place at one time.

20 It's the case of *U.S. v. Widi*, W-i-d-i, 684 F.3d.  It's

21 a First Circuit case.  And I'll just read from it, just

22 to give you the highlights before we begin.

23         In dicta, the First Circuit said, quote:  But

24 imagine that while the indictment easily passed the

25 Verrecchia test, which is the time and place test, trial

1    evidence showed that the weapons were so located that a

2    juror might reasonably believe quite different things

3    about the defendant's knowing possession of different

4    guns.

5             So that was *Widi.*

6             And then *Leahy* is another case where the

7    First Circuit cautions that this in one place at one

8    time rule should not be applied mechanically without

9    regard to the facts developed at trial.

10            Those two cases certainly raise an issue.  It

11   obviously depends on how the evidence comes in and we'll

12   have to deal with that.  I just wanted to make sure the

13   government was aware of -- of those cautions.

14            And the Court in *Leahy* did a plain error

15   review, but indicated if the objection had been

16   preserved that:  "We would be forced to delve into the

17   geography of the relevant unit of prosecution and

18   determine whether the pistol taken from a kitchen drawer

19   one evening and the rifle stowed in the pantry, but

20   perhaps handled at some indeterminate point, were

21   sufficiently related in time and place."

22            Okay.  You may be familiar with those two

23   cases.  I just wanted to make sure that we were all

24   grappling with this issue as the evidence comes in.

25            All right.  And clearly you've removed the

1    complex issue of how we deal with the one gun that had

2    some problematic connections to interstate commerce.

3    That gun has been removed.

4            So -- so unanimity we'll place to the side for

5    a moment unless you want to talk about that now.

6            With respect to immunity, what I -- I've

7    included, I've added to our draft jury instructions,

8    I've add immunity, the pattern instruction, making it

9    slightly more readable, but basically it's the pattern.

10           When the witness testifies, I don't -- I

11   haven't contemplated giving an instruction at that time,

12   but if the parties would like me to do that, you need to

13   let me know that.

14           Is that something you want at the time or

15   just -- I've got it in the jury instructions to read to

16   the jury as they assess witness testimony.

17           MS. KRASINSKI:  I think it's appropriate when

18   the Court instructs the jury along with all of the

19   instructions, your Honor.

20           THE COURT:  Same?

21           MR. FALKNER:  I think that's okay, your Honor.

22           THE COURT:  Okay.

23           MR. FALKNER:  And just so your Honor's aware,

24   and I -- and I did discuss it with the government --

25   there's a model instruction that's a little more

1   detailed than what your Honor has submitted in these

2   proposed instructions and it includes three different

3   categories and I expect all of these categories to come

4   in this case, which is provided evidence under

5   agreements with the government, received money from the

6   government in exchange for providing information, and

7   testified under a grant of immunity.

8           So we have made some handwritten markings to

9   it and I think both sides agreed to it.  And if --

10          THE COURT:  Okay.  Could you -- could you just

11  give that to my law clerk?  And you both agreed to that,

12  so if we make those changes --

13          MS. KRASINSKI:  Yes.

14          THE COURT:  -- you're agreeable?  Okay.  Thank

15  you.

16          All right.  What was the issue you wanted to

17  bring to my attention?

18          MS. KRASINSKI:  There are a few issues, your

19  Honor.

20          The first is the government this morning

21  included a new exhibit to its exhibit list.

22          On this past Saturday evening, on the 8th, in

23  a recorded jail communication, the defendant made

24  admissions relating to this case.

25          In about -- it was about an hour-long call.

1  We received the call or the communication yesterday.  We

2  disclosed it to counsel, identifying the 30-second

3  portion that includes the defendant's admissions.

4          If your Honor would like to hear it, we can

5  certainly play that clip for your Honor now, and

6  disclosed it to counsel and told him that we intended to

7  include it as an exhibit and he objects to its admission

8  and so we wanted to raise that issue with the Court.

9          THE COURT:  Okay.

10          Go ahead, Attorney Falkner.  What's your

11  objection?

12          MR. FALKNER:  Your Honor, my objection is

13  under Rule 403.  Basically, it's a 30-second clip and

14  I'll do my best to summarize it, although you'll be able

15  to listen to it.

16          The defendant is meeting with his mother and

17  another individual.  He says -- he complains to his

18  mother that she had sent text messages to --

19          THE COURT:  Can I just get -- I thought this

20  was a jail call.  It's not a call?

21          MS. KRASINSKI:  So the -- it's a jail visit,

22  but the visit is by phone and it is recorded like any

23  jail call.

24          THE COURT:  Okay.  All right.  Go ahead.

25          MR. FALKNER:  And so --

1          THE COURT:  It's his mom and one other

2    individual with her?

3          MR. FALKNER:  Correct.

4          THE COURT:  Talking on the phone with

5    Mr. Irish.

6          MR. FALKNER:  Correct.

7          THE COURT:  Okay.

8          MR. FALKNER:  And he complains to his mother

9    that she sent text messages to Mr. Roya.  Those text

10   messages are exhibits that the government intends to

11   introduce at trial.  He comments that her messages to

12   Mr. Roya make it appear as if he is in a conspiracy with

13   his mother to hide the firearms.

14          In response, she says something along the

15   lines that, well, it was your idea to send the text

16   messages.  And he responds, no, I told you not to send

17   messages; I told you to make phone calls.

18          So the issue is -- certainly there's some

19   probative evidence in the idea that he directed her to

20   make phone calls.  That is of somewhat low probative

21   value, I would suggest, because of the fact that it's

22   clear that there's a number of phone calls and text

23   messages that they're all involved in.

24          So it's certainly clear that -- from the

25   evidence that Mr. Irish and his mother are in

1   communication at the time.  And the government, I

2   believe, will be entering a lot of consciousness of

3   guilt evidence.

4           As to the comment that it appears that they're

5   in a conspiracy together, that's essentially a

6   commenting on the evidence.  He's not admitting that

7   they are.  He's commenting on that evidence in a way

8   that an attorney might do in a closing argument,

9   although I think it may not even be proper argument.

10          So basically the government is getting

11  argument, closing argument, out of the defendant in the

12  form of an exhibit and I'd suggest that it's unfairly

13  prejudicial because he really isn't saying there was a

14  conspiracy; he's saying that these -- this evidence that

15  is in evidence -- or is very likely to be in evidence

16  creates a certain appearance and that's really the

17  jury's decision as to what appearance that creates.

18          THE COURT:  Okay.  Can you play the clip?

19          MS. KRASINSKI:  Oh, yes.

20          THE COURT:  I'm sorry, go ahead.  I didn't

21  mean to cut you off.

22          MS. KRASINSKI:  No, that's --

23          THE COURT:  Okay.

24             (Audio recording played.)

25          MS. KRASINSKI:  Your Honor, I don't know if

1  you've had a chance to review Government's Exhibit 29D.

2  If not, I can certainly provide you with a copy.

3         There's going to be some evidence that these

4  guns were in his physical custody, physical possession,

5  but there's also going to be evidence that essentially

6  they were playing hot potato with these guns.  He gave

7  them to Neil, Neil gave them to this guy Gary.  And to

8  prove constructive possession, we have to show that he

9  exercised the authority, dominion, or control over the

10  gun.

11         Government's Exhibit 29D, there's going to be

12  testimony that the defendant's mother texted the person

13  who ultimately had possession of the guns:  Please text

14  him to set up times to receive those items, I'll send a

15  picture of receipt.

16         There are additional questions and text

17  messages from her that include sending the -- this

18  gentleman Gary and also this other gentleman, Roscoe

19  Whitney, an essentially falsified transfer of weapon

20  document, and there are text messages from the

21  defendant's mother that say J is waiting.  J wants these

22  documents.  And that's all in Government's Exhibit 29D.

23         THE COURT:  Who is J?

24         MS. KRASINSKI:  Johnathon.

25         THE COURT:  Oh, okay.

1          MS. KRASINSKI:  But this is the defendant

2     himself admitting that he's the one who directed his

3     mother to engage in all of this.  This is direct

4     evidence that he was in constructive possession of these

5     firearms, that he was exercising the power and intention

6     to control these firearms, and so its probative value is

7     high here.

8          It's the only statement of the defendant

9     that -- that shows that he is the one who was directing

10    his mother to do all of these things on his behalf, to

11    move the guns from one place to another, to -- to

12    essentially cover up the true path of the guns.

13         So its probative value here is very, very high

14    and they're the defendant's words.  They don't create an

15    unfair prejudice.  They're certainly prejudicial, but

16    not so unfairly prejudicial that they outweigh the

17    probative value here.

18         THE COURT:  All right.  These are admissible

19    statements of the defendant and you can argue what

20    weight they should be given when you make your arguments

21    to the jury, but I do not find that the prejudice --

22    that the probative value is substantially outweighed by

23    the prejudice.  They're highly -- highly probative and

24    ultimately I think that you can argue the issue and how

25    the jury should interpret those statements, but those

1     are -- those are relevant.

2              So what -- any other issues?

3              MS. KRASINSKI:  One other issue.  In the

4     context of this call -- it's not something we're going

5     to play to the jury, but I do want to raise it here.

6              The defendant seems to believe that one of the

7     witnesses, ATF Special Agent Forte, is on the Laurie

8     list.  I have discussed this with counsel before.  He

9     has never been a state employee and he has never

10    testified in state court.  He's not on the Laurie list.

11    We checked.

12             In addition, I have gone and done a Giglio

13    check with ATF and was told that there is nothing

14    responsive.

15             And so I raised that issue with counsel to

16    say, look, we know he's not on the Laurie list, we know

17    he doesn't have any adverse credibility determinations,

18    do you intend to impeach him with the defendant's belief

19    that he is on the Laurie list and was told to raise it

20    with the Court.

21             So I would ask that he not be permitted to

22    impeach Special Agent Forte about whether or not there

23    have been adverse credibility findings.

24             MR. FALKNER:  Your Honor, if the government is

25    representing on the record that there have been no such

1    findings, I don't know that there's anything more that

2    can be done.

3              THE COURT:  All right.  Then you will not be

4    inquiring or impeaching -- you don't have a good faith

5    basis to do so.

6              MR. FALKNER:  Correct.  I only --

7              THE COURT:  Okay.

8              MR. FALKNER:  I only have -- I only have that

9    the defendant has a belief that that may be so.  And in

10   the face of the government putting on the record that

11   that's not so, I think that that satisfies me.

12             THE COURT:  All right.  So when the jury comes

13   back out, I'll give them just some brief preliminary

14   instructions.

15             And who is going to be doing the opening for

16   the government?

17             MS. WEILAND:  Your Honor, I'll be opening on

18   behalf of the government.

19             THE COURT:  Excellent.  All right.

20             MR. FALKNER:  Your Honor, I don't believe

21   there's been an order of sequestration of the witnesses,

22   but I'd just ask that that be done at this time.

23             THE COURT:  All right.  And you don't have any

24   objection to sequestration?

25             MS. KRASINSKI:  No, your Honor.  The

1    government just asks that its case agent be authorized

2    to sit at counsel table.

3             THE COURT:  All right.  And you don't have any

4    objection to the case agent?

5             MR. FALKNER:  My only concern is that he did

6    interview some of the witnesses and may be theoretically

7    testifying to prior inconsistent statements if those

8    witnesses were to deny the statements that they made to

9    that agent, but --

10            THE COURT:  But other than that, you don't

11   have any objection to him sitting?

12            MR. FALKNER:  Only -- only -- my only concern,

13   like I said, is that when those particular witnesses are

14   testifying, I'm not sure that -- that he should be in

15   the courtroom, but ...

16            THE COURT:  Okay.  Well, when those witnesses

17   testify, come to sidebar and we'll deal with that issue.

18            Do you have any concerns about that?

19            MS. KRASINSKI:  No, your Honor.  I mean, Rule

20   615 generally authorizes the case agent to be --

21            THE COURT:  Right.

22            MS. KRASINSKI:  -- in the courtroom.

23            THE COURT:  Okay.  Well, if there are any

24   significant evidentiary issues or concerns, you could

25   bring them up at sidebar.  I can rule on those.

```
 1              MR. FALKNER:  I --
 2              THE COURT:  I would think that would often be
 3    the case with a case agent at the table, that if there
 4    is impeachment, obviously part of that would be you
 5    questioning him about what he's heard and he's been
 6    sitting here the whole time and that kind of thing.  But
 7    I'm not sure that I have a basis to sequester --
 8              MR. FALKNER:  I understand.
 9              THE COURT:  -- when the rule permits it.
10    Okay.
11              MR. FALKNER:  I'm asking for him to be
12    sequestered on that basis.  I don't think -- you know,
13    as those witnesses come up, I have no way to know ahead
14    of time who is going to need to be --
15              THE COURT:  Right.
16              MR. FALKNER:  -- impeached and who's not.  I
17    mean, every one of them could testify consistently with
18    their reports.
19              So if your Honor is making a decision now, if
20    I can reserve my rights on it unless your Honor wishes
21    me to come to the sidebar at the beginning of each such
22    witness.
23              THE COURT:  Let's do that.  Why don't you come
24    to sidebar.  All right?
25              MR. FALKNER:  (Nods head.)
```

 1                THE COURT:  All right.  Okay.

 2                So we are going to talk with our juror.  So

 3     I'm going to go in the back room and then if counsel

 4     could join me.

 5                And, Mr. Irish, we're going to just

 6     essentially let her leave the trial.  So we will --

 7     obviously we have two alternates.  And I saw you shaking

 8     your head in agreement with that approach, so I know you

 9     agree as well.

10                So we're just going to go handle that in a way

11     that's not quite as intimidating as being in front of

12     everybody in the courtroom, but we will have a record.

13     All right?

14                THE CLERK:  All rise.

15                          (In chambers.)

16                THE COURT:  Hello.

17                THE JUROR:  Hello.

18                THE COURT:  We didn't want to do this with you

19     out there because we heard, all of us heard, what

20     happened over the weekend.  And we wanted to just give

21     you the option.

22                Everybody was unanimous to let you go today.

23                THE JUROR:  Okay.

24                THE COURT:  So you can be with your

25     father-in-law.  Is that your much preferred approach?

1          THE JUROR:  You know, it's just the feeling

2     the not being available --

3          THE COURT:  Yeah.

4          THE JUROR:  -- is what's hard.  Like I said, I

5     have the logistics worked out, I just don't know what's

6     coming.  So --

7          THE COURT:  We think you might be

8     understandably totally distracted.

9          THE JUROR:  Possibly.

10          THE COURT:  So I think everybody's inclination

11     was just to bring you in, tell you how sorry we are,

12     that we hope your father-in-law comes through this, we

13     hope it ends up being something minor and that he is

14     okay, but we wanted to thank you for your service and

15     give you a pass.

16          THE JUROR:  All right.  Thank you very, very,

17     very much.

18          THE COURT:  You are very, very welcome.

19          THE JUROR:  Thank you.

20          THE COURT:  Thank you.

21          THE JUROR:  All right.  Thank you.

22          THE COURT:  So you -- if you don't mind,

23     just -- you're going to get your belongings and -- does

24     everybody else know?

25          THE JUROR:  I didn't say anything because I --

1    I wasn't sure.  I mean, I don't mind saying that.

2              THE COURT:  I don't think it -- I think you

3    can explain to them that you -- you know, you had a

4    family issue and that the Court has excused you because

5    of it.

6              THE JUROR:  Okay.  Thank you.  Thank you all

7    very much.  I appreciate it.

8              THE COURT:  Good luck.

9              THE JUROR:  Thank you.

10                   (Juror excused.)

11             THE COURT:  All right.  Anything else while

12   we're all standing here?  Anything?

13             MR. FALKNER:  No, your Honor.

14             MS. KRASINSKI:  No.

15             THE COURT:  Okay.  You're still okay with all

16   that ammunition sitting out there, the uncharged

17   ammunition?  I noticed that the government --

18             MR. FALKNER:  I don't know that it needs to be

19   on display throughout the entire trial.

20             THE COURT:  Well, it looks like every piece of

21   it has been agreed to by you.

22             MR. FALKNER:  I agreed to it -- I agreed to it

23   as an exhibit.  I don't know if the -- it needs to be

24   out of the box, all of the ammunition.  I realize that

25   the guns are there, but I don't know if all of the bags

1  need -- if it's going to be used during the opening

2  statement, then that's fine, but I don't know that it

3  needs to be -- the jury doesn't need to be constantly

4  looking at it throughout the whole trial.

5          MS. KRASINSKI:  We don't have a problem

6  putting it back in the box.  We did try to sort of move

7  it to the table that is angled away from where the jury

8  is --

9          THE COURT:  Okay.

10          MS. KRASINSKI:  -- and have the firearms be

11  sort of central, but we can certainly put the

12  ammunition --

13          THE COURT:  And you're not objecting to the

14  ammunition.  I'm just raising it as the trial judge.

15  And this is --

16          MR. FALKNER:  Right.

17          THE COURT:  -- obviously material that is not

18  charged.  So obviously they're seeing the ammunition.

19  If it's kept in the box, it's part of your story, you're

20  going to have the officer maybe identify certain pieces

21  and you don't object to that.  That seems the preferred

22  approach.

23          MS. KRASINSKI:  Okay.

24          THE COURT:  All right.

25          MS. KRASINSKI:  It may take us two or

1    three minutes to put it back in the box --

2              THE COURT:  Not a problem.

3              MS. KRASINSKI:  -- before the jury comes out.

4              THE COURT:  I'll be sitting there anyway.  We

5    all are there when the jury comes out.  So I'll just go

6    ahead and take the bench and give you time.

7              And you're ready to go?

8              MS. WEILAND:  Yes.

9              THE COURT:  And you're ready to go?

10             MR. FALKNER:  Yes.

11             THE COURT:  Excellent.

12             MS. KRASINSKI:  I think after openings we were

13   going to ask the Court to read the stipulation.  Or

14   would you prefer that I read the stipulation?

15             THE COURT:  I -- whatever you guys want.

16             MR. FALKNER:  I don't have a preference.

17             MS. KRASINSKI:  Then I intend to ask the Court

18   to read it.

19             THE COURT:  I will then -- I will read it and

20   tell them what a stipulation is.

21             MS. KRASINSKI:  And then move to formally

22   admit and publish the agreed-upon exhibits.

23             THE COURT:  Okay.  All right.  I think I have

24   the third amended list, so I think I at least have a

25   sense of what's -- are there any major disputes or are

1  you just waiting for foundation to be laid for certain

2  exhibits?

3          MR. FALKNER:  Yes, there may -- yes.  I think

4  it depends on the foundation --

5          THE COURT:  Okay.

6          MR. FALKNER:  -- that gets laid.

7          And then I thought there was another issue,

8  but --

9          THE COURT:  Okay.

10          MR. FALKNER:  -- it's escaping me right now.

11          THE COURT:  All right.  All right.

12          Now, obviously, if it's not clear to me what

13  the basis of an objection is and I'm overruling it and

14  you want to say further, you need to come up to sidebar.

15  And I don't think I have ever once told lawyers they

16  can't come to sidebar.  So you can come to sidebar and

17  alert me to something at any time.  I'm not going to say

18  no to that.  All right?

19          MR. FALKNER:  I was going to ask whenever the

20  government tries to introduce the -- the audio recording

21  that was the subject of today's hearing, I'd ask to be

22  heard at sidebar before that is introduced.

23          THE COURT:  All right.  And there were parts

24  of that that I couldn't -- I don't know that I heard

25  particularly well.

1          MS. KRASINSKI:  I think the defendant's voice

2    is clear on it.

