*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO JUNE 25, 2020

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                          \*
UNITED STATES OF AMERICA        \*
                                          \*   1:19-cr-251-LM-1
            v.                  \*   February 12, 2020
                                          \*   8:07 a.m.
JOHNATHON IRISH                 \*
                                          \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


TRANSCRIPT OF JURY TRIAL
DAY FOUR - MORNING SESSION
BEFORE THE HONORABLE LANDYA B. McCAFFERTY



Appearances:


For the Government:        Anna Z. Krasinski, AUSA
                           Kasey A. Weiland, AUSA
                           United States Attorney's Office




For the Defendant:         Benjamin L. Falkner, Esq.
                           Krasnoo, Klehm & Falkner, LLP




Court Reporter:            Liza W. Dubois, RMR, CRR
                           Official Court Reporter
                           United States District Court
                           55 Pleasant Street
                           Concord, New Hampshire 03301
                           (603)225-1442

```
 1                         I N D E X

 2
                                                      PAGE
 3

 4   CONFERENCE                                          3

 5
     WITNESS:           Direct    Cross   Redirect   Recross
 6

 7   GERALD ROYA          30        61       91         93

 8
     KEVIN LEBLANC       100       107       --
 9

10
     GOVERNMENT RESTS                                    94
11

12   DEFENSE RESTS                                      110

13

14   CLOSING ARGUMENTS

15       By Ms. Krasinski                              116

16       By MR. Falkner                                131

17       By Ms. Krasinski (rebuttal)                   149

18

19
     EXHIBITS:                      FOR ID          IN EVD
20

21   Government's 29A                                   42

22   Government's 29B                                   43

23   Government's 29C                                   44

24   Government's 29D                                   48

25   Government's 29F                                   58
```

```
 1                     P R O C E E D I N G S
 2             THE CLERK:  The Court has before it for
 3    consideration today United States vs. Johnathon Irish,
 4    19-cr-251-LM, jury trial day four.
 5             THE COURT:  All right.  Okay.  I've got a slew
 6    of last-minute motions.  I have looked at them.  We can
 7    obviously discuss them.  Let me get to --
 8             MR. FALKNER:  One of them, your Honor, as I
 9    was re-going through your draft instructions, I would
10    withdraw the one as to the constitutional right because
11    I think it's already included --
12             THE COURT:  It's already in there.  It's in
13    bold because we obviously know it's his right to
14    exercise, so we'll let him do that.
15             All right.  So that's -- Document 32 is moot,
16    denied as moot, because the instruction's already
17    included.
18             All right.  And I am not going to have a
19    special verdict form in the case.  I appreciate the
20    arguments being made in Document 28, but I think my
21    instructions are fairly clear on what the jury needs to
22    do.
23             Do you want to be heard any more on that,
24    Attorney Falkner?
25             MR. FALKNER:  (Shakes head.)
```

1            THE COURT:  Okay.

2            MR. FALKNER:  I'd just rest on the arguments

3    that I've made.

4            THE COURT:  All right.

5            And let's talk about requests for missing

6    witness jury instruction, Document -- it's Document 29

7    and 31.  I think 31 is just a corrected version of 29,

8    so let's deal with 29 and 31, this missing witness

9    issue.

10            And you're talking about Stephanie Irish; is

11    that correct, Attorney Falkner?

12            MR. FALKNER:  That's correct, your Honor.

13            THE COURT:  And my memory of this is that all

14    the testimony about the multiple times they had contact

15    with her came through cross-examination, if I'm not

16    mistaken.

17            MR. FALKNER:  That's correct.

18            THE COURT:  Okay.  And why is Stephanie Irish

19    someone that you could not call as a witness?

20            MR. FALKNER:  It's not that I -- that I could

21    not call her.  The issue is that the government has

22    made -- has in-depth contact with her.  She has

23    interviewed with them repeatedly; she's given them what

24    they describe as helpful and what they describe as

25    truthful evidence.

1          She's in divorce proceedings against

2    Mr. Irish, so one could reasonably infer that her

3    testimony will be adverse to him as she would have a

4    motive, a strong motive, to testify adverse to him in

5    that on the facts of this case, the investigation begins

6    at the time that she leaves him.  She's now in ongoing

7    divorce proceedings against him and cooperating with the

8    FBI against him.

9          So it's not that she could not be called,

10   but certainly the -- I think on this evidence, it's a

11   much -- it would -- it would make sense for the

12   government to be calling her in these circumstances.

13         She lives in the home where these firearms are

14   and she's got all this information that's helpful to the

15   government that she's providing to the government and

16   she continues to be cooperative with them and yet they

17   don't call her as a witness.

18         THE COURT:  Okay.  Now, the instruction

19   itself, the pattern instruction, Document 31-1,

20   specifically tells the jury, "You're not required to

21   draw that inference, but you may do so.  No such

22   inference is justified if the witness is equally

23   available to both parties."

24         MR. FALKNER:  And I would just say that she's

25   not equally available.  She is in constant contact and

1    cooperation with the government.

2              THE COURT:  So the -- I heard testimony that

3    Mr. Irish and Stephanie Irish have children.  They must

4    see each other.  There must be some availability for

5    Stephanie Irish to be served a subpoena.  No?

6              MR. FALKNER:  There may be.  There's no

7    testimony about service of a subpoena, that's true.

8    But --

9              THE COURT:  No, I'm just asking as a practical

10   matter, obviously.  I'm just wondering if this -- if

11   this instruction's warranted.

12             I mean, I don't know specifically, but

13   obviously they are in divorce proceedings, so --

14             MR. FALKNER:  The -- it's my understanding --

15   oh, I apologize, your Honor.

16             THE COURT:  That's okay.  Go ahead.

17             MR. FALKNER:  It's my understanding as to the

18   children that they're in DCYF custody, not in the

19   custody of Stephanie Irish.

20             THE COURT:  Okay.  All right.

21             Okay.  Let me hear from the government.

22             MS. KRASINSKI:  There are a couple of issues,

23   the first obviously being that the defendant could have

24   served her with a subpoena and had her here to testify,

25   could have included her on a witness list and did not.

1            There are other issues related to her

2    testimony.  Only the defendant could waive some of the

3    spousal communication privilege that would apply here.

4    So the government, as a practical matter, even if it

5    subpoenaed her, there are certain things that the

6    government could not elicit from her.

7            So even as a practical matter, I think the

8    defendant, actually, given that it's his decision

9    whether or not to waive spousal communication

10   privileges, she's actually more available to call as a

11   witness by him than the government for that issue alone.

12           A lot of the witness testimony about specific

13   instances of possession, according to that witness

14   testimony, occurred when she was not present.  And just

15   sort of in the context of this trial, defense counsel

16   specifically asked to exclude references of her speaking

17   to the FBI about the defendant's possession of the

18   firearm, for example, specifically sought to exclude

19   Government's Exhibit 4.

20           And so to now come back and say, well, you

21   didn't introduce any evidence about Stephanie Irish and

22   what she would say, you haven't called her as a witness,

23   and then to elicit testimony on cross-examination that

24   Stephanie Irish provided information that was helpful to

25   the government when the government didn't introduce that

1    evidence at all, it seems to me inconsistent with now

2    requesting a missing witness instruction.

3           THE COURT:  All right.  Do you want to be

4    heard any further, Mr. Falkner?

5           MR. FALKNER:  I'm sorry.  I'm just trying to

6    recall what is Government's Exhibit 4.

7           MS. KRASINSKI:  Those were the text messages,

8    the photographs, that Ms. Irish texted to Agent

9    Christiana of --

10          THE COURT:  And I excluded those pretrial.

11          MS. KRASINSKI:  Yes, your Honor.

12          MR. FALKNER:  And those were excluded on the

13   basis that the government wasn't calling Ms. Irish as a

14   witness, so I don't know how that's inconsistent.

15          But, secondly, in terms of any spousal

16   privilege, the New Hampshire state case law is very

17   clear that the spousal privilege applies to marital

18   communications, but it wouldn't apply to any of her

19   observations about the firearms and it may well not even

20   apply to many of the marital communications.

21          But private marital communications certainly

22   do not seem to be the -- the most important substance

23   that the government would be eliciting her.  We're

24   talking about the possession of the firearms in this

25   case and certainly whether she had possession of the

1   firearms or whether Mr. Irish had possession of the

2   firearms is an important issue for the jury.  And I

3   think to say that he might be able to object to some of

4   their conversations is -- does not mean that she's not

5   available as a witness.

6           THE COURT:  Okay.  I'm going to deny the

7   request.  I'm not persuaded that the request is

8   warranted for the reasons the government has argued.  I

9   don't think the Exhibit 4 moves the ball on the

10  argument, but I do agree with the government with

11  respect to the other arguments and I am not persuaded

12  that you have demonstrated that she would have been

13  either favorably disposed to testify on behalf of the

14  government or peculiarly available to the government.

15          And as I do recall, the government didn't

16  attempt to really introduce evidence of their heavy

17  reliance or conversations or communications with her.

18  That came out through cross-examination.

19          I am going to deny Document 31 and 29.

20          All right.  Let's move on to the other issues

21  that we need to decide in the case.

22          What are the other jury instruction issues

23  that need to be discussed before I turn them into a

24  final document?

25          MR. FALKNER:  Could I just ask, your Honor,

 1    before we move on, am I prohibited from making any

 2    argument along those lines or --

 3              THE COURT:  Oh, no, I think you can argue

 4    she's not here.  I'm not going to give them an

 5    instruction to that effect, but --

 6              MR. FALKNER:  Please note my objection.

 7              THE COURT:  Okay.  Your objection is

 8    definitely in the record.

 9              All right.  Any other issues with respect to

10    the jury instructions?

11              MS. KRASINSKI:  Not on behalf of the

12    government, your Honor.

13              THE COURT:  Okay.  Thus far I'm intending to

14    keep the unanimity instruction in there, which is page

15    19, starts on the bottom there, for all the reasons that

16    I've already said.

17              MR. FALKNER:  Your Honor, my -- my only issue

18    with regard to the jury instructions is -- are the ones

19    that we've already discussed this morning --

20              THE COURT:  Okay.

21              MR. FALKNER:  -- and the special verdict.

22              THE COURT:  Okay.  All right.  And the

23    government, any others?

24              MS. KRASINSKI:  No, your Honor.

25              As a matter of practice, does the Court tend

1    to instruct the jury before closing arguments?

2         THE COURT:  Yes, I'll do them before.  And

3    who's doing the closing?

4         MS. KRASINSKI:  I am, your Honor.

5         THE COURT:  Okay.  All right.

6         Let's talk about any other outstanding issues.

7    Obviously this Petrozziello issue, I need to make a

8    finding at the close of the case.  So I will make sure

9    that I do that.  If counsel could approach, I can put

10   that on the record at the time.

11        Any other issues?

12        MR. FALKNER:  I don't think so, your Honor.

13        MS. KRASINSKI:  No, your Honor.

14        THE COURT:  All right.  So we're here a little

15   early, but I -- I just wanted to anticipate.

16        Let's see.  All right.  So we'll have to take

17   a break or allow for the coconspirator finding to be

18   made outside the presence of the jury.  I'm trying to

19   think of any other issues.

20        All right.  Well, we've got until obviously

21   nine o'clock till the jury gets here if something else

22   comes up.

23        I think with respect to the forfeiture, if the

24   jury convicts, ultimately it is the defendant's election

25   with respect to that issue and so that's something that

1   you will have to let me know.  And I believe you have to

2   make that election at the close of the case.

3           MR. FALKNER:  I believe -- I think it's --

4           THE COURT:  Before deliberations, I think is

5   the rule --

6           MR. FALKNER:  (Nods head.)

7           THE COURT:  -- so I just remind you of that.

8           MR. FALKNER:  And, your Honor, I would request

9   that the jury make that.  But that --

10          THE COURT:  Okay.

11          MR. FALKNER:  -- that does raise one other

12  issue.

13          THE COURT:  Yeah.

14          MR. FALKNER:  With regard to the forfeiture,

15  given that there is no evidence in the case that his

16  possession of the rifle or that his possession of the

17  ammunition was unlawful and that those items had no

18  connection whatsoever to interstate commerce, I -- I

19  don't believe that those can be involved in the offense

20  and, therefore, subject to forfeiture and I believe that

21  the forfeiture would only apply to the items for which

22  there's some evidence of interstate commerce.

23          THE COURT:  Go ahead.

24          MS. KRASINSKI:  Your Honor, I think as it

25  relates to the ammunition, that's not accurate.  It's

1  specifically noticed in the criminal forfeiture

2  allegation.

3          I do think, candidly, that given the way that

4  we struck the rifle from the indictment and the way that

5  the forfeiture allegation is drafted, it references the

6  firearms involved in the commission of the offense

7  listed above in Count One.

8          So looking at it now, probably the rifle must

9  be taken out of the forfeiture instructions and verdict

10  form, but in terms of the ammunition, given that it is

11  specifically alleged, I think it should be included.  I

12  don't think there's a requirement that we have elicited

13  testimony that it have traveled in interstate commerce.

14          THE COURT:  And I think, too, the question on

15  forfeiture is slightly different and it's not whether he

16  knowingly possessed the ammunition, but whether the

17  ammunition was involved in or used in the offense of

18  possessing the firearms.

19          So we will redraft the forfeiture instruction

20  to remove the rifle.  Is that correct, it's the rifle?

21          MS. KRASINSKI:  Yes, your Honor.

22          THE COURT:  The AR rifle.

23          MS. KRASINSKI:  Yes, your Honor.

24          THE COURT:  Okay.  And, otherwise, at this

25  point, unless you can give me some case law, I'm going

1  to keep the ammunition in the forfeiture instruction.

2          MR. FALKNER:  Please note my objection and I

3  will do what I can to find some case law.

4          THE COURT:  Okay.  All right.

5          MR. FALKNER:  I -- while we have the time,

6  I'd just simply reiterate my objection to the testimony

7  of the expert.  And now that the jury's not in the room,

8  I -- I'd simply point out that I think the

9  cross-examination testimony was clear, particularly at

10  the end.

11          He specifically admitted that the only basis

12  for his opinion that the pistol had traveled in

13  interstate commerce was his reading the emails that said

14  that it had traveled in interstate commerce and his

15  reading the records and that there was no other basis

16  for it; that he didn't -- that there -- that he didn't

17  do anything other than simply repeat that.  And that's

18  what the case law provides.

19          And I think if your Honor reviews the

20  transcript of the last few questions of the closing

21  argument, Agent Forte specifically says that there was

22  no other basis other than reading those documents and

23  repeating them for the jury.  And that's exactly what's

24  prohibited.

25          THE COURT:  I -- again, I've ruled on that

1    issue.  I'm happy to talk about it further now, but

2    the -- again, I need to read the cases, but my

3    understanding of expert testimony and Rule 703 is that

4    experts are permitted to rely on hearsay.  They can't

5    come into court -- it becomes a problem if they start to

6    repeat hearsay statements.

7              And so the issue can become whether or not

8    that's permitted and whether or not that has happened.

9    And the Court needs to obviously listen to the evidence

10   with care.

11             And here what happened was the expert

12   testified that he relied on documents, he relied on

13   hearsay, but I'm not clear exactly on why his testimony

14   was objectionable.

15             I -- I understand that you -- you took a line

16   from the *Cormier* case about hearsay, but I think that

17   the case law and my understanding of Rule 703 is fairly

18   clear that this is proper; that experts can rely on

19   hearsay.

20             But, again, he studied the gun, the pistol.

21   He studied it as an expert.  He then looked and ran the

22   gun through the tracing ATF online -- the ATF database

23   and he talked and testified about how that was created

24   and that experts such as himself rely on that database

25   to form these conclusions.

 1              And my -- I don't remember him injecting the

 2     hearsay into -- in front of the jury.  He did talk about

 3     relying on it and he talked about the fact that the

 4     database led him to conclude that the gun had, indeed,

 5     traveled in interstate commerce.  So -- and based on his

 6     experience, expertise, he made the conclusion that this

 7     gun traveled in interstate commerce.

 8              And I -- the case law seems to suggest that

 9     his reliance on the manufacturer's corroborative hearsay

10     and his reliance on the ATF database are fine.

11              So that -- that was my ruling at sidebar.

12     That is my understanding of how Rule 703 works.  So ...

13              MR. FALKNER:  Could I just respond, your

14     Honor?

15              THE COURT:  Of course.  You're standing up and

16     I'm looking at you and I'm waiting for your response.

17              MR. FALKNER:  Okay.  So *Luna*, I think, is the

18     seminal case on the -- on this issue.  And in *Luna*, what

19     happens is the special agent testifies that he had been

20     certified as an interstate nexus expert and he examined

21     the markings on the shell casings and the markings on

22     the shell casings demonstrated that it was manufactured

23     by Remington Peters, which only manufactured ammunition

24     in Connecticut and Arkansas.  And that, in combination

25     with his review of consultation with the database and an

1    employee of the ammunition manufacturer, was what led
2    him to his opinion.
3            The difference here is, yes, the agent looked
4    at the gun.  He looked at the markings on the gun.  But
5    those markings on the gun told him only that the gun was
6    manufactured here in New Hampshire where the weapon was
7    seized.  He testified that that didn't contribute to his
8    opinion that the gun had traveled in interstate
9    commerce.
10           So, yes, he did look at that, at the gun, but
11   the markings on the gun didn't do anything to tell him
12   that the gun had traveled in interstate commerce.
13           THE COURT:  Right, but it's part of his
14   ultimate conclusions.  He starts with the gun, studies
15   the gun, and he knows from that that there's a
16   manufacturer in New Hampshire.  So now he needs to call
17   the manufacturer and he needs to run the gun through the
18   trace records.
19           So all -- that's the beginning of his
20   conclusion.
21           MR. FALKNER:  What I would suggest, though,
22   your Honor, is that in *Luna*, that, therefore, calls for
23   an expert opinion.  An expert opinion has to be one
24   which would assist the jury.
25           And so where the expertise comes into play in

1    a case like *Luna* is as a firearms expert, he has some

2    knowledge that the factories are out of state.  So he's

3    got knowledge now that he's adding to his review of

4    these databases.  He's got knowledge as an expert in the

5    field that this company that manufacturers it has

6    factories in these locations.  That's specialized

7    knowledge that the jury doesn't necessarily have.

8            This expert, nothing about his opinion that

9    the gun had traveled in interstate commerce was based on

10   specialized knowledge which the jury didn't have.  He

11   simply looked at records and repeated them.

12           And it specifically -- if this statement

13   doesn't mean -- if it's to mean anything, it would have

14   to apply in this case.

15           And this is directly from *Luna*:

16           An expert may rely on these sources, but the

17   entirety of his or her testimony cannot be the mere

18   repetition of the out-of-state -- out-of-court

19   statements of others.

20           And in terms of his opinion that this gun

21   traveled in out -- in interstate commerce, he testified,

22   I would suggest candidly, at the end of his

23   cross-examination that that was all he was doing; he was

24   simply repeating it.  And he candidly acknowledged that

25   none of his expertise added to that; that he was simply

1  repeating what he had found in those sources to the

2  jury.

3          So if he had -- if an expert relies on things

4  that are not admissible before the jury and does

5  something with that through some kind of reliable

6  process, that's one thing.  But that's not what happened

7  here.  He simply read it and told the jury, I read these

8  sources and that's what these sources said.

9          THE COURT:  Well, that's similar to *Luna*

10  because the Special Agent Kelsch in *Luna* looked at the

11  markings, but then reached his conclusion based on

12  studying the ATF database and the -- speaking with a

13  manufacturer of the ammunition.

14          So it's quite similar to the situation here.

15  He is reaching his conclusions based on this hearsay

16  database, as you would describe it.

17          So it's not as though in *Luna* the special

18  agent looked at the ammunition and had some unique

19  knowledge about that.  He was -- he was actually able to

20  form his conclusion by looking at the ATF database.

