*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO JUNE 25, 2020

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * *
                                *
UNITED STATES OF AMERICA        *
                                *   1:19-cr-251-LM-1
            v.                  *   February 11, 2020
                                *   11:07 a.m.
JOHNATHON IRISH                 *
                                *
* * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF STATUS CONFERENCE
BEFORE THE HONORABLE LANDYA B. McCAFFERTY

Appearances:


For the Government:        Anna Z. Krasinski, AUSA
                           Kasey A. Weiland, AUSA
                           United States Attorney's Office



For the Defendant:         Benjamin L. Falkner, Esq.
                           Krasnoo, Klehm & Falkner, LLP



Court Reporter:            Liza W. Dubois, RMR, CRR
                           Official Court Reporter
                           United States District Court
                           55 Pleasant Street
                           Concord, New Hampshire 03301
                           (603)225-1442

```
 1                    P R O C E E D I N G S
 2            THE CLERK:  The Court has before it for
 3    consideration today day three in the jury trial of USA
 4    vs. Johnathon Irish, 19-cr-251-LM.
 5            THE COURT:  All right.  I would like to make
 6    sure counsel has the latest copy of the jury
 7    instructions.  Okay?
 8            MS. KRASINSKI:  Thank you.
 9            MR. FALKNER:  Thank you.
10            THE COURT:  Okay.  I just want to start by
11    reiterating that the jail call is coming in.  It's
12    admissible.  I've ruled on that.
13            There was a question about a transcript.  I
14    know I wanted defense counsel at least to have it to
15    benefit from it, but the question remains do you want
16    the jury to have that transcript, so-called transcript.
17            MS. KRASINSKI:  Yeah, we did get a verbatim
18    transcript from one of the FBI transcriptionists.  I
19    have both emailed and given counsel a hard copy.
20            To the extent we use it, I think what we would
21    do is make copies and mark it for identification
22    purposes and have the jurors have it in hand while
23    they're listening to the call, but I think the case
24    law's pretty clear that it cannot go back to --
25            THE COURT:  Right.
```

1          MS. KRASINSKI:  -- the jury.

2          THE COURT:  And I have to give the jury an

3     instruction at the time.

4          What do you think of that, Attorney Falkner?

5          MR. FALKNER:  I haven't had a chance to

6     determine the accuracy of the transcript, but I agree

7     that the state of the law is that if your Honor -- I

8     believe it's in your Honor's discretion to allow them to

9     read the transcript, but they do have to be instructed

10    that it's the audio that's the evidence and not the

11    transcript.

12         THE COURT:  And the audio will be in with them

13    through JERS.  They can listen to that.

14         What do you want with respect to having them

15    have the transcript while they're listening?  Do you

16    have --

17         MR. FALKNER:  I haven't had a chance to listen

18    to it side by side with the transcript and I know that

19    it's short, but I think perhaps if I can have a chance

20    to at least do that before I respond --

21         THE COURT:  Okay.  Well, that would have been

22    good to do before we hit 11:00 a.m.  Maybe you just

23    didn't get it until moments ago.  But let's break in

24    time to give you time to do that.

25         MR. FALKNER:  Thank you.

```
 1                THE COURT:  All right.  Okay.
 2                Unanimity, I'm going to tell you where I'm
 3   leaning on unanimity.  We talked about it yesterday.  I
 4   think generally the government's instruction is
 5   obviously the correct statement of the law, but I think
 6   in this case, because the -- my jury instructions, I
 7   think, which both of you agree with on possession,
 8   describe direct, active possession as one theory of
 9   possession, but then there's also constructive
10   possession as a second theory.
11                And there's been evidence of active or direct
12   possession of a pistol, there's been evidence -- and
13   there may be more direct evidence or evidence of direct
14   possession of a gun, but there's certainly been sort of
15   competing theories.  There would be the active
16   possession of a firearm and constructive.  And I think
17   that alone, plus the facts of this case, to me, counsel
18   in favor of giving a unanimity instruction.
19                Let me tell you what I've drafted and point
20   you to it right away.  It is page 19.  It's in bold.
21   Can you just quietly read that to yourself.
22                Okay.  Any problems, Attorney Falkner?
23                MR. FALKNER:  No, your Honor.
24                THE COURT:  Any problems with that language?
25   I know you prefer the nonunanimity instruction, but I am
```

1    inclined at this point -- I'm leaning in this direction.

2    I don't obviously -- I want to carefully consider it in

3    light of the First Circuit case law and I think this

4    case provides a situation where this -- this is the way

5    to handle the question.