3          THE COURT:  It is.  His voice was clear.

4          MS. KRASINSKI:  We have a rough transcript

5    that I made last night -- I can email it to you today --

6    just for myself.  If the Court would prefer for us to

7    have a transcript, an agreed-upon transcript to pass

8    out --

9          THE COURT:  What do you prefer?  I mean,

10   obviously you're objecting to the admission, but I've

11   ruled that it comes in.

12         MR. FALKNER:  I think it depends on the -- how

13   accurate the transcript is and --

14         THE COURT:  Okay.  You haven't shared that

15   with him yet?

16         MS. KRASINSKI:  No.  I mean, we just got it

17   yesterday.

18         THE COURT:  All right.  When is it going to

19   come in?

20         MS. KRASINSKI:  We were going to move to admit

21   it today, but play it through a witness, publish it

22   through a later witness, possibly --

23         THE COURT:  This afternoon?

24         MS. KRASINSKI:  -- this afternoon or tomorrow,

25   depending on --

1          THE COURT:  So it's possible you could get him

2    the transcript and let him review that.

3          Okay.  All right.  I'll let you guys go out a

4    little bit ahead of me.

5          (Conclusion of chambers conference.)

6          MS. WEILAND:  Your Honor, may I adjust the

7    podium before the jury comes in?

8          THE COURT:  Of course.

9          MS. WEILAND:  Thank you.

10          THE CLERK:  All rise for the jury.

11          Please be seated and the jury remain standing,

12    please.

13          THE COURT:  Go ahead and please swear in the

14    jury.

15          THE CLERK:  Would you please raise your right

16    hand.

17            (Jury sworn by the deputy clerk.)

18          THE CLERK:  Thank you.  Please be seated.

19          THE COURT:  All right.  Good morning,

20    everyone.

21          Now, what I'm going to do now is give you some

22    brief preliminary instructions, probably not brief

23    enough, but then we'll hear opening arguments and then

24    the evidence.

25          All right.  Before we begin the trial, I'd

1    like to tell you about what will be happening.  I want

2    to describe how the trial will be conducted and explain

3    what we will be doing.  At the end of the trial, I will

4    give you more detailed guidance in writing on how you're

5    to go about reaching your decision, but now I simply

6    want to explain how the trial will proceed.

7             The criminal case has been brought by the

8    United States Government.  I will sometimes refer to

9    the government as the prosecution.  The government is

10   represented at this trial by Assistant United States

11   Attorneys Anna Krasinski and Kasey Weiland.

12            The defendant, Johnathon Irish, is represented

13   by his lawyer, Benjamin Falkner.

14            The charge against Mr. Irish is contained in

15   the indictment.  The indictment is simply the

16   description of the charge made by the government against

17   Mr. Irish.  It is not evidence of anything.  Mr. Irish

18   pled not guilty to the charge against him and denies

19   committing the crime.

20            Mr. Irish is presumed innocent and may not be

21   found guilty by you unless all 12 of you unanimously

22   find that the government has proven Mr. Irish's guilt

23   beyond a reasonable doubt.

24            The indictment charges that Mr. Irish

25   committed the crime of possession of a firearm by

1    convicted felon.  The first step in the trial will be

2    the opening statements.  The government in its opening

3    statement will tell you about the evidence which it

4    intends to put before you so that you will have an idea

5    of what the government's case is going to be.

6            Just as the indictment is not evidence,

7    neither is the opening statement.  Its purpose is only

8    to help you understand what the evidence will be and

9    what the government will try to prove.

10           After the government's opening statement,

11   Mr. Irish's attorney will make an opening statement.  At

12   that point in the trial, no evidence will have been

13   offered by either side.

14           Next the government will offer evidence that

15   it says will support the charge against Mr. Irish.  The

16   government's evidence in this case will consist of the

17   testimony of witnesses as well as documents and

18   exhibits.

19           Now, some of you probably have heard the term

20   circumstantial evidence and direct evidence.  Do not be

21   concerned with these terms.  You are to consider all the

22   evidence given in this trial, both circumstantial and

23   direct.

24           After the government's evidence, Mr. Irish's

25   lawyer may present evidence on Mr. Irish's behalf, but

1    is not required to do so.  I remind you, Mr. Irish is

2    presumed innocent and the government must prove his

3    guilt beyond a reasonable doubt.  Mr. Irish does not

4    have to prove his innocence.

5              After you've heard all the evidence on both

6    sides, the government and the defendant will be given

7    time for their final arguments.  I just told you that

8    opening statements by the lawyers are not evidence.  The

9    same applies to the closing arguments.  They are not

10   evidence either.  In their closing arguments, the

11   lawyers will be attempting to summarize their cases and

12   help you understand the evidence.

13             The final part of the trial occurs when I

14   instruct you about the rule of law which you are to use

15   in reaching your verdict.  I will give each of you a

16   written copy of my instructions and I'll read them to

17   you out loud.  After hearing my instructions, you'll

18   leave the courtroom together to make your decision.

19   Your deliberations will be secret.  You'll never have to

20   explain your verdict to anyone.

21             Now that I've described the trial itself, let

22   me explain the jobs that you and I are to perform during

23   the trial.

24             I will decide which rules of law apply to this

25   case.  I will decide this in response to questions

1    raised by the attorneys as we go along and also in the

2    final instructions given to you after the evidence and

3    arguments are completed.

4            You will decide whether the government has

5    proved beyond a reasonable doubt that Mr. Irish

6    committed the charged crime.  To help you follow the

7    evidence, I will now give you a brief summary of the

8    elements of the crime charged, each of which the

9    government must prove beyond a reasonable doubt to make

10   its case.

11           For you to find Mr. Irish guilty of possession

12   of a firearm by a convicted felon, you must find beyond

13   a reasonable doubt each of the following elements:

14           First that the defendant has been convicted in

15   any court of at least one felony, that is, a crime

16   punishable by imprisonment for a term exceeding one

17   year; second, that the defendant knew he'd been

18   convicted of a felony, a crime punishable by

19   imprisonment for a term exceeding one year; third, that

20   after being convicted of a felony, the defendant

21   knowingly possessed the firearms described in the

22   indictment; and, fourth, that the firearms described in

23   the indictment were connected with interstate or foreign

24   commerce.

25           Now, you should understand that what I've just

1   given you is only a preliminary outline.  At the end of

2   the trial, I'll give you a final and controlling set of

3   instructions on these matters.

4           During the course of the trial, you should not

5   talk with any witness or with Mr. Irish or with any of

6   the lawyers in the case.  Please don't talk with them

7   about any subject at all.

8           In addition, during the course of the trial,

9   you should not talk about the trial with anyone else;

10  not your family, not your friends, not the people you

11  work with, not even your fellow jurors.  You should not

12  discuss this case among yourselves until I have

13  instructed you on the law and you've gone to the jury

14  room to make your decision at the end of the trial.

15          It is important that you wait until all the

16  evidence is received and you have heard my instructions

17  on the law before you deliberate among yourselves.

18          Further, you should not communicate with

19  anyone else or the outside world about this case during

20  any part of the trial.  This prohibition applies to both

21  receiving information and to giving information.  Do not

22  email about it, text, tweet, or share information about

23  it on any blog or website, including Facebook, Google,

24  MySpace, LinkedIn, or YouTube.  You may not use any

25  similar technology or social medium, even if I've not

1   specifically mentioned it.

2          To disseminate any information about the trial

3   during the trial, whether to your family or coworker or

4   to the world at large, would violate both my

5   instructions and the Court's rules and could lead to a

6   mistrial in this case.

7          Let me add that during the course of the trial

8   you will receive all the evidence you properly may

9   consider to decide the case.  Because of this, you

10  should not attempt to gather any information on your own

11  which you might think would be helpful.

12         Do not engage in any outside reading on this

13  case, the matters in the case, or the individuals

14  involved in the case -- not on the Internet, not in the

15  library, not in your own house.  Do not attempt to visit

16  any places mentioned in the case and do not in any other

17  way try to learn about the case outside the courtroom.

18         Now that the trial has begun, you must not

19  read about it in the newspapers or watch or listen to

20  television or radio reports or read Internet news

21  reports, blogs, chat rooms, or anything else about what

22  is happening here.

23         Many people watch television shows or movies

24  about courts or lawyers or the criminal justice system.

25  Sometimes people are affected by that when they serve as

1    jurors.  Television shows and movies can create false

2    expectations about real life; for example, how the

3    trial's going to proceed or what the evidence might look

4    like.  You must decide this case on the evidence before

5    you and the law as I give it to you.  Do not decide this

6    case even in part based on something you saw on

7    television or in a movie.  That is improper and unfair.

8            The reason for these rules, as I'm certain you

9    will understand, is that your decision in this case must

10   be made solely on the evidence presented at this trial.

11   I expect you will inform me if you become aware of any

12   violation of my instructions.

13           At times during the trial a lawyer may make an

14   objection to a question asked by another lawyer or to an

15   answer by a witness.  This simply means that the

16   lawyer's requesting that I make a decision on a

17   particular rule of law.  Do not draw any conclusions

18   from such objections or from my rulings on the

19   objection.  These only relate to the legal questions

20   that I must determine and should not influence your

21   thinking.

22           If I sustain an objection to a question, the

23   witness may not answer it.  Do not attempt to guess what

24   answer might have been given had I allowed the question

25   to be answered.  Similarly, if I tell you not to

1    consider a particular statement, you should put that

2    statement out of your mind and you may not refer to that

3    statement in your later deliberations.

4            Further, a particular item of evidence is

5    sometimes entered for a limited purpose.  That is, it

6    can be used for you for -- by you for a particular

7    purpose and not for any other purpose.  I will tell you

8    when that occurs and instruct you on the purposes for

9    which the item can and cannot be used.

10           During the course of the trial, I may ask a

11   question of a witness.  If I do, that does not indicate

12   I have any opinion about the facts in the case.  You

13   should not take anything that I may say or do during the

14   trial as indicating what I think about the evidence or

15   what your verdict should be.

16           Let me clarify something ahead of time that

17   may occur in the case.  During the course of the trial,

18   I may have to interrupt the proceedings to confer with

19   the attorneys about the rule of law which should apply

20   here.  Sometimes we talk here at the bench, but some of

21   these conferences may take some time.

22           So as a convenience to you and to make sure

23   you're as comfortable as possible, I will excuse you

24   from the courtroom.  I'll try to avoid such

25   interruptions as much as possible, but please be

1   patient.  Even if the trial seems to be moving slowly,

2   these conferences can ultimately save time.

3         If at any time during the trial you have a

4   problem you'd like to bring to my attention, please

5   inform my courtroom deputy.  This goes for all issues.

6   If you feel ill or need to take a restroom break or --

7   just let the courtroom deputy know.  I want you to be

8   comfortable, so please do not hesitate to tell us about

9   any problem.

10        Finally, in this trial you have my permission

11  to take notes during the evidence.  The fact that you've

12  been given permission to take notes does not in any way

13  require you to do so.  However, if you decide to take

14  notes, please observe the following limitations with

15  great care:  First, do not allow your note-taking to

16  distract you from listening carefully to the testimony

17  that is being presented.  It's important that you

18  observe and listen to the witnesses.  If you would

19  prefer not to take notes at all, but simply to listen,

20  please feel free to do that.

21        Please remember also that not everything you

22  write down is necessarily what was said.  Thus, when you

23  begin your deliberations, do not assume simply because

24  something appears in somebody's notes that it

25  necessarily took place in court.  Notes are an aid to

 1   recollection, nothing more.  The fact that it's written

 2   down doesn't mean that it's necessarily accurate.

 3          With these limitations, you're granted

 4   permission to take notes.  At the end of each day and

 5   during any breaks during the day, please place your

 6   notes in the envelope which has been provided to you.

 7   That envelope will be taken and secured each night.  The

 8   envelope will be returned to you at the beginning of

 9   each day.  At the conclusion of the case, after you've

10   used your notes in deliberations, they will be

11   collected.  They will be destroyed.  Nobody will see

12   them.  No one will violate the secrecy of your

13   deliberations.

14          As you can see, we have a court reporter who's

15   creating a record of everything that happens in this

16   trial.  Sometimes jurors think that they will be able to

17   have a transcript of the trial when they go back to the

18   jury room.  That is not true.  You will not be given a

19   transcript.

20          There are a number of reasons for that, but

21   one of the reasons is strictly practical.  Usually

22   there's just not enough time to prepare one.  The court

23   reporter has a difficult job.  It's a time-consuming

24   task to take a raw record which she is creating and turn

25   it into a final transcript.

37

1            So you will not have a transcript and you

2     should listen, therefore, very carefully and take

3     whatever notes you think may be necessary to help you

4     remember the testimony.

5            If you choose not to take notes, remember it's

6     your own individual responsibility to listen carefully

7     to the evidence.  You can't give that responsibility to

8     someone who is taking notes.  We depend on the judgment

9     of all members of the jury.  You all must remember the

10    evidence in the case.

11           Finally, do not discuss this case with your

12    fellow jurors until all the evidence is in, you've heard

13    my instructions on the law, and I instruct you to begin

14    your deliberations.

15           Similarly, do not make up your mind about what

16    the verdict should be until you and your fellow jurors

17    have discussed the evidence and deliberated.  Keep your

18    mind open and do not ever forget that Mr. Irish is

19    presumed innocent of this charge now, throughout this

20    trial, and throughout your deliberations until such time

21    as all 12 of you find the government has proven each

22    element of the charged crime beyond a reasonable doubt.

23           All right.  Let me have Attorney Weiland for

24    the government do your opening statement.

25           MS. WEILAND:  Thank you, your Honor.

 1             MR. FALKNER:  Could we be briefly seen at

 2    sidebar, your Honor?

 3                    THE COURT:  Yes.

 4                         AT SIDEBAR

 5             MR. FALKNER:  Just two quick issues, your

 6    Honor.

 7             With regard to the motion to sequester, Agent

 8    Kevin LeBlanc is in the courtroom and he has been

 9    sequestered, so --

10             MS. WEILAND:  He's not in the courtroom any

11    longer.

12             MR. FALKNER:  He's --

13             MS. WEILAND:  He stepped out when opening

14    began.

15             MR. FALKNER:  Oh, he's not in the back right

16    there?

17             MS. WEILAND:  No.

18             MR. FALKNER:  Oh, I'm sorry.  I've mistaken

19    him from somebody else, a mistaken identity.

20             And, second, there was an agreement, as you're

21    aware, to strike one of the firearms from the indictment

22    and I'd move that that be done at this time before the

23    opening statements.

24             MS. KRASINSKI:  I assent, your Honor.

25             THE COURT:  I know.  Everybody assents to

1    that, so that is stricken.

2          Now, I don't give the actual indictment to the

3    jury.  I describe in my jury instructions firearms

4    described in the indictment and I tell them generally in

5    the final charge the two firearms at issue, but I just

6    describe them generally in my instructions at the end.

7    Obviously you can do what you do with regard to

8    describing to them what's in the indictment, but that's

9    how I handle it.  So they won't be looking at a redacted

10   indictment at any point.

11         MR. FALKNER:  I understand.

12         THE COURT:  All right.  So that is granted.

13   That is struck from the indictment.

14         Anything else.

15         MS. KRASINSKI:  No, your Honor.

16         MR. FALKNER:  Thank you.

17         THE COURT:  All right.

18         MS. WEILAND:  Okay.

19         THE COURT:  Are you ready?

20         MS. WEILAND:  Yes.

21              CONCLUSION OF SIDEBAR

22         THE COURT:  Attorney Weiland.

23         MS. WEILAND:  Good morning.  Thank you all for

24   being here today.

25         My name is Kasey Weiland and my colleague,

1  Anna Krasinski, and I represent the United States in

2  this matter.

3          Johnathon Irish, the defendant, is a convicted

4  felon.  He is prohibited by federal law from possessing

5  firearms.  The government's proof is going to show that

6  during 2018 and 2019, Mr. Irish possessed a Sig Sauer

7  1911 semiautomatic handgun and a Catamount Fury

8  semiautomatic shotgun.  We will also show that both of

9  these firearms traveled in interstate commerce.  That

10 just means that at some point they crossed a state line.

11         You are also going to hear during the course

12 of this trial about a third firearm, a firearm that

13 Mr. Irish is not charged with possessing.  That firearm

14 is a Sig Sauer AR-style rifle.

15         I want you to keep in mind as you're hearing

16 the evidence in this case that it is those first two

17 firearms I mentioned, the 1911 pistol and the Catamount

18 Fury shotgun, that Mr. Irish is charged with in this

19 case.  I'm going to talk a little bit more about those

20 firearms as we go through what we expect the evidence

21 will be in this case.

22         To sort of understand how it is that we got

23 here today, we have to go back to 2013.  In 2013, the

24 FBI took possession of some property belonging to

25 Mr. Irish.  That property included the 1911 Sig Sauer

1    handgun and also that Sig Sauer AR-style rifle.

2           Now, at that time, in 2013, Mr. Irish was not

3    a convicted felon.  But at a later point in 2014,

4    Mr. Irish was convicted of a felony.  So come 2015, when

5    the FBI was set to dispose of that property, they could

6    no longer lawfully return those firearms to Mr. Irish.

7           So after consulting with Mr. Irish, the FBI

8    agreed to release those two firearms to a friend of

9    Mr. Irish's family, a person named Roscoe Whitney.  And

10   you're going to hear from Mr. Whitney during the course

11   of this trial.

12          He will testify that he agreed to take

13   possession of those firearms from the FBI.  He will also

14   testify that in connection with his receipt of those

15   firearms, he agreed that he would not under any

16   circumstances return those firearms to Mr. Irish.

17          You will hear, however, that Mr. Whitney did

18   return those firearms to Mr. Irish.  He will testify

19   that sometime in September of 2017, Mr. Irish showed him

20   some paperwork.  And based on that paperwork, it was

21   Mr. Whitney's understanding that Mr. Irish was permitted

22   to possess firearms again.

23          And based on that understanding, Mr. Whitney

24   returned that Sig Sauer 1911 handgun and the AR-style

25   rifle back to Mr. Irish.  He will describe the

1   circumstances surrounding his return of those firearms

2   and he will testify that after that day in

3   September 2017, Mr. Whitney never laid eyes on those

4   firearms again.

5           So fast-forward to December of 2018.  You're

6   going to hear that the FBI at that time received a tip,

7   a tip that Mr. Irish may be in possession of firearms

8   again.

9           Now, the FBI was familiar with Mr. Irish, knew

10  him to be a convicted felon, knew him to be prohibited

11  from possessing firearms, and so they opened an

12  investigation.  That investigation really did not gain

13  traction until about October of 2019.  And during

14  October and November of 2019, the FBI interviewed

15  numerous witnesses.

16          And through the course of their investigation,

17  they learned that on or about October 25th of 2019,

18  Mr. Irish asked his cousin, Neil Prive, to take his

19  firearms.  Mr. Prive went to the defendant's home and

20  the defendant presented him with a large, black box.  It

21  had a lock on it.  And those -- that box contained those

22  firearms.

23          Mr. Prive took that box to his home.  When he

24  got there, he unlocked it and he removed three firearms

25  from that case; the 1911 Sig Sauer handgun, that

1    AR-style rifle, and a third firearm, a Catamount Fury

2    semiautomatic shotgun, one of the firearms that is

3    charged in the indictment.

4              Mr. Prive secured those firearms in a safe at

5    his home.  There were some other items in that case,

6    some ammunition and some other accessories, that

7    remained in that case and Mr. Prive stored those items

8    in his home for a couple of weeks before arrangements

9    were made for Mr. Prive to meet with a third individual,

10   a person named Gerald or Gary Roya, another friend of

11   the Irish family.