21          MR. FALKNER:  But he knew where the factories

22  were and he knew that they were out of state.  And

23  that's what he added to the database records.  He had

24  something that he knew that he added.  What this agent

25  never had was any unique information that was known to

1   him.  He simply repeated the sources.

2           THE COURT:  Well, how is that different?  You

3   didn't object to the other gun and on the other gun

4   there were markings that said China, I believe, and

5   there were other markings.  But that's hearsay.  Those

6   are words.  They're introduced for the truth.  He's

7   looking at markings on guns.  And --

8           MR. FALKNER:  The markings -- but the markings

9   on the gun, first of all --

10          THE COURT:  If the issue is hearsay, what's

11  the difference?

12          MR. FALKNER:  But the markings on the gun

13  are -- are both -- were made at the time.  They're

14  admissible records.  And not only are they admissible,

15  they've been admitted in this case.  The photographs of

16  the gun and the serial numbers on the gun and the guns

17  themselves are all in evidence here.

18          So as to the shotgun, he's got a shotgun

19  that says on the shotgun itself at the time it was

20  manufactured, this gun was manufactured in China.  And

21  the expert testifies as to how those markings come to

22  be, which demonstrates that those are -- to the extent

23  that it's an out-of-court statement, that's an

24  admissible out-of-court statement.  The gun itself is

25  manufactured with this evidence.  That's evidence that's

 1    seized by the FBI at the time that it takes the gun.

 2              I don't have any objection to the fact that

 3    the markings on the gun are going before the jury.

 4    That's relevant, admissible evidence.

 5              But here, what we don't have, the government

 6    hasn't produced and hasn't sought to introduce a single

 7    record.  And all he's doing -- he's not even testifying

 8    that he reviewed business records from -- from the

 9    manufacturer.  He's saying, I contacted the manufacturer

10    and the manufacturer told me they looked at their

11    records and their records said that it was -- that it

12    had been shipped in interstate commerce.  So he's

13    repeating thirdhand hearsay and then he's saying, and I

14    looked at our documents -- our records and our records

15    say that it was shipped in interstate commerce.

16              Whether those records would be admissible or

17    not, the government hasn't produced them, hasn't sought

18    to introduce them, hasn't even put them before your

19    Honor in any way.  And those records, whether they're

20    admissible or not, his repeating of those records is

21    repeating hearsay.  And -- and it -- it's the repetition

22    of hearsay that's the problem.  It's not -- it's not his

23    examination of the firearm that's the problem.

24              And vis-a-vis the shotgun -- his examination

25    of the firearm alone, he recognizes the manufacturer as

1    an expert in the field, he's exposed to where these

2    companies manufacture their weapons, and he knows if

3    that weapon was manufactured in China, it's traveled in

4    interstate commerce.  The only way it could get to

5    New Hampshire is being imported from China.

6            The handgun is in a very different position.

7    It has been manufactured in New Hampshire and that's all

8    he can tell from his examination of the gun.

9            So now what he has to opine isn't that it

10   came into New Hampshire, but that it was sent out of

11   New Hampshire first and then it came back.  And the only

12   way that he can do that is simply repeating what he's

13   learned from hearsay.

14           THE COURT:  All right.  I just -- I'm going to

15   overrule your objection.  And my understanding from *Luna*

16   is that *Luna* held -- and I'm going to quote from *Luna*

17   that the expert testimony was admissible because "his

18   testimony was, thus, not simply a summary of

19   out-of-court sources, but a thorough opinion drawing on

20   multiple sources to ensure accuracy."

21           That's *Luna*, 649 F.3d at 105.

22           Here I believe the expert did something

23   similar and I overrule the objection.

24           I certainly would have entertained a motion, a

25   further motion, to reconsider my ruling had you filed

1    that motion last night, but I ruled at sidebar and I

2    haven't really heard anything from you that persuades me

3    that that ruling was incorrect, so I'm going to overrule

4    it.

5           We've got 20 minutes.  Anything else?

6    Anything else?

7           MR. FALKNER:  I -- I just want to make sure.

8           Did your Honor consider my arguments made as

9    an oral motion to reconsider your ruling?  I understand

10   that you've --

11          THE COURT:  I'm sorry.  What are you asking

12   me?

13          MR. FALKNER:  I'm asking if your Honor would

14   consider the arguments that I made here today to be an

15   oral --

16          THE COURT:  I'm absolutely considering them

17   and I just ruled on them again.  I'm saying that it

18   would have been helpful, I think, to the Court to

19   receive a motion with cases cited so that the Court

20   could entertain your motion to reconsider on a more

21   thoughtful basis.  I would have read cases, I would have

22   reconsidered.

23          But you're alerting me now to the fact that

24   you want me to reconsider it.  I am.  I'm denying it.  I

25   am wishing that it were more fully briefed by both

1 counsel in the case ahead of this trial so that I don't

2 have to make an on-the-fly ruling at sidebar and I

3 wasn't anticipating that you would move to reconsider.

4 I'm entertaining it. I don't need to have a

5 written motion. I'm simply saying that that would have

6 been helpful to the Court had I understood ahead of time

7 that you might move to reconsider my sidebar ruling, I

8 would have been more prepared for that.

9 But having not received that and having only

10 heard your oral motion, I am ruling and denying it,

11 overruling the objection. I just haven't heard anything

12 that persuades me that my sidebar ruling was incorrect.

13 MR. FALKNER: I -- I understand and I -- I do

14 apologize, but I -- I just wanted to make sure that it

15 was being reconsidered and --

16 THE COURT: You have no -- you can make oral

17 arguments anytime. That is your right. I'm just saying

18 if you file briefing on it, you get an even more solid

19 ruling from the Court.

20 So anything further? We've got 20 minutes to

21 get ready for the last witness in the case and then any

22 evidence Mr. Falkner puts on, any rebuttal thereafter,

23 and then closing arguments and jury instructions.

24 Anything we need to discuss?

25 MS. KRASINSKI: Not on behalf of the

1   government, your Honor.

2            MR. FALKNER:  No, your Honor.

3            THE COURT:  All right.  Then we'll see you in

4   20 minutes sharp.

5        (Recess taken from 8:41 a.m. until 9:05 a.m.)

6            THE COURT:  We're just going to confirm

7   everybody's here in terms of the jury.

8            So while we're doing that, I think someone

9   asked which order I do jury instructions and I may have

10  misspoken.  I give jury instructions last.  Okay?  I may

11  have misspoken when you asked before.  So closings, and

12  then I'll give the jury instructions.

13           Okay.  Mr. Falkner, did you request -- I'm

14  going back just for a second to the expert issue.

15           Did you request any records, underlying

16  records, from the government about his -- his expert

17  testimony?  Did you make any requests for those

18  documents?

19           MR. FALKNER:  May I have a moment, your Honor?

20           THE COURT:  Yeah.

21           MR. FALKNER:  The request, your Honor, was for

22  a written summary describing the witnesses' opinions,

23  the basis -- the bases and reasons for those opinions,

24  and the witnesses' qualifications of any testimony that

25  the government intends to use under Rule 702, 703, or

```
 1   705 of the Federal Rules of Evidence during its case in
 2   chief at trial.  See Fed. R. Crim. P. 16(a)(1)(F), local
 3   criminal Rule 16.1(e)(1) -- oh, I'm sorry -- (a)(1)(G),
 4   see Fed. R. Crim. P. 16 (a)(1)(G), local criminal Rule
 5   16.1(e)(1) and (e)(3).
 6              THE COURT:  All right.  So you made those
 7   requests via a letter --
 8              MR. FALKNER:  Correct.
 9              THE COURT:  -- to the government?  And you
10   didn't receive anything from the government about the
11   expert witness?
12              MR. FALKNER:  I received -- I did receive a
13   two-page summary.
14              THE COURT:  Okay.  And when you received the
15   two-page summary, did you make any subsequent requests
16   of the government?
17              MR. FALKNER:  No, your Honor.
18              THE COURT:  And you didn't file any sort of
19   motion to compel or motion for discovery with respect to
20   that?
21              MR. FALKNER:  No.
22              THE COURT:  Okay.  All right.
23              MS. KRASINSKI:  Your Honor, can I proffer that
24   counsel and I discussed yesterday that I said to counsel
25   if you had requested any of this, I would have gotten it
```

1     to you earlier.  And counsel responded, I didn't request

2     it earlier because I didn't want you to know it was an

3     issue.  I didn't want to -- you to obtain the business

4     records.

5               THE COURT:  Okay.  All right.

6               Because I -- just in the time that I've had to

7     look at some of the cases more closely, the line that

8     you take from *Luna* on which you're relying cites a

9     Seventh Circuit case, which I just read, *U.S. v. Smith*.

10              That case is all about the confrontation

11    clause and I think had you made some effort to obtain

12    the documents and had you presented it in -- had you

13    presented that argument in that fashion, then I think

14    there may be a reason to take a break to further

15    consider this issue, but I'm fairly confident that this

16    *U.S. v. Smith* case and the confrontation clause issue is

17    not a concern, based on everything I've heard.

18              And I have read *Cormier* and *Luna* more

19    carefully and I think this is just one of those,

20    frankly, issues that if, in fact, the First Circuit is

21    going to allow nexus testimony in a different fashion,

22    the First Circuit's going to have to tell us.

23              But I think based on the testimony of the

24    agent here that he -- his testimony's admissible under

25    *Luna* and *Cormier* and *Corey* and I did look at the Seventh

1  Circuit case and I think there are no problems based on

2  everything I've heard with respect to that.

3          I'm revisiting that only because I was a

4  little concerned because you raised, I think, in your

5  recitation this morning the issue of you not getting

6  records and not receiving records from the government

7  with respect to that hearsay testimony.

8          MR. FALKNER:  I -- I'd point out, your Honor,

9  I am not suggesting there was a discovery violation.  I

10 did not -- if anything I argued meant to imply --

11 implied that there was a discovery violation, that's not

12 at all what I'm arguing.  What I'm arguing is that those

13 records aren't before the Court as part of the

14 evidentiary record is all I was suggesting.

15         THE COURT:  Okay.  Well, in an abundance of

16 caution, I was concerned, based on *U.S. v. Smith* and

17 based on the line from *Luna* that caused you to assert

18 this argument and the case that the First Circuit is

19 citing raises issues of confrontation.  So just wanted

20 to put that on the record.

21         All right.  So now we're going to hear, I

22 think, from Mr. Roya.  And is his counsel here today as

23 well?

24         MS. KRASINSKI:  Yes, your Honor.

25         He is.  Okay.  All right.

1           And we will take a break before -- well, let's

2    take a break before closings so I can make any findings

3    and make rulings out of the presence of the jury.  So

4    we'll take a break at the close of all the evidence in

5    the case before closings.  All right?

6           Okay.  All right.  Is the jury ready?

7           THE CLERK:  I'm just getting them lined up.

8           THE COURT:  Okay.  All right.

9           Have we read all the stipulations to the jury

10   as well?

11          MS. KRASINSKI:  Yes, your Honor.

12          THE COURT:  Okay.

13          THE CLERK:  All rise for the jury.

14              (Jury entered the courtroom.)

15          THE CLERK:  Please be seated.

16          THE COURT:  All right.  Good morning.

17          Has the jury followed all my instructions thus

18   far?

19          All right.  Good.  Thank you.

20          We are now going to continue day three of our

21   trial and the government may call its next witness.

22          MS. KRASINSKI:  United States calls Gerald

23   Roya.

24          THE CLERK:  Mr. Roya, you can come up toward

25   the witness stand and remain standing and raise your

1  right hand.

2          **GERALD ROYA**, having been first duly sworn,

3  testified as follows:

4          THE CLERK:  Thank you.  Please state your full

5  name, spell your last name for the record.

6          THE WITNESS:  Gerald E. Roya, G-e-r-a-l-d,

7  middle initial, E, R-o-y-a.

8          THE CLERK:  Thank you very much.  Please be

9  seated.

10                    DIRECT EXAMINATION

11  BY MS. KRASINSKI:

12      Q.   Good morning, Mr. Roya.

13      A.   Good morning.

14      Q.   Mr. Roya, where do you work?

15      A.   Victory Trading.

16      Q.   And where do you live?

17      A.   I live in Exeter.

18      Q.   New Hampshire?

19      A.   Yup.

20      Q.   Do you know the defendant, Johnathon Irish?

21      A.   Yes.

22      Q.   How do you know him?

23      A.   I've known him since high school, basically.

24  I had a crush on his sister and that's how I met him.

25      Q.   And did you baby-sit him ever?

1      A.    Once or twice, yeah.

2      Q.    Is it fair to say that you knew him as a boy,

3  but you lost touch?

4      A.    (Nods head.)  Over the years, yeah.

5      Q.    At some point did you guys get back in touch?

6      A.    We -- we did, yes.

7      Q.    Okay.  And when was that?

8      A.    We -- we saw each other at the campground and

9  we saw -- we went out, played pool once, and he met me

10  at my work once.

11      Q.    What campground are you referring to?

12      A.    I don't remember the name of it.

13      Q.    Do you recall where it was?

14      A.    It's over in Epsom.

15      Q.    Do you also know the defendant's mother?

16      A.    Yes.

17      Q.    What's her name?

18      A.    Nancy.

19      Q.    And is she married?

20      A.    Yes.

21      Q.    What's her husband's name?

22      A.    Les.

23      Q.    And have you communicated with the defendant

24  by phone?

25      A.    I have.

1      Q.   And what about with Nancy?

2      A.   Yes.

3      Q.   Now, I want to turn your attention to November

4  of 2019.  At some point in November of 2019, did you

5  arrange to take custody of some firearms?

6      A.   Yes.

7      Q.   Can you tell us how that happened?

8      A.   Basically, Johnathon was having a hard time

9  with his girlfriend and I was asked and/or, I don't

10  remember, I reached out to Johnathon to find out what

11  was going on because he was having such a hard time.

12  And basically there was -- there was this big blowout

13  between him and his girlfriend and that -- that's how we

14  got in touch.

15          And at some point he asked me to borrow money

16  or could I get him money.  And I said, yes, I can get

17  you $300.

18          We met at my work, I gave him the $300.  He

19  asked me if I wanted collateral or anything like that.

20  And he basically said he could give the guns or a dirt

21  bike or a four-wheeler.  It just happened to be the

22  guns, so ...

23      Q.   So I just want to break it down.

24          You or Johnathon, one of you, reached out to

25  the other --

```
 1        A.    Yeah.
 2        Q.    -- and that was because he was having
 3   relationship problems?
 4        A.    Yes.
 5        Q.    And he asked you for some money?
 6        A.    Yes.
 7        Q.    And did you agree to lend him $300?
 8        A.    Yes, I did.
 9        Q.    And so as part of that, if I understand you
10   correctly, he said, I can give you something as
11   collateral?
12        A.    Yup.
13        Q.    And so, if I understood you correctly, you
14   agreed that his guns would be the collateral?
15        A.    Yup.
16        Q.    And did you talk about the firearms other than
17   just --
18        A.    A little bit.  I mean, very, very briefly.
19        Q.    Can you describe that brief interaction?
20        A.    He -- he basically said, well, why don't you
21   take the guns; I can't have them anyway.
22        Q.    Now, the day that you had this conversation,
23   where were you?
24        A.    I was at work.
25        Q.    And where was the defendant?
```

1      A.    He had come to pick up the money.

2      Q.    And did he have the guns with him at that

3   point?

4      A.    Not to my knowledge.

5      Q.    When did you, in relation to when you had this

6   conversation, take custody of the guns?

7      A.    It was like a week to two weeks later.

8      Q.    And how did you arrange to get the guns?

9      A.    Basically, as far as I understood, Johnathon

10  had no control over -- over the guns.  I had to go

11  through Nancy.  She had to contact the person that had

12  the guns and then I had to meet him.

13     Q.    Okay.  So you had to talk to Johnathon's mom?

14     A.    Yup.

15     Q.    And she would tell you, it was your

16  understanding, who to get the guns from?

17     A.    Correct.

18     Q.    So did she provide you with information as to

19  who you should get the guns from?

20     A.    She gave me a contact number and I tried

21  contacting.  We were able to just text back and forth

22  for the most part.  It -- I guess he couldn't show up,

23  so he had Neil show up and --

24     Q.    When you say he couldn't show up, who do you

25  mean?

1      A.   It said to contact Roscoe and -- but I -- the

2  person I was pretty much texting was Neil.

3      Q.   So you communicated -- to arrange to pick up

4  these guns --

5      A.   Yeah.

6      Q.   -- you communicated with the defendant's mom,

7  Nancy?

8      A.   (Nods head.)

9      Q.   Yes?

10     A.   Yes.

11     Q.   Sorry.  It needs to be verbal for the court

12 reporter.

13     A.   Yeah.

14     Q.   And you communicated with a guy named Neil?

15     A.   Correct.

16     Q.   Had you ever met Neil before?

17     A.   Not to my knowledge.

18     Q.   All right.  Had you ever talked to him before?

19     A.   Not to my knowledge.

20     Q.   So did you make arrangements with Neil to pick

21 up the guns?

22     A.   Eventually we did get together.  It was on a

23 Sunday morning.

24     Q.   And where did you do that at?

25     A.   Epsom traffic circle McDonald's.

1    Q.    And can you describe that for us?

2    A.    Showed up roughly -- I don't remember if it

3 was 9:30 or ten o'clock exactly or so to speak.  I think

4 it was like five minutes late.  I pulled in, he pulled

5 in, grabbed a big case, that one --

6    Q.    Now, when you say that one, you're pointing at

7 this large box that --

8    A.    Yes.

9    Q.    And that, for the record, is Government's

10 Exhibit 33.

11          So you grabbed this box, Government's

12 Exhibit 33?

13    A.    Yup.

14    Q.    And what happened?

15    A.    Brought it over to the back of my truck, put

16 it in the back of my truck, said here you go, here's the

17 key.  I said okay.  He said he couldn't stay very long;

18 he was still sick or whatever.

19          And so I quickly opened up the box, just made

20 sure that the guns were there, and closed it back up,

21 closed -- closed it into my truck and that was it.

22    Q.    Now, when you opened it to check and make sure

23 the guns were there, were there guns in the box?

24    A.    Yes, there were.

25    Q.    So what did you do next?

1      A.    Went home.  Well, sorry.  I did not go home.

2  I went to my sister-in-law's -- Sunday, me and my

3  brother-in-law, we get together, go out for a while.

4           I didn't -- I left the guns, case, everything,

5  at my sister's.  And then we went out, we didn't get

6  back until about 8:00, 8:30 at night.  Then I just

7  transferred it back into my truck.

8      Q.    And after you put it back in your truck, what

9  did you do with it?

10     A.    I went home.  As soon as we got home,

11  basically went and did an inventory of the box.

12     Q.    And when you inventoried the box, what'd you

13  find?

14     A.    Found the 1911, what I assumed at the time was

15  an AR-15, found a shotgun, BB gun, respirator, like a

16  chem suit, flap (sic) jacket, a very small-type gun

17  cleaning kit.

18     Q.    Now, you mentioned a shotgun.

19     A.    Yup.

20     Q.    How many pieces was that shotgun in?

21     A.    Two.

22     Q.    And at some point -- actually, let me back up.

23           You open the box, you check out the contents.

24  Then what do you do?

25     A.    I made a -- I made a listing and took pictures

1    of everything that was in the box, so to speak; all

2    different magazines, all the weapons, the serial

3    numbers, the rough number of ammunition, the -- pretty

4    much all that.

5         Q.   Why'd you do that?

6         A.   My parents actually wanted me to do that

7    because they wanted to know what was in the house and

8    what -- what wasn't.  So ...

9         Q.   So you make this inventory.  And then what?

10        A.   Locked the box back up and brought it up the

11   three flights of stairs to my room, basically.

12        Q.   Now, at some point after you took this case

13   with guns in it from Neil, did the FBI show up at your

14   house?