6              So any objections to the way this is worded?

7              MS. KRASINSKI:  Obviously the government

8    prefers the instruction that it suggested.  I would just

9    ask that the Court wait to make a final decision --

10             THE COURT:  Right.

11             MS. KRASINSKI:  -- until after the proof is in

12   on this.

13             THE COURT:  And it is in bold because I really

14   want to hear all the evidence, but I wanted to give you

15   a heads-up as to the language I was contemplating using.

16             So if I stick with a unanimity instruction, do

17   you have any problem with this language?  Because we'll

18   plug this in based on my final decision.

19             I just want to see if you have any -- this

20   doesn't have to be our final charging meeting.  I'll do

21   that before I give the instructions.  So don't worry

22   if -- this won't be the last and final opportunity to

23   raise -- raise concerns.

24             MS. KRASINSKI:  I'm just curious.

25             THE COURT:  Uh-huh.

1          MS. KRASINSKI:  If this were the way that the

2  Court instructed the jury, would the Court also intend

3  to give them a special verdict form?

4          THE COURT:  I'm thinking no.  I'm thinking of

5  just telling them this is what they have to agree on and

6  I think a special verdict form I'm going to stay away

7  from.  I know that I think in general the circuit

8  prefers the general verdict forms.

9          But if you want to propose one and Attorney

10  Falkner agrees with it -- I've been leaning against

11  that.  So that's a good question.

12          MS. KRASINSKI:  I'm not sure that I would ask

13  for one.  I just sort of wondered what the Court's plan

14  was.

15          THE COURT:  Yeah.

16          MR. FALKNER:  I think I would ask for one,

17  your Honor, but --

18          THE COURT:  You would ask for a special

19  verdict form?

20          MR. FALKNER:  As to the particular firearms,

21  yes.

22          THE COURT:  Okay.  I'm leaning against that,

23  but if you can give me some case law, give me some

24  reason why I need to have them literally specify and

25  check off which firearm, I think if I describe to them

1    that with respect to this question an element of

2    possession that they have to be unanimous.

3          I -- so I'm leaning against it, but if you can

4    give me case law and persuade me that I should, I'm open

5    to that.  Okay?

6          MR. FALKNER:  Understood.

7          THE COURT:  All right.  So the instructions

8    are in front of you, the draft -- the latest draft, and

9    I just want to go through it with you.  I have left in

10   bold those things that we don't know yet.  So the

11   unanimity is still in bold, but everything else I think

12   we've removed the bold on.

13         I added your informant witnesses or witnesses

14   granted immunity instruction that both of you agreed on.

15   That is -- that starts at page 10, goes through 11.  So

16   I've added exactly -- I think they are slight wording

17   changes, but they were only made at -- made to make it

18   more readable.

19         All right.  And I think the elements, I've

20   added your stipulations to the first, your stipulation

21   to the second, and then possession, of course, is going

22   to be the key element in this case.  So you've seen

23   that.  You've had that language since the day of jury

24   selection and you haven't raised an issue, so I'm

25   assuming that is okay, that third element.

1            I've added unanimity.  It's in bold.  And if

2    ultimately -- let me see.  If I go with the government's

3    requested instruction, it would be much simpler:  The

4    government is not required to prove the defendant

5    possessed both firearms described in the indictment.

6    You may find the defendant has met the -- the government

7    has met its burden on possession if you find that the

8    defendant knowingly possessed at least one of the two

9    firearms described in the indictment.

10           That would be the government's requested

11   instruction.

12           And so I would substitute that, depending upon

13   how I finally rule there.

14           In or affecting commerce, I think the way it

15   had been proposed by I think the government was just

16   connected to and I just used the language that's in the

17   case law.

18           So I think that covers the jury instructions.

19   So we'll obviously have further conferences on these,

20   but at this point you, I think, have my latest complete

21   draft.

22           Okay.  Now, let me go to the Petrozziello

23   issue, which is the issue regarding the admissibility of

24   the statements in Exhibit 29D.

25           We heard argument -- I heard argument on that

 1    yesterday.  Is there anything anybody would like to do

 2    by way of supplementing that, that argument?

 3             MS. KRASINSKI:  No, your Honor.

 4             THE COURT:  Anything further from you,

 5    Attorney Falkner?

 6             MR. FALKNER:  I would just say I think under

 7    Petrozziello, you have to make -- you can admit the

 8    evidence de bene, but you can only make your final

 9    findings at the close of the case.  And I -- it's my

10    understanding that I have to request those findings at

11    the close of the case and there are -- we're only

12    halfway through the evidence.