12             And it was arranged that Mr. Prive would meet

13   Mr. Roya and transfer those firearms to him.  And that's

14   what happened.  Mr. Prive and Mr. Roya exchanged some

15   text messages, they agreed to meet, and on or about

16   November 17th of 2019, Mr. Prive met Mr. Roya in a

17   McDonald's parking lot in Epsom, New Hampshire, and

18   transferred that big, black case containing those three

19   firearms to Mr. Roya.  And after that point, Mr. Prive

20   never saw those firearms again.

21             From that point, Mr. Roya took that black case

22   back to his home in Exeter.  When he got there, he

23   inventoried the contents, which included those same

24   three firearms we've talked about, and then he locked

25   the case and he stored it away in his attic.  And that

44

1    is where the FBI found those firearms the week of

2    Thanksgiving, just about a week or two after Mr. Roya

3    collected them from Mr. Prive.

4            The FBI went to Mr. Roya's home the Wednesday

5    before Thanksgiving, they located the firearms, and

6    confirmed with Mr. Roya that he had received them from

7    Mr. Prive just a week or two earlier.

8            Now, Mr. Roya is also going to testify.

9    You'll hear from him in this trial.  He will talk to you

10   about receiving those firearms.  He's also going to talk

11   to you about a document that he was asked to sign

12   relating to those firearms.

13           Now, it is a document that appears to transfer

14   the weapons from Roscoe Whitney -- remember, who had

15   some of those firearms back in 2015 -- directly to

16   Gerald Roya.  Gerald Roya's signature is on that

17   document, Roscoe Whitney's signature is on that

18   document.

19           But Gerald Roya will testify that he did not

20   receive those firearms from Roscoe Whitney and Roscoe

21   Whitney will testify that he did not give those firearms

22   to Gerald Roya.  Both of them signed the document, both

23   were presented with that document by Nancy Haskell, the

24   defendant's mother, and were instructed to sign.  And

25   they did so.

1          Now, you may be wondering what was going on

2    with these firearms from the time Mr. Whitney gave them

3    back to Mr. Irish in September 2017 and the time that

4    Mr. Irish gave them to Neil Prive in October of 2019.

5          You're going to hear from numerous witnesses

6    who will put one or more of those firearms in the

7    defendant's hands during that time frame.  You're going

8    to hear that the defendant had those guns at his house,

9    that he liked to show them off, that he was very proud

10   of those guns and he was even known to carry the 1911 on

11   his hip.

12         Some of the witnesses that you're going to

13   hear from in this case are Peter Duguay, the defendant's

14   neighbor and former employer; Elizabeth Millett, the

15   defendant's mother-in-law; David Marcotte, a friend of

16   the defendant; Dylan Roosa, a former friend of

17   Mr. Irish; and then Neil Prive, the defendant's cousin;

18   and also Gerald Roya and Roscoe Whitney, who we've

19   already talked about.

20         Now, you're going to hear that two of these

21   witnesses, Elizabeth Millett and Dylan Roosa, agreed to

22   act as confidential sources with the FBI to assist in

23   the FBI's investigation of Mr. Irish.  All that means

24   essentially is that they agreed to try to gather

25   information that might be helpful to the investigation

1    and report it back to law enforcement.

2              I suspect that the proof is going to show that

3    both Ms. Millett and Mr. Roosa severed ties with the

4    defendant either before agreeing to act as confidential

5    sources or shortly thereafter and so the duration and

6    the extent of their assistance with the FBI was somewhat

7    limited for that reason.  But you'll hear more about

8    that through the testimony of the witnesses.

9              Now, you're also going to hear about Roscoe

10   Whitney and some of his interactions with the FBI.

11   You're going to hear that Mr. Whitney was first

12   interviewed by the FBI on the day Johnathon Irish was

13   arrested.  And during that initial interview with the

14   FBI, you're going to hear that Mr. Whitney provided some

15   information relating to those firearms that was not

16   truthful.

17             Mr. Whitney will tell you why he did that.  I

18   expect he will testify that he was instructed what to

19   say if he was asked about those firearms.  I expect he

20   will testify about his later interviews with the FBI and

21   the information that he eventually conveyed to them and

22   I believe he will also testify and tell you how he feels

23   today about that initial conversation with the FBI.  And

24   I ask you to take all of that into account as you're

25   assessing his testimony.

1          Now, you have heard about the origin of two of

2    the firearms in this case, the 1911 handgun and that

3    AR-style rifle.  You've heard that those were collected

4    from the defendant in 2013 and that they were released

5    to Mr. Whitney.  You might be wondering about this third

6    firearm, the Catamount Fury shotgun, where did it come

7    from.

8          Well, we expect that you're going to hear

9    testimony during this trial that that firearm, the

10   Catamount Fury shotgun, once belonged to a good friend

11   of the defendant, a friend named Anthony Costello, known

12   to the defendant as Tony, that Tony died in January of

13   2018.  When Tony died, he left the defendant a vehicle,

14   a pickup truck, and it's approximately a year after Tony

15   dies in roughly January of 2019 that the defendant is

16   first seen with that Catamount Fury shotgun.

17         Dylan Roosa will testify that he saw the

18   defendant with that gun at his home on several occasions

19   and that gun was in that black box that the defendant

20   gave to Neil Prive in October of 2019.

21         I think you'll hear that this is a rather

22   distinctive firearm, that it has some distinctive

23   characteristics.  I'm going to ask you to consider that

24   testimony when you're considering the origin of that

25   firearm.

1          Now, final question you may be asking yourself

2     at this point -- I have talked to you about three

3     firearms that the defendant possessed during this time

4     frame.  Recall, though, that only two of those are

5     charged in the indictment.  Mr. Irish is charged with

6     possession of that 1911 Sig Sauer handgun and the

7     Catamount Fury shotgun.

8          During the course of this trial, you are going

9     to hear testimony from Special Agent John Forte.  He is

10    with the Bureau of Alcohol, Tobacco, and Firearms.  And

11    he is going to talk to you about the movement of these

12    firearms in interstate commerce.

13         In his testimony, he will testify that two of

14    the firearms, the handgun and the shotgun, traveled in

15    interstate commerce.  All that means is that those

16    firearms, after final assembly, crossed a state line at

17    some point.

18         As to the rifle, I anticipate that Special

19    Agent Forte will testify that while some of the

20    components of the firearm may have traveled at some

21    point in interstate commerce, he could not definitively

22    conclude that the firearm, after being fully assembled,

23    ever crossed a state line.  And for that reason,

24    Mr. Irish is not charged with that firearm.

25         Nevertheless, the proof in this case will show

1    that Mr. Irish possessed that 1911 handgun and the

2    Catamount Fury shotgun, both of which traveled in

3    interstate commerce.

4           And once you have heard all of the evidence in

5    this case, we will ask you to find the defendant,

6    Johnathon Irish, guilty as charged in the indictment.

7           Thank you.

8           THE COURT:  Thank you, Attorney Weiland.

9           Attorney Falkner.

10          MR. FALKNER:  Good morning, ladies and

11   gentlemen.

12          My name is Benjamin Falkner and I represent

13   Mr. Irish.  At the end of this trial, I'm going to be

14   returning to you and I'm going to be asking that you

15   find Mr. Irish not guilty of these charges.

16          This case is not about whether Mr. Irish

17   didn't want to have the firearms.  This case is not

18   about whether Stephanie Irish possessed the firearms.

19   The evidence is going to show that Stephanie Irish,

20   Mr. Irish's wife, had these weapons in her home, which

21   she had every right to do.  Mr. Irish did not have

22   possession of the firearms during the time that's

23   charged in the indictment and I'm going to explain to

24   you why.

25          The evidence will show that at some point two

1    of the firearms that are in evidence in this case and

2    only one of the firearms that's charged before your

3    Honor were seized by the FBI and then at some point

4    after Mr. -- after Mr. Irish was convicted of a crime

5    punishable by more than a year of imprisonment -- and

6    that's what the word felony means, simply a crime that's

7    punishable by more than a year of imprisonment.

8            After he became no longer entitled to possess

9    a firearm that had traveled in interstate commerce,

10   those two weapons were returned to Mr. Roscoe Whitney.

11   They were returned also to Mr. Roscoe Whitney along with

12   a firearm that was owned by Stephanie Irish.  There were

13   three firearms that were returned to Roscoe Whitney; two

14   belonged to Johnathon Irish and one belonged to

15   Stephanie Irish and Roscoe Whitney took control of those

16   firearms.

17           So Stephanie Irish is not somebody who's never

18   possessed firearms.  She is -- she's intricately

19   involved in this case.

20           You'll hear that it was a troubled marriage

21   between Johnathon Irish and Stephanie Irish.  There's

22   going to be a fair amount of evidence about the troubles

23   in the marriage.  And on October 25th of 2019, Stephanie

24   Irish left Johnathon Irish.  And that set in motion the

25   chain of events that led to you being here today.

1           When Stephanie Irish left Mr. Irish, he

2     obviously realized that her weapons were still in that

3     home after she left.

4           You'll hear from Peter Duguay, who was

5     Mr. Irish's boss.  Peter Duguay will testify essentially

6     that he melted down when he found out that Stephanie had

7     left him.  At that time, he asked Mr. Duguay to take a

8     box from him.

9           And just backing up as to Mr. Duguay,

10    Johnathon Irish, who talked about firearms a fair bit of

11    time, had told Mr. Duguay that the 1911 handgun belonged

12    to Stephanie Irish when he was talking about it.

13          And so he melted down.  He asked Mr. Duguay to

14    take the box.  Mr. Duguay said no.

15          Then he called David Marcotte and he said, I

16    need you to take the 1911.  Mr. Marcotte said -- and

17    what he said was I'm afraid of what I might do with it.

18          But he said, I need you to take the 1911 and

19    Mr. Marcotte said, no, I won't take the weapon, but I'll

20    watch your kids when you go to a court hearing.  I'm not

21    quite sure that I understand that response, but that's

22    how Mr. Marcotte responded.  He didn't take them.

23          And you'll hear from Mr. Prive.  It was Nancy

24    Haskell that reached out to Mr. Prive and said, hey, I

25    need you to go up to get those firearms from -- out of

1    Johnathon's house.  And Neil goes up, he takes the

2    firearms, and he delivers them ultimately to Gary Roya.

3           Now, essentially why is it that Johnathon

4    Irish would be afraid of having those firearms in that

5    house?  As you know, he knows he was convicted of a

6    crime punishable by more than a year of imprisonment.

7    He's agreed to that.  The government is going to read

8    that stipulation.

9           He was aware of that.  He was aware that

10   Stephanie Irish was no longer in that house.  They're

11   her guns.  He can't be alone in that house with those

12   guns.  They belong to her.  There's a padlock on that

13   box.

14          Now, there are only two people that you will

15   hear of that put any of these firearms in the hands of

16   Johnathon Irish at any time before Stephanie leaves.

17   The first of them is Elizabeth Millett.

18          Elizabeth Millett becomes a confidential

19   informant to the FBI in the winter of 2019.  She starts

20   reporting that she's seen Johnathon Irish with firearms.

21          But what you'll know about Ms. Millett at that

22   time is she's really upset about the problems in the

23   marriage between Johnathon and Stephanie and she's not

24   getting along with Johnathon and Stephanie and she feels

25   that they're a financial drain to her.  She feels that

1  they're a burden.  The entire family isn't getting

2  along.  Stephanie isn't speaking with her mother.  And

3  her mother wants to get her and Johnathon apart.

4          She keeps talking to the FBI, she keeps

5  reporting, and then in April of 2019, Ms. Millett goes

6  in and files for a restraining order against Johnathon

7  Irish.  And when she files for that restraining order,

8  there's a question on the application about whether he

9  has access to a firearm.  And she checks no, but he has

10  owned a firearm in the past.  That was the truth, but

11  what she was telling to the FBI was not the truth.

12          Time goes on and Ms. Millett and both

13  Stephanie and Johnathon Irish on the one hand and

14  Ms. Millett on the other hand are at loggerheads.  They

15  end up in court proceedings and in September and there's

16  all kinds of problems between Stephanie Irish and her

17  mother, Elizabeth Millett.

18          And Elizabeth Millett attributes all of those

19  problems to Johnathon Irish.  And that's why Elizabeth

20  Millett will be here in this courtroom, to essentially

21  fabricate her story about seeing Johnathon Irish with

22  firearms.

23          Now, let's talk about Dylan Roosa.  Dylan

24  Roosa, supposedly the defendant's friend, reports to the

25  FBI that he was great friends with Johnathon Irish; he

1    knows about all the weapons.  It turns out that he's

2    really friends with Stephanie Irish.

3            But he reports back in the summer, I went over

4    to Johnathon's house, we went out, we went shooting, and

5    we shot the 1911 handgun off into the woods.  We had a

6    grand old time.  I didn't know he was a convicted felon,

7    he'll tell you.

8            And they had a great old time and then there

9    was a falling out.  What he tells the FBI, what he

10   refers to the FBI, is we had a falling out and it was

11   all about that he blamed my girlfriend for reporting to

12   Johnathon that Stephanie was cheating on him.

13           I don't know what all that means, but

14   basically what he's saying is there was this

15   interpersonal conflict between Johnathon and Dylan Roosa

16   and that's why he explains why he's no longer friends

17   with Johnathon Irish.

18           And the FBI makes him a confidential human

19   source.  They enter into an agreement with him -- they

20   tell him, we're not promising you you'll get money --

21   but you'll see that the FBI identifies that one of the

22   source -- one of the motivating sources for Dylan Roosa

23   talking to them might be that he's a little hard up on

24   money.  And, ultimately, he continues to meet with the

25   FBI and they pay him $250 for all of his help.  That's

1    in December of 2019.

2              Time goes by and they're getting ready for

3    this trial here.  And he reports, yeah, when I was

4    telling you about all those problems I had with

5    Johnathon Irish and the reason why we weren't friends

6    anymore, I forgot to mention there was also this little

7    matter that I owed him a small debt.

8              Dylan Roosa is at odds with Johnathon Irish

9    over money.  He owes Johnathon Irish money, he needs

10   money, he's getting then money from the FBI.  You cannot

11   trust Dylan Roosa.  And it turns out that as soon as

12   Johnathon Irish is arrested, he's off with Stephanie

13   Irish and they're taking the kids.

14             He -- he is involved -- he wants to help raise

15   Johnathon Irish's kids with Stephanie Irish.  Dylan

16   Roosa is not a man whose testimony you should trust.

17             So you need to look at the witnesses whose

18   testimony does fit together and who you can follow and

19   essentially it's that -- it's this:

20             His wife has left him, he gets the firearms

21   out of the house, and he doesn't want it to look like he

22   was in possession of the firearms.  Well, that's a

23   natural response.  Is it a perfect response?  No.

24             But everything he does is in the name of

25   getting the firearms out of his house and you'll hear no

1  good evidence that he actually was in possession of

2  those firearms, they were Stephanie's, and I would ask

3  when you come back at the end of this case, what this

4  case is about is whether the government can prove beyond

5  a reasonable doubt, the highest burden in the law, that

6  Johnathon Irish actually had the intention to exercise

7  dominion and control over those firearms and the only

8  evidence that you'll know about those firearms is that

9  he wanted them gone.

10         At the end of this case, I'll return to you

11  and ask you to find Mr. Irish not guilty.  Thank you.

12         THE COURT:  Thank you.

13         All right.  I know the government intended at

14  this point to introduce a stipulation.

15         MS. KRASINSKI:  Yes, your Honor.  Would the

16  Court, please, want to read that to the jury?

17         THE COURT:  Yes.  You're asking me to read the

18  stipulation to the jury.

19         Any objection, Attorney Falkner?  Any --

20         MR. FALKNER:  No, your Honor.

21         THE COURT:  All right.  As the government

22  approaches with the stipulation, I'm going to explain to

23  you that these are facts to which the lawyers have

24  agreed or stipulated.  And it means simply that the

25  government and the defendant accept the truth of a

1   particular proposition or fact.

2          And since there's no disagreement, there is no

3   need for evidence apart from the stipulation and you

4   must accept the stipulation as fact to be given whatever

5   weight you choose.

6          All right.  And I'm going to now read to you

7   the stipulation of fact which is Government's

8   Exhibit 36.

9          The United States of America, by Scott W.

10  Murray, United States Attorney for the District of

11  New Hampshire through the undersigned U.S. Assistant

12  Attorneys, defendant Johnathon Irish and defendant's

13  counsel, Benjamin Falkner, enter into the following

14  stipulation of fact:

15         There is no dispute among the parties that on

16  December 11, 2014, defendant, Johnathon Irish, was

17  convicted of a felony punishable by imprisonment for a

18  term exceeding one year.

19         There is also no dispute among the parties

20  that beginning on December 11, 2014, and during the

21  period between December 26, 2018, and November 17, 2019,

22  defendant, Johnathon Irish, knew that he had previously

23  been convicted in a court of a felony punishable by

24  imprisonment for a term exceeding one year.

25         Finally, there is no dispute among the parties

1   that defendant, Johnathon Irish, has not been pardoned

2   for this offense and has not had his firearm rights

3   restored.

4           All right.  So that is admitted as an exhibit.

5               (Government's Exhibit 36 admitted.)

6           THE COURT:  Government may call its first

7   witness.

8           MS. KRASINSKI:  Before that, your Honor, the

9   parties have agreed as to the authenticity and

10  admissibility regarding certain exhibits, so at this

11  time I formally move into evidence the following

12  exhibits.

13          THE COURT:  All right.  One -- let me get

14  my -- go ahead.

15          MS. KRASINSKI:  5, 6, 6A, 7, 7A, 8, 9, 9A, 9B,

16  9C, 9D, 9E, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20,

17  21, 22, 23, 24, 25, 26, 27, 27A, 27B, 27C, 27D, 27E,

18  27F, 28A, 28B, 28C, 28D, 28E, 28F, 28G, 28H, 28I, 28J,

19  28K, 28L, 28M, 28N, 28O, 28P, 28Q, 33, 35A, 35B, 35C,

20  35D, 35E, 35F, 35G, 35H, 35I, 35J, 35K, and 36.

21          THE COURT:  All right.  And you agree that

22  those are full exhibits, Attorney Falkner?

23          MR. FALKNER:  Yes, your Honor.

24          THE COURT:  All right.  Those are admitted as

25  full exhibits.

```
 1                    (Exhibits admitted.)

 2          MS. KRASINSKI:  Permission to publish those

 3   exhibits, your Honor.

 4          THE COURT:  At the time when they're relevant?

 5          MS. KRASINSKI:  Correct, your Honor.

 6          THE COURT:  All right.  Go ahead.

 7          MS. KRASINSKI:  The United States calls

 8   Special Agent Christiana.

 9          THE CLERK:  Agent Christiana, please remain

10   standing and raise your right hand.

11          PHILIP CHRISTIANA, having been first duly

12   sworn, testified as follows:

13          THE CLERK:  Thank you.  Please state your full

14   name, spell your last name for the record.

15          THE WITNESS:  It's Philip M. Christiana.  Last

16   name is C-h-r-i-s-t-i-a-n-a.

17          THE CLERK:  Thank you very much.

18                   DIRECT EXAMINATION

19   BY MS. KRASINSKI:

20        Q.   Agent Christiana, are you employed?

21        A.   I am.

22        Q.   Where are you employed?

23        A.   With the Federal Bureau of Investigation in

24   Bedford, New Hampshire.

25        Q.   And how long have you worked for the FBI?
```

1     A.    A little over 28 years.

2     Q.    What is your current role?

3     A.    I'm a supervisory special agent.

4     Q.    And when did you become a supervisory special

5  agent?

6     A.    Approximately 13 months ago.

7     Q.    And what were you doing before that?

8     A.    I was an investigator, field agent, for all

9  those years prior.