15        A.   Yup.

16        Q.   About how long after you took this box from

17   Neil did the FBI show up at your house?

18        A.   I want to say it was two to nine days.  I

19   don't remember exactly, but ...

20        Q.   You didn't have them for very long?

21        A.   No.

22        Q.   And when they showed up, did you provide them

23   with the firearms?

24        A.   As far as when the FBI showed up?

25        Q.   Yes.

1          A.    Yes.

2          Q.    And did you also allow them, in the course of

3     your contacts with them, to photograph communications in

4     your cell phone?

5          A.    Yes.

6          Q.    Before we look at those communications from

7     your cell phone, I want to ask you a few other questions

8     about those guns.

9              After you took possession of the case and

10    those guns, did the defendant ever talk to you about

11    those guns again?

12         A.    Yes.

13         Q.    Can you describe that to us?

14         A.    At one -- one point in time he asked to get

15    one gun back because someone had -- I don't believe this

16    to be true, but somebody had threatened him.  So ...

17         Q.    So he said, someone threatened me, I want one

18    of my guns back?

19         A.    Pretty much.

20         Q.    Which gun did he want back?

21         A.    I -- we didn't get into which gun, so I

22    couldn't tell you.

23         Q.    What did you say?

24         A.    When we made -- when we made the initial

25    agreement, since he's not supposed to have guns, I told

1    him, okay, then you will not be getting these back.

2         Q.    So he asked for them back and you said no.

3         A.    Correct.

4         Q.    Did you also communicate with the defendant's

5    mother after you took custody of that case and those

6    firearms?

7         A.    I believe we talked a couple times, yeah.

8         Q.    And did she send you a form to sign regarding

9    the firearms?

10        A.    Yup.

11        Q.    How did that come about?

12        A.    Basically, she said that she was going to send

13   me a form to transfer the weapons into my care.

14             I got a text message of a picture of a

15   piece of paper stating that the weapon -- transfer of

16   weapons and had the serial numbers on it.  And that's

17   mainly what I looked at, his name.  And then I signed,

18   had to recopy, rephoto it, whatever, email it back.

19             MS. KRASINSKI:  May I approach, your Honor?

20             THE COURT:  Yes.

21        Q.    I'm handing you what's been marked for

22   identification purposes as Government's Exhibit 29A.

23   Are those some of the photographs from your phone that

24   the FBI took?

25        A.    Looks like it, yeah.

```
 1        Q.   And what are those?

 2        A.   It's Johnathon's phone number and Nancy and

 3   Les's phone number.

 4        Q.   And Johnathon's phone number, do you mean

 5   Johnathon Irish?

 6        A.   Yeah.

 7        Q.   And who do you mean by Nancy and Les?

 8        A.   Nancy and Les Haskell.

 9        Q.   And is that the defendant's mother?

10        A.   Yup.

11        Q.   And her husband?

12        A.   Yes.  Now, yes.

13        Q.   And that's how it was in your phone?

14        A.   Yup.

15             MS. KRASINSKI:  Your Honor, I move to strike

16   the ID on Government's Exhibit A.

17             THE COURT:  That's exhibit --

18             MS. KRASINSKI:  29A.  Excuse me.

19             THE COURT:  29A.  Okay.  Do you have an extra

20   copy of that?  For some reason I --

21             MS. KRASINSKI:  I do, your Honor.

22             THE COURT:  Thank you.

23             Any objection?

24             MR. FALKNER:  No, your Honor.

25             THE COURT:  All right.  Full exhibit, 29A.
```

```
 1            (Government's Exhibit 29A admitted.)
 2            MS. KRASINSKI:  Permission to publish, your
 3  Honor?
 4            THE COURT:  Yes.
 5       Q.   Let's just briefly look at those.
 6            Again, just now that the jury has a chance to
 7  see it, that's the defendant, Johnathon Irish's, phone
 8  number in your phone?
 9       A.   One of them, yeah.
10       Q.   And if we go to the next page of this exhibit,
11  whose number is that?
12       A.   Nancy and Les.
13       Q.   And that's the defendant's mother?
14       A.   Yup.
15       Q.   I'm handing you now what's been marked for
16  identification purposes as Government's Exhibit 29B.
17  Are those also photographs of screenshots from your
18  phone?
19       A.   Yup.
20       Q.   And is it fair to say that this is ingoing and
21  outgoing calls?
22       A.   Appears to be, yeah.
23            MS. KRASINSKI:  Move to strike the ID on
24  Government's Exhibit 29B.
25            THE COURT:  Any objection, Attorney Falkner?
```

1      MR. FALKNER:  No, your Honor.

2      THE COURT:  All right.  29B is a full exhibit.

3      (Government's Exhibit 29B admitted.)

4      MS. KRASINSKI:  Permission to publish, your

5  Honor?

6      THE COURT:  Yes.

7      Q.    Now, if you look at the first page of

8  Government's Exhibit 29B, do you see a call on

9  November 1st, 2019?

10      A.    Yup.

11      Q.    And is that from the defendant, Johnathon

12  Irish?

13      A.    Yes.

14      Q.    Do you recall, approximately, the date that he

15  first asked you to lend him $300?

16      A.    I do not recall the exact date.

17      Q.    Would it have been around this time frame?

18      A.    Within probably a week of that, yeah.

19      Q.    I'm handing you now what's been marked for

20  identification purposes as Government's Exhibit 29C.

21      Are those screenshots of text messages from

22  your phone?

23      A.    Yes.

24      Q.    And who are those text messages with?

25      A.    To me from Johnathon.

1        Q.    And are there also some from Johnathon to you?

2        A.    The -- as in Johnathon made the -- made these,

3   yes.

4        Q.    So just to be clear, these are your

5   communications with the defendant?

6        A.    Yes.

7              MS. KRASINSKI:  Your Honor, I move to strike

8   the identification of Government's Exhibit 29C.

9              THE COURT:  Any objection?

10             MR. FALKNER:  No, your Honor.

11             THE COURT:  All right.  29C is a full exhibit.

12             (Government's Exhibit 29C admitted.)

13             MS. KRASINSKI:  Permission to publish, your

14   Honor?

15             THE COURT:  Yes.

16       Q.    Let's go through some of these.

17       A.    Yup.

18       Q.    What's the date of this first communication?

19       A.    November 2nd.

20       Q.    And was it 2019?

21       A.    Yes.

22       Q.    And is this -- can you read us the content of

23   this text message, please?

24       A.    "Gary, it's Johnathon, please call me."

25       Q.    And if we move to the next page of this,

1  what's the date of this incoming message from the

2  defendant?

3       A.    November 9th.

4       Q.    And what did he tell you in this message?

5       A.    "Gary, please pick up, man."

6       Q.    Let's turn to the next text message.

7             And what are the contents of that

8  communication?

9       A.    This was the day that Johnathon came to my

10 work to pick up the money.

11      Q.    And did he text you, "Dude, I have no fuel to

12 get home or anything.  You said you would still help.  I

13 counted on this"?

14      A.    Yes.

15      Q.    The date --

16      A.    November 9th.

17      Q.    -- on the bottom appears to be cut off, but

18 can you tell what that date is?

19      A.    November -- November 9th, 10:36.

20      Q.    And what did you understand this to mean?

21      A.    I -- from what I remember, I went to work, I

22 told him to meet me at work.  I was in the warehouse.

23 We don't have the best reception inside the warehouse,

24 so he called me.  He couldn't get ahold of me until I

25 got outside the warehouse.  And then that's -- that's

1   when I got the text message, because he was -- I guess

2   he was right around the corner and he used all of his

3   fuel to get from where he was to my location to pick up

4   the cash.

5        Q.   And then if we move on to the next

6   communication, let's go through the communication.  I

7   think it's three pages long in this exhibit and then

8   we'll talk about the date.

9             Is this a communication to you from the

10  defendant?

11       A.   Yes.

12       Q.   Does it read:  Gary, sorry for the early hour.

13  Stephanie will be making contact with Roscoe, then

14  presumably you, to verify location, how long you've had

15  them, that you picked them up from Roscoe, et cetera,

16  thank you?

17       A.   Yes.

18       Q.   What was the date of that message?

19       A.   November 24th, 6:27.

20       Q.   And had you taken that box by this point?

21       A.   I believe I had.

22       Q.   Did you pick up this box from Roscoe?

23       A.   To my knowledge, it was Neil.

24       Q.   So what did you understand this text to mean?

25       A.   Basically, it -- as far as I understood it,

1   Stephanie was trying to verify that someone else besides

2   Johnathon had the guns and they were out of his reach.

3            MR. FALKNER:  Objection; motion to strike.

4            THE COURT:  Overruled.

5        Q.    Now, if we turn to the next communication,

6   your response, how -- what was your response to this?

7        A.    Basically I was -- I was a little pissed off.

8        Q.    Why?

9        A.    As far as I'm concerned, nobody needs to know

10  who has guns, who doesn't.  There's too many thieves out

11  there, too many break-ins that happen, too many guns go

12  missing, you know.

13       Q.    So you just didn't want people to generally

14  know that there were guns in your house?

15       A.    Correct.

16       Q.    Let's look at the final communication from the

17  defendant, beginning on page -- the page ending in Bates

18  number 66.

19            And, again, is that a communication to you

20  from the defendant?

21       A.    Yes.

22       Q.    And he says:  I have not given any info.  All

23  that was said was she needs to talk to Roscoe.  I have

24  no idea if he was going to tell her or not is all.

25       A.    Yeah.

1     Q.    "Sorry, I'm out."

2     A.    Yeah.

3     Q.    And what was the date of that communication?

4     A.    It says November 24th.

5     Q.    Do you recall, at the point where you guys

6  were communicating about this, had the FBI already

7  seized the firearms or did you still have them?

8     A.    I personally don't remember.

9     Q.    I'm handing you now Government's Exhibit 29D.

10          Are those images from communications from your

11  phone?

12     A.    Yup.

13     Q.    And who are those communications with?

14     A.    Nancy and Les.

15     Q.    Do these communications relate to taking

16  possession of the guns?

17     A.    Yes.

18          MS. KRASINSKI:  Your Honor, I move to strike

19  the identification on Government's Exhibit 29D.

20          MR. FALKNER:  Objection.

21          THE COURT:  Conditionally admitted.  So full

22  exhibit, yes.

23          (Government's Exhibit 29D admitted.)

24          MS. KRASINSKI:  Permission to publish, your

25  Honor?

1            THE COURT:  Yes.

2       Q.   Now, this first communication, what's the date

3  of this?

4       A.   November 10th.

5       Q.   And, again, this is all 2019?

6       A.   Yes.

7       Q.   And in this communication, the text message

8  reads, need your address for bill of sale, please.

9       A.   Yup.

10      Q.   What did you understand that to mean?

11      A.   That they were going to make a bill of sale

12  for the weapons that I had.

13      Q.   Who's they?

14      A.   Nancy, mainly.

15      Q.   And then, moving to the communication

16  beginning at the document ending in Bates number 37,

17  which I believe would be page 3 of the exhibit,

18  what's -- what's this communication?

19      A.   This is so that I could contact the person

20  that I was supposed to get the guns from.

21      Q.   So this is what you described earlier, Nancy

22  sending you the contact information?

23      A.   Yup.

24      Q.   And then turning to the next communication

25  from the defendant's mom, let's look at the page of the

1   exhibit beginning with or ending with Bates number 51.

2           And, Mr. Roya, if it's easier for you, it

3   should be up on the screen in front of you.

4       A.   Yup.

5       Q.   Is this another communication from the

6   defendant's mother?

7       A.   Yes.

8       Q.   And what's the date of this communication?

9       A.   November 16th.

10      Q.   And she asks:  Did Neil meet up with you?

11      A.   Correct.

12      Q.   And what's this in relation to?

13      A.   To pick up the box containing the weapons.

14      Q.   And taking a look at the next text message on

15  the next page, is that your response?

16      A.   Yes.

17      Q.   Had you met up with Neil yet?

18      A.   No.

19      Q.   So as of November 16th, 2019, you didn't have

20  the case with the firearms yet?

21      A.   Correct.

22      Q.   Let's take a look at the communication from

23  the defendant's mother that begins on the page ending in

24  Bates number 57.

25           MR. FALKNER:  Objection.  May we be seen at

1  sidebar?

2      THE COURT:  Yes.

3                    AT SIDEBAR

4      MR. FALKNER:  He specifically testified that

5  these text messages and that this contact was Nancy and

6  Les.  And now she -- the -- that's what the witness

7  testified to when she asked.  She said, is that Nancy's

8  phone number and he said, Nancy and Les.  And he -- and

9  she said, are these your communications with Nancy, and

10  he said Nancy and Les.

11      So he didn't identify this communication as

12  being with Nancy and so, therefore, I object to the

13  question as phrased.

14      MS. KRASINSKI:  I think he testified earlier

15  that his communications with -- involving the firearms

16  and the bill of sale were with Nancy, but I can

17  certainly ask him if he understood this to be from Nancy

18  rather than Les.

19      THE COURT:  All right.  Please do that and

20  once that's done, if you need to approach again, go

21  ahead.

22      Obviously I admit this provisionally on my

23  findings outside of the presence of the jury and you

24  understood that.

25      MR. FALKNER:  Correct.

1          THE COURT:  Okay.

2                  CONCLUSION OF SIDEBAR

3     Q.   I just want to clarify something.

4          Did you understand when you were texting that

5  you were talking to the defendant's mother?

6     A.   As far as?

7     Q.   Rather than Les.

8     A.   I assumed it was Nancy.

9     Q.   So you understood that you were talking to

10  Nancy?

11     A.   (Nods head.)

12     Q.   Is that a yes?

13     A.   Yes.

14     Q.   Thank you.

15          Now, looking back at this communication, so

16  you understood this to be Nancy texting you:

17          Just talked to Johnathon; no need for you to

18  come to court Wednesday; he wants to keep you in the

19  background, LOL.  At your convenience, please do that

20  list, send me a picture of the list, and I will redo the

21  letter.  I have POA for Roscoe, so it's all legal.

22          First, what's the date of that communication?

23     A.   November 17th.

24     Q.   When -- when the communication says please

25  send -- please do that list, what did you understand

53

1  that to mean?

2      A.   A copy of the list that I had made of the box,

3  what was in the box.

4      Q.   And did you do that?

5      A.   I actually forgot to send the copy of the

6  list.

7      Q.   And this communication says that "I will redo

8  the letter."

9           What did you understand that to mean?

10      A.   Because of the fact of from what I had

11  understood, that it was only supposed to be the pistol

12  and the rifle, but I got a whole lot more than I

13  bargained for, so ...

14      Q.   So I just want to break that down.

15           Your understanding was that you were supposed

16  to be taking possession of a pistol and a rifle?

17      A.   Correct.

18      Q.   Where did that understanding come from?

19      A.   That's what was, I believe, said to me between

20  me and Johnathon.

21      Q.   So if I'm understanding you correctly,

22  Johnathon -- when you have this discussion with

23  Johnathon about $300 and the collateral --

24      A.   Uh-huh.

25      Q.   -- he says something like, you can take my

1    pistol and rifle as collateral?

2         A.    Well, the -- those were the guns I believe he

3    stated.

4         Q.    And so you said you got a whole lot more than

5    you bargained for.

6         A.    Yeah.

7         Q.    Were you expecting a big black case?

8         A.    No, I was not.

9         Q.    But the shotgun in two pieces, was it in the

10   case?

11        A.    It was in there, yes.

12        Q.    Along with all of these other items?

13        A.    Correct.

14        Q.    So you got more than you bargained for.

15              So what was your discussion with Nancy

16   relating to that?

17        A.    It was basically said -- I said that there's

18   just -- there's more than just the pistol and the rifle

19   in here and there's a shotgun, there's this, there's

20   this.  And she said, okay, I -- send me a list; I will

21   remake the bill of sale, so to speak.

22        Q.    Now, I want to turn to the communication that

23   begins on the page that ends in Bates number 69.

24              And what's this?

25        A.    Huh?

1    Q.   What is this?

2    A.   That's the picture text that I got of the

3    weapons transfer.

4    Q.   And who'd you get this from?

5    A.   Nancy and Les.

6    Q.   And what were you supposed to do with that?

7    A.   Print it, sign it, send it back.

8    Q.   Now, if we move to the communication that

9    begins at the page that ends in Bates number 75, who's

10   that from?

11   A.   From Nancy and Les.

12   Q.   And what's the date of that?

13   A.   November 25th.

14   Q.   And it says:  J is waiting for me to send it

15   to him.

16   A.   Yup.

17   Q.   What did you understand that to mean?

18   A.   Truthfully, I -- I don't remember the J part,

19   but I -- I just thought he was waiting to see the signed

20   bill of sale.

21   Q.   And who is he?

22   A.   I'm guessing J might be Roscoe's first name.

23   I don't know.  I -- I -- Johnathon, I -- I have no clue.

24   Q.   So when you look at this, it could be

25   Johnathon, it could be Roscoe; you don't know?

1          A.      Yup.

2          Q.      And if we turn to the next communication, that

3   communication reads:  Any clue when you are sending it;

4   J is waiting.

5          A.      I -- I was working a lot that week.  I didn't

6   have time to really go through much.

7                  "Any clue when you're sending it?"

8                  I didn't -- I believe I got to it roughly

9   around 10:00-ish Monday night after work.

10         Q.      Is it fair to say that you were asked a number

11  of times to sign and send this document?

12         A.      Two or three times, yeah.

13         Q.      I just want to go back to Government's

14  Exhibit 29B briefly.  We're looking at the page that

15  ends in Bates number 26.

16                 Do you see calls with Nancy and Les?

17         A.      Yes.

18         Q.      Do you remember who you talked to?

19         A.      I mostly talked to Nancy.

20         Q.      And is that true for the call noted on the

21  next page, ending in Bates number 27, dated

22  November 25th -- or 15th, excuse me.

23         A.      I believe so.

24         Q.      And looking at the next page ending in Bates

25  number 29, there is a November 17th, 2019, call with

1   Nancy and Les.  Do you recall who you would have spoken

2   to at that point?

3        A.   At one point I was invited to go to a

4   Thanksgiving dinner and that was by Les.  I cannot say

5   for sure exactly which call it was.

6        Q.   In your voice communications and your calls

7   regarding the guns and regarding the list, who did you

8   talk to?

9        A.   It was mainly Nancy.

10       Q.   I'm handing you what's been marked for

11  identification purposes as Government's Exhibit 29F.  Is

12  that the -- I guess the data associated with you

13  receiving the document you were supposed to sign --

14       A.   I believe so, yes.

15       Q.   -- that you received from the contact titled

16  Nancy Les?

17            MR. FALKNER:  Objection; the same Petrozziello

18  objection.

19            THE COURT:  Overruled.

20       Q.   You can go ahead and answer the question.

21       A.   I believe so.

22            MS. KRASINSKI:  Your Honor, I move to strike

23  the ID from Government's Exhibit 29F.

24            MR. FALKNER:  Objection.

25            THE COURT:  Overruled.

1           Go ahead.  Full exhibit.

2           (Government's Exhibit 29F admitted.)

3           MS. KRASINSKI:  Permission to publish, your

4   Honor?

5           THE COURT:  Yes.

6       Q.   And we'll look at the document itself in a

7   minute, but we'll just take a look at this first page of

8   Government's Exhibit 29F.

9           What was the date that you received the

10  document you were supposed to sign?

11      A.   According to this, November 24th.

12      Q.   Now, I want to look at Government's

13  Exhibit 30, which has previously been admitted.

14          What's that?

15      A.   The transfer of weapons.

16      Q.   Is your signature on that document?

17      A.   Yes, it is.

18      Q.   Now, the date of that -- what's the date of

19  that?

20      A.   That says October 20th, 2019.

21      Q.   Is that the date that you took custody of the

22  guns?

23      A.   No, it is not.

24      Q.   Approximately what date did you take custody

25  of these guns?