13             So I'm objecting to their admission under

14    Petrozziello for the -- for the same reasons, but --

15             THE COURT:  For the same reasons.  Your

16    reasons yesterday were essentially authentication,

17    foundation.

18             MR. FALKNER:  Well, but also that -- that the

19    only evidence of the conspiracy is the -- is the --

20    those messages themselves and that --

21             THE COURT:  What about the jail call?

22             MR. FALKNER:  And that that jail call it -- is

23    essentially a bootstrapping on that.  It's a commentary

24    on that very same evidence and not some additional

25    evidence.

1          THE COURT:  Okay.  Now, there's also other

2    evidence that hasn't yet been fully admitted that are

3    only marked for ID and I believe that there are texts

4    between Mr. Irish and -- is it Mr. Roya?

5          MR. FALKNER:  Mr. Roya.

6          THE COURT:  And those are 29C?

7          MS. KRASINSKI:  Yes, your Honor.

8          THE COURT:  And I think we -- did we discuss

9    that yesterday?  And those were statements of the

10   defendant and I believe, Mr. Falkner, you said as long

11   as they are properly authenticated, you didn't have any

12   other basis on which to object to those.

13         MR. FALKNER:  That I agree with, right.

14         THE COURT:  Okay.  All right.  So that's 29C.

15         So presuming that Mr. Roya testifies, he's

16   going to be called today as a witness?

17         MS. KRASINSKI:  (Nods head.)

18         THE COURT:  He's testifying and presuming he

19   is able to authenticate these texts as you anticipate,

20   Mr. Falkner -- and, again, this is a provisional

21   finding, but I want to make these findings right now and

22   supplement them as I go.

23         But my provisional findings with respect to

24   this issue are as follows:

25              Now, under 801(d)(2)(E), I need to find by a

1    preponderance of the evidence the following exists in

2    order to admit the statements in 29D, the statements of

3    the mom.  Her name is Nancy Haskell.

4              Number one, first, the existence of a

5    conspiracy and supporting the existence of a conspiracy,

6    the sort of first finding that I need to make, are the

7    following:  The jail call, where Mr. Irish says he

8    wanted his mom not to text, but to call people; and

9    further evidence would be the evidence that we've

10   already seen about Nancy taking action related to

11   transferring the guns in an effort to conceal them.  So

12   the existence of the conspiracy, I -- I find -- or the

13   conspiracy itself is this agreement to conceal the

14   possession, defendant's possession, of these guns.

15             So we've heard evidence about Nancy taking

16   action related to transferring the guns, Neil Prive's

17   testimony, as well as Roscoe Whitney's testimony about

18   her communications with them.  And then the content of

19   the texts themselves while alone would not suffice to

20   establish the admissibility of these -- this exhibit,

21   29D, the content of the texts themselves, however,

22   coupled with the jail call, coupled with the other

23   evidence about Nancy Haskell's communications, the texts

24   themselves corroborate the conspiracy which is evidenced

25   by the jail call.

1        Now, again, I need to find that there is

2    this single conspiracy.  My finding is, as I think the

3    government is arguing, that the conspiracy is an

4    agreement to conceal the possession of the firearms, an

5    agreement between Mr. Irish and his mom.  There are

6    three factors to determine whether a set of criminal

7    activities constitutes a single conspiracy.

8        First factor, the existence of a common goal.

9    The common goal -- and, again, I have looked at the

10   texts in 29D.  I've looked at, also, the texts in 29C.

11   So -- so this finding is provisional on those being

12   admitted.  But the existence of a common goal, the

13   common goal being to conceal possession of the firearms.

14        Overlap among the activities' participants, it

15   looks as though, based on what has come in thus far and

16   based on 29C and D, it looks as though there is overlap.

17   Mom and Mr. Irish are the central hubs and then there

18   are spokes from them to Roscoe Whitney thus far, to

19   Prive, and it looks like there will be evidence that the

20   spokes extend to Mr. Roya.

21        Then there are connections among them as well.

22   Mom is texting Prive's phone number to Roya in Exhibit

23   29D.  Mr. Irish emailed a document to Mr. Whitney or at

24   least Mr. Whitney testified that it came from

25   Mr. Irish's email address.

1          There were interactions and communications

2     between the mother and Mr. Whitney, according to

3     Mr. Whitney's testimony yesterday.  And then there in

4     29C, the texts between Mr. Irish and Mr. Roya really

5     reference and tie in the whole conspiracy.

6          So there's also interdependence upon the

7     participants which is a third factor.  All parts of the

8     scheme were necessary, really, for it to be successful.