10     Q.    And did you receive training to become a field

11  agent?

12     A.    I did.

13     Q.    Can you briefly describe that training?

14     A.    The initial training -- is this too loud?  I

15  feel like I'm too close to it.

16           The initial training was a 16-week training

17  course at the FBI Academy in Quantico, Virginia.  Back

18  then, when I went through it at least, it was 16 weeks.

19     Q.    And do you also serve as an FBI firearms

20  instructor?

21     A.    I do.

22     Q.    Do you have a personal interest in firearms?

23     A.    I do.

24     Q.    Can you just briefly explain that?

25     A.    Yeah.  I'm a competitive shooter.  I've taught

1    firearms training at Sig Sauer Academy on a part-time

2    basis and I -- and one of my duties within the FBI is

3    a -- is as a firearms instructor.

4         Q.   Now, I want to turn your attention to

5    Johnathon Irish.  Are you familiar with Johnathon Irish?

6         A.   I am.

7         Q.   When did you first meet him?

8         A.   In February of 2013.

9         Q.   Do you see him in the courtroom here today?

10        A.   I do.

11        Q.   Can you please describe something that he's

12   wearing?

13        A.   Yeah.  He's got a white shirt and a black

14   jacket on, sitting at the defense table.

15             MS. KRASINSKI:  Your Honor, will the record

16   please reflect that Agent Christiana has identified the

17   defendant?

18             THE COURT:  Yes.

19             MR. FALKNER:  Your Honor, may we very quickly

20   be seen at sidebar?

21             THE COURT:  You want to approach?

22             MR. FALKNER:  Yes.

23             THE COURT:  Yes.

24                          AT SIDEBAR

25             MR. FALKNER:  I just want to note on the

1   record on the TV screen that's behind the witness is in

2   a small box a video of the witness testifying and if we

3   could have that taken down.

4           THE COURT:  Do you see that, Donna?

5           THE CLERK:  I think so.

6           MR. FALKNER:  On the monitor behind -- right

7   behind the witness.

8           THE COURT:  Do you think it's distracting?

9           MR. FALKNER:  Right.

10          THE COURT:  We'll try to get technology to

11  take care of it.  You're not asking us to halt; we're

12  just going to --

13          MR. FALKNER:  I think we can go forward, but

14  if it's that way through the trial, it's distracting.

15          THE COURT:  While you're here, I'm going to

16  allow the case agents to remain throughout the trial.

17          MR. FALKNER:  So my rights are preserved; I

18  don't need to approach?

19          THE COURT:  You've made your objection, it's

20  preserved, as far as I'm concerned.  If there's some

21  specific objection you want to bring to my attention,

22  feel free to renew it, but I've done the research on

23  that and I'm comfortable the case agent can stay.

24          MR. FALKNER:  Please note my objection.

25          THE COURT:  All right.  Thank you.

CONCLUSION OF SIDEBAR

1

2         THE COURT:  Apparently there's a little video,

3    that is, a real-time video.  We're going to try to

4    remove that and hopefully it won't be distracting.

5    We're going to try to get our IT folks to fix that.

6         But go ahead.

7    Q.    Now, I think you said you first met the

8    defendant in fall of 2013?

9    A.    February of 2013, yes.

10   Q.    February of 2013.

11   A.    Yes.

12   Q.    Now, I want to turn to fall of 2013.  In fall

13   of 2013, were two of the defendant's firearms seized by

14   law enforcement?

15   A.    They were.

16   Q.    And, ultimately, did FBI take custody of those

17   two firearms?

18   A.    We did, I did, in 2014.

19   Q.    And what were those two firearms?

20   A.    It was a Sig Sauer 1911 semiautomatic pistol

21   and a Sig Sauer 513 -- 516 semiautomatic rifle.

22   Q.    Now, at the time that those two firearms were

23   seized, was the defendant a convicted felon?

24   A.    No.

25   Q.    So at that time when his firearms were seized,

1   no felony conviction precluded him from possessing those

2   firearms?

3       A.    Correct.

4             MS. KRASINSKI:  Your Honor, may I approach?

5             THE COURT:  Yes.

6       Q.    Agent Christiana, I'm handing you what's been

7   marked as Government's Exhibit 5.

8             Before we talk about that, I just want to ask

9   you, is it your understanding that all the firearms in

10  the courtroom today have been rendered safe?

11      A.    Yes, absolutely.

12      Q.    And inspected by the marshals before brought

13  into the courtroom?

14      A.    I believe so, yes.

15      Q.    Now, turning to Government's Exhibit 5, do you

16  recognize that firearm?

17      A.    I do.

18      Q.    Is that one of the defendant's firearms that

19  was seized in 2013?

20      A.    It is.

21      Q.    What type of firearm is that?

22      A.    This is the -- this is the semiautomatic

23  pistol, the 1911 pistol, Sig Sauer brand.

24      Q.    And what's the caliber?

25      A.    It's a .45caliber.

1      Q.    What does caliber mean?

2      A.    Caliber is the diameter of the projectile.

3  It's -- you know, there's -- obviously there's a whole

4  host of ranges in pistol calibers, .45, you know, being

5  one of them.

6      Q.    And is there a serial number on that firearm?

7      A.    There is.

8      Q.    What is it?

9      A.    I believe it's GS34120.

10     Q.    And what is a serial number as it relates to a

11 firearm?

12     A.    Yeah, the serial number is the particular

13 identifier that distinguishes one firearm from another.

14 It's the one identifier that you can say basically it --

15 this is one firearm as opposed to another.

16     Q.    So a serial number on a gun is unique to that

17 particular gun?

18     A.    It is, absolutely.

19     Q.    Now, is there anything different about that

20 1911 pistol now than when it was first seized in 2013?

21     A.    Yes, there is.

22     Q.    And what's that?

23     A.    So there's -- it looks like an add-on

24 compensator, this metallic silver compensator that is

25 added to the muzzle end of the firearm.  And that was

 1   not there back when I was -- when this firearm was in my

 2   custody.

 3        MS. KRASINSKI:  Does your Honor want me to ask

 4   each time I approach or is asking --

 5        THE COURT:  No, you can approach throughout.

 6   Thank you.

 7        MS. KRASINSKI:  Thank you, your Honor.

 8        Q.   I'm now handing you what's been marked as

 9   Government's Exhibit 6.  Do you recognize that firearm?

10        A.   I do.

11        Q.   What is it?

12        A.   This is the Sig Sauer 516 semiautomatic rifle.

13        Q.   And is that the defendant's firearm that was

14   seized in 2013?

15        A.   Yes, it is.

16        Q.   How do you know that?

17        A.   From the serial number.  I've compared the

18   serial numbers from some of the documentation that we

19   had back in 2015 to the serial number to this -- to both

20   firearms.

21        Q.   And what is the serial number on that firearm?

22        A.   So it's partially covered, but the last four

23   are 1626.

24        Q.   Now -- thank you.

25             Let's talk a bit about what happened to these

1    firearms.  In early July of 2015, were they still in FBI

2    custody?

3         A.    They were.

4         Q.    And at some point did the FBI arrange to

5    release those firearms?

6         A.    We did.  We did.

7         Q.    And at that time, could you release them back

8    to the defendant?

9         A.    Could not.

10        Q.    And why not?

11        A.    Because at that point he was a convicted

12   felon.

13        Q.    And that means he can't legally possess those

14   firearms?

15        A.    Any firearms.

16        Q.    Now --

17             MR. FALKNER:  Objection.  May we be seen at

18   sidebar?

19             THE COURT:  Yes.

20                         AT SIDEBAR

21             MR. FALKNER:  That testimony was untrue as a

22   matter of law.  He has just testified that he cannot

23   legally possess any firearms and what's true is that he

24   cannot possess any firearms that have traveled in

25   interstate commerce.  And I would ask that the jury be

1    instructed that his answer was incorrect and that the

2    answer is that he cannot legally possess firearms that

3    have traveled in interstate commerce.

4            MS. KRASINSKI:  I think that's his

5    understanding of it.  It's why the FBI didn't release

6    them to him.  And, furthermore, at that time in 2015,

7    this December of 2019 case discussing the frames of

8    AR-style rifles wasn't in effect.  The FBI said that

9    they didn't release the firearms to him because they

10   believed he couldn't possess them.

11           THE COURT:  Under federal law, you're talking

12   about, interstate commerce.

13           MR. FALKNER:  Correct.  And under the state

14   law of New Hampshire, he's not prohibited from

15   possessing firearms.  There's no law that prohibits him

16   from possessing firearms that did not travel in

17   interstate commerce.

18           THE COURT:  Okay.  Can you ask him a

19   clarifying question:  You just said he can't possess any

20   firearm; did you mean by that -- you can ask him, I

21   think, a leading question to --

22           MS. KRASINSKI:  I will.  I can't guarantee his

23   answer, because he's not an ATF agent --

24           THE COURT:  Okay.

25           MS. KRASINSKI:  -- so he may not be familiar

 1   with the interstate commerce requirements, but I'm happy

 2   to ask the question.

 3           THE COURT:  And you can be leading in your --

 4   in your question.

 5           MR. FALKNER:  And I'd just ask that it -- to

 6   the extent that his answer is incorrect as a matter of

 7   law, if the jury can be instructed as to what the

 8   correct state of the law is.

 9           THE COURT:  Do you have any objection to me

10   simply saying to the jury, you're to understand that he

11   can't possess firearms that traveled in interstate

12   commerce?

13           MS. KRASINSKI:  I don't have an objection to

14   it.  I -- I don't have an objection to it.

15           THE COURT:  All right.  Hopefully you can cure

16   it with him.

17           MR. FALKNER:  Okay.  Thank you.

18                     CONCLUSION OF SIDEBAR

19       Q.   So, now, I just want to make sure that we're

20   clear and all on the same page about something.

21           As a convicted felon, the defendant is not

22   allowed to possess firearms under federal law and that

23   federal law requires as an additional element that the

24   firearm have traveled in interstate commerce, correct?

25       A.   That -- yes, absolutely.

1      Q.   Now, on July 7th of 2015, did you meet with

2 the defendant?

3      A.   I did.

4      Q.   And what was the purpose of that meeting?

5      A.   It was -- I had to return some items to him

6 and it was also to consummate an agreement about how --

7 what the disposition of the firearms -- how they would

8 be dispositioned.

9      Q.   So you have these firearms, FBI is not going

10 to return them to the defendant.  Who gets to decide

11 where the defendant's firearms go to?

12      A.   In this case, Mr. Irish did.

13      Q.   And when you met with him on July 7th of 2015,

14 did you sign a document relating to the release of those

15 firearms?

16      A.   He -- he did.

17      Q.   He did?

18      A.   He did, yes.

19      Q.   I'm handing you what's been marked for

20 identification purposes as Government's Exhibit 1.  Can

21 you please take a look at that.  Do you recognize it?

22      A.   I do.

23      Q.   What is it?

24      A.   This is the agreement that Mr. Irish signed

25 on July 7th, 2015, indicating where he wanted his

1    firearms -- what third party he wanted to take

2    possession of the firearms.

3         Q.   How do you know that's what that document is?

4         A.   Well, because I presented it to Mr. Irish for

5    signature that day.  We had drafted it, obviously, and

6    he agreed to it.

7         Q.   So you saw the defendant sign it?

8         A.   I did.

9         Q.   And are your initials on that document as

10   well?

11        A.   They are.  They are.

12             MS. KRASINKSI:  Your Honor, I move to strike

13   the ID on Government's Exhibit 1.

14             THE COURT:  Any objection?

15             MR. FALKNER:  No, your Honor.

16             THE COURT:  Exhibit 1 is a full exhibit.

17             MS. KRASINSKI:  Permission to publish, your

18   Honor.

19             THE COURT:  Yes.

20                (Government's Exhibit 1 admitted.)

21             MS. KRASINSKI:  Let's take a look at

22   Government's Exhibit 1.

23             Ms. Sheff, can you --

24             MS. SHEFF:  Just one second.

25             MS. KRASINSKI:  Thank you.

1          And let's enlarge the top through the first

2     set of signatures and focus on that first.

3          Q.   Now, Agent Christiana, can you please --

4     paragraph 1, can you please read the highlighted

5     portion?

6          A.   Yeah.  It says Johnathon Irish and then it

7     describes the Sig Sauer 516 5.56 caliber AR-type rifle

8     bearing serial number 53E, as in echo, 001626, and then

9     is also highlighted, "belonged to me."

10          Q.   And so this is indicating that Government's

11     Exhibit 7 -- 6, excuse me, this rifle, belonged to the

12     defendant?

13          A.   Correct.

14          Q.   Now, let's move down and look at paragraph 2

15     of Government's Exhibit 1.

16          And can you read that, please?

17          A.   It says:  The Sig Sauer .45 caliber 1911 type

18     pistol bearing serial number GS34120, and then "belonged

19     to me."

20          Q.   And is that Government's Exhibit 5?

21          A.   It is.

22          Q.   So it's the defendant acknowledging that this

23     firearm, Government's Exhibit 5, belonged to him?

24          A.   Correct.

25          Q.   Let's go to the final portion of this

1  document.

2          Can you read the first sentence of that?

3      A.   It says:  I understand and agree that these

4  items will be turned over by the government to Roscoe

5  Whitney.

6          Do you want --

7      Q.   Now --

8      A.   Yeah.

9      Q.   Again, I'm sorry.  Who directed that the

10 firearms be released to Roscoe Whitney?

11     A.   Mr. Irish.

12     Q.   Now, I want to turn your attention to

13 July 14th of 2015.  Did you meet Roscoe Whitney that

14 day?

15     A.   I did.

16     Q.   And for what purpose?

17     A.   To turn over these firearms and some other

18 items to him.

19     Q.   And when you turned some items over to him,

20 did you -- did you document the release of that property

21 in any way?

22     A.   I did in several ways.

23     Q.   How?

24     A.   One way that we documented -- we always

25 document the return of property is through a standard

1    form we use.  It's called an FD-597 and it lists every

2    item that is being presented to whoever this person is.

3    And it's signed by the receiver, person I'm presenting

4    the property to, and it's signed by me.

5         Q.    Now, let's -- I'm handing you what's been

6    marked for identification purposes as Government's

7    Exhibit 3.  Do you recognize that?

8         A.    I do.

9         Q.    What is it?

10        A.    This is the FD-597 that I described.

11        Q.    And does it relate to releasing property to

12   Roscoe Whitney?

13        A.    It does.

14        Q.    And how do you know that's what it is?

15        A.    Well, I'm familiar with this form, but I

16   actually was there and I signed it along with

17   Mr. Whitney that day on July 14th, 2015.

18        Q.    Now, what you have, it's not the original; is

19   that fair?

20        A.    Correct.

21        Q.    And is that because it has some personal

22   information redacted from it?

23        A.    Exactly.

24        Q.    Other than the redacting of that personal

25   information, is it a true and accurate copy of the

1    original receipt?

2        A.    It -- yes, absolutely, it is.

3        Q.    Now, was this receipt made at or near the time

4    that you transferred those items to Roscoe Whitney?

5        A.    It was -- it was at the -- at the time.

6        Q.    And was it made by someone with knowledge of

7    what items were transferred?

8        A.    Correct.

9        Q.    Is this form, the FD-597, kept in the ordinary

10   course of FBI business?

11       A.    It is.  It's bureau policy, you know, for the

12   return of any property.

13       Q.    And so is -- as bureau policy, is it the

14   regular practice of the FBI to make and complete this

15   FD-597 when properly -- property is released from FBI

16   custody?

17       A.    Absolutely it is.

18            MS. KRASINSKI:  Your Honor, I move to admit

19   Government's Exhibit -- or strike the ID of Government's

20   Exhibit 3.

21            THE COURT:  Any objection?

22            MR. FALKNER:  No objection.

23            THE COURT:  All right.  Government's Exhibit 3

24   is a full exhibit.

25            (Government's Exhibit 3 admitted.)

1          MS. KRASINSKI:  Permission to publish, your

2     Honor?

3          THE COURT:  Yes.

4     Q.   Now, let's enlarge from the name down through

5     the firearms that were released to Mr. Whitney.

6          What's the first firearm that was released to

7     Mr. Whitney?

8     A.   It's the Sig Sauer 1911 handgun.

9     Q.   And that was one of the defendant's firearms?

10    A.   Correct.

11    Q.   What's the second firearm on there?

12    A.   That's a -- that's another firearm that was

13    seized, but -- not necessarily belonged to Mr. Irish,

14    but was -- that he had access to.

15    Q.   Was that Stephanie Irish's gun?

16    A.   I believe it was.

17    Q.   So Stephanie Irish's gun was released to

18    Roscoe Whitney?

19    A.   Correct.

20    Q.   And what's the third firearm listed?

21    A.   It's the Sig Sauer rifle and a bag, a rifle

22    bag that came along with it.

23    Q.   Now, we won't go through it all right now, but

24    generally, what are some of the other items that you

25    returned to Mr. Whitney?

1    A.    There were some -- there was various calibers

2  of ammunition, there was a pistol magazine, quite a bit

3  of ammunition, and I actually went down the list and had

4  to check it off with Mr. Whitney, just to make sure that

5  we all -- that we agreed on -- in what I was giving him.

6         There was a -- there was a magazine for an

7  AR-style -- there were several magazines for an AR-style

8  rifle.

9    Q.    And when you returned the 1911 pistol,

10 Government's Exhibit 5, this compensator that's attached

11 to the muzzle, was it there when you returned this

12 firearm to Mr. Whitney?

13   A.    It was not.

14   Q.    Now, I want to turn your attention to

15 December 26th, 2018.

16         Were you working that day?

17   A.    I was working.

18   Q.    What happened that day?

19   A.    I received a tip.

20   Q.    What was generally the tip?

21   A.    It was -- the general nature of it was that it

22 was indicating that Mr. Irish was in possession of some

23 firearms.

24         MR. FALKNER:  Your Honor, I'd just ask for a

25 limiting instruction as to --

1     THE COURT:  Can counsel please approach.

2                    AT SIDEBAR

3     THE COURT:  Are you asking for a limiting

4  instruction along the lines of you just heard testimony

5  that there was a tip and you're not to use that

6  testimony in any way to show Mr. Irish's consciousness

7  of guilt or his guilt in this case?

8     MS. KRASINSKI:  Your Honor, I was going to

9  follow up with, you know, he passed the tip along and

10  then do you have any knowledge of whether or not

11  Mr. Irish possessed firearms in 2018 and 2019 and he

12  will say no.  So I was going to follow up with that.

13     MR. FALKNER:  I'm just asking, though, for

14  just that it can't be used for the truth of the matter

15  asserted, to be used to suggest that he did, in fact,

16  possess firearms, because it's hearsay.

17     MS. KRASINSKI:  I don't think there needs to

18  be an instruction.  We're not offering it for hearsay;

19  we're going to ask him what he did with it.  Frankly, I

20  think an instruction is going to be confusing to the

21  jury.  He got a tip.  What he did with it was pass it

22  along, an investigation was opened.  He doesn't know one

23  way or the other whether the tip was accurate and that

24  was it.

25     MR. FALKNER:  As it stands, however, his

1   testimony, there's now substantive evidence that --

2          THE COURT:  All right.  I'm going to give the

3   limiting instruction.

4          MR. FALKNER:  Thank you.

5          THE COURT:  Thanks.

6                    CONCLUSION OF SIDEBAR

7          THE COURT:  You just heard testimony, ladies

8   and gentlemen of the jury, that Agent Christiana

9   received a tip that contained information in the tip.

10  You are not to consider that information for the truth

11  of the matter that Mr. Irish did or did not possess

12  firearms.