1      A.    I don't know.  That's why I have my phone.

2   I'm not great with dates.

3      Q.    If I showed you your communications with

4   Neil --

5      A.    Yeah.

6      Q.    -- would that help you recall the date that

7   you actually met up with Neil?

8      A.    Yes.

9      Q.    I'm showing you what's been marked for

10  identification purposes as Government's Exhibit 29E.

11  Can you take a look at that and then, once you're done,

12  let me know.

13     A.    Okay.

14           Okay.  So it appears on November 17th.

15     Q.    Now, if we look back at the weapons identified

16  in this transfer document, it includes a handgun, rifle,

17  and magazine and ammunition, right?

18     A.    Uh-huh.

19     Q.    Does it include the shotgun?

20     A.    No, it does not.

21     Q.    Do you -- do you know have any idea why?

22     A.    I don't know why.  From -- I can only

23  speculate on that.

24     Q.    Okay.  I'm not going to ask you to speculate.

25  You don't know.

1          So the date is October 20th and I think you

2   said that's not the date you got the guns, right?

3        A.   Correct.

4        Q.   The document -- if we go back to the entire

5   document and focus on the top portion, is it fair to

6   say that this indicates that you got them from Roscoe

7   Whitney?

8        A.   Yes.

9        Q.   But did you get them from Roscoe Whitney?

10       A.   No.

11       Q.   So -- and you said the shotgun was in the box,

12   but it's not on this transfer of weapons?

13       A.   Correct.

14       Q.   So why'd you sign this?

15       A.   Pretty much being an idiot, I guess.  I...

16       Q.   Just a few more brief questions.

17          Do you know Roscoe Whitney?

18       A.   Not to my knowledge.

19       Q.   Do you know anyone named David Marcotte?

20       A.   Not to my knowledge.

21       Q.   All right.  Do you know anyone that -- other

22   than meeting up with him in a parking lot, did you ever

23   see or talk to Neil again?

24       A.   Not to my knowledge.

25       Q.   Do you know anyone named Elizabeth Millett?

```
 1          A.   Not to my knowledge.

 2          Q.   Do you know anyone named Peter Duguay?

 3          A.   No.  Not to my knowledge.

 4               MS. KRASINSKI:  No further questions.

 5               THE COURT:  All right.  Attorney Falkner.

 6                         CROSS-EXAMINATION

 7   BY MR. FALKNER:

 8          Q.   So this is the box you got, right?

 9          A.   Yes, it is.

10          Q.   The box itself is pretty heavy, right?

11          A.   It box itself is light, just awkward.

12          Q.   Okay.  But it's big, right?

13          A.   Yes.

14          Q.   And it had this shotgun in it, right?

15          A.   Appears though.

16          Q.   And this other part of the shotgun?

17          A.   Yes.

18          Q.   And this?

19          A.   (Nods head.)  Yes.

20          Q.   And this is the pistol that I was just showing

21   you?

22          A.   I believe so.

23          Q.   And this rifle?

24          A.   Yes.

25          Q.   And this bag of ammunition?
```

```
 1          A.    Looks right.

 2          Q.    And this bag of ammunition?

 3          A.    Yes.

 4          Q.    And all of these magazines?

 5          A.    I can't see for certain, but it looks -- it

 6    appears to be about right.

 7                MR. FALKNER:  May I approach the witness, your

 8    Honor?

 9                THE COURT:  Yes.

10          Q.    All of these magazines, right?

11          A.    Short a few.

12          Q.    You mean there were more?

13          A.    There were more.

14                MR. FALKNER:  May I show the jury, your Honor?

15                THE COURT:  Yes.

16          Q.    And this box, correct?

17          A.    Yes.

18          Q.    And in this box are more magazines, correct?

19          A.    Yes.

20          Q.    And this box --

21          A.    (Nods head.)

22          Q.    -- there are more magazines in here, right?

23          A.    I believe so, yes.

24          Q.    And the holster?

25          A.    Okay.
```

63

1      Q.    And there were other items as well, right?

2      A.    Yes.

3      Q.    There was a BB gun in there?

4      A.    There was a BB gun in there.

5      Q.    With all that stuff in this box -- oh, there

6   were also blankets in this box, right?

7      A.    Yes.

8      Q.    At least three, right?

9      A.    I recall two, but ...

10      Q.    So the weapons were wrapped in blankets,

11   right?

12      A.    Yes.

13      Q.    So with all of that, this box here was very

14   heavy, wasn't it?

15      A.    It was decent weight, yes.

16      Q.    In fact, it took you and Neil both to put it

17   into the back of the truck, right?

18      A.    No.

19      Q.    You did it by yourself?

20      A.    No, Neil did it by himself.

21      Q.    Neil is the one that put it in the back of

22   your truck?

23      A.    Yes.

24      Q.    Okay.  But when the -- when that went up to

25   your room, you had help carrying that up, right?

64

1      A.   Yes.

2      Q.   It was too heavy to carry up three flights of

3 stairs, right?

4      A.   (Nods head.)  It was more awkward, but yes.

5      Q.   And when the FBI came to your house

6 unannounced, you and your dad had to carry that down the

7 stairs together, right?

8      A.   (Nods head.)

9           THE COURT:  You just shook your head yes.

10          THE WITNESS:  Yes.  Sorry.

11          THE COURT:  That's all right.

12     Q.   Fair to say it was surprising to have the FBI

13 show up at your home on the day before Thanksgiving?

14     A.   Yes.

15     Q.   Embarrassing, right?

16     A.   Yes.

17     Q.   You were very upset, were you not?

18     A.   Yes.

19     Q.   And at the time the FBI showed up at your

20 house, you knew that you had gotten all of those weapons

21 from someone that wasn't allowed to have weapons, right?

22     A.   I -- I'd have to say probably, yes.

23     Q.   Because Johnathon had told you that he wasn't

24 supposed to have weapons, hadn't he?

25     A.   Yes.

1    Q.    And he told that to you before he gave you the

2  weapons?

3    A.    Before who gave me the weapons?

4    Q.    Johnathon told you that Johnathon wasn't

5  supposed to have weapons before --

6    A.    Correct.

7    Q.    -- you took custody of those weapons --

8    A.    Correct.

9    Q.    -- right?

10         And what originally Johnathon had told you was

11  that he needed to borrow $300, right?

12    A.    He -- from what I gathered, he said he could

13  get Stephanie back with money.  I didn't technically

14  believe it, but he asked to borrow money.  I gave him

15  the money.

16    Q.    Who came up with the sum of $300?

17    A.    He asked me what I could afford and that's

18  what I came up with.

19    Q.    You told him you'd give him $300?

20    A.    Yup.

21    Q.    Did you ask for collateral or did Johnathon

22  come up with the idea of giving you collateral?

23    A.    He offered.

24    Q.    He offered what?

25    A.    He offered stuff for collateral.

1        Q.    And there were various things that were

2   offered for collateral?

3        A.    Yes.

4        Q.    From the guns to, you said, a --

5        A.    Dirt bike, a four-wheeler.

6        Q.    Who chose the collateral?

7        A.    I didn't have a preference, personally.  He

8   said:  Why don't you take the guns; I can't have them

9   anyway.

10       Q.    And do you have any idea how much the guns are

11  worth?

12       A.    No.

13       Q.    Did you think that the rifle, the pistol, the

14  shotgun, all that ammunition and the BB gun and

15  everything else in that box, probably worth more than

16  $300?

17       A.    Probably.

18       Q.    By a lot, right?

19       A.    Yeah.

20       Q.    You didn't think you were buying these guns

21  for $300, did you?

22       A.    No.

23       Q.    But you didn't expect to be paid back either,

24  did you?

25       A.    It was iffy with Johnathon.

```
1          Q.    So you were hoping to get a lot more than $300
2    worth of guns for $300, right?
3          A.    Even if Johnathon hadn't paid me back, in my
4    mind, in my personal heart, whatever, if Johnathon
5    didn't pay me back, who cared.  I've known Johnathon
6    20-something years.
7                If Nancy and -- Nancy, as far as I know,
8    pretty much who has say of -- has the guns.  If they had
9    asked for me to -- for them back, I would have given
10   them back.
11         Q.    So you gave him $300 at his request?
12         A.    Yup.
13         Q.    You didn't care whether you got the money
14   back?
15         A.    (Nods head.)
16         Q.    But you took --
17         A.    They --
18         Q.    You took however many hundreds or thousands of
19   dollars worth of firearms as collateral for that $300,
20   right?
21         A.    Correct.
22         Q.    Pretty good deal, huh?
23         A.    (Shrugs shoulders.)
24         Q.    Now, after you made the deal for these weapons
25   that were coming from somebody that you had been told
```

1 wasn't allowed to possess them, at some point you were

2 told that they belonged to a Roscoe Whitney, right?

3       A.   Yes.  Or -- I was told that Roscoe was holding

4 on to them.

5       Q.   Okay.  And you had bumped into Roscoe around

6 the campground before, right?

7       A.   I may have.  I do not remember names and faces

8 very well.  But as far as I'm concerned, have we

9 actually fully met?  I don't believe so.

10       Q.   He wasn't a complete stranger who you'd never

11 heard of before at the time?

12       A.   Again, names and faces.

13       Q.   Okay.  So I just want to be clear.  You hung

14 around Nancy and Les's campground from time to time,

15 right?

16       A.   At one point I worked for them, yes.

17       Q.   And Roscoe Whitney was a regular camper at

18 that campground, right?

19       A.   I don't know.

20       Q.   You socialized a lot with Nancy and Les and

21 Johnathon, right, during the time that you were camping

22 there?

23       A.   Yes.

24       Q.   Fairly small circle of friends hanging out at

25 the campground, right?

1      A.    I don't know.  I'm -- I pretty much stay to

2  myself most of the time.

3      Q.    Now, you also knew when you took the guns that

4  Stephanie Irish had recently left Johnathon and that he

5  was upset about that, right?

6      A.    Yes.

7      Q.    And you don't know specifically what he was

8  upset about other than generally that his wife had left

9  him, right?

10      A.    If you say wife, okay.  I did not know that

11  they had actually married or not.

12      Q.    You've known both of them for years, right?

13      A.    I've known the both of them for a few years,

14  yes.

15      Q.    You didn't attend their wedding?

16      A.    No.

17      Q.    But you knew them to have been in a close

18  relationship for a long time, right?

19      A.    Yes.

20      Q.    Now, he also told you, he being Johnathon,

21  that Stephanie didn't want the guns around; is that

22  right?

23      A.    Yes, at some point in time he did say that.

24      Q.    And after Johnathon had told you that you were

25  going to be the recipient of these guns, is that when

1    you started being in contact with Nancy and Les?

2         A.    Repeat.

3         Q.    Let me put it to you another way.

4               You were in contact with Nancy and Les Haskell

5    before Johnathon contacted you about these guns and

6    after, right?

7         A.    Probably, yeah.

8         Q.    You were going to go to Thanksgiving with

9    them, right?

10        A.    I was considering it, yes.  However --

11        Q.    During -- during your direct examination, you

12   said they said to contact Roscoe.  Who was the they?

13        A.    Nancy and Les.  I have it under one name, both

14   of their names together, on the phone.

15        Q.    You don't know who was sending and receiving

16   the text messages, do you?

17        A.    No.

18        Q.    And how many phone conversations did you have

19   with Nancy and/or Les about these -- about the guns?

20        A.    I could not say.

21        Q.    And you said that the -- well, do you know

22   whether it was five phone calls or a hundred?

23        A.    I -- it could -- could be anywhere from five

24   to 15.  I -- I don't know the exact number.

25        Q.    And you said your -- the phone calls were

1   mainly with Nancy, right?

2         A.    Yes.

3         Q.    So you did talk to Les about the guns, right?

4         A.    No.

5         Q.    So what did you mean when you said they were

6   mainly with Nancy?

7         A.    It -- the -- Nancy was pretty much the only

8   one that talked to me about the guns and everything

9   else.  It was -- Les pretty much only called me for the

10  invitation to the dinner, which I did -- which I did not

11  attend.

12        Q.    Okay.  And you had five to ten phone calls

13  with Nancy about the guns?  Or five to 15, I think you

14  said.

15        A.    Yeah.

16        Q.    When the agents were taking messages from your

17  phone, did they take a picture of every contact you ever

18  had with Nancy and Les?

19        A.    I don't know.  You'd have to ask them.

20        Q.    Were you in control of your phone when they

21  were taking pictures of it?

22        A.    I put my phone down on the table and said, do

23  what you need to do; if you need to confiscate it, go

24  ahead.

25        Q.    So fair to say then that you know that the

1    pictures they took of your phone are pictures of -- from

2    your phone, but you have no idea whether they took a

3    picture of all of the messages between you and

4    Johnathon?

5           A.    Correct.

6           Q.    You have no idea whether they took a picture

7    of all of the messages between you and Nancy or Les?

8           A.    Correct.

9           Q.    And you have no idea whether they took a

10   picture of the call logs that would depict all of the

11   calls between you and Nancy or Les?

12          A.    True.

13          Q.    And you have no idea whether they took a

14   picture of all of the calls between you and Johnathon?

15          A.    True.

16          Q.    So you don't know whether these are selective

17   photographs or complete photographs?

18          A.    I do not know.

19          Q.    Did they talk about taking your phone?

20          A.    They tried to plug it into their computer to

21   try and download it.  They took pictures of it.  Beyond

22   that, as I said, here's my phone, if you need it, take

23   it.  They chose not to take it.  They told me not -- not

24   to delete anything on the phone and I did not.

25          Q.    Did they ever come back for the phone?

1    A.    No.  I still have the phone.

2          MR. FALKNER:  May I have a moment, your Honor?

3          THE COURT:  Yes.

4    Q.    Now, I want to go in particular to

5  Exhibit 29C.

6          Okay.  And I'm looking at the page that ends

7  in 0063.  You remember looking at this during your

8  direct examination?

9    A.    Uh-huh.

10   Q.    "Gary, sorry for the early hour.  Stephanie

11 will be making contact with Roscoe, then presumably you,

12 to verfiy" -- I assume that means verify --

13   A.    Uh-huh.

14   Q.    -- "location, how long you had them, that you

15 picked them up from Roscoe, et cetera, thank you."

16         And you received that on November 24th at 6:27

17 a.m., right?

18   A.    Yes.

19   Q.    And your response was to -- this is your text

20 message to Johnathon, right?

21   A.    Yup.

22   Q.    "Stop giving info."

23   A.    Yes.

24   Q.    "People don't need to know who has what."

25   A.    Correct.

74

```
 1          Q.    "Just that they were gone."

 2          A.    (Shrugging shoulders.)

 3          Q.    And you sent that on November 24th at 6:31

 4    a.m.?

 5          A.    Yup.

 6          Q.    Now -- and you responded -- Johnathon

 7    responded to you:  I have not given any info; all that

 8    was said was she needs to talk to Roscoe; I have no idea

 9    if he was going to tell her or not at all; sorry, I'm

10    out.

11                And you sent that November 24th at 6:32 a.m.,

12    right?

13          A.    He sent me that, yes.

14          Q.    Right.  I'm sorry.  Right.

15                But that was the text message that you

16    received from him?

17          A.    Yes.

18          Q.    And they were sent in that sequence?

19          A.    I believe so.  I --

20          Q.    To the best of your memory?

21          A.    Dates and times on the phone.  There you go.

22          Q.    You don't have any reason to believe that

23    there were other messages in between those messages?

24          A.    I just remember having to wake up at 6:30 in

25    the morning to my phone and getting really agitated and
```

1    irritated.

2         Q.   At Johnathon?

3         A.   Yeah.

4         Q.   You said you were concerned about thieves

5    finding out where the guns were.

6         A.   I say that in pretext to who hasn't had

7    something burglarized, who hasn't had something stolen.

8    I mean, pretty much everybody has.

9         Q.   So Johnathon Irish is telling you that guns

10   that were in his home, that are coming to you, allegedly

11   from Roscoe, that are known to be guns of his wife, he's

12   telling you that he said something to Stephanie, right?

13             MS. KRASINSKI:  Objection.  I think

14   Mr. Falkner misstated the testimony in his question.

15             THE COURT:  Approach.

16                      AT SIDEBAR

17             MS. KRASINSKI:  The question was that they

18   were known to belong to his wife.  I don't think there's

19   been any testimony from this witness that he understood

20   or knew these firearms to belong to Stephanie.

21             THE COURT:  I think you can get up on redirect

22   and ask him that, but there was some reference from

23   Johnathon Irish in a text about Stephanie's involvement.

24             Can you point me to something more specific?

25             MR. FALKNER:  I'll withdraw this question,

1  your Honor.  I'm just going to move on to another

2  question.

3        THE COURT:  Okay.

4        MR. FALKNER:  It was an inartfully worded

5  question.

6        THE COURT:  All right.  Go ahead.

7        MR. FALKNER:  Thank you.

8                  CONCLUSION OF SIDEBAR

9     Q.   Let's try it again.

10         You knew who -- even if you didn't know

11  exactly who he was, you knew who Roscoe was in the

12  scheme of -- in this scheme, correct?

13    A.   As far as I know, Roscoe was the one that had

14  the weapons.  That's it.

15    Q.   Right.  So you weren't concerned that Roscoe

16  was going to find out where the guns were, were you?

17    A.   No.

18    Q.   In fact, you were signing a document that

19  Roscoe had signed saying he was giving weapons to you,

20  right?

21    A.   Correct.

22    Q.   You weren't concerned that Stephanie was going

23  to find out where the guns were, were you?

24    A.   As far as I know, him and Stephanie were

25  separated at that time.  As far as who actually really

1    owned the guns or where they were kept, I have no clue.

2          Q.    You knew you weren't really getting the guns

3    from Roscoe, right?

4          A.    According to the paperwork, according to what

5    I was told, he had the ownership.

6          Q.    I'll put it to you another way.

7                Those text messages were on November 24th,

8    right?

9          A.    Yeah.

10         Q.    You had gotten the guns on November 17th,

11   right?

12         A.    Yeah.

13         Q.    And they came from Neil Prive, right?

14         A.    Yes.

15         Q.    You didn't want anybody to know that you had

16   these guns, right?

17         A.    I don't need any outsider people to know.

18         Q.    Like the FBI?

19         A.    Like other criminals, other people.  I don't

20   know who Johnathon hangs around with anymore.  I haven't

21   really hung out with him.  I mean, I don't keep many

22   friends myself.

23         Q.    Now, sir, let's talk about another text

24   message.

25                Do you remember on your direct examination one

1    of the text messages that said something about no need

2    to come to court?

3        A.    Yes.

4        Q.    And that was from Nancy and/or Les, right?

5        A.    Correct.

6        Q.    And Johnathon wants to keep you in the

7    background, right?

8        A.    I --

9        Q.    That's what the text message said.

10       A.    That's what the text message said, yes.

11       Q.    Had you been asked to come to court?

12       A.    At one point, Johnathon did ask me to go to

13   court up in Tilton.

14       Q.    What court was he talking about?

15       A.    I truthfully do not know.  I don't know the

16   reason why.  I had to work that day and so I didn't go.

17       Q.    Did he tell you where you might have to go?

18       A.    He said Tilton.  Other than that, I don't

19   know.  I -- I remember him telling me something about

20   it, but I did not actually keep it in my head or

21   anything like that.

22       Q.    All right.  Now, were you surprised then

23   that -- well, let me put it to you another way.

24             You said that Johnathon asked you to go to

25   court, but you had to work that day.

1      A.   Yeah.

2      Q.   Did you tell that to Johnathon?

3      A.   I'm pretty sure I said that I had to work that

4  day.

5      Q.   Because this text message said that you no

6  longer have to come to court, right?

7      A.   Correct.

8      Q.   Was it your understanding at the time you got

9  that text message that Johnathon still wanted you to go

10  to court?

11      A.   Probably.  I don't know.  I mean, again, I

12  wasn't going to show up because I had to work.

13      Q.   When it said that Johnathon wanted to keep you

14  in the background --

15      A.   I have no clue.

16      Q.   Did that message seem odd to you at the time?

17      A.   Not really.

18      Q.   You didn't think there was anything -- what

19  were you being kept in the background of?