9          So, now, that's -- that's the existence of a

10    conspiracy, number one, and number two, I have to find

11    that Mr. Irish had a membership in that conspiracy.  The

12    jail call and the texts in Exhibit 29D and 29C reveal

13    that and corroborate that.  Again, dependent on how the

14    testimony comes in to establish a foundation to

15    authenticate the Exhibit 29C and D.

16          But if those are admitted as full exhibits,

17    then I believe the jail call plus those reveal his

18    membership in that conspiracy.

19          The declarant's membership is the third

20    element or factor finding I need to make.  The

21    declarant's membership in the same conspiracy, again,

22    the same basic evidence, the jail call, plus the content

23    of her text in 29D, the content of Mr. Irish's text in

24    29C, and additionally, Mr. Whitney's testimony described

25    her role in communicating with him, Mr. Whitney, about

1    this wider scheme of concealing the firearms, his

2    possession of the firearms.

3          The final factor -- finding that I need to

4    make is that the statement is made in furtherance of the

5    conspiracy.  We're talking about exhibits -- Exhibit

6    29D, the statements of the mom, and I -- there is a

7    preponderance of evidence that her statements in 29D

8    were made in order to further the conspiracy to conceal

9    Mr. Irish's possession of the guns.

10         The statements themselves, again, would not be

11   enough, but the statements plus the other corroborating

12   evidence that I've already mentioned support a finding

13   that they were made in furtherance of the conspiracy.

14         The texts themselves show that the declarant,

15   the mom, is arranging with Roya for Roya to pick up the

16   guns from Prive and referencing Mr. Irish and his

17   awareness of the plot throughout the texts with

18   Mr. Roya.

19         All the evidence I've already mentioned

20   corroborates the fact that the statements in 29D were

21   made in furtherance of the conspiracy, so I find that

22   there is a preponderance of evidence at this early

23   stage.

24         Now, again, what happens with this is I -- I

25   need to hear evidence on 29C and 29D with respect to

1     those two documents.  So I think in order for me to make

2     that finding, I think the evidence on 29C would have to

3     come in.

4              Is it -- is 29C coming in before the 29D

5     texts?

6              MS. KRASINSKI:  It'll all likely come through

7     the same witness.

8              THE COURT:  Okay.

9              MS. KRASINSKI:  The one thing I will say is

10    that Government's Exhibit 29A identifies what the number

11    associated with Johnathon in the phone.  Special Agent

12    Christiana testified that that phone number is the same

13    phone number that the defendant provided as his when he

14    called the FBI in late October of 2019.

15              And so I -- I anticipate that Gary Roya will

16    also testify that that's who he -- that that is who he

17    was communicating with, but that's just an additional

18    piece of authentication that came in yesterday.

19              THE COURT:  Okay.  Well, I think, under --

20    under the ruling I can provisionally admit a

21    coconspirator's statement before the evidence -- other

22    evidence comes in, admitted on a provisional basis.

23              So -- but I think obviously it would be

24    cleaner were they to come in in the order I described.

25              Attorney Falkner?

1          MR. FALKNER:  Yes, obviously I object to your

2    findings, but I think the practical significance of

3    those findings and, in particular, in the context of

4    29C, an outgoing message from Gary Roya to stop giving

5    info to people -- stop giving -- this is page 7 of the

6    exhibit -- stop giving info people don't need -- who

7    has -- what just -- that they were gone -- gone will be

8    shooting -- and then it goes on:  Will be shutting off

9    phone until 8:30 a.m. from now on.

10         That given your Honor's findings of the

11   existence of a conspiracy that Gary Roya is a member of

12   that conspiracy, that -- or potentially a member of that

13   conspiracy, that he may be incriminating himself by his

14   testimony and probably --

15         THE COURT:  But, no, the issue I'm making

16   findings on are the mom.  That's what I have to find.  I

17   have to have -- I have to have an understanding that the

18   declarant is a member of the conspiracy.  I think this

19   issue of concealing the firearms and her role in that

20   and Mr. Irish's role are central to that.  The fact that

21   there are other people that they've involved in that,

22   that's part of the narrative, but --

23         MR. FALKNER:  But my point is, your Honor,

24   that given that so-called hub-and-spoke conspiracy

25   described by your Honor and given Mr. Roya's message

1    that he -- that Johnathon Irish should not be speaking

2    to people or giving them information, that potentially

3    suggests that he also has a role in concealing the

4    firearms.  And given that that's the case, or certainly

5    could be the case, depending on the questions, I think

6    out of an abundance of caution, he ought to be given the

7    opportunity to speak with counsel.