13      Q.   So you received this tip.  What do you do with

14  it?

15      A.   I passed it on to some colleagues in my

16  office.

17      Q.   And after that, were you involved in

18  investigating whether or not that tip was accurate?

19      A.   I was not.

20      Q.   So do you have any personal knowledge as to

21  whether or not the defendant possessed firearms in 2018

22  or 2019?

23      A.   I do not.

24      Q.   Now, on October 31st, 2019, were you working

25  that day?

1    A.    I was.

2    Q.    And what happened that day?

3    A.    I received a phone call from Mr. Irish.

4    Q.    And how do you know it was Mr. Irish?

5    A.    He had called our office.  He asked for me.

6  He was transferred to me.  He identified himself and

7  then he wanted to discuss some issues with me.

8    Q.    And did he give you a phone number, his phone

9  number, a phone number you could reach him at?

10    A.    He did.

11    Q.    Do you remember that phone number?

12    A.    I do.

13    Q.    What is it?

14    A.    It's a 603 area code, 991-5718.  I believe it

15  to be a cell phone number.

16         MS. KRASINSKI:  Nothing further, your Honor.

17         THE COURT:  All right.  Let's take a morning

18  break.  It'll be about ten minutes.

19         THE CLERK:  All rise for the jury.

20                  (Jury excused.)

21    (Recess taken from 10:32 a.m. until 10:43 a.m.)

22         THE COURT:  Counsel, if you want a limiting

23  instruction at any point, just approach.

24         MR. FALKNER:  May I proceed?

25         THE COURT:  Yes, you may.

<u>CROSS-EXAMINATION</u>

1

2  <u>BY MR. FALKNER:</u>

3      Q.    Good morning, Mr. Christiana.

4      A.    Good morning.

5      Q.    You said that you're a bit of a firearms

6  enthusiast, correct?

7      A.    Correct.

8      Q.    And in that capacity, you have some

9  familiarity with where certain firearms are

10 manufactured, correct?

11     A.    Some.

12     Q.    You know that Sig Sauer has a plant in

13 New Hampshire, correct?

14     A.    I do.

15     Q.    You know that the 1911 is a Sig Sauer model,

16 correct?

17     A.    Correct.

18     Q.    And you know that the rifle that we've been

19 discussing is a Sig Sauer model also, correct?

20     A.    Correct.

21     Q.    And you also know that it's illegal for

22 somebody who has been convicted of a crime punishable by

23 more than a year to punish a firearm (sic) that has

24 affected interstate commerce, correct?

25     A.    To possess, you said?

1      Q.    To possess a firearm that has had some effect

2    on interstate commerce; is that correct?

3      A.    Correct, yup.

4      Q.    But if a firearm had no effect on interstate

5    commerce, it would not be illegal for a felon to possess

6    that firearm, correct?

7      A.    I'm not sure of that.  I'm not an attorney and

8    I don't -- I don't prosecute cases.  I investigate them.

9      Q.    So I just want to make clear when you said

10   that it would be illegal for somebody who had been

11   convicted of a felony to possess any firearms, you're

12   not sure whether that's a categorically true statement

13   or not?

14     A.    I understand the law to the degree that a

15   convicted felon cannot be in possession of firearms by

16   federal law.

17     Q.    And those firearms, again, you agree, are the

18   ones that affect interstate commerce, correct?

19     A.    I believe that that is an element of the

20   statute.

21     Q.    All right.

22     A.    I'm not an expert on the statute by any means.

23     Q.    Now, you also have some familiarity with

24   serial numbers on firearms, correct?

25     A.    Correct.

1         Q.    And you know that in your capacity both as a

2   firearms enthusiast and as a law enforcement officer,

3   correct?

4         A.    I know what?

5         Q.    You're familiar with the serial numbers, both

6   in the context of your work as a law enforcement

7   officer, but also in your spare time as an enthusiast,

8   correct?

9         A.    Yes, I'm familiar with serial numbers in

10  general.

11        Q.    And that's in part because you own firearms

12  that have serial numbers, correct?

13        A.    True, in part.

14        Q.    And you also have access to firearms in your

15  work and those have serial numbers, correct?

16        A.    Correct.

17        Q.    And also I assume -- I shouldn't assume.

18              Do you investigate crimes that do not involve

19  firearms as well?

20        A.    Absolutely.

21        Q.    Drug crimes, for instance?

22        A.    I have in the past.

23        Q.    And sometimes when you're investigating those

24  kinds of crimes, firearms get seized along with the

25  drugs or something like that, correct?

1      A.   Correct.

2      Q.   And often in those kinds of cases, you see

3 that the markings on the firearm, the serial number, has

4 been obliterated, correct?

5      A.   I know it to happen on occasion.

6      Q.   Criminals sometimes obliterate the serial

7 numbers to hide who owns that weapon, correct?

8      A.   I've known it to be the case.

9      Q.   And to make it difficult to trace the weapon,

10 correct?

11      A.   Correct.

12      Q.   In this case, neither the 1911 nor the pistol,

13 right, nor the rifle, neither one of those have the

14 serial numbers obliterated in any way, correct?

15      A.   No.

16      Q.   They're completely intact.

17      A.   Yeah.  Yeah, I'd say so.

18      Q.   And as a result of that, you were able to at

19 the appropriate time, run traces on those firearms,

20 correct?

21      A.   Correct.

22      Q.   Now, I just want to return to your

23 conversation with Roscoe Whitney.

24           As part of returning those firearms to Roscoe

25 Whitney, there was a receipt that was signed by both

1    parties, correct?

2        A.    Correct.

3        Q.    But there was also some kind of an agreement

4    that you signed with him; isn't that so?

5        A.    There was.

6        Q.    And in that agreement it indicated that that

7    P226 firearm was, indeed -- belonged to Stephanie Irish,

8    correct?

9        A.    I'd have to look at that document to verify

10   that, sir.

11            MR. FALKNER:  Your Honor, may I approach the

12   witness?

13            THE COURT:  Yes, you may.

14       Q.    Sir, I've placed what has been marked as

15   Exhibit 2 for ID in front of you.  Do you recognize that

16   to be the document that you and Roscoe Whitney signed?

17       A.    One of them, yes.

18       Q.    That's the agreement, right?

19       A.    This -- this is the agreement.

20       Q.    And your signature is on that agreement,

21   correct?

22       A.    It is.

23       Q.    And specifically going to paragraph 3, you

24   identified the 226 pistol as previously belonging to

25   Stephanie Irish, correct?

1       A.    That's the way it reads, yes.  It says

2   Stephanie Taylor.  She was Stephanie Taylor, I believe,

3   at the time.

4       Q.    It specifically says Stephanie Taylor, now

5   Stephanie Irish?

6       A.    Now Irish.  Yeah, correct.  You're right.  I

7   stand to be corrected.  She was previously Stephanie

8   Taylor.

9       Q.    And you understand her to be Johnathon Irish's

10  wife, correct?

11      A.    I do.  I do.

12            MR. FALKNER:  And may I have a moment, your

13  Honor?

14            THE COURT:  Yes.

15      Q.    Now, on October 31st of 2019, that's when you

16  received a call from Johnathon Irish; is that right?

17      A.    Correct.

18      Q.    And do you know that to be six days after his

19  wife left him?

20      A.    No, I don't.

21      Q.    But in the call, you just -- did you speak

22  with him personally or did you just receive a voicemail?

23      A.    No, personally.

24      Q.    And essentially he complained that Stephanie

25  Irish and Donnie Trent were out to get him, right?

1          A.    He'd mentioned both names and he described

2     like a plot against him by -- by those two parties.

3          Q.    He was concerned that those two parties were

4     in some kind of plot to get him in some way, correct?

5          A.    Correct.

6          Q.    And at that point you ended the conversation,

7     right?

8          A.    I wouldn't say -- I mean, there was other

9     conversation besides what you described.

10         Q.    Let me put it another way.  You didn't intend

11    to investigate that information, correct?

12         A.    I didn't intend to receive it and, no -- and I

13    had no intention to investigate it.  I passed it on.

14         Q.    And the persons to whom you passed it on were

15    Agent Tongbua, correct?

16         A.    I'm sure he eventually saw it, yes.

17         Q.    Well, to whom did you pass the information?

18         A.    It doesn't go directly to a person.  It goes

19    to a file.  So I documented the conversation.  It went

20    to a file.  So I can't say that I handed it to Agent

21    Tongbua or someone else.

22         Q.    Did you have any conversations about -- strike

23    that.

24              Did you speak with Agent Tongbua or Agent

25    LeBlanc about your conversation with Johnathon Irish?

88

1      A.    I'm sure I brought it to one of their

2 attention.  I don't have any direct recollection to that

3 conversation.

4      Q.    Okay.

5      A.    But I would have brought it to one of their

6 attention.

7      Q.    And that's because you knew those parties to

8 be investigating Johnathon Irish, correct?

9      A.    At that point, yes.

10     Q.    And did you know that because those parties

11 had told you?

12     A.    I'm sure there was some conversation.  I had

13 some knowledge of the -- the ongoing investigation.  I

14 don't remember conversations with either one of them,

15 specific conversations.

16     Q.    Okay.  But it wasn't you who returned the call

17 to Mr. Irish?

18     A.    No, I definitely did not return a call to

19 Mr. Irish.

20          MR. FALKNER:  Just one more moment, your

21 Honor.

22          THE COURT:  Sure.

23          MR. FALKNER:  I have nothing further, your

24 Honor.

25          THE COURT:  Attorney Krasinski.

REDIRECT EXAMINATION

BY MS. KRASINSKI:

    Q.   Agent Christiana, Attorney Falkner sort of vaguely referenced a plot that the defendant called you about involving his wife and Donnie Trent.

        What was this plot that he was reporting?

    A.   Mr. Irish described it as a murder for hire.

    Q.   So I just want to be clear.  When he was reporting to you a plot to do him harm, he did not say, she's trying to frame me holding her guns, right?

    A.   No, absolutely not.

    Q.   He said something more like she's -- it's a murder for hire; is that what you said?

    A.   Yeah, exactly.  He said he -- he described that both Mrs. -- Mrs. Irish and the other party were plotting to potentially kill him, but he used the specific murder for hire term, phrase.

    Q.   He did not call to report that anyone was trying to set him up with guns?

    A.   No.

    Q.   He didn't mention that at all?

    A.   No.

    Q.   He thought his wife was trying to hire someone to kill him?

    A.   Potentially, yeah.

1      Q.   Now, just briefly, you testified that

2  sometimes criminals will obliterate serial numbers to

3  hide ownership?

4      A.   Uh-huh.

5      Q.   Does that happen in all cases?

6      A.   Absolutely not.

7      Q.   So are there times where firearms are

8  recovered involved in crimes where the serial number is

9  fully intact?

10     A.   I think it's more common that they're intact

11  than they're destroyed.

12          MS. KRASINSKI:  I have no further questions,

13  your Honor.

14          THE COURT:  Anything further, Attorney

15  Falkner?

16          MR. FALKNER:  No, your Honor.

17          THE COURT:  All right.  Agent Christiana, you

18  may step down.  Thank you, sir.

19          THE WITNESS:  Thank you, your Honor.

20                  (Witness excused.)

21          THE COURT:  The government may call its next

22  witness.

23          MS. WEILAND:  The United States calls Task

24  Force Officer Kevin LeBlanc.

25          THE CLERK:  Officer LeBlanc, please remain

1   standing and raise your right hand.

2          **KEVIN LEBLANC,** having been first duly sworn,

3   testified as follows:

4          THE CLERK:  Thank you.  Please state your full

5   name and spell your last name for the record.

6          THE WITNESS:  It's Kevin LeBlanc,

7   L-e-B-l-a-n-c.

8          THE CLERK:  Thank you.

9                    DIRECT EXAMINATION

10  BY MS. WEILAND:

11       Q.   Good morning, Officer LeBlanc.

12       A.   Good morning.

13       Q.   How are you employed?

14       A.   I'm employed with New Hampshire State Police.

15       Q.   And what is your current assignment?

16       A.   I'm assigned as a task force officer for the

17  FBI's Joint Terrorism Task Force.

18       Q.   How long have you been assigned to that task

19  force?

20       A.   For two and a half years.

21       Q.   And how long have you been with the state

22  police?

23       A.   Since 2007.

24       Q.   Prior to working for the New Hampshire State

25  Police, what did you do?

1    A.    My career began in 1998 with the Baltimore

2  City Police Department and then in 2003, I moved to

3  New Hampshire and got a job with the Concord,

4  New Hampshire, Police Department and then employed with

5  New Hampshire State Police in 2007.

6    Q.    Could you describe generally your law

7  enforcement training?

8    A.    Sure.  Back in the 1998 time frame, I went to

9  a 24-week police academy for Baltimore City Police,

10  became certified as a police officer in the state of

11  Maryland.

12         Then in 2003, when I moved here, I went

13  through what's called a law package through the

14  New Hampshire Police Academy, where I got certified as a

15  New Hampshire police officer.

16         And then as part of my training with the task

17  force of the FBI, I went to a week-long school down in

18  Quantico, Virginia.

19    Q.    All right.  Are you familiar with Johnathon

20  Irish?

21    A.    I am.

22    Q.    In December of 2018, did the FBI open an

23  investigation related to Mr. Irish?

24    A.    Yes.

25    Q.    What was the general nature of the

1    investigation?

2         A.    We received information that he was in

3    possession of firearms.

4         Q.    So is it fair to say then that it was a

5    firearms investigation?

6         A.    Yes.

7         Q.    In the early stages of the investigation, what

8    did you do as part of your role in the investigation?

9         A.    I assisted doing interviews.

10        Q.    Okay.  Who did you interview early on in the

11   investigation?

12        A.    Elizabeth Millett, who's the mother-in-law of

13   Johnathon Irish.

14        Q.    Approximately when did you interview

15   Mrs. Millett?

16        A.    That was in late January of 2019, early

17   February 2019 time frame.

18        Q.    Okay.  You said -- okay.  Did she have any

19   information that was relevant to your investigation?

20        A.    Yes.

21        Q.    Was it information that was actionable at that

22   point?

23        A.    No, it was not.

24        Q.    Did you -- did the FBI discuss with

25   Mrs. Millett the possibility of enlisting her to work

1   as a confidential human source?

2        A.   Yes, we did.

3        Q.   What is a confidential human source?

4        A.   It's someone who we attempt to keep

5   confidential to assist law enforcement in obtaining

6   information for us that we think would be beneficial or

7   help us gather information for the case.

8        Q.   And are there certain ground rules that apply

9   to people who are enlisted to assist the FBI in this

10  capacity?

11       A.   Yes.

12       Q.   Could you go over what some of those general

13  ground rules are?

14       A.   Well, they're told that first and foremost,

15  any information they get and provide us must be truthful

16  and accurate.  They're advised that they're not law

17  enforcement officers, that they can't act on their own,

18  that any actions that they do as their role as the

19  informant must be done through us, through -- by

20  instruction through us only.

21       Q.   And were those ground rules reviewed with

22  Mrs. Millett?

23       A.   They were.

24       Q.   Generally speaking, what are some of the

25  reasons why people might agree to act in this capacity

1    on behalf of law enforcement?

2              MR. FALKNER:  Objection.

3              THE COURT:  Sustained.

4         Q.    To the best of your knowledge, did Elizabeth

5    Millett have any criminal charges pending at the time

6    that she agreed to sign up as a confidential human

7    source?

8         A.    She did not.

9         Q.    Was she the target of a criminal

10   investigation?

11        A.    No, she was not.

12        Q.    Did Mrs. Millett receive any financial

13   compensation for her assistance?

14        A.    She did not.

15        Q.    Did she ever request any?

16        A.    She did not.

17        Q.    Did she agree to serve as a confidential human

18   source?

19        A.    Yes, she did.

20        Q.    And after that point, did she check in with

21   you periodically?

22        A.    She did.

23        Q.    Was any of the information that she provided

24   to you during that time actionable?

25        A.    It was not.

1  Q. Okay.  Anything else that was happening in

2 terms of your investigation in those early stages,

3 December, January of 2019?

4  A. Nothing significant, no.

5  Q. Is it fair to say that the case sort of went

6 stale for a time?

7  A. Yes.

8  Q. Did there come a point when that changed?

9  A. Yes.

10  Q. When was that?

11  A. October 25th, 2019.

12  Q. What happened on that day?

13  A. On that late afternoon, I received information

14 that Stephanie Irish, the wife of Johnathon, had left

15 him.

16  Q. And did that sort of invigorate the

17 investigation?

18  A. It did.

19  Q. During the days and week or so that followed

20 that event, did you interview some additional witnesses?

21  A. I did.

22  Q. Who did you interview during that time?

23  A. Initially during that time, I interviewed

24 Peter Duguay, David Marcotte, and Dylan Roosa.

25  Q. Who was Peter Duguay?

1    A.   Peter Duguay is someone that lived up the

2    street from Johnathon.  And he owns his own HVAC

3    business, I believe, and he would employ Johnathon as a

4    temporary worker.

5    Q.   And you mentioned David Marcotte.  Who is

6    that?

7    A.   My understanding is he's a friend or

8    acquaintance of the Irishes.

9    Q.   And Dylan Roosa, who was he?

10    A.   The same, a friend, acquaintance of the

11    Irishes.

12    Q.   All right.  Were they able to provide any

13    information that was relevant to your investigation?

14    A.   They were.

15    Q.   Now, with regard to Dylan Roosa, did you also

16    discuss with him the possibility of serving as a

17    confidential human source?

18    A.   I did.

19    Q.   And you mentioned already some ground rules

20    that are generally applicable to people working in that

21    capacity.  Were those ground rules reviewed with

22    Mr. Roosa as well?

23    A.   They were.

24    Q.   Did Dylan have any pending criminal charges

25    against him at this time?

```
 1                    MR. FALKNER:  Objection.

 2                    MS. WEILAND:  May we approach, your Honor?

 3                    THE COURT:  Yes.

 4                              AT SIDEBAR

 5                    MR. FALKNER:  Your Honor, I didn't object

 6   vis-a-vis Ms. Millett, but this is like a reverse 609

 7   situation.  How can the government basically be

 8   bolstering their credibility of a witness by -- by

 9   indicating that they don't have criminal charges?  I

10   wouldn't be entitled to impeach him if he did have

11   criminal charges.

12                    THE COURT:  I think what she's getting at is

13   the question that you objected to and I sustained, which

14   would be what are all kinds of different reasons that a

15   witness would engage in this.

16                    MR. FALKNER:  Right.

17                    THE COURT:  And one of them would be because

18   there are charges.  And so I think that that is

19   essentially removing that from the jury's consideration

20   and she's going to move to the next question, so I'm

21   not --

22                    MR. FALKNER:  But they haven't been told that

23   that would be a reason.

24                    MS. KRASINSKI:  But the Court is going to

25   instruct them that that could be a reason.
```

1          THE COURT:  Yeah.  I'm going to overrule the

2     objection.

3          MR. FALKNER:  Okay.

4               CONCLUSION OF SIDEBAR

5          THE COURT:  Go ahead, Attorney Weiland.

6          MS. WEILAND:  Thank you, your Honor.

7     Q.    Officer LeBlanc, did Dylan Roosa have any

8     pending criminal charges at the time he agreed to serve

9     as a confidential human source?

10    A.    None that I'm aware of.

11    Q.    Was he a target of an investigation, a

12    criminal investigation?

13    A.    No, he was not.

14    Q.    Did he receive any benefit in exchange for his

15    assistance?