20      A.   I don't know.

21      Q.   Now, let's talk about the text message that

22  said, I have a power of attorney for Roscoe, so it's all

23  legal.

24           Do you remember reading that text message?

25           And this is Exhibit 29D, your Honor.

1          You remember reading this message that you

2   received from Nancy or Les?

3      A.   I -- now that I see it, yes, I remember it.

4      Q.   And do you remember reading it during your

5   direct examination just a few minutes ago?

6      A.   I guess, yeah.

7      Q.   Had you asked Nancy whether it was legal?

8      A.   No, I did not ask.

9      Q.   It wasn't Nancy's signature on the transfer

10  document, was it?

11     A.   No, it was not.

12     Q.   It was Roscoe's signature.

13     A.   Yes, it was.

14     Q.   Did you ask Nancy what a power of attorney had

15  to do with it at all?

16     A.   No, I did not.

17     Q.   Did it concern you that she was representing

18  she had a power of attorney?

19     A.   To tell you the truth, I didn't -- I didn't

20  even associate POA with power of attorney.  I'm not

21  tech-savvy.

22     Q.   Now, when the guns came into your house --

23     A.   Yes.

24     Q.   -- you made a detailed list of what was --

25  went into that?

1       A.      Yes.

2       Q.      I shouldn't say what went into that.  What you

3  took out of that chest, right?

4       A.      Correct.

5       Q.      And your detailed list itemized all the items

6  that I showed to you while you were on the witness

7  stand, right?

8       A.      Minus a couple of cases.  I didn't write those

9  down.

10       Q.      Good amount of stuff, right?

11       A.      Yes.

12       Q.      And -- and you needed some kind of power of

13  attorney, I'm -- strike that.

14              You needed some kind of bill of sale, right?

15       A.      Letter of transfer, yeah.

16       Q.      And so even though you had been very careful

17  to itemize all the weapons that came out of that box,

18  this transfer of weapons didn't mention any of those

19  things, did it?

20       A.      No.

21       Q.      It only mentioned the pistol and the rifle and

22  ammunition, right?

23       A.      Various mags, yeah.

24       Q.      Didn't say anything about a shotgun?

25       A.      No.

1     Q.   Didn't say anything about a BB gun?

2     A.   Correct.

3     Q.   Didn't say anything about the -- the suit or

4 whatever it was?

5     A.   The chem suit, yeah.

6     Q.   So you -- even after you received that

7 document and signed it, you didn't have any record of --

8 or bill of sale, as you called it, as to the shotgun,

9 right?

10    A.   Correct.

11    Q.   Just returning to the weapons as the

12 collateral, why would you need a bill of sale if this

13 wasn't a sale?  I'll withdraw that.

14    A.   That's a good question.  Truthfully, I didn't

15 think about it, but okay.

16    Q.   You didn't think about why you would need a

17 bill of sale for something you weren't buying?

18    A.   Pretty much, yeah.  I'm a simple person.  I

19 usually take people for their word.

20          MR. FALKNER:  Just a few more questions, your

21 Honor.

22    Q.   When -- when you were working at the -- by the

23 way, is Saddleback the name of the campground?

24    A.   That Nancy and Les used to own?

25    Q.   Right.

1      A.    And -- but it was not the one that me and

2    Johnathon had met recently.

3      Q.    Okay.  But you used to work at the Saddleback

4    Campground, right?

5      A.    Yup.

6      Q.    And you lived there for some period of time?

7      A.    A couple months.  Maybe a month.

8      Q.    And you lived with the Haskells in Hampton

9    Falls at some point?

10     A.    Yes.

11     Q.    Johnathon originally offered his truck for

12   collateral, right?

13     A.    He said the truck was one thing that he didn't

14   want to give up.

15     Q.    Okay.

16     A.    His Bronco or whatever.

17     Q.    Did he tell you that he couldn't have the guns

18   around, but that the guns actually belonged to

19   Stephanie?

20     A.    No, he did not.

21     Q.    Did he tell you who the guns belonged to?

22     A.    He told me that he had guns.  I did not know

23   who ...

24     Q.    By the way, you were visited twice by the FBI,

25   right?

1      A.   Yes.

2      Q.   The first time was when they came and took

3  this box of guns?

4      A.   Three times.

5      Q.   Three times?

6      A.   Three times.

7      Q.   Let's start with the first one.

8           The first one was the day before Thanksgiving,

9  right?

10     A.   The first time was like two days after I sent

11 back the weapons transfer signature thing.  And it was

12 literally two days after that that the FBI came and

13 picked up the guns.

14     Q.   And that's the day that they surprised you in

15 the morning on the day before Thanksgiving, right?

16     A.   If it was the day before Thanksgiving, it was.

17 I -- I couldn't tell you.

18     Q.   Were you working that day?

19     A.   Yes, I was.  I was supposed to be.

20     Q.   Did you go to work that day?

21     A.   I did go in late, yes.

22     Q.   How long did you talk with the FBI?

23     A.   Approximately two hours, roughly, I guess.

24     Q.   They interviewed you at length about the guns,

25 right?

1    A.   They asked me who I got them from or --

2    actually, I should say they knocked on the door, asked

3    for me.  They said, did you pick up some guns from

4    Johnathon Irish?  I knew exactly which ones they were

5    talking about.  I walked upstairs, I grabbed the case,

6    and said yeah.

7    Q.   And then -- and then they spent some time

8    talking to you, right?

9    A.   A little bit, yeah.

10   Q.   They even had you go through the case and took

11   pictures of the weapons in your hands, right?

12   A.   They -- I don't believe that they took

13   pictures right then and there.  I don't remember

14   exactly, but I know that I showed them each of the

15   weapons.

16        MR. FALKNER:  This is Exhibit 28A, your Honor.

17   Q.   Is that the black box in your kitchen?

18   A.   Yes, it is.

19   Q.   This is Exhibit 28B.  Is that the black box in

20   your kitchen?

21   A.   Yup.

22   Q.   It's just open now?

23   A.   Yup.

24   Q.   It's full to the top, right?

25   A.   Yes.

1    Q.    This is Exhibit 28G.  Is that the gun in your

2  hands?

3    A.    I cannot verify that it is in my hands.

4    Q.    This is 28L.  Is that ammunition in your

5  hands?

6    A.    That appears to be, yeah.

7          MR. FALKNER:  Your Honor, I'm going to

8  approach him with the physical exhibit, if I may.

9          THE COURT:  Yes.

10    Q.    Take a closer look at Exhibit 28G.  Is that

11  your kitchen floor underneath the gun, even though it's

12  in darkness?

13    A.    It appears so.

14    Q.    Does that help you determine whether the gun

15  is in your hands in that picture?

16    A.    No, it does not.

17    Q.    But that picture appears to have been taken in

18  your kitchen?

19    A.    Yes.

20    Q.    And then you sat down at the kitchen table and

21  talked to them, right?

22    A.    Yes.

23    Q.    And how long was the conversation itself as

24  opposed to going through the case?

25    A.    Probably -- I think it was pretty quick.  I

87

1    mean, they -- they said, yeah, we're going to have to

2    seize the weapons, did a paper, there you go.

3          Q.   Well, they talked to you about Neil, right?

4          A.   I don't remember at that time.  It's possible.

5    I don't know.

6          Q.   At any point during your conversation with

7    those two agents at your home did you tell them that

8    Johnathon had asked to get one of the weapons back?

9          A.   I do not remember.  I think I did.

10         Q.   Excuse me?

11         A.   I said I do not remember.  I -- I'm -- I think

12   I did.

13         Q.   You think that you did tell them that?

14         A.   At one point in time.

15         Q.   Did you tell it to them during that meeting in

16   the kitchen?

17         A.   All three -- well, two of the meetings took

18   place in the kitchen, one of them was just for the

19   subpoena.

20         Q.   Okay.  Now, the second time that you met --

21         A.   They came back with the cell phone --

22         Q.   On December 6th or so?  Does that sound about

23   right, even if it's not the exact date?

24         A.   Sounds about right.  I don't know.

25         Q.   A week or two after the first time you saw

1    them?

2         A.    Yeah.

3         Q.    This time, was it a prearranged visit?

4         A.    No, not really.

5         Q.    They showed up unannounced again?

6         A.    I don't remember setting up any type of a time

7    frame.  I'll put it that way.  I mean, they just showed

8    up; okay, we're going to try and clone your phone, try

9    and get all the information out of it; yup, okay.

10        Q.    And was that with one of the two agents that

11   you had met the first time?

12        A.    Yes.

13        Q.    Only one of them this time, though, right?

14        A.    Correct.

15        Q.    At any point during that conversation did you

16   ever tell the FBI agent that Johnathon Irish had asked

17   to get one of the weapons back from you?

18        A.    I -- as I said, I don't remember.  I don't

19   know.  I remember saying it to someone.  I just don't

20   recall who.

21        Q.    The most recent meeting was after you got a

22   trial subpoena, right?

23        A.    Yeah.

24        Q.    That was fairly recently?

25        A.    Yes.

1    Q.   Within the last week or two?

2    A.   Yes.

3    Q.   Where was that meeting?

4    A.   FBI office, Portsmouth.

5    Q.   Okay.  And who was at the meeting?

6    A.   Jen, Kevin -- I'm terrible with names again.

7    Q.   Okay.  And at that meeting, is that when you

8  disclosed this incident when Johnathon Irish had

9  supposedly asked for one of the firearms back?

10   A.   It very well could have been.

11   Q.   That was the first time you ever told anyone

12 that, right?

13   A.   Very well could have been.

14   Q.   It was your communications with Nancy that

15 told you what you were and were not supposed to do with

16 these guns, right?

17   A.   As far as?

18   Q.   As far as this entire transaction, right?

19 Nancy told you who to speak with, when to speak with

20 them, et cetera, right?  She prepared the documents?

21   A.   Yeah.

22   Q.   All of those things, right?

23   A.   As far as I know.

24   Q.   Johnathon never told you what you should do

25 with the guns, did he?

1      A.   No.

2      Q.   And he never told you what to say to anyone,

3  did he?

4      A.   No.

5      Q.   But Nancy did, didn't she?

6      A.   As far as?

7      Q.   Did she tell you what to say to the FBI?

8      A.   No.

9           MR. FALKNER:  Just one more moment, your

10  Honor.

11           Nothing further.

12           THE COURT:  All right.  Attorney Krasinski,

13  how much time would you need?

14           MS. KRASINSKI:  Brief, your Honor.

15           THE COURT:  Brief.  Minutes?

16           MS. KRASINSKI:  Five or six questions, your

17  Honor.

18           THE COURT:  Okay.  Because it will save us

19  some time if we can allow that.  Can the jury handle

20  five to six --

21           THE JUROR:  Can you turn this wide screen off?

22           THE COURT:  Okay.  Let's turn that off.  It's

23  bothering people.

24           Better?  All right.

25           THE COURT:  Go ahead, Attorney Krasinski.

```
 1                    REDIRECT EXAMINATION
 2   BY MS. KRASINSKI:
 3       Q.    During your conversation with Attorney
 4   Falkner, you said something about the defendant saying
 5   something about getting Stephanie back.
 6       A.    Yes.
 7       Q.    And I -- I'm not sure I understood that.
 8             Were you saying that at some point the
 9   defendant said he thought he could get his -- Stephanie
10   back if he got the guns out of the house?
11       A.    As far as I knew, he did say something about
12   I -- I can't have the guns -- how should I put it?  Let
13   me rearrange my thoughts here.
14             He -- he could not have access, so he needed
15   someone that would not allow him access to them.
16       Q.    And how did that relate to whether or not he
17   was going to get Stephanie back?
18             MR. FALKNER:  Objection, your Honor.  May we
19   be seen at sidebar?
20             THE COURT:  Yes.
21                         AT SIDEBAR
22             MR. FALKNER:  This line of questioning is
23   misstating his testimony.  His testimony was that he
24   needed the money in order to get Stephanie back.  That's
25   what he testified to.  He never said he needed to get
```

1   the guns to get Stephanie back.  And this entire line of

2   questioning is assuming that he said something that he

3   just didn't say.

4           MS. KRASINSKI:  I -- I honestly did not

5   understand what he said and I'm just trying to

6   understand.

7           THE COURT:  Okay.  He -- I remember him

8   connecting the $300, that somehow money would get

9   Stephanie back.  I remember him testifying to that.  I

10  don't know that it's clear what was meant by any of

11  that.  So I think if you could move along --

12          MS. KRASINSKI:  I will, your Honor.

13          THE COURT:  All right.  Thank you.

14          MR. FALKNER:  Thank you.

15          THE COURT:  Sustained.

16                  CONCLUSION OF SIDEBAR

17      Q.   Now, you mentioned that you were told that

18  Roscoe owned the weapons.

19      A.   That's what I was led to believe.

20      Q.   By whom?

21      A.   By the paperwork, by Nancy stating that

22  Roscoe -- she had to get ahold of Roscoe who owned the

23  weapons.

24          MS. KRASINSKI:  Nothing further, your Honor.

25          THE COURT:  Anything further, Attorney

1    Falkner?

2                          RECROSS-EXAMINATION

3    BY MR. FALKNER:

4        Q.   Regardless of who owned the weapons, it was

5    your understanding that Johnathon is the one who wanted

6    to get rid of these weapons, right?

7        A.   That's fair to say, yeah.

8        Q.   And your testimony during cross-examination

9    was that he needed the $300 to somehow be involved in

10   getting Stephanie back, right?

11       A.   Yup.

12       Q.   You don't know -- do you know how the $300 was

13   connected with trying to get Stephanie back or not?

14       A.   Truthfully, I did not listen to him very much

15   because it did not seem credible to me.

16       Q.   He explained what he was going to do with the

17   $300 to try to get Stephanie back, but you don't

18   remember what it was because you weren't listening; is

19   that right?

20       A.   Pretty much, yeah.

21            MR. FALKNER:  Nothing further.

22            THE COURT:  All right.

23            THE WITNESS:  Trying to buy somebody's love,

24   and it's never worked.

25            MR. FALKNER:  I'd move to strike, your Honor.

1           THE COURT:  All right.  Disregard the last
2    comment; unresponsive.
3           Does the government have any further
4    witnesses?
5           MS. KRASINSKI:  No, your Honor.
6           THE COURT:  All right.
7           MS. KRASINSKI:  May the witness be excused?
8           THE COURT:  Yes.
9           Mr. Roya, you may be excused.
10          THE WITNESS:  Thank you.
11          THE COURT:  Thank you, sir.
12                  (Witness excused.)
13          MS. KRASINSKI:  And with that, the government
14   rests, your Honor.
15          THE COURT:  All right.
16          MR. FALKNER:  May we be seen at sidebar?
17          THE COURT:  We will allow the jury to take the
18   morning break and then we can --
19          THE CLERK:  All rise for the jury.
20                  (Jury excused.)
21          THE COURT:  All right.  I know we probably all
22   need a little break.  Let's go ahead and --
23          MR. FALKNER:  Your Honor --
24          THE COURT:  You don't need to approach sidebar
25   at this point.  Go ahead.

1          MR. FALKNER:  Fine, your Honor.

2          I'd move for judgment of acquittal at the

3  close of the government's case.  I don't intend to

4  present specific grounds because my understanding is if

5  I present specific grounds, all the other grounds are

6  waived.  I'd just argue that all of the elements, the

7  evidence is insufficient.

8          THE COURT:  After viewing the evidence and

9  considering it in the light most favorable to the

10  government's case, I find that a rational factfinder

11  could conclude beyond a reasonable doubt that the

12  defendant committed the charged crime, so I deny that

13  motion.

14          Your -- you're going to call a witness and

15  perhaps your client.  Any others?

16          MR. FALKNER:  No, your Honor.  Just -- I would

17  ask with regard to Detective LeBlanc, I believe he's --

18  Task Force Officer LeBlanc, I -- I discussed the two

19  specific areas that I intend to -- intended to inquire

20  with the government as a result of Mr. Roya's testimony.

21          I would just intend to address one more

22  specific area and I don't know whether the government

23  has any objection to that or not before I raise it with

24  your Honor.

25          THE COURT:  Any problem calling Mr. LeBlanc on

1   one issue?  And apparently the two of you know what that

2   issue is.

3            MS. KRASINSKI:  Well, we discussed two and I

4   don't have an issue with that.  I don't know what the

5   third is.

6            MR. FALKNER:  The third, your Honor, is simply

7   to establish that in neither of the -- in the meeting in

8   the kitchen nor in the meeting -- the second meeting did

9   Mr. Roya ever disclose to federal agents that Mr. Irish

10  had asked for one of the weapons back at any point.

11           THE COURT:  All right.  Do you have any

12  problem with that?

13           MS. KRASINSKI:  On the third one, I don't

14  think that fits within 613(b).  He said he didn't

15  recall.  He said he said it at some point; he didn't

16  know if it was in the first, the second, or the meeting

17  as it relates to the subpoena --

18           THE COURT:  I'm going to allow it.  I'm going

19  to allow the question.

20           MS. KRASINSKI:  All right.

21           THE COURT:  All right.

22           Let me go ahead now -- unless you have any

23  objection, I'm going to go ahead and make the final

24  Petrozziello ruling.

25           Do you have any --

1          MR. FALKNER:  Your Honor, does it --

2          THE COURT:  I can wait until --

3          MR. FALKNER:  I'm just unclear whether it is

4   made now or made at the close of all the evidence.

5          THE COURT:  I can wait until the end.  I think

6   I've heard all the relevant evidence with respect to it

7   and this is a good time in terms of saving the jury's

8   time.  So I can do that, however, at the end of the

9   case.

10          MR. FALKNER:  If your Honor wishes to make the

11   findings now and then simply briefly supplement it based

12   on any additional evidence, I don't have a problem with

13   that so that I can preserve my objection at the close of

14   all the evidence.

15          THE COURT:  I'm going to wait until the close.

16          Okay.  Anything else to discuss before --

17          MR. FALKNER:  No, your Honor.

18          MS. KRASINSKI:  Your Honor, while the jury's

19   excused, is now an appropriate time to advise the

20   defendant that it is his choice to testify or remain

21   silent and do that while the jury is on a break or would

22   you like to excuse them do it at a later point?

23          THE COURT:  It's not my custom to.  He's

24   represented by able counsel and I think he knows his

25   rights and I'm going to presume his counsel has talked

1    to him about his rights.

2              So, you know, unless you are urging me to do

3    so --

4              MS. KRASINSKI:  I am simply accustomed to

5    having the Court voir dire the defendant on the record

6    as to it being the defendant's choice.  If that's not

7    the practice in this district, then --

8              THE COURT:  It's not my practice.  It may be

9    some other judges' practices.

10              Do you want me to do that, Mr. Falkner?

11              MR. FALKNER:  No, your Honor.  I actually

12    think --

13              THE COURT:  Yeah.

14              MR. FALKNER:  -- that it's improper.

15              THE COURT:  All right.  Anything else before

16    we have our morning break?

17              And then if Officer LeBlanc is short,

18    relatively short, and you have no rebuttal, which I

19    anticipate, and -- it all depends on whether Mr. Irish

20    exercises his right to remain silent, exercises his

21    right to testify.  And then, depending upon the length

22    of that, we may go straight into closing arguments.

23    We'll take a break before I charge the jury and

24    obviously approach sidebar to make final rulings.

25              Does that make sense?

1          MR. FALKNER:  I'm sorry, your Honor.  I was

2     just trying to --

3          THE COURT:  It's all going to depend on

4     ultimately whether Mr. Irish testifies in terms of the

5     breaks and the timing.

6          MR. FALKNER:  Assuming Mr. Irish were not to

7     testify after Mr. LeBlanc testified and the defense

8     rested, would your Honor send the jury out to make the

9     Petrozziello rulings at that point?

10          THE COURT:  I think I'll do it at sidebar

11     because I've already made some provisional rulings.  I

12     think I can simply incorporate those rulings and

13     findings, reiterate them briefly and then add to them.