8         THE COURT:  Well, this was an issue that we

9    knew would come up as well, so I appreciate that you're

10   making the argument, but appointing counsel and getting

11   counsel for him is something we can do.  I'm not sure --

12   I'm not sure there's enough here to be concerned about

13   that, but let me hear from the government.

14        MS. KRASINSKI:  I don't think there's

15   evidence that he knew that the -- his possession of the

16   guns that -- the defendant's possession of the guns was

17   unlawful.  I -- I don't think there's enough here that

18   he would need counsel.  And to the extent that counsel

19   wants to cross-examine him on these statements, he'll be

20   here, he can certainly cross him on them.  But I am not

21   aware of evidence that suggests that he was a knowing

22   member of a conspiracy to hide the defendant's unlawful

23   possession of weapons.

24        Did he hold on to those weapons?  Yes.  But I

25   don't think -- I'm not aware of anything that indicates

1   that he was knowingly helping --

2           THE COURT:  So he's similar in that way to

3   Mr. Prive?

4           MS. KRASINSKI:  Correct, your Honor.

5           THE COURT:  Okay.  So tell me what evidence

6   there is, Mr. Falkner, that would -- that would justify

7   that.  It's -- it's the text you were just reading.

8           MR. FALKNER:  The text message that he was

9   just reading, I think, it's -- potentially demonstrates

10  and also --

11          THE COURT:  And that's in 29C?

12          MR. FALKNER:  29C.

13          THE COURT:  Let me just go there with you.

14          MR. FALKNER:  Page 7.

15          MS. KRASINSKI:  The page ending in Bates

16  number 86.

17          THE COURT:  So 29 -- 29C.  All right.  Bates

18  number ending in 86.

19          Your Honor, I think, actually, if you start at

20  page 63 to review the text message from the defendant --

21          THE COURT:  Okay.  So start at 63?

22          MS. KRASINSKI:  -- to make sure that it's in

23  context.

24          THE COURT:  Okay.  63.

25          Okay.  So I'm looking at 86 and, Attorney

1   Falkner:  Stop giving info to people who don't need to

2   know who has what, just that they were gone, will be

3   shutting off phone.

4          Okay.  Explain -- that's the key text that

5   you're talking about?

6          MR. FALKNER:  And that's in response, as the

7   government pointed out, to Johnathon's -- Johnathon is

8   the texter, from Johnathon, and that's on page 63:

9   Gary, sorry for the early hour, Stephanie will be making

10  contact with Roscoe, then presumably you, to verify

11  location, how long you had them, that you picked them

12  up.

13         THE COURT:  Okay.  Tell me how else could that

14  be interpreted, Attorney Krasinski.  I understand his

15  argument.

16         MS. KRASINSKI:  So I'll proffer that my

17  understanding of what he would say if asked about this

18  is that he would say he was irritated, that he just

19  didn't want -- he took custody of these and that he

20  just didn't want people calling him.  He didn't want

21  Stephanie calling him.  He just wanted to be left alone.

22         It doesn't -- the text itself doesn't say, you

23  know, I'm helping you hide these, I know you're not

24  allowed to have these.

25         So I certainly think Attorney Falkner can

1  cross him on it.  If he says something different than I

2  expect, you know, maybe --

3  THE COURT:  So is this something we would do

4  via voir dire outside of the presence of the jury just

5  to find out --

6  MR. FALKNER:  Your Honor --

7  THE COURT:  -- or are you thinking he

8  absolutely needs a lawyer to advise him before he says

9  anything?

10  MR. FALKNER:  I mean, I think that he probably

11  needs a lawyer before he says anything.

12  Again, and although he may have a so-called

13  innocent explanation, certainly based on the -- based

14  on the fact that there's the finding of this conspiracy,

15  I certainly intend to cross-examine him thoroughly

16  about -- about this issue before the jury.

17  And certainly his answers to those questions,

18  whether he denies it or not, given these text messages,

19  suggests his involvement or it could reasonably suggest

20  his involvement in the conspiracy.

21  MS. KRASINSKI:  Your Honor, the other thing

22  that I would say is that the defendant's text message,

23  "Stephanie will be making contact with you to verify

24  location of the guns" -- the defense's -- the defense

25  here is these were Stephanie's guns, she tried to get me

1   in trouble by leaving them at my house.

2          The fact that he's talking about Stephanie

3   related to the guns, that he's trying to conceal or tell

4   Stephanie that they went from one place to another when

5   they, in fact, didn't, that doesn't relate to an

6   unlawful -- his unlawful possession of the firearms.