16    A.    Yes.

17    Q.    What was that?

18    A.    We paid him $250.

19    Q.    Was that at his request?

20    A.    No.

21    Q.    Did he condition his willingness to assist the

22    FBI on the receipt of any money?

23    A.    He did not.

24    Q.    Has he been offered anything by the FBI in

25    exchange for any expected testimony?

1      A.    He has not.

2      Q.    How many times did the FBI interview Mr. Roosa

3 in connection with the investigation into Mr. Irish?

4      A.    I believe it was two times.

5      Q.    And how many of those interviews -- did any of

6 those interviews take place before he was enlisted as a

7 confidential source?

8      A.    Yes.

9      Q.    How many?

10      A.    One time.

11      Q.    Do you recall approximately at what point he

12 was signed up as a source?

13      A.    I believe that the first interview would have

14 occurred approximately within one week or so of that

15 October 25th time frame.  Then after that interview, I

16 believe I reapproached him a week or two later, in that

17 time frame.

18      Q.    Now, as your investigation advanced, did there

19 come a point where you had reason to believe that

20 Mr. Irish no longer had physical custody of the

21 firearms?

22      A.    Yes.

23      Q.    Did you ultimately get a lead as to where the

24 firearms might be?

25      A.    I did.

1   Q.   Where did that lead take you?

2   A.   To Gerald Roya's house.

3   Q.   Is Gerald Roya also referred to as Gary Roya?

4   A.   He is.

5   Q.   When did you learn about Mr. Roya?

6   A.   I'm sorry?

7   Q.   When did you learn about Mr. Roya?

8   A.   When?  It was the week of Thanksgiving.

9   Q.   And that would be in November of 2019?

10  A.   2019, yes.

11  Q.   Did you go to his home?

12  A.   I did.

13  Q.   Where does he live?

14  A.   In Exeter, New Hampshire.

15  Q.   Do you recall when you visited his home?

16  A.   It would be the Wednesday before Thanksgiving.

17  Q.   Tell the jury about that visit, please.

18  A.   During that visit we -- we knocked on his

19  door, we spoke to him and told him why we were there.

20  He agreed to speak to us and we asked him about the

21  firearms.

22  Q.   Did you confirm that Mr. Roya was in

23  possession of some firearms?

24  A.   We did.

25  Q.   And what happened next?

1      A.    After discussing with him the firearms and how

2  he got them, we asked to -- if we could see the

3  firearms.

4      Q.    Did he show them to you?

5      A.    He did.

6      Q.    Where were you in Mr. Roya's home when this

7  occurred?

8      A.    We were sitting in the kitchen, at the kitchen

9  table.

10      Q.    Were you alone or was somebody with you?

11      A.    Special Agent Tongbua was with me.

12      Q.    And did Mr. Roya retrieve the firearms?

13      A.    Yes, he had to go up to his attic to get them.

14      Q.    And did he retrieve them by himself?

15      A.    No.  He said, they're up on the third floor,

16  so he had to ask his father for help to carry everything

17  down.

18      Q.    And did he bring them to the kitchen?

19      A.    Yes, he went out of my sight up to the attic

20  to get them, he indicated, and then I could hear him

21  carrying a large -- I could hear this thumping noise as

22  he brought down a box to the kitchen, as he came down.

23      Q.    You said that he brought a box.  Can you

24  describe the box?

25      A.    It's a plastic crate.  It's -- looks like a --

1    like a foot locker, but it's plastic with a lid that

2    flips open, maybe three feet wide -- two and a half feet

3    tall, two feet wide, like a big giant foot locker with a

4    lid that opens and closes that can be locked with a

5    padlock.

6              MS. WEILAND:  May I approach, your Honor?

7              THE COURT:  Yes.

8         Q.   Officer LeBlanc, I've placed in front of the

9    witness stand what's been previously admitted as

10   Government's Exhibit 33.  Do you recognize that

11   container?

12        A.   That is the black box that Gary Roya had to

13   carry down from his attic.

14        Q.   Okay.  While you were there with Mr. Roya,

15   did -- well, you mentioned, first of all, that the box

16   was locked.

17             Directing your attention to the front of this

18   box, do you see a lock on it today?

19        A.   I do.

20        Q.   And is that the same lock that was on it when

21   Mr. Roya retrieved it from the attic?

22        A.   Yes.

23        Q.   Was the lock opened or closed?

24        A.   It was locked and Mr. Roya unlocked it with a

25   key.

1        Q.    Okay.  Did you examine the contents?

2        A.    I did.

3        Q.    Just generally speaking, what was inside?

4        A.    I saw a BB gun, an AR-style rifle, a shotgun,

5    a handgun, various moving blankets were in there with

6    firearms wrapped in them, a tactical vest, a gas mask,

7    holster, various canned -- metal cans that held ammo,

8    various ammunition, gun magazines.

9        Q.    I'm going to move this off to the side

10    momentarily.

11            I'm approaching you now with Government's

12    Exhibit 5.  Do you recognize that firearm?

13        A.    Yes.  This is the -- one of the firearms that

14    was in that black box.

15        Q.    Okay.  And approaching you now with

16    Government's Exhibit 6 and 6A, do you recognize this

17    firearm?

18        A.    Yes, this would be the rifle that was inside

19    the firearm (sic) and this bag with the ammunition for

20    it was found inside this sort of compartment here at the

21    butt stock.

22        Q.    Okay.  And just to be clear, that

23    ammunition -- was the firearm loaded, to the best of

24    your recollection?

25        A.    No, it was not.

1      Q.   Okay.  So that compartment that you're

2  referring to on the butt stock there, is that simply a

3  storage compartment?

4      A.   So the door flips open, there's a hollowed-out

5  area, and these were found inside there.

6      Q.   And I'm going to approach now with

7  Government's Exhibit 7 and 7A.  Do you recognize these

8  items?

9      A.   Yes.

10      Q.   And what are they?

11      A.   So this is a Catamount Fury semiautomatic

12  shotgun that was found inside that box and this --

13      Q.   Okay.  And I notice that there are two

14  components there.  Is that the way it looked when you

15  opened the box and retrieved those items?

16      A.   We found them as separate, but it should

17  go together as one component to make a long shotgun

18  that's --

19      Q.   Okay.  So that -- this component there, the

20  shorter component, that is --

21      A.   The butt stock.

22      Q.   -- the butt stock.

23           Okay.  Now, you mentioned that there were some

24  other items in addition to the firearms inside the box;

25  is that correct?

1    A.    Yes.

2         MS. WEILAND:  Your Honor, just for ease of

3    reference, would it be all right if I just handed this

4    box to Officer LeBlanc?

5         THE COURT:  I think so.  Do you have any

6    problem --

7         MR. FALKNER:  No objection.

8         THE COURT:  All right.

9    Q.    Officer LeBlanc, I'm handing you a box

10   containing some items.

11        Now, just to be clear, this cardboard box, was

12   it inside this black container when you opened it at

13   Gary Roya's house?

14   A.    This cardboard box was not --

15   Q.    Okay.

16   A.    -- but the contents --

17   Q.    If you wouldn't mind looking inside, and if

18   you wouldn't mind just sort of briefly going through the

19   contents of that box.

20   A.    There are several 30 aught magazines for the

21   AR-style rifle.  Do you need me to show them all.

22   Q.    Let's just move this out of the way.

23        Do you know -- if you wouldn't mind, just for

24   the sake of the jury, I don't think it's necessary for

25   you to display each one, but how many similar magazines

1    are there inside?

2         A.    I believe there are about seven.

3         Q.    Okay.  Now, just in regard to -- I'm

4    displaying Government's Exhibit 13.  Can you describe

5    specifically what this item is?

6         A.    That's a 30-round magazine, meaning it holds

7    30 rounds of 5.56 ammunition that would fit the AR-style

8    rifle.

9         Q.    Okay.  And how many of these magazines were in

10   that box?

11        A.    I'd have to go through and count them again.

12   There are eight right here.

13        Q.    Okay.

14        A.    Some loaded, some unloaded.

15        Q.    You said some of those magazines were loaded?

16        A.    Yes.

17        Q.    And each one has a 30-round capacity?

18        A.    Yes.

19        Q.    All right.  And just so we are clear, these

20   are -- Government's Exhibits 10 through 16 are the

21   extended round magazines; is that correct?

22        A.    Yes.

23        Q.    Okay.  Was there also a standard capacity

24   magazine for that 5.56 caliber rifle?

25        A.    There's this one here that goes to that same

1    rifle.

2        Q.    Okay.  And that's Government's Exhibit 17?

3        A.    Yes.

4        Q.    Okay.  You're holding some other items in your

5    hand there.  Could you please explain what those are?

6        A.    These are loaded magazines that go to the

7    1911, .45 handgun.  It looks like these are eight-round

8    capacities.

9        Q.    Okay.  And those are -- Government's Exhibits

10   19 through 24 are loaded; is that correct?

11       A.    Yes.

12       Q.    And they are loaded with .45 caliber

13   ammunition?

14       A.    Yes.

15       Q.    And that is the type of ammunition that would

16   go with that 1911 Sig Sauer pistol, is that correct?

17       A.    Correct.

18       Q.    Okay.  And then is there also one unloaded .45

19   caliber magazine?

20       A.    Yes.

21       Q.    All right.  And that would be Government's

22   Exhibit 25.  Any additional --

23       A.    Yes.

24       Q.    -- items in that box that we have not talked

25   about?

1      A.   Bags of ammunition.  There's .45 rounds here,

2  .45 caliber rounds.

3      Q.   Okay.  And for the record, that is

4  Government's Exhibit 8?

5      A.   Yes.  And this bag here is a bag of -- it's

6  blank ammunition, it looks like, for the 5.56 rifle.

7           MS. WEILAND:  Okay.  And also, for the record,

8  that is Government's Exhibit 26.

9      Q.   To be clear, this bag of ammunition, that

10  Government's Exhibit 8, that was .45 caliber rounds?

11      A.   Yes.

12      Q.   Okay.  Does that complete the items that are

13  in that cardboard box?

14      A.   Yes, the magazine -- yup.

15      Q.   Okay.  Were there some additional items in

16  that black case at Mr. Roya's house?

17      A.   Yes.

18      Q.   Showing you what's been marked as Government's

19  Exhibit 18, do you recognize this?

20      A.   Yes.  That is a holster for the 1911 pistol.

21      Q.   Okay.  Is this how it looked when you actually

22  saw it in the case when it was first opened?

23      A.   No, the pistol was inside of it.

24      Q.   Okay.  And handing you now Government's

25  Exhibit 27.

1      A.   This is one of the ammo containers that we

2  found inside the black box and inside of it are the

3  loaded 30-round magazines for the 5.56 rifle.

4      Q.   So the black case there -- I'm sorry, the

5  green case, this was inside that black box?

6      A.   Yes.

7      Q.   And this is Government's Exhibit 27?

8      A.   Yes.  So there are --

9      Q.   And that contains additional extended

10  magazines for the --

11      A.   Four extended magazines and a bag of 5.56

12  ammunition.  These ones are not blanks.  These are all

13  live ammunition.

14      Q.   Okay.  And then, finally, approaching you with

15  Government's Exhibit 9, do you recognize this?

16      A.   Yes.  It's a black case, I guess a

17  Pelican-style case, and inside was magazines for the

18  automatic shotgun.  A semiautomatic shotgun, sorry.

19      Q.   Okay.  So that case is Government's Exhibit 9.

20  How many magazines are inside?

21      A.   Five.

22      Q.   So that is Government's Exhibits 9A through E.

23  Were any of these loaded?

24      A.   They were not.

25      Q.   And what is the capacity of these magazines?

1    A.   I believe -- I'm not a hundred percent sure.

2    Eight or ten.

3    Q.   Would this be considered a standard capacity?

4    A.   I believe so.

5    Q.   Okay.  Now, when you were there at Mr. Roya's

6    house examining the contents of this case, did you

7    document what you were seeing as that case was unpacked?

8    A.   Yes, photographs were taken.

9         MS. WEILAND:  Okay.  And if we could -- just a

10   moment.

11        If we could pull up, Ms. Sheff, Government's

12   Exhibit 28.

13        MS. SHEFF:  28A.

14        MS. WEILAND:  28A, that's fine.

15        Okay.

16   Q.   Showing you now Government's Exhibit 28A --

17   and, Ms. Sheff, if you wouldn't mind just sort of

18   briefly scrolling through the remaining exhibits in this

19   28 series.

20        Officer LeBlanc, do these appear to be the

21   photographs that you took at Mr. Roya's house during

22   your visit there the Wednesday before Thanksgiving?

23   A.   Yes.

24   Q.   And is this how the items appeared in that

25   black case as you unpacked it?

1         A.    Yes.

2         Q.    Are these some other items that were actually

3    found inside that black case?

4         A.    Yes, but we did not take those.

5         Q.    Can you describe what they are?

6         A.    There's a little bit of a glare there.

7               That's like a protective suit in that bag that

8    you'd wear, personal protection equipment, I believe is

9    what the PPE stands for, like a biohazard-type suit.

10   And there was like a camouflage tactical vest you would

11   wear.

12        Q.    And, finally, I'm just going to approach and

13   hand you Government's Exhibit 35.  And these are 35A

14   through K.

15              Just very briefly, are these photographs of

16   the same physical items that we've just reviewed that

17   are at Government's Exhibit 5 through 27?

18              If I misspoke, I apologize.  Those were

19   Exhibits 35A through 35K; is that correct?

20        A.    Yes.

21        Q.    And those are just photographs of the physical

22   exhibits in this case; is that accurate?

23        A.    Yes.

24        Q.    And is that just because those physical

25   exhibits cannot go back to the jury room?

1      A.    Correct.

2      Q.    All right.  Now, while you were at Mr. Roya's

3  house, did you ask him for permission to review the

4  contents of his cell phone?

5      A.    I did, yes.

6      Q.    Did he agree?

7      A.    He did.

8      Q.    In reviewing the contents of his cell phone,

9  did you observe anything that you believed was relevant

10  to your investigation?

11      A.    Yes.

12      Q.    Did that include phone calls and text

13  messages?

14      A.    It did.

15      Q.    And did you document any of those

16  communications?

17      A.    Yes, we took a few pictures of his phone that

18  day.

19      Q.    Did -- was there any discussion with Mr. Roya

20  about attempting a full extraction of his cell phone at

21  a later time?

22      A.    Yes, there was.

23      Q.    And was that physical extraction completed?

24      A.    No.  So we followed up with him and again with

25  his permission we asked if we could -- I think it's

1    called a Cellebrite device, where you can connect to his

2    phone to extract the messages we wanted to retain.  And

3    we attempted to do that, but it's a -- his phone is

4    very -- older phone, almost like a flip phone

5    technology, so we were unable to extract it.

6         Q.   Did you document the contents of the phone in

7    some other way?

8         A.   Yes, so the backup plan was I physically went

9    through each of his messages and took pictures of them.

10        Q.   When you say you went through each of his

11   messages, I just want to make sure that I understand.

12             You did not take photographs of the full

13   contents of his cell phone; is that correct?

14        A.   Correct, just the ones that were believed to

15   be relevant to the case.

16        Q.   Did that include some communications with a

17   number that you knew to be associated with Mr. Irish?

18        A.   Yes.

19        Q.   Did that also include some communications with

20   other individuals?

21        A.   It did.

22        Q.   And as you were reviewing the contents of his

23   phone and photographing the contents of his phone, did

24   you alter the contents in any way?

25        A.   I did not.

1     Q.    Did you modify any of those messages or phone

2  logs?

3     A.    No.

4           MS. WEILAND:  If I could approach, your Honor.

5           THE COURT:  Yes.

6     Q.    Officer LeBlanc, I'm handing you now what's

7  been marked for identification as Government's

8  Exhibit 29A -- pardon me just a moment -- 29A, B, C, D,

9  E, and F for identification.  If you wouldn't mind just

10  reviewing those momentarily.

11          Do you recognize those photographs?

12     A.    Yes, these are the pictures that I took of

13  Gary's phone.

14     Q.    And do those pictures fairly and accurately

15  depict the content that you reviewed on Mr. Roya's phone

16  on November 27th, 2019?

17     A.    Yes, they do.

18     Q.    Now, after your interview with Mr. Roya, did

19  you identify any additional witnesses who might have

20  information that was pertinent to your investigation?

21     A.    We did.

22     Q.    And who was that?

23     A.    A subject by the of name of Neil.

24     Q.    All right.  Were you able to eventually

25  determine Neil's identity?

1        A.   Yes, we were able to identify him as Neil

2   Prive.

3        Q.   And who is Neil Prive?

4        A.   My understanding is he's the cousin of

5   Johnathon Irish.

6        Q.   All right.  Did you interview him right away?

7        A.   I did not, no.

8        Q.   Why not?

9        A.   At that time we wanted to --

10            MR. FALKNER:  Objection.

11            THE COURT:  I'm sorry?

12            MR. FALKNER:  I objected, your Honor, to the

13   question.  The question was why not and I objected.

14            THE COURT:  Overruled.  Go ahead.

15        Q.   Is there a reason you did not interview him

16   right away?

17        A.   Yes.  We wanted to protect the integrity of

18   the case, so we held off interviewing him.

19        Q.   What do you mean by protecting the integrity

20   of the case?

21        A.   Well, believing what his relationship with

22   Johnathon Irish, we didn't know where his loyalties

23   would stand, so by interviewing him, information could

24   have gotten back to Johnathon that we were conducting

25   these interviews.

1      Q.    Okay.  Did you eventually interview Mr. Prive?

2      A.    I did.

3      Q.    When was that?

4      A.    After Johnathon got arrested.

5      Q.    Okay.  When was Johnathon arrested?

6      A.    I believe it was December 20th of 2019.

7      Q.    Okay.  Were there any additional witnesses

8  that you interviewed after the defendant's arrest?

9      A.    Yes.

10     Q.    Who was that?

11     A.    Mr. Roscoe Whitney.

12     Q.    When did you first interview Mr. Whitney?

13     A.    On the -- same thing.  We waited until after

14  the arrest to protect the integrity of the case and then

15  I interviewed him the same day, but after -- the same

16  day of the arrest, but after Johnathon was in custody.

17     Q.    Okay.  How many times did you interview

18  Mr. Whitney in total?

19     A.    Two times.

20     Q.    And in your first interview with him, did he

21  provide you some information related to the firearms

22  that you had reason to believe was incorrect?

23     A.    Yes.

24           MR. FALKNER:  Objection.

25           THE COURT:  Okay.  Did you object?  I didn't

1  hear --

2          MR. FALKNER:  Yeah.  Objection, your Honor.

3  The question was did he have information that he had

4  reason to believe was incorrect that he had received

5  from Roscoe Whitney.

6          THE COURT:  Overruled.

7     Q.    Just following up, did Mr. Whitney provide

8  some information about those firearms that you had

9  reason to believe was incorrect?

10    A.    Yes.

11    Q.    In subsequent interviews, did any of the

12  information he provided about the firearms change?

13    A.    Yes.

14    Q.    Now, after Mr. Irish's arrest and apart from

15  your interviews with Mr. Prive and Mr. Whitney, did you

16  have any additional role in the investigation?

17    A.    Yes.

18    Q.    And what was that?

19    A.    I monitored jail phone calls placed by

20  Johnathon Irish from the Merrimack County Jail.

21    Q.    Okay.  Are all telephone calls made by inmates

22  in the jail recorded?

23    A.    The outgoing phone calls, yes.

24    Q.    Okay.

25          MR. FALKNER:  Your Honor, may we approach

1   sidebar?

2          THE COURT:  Yes.

3                    AT SIDEBAR

4          MR. FALKNER:  Your Honor, there's now

5   testimony that there were jail calls made and I just

6   want some kind of instruction to the jury that the fact

7   that he was in jail doesn't have any indication as to

8   whether he's guilty or not guilty of these crimes.