14     So I think I can do that fairly quickly at sidebar and

15     then we'll go into closings.

16          Does that work?

17          MR. FALKNER:  May I have a moment to speak

18     with Mr. Irish before the jury comes back?

19          THE COURT:  We're going to have a little break

20     now anyway, so you'll have a chance to speak to him.

21          MR. FALKNER:  Thank you.

22          THE COURT:  All right.  So we'll come back in

23     five, ten minutes.

24        (Recess taken from 10:55 a.m. until 11:10 a.m.)

25          THE COURT:  All right.  The government has

1    rested, so Attorney Falkner --

2           MR. FALKNER:  The defense recalls Task Force

3    Officer Kevin LeBlanc.

4           THE CLERK:  Officer LeBlanc, please remain

5    standing and raise your right hand.

6           **KEVIN LEBLANC**, having been first duly sworn,

7    testified as follows:

8           THE CLERK:  Thank you.  Please just identify

9    yourself again for the record.

10           THE WITNESS:  Kevin LeBlanc, L-e-B-l-a-n-c.

11           THE CLERK:  Thank you.

12                    DIRECT EXAMINATION

13   BY MR. FALKNER:

14      Q.   Good morning, Mr. LeBlanc.

15      A.   Good morning.

16      Q.   As part of your investigation in this case,

17   you had occasion to interview Peter Duguay, correct?

18      A.   Yes.

19      Q.   At his workplace?

20      A.   At a jobsite.

21      Q.   And that was on October 29th of 2019?

22      A.   I don't recall the exact date.

23      Q.   Approximately?

24      A.   Approximately.

25      Q.   And you were accompanied by Agent Wesley Ross

1   Garland?

2        A.   Yes.

3        Q.   And during your interview, you were seeking

4   basically whatever relevant information you could get

5   about these guns from Mr. Duguay, correct?

6        A.   Yes.

7        Q.   And during that interview, did you ask about

8   the relationship between Mr. Duguay and Mr. Irish?

9        A.   Yes.

10       Q.   What he told you was that Mr. Irish was a

11   keep-your-enemies-close kind of relationship, right?

12       A.   Yes.

13       Q.   And at no time during that first interview did

14   he tell you anything about an incident where Mr. Irish

15   was purportedly racking the slide of the pistol,

16   correct?

17       A.   No.

18       Q.   Then there was a follow-up phone call the same

19   day, right?

20       A.   I was not on that phone call.

21       Q.   Were you on any of the phone calls?

22       A.   No, sir.

23       Q.   Were you aware of the information that was

24   given to the FBI?

25       A.   Yes.

1    Q.   And your understanding that that information

2    about the racking the slide was first given on the

3    second phone call after the -- that interview?

4    A.   I don't recall which phone call.

5    Q.   You were involved in the creation of 302

6    reports, correct?

7    A.   Yes.

8    Q.   And you reviewed the 302s that are involved in

9    your interviews, correct?

10   A.   Yes.

11   MR. FALKNER:  May I approach the witness, your

12   Honor?

13   THE COURT:  Yes.

14   Q.   A 302 is essentially the FBI's version of a

15   police report, correct?

16   A.   Yes.

17   Q.   Can you review that and let me know if it

18   refreshes your recollection as to when the FBI received

19   the information about Mr. Irish racking a pistol?

20   A.   Yes.  I recall this now.  That was after

21   Duguay, Peter Duguay, had called back Agent Garland.

22   And then I was filled in on that information and then we

23   decided to give him a call back together.

24   Q.   Okay.  So it was a -- so you interviewed him

25   and then he -- then he spoke with Agent Garland and then

1  you and Agent Garland then called him?

2      A.   Called him back.

3      Q.   And it was during that call that he first

4  relayed this information about racking a shotgun --

5  racking a pistol, correct?

6      A.   I don't know if he told Garland on the phone

7  before this conversation or he just repeated it back to

8  the two of us together.

9      Q.   But you weren't aware of that information when

10  you called him back?

11      A.   Honestly, I don't remember if he had told

12  Garland that beforehand or not when we decided to call

13  him back.

14      Q.   Does your review of that report help refresh

15  your recollection?

16      A.   So, yes, we talked about he did not see the

17  gun, but he could hear it being racked.

18      Q.   And that was during the third conversation,

19  correct, the second phone call?

20      A.   This report is from when we went to the

21  jobsite.

22      Q.   Have you read the whole report?

23      A.   No, I'm skimming through it to talk about --

24  to find the areas you're talking about, sir.

25           MR. FALKNER:  May I approach the witness, your

1    Honor?

2          THE COURT:  Yes.

3      Q.    Can I call your attention --

4      A.    I'm sorry.

5      Q.    -- to this agent note and this agent note.

6      A.    I didn't realize there was the second page.

7            Okay.  So I was not a part of that phone call,

8    sir.

9      Q.    Okay.  But your review of this report, the

10   first time that that information about racking the

11   pistol in the truck came about was during the second

12   phone call, correct?

13     A.    Correct.

14     Q.    Not during your interview of him at the

15   jobsite?

16     A.    Right.

17     Q.    And not during the first phone call?

18     A.    Correct.

19          MR. FALKNER:  May I approach, your Honor?

20          THE COURT:  Yes.

21     Q.    You also had occasion to interview Gary Roya,

22   correct?

23     A.    Yes, sir.

24     Q.    The first time was, as you testified to the

25   first time you were on the witness stand, the day before

1    Thanksgiving, correct?

2         A.    Yes.

3         Q.    And during that interview, you reviewed the

4    contents of the box and also discussed any information

5    that you could get with him about those weapons, right?

6         A.    Yes.

7         Q.    And about Johnathon Irish?

8         A.    Yes.

9         Q.    And he spent a good amount of time talking to

10   you about that, right?

11        A.    Yes.

12        Q.    Answered all your questions?

13        A.    Yes.

14        Q.    Volunteered information?

15        A.    As we asked it, he answered.

16        Q.    And at no time during that conversation did he

17   say anything at all about Johnathon Irish asking to get

18   any of the firearms back, did he?

19        A.    Not that I recall.

20        Q.    You don't recall, or that information wasn't

21   given?

22        A.    I don't recall.

23        Q.    Would a review of the 302 report refresh your

24   recollection?

25        A.    Sure.

1          MR. FALKNER:  May I approach, your Honor?

2          THE COURT:  Yes.

3      Q.    Is that the report of your interview of Gary

4  Roya on the day before Thanksgiving?

5      A.    Yes, sir.  On November 27th.

6          It does not indicate that that happened.

7      Q.    He never told you anything like that during

8  that interview?

9      A.    Correct.

10     Q.    And you went back to visit him alone on

11 December 6th of 2019, correct?

12     A.    No, when I went back I had another task force

13 officer with me.

14     Q.    Okay.  Well, when you went back, that was on

15 December 6th, 2019, right?

16     A.    I'd have to check the report for the exact

17 date.

18     Q.    Would you like to see your report?  Would that

19 refresh your recollection?

20     A.    If you need an exact date, yes, sir.

21     Q.    Was it approximately December 6th?

22     A.    Sure.

23     Q.    And during that interview, that's when you

24 tried to download the contents of his phone without

25 success, right?

1      A.   Yes.

2      Q.   And -- but you also interviewed him further

3   about the facts of the case, right?

4      A.   I think we made general talk, but the main

5   purpose was to get the information off the phone.

6      Q.   At any point during -- well, you asked him

7   about whether he had any further contacts with Johnathon

8   Irish, right?

9      A.   I believe so, yes.

10     Q.   And with Nancy Haskell?

11     A.   Yes.

12     Q.   At any point during that interview did he say

13   anything at all about Johnathon asking to get the

14   firearms back?

15     A.   I don't believe so.

16          MR. FALKNER:  I have nothing further, your

17   Honor.

18          THE COURT:  All right.  Any questions?

19                    CROSS-EXAMINATION

20   BY MS.  WEILAND:

21     Q.   Officer LeBlanc, you mentioned that another

22   agent by the name of -- was it Wes Garland that

23   accompanied you on your interview with Gary Roya?

24     A.   No, it was Patrick Hennessey.

25     Q.   I'm sorry.  I'm sorry.  Let me be more

1    specific.

2              Your very first visit to Mr. Roya's house --

3              I'm sorry.  Just a moment, your Honor.

4              Was it your testimony -- and if I've

5    misunderstood, please correct me -- that Special Agent

6    Garland accompanied you on some of your witness

7    interviews?

8        A.   Yes.

9        Q.   Okay.  Did that include any of your interviews

10   with Dylan Roosa?

11             MR. FALKNER:  Objection.

12             THE COURT:  Approach, please.

13                        AT SIDEBAR

14             MS. WEILAND:  This is my only question on this

15   topic.

16             THE COURT:  How does it come in?  It wasn't a

17   subject of direct.  You can tell me how it comes in.

18             MS. WEILAND:  Well, he mentioned that Special

19   Agent Garland did accompany him in participating in this

20   witness interview.  I just want to ask whether Special

21   Agent Garland accompanied him on other interviews as

22   well.

23             If your Honor would like me to withdraw that

24   question, but I -- I believe it's -- I do intend to ask

25   a follow-up question relating specifically to the fact

1    that Special Agent Garland -- that did come up as far as

2    in direct, his interview of Mr. Roya.

3              MR. FALKNER:  I don't understand how

4    accompanying him on an interview with Dylan Roosa --

5              THE COURT:  I'm not seeing the relevance

6    either.

7              MS. WEILAND:  I can withdraw that question --

8              THE COURT:  Oh.

9              MS. WEILAND:  -- but I do intend to ask

10   whether he sees Special Agent Garland in the courtroom.

11             Special Agent Garland -- and I believe this

12   came out on direct, correct me if I'm wrong -- was with

13   him when he interviewed Gary Roya on the first occasion.

14   I believe that was the testimony.

15             THE COURT:  And why does the jury need to know

16   he's in the courtroom?  Why does the jury need to know

17   whether he's in the courtroom?

18             MS. WEILAND:  Your Honor, I believe during

19   the testimony of another witness there may have been a

20   misidentification.  I just want to ask whether he sees

21   Special Agent Garland in the courtroom because Special

22   Agent Garland was not a witness in this case, but I

23   think he got him confused with another witness in the

24   case.

25             THE COURT:  I'm not going to allow it.  I

1   don't see the relevance.

2           MS. WEILAND:  Okay.

3           THE COURT:  Go ahead.

4                   CONCLUSION OF SIDEBAR

5           MS. WEILAND:  I have nothing else, your Honor.

6           THE COURT:  All right.  Anything at all

7   further, Attorney Falkner?

8           MR. FALKNER:  The defense rests.

9           THE COURT:  All right.

10          Officer LeBlanc, you may step down and be

11  excused, sir.  Thank you.

12          THE WITNESS:  Thank you.

13                  (Witness excused.)

14          THE COURT:  All right.  Counsel, please

15  approach.

16                      AT SIDEBAR

17          MR. FALKNER:  First, I raise again the motion

18  for a judgment of acquittal.

19          THE COURT:  Let me make sure -- are you going

20  to rebut anything?  I assume not, but I'm just asking

21  for the record.

22          MS. KRASINSKI:  Correct, your Honor.

23          THE COURT:  You both rest your entire case?

24          MS. KRASINSKI:  Yes, your Honor.

25          MR. FALKNER:  Right.

1          THE COURT:  Okay.  All right.  So your Rule

2    29, you're basically making the same argument --

3          MR. FALKNER:  The same argument.

4          THE COURT:  -- general argument.

5          All right.  I make the same finding that after

6    viewing the evidence in the light most favorable to the

7    government's case, I find that a rational factfinder

8    could conclude beyond a reasonable doubt the defendant

9    committed the charged crime.

10          All right.  Now I'm going to --

11          MR. FALKNER:  I --

12          THE COURT:  -- rule on the Petrozziello issue.

13          MR. FALKNER:  I was -- if I could, I'm

14    objecting on the record, your Honor, to the Petrozziello

15    evidence, the coconspirator hearsay evidence, in

16    particular to the text messages of Nancy Haskell, but to

17    any other statements of Nancy Haskell.

18          THE COURT:  Okay.  All right.  And I'm going

19    to shorten this by incorporating my earlier findings.

20    I'm going to go through them in a summary fashion and

21    add to them only.

22          First, I find that they are admissible.  This

23    was specifically Exhibit 29D that you also -- any

24    statement by Nancy Haskell that came in.  And I find

25    that -- now, your Petrozziello ruling, as I recall, was

1  limited to Exhibit 29D and those are the statements that

2  I made my original findings on, so I'm a little bit

3  confused about --

4           MR. FALKNER:  Well, I --

5           THE COURT:  Those are the statements that you

6  were --

7           MR. FALKNER:  Those are the statements in

8  particular.

9           THE COURT:  Okay.  All right.  So I am ruling

10  that Exhibit 29D comes in as a full exhibit and that my

11  provisional ruling is correct and the factors, the four

12  factors, I find by a preponderance, number one, the

13  existence of a conspiracy for all the reasons that I

14  said earlier in the case, but I would also add that now

15  that I've heard the testimony Gary Roya, which also

16  confirms the existence of this conspiracy between

17  Johnathon Irish and his mother to conceal Johnathon

18  Irish's possession of the guns.  Again, really by way of

19  summary, the jail call itself also supports that.

20           The evidence of Neil Prive and Roscoe Whitney

21  as well as now Gary Roya, the content of the texts

22  themselves in Exhibit 29D corroborate the conspiracy

23  which is evidenced by the jail call.

24           I reiterate that I find a -- that to be a

25  single conspiracy looking at the three factors, the

1    existence of a common goal, the overlap among the

2    activities' participants, now including Mr. Roya's

3    testimony as well, and then the interdependence among

4    the participants in all parts of this scheme are part of

5    the same conspiracy and necessary for it to be pulled

6    off; and, second, the defendant's membership in that

7    conspiracy, same evidence, the jail call, the content of

8    Exhibit 29D, also the content of Exhibit 29C and the

9    additional evidence of the conversations with Mr. Irish

10   and various witnesses, particularly Mr. Roya.

11         The mom's membership in the same conspiracy, I

12   would add to what I previously found with respect to the

13   jail call, the content of the texts in 29D and 29C, as

14   well as Mr. Whitney's testimony, now Mr. Roya's

15   testimony.  He understood that these texts were coming

16   from Nancy even though his phone contact had both their

17   names.  He specifically said there were phone calls from

18   that same contact on his phone, calls -- between five

19   and 15 calls about the guns and that all calls about the

20   guns were with Nancy and not with Les and he understood

21   that the texts were coming from Nancy.  So I would add

22   that to my finding that she, the mom, the declarant, was

23   a member in the same conspiracy.

24         And then finally the statements are made in

25   furtherance of the conspiracy and I would just reiterate

1    all the findings that I made with respect to that

2    earlier in the case.  I find that a preponderance of the

3    evidence supports this and it's not simply the texts

4    themselves; it is all of the other corroborating

5    evidence that I've just summarized.

6              So that's my ruling on that.

7              And I need to check with you again about the

8    issue of forfeiture.  Do you want that submitted to the

9    jury?

10             MR. FALKNER:  Yes, your Honor.  And just --

11   I'm sorry, I -- I think I was a little confused and

12   misspoke myself.

13             I'm not sure whether I specifically raised the

14   objection at the time.  I'm asking your Honor to

15   consider it as to not all statements of Nancy Haskell,

16   but specifically the phone contacts and --

17             THE COURT:  The 29D.

18             MR. FALKNER:  But the telephone calls from her

19   to him as well, because I -- I viewed it all -- all of

20   that evidence as of a piece.  In other words, her --

21             THE COURT:  Okay.  So it would be -- I can't

22   remember the specific exhibits, but any exhibits in 29,

23   29B, I find that that is also supported by all the other

24   findings that I've made, so those are also admissible.

25             MR. FALKNER:  And her statements on the

1    telephone to Gary Roya.

2              THE COURT:  Yes.  His testimony is also

3    corroborated with the conspiracy and all of that is

4    admissible for the same reasons.

5              MR. FALKNER:  And please note my objection.

6              THE COURT:  I do.

7              And now we're going to start closing

8    arguments.

9              MR. FALKNER:  Yes, your Honor.  Does your

10   Honor -- I know that we'll have a chance again, but I

11   just wanted to now reiterate my objection to the not

12   giving of a missing witness instruction.

13             THE COURT:  That's preserved.  Go ahead.  That

14   is denied.

15             MR. FALKNER:  And also to the not -- not using

16   the special verdict form in the -- vis-a-vis which gun

17   was possessed.

18             THE COURT:  That is also preserved and I --

19             MR. FALKNER:  And to the extent it hasn't

20   already been done, I am requesting that the jury be

21   retained to deliberate about the issue of forfeiture.

22             THE COURT:  Yes.  Okay.  And just to be clear,

23   so the record is clear, you are asking the jury to

24   deliberate on forfeiture, not submit it to me.

25             MR. FALKNER:  Correct.

1           THE COURT:  All right.  I think we've covered

2    everything.

3           Anything else?

4           MS. KRASINSKI:  No, your Honor.

5           THE COURT:  You're going first, you'll go, and

6    then rebuttal.  So good luck.

7           MR. FALKNER:  Thank you, your Honor.

8           MS. KRASINSKI:  All right.

9                    CONCLUSION OF SIDEBAR

10          THE COURT:  We're now going to hear closing

11   arguments.  First we will hear from the government.

12          Attorney Krasinski, go ahead.

13          MS. KRASINSKI:  Thank you, your Honor.

14          Ladies and gentlemen, the defendant, Johnathon

15   Irish, was proud of his guns.  He carried that Sig Sauer

16   1911 pistol.  He showed off his Catamount Fury shotgun.

17   And he had them despite the fact that he knew he had

18   previously been convicted of a felony.  He stored them

19   in the case in the bedroom closet and he had the key.

20          And when things got heated in October of 2019,

21   he tried to hide the guns and then he tried to cover up

22   that he'd ever possessed them.  But he did have them.

23   He did possess them.  And for that, Johnathon Irish is

24   guilty of the unlawful possession of firearms.

25          Before we talk about the evidence in this

1   case and how it shows beyond a reasonable doubt the

2   defendant's guilt, I want to briefly review the

3   essential elements that you're going to hear, the

4   elements that the government must prove beyond a

5   reasonable doubt that the defendant committed this

6   crime.

7           And the way I think of it is these essential

8   elements, they become your checklist.  So let's go

9   through your checklist.

10          First, you have to find that we proved beyond

11  a reasonable doubt that the defendant has been convicted

12  in any court of at least one felony.  That is, a crime

13  punishable by imprisonment for a term exceeding one

14  year; second, that he knew that he had been convicted of

15  a felony; third, that after that conviction, he

16  knowingly possessed the Sig Sauer rifle -- excuse me --

17  the Sig Sauer pistol or the Catamount Fury shotgun; and,

18  fourth, that those firearms, the pistol and the shotgun,

19  were connected in interstate commerce.

20          And based on what you've seen and heard, the

21  government has proved all of these elements beyond a

22  reasonable doubt.

23          The first two are easy to dispense with.  You

24  know that he was convicted of a felony and you know that

25  he had knowledge of it because the defendant has agreed

1    to this.  That's Government's Exhibit 36.  That's a

2    stipulation.  And in that stipulation, the defendant

3    acknowledges both of those elements.  And you'll have

4    that stipulation back in the jury room with you.

5              The fourth element, interstate commerce.  All

6    that means is that the firearm moved from one state to

7    another at any point.  It doesn't need to have done it

8    with the defendant, doesn't need to have been when he

9    had custody of those items.

10             And you know that Government's Exhibit 7, the

11   Catamount Fury shotgun, was manufactured in China,

12   traveled or was imported into Vermont, and then was

13   recovered in New Hampshire.  And you know that based on

14   Agent Forte's testimony.  He talked to you about the

15   markings on this gun.  You know that this firearm

16   traveled in interstate and foreign commerce.