7          THE COURT:  Did he ever sign anything or --

8   that he -- that he received the guns from Roscoe

9   Whitney?

10          MS. KRASINSKI:  After these text messages, he

11   did sign that form.  And he'll say he didn't really read

12   it, he signed it, now that he looks at it -- similar to

13   what Roscoe Whitney testified.

14          THE COURT:  Okay.  But he -- he signed the

15   form, but it wasn't -- it wasn't ever a statement made

16   to an FBI agent or a false statement --

17          MS. KRASINSKI:  Correct.

18          THE COURT:  -- other than the signature on

19   that document.

20          MS. KRASINSKI:  Correct.

21          THE COURT:  Okay.  Stick with me for a minute

22   on this because I'm just thinking out loud.

23          So the conspiracy here is with respect to the

24   conspiracy that I need to find in terms of admitting

25   statements in 29D.  That is activity that is designed to

1   conceal Mr. Irish's possession of the weapons.  So

2   Mr. Roya is -- he's taking guns from someone.  He's not

3   actually giving guns to a felon; he's taking guns

4   himself.  And that's what he is doing here.  How is

5   what he is doing a criminal act?  What crime is he

6   committing?

7           MR. FALKNER:  Any more than the criminal

8   conspiracy to hide -- the very criminal conspiracy,

9   basically, that the government is alleging to get these

10  admitted in the first place, the conspiracy to hide

11  Johnathon Irish's possession of these firearms.

12          And it -- it's interesting, because it seems

13  the government wants to have it both ways; that Nancy --

14  the evidence that Nancy Irish is committing a crime of

15  conspiracy is that she's sending this false document for

16  people to sign so that no one knows where the guns went.

17          He's the recipient of the guns.  He signed the

18  same very false document.  When Johnathon Irish sends

19  him a text message that says, hey, Stephanie's going to

20  be reaching out to you to confirm when you got these

21  messages from Roscoe Whitney, his response is I didn't

22  get these -- is not -- he doesn't respond to it I didn't

23  get these weapons from Roscoe Whitney, I'm getting them

24  from Neil Prive.  It's you need to shut up and stop

25  talking to people about where these weapons are going.

1           So as far as I can tell, on the government's

2    theory of why these -- exactly why these messages are

3    being admitted, he's playing a central role in that

4    exact conspiracy.  He's the person that ends up hiding

5    these firearms.

6           I'm sorry.  If I said Nancy Irish, I meant

7    Nancy Haskell.

8           MS. KRASINSKI:  I -- I just think there's a

9    difference in knowledge here.  I mean, I think the

10   evidence is that Nancy Haskell and the defendant used

11   all of these people, used Neil Prive, and I think the

12   evidence will be that they similarly used Gary Roya.

13          But to the extent that he is a member of any

14   conspiracy, it is unknowing.  It is unwitting.  I don't

15   think there's going to be -- I don't anticipate any

16   evidence that he purposefully joined a conspiracy to

17   hide the defendant's guns.

18          THE COURT:  Okay.  All right.  I need to think

19   about this further.  So with respect to Mr. -- was he

20   going to be early on?  What was your order of witnesses?

21          MS. KRASINSKI:  No, your Honor.  He should be

22   later.

23          THE COURT:  Okay.  That'll give us some time.

24   What's your order?

25          MS. KRASINSKI:  I think we're going to start

1    with Ms. Millett and then we should hear from David

2    Marcotte and then Dylan Roosa.

3         THE COURT:  Okay.  All right.  Let me just --

4    I'll have to research that and if we need ultimately to

5    get him counsel before he testifies, then obviously I

6    think it would assist any appointed counsel for both of

7    you to be able to meet with counsel.

8         But ultimately I want to make a decision on

9    that and, again, this is one of those issues that

10   requires -- requires some research and thinking before

11   I -- before I rule.

12        So I -- I think that's all we need before

13   11:00, before the jury comes in.

14        MR. FALKNER:  Excuse me?  I'm sorry.

15        THE COURT:  I think those are the issues we

16   needed to resolve.  Are there any others?

17        MR. FALKNER:  Two --

18        THE COURT:  Okay.

19        MR. FALKNER:  -- your Honor.

20        There's a witness named Dylan Roosa, and

21   just -- there's been a lot of testimony that the

22   government's eliciting about who knows who.  And Dylan

23   Roosa is a witness who had an interaction with Mr. Irish

24   after -- just before his arrest, after the seizure of

25   the weapons and just before his arrest.

1          And I don't at all want to go into that

2    interaction itself, just the fact that it occurred.   And

3    I just want to be careful in -- I can explain the

4    interaction.