9          THE COURT:  Okay.  And you're going to

10  elicit -- are you eliciting the call at this point?  I'm

11  sorry.

12         MS. WEILAND:  We will be -- yes, we will be

13  moving to admit the call through Officer LeBlanc.  We

14  will not be publishing it at this time.

15         THE COURT:  Okay.  All right.  So that you can

16  absolutely have an opportunity also to look at the

17  transcript, perhaps at lunch.

18         MR. FALKNER:  Yeah, I'd object to its

19  admission.  If your Honor is going to admit it, I would

20  just ask that it be de bene or something to that -- de

21  bene so that I can object in the context of the evidence

22  when it actually comes in.

23         THE COURT:  So you can approach sidebar.  Is

24  that what you're asking?

25         MR. FALKNER:  Yeah.  In other words, I'm

1    asking -- I'm objecting to its admission now under the

2    state of the evidence as it exists.  And I may have

3    additional evidence later -- additional objections -- if

4    it were to be introduced under a different state of the

5    evidence, but I would -- I'm objecting under the state

6    of the evidence now to its admission in addition to --

7              MS. WEILAND:  We haven't offered it yet.

8              MR. FALKNER:  I understand, but I'm just

9    raising it with your Honor at sidebar if --

10             THE COURT:  I will never prohibit you from

11   approaching sidebar.  Sometimes I can't hear and it

12   almost sounds to me like you were going to object, but

13   then sat down.  So I apologize.

14             MR. FALKNER:  I'm sorry.  I'll try to speak

15   louder when I do.

16             THE COURT:  Okay.  That's all right.  So you

17   simply now want to have an instruction that the jury's

18   heard testimony that he's in jail and that there may be

19   calls and you may not in any way use the fact that he

20   was in jail to find that he was guilty.

21             MR. FALKNER:  Right.  I mean, it's the same

22   concern, your Honor, as if he weren't in a suit and were

23   brought in wearing an orange jumpsuit.  You know, the

24   jury is basically being exposed to evidence that he was

25   in jail pending this case and up until today, I wasn't

1  aware that there was going to be any such evidence, but

2  now because of this tape, there is such evidence, which

3  is why I'm asking for the instruction now.

4          THE COURT:  Okay.  I just want to make sure I

5  give the instruction you want.

6          The fact that he is in jail, that you've heard

7  evidence of that, you may not use against him and you

8  may not use it in any way to find that he is guilty of

9  the charged crime.

10         MR. FALKNER:  Correct.

11         THE COURT:  Okay.  Everybody okay with that?

12  All right.

13         Anything else, Attorney Weiland?

14         MS. WEILAND:  No.

15         THE COURT:  I keep saying Weiland.  It's

16  Weiland.

17         MS. WEILAND:  It's Weiland.

18         THE COURT:  I'm so sorry.  I'll try to correct

19  that.

20         MS. WEILAND:  Okay.

21                 CONCLUSION OF SIDEBAR

22         THE COURT:  You have heard testimony that

23  Mr. Irish was in jail.  You may not use that evidence

24  against Mr. Irish in any way and you may not use it in

25  any way to find that he is guilty of this charge.

1          Go ahead, Attorney Weiland.

2      Q.   Officer LeBlanc, are all outgoing telephone

3  calls made by inmates at the jail recorded?

4      A.   Yes, they are.

5      Q.   And what about jail visits?  Are the

6  communications made during jail visits recorded in a

7  similar fashion?

8      A.   Yes.  The visits occur with the parties and

9  the inmates speaking via a telephone and that

10 conversation is recorded as well.

11     Q.   Okay.  Are you familiar generally with how the

12 recording system operates?

13     A.   I'm familiar with the program that I use to

14 access it in order to monitor the jail calls.

15     Q.   Okay.  But in terms of an inmate wishing to

16 place an outgoing call, for instance, how is it that

17 certain calls are associated with a particular inmate on

18 that system?

19     A.   Each inmate has a unique inmate ID or PIN

20 number that is used when they make the outgoing call, so

21 it registers that phone call with them.

22     Q.   And is there anything to prevent inmates from

23 sharing that unique PIN number with other inmates?

24     A.   Well, it's a rule they're not supposed to, but

25 it can happen.

1      Q.    And does it, in fact, happen from time to

2  time?

3      A.    Yes.

4      Q.    So, conceivably, it's possible that someone

5  other than the inmate to whom that unique PIN number is

6  assigned could be making a phone call associated with

7  that PIN number?

8      A.    Correct.

9      Q.    Are there other ways that you can determine

10  whether or not any particular calls or communications

11  that you're monitoring are, in fact, associated with the

12  inmate belonging to that ID?

13      A.    Yes.  In this case, I -- voice recognition and

14  in the content of the conversation, I'm able to tell who

15  it is.

16      Q.    Now, you mentioned voice recognition.  Are you

17  familiar with Johnathon Irish's voice?

18      A.    Yes.

19      Q.    And is that solely through monitoring his

20  communications while he's been in custody?

21      A.    No, I've had face-to-face conversations with

22  him before and on the time of his arrest.  I've also

23  heard his voice on a recorded call as well.

24      Q.    Now, are the recorded calls and communications

25  available for review by law enforcement on some type of

1    platform?

2         A.    Yes.  So for me to get access to that, I had

3    to contact an administrator at the county jail, have

4    proof of my law enforcement credentials, and through

5    their administrator, I get a unique user name and unique

6    password to log in to the program that's called Securus

7    Technologies.

8         Q.    And once you have -- well, first of all, can

9    anybody get access to that database?

10        A.    I do not believe so, no.

11        Q.    Once you log into the platform, what do you do

12   to retrieve communications associated with a particular

13   inmate?

14        A.    Within that program, I search either by the

15   inmate's name or by that unique number assigned to them

16   and then that will give me a list of all the outgoing

17   phone calls or visit calls that have been recorded.

18        Q.    Within that system, when -- when that system

19   retrieves the calls that are associated with a

20   particular individual or a particular PIN number, are

21   you able to see within the platform the outgoing numbers

22   that were dialed from within the jail?

23        A.    Yes, I see the date and the time and the

24   length of the phone call and then the number dialed of

25   who they called.  And then I can also differentiate

1   between that number and whether it's a phone call or a

2   visit recording.

3        Q.   Okay.  In the course of monitoring Mr. Irish's

4   communications, do you have a rough estimate of how many

5   communications you listened to?

6        A.   Many, many hours.  I'd estimate at least 60,

7   70, 80 phone calls.

8        Q.   All right.  Were the majority of those phone

9   calls made to the same individual or individuals?

10       A.   Yes.

11       Q.   What individuals did Mr. Irish communicate

12   with most frequently?

13       A.   I'd say at least 50 percent, if not more, of

14   the time was to his mother Nancy or another gentleman

15   named Don.

16       Q.   Okay.  And in the course of monitoring those

17   communications, did you also become familiar with the

18   sound of Mr. Irish's mother's voice?

19       A.   Very familiar, yes.

20       Q.   Okay.  Directing your attention to

21   February 8th, 2020, so over this past weekend, did you

22   log in to that database on that date?

23       A.   I did.

24       Q.   And did it appear to be operating as normal?

25       A.   It was.

1     Q.    Did you review any recordings associated with

2  Johnathon Irish on that day?

3     A.    Yes, I monitored the visit call on Saturday

4  night.

5     Q.    Okay.

6     A.    This past Saturday night.

7     Q.    Did you recognize Mr. Irish's voice on that

8  recording?

9     A.    I did.

10    Q.    Did you recognize any other voices on that

11  recording?

12    A.    I recognized the voice of his mother Nancy and

13  the voice of the gentleman named Don Lane.

14    Q.    Okay.  And to be clear, was this a -- a phone

15  call?

16    A.    It was a -- a visit.  Don and Nancy were

17  visiting Johnathon at the jail.

18    Q.    And the content of their communication was

19  recorded?

20    A.    Yes, they talked via telephone and that

21  conversation's recorded.

22    Q.    Okay.  Did you download or save that recording

23  in some way?

24    A.    Yes.  So within that program, any call that's

25  monitored, you can literally just click a box of that

1    individual call and then you click create CD image.  And

2    through the program it sends an email or a link to my

3    government email and then that allows me to save it to a

4    CD --

5         Q.   Now --

6         A.   -- or DVD.

7         Q.   -- when you receive that link to download any

8    particular recording, do you have the capability of

9    altering or modifying the content of the communication

10   at all?

11        A.   I can't do anything but save it as is.

12        Q.   Okay.

13        A.   It doesn't allow anything.

14        Q.   And did you follow that procedure to save the

15   recording that -- or I'm sorry -- the communication that

16   you reviewed on February 8th of 2020?

17        A.   I did.

18        Q.   Approaching now with what's been marked for

19   identification as Government's Exhibit 37, do you

20   recognize that disk?

21        A.   I do.

22        Q.   How do you recognize it?

23        A.   Well, my initials are on it.  I initialled it.

24        Q.   When did you place your initials on that disk?

25        A.   This morning, February 10th.

1      Q.    Have you reviewed the contents of that disk?

2      A.    I did.

3      Q.    When?

4      A.    This morning, February 10th.

5      Q.    Does that disk contain a portion of the

6  recorded visit between Mr. Irish and his mother and

7  Mr. Lane on February 8th, 2020?

8      A.    It does.

9      Q.    And is that disk a true and accurate copy of

10  that portion of the phone call?

11      A.    It is.

12          MS. WEILAND:  Your Honor, at this time, I move

13  to strike the ID from Exhibit 37.

14          MR. FALKNER:  Objection, your Honor.  And may

15  I be heard at sidebar?

16          THE COURT:  Yes.

17                        AT SIDEBAR

18          MR. FALKNER:  Your Honor, at this time I'd

19  simply reiterate the 403 grounds.  Certainly it could be

20  redacted so as to exclude the comments about conspiracy.

21          I'd additionally point out -- and it's unusual

22  to raise it at this point -- but I -- I object under the

23  Fourth Amendment to the introduction of this.

24          There's been no testimony as to the -- any

25  penilogical goal.  This agent has testified that it's

1    simply as a law enforcement agent who's unaffiliated

2    with the jail, he just logs in -- it's a nonprivate

3    database, and he just logs in and listens to every phone

4    call of the defendant.

5            As a result of that, because it's nonpublic,

6    there is some privacy interest in it so that Mr. Irish

7    has a privacy -- some privacy interest vis-a-vis law

8    enforcement.

9            There's been no subpoena here, there's been no

10   showing that the agent, other than simple -- simply

11   listening to him, monitoring all communications of the

12   defendant, and this communication's included in that,

13   and as a result of that, I'd object under the Fourth

14   Amendment.

15           And I'd point out that I've had no prior

16   opportunity, because this evidence didn't even come into

17   being until Saturday and I wasn't informed that it would

18   be introduced until yesterday.

19           MS. WEILAND:  I think the Fourth Amendment

20   jurisprudence is pretty well settled that inmates in a

21   penal institution have no legitimate expectation of

22   privacy in the content of their communications.  And I

23   am happy to elicit testimony that inmates are advised

24   that all of their communications within the jail are

25   subject to monitoring and recording.

1          MR. FALKNER:  And I'd stipulate to that and

2     agree to that, that the -- that at the beginning of the

3     call, not the part that's been introduced, it does say

4     that it's being subject to monitoring and recording.

5     But that doesn't mean that it's necessarily available to

6     the FBI as opposed to the persons working at this jail

7     and for the purpose of maintaining the security of the

8     institution.

9          THE COURT:  Okay.  Overruled, Fourth Amendment

10    objection.  There's no legitimate expectation of privacy

11    with respect to these calls.

12          The 403 issue, with respect to a certain basis

13    being redacted, I'm not sure I'm clear on that.

14          MR. FALKNER:  So -- so, your Honor, in

15    particular, it's a 30-second clip, approximately.

16          THE COURT:  Uh-huh.

17          MR. FALKNER:  The specific words that makes it

18    sound as if he's in a conspiracy with his mother, I'd

19    like for that to be redacted.  I think that's unfairly

20    prejudicial, even if the rest of the clip would

21    otherwise be admissible.

22          MS. KRASINSKI:  As a --

23          THE COURT:  I'm going to overrule that

24    objection.  I think you can make whatever argument you

25    want to make about those statements, but I'm not finding

1   that the probative value is substantially outweighed by

2   the prejudice on that.

3           Anything else?  Do you have any arguments with

4   respect to the foundation?

5           MR. FALKNER:  No, your Honor.

6           THE COURT:  And you're stipulating, so you

7   have no problem with her asking him are inmates informed

8   of the -- would you rather handle that via a

9   stipulation?

10          MR. FALKNER:  I'd rather -- I think that's

11  only relevant to the Fourth Amendment considerations

12  that go before the jury, so I don't think that's

13  testimony that needs to be introduced.

14          THE COURT:  And she didn't -- okay.  All

15  right.

16          MR. FALKNER:  Okay.

17          THE COURT:  Okay.  Thank you.

18                  CONCLUSION OF SIDEBAR

19          THE COURT:  Go ahead, Attorney Weiland.

20          MS. WEILAND:  Your Honor, at this time we do

21  move to strike the ID on Government's Exhibit 37.

22          THE COURT:  All right.  Objection noted, but

23  that is a full exhibit.

24          MS. WEILAND:  And I would just ask your

25  Honor's permission to publish this through a later

1   witness.

2            THE COURT:  I'm sorry?

3            MS. WEILAND:  We would ask to publish this

4   through a later witness.

5            THE COURT:  All right.  Permission granted.

6            (Government's Exhibit 37 admitted.)

7            MS. WEILAND:  No further questions, your

8   Honor.

9            THE COURT:  All right.  Attorney Falkner, go

10  ahead.

11                    CROSS-EXAMINATION

12  BY MR. FALKNER:

13       Q.   Good morning, Mr. LeBlanc.

14       A.   Good morning.

15       Q.   How many years have you been working at the

16  FBI?

17       A.   About two and a half years, sir.

18       Q.   And on this investigation, you were working

19  with Agent Tongbua, correct?

20       A.   Yes.

21       Q.   And his title is special agent, correct?

22       A.   His title?

23       Q.   Correct.

24       A.   Yes.

25       Q.   Fair to say that special agent refers to every

1    agent of the FBI?

2         A.    Their title?

3         Q.    Their title is just special agent, correct?

4         A.    Yes.

5         Q.    There's no other kind of agent other than

6    special agent, correct?

7         A.    Not that I'm aware of.

8         Q.    Now, in this case, in or around January of

9    2019 is when you interviewed Ms. Millett, correct?

10        A.    Yes.

11        Q.    And that is Johnathon Irish's mother-in-law?

12        A.    Yes.

13        Q.    And it was at that interview that she was

14   signed up so to speak as a -- as a confidential

15   informant, correct?

16        A.    I believe so, yes.

17        Q.    And were you involved in preparing the

18   confidential informant paperwork?

19        A.    I believe I -- yes.  The admonishments and --

20        Q.    There's an application that's filled out also,

21   correct?

22        A.    Yes.

23        Q.    And in that application, among other things,

24   you have to identify potential reasons why that person

25   would be -- want to be an informant, correct?

1          A.    Yes.

2          Q.    And that was filled out vis-a-vis Elizabeth

3     Millett, correct?

4          A.    It was filled out by --

5          Q.    That was filled out in the case of Elizabeth

6     Millett, correct?

7          A.    Yes, sir.

8          Q.    Did you fill that out?

9          A.    I don't think I did.

10         Q.    Did Agent Tongbua fill that out?

11         A.    I believe so.

12         Q.    Did you ever review that paperwork?

13         A.    Yes.

14         Q.    And it's fair to say that there were generally

15    three grounds on which the FBI believed were motivations

16    for her to be signing up as a confidential informant,

17    correct?

18         A.    Which three -- are you referring to something

19    on that paperwork?

20         Q.    Yes.

21         A.    I'd have to see it again, sir.  Sorry.

22         Q.    Well, for instance, you were able to identify

23    that she had a family motive in the sense that she had

24    some concern for her family and that was a motive why

25    she was signing up as a confidential informant, correct?

1      A.   My understanding, her motive was to help us

2 out because she had information.

3      Q.   Right.  But also it was identified that she

4 was concerned because her daughter and her son-in-law

5 were draining her financially; isn't that so?

6      A.   If you -- sir, if you're referring to the

7 paperwork, I'd have to look at it.  I have not looked at

8 it recently.

9           Thank you.

10      Q.   Is that a portion of the application for

11 Elizabeth Millett to be signed up as a confidential

12 informant, to the best of your knowledge?

13      A.   I'm sorry, sir.  I was reading this.  Can you

14 repeat?

15      Q.   Have I shown you a portion of the application

16 for Elizabeth Millett to sign up --

17      A.   Yes.

18      Q.   -- as a confidential informant?

19      A.   Yes.

20      Q.   And there's three generalized motives,

21 correct?  The first, her family.

22           MS. WEILAND:  Your Honor, may we approach?

23           THE COURT:  Yes.

24                     AT SIDEBAR

25           MS. WEILAND:  Your Honor, I'm going to object

1    to that.  This is an improper means of refreshing the

2    witness's recollection.  He's asking about specific

3    information that is contained within that paperwork.

4           The witness testified he did not recall

5    specifically what was in that paperwork and now he's

6    being asked basically to read from the paperwork what

7    exactly is on there.

8           MR. FALKNER:  I'll ask him if he can refresh

9    his recollection first and then ask him questions if

10   that's --

11          THE COURT:  I think, too, just asking him, do

12   you remember what she said before --

13          MR. FALKNER:  Right.

14          THE COURT:  -- and then you can simply look at

15   the exhibit, do you remember her telling you X.  And if

16   he says no, I don't remember that, then you can impeach

17   him with the document.

18          But I don't even think he's testified totally

19   that his memory was -- he has no memory and it needs to

20   be refreshed, so I think that's a correct objection.

21   I'll let you go ahead and --

22          MR. FALKNER:  That's fine.

23          THE COURT:  -- correct that.  So objection's

24   sustained.

25          MS. WEILAND:  And I would just note that if he

1   is attempting to refresh recollection that the document

2   should be retrieved before asking additional questions.

3              THE COURT:  I think that's correct.

4              MR. FALKNER:  I have no problem with that.

5              THE COURT:  All right.

6                   CONCLUSION OF SIDEBAR

7       Q.   You remember having a conversation with

8   Elizabeth Millett about her motivations for why she

9   would want to be a confidential informant, correct?

10      A.   Yes.

11      Q.   And is it fair to say that during that

12  conversation she gave you three generalized areas of --

13  of reasons why she may want to be a confidential

14  informant?

15      A.   Yes.

16      Q.   Is it fair to say that the first motivation

17  was of some concern for her family?

18      A.   Yes.

19      Q.   And then is it fair to say that the second

20  reason is that -- that she gave you is she's just

21  friendly with law enforcement and was eager to assist?

22      A.   Yes.

23      Q.   And is it also fair to say that the third

24  motivation which she identified was that her daughter

25  and her son-in-law, meaning Stephanie Irish and

1    Johnathon Irish, were draining her financially?

2         A.   I don't think it's fair to say it in that

3    context, no, sir.

4         Q.   Did she say that her daughter and her

5    son-in-law were draining her financially?

6         A.   It's in the context of the totality of the

7    circumstances that she believed her daughter was in.

8         Q.   Okay.  I'm not sure that I understand your

9    question.  My -- or answer.

10             My question is did she say that her daughter

11   and her son-in-law were draining her financially?

12        A.   Yes.

13             MS. WEILAND:  I'm going to object on hearsay

14   grounds, your Honor.