17             Government's Exhibit 5, the pistol, again, you

18   heard Agent Forte testify that he determined that this

19   firearm was manufactured in New Hampshire, that after

20   final assembly it was shipped to a retailer in

21   Minnesota, and then after that, it was recovered here in

22   New Hampshire.  This firearm traveled in interstate

23   commerce.

24             So now let's get to the heart of this case.

25   Did the defendant, Johnathon Irish, knowingly possess

1    those two firearms?

2            The pistol.  This was the defendant's gun.  It

3    was his gun in 2013 and when the FBI had to release

4    custody of it, it was the defendant who identified

5    Roscoe Whitney, who chose Roscoe Whitney, to take

6    custody of this gun, the man that the defendant calls

7    grandpa.

8            Then you heard Mr. Whitney testify that in

9    2017, Mr. Whitney got an email from an email address

10   with the defendant's name in it, some documents, and

11   those documents seemed to Mr. Whitney to show that the

12   defendant could now have his guns.

13           You know based on the stipulation that the

14   defendant knew he had been convicted of a felony.

15   Mr. Whitney was tricked.  Mr. Whitney was duped into

16   believing that he could give those guns back.

17           And why would Roscoe Whitney have to receive

18   any documentation?  Why would he have to be shown

19   anything about the defendant and whether or not

20   Mr. Irish could have guns if those guns weren't going

21   back to the defendant?  They were going back to the

22   defendant.  Roscoe Whitney told you he gave them back to

23   the defendant.  He said, we met at the campground; I

24   gave those guns to the defendant; I gave those guns to

25   Johnathon.

1        And you've heard that Johnathon Irish carried

2   that Sig Sauer pistol.  Elizabeth Millett told you he

3   had it tucked in his waistband around the holidays,

4   December of 2018.  Mr. Marcotte told you that when he

5   went to the defendant's home in Mr. Irish's time of

6   need, the defendant said, I've got a 1911 in the

7   bedroom.

8        I want you to think about this.  Mr. Marcotte

9   didn't say -- no testimony that the defendant said, my

10  wife's gun is in the bedroom.  No.  Mr. Marcotte told

11  you that what the defendant said is "I have a 1911 in

12  the bedroom."

13       You heard Dylan Roosa testify that he saw the

14  defendant carrying that pistol.  You heard Dylan Roosa

15  testify that he and Mr. Irish went to Mr. Irish's

16  backyard and shot that pistol together.  You heard

17  Mr. Duguay describe to you the sounds that he heard when

18  they were driving back from Mr. Duguay's hunting camp.

19       He told you he served in the Army.  He has

20  heard that sound hundreds, if not more, times.  You

21  don't confuse that sound with a bump in the road

22  (demonstrating).  You don't confuse that sound.

23       Now, the Catamount Fury shotgun.  What did you

24  learn from the testimony?  That shotgun belongs to Tony.

25  Tony was Mr. Marcotte's friend.  Mr. Marcotte told you

1  he was Tony's Army dad.  Mr. Marcotte told you that he

2  met the defendant through Tony.  They were both Tony's

3  friends.

4         He told you he had seen this shotgun.  In

5  fact, he had fixed this shotgun when it still belonged

6  to Tony.

7         He told you Tony had a truck, Big Red, and

8  when Tony passed away, Johnathon Irish got Big Red.

9  Johnathon Irish was driving Big Red around.  And

10  Johnathon Irish got that shotgun.

11        And when the defendant gave this case,

12  Government's Exhibit 33, to Neil Prive, it had both

13  Government's Exhibit 7, the shotgun, and Exhibit 5, the

14  pistol -- both were in that box.  Both were in that box

15  when the defendant showed his gun collection off to

16  Dylan Roosa.

17        Now, before we talk about the defendant's

18  attempts to hide the guns and then hide his possession

19  of the guns, I want to talk about the different forms of

20  possession.

21        You're going to hear, when the judge instructs

22  you, about actual possession, constructive possession,

23  joint and sole possession.

24        Actual possession, you've got it in your

25  hands.  You're holding it.

1           Constructive possession, you have the ability

2   to direct and control what happens to it.

3           I like to think about it in terms of a car.  I

4   got up this morning, got my keys, drove my car, parked

5   halfway up the hill, because there's so many new meters

6   here.  When I'm driving that car, I'm in actual

7   possession of my vehicle.

8           Now it's parked on the street.  I've still got

9   the keys.  It's still the car that I can go access at

10  any time.  If I need to go drive somewhere, I've got the

11  keys.  I can go, I can get in that car.  Even though I

12  am not physically in the car right now, it is within my

13  constructive possession.

14          And I just want to be clear.  It doesn't

15  matter whose name the car is in.  It doesn't matter if

16  there's a lienholder on the car.  What matters is I've

17  got the key and I can go use that car.

18          And sole possession, that means only one

19  person has possession of an item.  Joint possession,

20  multiple people can share possession of an item, just

21  like that car.  You may have a vehicle that you share

22  with your spouse.  You have the keys, you can use it.

23  Your spouse also has a set of keys and your spouse can

24  use that vehicle.  You share possession.  It still

25  might -- it's still in your possession even if, for

1    example, it's titled in your wife's name.

2            Now, you heard evidence about actual

3    possession, right?  That's the testimony about Mr. Irish

4    carrying the pistol, shooting the pistol, showing the

5    pistol off, showing the shotgun off, clearing the pistol

6    in the car, physically moving the box with those

7    firearms in it and giving that to his cousin.  That's --

8    that's actual possession.

9            But let's talk about his constructive

10   possession of the guns.  After he gave the guns to Neil,

11   he arranged for them to go to Gary.  You saw the texts

12   in Exhibit 29C:  Gary, it's Johnathon, please call me.

13   And the next one:  Gary, please pick up, man.

14           And you heard Mr. Roya testify and you saw the

15   text messages in Government's Exhibit 29D.  And let's

16   just briefly look at three of those.

17           Nancy Haskell giving Mr. Roya Neil's number.

18   And then Nancy Haskell, the defendant's mother, sending

19   Gary Roya this transfer document.  And then Nancy

20   Haskell telling Mr. Roya:  Please send it back; J is

21   waiting for me to send it to him.

22           And Gary said he thought it was Nancy that was

23   orchestrating the movement of these guns, but you know,

24   based on the evidence that you heard, that it was

25   Johnathon Irish who was directing his mother to

 1   orchestrate the movement of these guns.  And you know

 2   that because of what's -- because that's what the

 3   defendant said to his mother.

 4             So you've seen these texts.  Now let's listen

 5   to what the defendant has to say about these texts in

 6   his recorded call.

 7                  (Audio recording played.)

 8             MS. KRASINSKI:  I told you to call.  I told

 9   you to call.  I told you to arrange the movement of

10   these guns from Neil to Gary.  I controlled that.  I

11   controlled who these guns went to.  That's constructive

12   possession.

13             And what about the fake transfer document,

14   Government's Exhibit 30?  Why create this?  Why have

15   this?  You know that Roscoe gave those guns back to the

16   defendant.  You know that once he gave those guns back

17   in 2017, he never saw those guns again.  You know that

18   Roscoe didn't give those to Gary.

19             So why the smoke and mirrors?  Why would

20   Johnathon direct his mother to send some type of fake

21   transfer document and ask everybody to sign it?  The

22   only reasonable inference is that he was trying to

23   distance himself from the guns.  He's trying to hide the

24   fact that he had the guns.

25             Now, I expect you're going to hear a lot of

1  argument about witnesses who testified and why they may

2  have reason to tell you tall tales.  So let's go through

3  that.

4          Elizabeth Millett testified that she saw the

5  defendant with a pistol and that when her daughter took

6  out a restraining order against the defendant, he asked

7  his mother-in-law to take his guns.

8          And you heard that there's family drama.  You

9  heard that there's this landlord-tenant dispute; you

10 heard that Stephanie made some claims about her brother;

11 you heard about all these court proceedings.

12         You also heard that she provided this

13 information and then she was signed up as a confidential

14 source and that information never changed.  If she was

15 here trying to get her son-in-law in trouble, trying to

16 do something, wouldn't you have expected her to tell a

17 better story?

18         She sat there, she told you, yeah, I saw him

19 carry it in his waist.  I never saw him use it in a

20 threatening way; I never saw him do anything like that.

21 And then after he asked me if I would take the guns and

22 I said no, he told me he had taken care of it.  I didn't

23 know if he had the guns or not.  I didn't know.

24         If she was up here trying to get her

25 son-in-law in trouble, if she was up here testifying out

1   of some ill will, don't you think she would have told

2   you a more exciting, more embellished story than that?

3             And the same thing for Dylan Roosa.  He told

4   you about shooting the pistol with the defendant.  He

5   told you about the defendant opening this black box,

6   about seeing all three of the firearms that were in the

7   box.  He told you that there was no lock on the box at

8   that point, that they moved it into the bedroom, that

9   the defendant opened up the case and they looked at all

10  three of those guns.

11            And then at some point after he provided that

12  information to law enforcement, he was also signed up as

13  a confidential source.  And he told you he received a

14  payment of $250 and he told you he didn't expect

15  anything for his testimony, and his statements never

16  changed.  He never added to what he initially told law

17  enforcement.  He never said, oh, no, no, no, there's

18  more.

19            If he was providing information, if he was

20  hoping for additional payments, don't you think he would

21  have come up with something else?  He didn't.

22  Everything he said stayed consistent from before he was

23  signed up as a confidential source through when he

24  received $250 and after.

25            And, yeah, he had a falling out with the

1  defendant.  But, again, everything he has said remains

2  consistent.

3           And what real motive does Mr. Duguay have to

4  tell you something that -- some tall tale?  He told you

5  the defendant was a hard worker, that he worked for him,

6  that he worked hard, that he took care of his chickens,

7  that he was his neighbor.  He told you that after the

8  FBI showed up, he was mad and their relationship

9  changed.  But he doesn't have any reason to come in here

10  and tell you anything other than what he remembers, what

11  he heard.

12           What about Mr. Marcotte?  He doesn't have any

13  motive to come in and tell you anything other than the

14  limited information that he recalled; seeing that

15  shotgun, knowing that it came from his friend Tony,

16  seeing it with Tony, and hearing the defendant talking

17  about the pistol, saying that Mr. Irish had that 1911 in

18  his bedroom.

19           And you also heard all of them go through, say

20  that they don't know any of the other people who were

21  here.  This isn't some big conspiracy to stick Mr. Irish

22  with his wife's guns.  None of those witnesses knew each

23  other.

24           And think about the testimony from both Neil

25  and Gary Roya.  Both of them said that there was some

1    talk of using these guns as collateral for money.  Both

2    of them said that.  They both said that other than

3    meeting in a parking lot to exchange this case with

4    those guns, they never talked to each other or saw each

5    other again.

6               Is there a reasonable explanation, a

7    reasonable inference, you can draw from that?  The

8    defendant asked that of both of them.

9               And how could he use as collateral something

10   that's not his?

11              All of the evidence, all of the testimony that

12   you've heard in this courtroom, demonstrates beyond a

13   reasonable doubt that this pistol and this shotgun were

14   Johnathon Irish's firearms and that he possessed them in

15   2018 and 2019 and that he gave them to his friend Neil

16   and then he directed and controlled their transfer to

17   Gary Roya.

18              These aren't Stephanie's guns.  You didn't

19   hear any evidence that those were Stephanie's guns.

20   They were Mr. Irish's guns.  And I ask that you find the

21   defendant guilty of unlawful possession of those

22   firearms.

23              THE COURT:  All right.

24              MR. FALKNER:  Your Honor, may we be seen

25   briefly?

1    THE COURT:  Yes.

2                    AT SIDEBAR

3    MR. FALKNER:  I may be mistaken, but I believe

4    that there was argument that Stephanie Irish took out a

5    restraining order causing Elizabeth Millett to --

6    causing Johnathon Irish to ask Elizabeth Millett to take

7    the guns.  There was no testimony at any time about

8    Stephanie Irish ever taking a restraining order out.

9    MS. KRASINSKI:  I believe Ms. Millett

10   testified that on one evening the defendant called her

11   because Stephanie had taken out an order and asked her

12   to hold these guns.

13          She had taken a sleeping pill, she said she

14   couldn't drive, when he called her the next day, that

15   she agreed to get the kids and that he had said he had

16   taken care of the guns.

17   MR. FALKNER:  All of that is true except for

18   the first part.  There was never any testimony about a

19   restraining order.

20   THE COURT:  I don't -- I do not have a

21   recollection of this.  One of my instructions to the

22   jury is the closings aren't evidence, I've already told

23   them that, and that they are the factfinders and --

24   MR. FALKNER:  My concern, though, your Honor,

25   is that it's extremely prejudicial to suggest that

1    Stephanie Irish had taken out a restraining order

2    against him at that time.

3              THE COURT:  All right.  You want me to

4    highlight that and tell them that ultimately they are

5    the factfinders and they find the evidence in the case

6    and closing arguments, the statements by lawyers, are

7    not evidence, something to that effect?

8              MR. FALKNER:  I'm not sure that's sufficiently

9    curative, but it certainly would be helpful.

10             THE COURT:  Okay.  I just -- I cannot recall

11   whether or not there was testimony of her taking out a

12   restraining order.  You're telling me there was no

13   testimony to that effect.  I honestly -- I don't recall.

14   I suspect the jury doesn't recall, but I'm happy to

15   remind them that they are the factfinders and that this

16   is not evidence.

17             I will highlight the fact that the government

18   says Stephanie Irish took out a restraining order.  I

19   think that highlights that evidence that you don't want

20   them focused on.  I'll do that if you're requesting

21   that.

22             MR. FALKNER:  I am.

23             THE COURT:  Okay.

24             MR. FALKNER:  Thank you, your Honor.

25             THE COURT:  All right.

CONCLUSION OF SIDEBAR

1
2          THE COURT:  Ladies and gentlemen of the jury,
3   you just heard in closing argument the government --
4   Attorney Krasinski state that there had been evidence
5   that Stephanie Irish had taken a restraining order out
6   against Mr. Irish.
7          Let me just say to you that you are the
8   factfinders.  You will decide the evidence in this case.
9   As I told you in my original instructions, closing
10  arguments are not evidence.  To the extent that your
11  memory of the evidence on this issue is different, you
12  control that question.  You are the factfinders and you
13  will decide the facts in this case.
14         Attorney Falkner.
15         MR. FALKNER:  Good afternoon, ladies and
16  gentlemen.  I apologize for moving this cart around.
17  I'm just trying to keep it as out of the way as I can
18  while still being able to look at the computer.
19         The first thing that I just want to briefly
20  say before I get into my argument is there was no
21  evidence in this case that at any time Stephanie Irish
22  ever took a restraining order out against Johnathon
23  Irish.  And I think when you go to your collective
24  memory, you will recall that.
25         Getting into my argument, in this case, the

1    burden of proof is entirely on the government.

2    Johnathon Irish has to prove nothing.  The government

3    has to prove all of these elements -- each of the

4    elements that were described by the prosecutor and that

5    will be described by the judge -- each of those beyond a

6    reasonable doubt.  That's a very high burden.  And when

7    you go back into that jury room, I ask that you hold the

8    government to that burden.

9            And, again, it's on the government to prove

10   that Johnathon Irish possessed those firearms.  It's not

11   on Johnathon Irish to prove that Stephanie Irish or

12   anybody else possessed the firearms or even to prove

13   that he didn't possess the firearms.  It's entirely on

14   the government to prove to you and to satisfy you based

15   on the evidence that they've presented here in this

16   courtroom.

17           And I want to -- I want to go through that

18   evidence with you and try to explain to you why it is

19   that when you look carefully at that evidence and

20   scrutinize it and think about each piece of it and what

21   does it actually mean, when you add it all up, it does

22   not add up to proof beyond a reasonable doubt.

23           Johnathon Irish, as he sits here before you,

24   is cloaked in the presumption of innocence until you go

25   into that room and start to make up your minds.  I would

1    ask you that if you've made up your mind already, if you

2    were to make up your mind either during any of these

3    closing arguments or even during the jury instructions,

4    please set it aside, go into that room.  When you all

5    start to deliberate, that's when you need to start to

6    make up your mind.

7           And as the judge will instruct you, it's your

8    memory of the evidence that controls.  Nothing that I

9    tell you is a substitute for the evidence.  I'm trying

10   to give you my best memory as best I can and I know that

11   the attorney for the government did the same, and nobody

12   has a perfect recollection.  So I'm just trying to guide

13   you through the evidence to point out the places where

14   the evidence doesn't hold up and the places where the

15   evidence does fit together.

16          Where I'd like to start is with the interstate

17   commerce.  The government has to prove beyond a

18   reasonable doubt as to each of these firearms, as to

19   this pistol that was manufactured in the state of

20   New Hampshire, the government has to prove to you beyond

21   a reasonable doubt that this firearm left the state of

22   New Hampshire at some point before this alleged

23   possession by Johnathon Irish.

24          This rifle here is off the table.  It wasn't

25   illegal for Johnathon Irish to possess that rifle.

1    You're not here to decide that.  The rifle, after it was

2    assembled, never left the state of New Hampshire.  And

3    you heard that even from the government's so-called

4    expert.

5            This, the shotgun, there is no dispute that

6    this was in interstate commerce.  We know it was

7    manufactured in China.  You can see that from the

8    markings on it itself.  It even says where it was

9    imported to, in Georgia, Vermont.  There's no dispute

10   that that shotgun came into the United States.

11           The question is did the jury -- did the

12   government prove to you beyond a reasonable doubt that

13   that pistol left the state of New Hampshire.

14           The only evidence presented is Agent Forte.

15   Think carefully about Agent Forte's testimony.  He took

16   a test, they trained him.  And what did they train him

17   to do?  His job?  He looks at the markings on

18   firearms -- he's been trained what the markings mean --

19   but you can look at those markings -- and then he looks

20   up in a database -- anybody can look up records in a

21   database -- he sees what those records say.  Then he

22   emails the company and he gets an email back from the

23   company that says, oh, yeah, we shipped that one out to

24   some sporting goods company.  That's all he does.

25           You don't have any of those records before

135

1    you.  There's no records from Sig Sauer showing when it

2    was manufactured, how it was manufactured, what was done

3    with it.  You don't have any shipping labels, bills of

4    lading, all the kinds of things that you see when items

5    are shipped.  None of that.  You don't have anything at

6    all to show you that that gun ever left the state of

7    New Hampshire.

8             It was sent, according to the records that you

9    don't have but were told to you by somebody who read

10   them, that they went to Reeds Sporting Goods in

11   Minnesota.  He didn't even bother to call Reeds Sporting

12   Goods to see if they ever got the gun.

13            I would suggest to you that on his testimony,

14   you cannot find beyond a reasonable doubt that that gun

15   was shipped in interstate commerce.

16            If they had records showing when it was sent,

17   when it was received, that would be one thing.  You

18   don't even have those records.  You just have somebody's

19   say-so that they looked at records.  And they didn't

20   even confirm that it went where it supposedly went.

21            There's another thing I'd like to talk about

22   with regard to the interstate commerce.  This is

23   emblematic of most of the witnesses the government

24   called.

25            Almost every witness the government called

1     likes to give you some of the information, but not all

2     of the information.  It's all just a little bit skewed.

3           One of the first witnesses that the government

4     called was Agent Phil Christiana.  And Agent Christiana

5     told you that he had seized the pistol and the rifle at

6     one point from Johnathon Irish and at some point he

7     returned those to Roscoe Whitney, along with

8     instructions that you shouldn't give these weapons back

9     to Johnathon Irish because it would be illegal.

10          Well, there's two problems with that.  I'm

11    sorry.  There's another part of his testimony.