5          Mr. Irish at the time had a restraining order

6    against Stephanie Irish and Mr. Irish is at a gas

7    station.  And Stephanie Irish pulls in in one car, Dylan

8    Roosa pulls in in the second car, and they're

9    essentially caravanning together and it results in

10   Stephanie Irish being charged with violating the

11   restraining order and there's some evidence that

12   Johnathon Irish was threatening to Dylan Roosa.

13          I don't want to get into any of those crimes

14   whatsoever, just the simple fact that they had an

15   interaction and that he was -- he was carpooling with

16   Stephanie Irish on that occasion.

17          And -- and the reason why I'm raising it now

18   is because if your Honor's ruling is, well, if you get

19   into that at all, I'm going to let you get into -- I'm

20   going to let the government get into the actual

21   underlying acts and the restraining order and the

22   attack -- or the alleged attack and all that stuff, then

23   I just wouldn't go there.

24          But I don't in any way want to elicit any

25   evidence of any crimes, just the fact that -- that there

1    was an interaction that occurred on that location and

2    that he was carpooling with Stephanie on that occasion.

3            THE COURT:  Okay.  Let me just -- let me just

4    generally respond to that.

5            As we saw yesterday, some witnesses do not

6    answer your limited, direct question.

7            MR. FALKNER:  Right.

8            THE COURT:  They answer what it is they

9    want --

10           MR. FALKNER:  Right.

11           THE COURT:  -- everyone to know.  So it's

12   always a risk when you ask questions of witnesses.

13           So, ultimately, I don't know what to tell you

14   about that.  It sounds as though the extraneous details,

15   I'm not seeing how they would be relevant, but if you

16   could ask your question in a way that is so crystal

17   clear to that witness that that's all you're asking

18   about and that -- that is on you.

19           If your question leaves any room for him to

20   embellish, if he's so inclined, then I think it's risky

21   and ultimately I would -- if it's material you don't

22   want in, I might err on the side of not asking him.

23   Depends on how important that single interaction is.

24           Attorney Krasinski?

25           MS. KRASINSKI:  I mean, I think the point is

1    that this witness is closer to Stephanie Irish than with

2    the defendant.  I think there are ways to elicit that

3    without going into the specific incident.

4            He -- what he describes about that incident is

5    they were driving, they were caravanning up to his

6    house, they stopped for gas.  There was an interaction

7    between the defendant and Stephanie.  He pulled his car

8    across the street to kind of wait for things to clear up

9    and then at some point he drove back into the gas

10   station.

11           The defendant came up, stood in front of his

12   car, was yelling at the witness, was yelling at the

13   witness's wife.  So the witness got out of his car and

14   then the defendant pulled a knife that he carried and

15   threatened him with a knife, sort of at his hip.  He

16   didn't point it at him but sort of pulled it out, kind

17   of let him know, showed that he had it, and the witness

18   then got back in his car and then drove away.

19           I think there are other ways to get the point

20   across that this witness has a relationship, a friendly

21   relationship, with Stephanie Irish.  We don't intend to

22   elicit that information.

23           THE COURT:  All right.

24           MS. KRASINSKI:  So --

25           THE COURT:  I'm not going to give you advice

1   on that.  I can tell you that it doesn't sound as though

2   that information would be admissible, but I can't --

3   it's hard for me to give you a ruling ahead of time.

4           I think it's risky.  It sounds like very

5   prejudicial -- potentially prejudicial information that

6   you wouldn't want anywhere near a jury, and if there's

7   some other way to ask him a question and not risk that

8   he just will be like certain witnesses yesterday and

9   answer -- tell the jury whatever he wants to tell them,

10  I would stay away.  But ultimately that's just your call

11  and Mr. Irish's call in terms of how you want to handle

12  that.

13          So -- all right.

14          MR. FALKNER:  Sorry.

15          THE COURT:  Yes.

16          MR. FALKNER:  Two more brief issues.

17          One, this is just scheduling and just --

18          THE COURT:  Yup, go ahead.

19          MR. FALKNER:  -- looking ahead.

20          Thursday morning, which really hadn't been

21  anticipated to be on our trial docket, but I just --

22  imagining that the jury could theoretically still be

23  deliberating at that point, Thursday morning, I've --

24  I'm held as a reserve argument for the Supreme Judicial

25  Court in Boston and they won't tell me until tomorrow

1    whether I am on or not.

2           I did tell them that I was potentially

3    still in a jury trial and they said that they could

4    potentially make accommodations like calling my argument

5    first or last, but I just wanted to flag it to the Court

6    because I don't think anyone anticipated that we might

7    still be going Thursday.  And we may not be, but that's

8    out there.