15             THE COURT:  Overruled.

16             Go ahead.

17        Q.   And she indicated to you that she had recently

18   purchased a home for her daughter and son-in-law,

19   correct?

20        A.   Yes.

21        Q.   And that she had also sold a substantial

22   property, correct?

23        A.   I believe so.

24        Q.   And that Stephanie Irish and Johnathon Irish

25   were constantly requesting money and access to an

1    inheritance, correct?

2            MS. WEILAND:  Your Honor, may we approach?

3            THE COURT:  Yes.

4                      AT SIDEBAR

5            MS. WEILAND:  Your Honor, I'm going to relodge

6    my hearsay objection.  The -- Ms. Millett is expected to

7    testify.  Right now Attorney Falkner is eliciting from

8    this witness information that -- what did Elizabeth

9    Millett say to you.

10           THE COURT:  That's correct.

11           MR. FALKNER:  But it's not being offered --

12           THE COURT:  What's the purpose?

13           MR. FALKNER:  It's not being offered for the

14   truth of the matter asserted.  It's being offered for

15   the fact that this is the complaint that she made to law

16   enforcement and that helps establish her bias.

17           THE COURT:  Well, you'll be able to ask her

18   that in terms of reasons that --

19           MR. FALKNER:  I understand that.

20           THE COURT:  -- she -- motives to perhaps

21   fabricate.  You'll be able to ask her that.  So I am

22   sustaining the objection.

23           MR. FALKNER:  Your Honor, if I just may

24   briefly --

25           THE COURT:  Yes, go ahead.

1          MR. FALKNER:  The fact that she identified to

2    law enforcement these issues as a -- as reasons why she

3    was cooperating with them at that time goes to her bias

4    at that time as opposed to whatever she testifies as her

5    motives here today in this courtroom.

6          THE COURT:  And she is going to testify and if

7    she denies any of that, you can call him again to

8    impeach her.  I believe that's the proper way to do it.

9    So I do believe that it's a correct objection and it's

10   sustained.

11         MR. FALKNER:  Okay.

12                   CONCLUSION OF SIDEBAR

13         THE COURT:  All right.  Go ahead, Attorney

14   Falkner.

15     Q.   After this January meeting where you signed up

16   Elizabeth Millett as a confidential informant, did you

17   meet with her again or was it Agent Tongbua, to your

18   knowledge?

19     A.   I don't believe I did.

20     Q.   Do you have knowledge as to when Agent Tongbua

21   met with her?

22     A.   Not without reviewing the file.

23     Q.   And so were you informed in the case from

24   January 24th up until October 25th of 2019?

25     A.   I was assigned to the case, but early on in

1    2019, that's the time period when things were sort of

2    cold or stalled.

3         Q.   So were you working on the case from the time

4    after you met with Elizabeth Millett up until the time

5    that Stephanie Irish left Johnathon Irish?

6         A.   I guess depends what you call working on the

7    case.

8         Q.   Well, you weren't interviewing witnesses

9    during that time period?

10        A.   No, sir.

11        Q.   And you weren't in the process of obtaining

12   evidence in some other way during that time period?

13        A.   Not at that time, no.

14        Q.   Now, October 25th comes and goes and at that

15   point you become involved in interviewing various

16   witnesses, correct?

17        A.   Yes.

18        Q.   Was Peter Duguay the first witness that you

19   interviewed?

20        A.   I don't remember the exact order of who I saw

21   first.

22        Q.   Well, do you remember on October 29th of 2019

23   meeting with Peter Duguay and David Marcotte?

24        A.   Do I remember meeting with them.  I believe he

25   was the first, then I believe I saw David afterwards.

1    I'd have to refresh.

2        Q.   And then it was a couple weeks before your

3    next interview, correct?

4        A.   I would -- I'm sorry, I need a name or

5    something to refresh which --

6        Q.   Dylan Roosa was the next person you met with?

7        A.   After Peter and David, yes.

8        Q.   And that was November 14th, correct?

9        A.   Yes.

10       Q.   And you met -- it was after that you met with

11   Dylan Roosa -- I'm sorry.

12            Were you involved in the application for Dylan

13   Roosa to become a confidential informant?

14       A.   Yes.

15       Q.   And so you were also part of -- and did that

16   occur on November 14th?

17       A.   If November 14th is the first time I

18   interviewed him, no, it did not.

19       Q.   Well, he was next interviewed on December 5th.

20   Is that when you filed the application?

21       A.   Again, I'd have to look at the paperwork.

22   What I remember is the initial interview when I first

23   interviewed him.  After that interview was complete and

24   going back to the office, there was discussion how --

25   maybe reapproach him to ask if he could be or would be

1    willing to be an informant and what he could possibly do

2    to help us.  I'd have to refresh -- look at all

3    paperwork to lock in dates.

4         Q.   Let me ask you this.  During the November 14th

5    interview with Dylan Roosa, was there any conversation

6    at all about his finances?

7         A.   His finances?

8         Q.   Correct.

9         A.   Not that I can remember at the moment.

10        Q.   And what about on the December 5th interview?

11        A.   With?

12        Q.   Dylan -- with Dylan Roosa.

13        A.   About his finances?

14        Q.   Correct.

15        A.   I don't remember specifically.  I know he

16   didn't have a license and owed money to get a license.

17        Q.   Now, November 27th, the day before

18   Thanksgiving, that's when you and Agent Tongbua go to

19   visit Gary Roya, right?

20        A.   It was the Wednesday before Thanksgiving?

21        Q.   Right.

22        A.   Yes, sir.

23        Q.   What time of day was this visit?

24        A.   Morning, early morning.

25        Q.   When you say early morning, can you --

1      A.   7:00 a.m., 8:00 a.m.

2      Q.   Okay.  And was Mr. Roya alerted that you'd be

3   coming to the house?

4      A.   No, he was not.

5      Q.   Did you and Agent Tongbua travel in the same

6   vehicle?

7      A.   No.

8      Q.   Did you travel in marked vehicles?

9      A.   No.

10      Q.   Did anybody else other than yourself or Agent

11   Tongbua go to this home?

12      A.   That morning?

13      Q.   Correct.

14      A.   No.

15      Q.   So you and Agent Tongbua walk up to the door

16   and knock and at that point, to the best of your

17   knowledge, Gary Roya has no idea you're coming?

18      A.   Correct.

19      Q.   How were you dressed?

20      A.   Regular street clothes, probably a collared

21   shirt and jeans is what I typically wear.

22      Q.   Nothing to indicate that you're a member of

23   law enforcement?

24      A.   I would have had credentials and a badge in my

25   hand.

1      Q.   And what about Agent Tongbua?

2      A.   I believe he would have had his credentials

3 out as well.

4      Q.   Was he dressed similarly?

5      A.   I believe so, yes.

6      Q.   So you knock on the door.  Who goes in first?

7      A.   I'm sorry?

8      Q.   Who goes into the home first?

9      A.   I don't remember which order we walked in.

10     Q.   Who else was home with Gary Roya at this time?

11     A.   His parents.

12     Q.   Who answered the door?

13     A.   I believe it was his father.

14     Q.   Was his name Gerald Roya as well?

15     A.   Senior, I believe.

16     Q.   And fair to say that Gary Roya was embarrassed

17 to be receiving a visit from two FBI agents on the

18 morning before Thanksgiving?

19     A.   I don't know if he was embarrassed or not,

20 sir.

21     Q.   Did he say anything about being embarrassed?

22     A.   I don't recall.

23     Q.   Was he upset that he was being visited by two

24 FBI agents on the morning before Thanksgiving?

25     A.   Just in general, from my experience when

1    people -- when law enforcement knocks on someone's door,

2    their first -- there's concern that, you know, their

3    first fear is is there some kind of death notification

4    of some sort if you're not expecting the police knocking

5    at your door.

6            So there's getting past that initial

7    introduction and then basically that -- other than --

8    you know, him wondering why we were there and then it

9    was explained.

10        Q.   Did you suggest to him that he had some reason

11   to be concerned that you were looking for these firearms

12   at his house?

13        A.   I did not, no.

14        Q.   Did Agent Tongbua?

15        A.   Suggest to him that he should be concerned?

16        Q.   Correct.

17        A.   No, sir.

18        Q.   What was his demeanor like when you first came

19   into the home?

20        A.   He was polite and cooperative with us.

21        Q.   And I just want to go through the items in the

22   plastic crate.

23            There was a BB gun in there, right?

24        A.   Yes.

25        Q.   That's not in this courtroom.  Was that seized

1    by you?

2         A.    No.

3         Q.    Was that given back to Mr. Roya?

4         A.    Yes.

5         Q.    So does that mean the BB gun and that suit

6    that was depicted in a -- in the photograph and those

7    other items that aren't in this courtroom, those were

8    items that were given back to Mr. Roya?

9         A.    Yes.  Well, they never left his possession,

10   never left that house.

11        Q.    Well, were they in the box when you went

12   through the box?

13        A.    Yes.

14        Q.    So who took them out of the box, you or

15   Mr. Roya?

16        A.    I don't remember exactly.  I know he was there

17   as we inventoried what was in the box.

18        Q.    Now, there were some blankets in that box,

19   right?

20        A.    Yes.

21        Q.    The firearms and the BB gun were wrapped in

22   those blankets, correct?

23        A.    Yes.

24        Q.    So when you first opened that box, was it just

25   full to the top and all you could see at the top were

1  blankets?

2      A.    I'd have to go back to that -- one of the

3  pictures that was shown to me earlier.  I believe you

4  could see firearms.

5      Q.    Let me ask it a different way.

6            So the picture of the box that you looked at

7  earlier in front of the jury showed some firearms laying

8  on top of a blanket, correct?

9      A.    Yes.

10     Q.    And that was the rifle and the BB gun, right?

11     A.    I believe so.

12     Q.    When the box was opened, were they lying on

13  top like that or were they covered by a blanket?

14     A.    I believe that's how they were when Mr. Roya

15  opened the box.

16     Q.    Were those the only firearms that you could

17  see at that time?

18     A.    I believe so, yes.

19     Q.    Who went through the box?  Did Mr. Roya go

20  through the box or did you go through the box?

21     A.    I believe it was Special Agent Tongbua and I

22  with Mr. Roya there.

23     Q.    Okay.  And some of the pictures depict

24  Mr. Roya holding on to the firearms, right, in his

25  hands?

1      A.    Yes.

2      Q.    Did you then hand those firearms to him for

3  purposes of taking the pictures?

4      A.    I believe he was just there next to us as we

5  were going through the box and helping us move stuff.

6  Like I said, he was cooperative and helpful.

7      Q.    So you didn't have a security concern while

8  you were doing this inventory of the box?

9      A.    No.

10      Q.    And what about Gary Roya Sr.?  Was he involved

11  in this at all?

12      A.    Other than helping him carry down that box,

13  no.

14      Q.    Between the time that you seized the firearms

15  and the time that Mr. Irish was arrested, you only

16  performed two more interviews, one of Mr. Roosa and a

17  second interview of Mr. Roya, correct?

18      A.    I believe so, yes.

19      Q.    And then it was on December 30th that you

20  actually arrested Johnathon Irish?

21      A.    I believe it was December 20th.

22      Q.    And it was after that that you performed any

23  and all of your interviews with Roscoe Whitney and Neil

24  Prive?

25      A.    After the arrest, yes.

1      Q.   Were you -- were you aware that there was some

2  kind of a recorded call with Roscoe Whitney on

3  November 10th of 2019?

4      A.   Which date?

5      Q.   November 10th.

6      A.   If it's the call I'm thinking of, yes.

7      Q.   Did you participate in that call?

8      A.   I did not.

9      Q.   You weren't present when it occurred?

10     A.   No.

11          MR. FALKNER:  May I have just one more moment,

12  your Honor?

13          THE COURT:  Yes.

14     Q.   Just a follow-up on the jail calls.

15          You said you listened to 60 to 70 hours' worth

16  of jail calls; is that right?

17     A.   It's just an estimate.  There was quite a bit.

18     Q.   He was probably making a couple of different

19  phone calls every day, correct?

20     A.   Yes.

21     Q.   And some of those calls lasted up to hours,

22  correct?

23     A.   What?  I'm sorry.

24     Q.   Some of those calls lasted upwards of an hour,

25  correct?

1     A.     No, each call is limited to 20 minutes.  The

2  visit calls are up to, I believe, 53-ish minutes, but if

3  he were to make a repeat phone call, then, yes, they

4  could extend it for a maximum of 20 minutes at a time to

5  when the call gets shut off.

6     Q.     All right.  And so would it be fair to say

7  that out of those 60 to 70 hours, at least 30 or more

8  hours of those phone calls involved his speaking to

9  Nancy Haskell, his mother?

10    A.     Yes.

11    Q.     And on that -- during the visit that was

12  recorded, was that the only visit that was recorded?

13    A.     No, any visit he had would have been recorded.

14    Q.     Did you listen to other calls recording

15  visits?

16    A.     Yes.

17    Q.     How many of those did you listen to?

18    A.     Of the visits?

19    Q.     Right.

20    A.     I believe two, maybe three.

21    Q.     All right.  And were all of those close to an

22  hour long?

23    A.     From memory, I believe so.

24    Q.     And I just want to be clear.  The recording

25  that is now the government's exhibit, that's a 30-second

1    clip, approximately, right, 20- to 30-second clip?

2         A.    Yes.

3              MR. FALKNER:  Your Honor, I have no further

4    questions.

5              THE COURT:  All right.  Thank you.

6              MS. WEILAND:  May I have just a moment, your

7    Honor?

8              THE COURT:  Yes.

9              MS. KRASINSKI:  May we approach, your Honor?

10             THE COURT:  Yes.

11                        AT SIDEBAR

12             MS. KRASINSKI:  I am slightly concerned with

13   the sort of last portion of the questioning, you've

14   listened to hundreds of hours of calls and all this is

15   is a 20-second clip.

16             We have disclosed transcripts of jail calls.

17   I've discussed portions of jail calls with counsel that

18   talk about the defendant talking about this case, about

19   these guns, about purposely saying things on jail calls

20   that are red herrings.

21             In fact, there is one call where the defendant

22   says, my attorneys told me to stop planting red herrings

23   in these calls.  He specifically says in one call that

24   he says things for the purposes of misdirection.  He

25   specifically talks to the federal government in some of

1    those calls.

2          I'm not going to repeat the cursing in this,

3    but in one particular call he says, now, stop, stop,

4    stop, to all you feds listening, suck an F-ing D word.

5          So I am concerned that this line of

6    questioning gives the jury the opinion that this is the

7    only time that he's talking about the case or anything

8    like that.

9          Now, we chose not to introduce that.  We

10   thought it -- given his statements about misdirection

11   and red herrings, it was kind of confusing.  But I'm not

12   sure the appropriate remedy for this now because the

13   jury should not be left with an impression that only 20

14   seconds of all of these calls were relevant.

15         So I don't know if -- I bring this up now

16   because I don't know that the -- I don't know that we

17   should get into the contents of all of those calls --

18               THE COURT:  Right.

19               MS. KRASINSKI:  -- but that is a concern I

20   have now.

21               THE COURT:  All right.  But you don't have any

22   suggested cure at this point?

23               MS. KRASINSKI:  I mean, we can question him

24   about the content of the calls, about red herrings,

25   about speaking directly to us, about stating that he's

1   purposely saying things for misdirection.

2          MS. WEILAND:  Reflecting an awareness that his

3   calls are being recorded and monitored.

4          THE COURT:  At this point -- I understand what

5   you're saying and I don't think that at this point he's

6   opened the door to that.  I think it's close and I

7   understand what you're saying, but at this point I'm

8   going to -- I'm not going to allow any further

9   questioning on that.

10         I think you could ask him one generic

11  question:  Defense counsel asked there were hundreds of

12  hours of questions and there's only this one call that

13  you recorded; were there other relevant statements and

14  calls that you heard him say, something generic such as

15  that, and I think that would cure at this point the

16  limited impression that's been left with the jury.  I'll

17  let you do that.

18         I'm sorry --

19         MS. WEILAND:  That's okay.

20         MS. KRASINSKI:  I've just been the one that's

21  listened to all of the jail calls, which is why --

22         THE COURT:  All right.  I'll let you do that.

23         MS. WEILAND:  Okay.

24         THE COURT:  And then we're going to take a

25  lunch break for one hour.  Okay?  All right.

CONCLUSION OF SIDEBAR

REDIRECT EXAMINATION

BY MS. WEILAND:

Q.   Just a few quick questions, Officer LeBlanc.

You mentioned that in signing up Mr. Roosa to work as a confidential source, that did not take place during your first interview of him; is that correct?

A.   Correct.

Q.   And, in fact, I believe you just stated on cross that it was after that interview back at the office that you and some of your colleagues discussed the possibility of approaching him and seeing if he'd be willing to work in that capacity; is that accurate?

A.   Yes.

Q.   So is it fair to say Mr. Roosa did not approach you about working as a source?

A.   Correct.  We approached him.

Q.   Is the same true of Mrs. Millett?

A.   Yes.

Q.   You approached her with the idea?

A.   Yes.

Q.   And then turning your attention to your monitoring of the jail calls, I just want one point of clarification.

I believe on cross-examination you were asked

1    whether you had reviewed 60 to 70 hours of jail calls.

2    Was it your testimony on direct that you listened to 60

3    to 70 hours' worth of calls or 60 to 70 calls, if you

4    remember?

5         A.    I don't remember the exact hours.  Like I

6    said, I would estimate at least 60, 70, 80 calls with

7    each one ranging anywhere from three to four minutes

8    long to 20 minutes long with probably many of them being

9    in the 11- to 19-minute range.

10        Q.    Okay.  And in those calls, you said maybe half

11   of them or so were with the defendant's mother,

12   Ms. Haskell; is that correct?

13        A.    The calls that I listened to, the majority of

14   calls were between him, his mother, and Don Lane.

15        Q.    And I just want to be clear.  The 30-second

16   clip that's been admitted as Government's Exhibit 37,

17   in all your hours of monitoring jail calls, is that

18   30-second clip the sum total of relevant discussions

19   that Mr. Irish had with other people related to

20   information about this case?

21        A.    Say that again.

22        Q.    Was that 30-second clip the only time that you

23   heard recorded jail calls that appear to be discussing

24   information pertinent to this case?

25        A.    It's not the only time, no.

1          MS. WEILAND:  No further questions, your

2    Honor.

3          THE COURT:  Anything further?

4          MR. FALKNER:  Nothing, your Honor.

5          THE COURT:  All right.  It is time for our

6    lunch break.

7          At any point if a juror needs to take a break,

8    just signal and if I can't see you, somebody will see

9    you and let me know.

10          We're going to take a lunch break, an hour.

11    And remember all my instructions.  I'm not going to

12    repeat them again.  But most importantly, do not discuss

13    the case with each other, but keep all my other

14    instructions in mind as well and I'll see you after the

15    lunch break.

16          THE CLERK:  All rise for the jury.

17                    (Jury excused.)

18          THE COURT:  Officer LeBlanc you may step down,

19    sir.  Thank you.

20                    (Witness excused.)

21          THE COURT:  Anybody need to talk to me before

22    you take your lunch break?

23          MS. WEILAND:  No, your Honor.

24          THE COURT:  All right.  Good.  See you in an

25    hour.

1          (Lunch recess taken at 12:23 p.m.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

C E R T I F I C A T E

I, Liza W. Dubois, do hereby certify that the foregoing transcript is a true and accurate transcription of the within proceedings, to the best of my knowledge, skill, ability and belief.

Submitted: 3/27/2020      /s/  Liza W. Dubois
                          LIZA W. DUBOIS, RMR, CRR