12          Then he sat there on this witness stand, a

13    federal law enforcement agent charged with enforcing the

14    ban on possession of weapons shipped in interstate

15    commerce by felons, and he didn't tell you it would be

16    illegal for Johnathon Irish to possess weapons that were

17    shipped in interstate commerce; he said it would be

18    illegal for Johnathon Irish to possess any firearms at

19    all.  Not true.  A federal law enforcement agent

20    couldn't even acknowledge that it was not illegal for

21    Johnathon Irish to possess firearms that were not

22    shipped in interstate commerce.

23          You're going to hear the elements of the crime

24    from the judge.  The judge will tell you the law.  And

25    even the government acknowledges that they have to prove

1    that the firearms were shipped in interstate commerce.

2    But yet Agent Christiana on that witness stand said

3    Johnathon Irish can't possess any firearms at all, and

4    it was not true.

5            Now, I want to talk to you a little bit about

6    the missing evidence in this case.  I already talked to

7    you a little bit about some of the missing evidence as

8    regards to interstate commerce, but I'd like to talk to

9    you about some of the other missing evidence.

10           Much adieu about this 30-second telephone or,

11   well, in-person visit.  Detective LeBlanc or Task Force

12   Officer LeBlanc, from Johnathon Irish's arrest in

13   December of 2019 up until today, sat and listened to

14   every telephone call, every visit, that Johnathon Irish

15   had with any person other than his attorney from that

16   time up until we get to this trial.  Everything.

17   Imagine every telephone call that you make, every word

18   that you speak to anyone -- your mother, your brother,

19   your friends -- every single word that you speak is

20   being listened to and monitored by the government.

21           And you hear this one 30-second clip, as if

22   that tells you anything that you need to know about

23   Johnathon Irish's intentions and motives, one 30-second

24   clip out of all of that, all of his communications with

25   anybody besides his attorney.  It's what I would call

1    cherry-picked.

2            What's also cherry-picked?  The fingerprints.

3    No fingerprints are ever done.  Why -- why don't you do

4    fingerprints?  When the government was asking Agent

5    Tongbua, why don't you fingerprint the gun, well, it

6    doesn't matter; we already know the guns belong to

7    Johnathon Irish.  Okay.  Well, it's been through many

8    hands.  We don't -- we don't know if the fingerprints

9    would even still be there.

10            When I asked him on cross-examination

11   questions about the fingerprints, for the first time you

12   hear him say, oh, I don't know; I'm not a fingerprint

13   expert; I don't know anything about how long the

14   fingerprints last.

15            Why the evasion?  Why -- why is everything

16   slanted just a little bit from all of these witnesses?

17            Not just slanting.  Let's -- let's talk about

18   the corruption of this case.  Let's talk about Dylan

19   Roosa.  And I don't mean corruption in the legal sense.

20   I mean just things that make this evidence something

21   that you should be very skeptical of.

22            Dylan Roosa, he complains about money.  He

23   doesn't have any money.  And that comes up in two ways

24   for Dylan Roosa.  The first way it comes up is he's such

25   good friends with Johnathon Irish that they end up

1   having this fight that blows up their entire friendship

2   over a 20 to $30 debt.

3          Okay.  So that seems unreasonable, but when

4   he's interviewed by the FBI, he doesn't tell them that

5   was what the fight was about at all.  And he says -- he

6   tells the FBI, we had a fight, actually, about

7   accusations that Johnathon Irish was cheating on

8   Stephanie Irish.  That's why -- that's what he tells the

9   FBI; that's what we had a fight about, and that's why

10  I'm no longer friends with him.  He doesn't say we had a

11  fight about money.

12         But they want to meet with him again and talk

13  to him and get some more information from him.  And he

14  says, you know what, I don't have the gas money.  I

15  don't have the gas money to go 60 miles out of my way

16  round-trip to come meet with you.  He's complaining

17  about his finances.  He needs money.

18         I'm not -- I don't in any way mean to diminish

19  the cost of gasoline.  It's important to all of us.  But

20  he's talking about meetings with the FBI and he's

21  telling them, I can't meet with you because it's too

22  expensive for me to drive.  And, magically, $250 shows

23  up.

24         He didn't ask for the money beforehand.  He

25  didn't say, I need $250; if you give me $250, I'll talk

 1   with you.  That's not the way it works.  He didn't ask

 2   ahead of time to get paid for his testimony before you.

 3          They haven't told him ahead of time exactly

 4   how much or whether he will get his money.  But it sure

 5   as heck is understood.  I met with you, I got $250.  I

 6   drive all the way down to Concord from North Stratford.

 7   It's already 30 miles south just to get to Littleton,

 8   and then from Littleton all the way down here to Concord

 9   in this courtroom.

10          That was a tank of gas for him, wasn't it?

11   We'll never know.  You'll never know how much he's going

12   to be paid for his testimony in this courtroom.  Because

13   once you're all done, there'll be meetings with Agent

14   Tongbua and AUSA Krasinski and they'll get together and

15   they'll decide how much money, if any, they should give

16   to Dylan Roosa.  But don't think that Dylan Roosa's not

17   counting on it.  You know that he is.

18          Elizabeth Millett, she wants Johnathon Irish

19   out of the picture.  She's told you she's got a strained

20   relationship with Stephanie.  She thinks Johnathon Irish

21   is keeping Stephanie away from her.  It is a huge family

22   feud.

23          Stephanie Irish has taken out restraining

24   orders against her brother who's living with Elizabeth

25   Millett.  Elizabeth Millett is upset because she's

1   financially drained by caring for the couple.  She feels

2   that Stephanie isn't in contact with her anymore.  She

3   even goes so far as to get restraining orders against

4   both Johnathon and Stephanie.

5         And they're in engaged in ongoing court

6   proceedings about the house, this landlord-tenant

7   complaint.  Johnathon and Stephanie have complained

8   about her care of the property that they're living in,

9   so much that she decides, she says, that she wrote a

10  deed just to get them out of her hair.  And this is all

11  shortly before, about a month or two, before ultimately

12  Stephanie leaves Johnathon.

13        But it's clear she wants Johnathon Irish out

14  of the picture and now she's gotten what she wants.

15  Stephanie is out of there and now she needs to make sure

16  that Stephanie and Johnathon end up away from each

17  other, which leads me to Stephanie Irish.

18        Besides -- what person could the government

19  have called who could be more insightful as to whether

20  Johnathon Irish was in possession of those firearms than

21  Stephanie Irish?  Think about this.  She leaves

22  Johnathon on October 25th of 2019.  Their marriage is

23  caput.  They're in divorce proceedings.  She's in almost

24  constant contact with Agent Tongbua.  She's cooperating

25  with them, she's giving them information that they find

1    truthful, information that they say helps them with

2    their investigation.  And you heard Agent Tongbua say

3    that; she was giving us information that was truthful,

4    she was giving information that was helpful to our

5    investigation.

6              Then where is she?  Why didn't the government

7    call her as a witness?  Is it -- is it that like the

8    other witnesses, she has a motive to make it look bad

9    for Johnathon Irish?  She was in contact with the FBI on

10   October 26th of 2019.  She leaves the house, she leaves

11   the guns in the house, and she calls the FBI.  That's

12   called being framed.

13             Now, Peter Duguay.  Peter Duguay testifies, I

14   was friendly with Johnathon; we're such great friends;

15   it was -- he's such a hard worker.  He's got nothing but

16   love for Johnathon Irish.  That's what he tells you here

17   on the witness stand; they're friends, and all that

18   matters to him is just telling the truth.  Hey, he

19   worked for me, he liked to talk about guns, but he's a

20   hard worker, I like him, I was a little upset about that

21   incident in the truck when he was racking the firearm,

22   but, you know, a good guy.

23             If that testimony were true, why would

24   the first thing he says to the FBI be we had a

25   keep-your-enemies-close kind of relationship?  Is that

1   the kind of thing that you say about your friends?  The

2   FBI came and interviewed you about a good friend who you

3   work with and is a hard worker and you share meals with

4   and visit at the home, the first thing you say to them

5   is it's a keep-your-enemies-close kind of relationship?

6   I don't think so.  They're not friends.

7            David Marcotte -- I want to clear one thing

8   up.  David Marcotte never, never said that Tony Costello

9   gave that gun to Johnathon Irish.  He didn't say that.

10  He said Johnathon Irish drove the truck that Tony

11  Costello used to have and Johnathon fixed it.  True.

12           He said that used to be Tony Costello's gun.

13  That's what he told you.  He didn't say what the

14  government told you he said.  He didn't say that that

15  gun was given by Tony Costello to Johnathon Irish.  He

16  didn't know anything -- the only thing he knew about

17  that gun was that it used to be Tony Costello's and that

18  he had fixed it.  He now, when presented with that gun,

19  says, I recognize that gun, that's Tony's old gun.

20  That's the information you got from him.

21           Just because Tony Costello gave Johnathon

22  Irish a truck does not mean that he gave Johnathon the

23  shotgun.  One does not equal the other.  We don't know

24  whether he gave it to Stephanie, we don't know whether

25  Johnathon knew whether it was in that trunk or not.

1          Gary Roya, who you just heard from today,

2    Nancy -- he says that Nancy Haskell was driving the bus

3    on all of this.  Nancy tells him Roscoe is in charge of

4    the weapons; Nancy's the one that's telling him about

5    signing the paperwork; Nancy says Johnathon is waiting

6    for the paperwork.  Johnathon, his text message, says

7    something along the lines, we need to get this

8    information for Stephanie.

9          Now, I want you to think carefully about Gary

10   Roya's testimony and whether it made a whole lot of

11   sense.  Oh, I'm just a simple guy, he says; I didn't

12   know any better; when they presented me with the

13   transfer document, the transfer document that said I was

14   getting this gun and this gun and various ammunition, I

15   didn't think anything about it, I just went ahead and

16   signed it.  I just wasn't -- wasn't careful about it.

17         But that's just not true.  He's a very careful

18   guy.  He's not simple.  Everything he did was calculated

19   and planned.  The first thing he did with that box when

20   he got home was open it up and inventory, a detailed

21   inventory.  The inventory included the shotgun, all the

22   various ammunition, the chemical suit, the BB gun,

23   various other things.  A detailed inventory that he

24   takes the moment he gets home with that.

25         But yet he's presented with this transfer and

1    oh, well, that looks close enough and just signs it.

2    It's the wrong date.  Everything's wrong about it.

3            And he says it's collateral for $300.  Why

4    would he need a bill of sale if he's just holding on to

5    it to make sure he gets his 300 bucks back?  Especially

6    when he says he didn't even care about the $300.  Would

7    you take a box full of guns as collateral for a $300

8    loan that you didn't even care about?  It doesn't make a

9    whole lot of sense to me.  And if his testimony is, hey,

10   I'm just a simple guy, that's belied by his actions.

11           When Johnathon Irish sends him a text message

12   saying, hey, I need to let Stephanie know this

13   information, his response is, you need to stop

14   telling -- giving people information.  That's the Gary

15   Roya, the simple Gary Roya, that's on the witness stand,

16   right?  The one who doesn't know anything better.  The

17   one that sends the text message saying, you need to shut

18   up; nobody needs to know where these guns are.  Or maybe

19   he's just worried about thieves.  I don't know how

20   thieves are going to find out about his communications

21   directly with the person he's supposedly getting the

22   firearms from.

23           Just returning to -- I just want to go through

24   with you a couple of last points about trustworthiness

25   of the various information you've seen and about how

1   everything is slanted just a little bit in the

2   government's favor in this case, or maybe even just a

3   lot.  You have to determine how much it's slanted.

4         Peter Duguay sees -- says, I heard the

5   firearm being racked.  The demonstration you got

6   (demonstrating) -- Peter Duguay says, no, it wasn't

7   quite that loud; it wasn't quite that fast.  But -- but

8   you got a show.  That's what this all is.  It's just a

9   show.  You got the show (demonstrating).

10         That wasn't the testimony about what he did.

11   Even assuming that you buy that that testimony is true,

12   David Marcotte showed you something.  It wasn't quite

13   that dramatic, was it?  David Marcotte showed you how to

14   do the clearing.  Didn't -- wasn't a big show like it

15   was from the government.

16         Now, the last point about Elizabeth Millett's

17   testimony, she tells the FBI that Johnathon's walking

18   around with the firearm tucked into his waistband and

19   she's seen that.  That's what she says.  And she tells

20   that to the FBI in January of 2019.

21         Then she goes out to get a restraining order

22   in April of 2019 and when she signs up for that

23   restraining order, she's asked whether the defendant,

24   meaning Johnathon Irish, vis-a-vis that restraining

25   order, whether Johnathon Irish has access to any

1  firearms.  She checks off no, he had owned one in the

2  past.  Well, we all know he owned one in the past.  The

3  FBI took it all those years ago.

4          But yet the same day she's swearing out a

5  complaint in a court under oath saying, no, he doesn't

6  have access to a firearm, but he's had one in the past,

7  she's on the phone with Agent Tongbua saying he's got

8  the guns; they're in a chest in his bedroom.  Which one

9  is the truth?

10          Well, it's up to the government to prove

11  beyond a reasonable doubt that it's one of the two, but

12  the government's witness isn't able to keep that same

13  story straight.

14          The last witness I'd like to talk about is

15  Dylan Roosa.  We talked a little bit about the money.

16  Dylan Roosa, the only witness anywhere in this trial

17  that's actually put one of these guns into Johnathon's

18  hands, he says, oh, he lays the firearms all out, he's

19  so proud of them, he's showing us all the firearms, and

20  we went out into the woods and we're shooting at the

21  tree and all this stuff, the same Dylan Roosa who's

22  probably going to get paid for his testimony.

23          And he sits there on the stand and the very

24  agent who -- Agent Tongbua, who was the -- who is the

25  case agent in this case and who's signed him up as a

1    confidential informant -- he's asked, who is Agent

2    Tongbua, and he points to someone off in the audience.

3    There's a reliable witness.  He can't even identify his

4    own FBI agent.

5           Now, I told you that was the last witness.

6    There's one more witness.

7           David Marcotte.  We talked a little bit about

8    Marcotte's testimony about the shotgun, but there's one

9    last piece of Marcotte's testimony I think that's both

10   important and illustrative.

11          Marcotte goes over the day that Johnathon's

12   wife has left him.  Johnathon's in the driveway; he's

13   distraught, he's upset, and he suggests that he might

14   harm himself, as one might be when their spouse leaves.

15   And Marcotte asks if there's any weapons.  And he says,

16   Johnathon Irish says, there's a 1911 in the house.

17   There was, because Stephanie left it behind.

18          He -- Marcotte didn't say -- he did not

19   testify that Johnathon Irish said, I've got a 1911 in

20   the bedroom.  That's not what he said.  He said, there

21   is a 1911 in the house or the bedroom.

22          Well, that makes a big difference.  I've got,

23   or there is one.  There is one, but he didn't say I've

24   got it.

25          When you go back and you carefully examine all

1    of this evidence, when you put it all together, I would

2    ask you -- I would suggest that you not find and you

3    can't find beyond a reasonable doubt that Johnathon

4    Irish was in possession of these weapons.

5            And that's the test.  You have to determine,

6    again, returning to this very heavy burden of proof to

7    overcome his presumption of innocence that he possessed

8    these weapons; that he had the intention and ability to

9    control them, that he didn't want to just get rid of

10   them and get them out of the house; and in particular

11   with regard to the pistol, that it actually traveled in

12   interstate commerce.

13           I would suggest when you deliberate that you

14   will not be able to find the elements of this crime have

15   been met and I ask that you find Johnathon Irish not

16   guilty.

17           THE COURT:  Attorney Krasinski --

18           MR. FALKNER:  Thank you.

19           THE COURT:  -- any rebuttal?

20           Thank you, Attorney Falkner.

21           MS. KRASINSKI:  Briefly, your Honor.

22           THE COURT:  All right.

23           MS. KRASINSKI:  First, I'd submit that the

24   evidence that you heard demonstrated that Dylan Roosa is

25   not the only witness that put the defendant in physical

1   possession of those guns.  So did his cousin, Neil; so

2   did Elizabeth Millett; so did Roscoe Whitney, when

3   Roscoe Whitney sat there and told you he handed those

4   guns, the pistol and the rifle, back to the defendant.

5           Now, the defendant faults the government for

6   not calling Stephanie Irish as a witness.  What would

7   she have added?

8           When Mr. Roosa told you that he shot that

9   pistol out with the defendant in the backyard, he told

10  you Stephanie Irish wasn't there; she was inside with

11  Mr. Roosa's wife and all their kids.  She wasn't outside

12  with them.  She wasn't there.  What would she have added

13  to that?

14          When Peter Duguay told you about Mr. Irish

15  clearing the gun in the car, he told you they were the

16  only two people in the car.  What would Stephanie Irish

17  have added to that testimony?  Nothing.

18          When the defendant told David Marcotte --

19  you've heard Mr. Marcotte testify -- that there's a 1911

20  in the bedroom, Stephanie Irish wasn't there.  What

21  would she have added to that?

22          And as it relates to the Catamount Fury rifle,

23  you are allowed to draw reasonable inferences from the

24  testimony that you heard on the stand.  You heard

25  Mr. Marcotte tell you that he'd seen that shotgun

1  before, that it was his friend Tony's.  You heard him

2  tell you that Tony had Big Red.  You heard him tell you

3  that Johnathon Irish got Big Red.  You are absolutely

4  allowed to draw reasonable inferences from that

5  testimony and the only reasonable inference from that

6  testimony is that the defendant got that shotgun from

7  his friend Tony.

8          The defendant argues that he's being framed.

9  If he's being framed, why would he have called Neil and

10  asked Neil if Neil had wiped the guns down?

11          Why would he have called Gary and asked for

12  one of the guns back?

13          Do you really think that Elizabeth Millett is

14  lying and Gary Roya is lying and Roscoe Whitney is lying

15  and Peter Duguay is lying and David Marcotte is lying?

16  All of them?

17          I submit that there is a much simpler

18  explanation, and that explanation is that the defendant

19  possessed those guns.

20          I'd just ask you to consider one other thing.

21          Who had the key?  The only evidence you heard

22  about this key was from Neil, who told you that it was

23  the defendant, Johnathon Irish, who gave him this key.

24  Who had possession of the gun in the box?  Who had

25  possession of the pistol and the shotgun?  The person

1    with the key, Johnathon Irish.

2              Thank you.

3              THE COURT:  Thank you.  All right.  Thank you,

4    Attorney Krasinski.

5              We are now going to take our lunch break.  We

6    will be back at 1:30 and then I will give you the jury

7    instructions.  You'll have a copy of them and I will

8    read them to you as well.  Then you will go into the

9    jury deliberation room finally for your deliberations.

10             So until you have begun your deliberations

11   after I give you jury instructions, until that point,

12   you need to continue to follow my instructions and you

13   need to not talk to one another about the case in any

14   way.

15             So we'll be back at 1:30.  I'll give you

16   instructions and then will begin deliberating.

17             Thank you.

18             THE CLERK:  All rise for the jury.

19                       (Jury excused.)

20             THE COURT:  All right.  Anything counsel

21   wants?

22             All right.  Any final issues with respect to

23   the jury instructions, I'll make sure to check in with

24   you about that.  I'm going to have those final printed

25   based on everything we talked about.

1           All your objections are noted and preserved,

2    Mr. Falkner.

3           Is there anything --

4           MR. FALKNER:  Will I be at least just given an

5    opportunity to object to them after they're given?

6           THE COURT:  Yes.

7           MR. FALKNER:  Thank you.

8           THE COURT:  Anything further?

9           MS. KRASINSKI:  No, your Honor.

10          THE COURT:  All right.  See you at 1:30.

11          (Lunch recess taken at 12:44 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


      I, Liza W. Dubois, do hereby certify that
the foregoing transcript is a true and accurate
transcription of the within proceedings, to the best of
my knowledge, skill, ability and belief.


Submitted: 3/27/2020     /s/  Liza W. Dubois
                               LIZA W. DUBOIS, RMR, CRR