9           THE COURT:  Again, I see that as your issue

10   and you're going to have to handle that.  We're going to

11   continue with the trial.  You're going to have to tell

12   the SJC exactly how they handle that.  I -- you're in a

13   trial, the trial has started, and I'm inclined to just

14   keep it going.

15          So to the extent you need my assistance with

16   anything, verifying that you are in a trial, I would be

17   happy to have my case manager help you with that, but I

18   am not going to stop the trial for that.

19          MR. FALKNER:  All right.

20          THE COURT:  Okay?

21          MR. FALKNER:  I understand.

22          THE COURT:  What was the other issue?

23          MR. FALKNER:  I'd ask if we could approach to

24   sidebar for this issue.

25          THE COURT:  Sure.

```
 1                        AT SIDEBAR

 2              MR. FALKNER:  I received text messages last

 3    night from Nancy Haskell suggesting that she had heard

 4    the testimony in court, was unhappy with the way that

 5    the testimony had been elicited and was unhappy with my

 6    performance, and that essentially she may well find a

 7    way to find -- make her voice be heard and that she may

 8    appear at the courthouse.

 9              I would just ask that if for some reason she

10    comes into this courthouse while the jury's in session

11    that we find a way to send the jury out and admonish her

12    not -- that she's not to have any kind of outburst in

13    the courtroom or something to that effect, because I

14    think that could be extremely unfairly prejudicial to

15    Mr. Irish and it could really jeopardize the integrity

16    of the proceedings.

17              THE COURT:  I won't know her.  Obviously, I'm

18    in a position to see.  You guys have your back to

19    everything.

20              MR. FALKNER:  Right.

21              THE COURT:  So perhaps somebody could be on

22    alert and let you know.

23              I mean, what do you think of that?

24              MS. KRASINSKI:  Since the CSOs typically check

25    IDs.  Can we ask them to sort of flag that name and let
```

1  us know if someone showing that ID comes into the

2  courthouse?

3          THE COURT:  Let me speak with our marshal if I

4  can find him and just ask him what's the correct

5  protocol for something like this.  This is unusual.  I

6  appreciate you bringing it to -- and you knew about this

7  as well?

8          MS. KRASINSKI:  We just discussed it this

9  morning.

10          The other sort of thing that we can do is

11  Officer LeBlanc is outside the courtroom.  He's not

12  sitting in testimony.  But he would know her.  If he

13  sees her, may he come in and alert one of us?

14          THE COURT:  Why couldn't he?  What would

15  prohibit that?

16          MR. FALKNER:  Oh, to -- well, just the

17  sequestration order, I guess, your Honor.  But I think

18  if he was coming in solely for that purpose --

19          THE COURT:  Okay.

20          MS. KRASINSKI:  So if that's acceptable to

21  both counsel and the Court, I can also ask him to do

22  that.

23          THE COURT:  I don't see anything wrong with

24  that.  And, again, he's -- he's sequestered because you

25  may call him back.

```
 1              MR. FALKNER:  Right.

 2              THE COURT:  And we'll allow for that

 3   exception.

 4              Let me also just talk to the U.S. Marshal and

 5   see if I can do that in the next ten minutes and then I

 6   want to think about the other issue.  Hopefully we don't

 7   go to Thursday.

 8              MR. FALKNER:  Right.

 9              THE COURT:  You know, that's a tough issue,

10   but I -- I think we're just going to keep the trial --

11   I'll do everything I can to help you with it.  If you

12   need a call from the Court --

13              MR. FALKNER:  And just so that your Honor's

14   aware, I don't know whether I had misunderstood it, but

15   the information I had originally been given was that I

16   would be told as of last Thursday whether I was on or

17   not for this Thursday.  And then when I called last

18   Thursday, I was told, you'll find out Wednesday.

19              THE COURT:  That was nice.  Anything I can do

20   to help with that, I will.  But I do want to keep --

21              MR. FALKNER:  I understand.

22              THE COURT:  Okay.  All right.  I'll see you

23   then in seven minutes.  I'm going upstairs.

24                    CONCLUSION OF SIDEBAR

25              THE CLERK:  All rise.
```

1          (Recess taken at 11:55 a.m.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

C E R T I F I C A T E


       I, Liza W. Dubois, do hereby certify that the foregoing transcript is a true and accurate transcription of the within proceedings, to the best of my knowledge, skill, ability and belief.


Submitted: 3/27/2020     /s/  Liza W. Dubois
                                 LIZA W. DUBOIS, RMR, CRR