*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 6/25/20

1              UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF NEW HAMPSHIRE
2

3   * * * * * * * * * * * * * * * * *
                                    *
4   UNITED STATES OF AMERICA        *
                                    *
5                                   * No. 1:19-cr-00251-LM-1
            v.                      * February 6, 2020
6                                   * 9:50 a.m.
                                    *
7   JOHNATHON IRISH,                *
                                    *
8                                   *
                    Defendant.      *
9                                   *
    * * * * * * * * * * * * * * * * *

10

11          TRANSCRIPT OF STATUS/SPECIAL HEARING

12        BEFORE THE HONORABLE LANDYA B. McCAFFERTY

13

14  APPEARANCES:

15

16  For the government:     AUSA Anna Z. Kraskinski
                            AUSA Kasey Weiland
                            United States Attorney's Office
17

18  For the Defendant:      Benjamin L. Falkner, Esq.
                            Krasnoo Klehm & Falkner LLP
19

20

21  Court Reporter:         Brenda K. Hancock, RMR, CRR
                            Official Court Reporter
22                          United States District Court
                            55 Pleasant Street
23                          Concord, NH 03301
                            (603) 225-1454
24

25

```
 1                  P R O C E E D I N G S

 2          THE CLERK:  All rise for the Honorable Court.  The

 3   Court has before it for consideration today a status hearing in

 4   criminal case 19-cr-251-01-LM, United States versus Jonathan

 5   Irish.

 6          THE COURT:  All right.  Let me just get my papers

 7   organized here.

 8          All right.  Let's deal with -- and I may not be able

 9   to resolve it right now, but I'd just like to hear the

10   arguments with respect to the defendant's objection to the

11   government's forfeiture jury instructions.  That's Document 23.

12   And then there's also a request for a supplemental jury

13   instruction, Document 22.  And then and then I want to ask

14   about the unanimity instruction the government's requesting

15   with regard to the guns.  So, proof by clear and convincing

16   evidence or a preponderance of the evidence, and you're saying

17   it's clear and convincing evidence.

18          MR. FALKNER:  Your Honor, I mostly filed it because I

19   wanted to flag it early for your Honor.  I did just look at the

20   statute itself, and the statute itself appears to require a

21   finding by clear and convincing evidence and a finding that

22   that particular item that's to be forfeited was intended for

23   use in the commission of the offense.  I think the government's

24   instructions request both by a preponderance of evidence in

25   that the item was involved in the offense, which is, I think,
```

1    not the same standard as set forth in the statute.  I very

2    quickly, I tried to do a little bit of research.  I didn't find

3    any definitively one way or the other, but I wanted at least

4    for your Honor to be aware of it, but I think that that's the

5    proper standard.

6         THE COURT:  And you're looking at 924 and you're

7    looking specifically at (d)(1)?

8         MR. FALKNER:  That's correct, your Honor.

9         THE COURT:  "Any firearm or ammunition involved in or

10   used in any knowing violation of subsection" -- here it would

11   be (g), or -- now, that looks, as I'm reading it -- again, this

12   is the first time I'm really studying this, but it looks like

13   the "where" is talking about "any offense referred to in

14   paragraph 3 of this subsection, where such intent is

15   demonstrated by clear and convincing evidence."

16        Has the government had time to study this issue?

17        MS. KRASINSKI:  No, your Honor.  I will note that

18   footnote 4 of the government's proposed forfeiture instructions

19   states that the language of 18 U.S.C. 924(d) regarding proof of

20   intent by clear and convincing evidence isn't applicable to the

21   forfeiture phase of a criminal trial because the only issue in

22   forfeiture is nexus between the firearm and the offense, not

23   criminal intent, which, if we get there, the jury will have

24   found intent beyond a reasonable doubt.  But, as we were

25   discussing it this morning, Attorney Faulkner sort of tied it

1    into the instruction that you referenced earlier.  We may not

2    know which firearm they have found that he possessed if we have

3    a unanimity instruction.  So, I think it's something that both

4    Attorney Faulkner and I are going to have to look into it a bit

5    more.

6            THE COURT:  All right.  Well, I appreciate that, then.

7    I just wanted to touch base with you on it and just see if you

8    had any feel for that.

9            Okay, then.  Number 22 is talking about adding to the

10   definition the frame or receiver of a firearm.  What's your

11   position on that?

12           MS. KRASINSKI:  So, this is actually a broader issue

13   we wanted to raise with the Court today.  As the Court is

14   generally aware, the government typically proves nexus by

15   explaining -- having an ATF expert explain that the firearm was

16   manufactured out of state and shipped into the state.  That's

17   typically the way it's done.

18           With one of the firearms here, it's sort of an

19   AR-style rifle, and there is developing case law, a case from

20   the Northern District of Ohio from December where the District

21   Court found that the lower receiver of this type of rifle is

22   not a firearm.  So, that's sort of where that instruction comes

23   in.  We anticipate that the defense is going to argue that the

24   government can't meet its burden of proof on the nexus

25   requirement with that rifle because the lower receiver, when it

1   traveled in interstate commerce, wasn't a completed firearm, it

2   was just a portion of a firearm, and that it was manufactured,

3   you know, attached to the upper here in New Hampshire, and so

4   it didn't -- the firearm itself didn't cross state lines.

5         In this case, however, as it relates to that firearm,

6   we intend to prove nexus sort of differently than we normally

7   would.  As your Honor knows, the statute requires that -- it

8   prohibits a felon from possessing a firearm to ship or

9   transport in interstate or foreign commerce or possess in or

10  affecting commerce any firearm or ammunition.

11        Here there's going to be testimony that the defendant

12  modified that firearm, that he put on additional sights to the

13  firearm, that he put a flashlight on the firearm, that

14  flashlight requires batteries, that his possession of this

15  AR-style rifle affected interstate commerce, and I am working

16  on preparing a supplemental jury instruction that sort of lays

17  out -- that lays this out and also cites the authority for it.

18        It's sort of a different case.  I don't know how

19  familiar you are with firearms, your Honor.

20        THE COURT:  No, I'm not, not that familiar.

21        MS. KRASINSKI:  So, I have --

22        THE COURT:  And there's case law that would suggest

23  that his modifications in the State of New Hampshire would

24  actually affect interstate commerce?

25        MS. KRASINSKI:  Yes, your Honor.

1          THE COURT:  Okay.

2          MS. KRASINSKI:  So, most recently the issue has come

3   about in relation to what are called "ghost guns," guns that

4   people are manufacturing sort of in their homes that never

5   cross state lines and whether or not the possession of that

6   type of firearm affects interstate commerce, and what Courts

7   have been holding is that, because there is a broader market

8   for firearms, there is a national and international market,

9   that the possession of that firearm, even though that firearm

10  never crossed state lines, affects interstate commerce, and

11  I'll add all of that --

12          THE COURT:  Is it Circuit case law as well as District

13  Courts?

14          MS. KRASINSKI:  Yeah.  Yes.

15          THE COURT:  Okay.

16          MS. KRASINSKI:  So, there's a Ninth Circuit case

17  related to homemade machine guns.  And it's all based on a

18  Supreme Court case that actually discusses whether or not the

19  Federal Government can regulate intrastate marijuana, and in

20  that case the Supreme Court held that, because there is, legal

21  or not, a broader interstate --

22          THE COURT:  Market.

23          MS. KRASINSKI:  -- marketplace for marijuana, that the

24  government can still regulate intrastate marijuana, because it

25  impacts that broader market.

1          THE COURT:  Can I ask a bigger question?  Aren't there

2     multiple guns alleged?

3          MS. KRASINSKI:  There are multiple guns alleged.

4          THE COURT:  So, why wouldn't you just -- and let me

5     ask you this:  Are the guns -- I don't know anything about the

6     facts.  Are the guns all located in the same place?

7          MS. KRASINSKI:  They were all seized from the same

8     location, yes.

9          THE COURT:  Okay.  So, it's not a question of one gun

10    is in this room, one gun is in that car.  They're all together

11    when they're seized?

12         MS. KRASINSKI:  Correct.

13         THE COURT:  Okay, so --

14         MS. KRASINSKI:  So, why does it matter?

15         THE COURT:  Yeah.

16         MS. KRASINSKI:  There are sentencing issues that

17    relate to this.  There were extended magazines found that fit

18    with this firearm.  That is a sentencing enhancement, if we

19    prove it.  There are sentencing enhancements if the offense

20    involved three firearms.  So, it's certainly something that we

21    could -- you know, we could take this one firearm out, or the

22    jury could find that we haven't met our burden of proof with

23    relation to this firearm, but this actually ties into why we

24    have proposed the unanimity requirement, because we anticipate

25    the defense will argue that we can't meet our burden of proof

1    with relation to this one firearm.

2             THE COURT:  If they're all in the same place why would

3    you need -- I could see if they're in different places needing

4    a unanimity instruction, but if they're all located in the same

5    place and they're seized, why would the jury -- I think it

6    would confuse the jury to be asked to decide with respect to

7    each specific gun that was seized in one location and at one

8    time.

9             MS. KRASINSKI:  So, I don't think they need to decide

10   with respect to each -- I guess somehow if the argument is,

11   well, one of these is not a firearm, or one of these didn't

12   travel in interstate commerce, we need to instruct the jury

13   that, even if one of these firearms doesn't meet the nexus

14   requirement or they find that it's not a firearm that they can

15   still find him guilty if the other two firearms are firearms

16   and are connected, you know, traveled interstate, that they

17   don't need to find that all three are firearms and meet the

18   nexus requirement.  There may be a better solution than the

19   unanimity requirement.  I'm certainly open to suggestion.

20            THE COURT:  Okay.  So, there may be with respect to

21   individual -- how many guns are there?

22            MS. KRASINSKI:  There are three.

23            THE COURT:  Three?  That there may be an argument that

24   you can't meet the element of interstate commerce.

25            MS. KRASINSKI:  With regards to one of them, yes.

1      THE COURT:  Okay.  All right.  This seems something

2   worth further thought, research, thinking.

3      What do you have to say about it, Attorney Faulkner?

4      MR. FALKNER:  I would just say that the government has

5   charged the three and, while they were -- all three guns were

6   seized in one location, they were not seized from the

7   defendant; they were seized from another person after even by

8   accepting what I expect to be the government's case.  So, just

9   a brief overview of what I expect to be the government's case

10  is that the weapons were in the home that he shared with his

11  wife for a period of time from December 27th, 2018, more or

12  less, up until approximately October 25th of 2018.  At that

13  time his wife left him, and, according to several of the

14  government's witnesses, at least in their interviews with the

15  FBI, essentially he tried to get the firearms out of the house,

16  and they went through a string of other people, and the federal

17  officials tracked them down and seized them from a man named

18  Gary Roya.  So, they weren't seized from the defendant, they

19  weren't seized at his home, they weren't seized in his

20  presence.

21      THE COURT:  Can you just back up a little bit and tell

22  me -- the wife was living in the house, the wife leaves, and I

23  missed what you said after that.

24      MR. FALKNER:  According to several of the government's

25  witnesses, when the wife leaves he starts making phone calls

1    saying --

2         THE COURT:  He starts making phone calls?

3         MR. FALKNER:  Correct.

4         THE COURT:  Mr. Irish?  That's what the government's

5    case will --

6         MR. FALKNER:  Correct.  So, according to Peter Dugay,

7    he asked Peter Dugay to take the firearms.  He says, "No."  He

8    asks David Marcotte to take a box, and the firearms were seized

9    out of a box, and David Marcotte says, "No."  Ultimately, the

10   firearms end up in the hands of a Neil Prive, and he says that

11   Mr. Irish said, "Hey, take these firearms out of my house,"

12   and Neil Prive actually did take the firearms out of the house,

13   and then Neil Prive gave the firearms to Gary Roya.

14        THE COURT:  And that's where the law enforcement --

15        MR. FALKNER:  And the law enforcement seized the

16   firearms from Gary Roya.

17        THE COURT:  Okay.  And they're all in the same box?

18        MR. FALKNER:  They're in the same box, but -- so,

19   there are other issues.  So, two of the firearms -- there's a

20   handgun, a 1911 is the name of the handgun, and then there's

21   the rifle, and there's a shotgun.  The handgun and the rifle

22   had previously belonged to Mr. Irish and were seized by the

23   government in the past and released to Roscoe Whitney.  Mr.

24   Whitney then, after Mr. Irish finished all of his sentences,

25   returned the firearms, depending on how the evidence comes out,

1     to Mr. Irish and/or Mrs. Irish, and that's how they came to be

2     in the Irish home.  But that only involves the handgun and the

3     rifle but not the shotgun.  There's no evidence as to where the

4     shotgun came from that I know of.  So, theoretically, there's

5     potentially proof issues as to the possession of the shotgun

6     and potentially other issues as to the shotgun.  As to the

7     rifle, there's the issues vis-a-vis interstate commerce.

8          And then that leaves the handgun, and so potentially

9     the jury may be left having to base its verdict only on the

10    handgun, depending on how the testimony comes out and depending

11    on the results of motions for judgment of acquittal and things

12    like that.  And it may or may not matter in the end to the

13    jury's verdict, but it may matter in the end to the jury's

14    verdict, because there is testimony also along the way about

15    various -- various witnesses from the government may say that

16    he was carrying, that he physically had the 1911 in his

17    presence, on his person at various times, or there may be

18    circumstantial evidence.

19         So, it's not just a matter of where they were seized

20    from, but in the grand scheme of things I'm not sure that the

21    three -- even though he's alleged to have possessed all three

22    firearms over this extended period of time, there is

23    potentially independent evidence as to each firearm.

24         THE COURT:  Okay.  What's the Ohio case?  Do you have

25    the cite for that?

1          MS. KRASINSKI:  I do, and I actually have a copy for

2     your Honor, if that would help.

3          THE COURT:  Okay, that's great.

4          MR. FALKNER:  And I have a Lexis cite for that case,

5     your Honor, if that's helpful.

6          THE COURT:  Sure.

7          MR. FALKNER:  It's 2019 U.S. District Lexis 217016.

8          MS. KRASINSKI:  The only thing I want to note about

9     that case is that that case dealt specifically with only the

10    lower receiver and not a completed firearm.  May I approach?

11         THE CLERK:  Oh, sure.

12         MS. KRASINSKI:  This case involves a fully assembled

13    rifle, as depicted in government's Exhibit 35b marked for

14    identification purposes, but a full firearm.  That case and the

15    case law addressing whether or not a lower receiver meets the

16    federal definition of a firearm is dealing with the lower

17    receiver by itself, the portion that is depicted on the single

18    web page that's printed.  So, I just want to make sure that's

19    clear when your Honor is looking at that, that what that Ohio

20    case is dealing with is only the lower receiver component and

21    not the entire assembled, fully functional firearm.

22         THE COURT:  Okay.  Go ahead, Attorney Faulkner.

23         MR. FALKNER:  Yes, your Honor.  I would point out that

24    the contention isn't that the rifle isn't a firearm at the time

25    that it's seized, but that the part that is shipped in

1   interstate commerce, according to the government's evidence,

2   isn't a firearm.  It may become a firearm at a later time, so a

3   part of the firearm may have traveled in interstate commerce,

4   but the firearm itself did not.  And so, I understand the

5   government to be now suggesting that they may be seeking some

6   kind of broader instruction as to interstate commerce than that

7   which they requested and that which is in the model

8   instruction, but the model instruction at least talks about the

9   firearm itself having traveled in interstate commerce.  So, if

10  a lower receiver is what traveled in interstate commerce and a

11  lower receiver is not a firearm, then --

12          THE COURT:  But can a portion of a unified object, if

13  a portion of that traveled in interstate commerce is that

14  sufficient?

15          MS. KRASINSKI:  There's some case law that suggests

16  that it is; there's some case law that suggests that it isn't.

17  The model instruction only focuses on a portion of the statute

18  itself.  The statute is broader than the model instruction, and

19  so we intend to submit a revised instruction that is more

20  closely aligned with the wording of the statute itself rather

21  than the model instruction, which only focuses on how the

22  government traditionally proves the nexus element.

23          THE COURT:  Okay.  This is important enough and is

24  something that needs to be briefed, and so what I'd like

25  counsel to do is brief this issue, this sole issue with respect

1    to this particular rifle and that lower receiver and the case

2    law on whether or not it qualifies.

3           Now, you're concerned enough about it that you've got

4    another approach that you're going to take with respect to

5    proving nexus.

6           MS. KRASINSKI:  Yeah.  I think our position is that

7    we're establishing the nexus element by showing that his

8    possession of the rifle affected interstate commerce.

9           THE COURT:  Because he added onto it and made it --

10          MS. KRASINSKI:  Right.

11          THE COURT:  Okay.  And you're saying there's solid

12   case law on that?

13          MS. KRASINSKI:  There is new emerging case law on it.

14   I think it's based on a solid Supreme Court case, your Honor,

15   discussing about it in the context of marijuana.

16          THE COURT:  So, Attorney Faulkner, if that's the

17   approach and the government is going to use that theory and

18   that theory holds up, there's case law supporting it, then this

19   becomes immaterial; is that right?

20          MR. FALKNER:  It may, and it depends on -- the law

21   does, I think, potentially go both ways.  United States versus

22   Lopez, the 1995 case, suggests at least with regard to

23   firearms, that broader theory of the possession of a firearm

24   can affect the market of firearms doesn't apply, and that

25   struck down the statute which was possession of a firearm in a

1   school zone because -- and the argument that the government had

2   made in that case was that possession of firearms affects the

3   broader market.  I'm not aware of any cases that deal with the

4   interstate shipment of parts of a firearm.

5          THE COURT:  Okay.  Well, let's do this, then:  I would

6   say that we want briefing on both issues, the more conventional

7   nexus theory, which Attorney Faulkner says doesn't hold water

8   based on the new case out of Ohio.  So, I'll need that issue

9   briefed as well as the government's other, newer nexus theory

10  that the government intends to propose.  If you can brief the

11  viability of that and the instruction, and if you can both file

12  your briefs by tomorrow at 5:00 p.m. that would be very

13  helpful.

14         MS. KRASINSKI:  I'm happy to do that, your Honor, but,

15  candidly, I have to say I think that the Ohio case is probably

16  correctly decided.  I think it is probably correct that the

17  lower receiver itself does not constitute a firearm, and I

18  think that -- so, I'm not sure --

19         THE COURT:  So, you're not going to be even arguing

20  that theory or that nexus theory?

21         MS. KRASINSKI:  Correct, your Honor.

22         THE COURT:  Okay.  Well, that simplifies things, then.

23  So, then brief the question of your alternative nexus theory

24  and file that by 5:00 p.m. tomorrow.

25         MR. FALKNER:  Your Honor, I just ask -- I have a

1    long-scheduled medical appointment with my son at 1:00 p.m. in

2    Boston, and if I could --

3              THE COURT:  Today?

4              MR. FALKNER:  No, no, no, no, tomorrow afternoon at

5    1:00 p.m., and so I may not be able to get it filed right at

6    5:00 p.m.  If it's filed by 6:00 or 7:00 would that be --

7              THE COURT:  If you can file it by Saturday morning,

8    I'll spend the weekend studying the issue, so if you can get it

9    in by Saturday morning.

10             MR. FALKNER:  Thank you, your Honor.

11             THE COURT:  Yeah.  All right.  And I'll give you the

12   same leeway.

13             MS. KRASINSKI:  Thank you, your Honor.

14             THE COURT:  All right.  Now, and the unanimity issue,

15   the unanimity question, I'll have to think about that issue as

16   well, and I think if you can include that issue in your

17   briefing that would be helpful to the Court.  So, both the

18   nexus issue and unanimity question.

19             All right.  The stipulations in the case, I just want

20   to go over those.  There's a stipulation that Mr. Irish was

21   convicted of a felony and knew it was a felony, and the

22   government is going to at some point introduce that and either

23   read it to the jury or have me read it to the jury, and then I

24   give a separate instruction on that stipulation in the jury

25   instructions.

1          Okay.  The definition of a firearm there's no

2    stipulation.

3          MR. FALKNER:  No, your Honor.  And could I just

4    briefly inquire -- so, there are exhibits labeled

5    "Stipulation," which are 1 and 2, which are not stipulations in

6    this case.  That's something different.  But as to the

7    stipulation that we reached about the felony status, the

8    government has listed that as an exhibit.  I don't necessarily

9    have any position on it, only because we had discussed it with

10   the government as to whether you intend it to be an exhibit or

11   just read to the jury and a fact that the jury is to accept.  I

12   just flag the issue, because at some point it will come up.  I

13   don't necessarily object to it being an exhibit, but I don't

14   know what your Honor's practice is.

15         THE COURT:  That's easy.  We can deal with that when

16   it comes up, and I don't think that's an issue that's going to

17   make or break anything.  Ultimately, it does have to be read to

18   them, it does have to be part of the evidence.  How it comes

19   in -- I think reading it to the jury is fine.  If you want it

20   also to be an exhibit, tell me why that's not feasible, kosher.

21         MR. FALKNER:  I don't have an objection to it.

22         THE COURT:  Okay.  So, we'll just let the government

23   decide how they're going to introduce that at the time.

24         MR. FALKNER:  That's fine.  I just want to be careful

25   because that their Exhibits 1 and 2 are labeled as

1      stipulations, that somehow it's differentiated from the jury

2      that those are not the same as stipulations as defined in your

3      jury instructions.

4               THE COURT:  Okay.  Can you explain that, Attorney

5      Krasinski?

6               MS. KRASINSKI:  Sure, your Honor.  The defendant was

7      convicted in this court of aiding and abetting a straw purchase

8      and lying to a federal agent.  At the conclusion of that case

9      he directed that his firearms, rather than the FBI retaining

10     them, directed that they go to someone else, this individual

11     Roscoe Whitney.  So, in the context of that case in 2015 the

12     defendant signed a stipulation saying, you know, "These were my

13     firearms.  I understand and agree that these will be turned

14     over by the government to Roscoe Whitney."

15               And then, in the context of releasing these firearms,

16     this individual, Roscoe Whitney, also filed what we're calling

17     a "stipulation."  I mean, it says, "I, Roscoe Whitney, do

18     hereby stipulate the following," the fact that he takes

19     possession of these firearms, he agrees not to return them to

20     the defendant.  So, I think we can address that in jury

21     instructions when you're instructing --

22               THE COURT:  Can I ask you a quick question?  Which of

23     these are the same guns as in this case?

24               MS. KRASINSKI:  So, the 1911 handgun and --

25               THE COURT:  Which is that?  Because I'm looking at

1    Roscoe Whitney.

2            MS. KRASINSKI:  1 and 2.

3            THE COURT:  1 and 2?

4            MS. KRASINSKI:  Yes, your Honor.

5            THE COURT:  Okay.  So, those same exact guns,

6    firearms, appear in this case?

7            MS. KRASINSKI:  Yes, your Honor.

8            THE COURT:  Okay.  Why does the jury need to see the

9    other gun and the other ammunition?  That's a stipulation

10   dealing with a prior case.  Certainly, the fact that Roscoe

11   Whitney took personal possession, and he can testify to that,

12   and if he's cross-examined his credibility is challenged on

13   this, it seems to me, then, this would come in to rehabilitate

14   his credibility, but --

15           MS. KRASINSKI:  Are you talking about the entire

16   stipulation itself or the firearms that are not at issue in

17   this case?

18           THE COURT:  I'm talking about the firearms not at

19   issue.  I don't know.  I should let Attorney Faulkner raise

20   objections to it, to the extent you have any.  But I'm looking

21   at it thinking that that may be his objection, that this would

22   introduce further firearms and introduce prejudice.

23           Attorney Faulkner, go ahead.

24           MR. FALKNER:  Well, I guess I do have a problem with

25   -- so, in terms of this stipulation, which is Exhibit 1, I

1    guess --

2         THE COURT:  We're looking at Exhibit 1 now?

3         MR. FALKNER:  Or whichever exhibit you want to address

4    first.

5         THE COURT:  Okay.  Exhibit 1 has references to guns

6    and then ammunition.

7         MR. FALKNER:  Right.  And I guess I think Part 3

8    should be redacted and redacted in a form that simply doesn't

9    indicate that there's something missing, so rather than blacked

10   out perhaps whited out or something to that effect.

11        THE COURT:  So, you don't object to the actual

12   document being admitted with redactions?

13        MR. FALKNER:  I'm not sure that I can, because I think

14   the government's theory is that these were his guns all along

15   and that this is some evidence that they were his guns in the

16   first instance.

17        THE COURT:  Okay.  And does the government, do you

18   have any problem redacting the guns that aren't relevant to

19   this case?

20        MS. KRASINSKI:  So, on Exhibit 1 the only firearms

21   listed are firearms relevant to this case.

22        THE COURT:  Right.

23        MS. KRASINSKI:  So, Paragraph 3 relates to ammunition.

24   I think there will be testimony that witnesses who saw all of

25   this stuff in the case that it was ultimately seized in still

1   had evidence tape on it, not the firearms themselves, but bags

2   of ammunition, things like that.  So, I think it is relevant to

3   whether or not the defendant got all of this stuff that was

4   once his was, we believe, given back to him.  So, I think it is

5   relevant in that broader context.  The jury is going to hear

6   evidence about all of the ammunition and magazines that were

7   found in the case with these three firearms as well.

8           THE COURT:  That makes sense to me, Attorney Faulkner,

9   in terms of Exhibit 1.  This is the problem with ruling on

10  evidentiary questions before I hear the evidence --

11          MR. FALKNER:  I know.

12          THE COURT:  -- and out of context of evidence.  So,

13  look at Exhibit 1, if you would, and just are you okay with the

14  admission of that at this point, as you understand the

15  government's case?

16          MR. FALKNER:  And I guess I would just reiterate the

17  same thing.  Even if there is other testimony, he's not

18  contesting that they were his guns.  We're not objecting to the

19  fact that he owned these two guns.  There's just no -- there's

20  minimal, if any, probative value to the fact that there was

21  also ammunition seized, and so, as a result of that, I think

22  that Paragraph 3 ought to be redacted just under Rule 403, just

23  because it's, again, we know he has the ammunition now, but

24  he's not contesting that these were his firearms in the first

25  instance.  So, as a result of that, I think under 403 that

1    third paragraph referencing the ammunition ought to come out.

2              THE COURT:  All right.  And you want to keep it in?

3              MS. KRASINSKI:  Yes, your Honor.

4              THE COURT:  Okay.  All right.  I'm not seeing huge

5    prejudice with respect to Paragraph 3 of the first exhibit, but

6    I'm going to withhold ruling on that until we hear the evidence

7    and I can make a ruling in the context of the evidence.  I

8    think Exhibit 2 -- now, Exhibit 2 has a gun and ammunition that

9    are not part of this case; is that right?

10             MR. FALKNER:  That's right.

11             THE COURT:  And you're not objecting to 1 and 2.  It's

12   just 3 and 4.

13             MR. FALKNER:  Correct.  There's another problem with

14   Exhibit 2 that we can get to.

15             THE COURT:  Okay.  Go ahead.

16             MR. FALKNER:  On Page 2 I'm concerned about Paragraph

17   3 and, in particular, about the second sentence of Paragraph 3.

18             THE COURT:  Okay.  Go ahead.

19             MR. FALKNER:  And my main concern about that, I do

20   expect -- well, I shouldn't say "I expect."  I don't know

21   whether Roscoe Whitney will testify or not.  He has counsel.

22   But assuming that he does testify, and assuming -- certainly

23   there may well be cross-examination about the fact that he knew

24   he wasn't supposed to return these guns to him, but to suggest

25   that giving the guns constituted -- would constitute him aiding

1   and abetting the crime of being a felon in possession sort of

2   tells the jury, in essence, that that is the crime that has

3   been committed here and that's what the jury is here to decide.

4   So, I think, one, it's a danger of confusing and/or misleading

5   the jury and also a danger of unfair prejudice.  It's

6   essentially -- it's saying it could constitute that crime,

7   which invites the jury to speculate, and there's really, I

8   don't see any probative value to that evidence.

9          THE COURT:  Let me hear from the government.

10          MS. WEILAND:  On that point, your Honor, a few things

11  the government would say.  First of all, the government's

12  position is that this is simply sort of baked into

13  Mr. Whitney's dealings with the FBI in terms of the release of

14  weapons to him and the circumstances surrounding that release,

15  his understanding of the limitations, you know, that were

16  imposed on him.  He was given this admonishment by the FBI.

17  So, on the one hand, it's just sort of baked into his dealings

18  with the FBI in regards to receiving the firearms.

19          The witness -- we're not seeking to introduce evidence

20  that the witness has been charged with aiding and abetting the

21  possession of a firearm by a felon, and, in fact, this witness

22  hasn't been charged with that.  I could see the introduction of

23  that type of evidence being perhaps, you know, prejudicial in

24  the sense that it presupposes that the defendant has committed

25  this crime, but that's not what the government is seeking to

1    introduce.  It's simply the mere fact that he was admonished

2    that doing so could constitute a crime I don't think

3    presupposes that the defendant has committed that crime.

4         But third, your Honor, and most importantly, as

5    Attorney Faulkner has said, we fully expect that Mr. Whitney

6    will be cross-examined on the legality of his conduct in regard

7    to the firearms.  And so, to the extent that Attorney Faulkner

8    intends to elicit that testimony anyway, I don't see how the

9    introduction of this document adds any additional prejudice

10   that might already be suggested by cross-examination on that

11   topic.

12        Now, if Attorney Faulkner stated that he wanted to

13   avoid that line of questioning entirely and not cross-examine

14   Mr. Whitney on the legality of his own conduct in regards to

15   this case, then I could see redacting that portion of the

16   stipulation.  But to the extent that that line of questioning

17   is coming in, which Attorney Faulkner has represented that he

18   would elicit testimony like that, I don't see how this adds to

19   or creates any unfair prejudice.

20        THE COURT:  Go ahead.

21        MR. FALKNER:  Just briefly in response, I'm not sure

22   that I can elicit testimony as to the legality or illegality of

23   any conduct.  I think I can elicit testimony as to the conduct

24   itself, and whether he's concerned about legal consequences

25   could potentially be relevant to bias, but whether conduct is

1   actually legal or illegal, I don't think any witness can

2   testify to the legality or illegality of his own conduct.  So,

3   I'm not sure why the government document would be able to do

4   what a witness cannot do.

5           THE COURT:  Okay.  It looks like Stipulation 1 --

6   calling them "stipulations" does seem problematic, because,

7   obviously, there are stipulations that Mr. Irish has entered

8   into for this trial, so I think we'll have to deal with that

9   issue.

10          But Exhibit 1 is clearly highly relevant with respect

11  to Mr. Irish's stipulation that the guns were his.  Again, he's

12  not contesting that in this trial.  So, this exhibit, it seems

13  to me Roscoe Whitney is going to be testifying, and to the

14  extent some issue comes up that would challenge something that

15  he has said in this stipulation or his credibility -- and,

16  again, I just don't know the facts well enough -- but

17  ultimately it seems to me this could easily become relevant

18  somehow based on what Mr. Whitney testifies to.  But I'm not

19  sure I'm seeing the relevance beyond -- he tells his story.  As

20  you said, as part of his dealings with the FBI he testifies to

21  those facts, and assuming those facts aren't really challenged,

22  I'm not seeing the need for the jury to actually see the signed

23  stipulation, but I could see it becoming relevant perhaps to

24  rehabilitate him somehow.

25          MS. WEILAND:  The one thing I will note, your Honor,

1    is it does include a clear identification of the firearms and

2    the fact that two of the firearms are identified by serial

3    number that these were the same guns that were released to

4    Roscoe Whitney are the same guns that are at issue in this

5    case.

6             THE COURT:  Okay.  And if that becomes an issue, if

7    that somehow is challenged, which he's stipulating that he was

8    a felon, he's stipulating that he knew he was a felon, and with

9    respect to Exhibit 1 he has stipulated to ownership of at least

10   those two guns listed in Stipulation 1, Exhibit 1, and what

11   Roscoe Whitney has stipulated to with respect to guns does not

12   seem as relevant in terms of the documentary evidence at

13   Exhibit 2, but I could see it coming in, I could see it

14   becoming relevant.  That's my take on it without the benefit of

15   the context of the trial.  So, obviously, I'm just giving you a

16   sense of my initial impression with regard to Exhibits 1 and 2.

17            It looks like you've agreed, however, on most of the

18   other exhibits.  There are only some that are still marked with

19   ID.

20            MS. KRASINSKI:  Yeah.  I will note that there are two

21   that I inadvertently removed the ID from, and I will file an

22   amended list.  29a and 29r should still be marked for

23   identification purposes, but the remainder where the ID has

24   been stricken are accurate.

25            THE COURT:  All right.  And are there any other

1    evidentiary issues with respect to these exhibits that we

2    should go over now so that I have a heads-up on them and I can

3    do some research, I can take less of the jury's time when the

4    issue happens to come up during the trial?

5           MR. FALKNER:  The motions *in limine* that were filed

6    with regard to Exhibit 4 and Exhibit 34.

7           THE COURT:  Those are going to be the main issues?

8    Okay.  All right.

9           MS. KRASINSKI:  And then I have one just sort of minor

10   issue.  As you'll note on the exhibit list, there are a number

11   of exhibits that are marked by ".r."

12          THE COURT:  Yes.

13          MS. KRASINSKI:  Sort of redacted versions.  For

14   purposes of the trial, and I've discussed this with counsel, we

15   intend to use the non-redacted versions, but for purposes of

16   what is then publicly available in the Clerk's Office, some of

17   these have information that, while relevant for the jury's

18   purposes, people's phone numbers, things like that, shouldn't

19   necessarily be in the public record.

20          So, under Rule 49.1(f) of the *Federal Rules of*

21   *Criminal Procedure*, to the extent that an exhibit that has that

22   information, for example, Exhibit 4, if it's admitted, or some

23   of these other, you know, Exhibit 29A, if they are admitted at

24   trial, I would ask that for purposes of the record after trial

25   that they be sealed and that the redacted version be the

1       publicly accessible version.

2              THE COURT:  Okay.  So, anything that is marked with

3       ".r" is the version that would go in the public record?

4              MS. KRASINSKI:  Correct, your Honor.

5              THE COURT:  All right.  Is that all right with you in

6       terms of procedure, Attorney Esposito?

7              THE CLERK:  I think so, your Honor.  I think it's

8       okay.

9              THE COURT:  All right.  And before we get to the

10      evidentiary motions *in limine*, Roscoe Whitney, I went ahead and

11      appointed counsel just so that this can go smoothly and counsel

12      can at least consult with him before we begin the trial,

13      hopefully.  Can you give me an update on him, his arrival time?

14      I know Attorney Reese has agreed to represent him if, in fact,

15      he wants a lawyer.

16             And just suggest to me the procedure you would prefer

17      in terms of how to handle Mr. Whitney, and, obviously, it would

18      be done outside of the presence of the jury, but what would be

19      your preferred approach to Mr. Whitney?  Obviously, number one,

20      does he even want a lawyer, does he qualify for appointed

21      counsel?  Obviously, I've made the appointment because I don't

22      want there to be any delay.  So, I would need to find out what

23      his position is with respect to an attorney, and then, if he is

24      going to testify, then I would need to go through some sort of

25      colloquy with him about his Fifth Amendment rights and his

1     waiver of his right to counsel, even, I think.  What are your

2     preferred methods?

3                 MS. KRASINSKI:  So, I understand that he met with

4     counsel yesterday.  We intend to meet with him and counsel

5     today.  We have not done so yet, but we intend to, and, once

6     it's executed I'll provide a copy to defense counsel, grant him

7     immunity.  He will be testifying, so once those documents are

8     executed we'll get a copy to Attorney Faulkner.

9                 THE COURT:  Okay.  So, the government will be actually

10    granting him immunity to testify?

11                MS. KRASINSKI:  Yes, your Honor.

12                THE COURT:  Okay.  All right.  That's important to

13    know.  All right.

14                MR. FALKNER:  And, your Honor, that's the first that

15    I've learned of that.  I would just -- I think there may be

16    appropriate jury instructions that need to be addressed.

17                THE COURT:  We will look into that and add those as

18    well.  All right.  But at least that probably is going to

19    obviate the whole issue of the Fifth Amendment, so I am glad I

20    did appoint him counsel ahead of time to help advise him on

21    that.

22          All right.  Let's go through, then -- any other issues

23    out there that you want to raise before we get into the motions

24    *in limine*?

25                MS. KRASINSKI:  There are two other issues.  One of

1    the government's witnesses is Neil Prive.  He had a substance

2    abuse problem.  He has been clean for approximately 15 months.

3    He was clean for the purposes of all of the time frame alleged

4    in this indictment.  So, what we have discussed with Attorney

5    Faulkner is outside of the presence of the jury inquiring as to

6    whether he remains sober, and if he is not delving into that in

7    front of the jury, if he has had a relapse, that obviously is

8    something that will be discussed in front of the jury.  But

9    because he has been clean for 15 months and was not using

10   during the time period alleged in the indictment, that's the

11   procedure that we've agreed to.

12          THE COURT:  You've agreed to that, then, Attorney

13   Faulkner?

14          MR. FALKNER:  To the voir dire out of the presence of

15   the jury?  I believe that that's correct, and my reasoning on

16   it, your Honor, is this:  In previous cases my understanding of

17   the case law is that a witness can be examined as to substance

18   use if they were using a substance at the time of their

19   perception of events or if they were using a substance at the

20   time they're testifying but not necessarily based on just past

21   use or at other times.  I don't necessarily have a good-faith

22   basis to be able to ask him if he's currently using substances

23   in front of the jury, but I think, given the extent of his

24   substance abuse history, if we could voir dire him, I think

25   that would be appropriate.

1          THE COURT:  Okay.  And just let you voir dire him out

2     of the presence of the jury?  Is that what you're asking?

3          MR. FALKNER:  Correct.

4          THE COURT:  Okay.  And it would be essentially

5     confirming that he was clean and sober for the 15 months that

6     are relevant.  Are there 15 months, is the span?

7          MS. KRASINSKI:  Well, he has been clean for

8     approximately 15 months.

9          THE COURT:  Okay.  And so, you would establish that

10    through questions and then whether or not he has had any

11    relapses and whether he's currently clean and sober.

12         MR. FALKNER:  Yes.

13         THE COURT:  Okay.  All right.  Thank you for bringing

14    that to my attention.  Anything else?

15         MS. KRASINSKI:  One other issue.

16         THE COURT:  Yes.

17         MS. KRASINSKI:  We anticipate that one of the

18    witnesses, Peter Dugay, will testify that he was driving in a

19    vehicle where the defendant was in the passenger seat, and he

20    heard the defendant, the only other person in the car, he heard

21    the distinct sound of the defendant racking the slide of his

22    pistol.  Because he was driving, watching the road, he heard

23    the sound, he didn't see it.  So, obviously this involves

24    firearms, it involves firearms in the courtroom, and so I would

25    like to, with the Court's blessing --

1          THE COURT:  Make the sound?

2          MS. KRASINSKI:  Make the sound.  Obviously, the

3    firearms will not be loaded; both the FBI and the Marshals will

4    ensure that they are rendered safe before they are brought into

5    the courtroom.  But I did not want to make the sound of racking

6    a slide without notifying the Court first and making sure the

7    Marshals were aware of it as well.

8          THE COURT:  Thank you.

9          MS. KRASINSKI:  So, I would like the Court's

10   permission to do that.

11         THE COURT:  Any objection to that, Attorney Faulkner?

12         MR. FALKNER:  No.

13         THE COURT:  Okay.  All right.  Thank you for the

14   advance notice.

15         All right.  Attorney Faulkner, any other issues you

16   can think of that you might want to bring to my attention now

17   so I can have the benefit of thought, research?

18         MR. FALKNER:  Yes.  There were two issues with Peter

19   Dugay, and, now that I'm looking at my notes, I addressed one

20   of them with the government, and they agreed not to be

21   eliciting the testimony that Mr. Dugay had told federal

22   investigators that at some point he asked Mr. Irish to -- or

23   Irish at some point took possession of Mr. Dugay's rifle for a

24   short period of time and then returned it.  I don't remember

25   who asked who.  But that was, essentially, the line of

1    questioning.  The government does not intend to elicit that.  I

2    should have at the same time conferenced with the government,

3    and I didn't have a chance to.  Mr. Dugay says that at some

4    point Mr. Irish had a lower receiver from an AR and explained

5    how the rest of the rifle could be built.  I don't think

6    there's any evidence that that's the lower receiver from this

7    AR, because I don't think there's any testimony that this one

8    at any relevant point in time was anything other than fully

9    constructed.  But that clearly would be 404(b) evidence, and so

10   I just -- I don't whether the government intends to elicit it

11   and it's something that I may need to file a further motion *in*

12   *limine* as to.

13            MS. KRASINSKI:  We don't intend to elicit it, your

14   Honor.

15            THE COURT:  All right.  That makes it easy.

16            MR. FALKNER:  Perfect.

17            THE COURT:  All right.  So, both those issues the

18   government's agreeing not to ask about that.

19            MS. KRASINSKI:  Correct, your Honor.

20            THE COURT:  All right.  Let's start with the 404(b)

21   Document Number 16, and my understanding is that Attorney

22   Faulkner wants to keep out the 2014 convictions for false

23   statement and also -- is it just the false statement

24   conviction, or is it also the charge, the conviction for --

25   that was a false statement as well.  The girlfriend or wife is

1    a straw purchaser.  Those two convictions in 2014?

2         MR. FALKNER:  Right.  And I think the issue isn't the

3    convictions themselves but the conduct underlying it.  And so,

4    it's my understanding that the government -- and I guess the

5    reason why I filed this as a motion *in limine* is the government

6    has indicated that it does not intend to elicit this evidence

7    unless the defendant opens the door, and I'm not quite sure in

8    the context of this case, and even in the context of their

9    response, exactly what that means.

10        In this case at the very least Mr. Irish made a

11   statement to Mr. Dugay that the 1911 belonged to Stephanie

12   Irish, and there's some evidence that the jury could either

13   interpret it as her sole possession or joint possession, and

14   there's evidence that when she leaves the house he tries to get

15   the firearms out of the house.  And so, the question I have is,

16   all that was established in the previous case with regard to

17   Stephanie Irish is that he sent her to a store to buy a firearm

18   on his behalf and that was a lie.  So, we've got one occasion

19   in the past six or, you know, five to six years before the

20   conduct in this case where she's used her name, she has used

21   her name falsely at a store to purchase the firearm.  The

22   contention in this case is that she actually does possess these

23   firearms, and if Mr. Irish were to testify it certainly may be

24   possible that some of this evidence comes in, but simply

25   cross-examining the government and holding -- or the

1    government's witnesses and holding the government to its burden

2    of proof as to whether it's proven that these guns were in the

3    possession of Mr. Irish versus Mrs. Irish doesn't seem to me to

4    be sufficient to open the door to this kind of evidence that

5    the government intends to elicit, and I'm concerned that by

6    simply eliciting that evidence they're going to be considered

7    opening that door, and I'm just trying to get some guidance

8    from the Court to make sure that I'm not crossing any lines

9    that open the door to that evidence.

10            THE COURT:  Okay.  How would he be opening the door to

11    this?

12            MS. KRASINSKI:  So, I don't think standard, you know,

13    cross-examination on whether or not the witnesses know whether

14    the defendant possessed it or if it was his wife's, I don't

15    know that I think that opens the door.

16            THE COURT:  You just can't predict what might happen;

17    is that what you're saying?

18            MS. KRASINSKI:  Exactly.

19            THE COURT:  Yeah.

20            MS. KRASINSKI:  And what I can tell your Honor is

21    that, if something happens where we think the door has been

22    opened, we'll ask to approach.  We'll discuss it with your

23    Honor.  Honestly, I don't have an example of what a question

24    would be that would open the door, but I didn't want to fail to

25    notify, fail to include it in a 404(b) notice and then have

1    something unanticipated happen at trial and be limited.

2         THE COURT:  Okay.  It sounds like it's not going to

3    come in.  It is extremely prejudicial, so even if it becomes

4    relevant, if somehow the door is opened, I would still have to

5    do a 403 analysis.

6         So, I think this one seems doubtful, Attorney

7    Faulkner, but I think there are ways where you could create a

8    misleading misimpression somehow, and then the government

9    approaches, I weigh that, and I decide whether or not that

10   needs to be cured and whether or not the prejudice is still so

11   great that the cure is not probative enough.  So, I would do

12   all of that in the context of whatever would happen, but I just

13   don't see you creating some obviously misleading impression

14   that will then make this somehow relevant.

15        So, I'll put this one to the side, and I appreciate

16   you both alerting me to that.

17        Now, we've got photographs and we've got something

18   from Mr. Irish's phone.  Let's start with the photos, and I'm

19   going to be honest.  I have a hard time just understanding how

20   these photos come in.  I can see -- the problem is the jury's

21   going to see the photos, the jury's going to hear that the

22   officer received them on the 27th, a relevant time date, but

23   there's no testimony about when the photo was taken, and so I

24   just see the jury looking at the photo and assuming that this

25   was taken now and is relevant now and was taken by Ms. Irish at

1    the relevant time, but ultimately what you're introducing it

2    for I think, as you describe, is just to simply describe the

3    narrative, how did this case start, and I think these photos

4    are problematic in terms of the potential for confusion and

5    potential for misleading the jury and also potential prejudice.

6    That's just my take on reading the paragraph and then your

7    attempt to justify authentication of these photos, but I'm

8    having trouble with that.  I understand your argument.  He's

9    going to recognize an item in the photo, but, still, I have

10   some serious concerns about admitting the photo.

11           MS. KRASINSKI:  I understand that, your Honor.  I have

12   to say, when I was looking at it and talking about it and

13   thinking about how to discuss how the case investigation was

14   initiated, testimony that he received -- that I received

15   photographs from Stephanie Irish.  He can describe, "One of

16   them included a firearm that I knew to be the firearm that I

17   had seized from the defendant who had given it to Roscoe

18   Whitney."

19           If the jury doesn't see the photographs they might

20   actually think they are more or worse than what they are.  I

21   mean, here it's clear I don't think that -- I mean, we would

22   elicit testimony that, "You don't know when these were taken."

23   These don't put the firearms in his hand.  It is just what

24   initiated the investigation.

25           My broader concern, if we don't use the photographs,

1   is that the jury has some idea in their mind that the

2   photographs are more than what it is they actually are.

3          THE COURT:  Let me hear from Attorney Faulkner on

4   that, because, obviously, if you think that's more

5   prejudicial --

6          MR. FALKNER:  Your Honor, frankly, the testimony that

7   the government is describing here in this courtroom I think is

8   as problematic as the photos themselves, because, in essence,

9   it's one thing for the FBI to testify, "We were concerned" --

10  or, "We received information that Mr. Irish might be in

11  possession of firearms," something generalized to that degree.

12  But now they want to specify that that information came from

13  Stephanie Irish without putting Stephanie Irish on the witness

14  stand and essentially amounts to an accusation by Stephanie

15  Irish that Jonathan Irish is in possession of the firearms,

16  which is the very question that the jury is to decide.

17         THE COURT:  I'm going to keep the photographs out.

18  They're just too problematic and not relevant or probative

19  enough, and obviously Attorney Faulkner is not concerned about

20  the prejudice that you were just talking about.

21         MR. FALKNER:  But I'm also concerned about the

22  testimony, your Honor, that was just described.  I realize it

23  wasn't part of the motion, but the government's proposition

24  that the agent be testifying that Stephanie Irish is the person

25  that suggested that he was in possession of firearms to the

1    FBI.

2          THE COURT:  How does that come in?  How is it not for

3    the truth of the matter?

4          MS. KRASINSKI:  We're not going to elicit testimony of

5    what she said, but I think the fact that on December 26th Agent

6    Christiana can say, "I received a phone call from Stephanie

7    Irish on December 27th.  I received photographs from Stephanie

8    Irish.  One of the photographs contained a firearm that I was

9    familiar with.  In light of the circumstances, my knowledge of

10   the defendant, he is the -- "

11         THE COURT:  I get it.  I get that that's what he's

12   going to testify she said to him.  What's the exception?

13         MS. KRASINSKI:  He's not going to testify what she

14   said.  The fact that he spoke to her, the fact that he received

15   photographs, none of that's hearsay, so there's no exception

16   needed.

17         THE COURT:  Okay.

18         MS. KRASINSKI:  The fact that he got photographs on

19   his phone and the photograph is of something that he

20   recognizes, he recognizes that specific firearm, he recognizes

21   that specific vehicle as a vehicle that he has seen the

22   defendant driving in the past, and because he is the same agent

23   that seized those firearms from the defendant in 2013, he's the

24   same agent that released this firearm to Roscoe Whitney, he

25   sees all of this and he says, "Okay, I'm going to assign an

1     agent to investigate whether or not the defendant is in

2     possession of these firearms."

3          THE COURT:  Right.  There is content there that is

4     conveyed to the jury about what essentially this witness who is

5     not going to testify as saying, and he doesn't have an

6     opportunity to cross-examine Irish or confront her.

7          MS. KRASINSKI:  But him saying, "I spoke to someone,"

8     without revealing the contents of what she said --

9          THE COURT:  Why can't he just generally testify, "I

10    learned and became concerned, so I started my investigation"?

11    Why do you need all of those details?  Why couldn't he just

12    generally describe his renewed investigation?

13         MS. KRASINSKI:  Because it relates, in particular, to

14    this firearm that was the defendant's, was released to

15    Mr. Whitney, and now is the same firearm that was seized and we

16    allege --

17         THE COURT:  Then, call Ms. Irish and put her on, and

18    she can talk about the photos, she can identify it, she can

19    talk about when she took it, and all of that then becomes

20    something he can confront.  But, as it is, you're describing

21    something that you're saying is not that relevant, it's just

22    part of the story, "I want to tell the jury how he began his

23    investigation;" but the risk, on the other hand, is that the

24    jury is implying all kinds of testimony from Ms. Irish about

25    the guns, the photo, the fact that Mr. Irish does certainly

1   imply that she's trying to rat him out somehow and that he's

2   possessing weapons, and that's the very issue in the case.  So,

3   without her testifying I don't see -- I think that's too -- I

4   mean, I think what he's doing is testifying essentially to

5   hearsay without maybe exactly saying what she's telling him, by

6   the way you're describing the testimony.  So, it seems to me

7   that you would need Ms. Irish to get these photos in and to get

8   that conversation in under some hearsay exception.

9           MS. KRASINSKI:  So, I want to make sure that I don't

10  cross any lines when I have Agent Christiana on the stand, that

11  he received a call from someone he knew.

12          THE COURT:  He received a call.  It alerted him that

13  he wanted to investigate this.  However you want to elicit that

14  from him without bringing in the whole story of Ms. Irish, who

15  is a witness who is, as I understand it, not going to testify,

16  then it seems to me it obviates this confrontation problem.

17          MS. KRASINSKI:  Okay.

18          THE COURT:  Okay.  And maybe just let Attorney

19  Faulkner know how you're going to do that with the witness so

20  he's prepared and doesn't -- I think he could open the door to

21  it if he starts challenging Officer Christiana about how he

22  came to learn that he should be investigating this.

23          MS. KRASINSKI:  Yes, your Honor.

24          THE COURT:  Okay.  So, essentially the photos are out,

25  and the testimony about the photos and the conversations with

1   Ms. Irish, even obliquely referenced, that is all out.

2          All right.  The information from Mr. Irish's phone

3   seems to me of limited probative value.  I'm not sure how it's

4   prejudicial.  So, go ahead, Attorney Faulkner.  How is that

5   prejudicial that he would be looking that up?

6          MR. FALKNER:  Your Honor, so the download to the phone

7   occurs, according to the phone records, on -- just a moment.

8   Reviewing the trial exhibits, the extraction report to the

9   phone indicates that on December 13th of 2019 a document

10  entitled "Quick Facts Felon in Possession of a Firearm" was

11  downloaded to the phone.  The firearms in this case were seized

12  from Gary Roya just after Thanksgiving, so about two weeks

13  before.  I expect there to be a decent amount of testimony that

14  Mr. Roya knows Jonathan Irish's mother very well and, indeed,

15  that Mr. Irish's mother and/or Mr. Irish had conversations with

16  Mr. Roya about those firearms being seized, and, again, there's

17  going to be a fair amount of testimony that those firearms came

18  out of Mr. Irish's house.

19          And so, what I would suggest is -- and, again, we're

20  not challenging the fact that he was, indeed, a felon and that

21  he knew he was a felon, and certainly, knowing that he's a

22  felon, these firearms which had come out of his house, had just

23  been seized by federal agents and that the federal agents were

24  interviewing people about the source of the firearms, and

25  shortly before his arrest he downloads a document to determine

1    what are the penalties for this crime that he may well be

2    charged with, I'm not sure that that demonstrates a

3    consciousness of guilt as opposed to simply telling the jury,

4    again, presupposes just what the crime is and just what it is

5    they are to decide.  It doesn't give any insight as to whether

6    he -- all it gives insight into is whether he's concerned that

7    he may be charged with this.  Well, that's a very valid

8    concern, given all the circumstances, very few of which he's

9    even contesting.

10              THE COURT:  Let me hear from the government.  I think

11   it does -- I mean, it's probative on consciousness of guilt,

12   but somebody who is just also wanting to look at risks of being

13   charged with something like this might look that up, that seems

14   an argument you make to the jury, but it seems minimally

15   probative.  I'm not seeing how it's particularly prejudicial.

16              MR. FALKNER:  Perhaps the document itself should also

17   come in.

18              THE COURT:  Maybe I should look at that.  Were you

19   planning on introducing that?

20              MS. KRASINSKI:  I wasn't, your Honor, because -- I did

21   bring a copy today.  It relates to the penalties and, given

22   that penalties are not in the purview of the jury --

23              THE COURT:  Yeah.

24              MS. KRASINSKI:  May I approach?

25              THE COURT:  Do you have other evidence of

1    consciousness of guilt?

2         MS. KRASINSKI:  We do, your Honor.  In this time frame

3    and after the firearms were out of his physical possession he

4    and his mother sort of made this scheme to look like the

5    firearms were never in his possession.  So, our evidence will

6    be that the firearms went from the FBI to Roscoe Whitney, back

7    into the defendant's household, and then from the defendant to

8    his cousin Neil Prive, and then from Mr. Prive to who they were

9    ultimately seized from, Gary Roya.

10        After that transfer occurred the defendant's mother

11   sent Gary Roya a document to have him sign indicating that the

12   firearms were transferred to him directly from Roscoe Whitney,

13   and we anticipate both Roscoe Whitney and Neil Prive will say

14   that that's false, that the transfer occurred approximately a

15   month earlier than the actual transfer, that the defendant

16   asked Roscoe Whitney to lie to federal agents about whether or

17   not the firearms ever left his possession and was inquiring of

18   other witnesses whether or not they were talking to federal

19   informants.

20        In fact, on a relatively recent jail call the

21   defendant directed his aunt to tell Mr. Prive, in his words,

22   I'm not sure I'll get them exactly accurate, "The Duke boys

23   stick together," which Mr. Prive understood to mean the

24   defendant instructing him not to testify or not to testify

25   truthfully.  So, it's in the context of that broader conduct.

1        MR. FALKNER:  Your Honor, I expect there to be a

2   substantial amount of potential consciousness of guilt evidence

3   coming in as part of the government's case.  I don't know that

4   this -- it just seems, given the evidence that they intend to

5   elicit and the scope of it, this just seems to add almost

6   nothing to the mix, and, in particular, just given that it

7   relates specifically to the crime at issue I think that it's

8   unfairly prejudicial.

9        THE COURT:  Well, that's exactly why it's probative,

10  too, ultimately, because the government's arguing he's aware

11  he's going to be charged with this, he's concerned about

12  possession.  This won't come in.  This document won't come in.

13  But I think ultimately this is so -- I think that it shows some

14  consciousness of guilt, and I think the consciousness of guilt

15  that it shows is also, frankly, the same prejudice.  And the

16  prejudice is not just any prejudice; it has to outweigh the

17  probative value.  And I will weigh that, I think, in the middle

18  of the trial, but, as I sit here, I see this one as coming in,

19  but I'd like to make that ruling at the time in the context of

20  all of the other evidence that the government just laid out,

21  but I could also see in the moment deciding that it just isn't

22  moving the needle in either direction or certainly not moving

23  it significantly enough to inject the prejudice into the case.

24  So, I really want to rule on this I think in the context of the

25  trial, but, as I sit here, I think I would probably allow it

1    in.

2    MR. FALKNER:  Can I just -- I understand your Honor is

3    not making a ruling now.  Just I think a couple of points for

4    consideration are that the title of the document coming in

5    without the document itself potentially invites the jury to

6    speculate as to what the document is.  And one of the reasons

7    -- there's obviously issues with the document itself coming in,

8    but the document itself is from the United States Sentencing

9    Commission as opposed to, you know, something else that could

10   have been found on the Internet from --

11   THE COURT:  Right.

12   MR. FALKNER:  -- some kind of fringe group or something

13   like that.

14   THE COURT:  So, what does that show?  I'm saying the

15   document definitely is not coming in.  You're saying --

16   MR. FALKNER:  My point is, though, that showing just

17   the link to the name of the document without the document

18   invites the jury to speculate as to what the document may be as

19   opposed to a document that's produced by the United States

20   government, instead the jury --

21   THE COURT:  They're not going to get into that.  They

22   would just simply -- as I understand, the government's going to

23   offer that they found it on his phone.  It was just a link

24   describing "Quick Facts About Felon in Possession."  But

25   there's no -- I would not permit detailed testimony about that.

1          MR. FALKNER:  I'm not expecting that.  My concern,

2     your Honor, is that, if the jury knows the name of this

3     document but does not know the source of the document, they're

4     invited to speculate as to what the document may actually be.

5     The jury doesn't know that this is a U.S. Sentencing Commission

6     document, like I said, as opposed to, for instance, they may be

7     speculating that it may be from some kind of gun rights group

8     or something like that or from an illegal source.

9          There's also no kind of indication as to how it was

10    downloaded, whether it was sent onto his phone or any other

11    information.  So, I think there's a lot of speculation that

12    comes along with -- just bringing the fact that a document with

13    that title was downloaded to his phone invites an awful lot of

14    speculation in the jury that doesn't need to be there.

15         THE COURT:  I'm not seeing that particularly as

16    persuasive.  The fact that he did a search looking for facts

17    about felon in possession is essentially what the evidence

18    would tend to show.

19         MR. FALKNER:  We don't know that he did a search.  We

20    just know that a document with that title was downloaded to his

21    phone.  We don't know that there was a search done for those

22    facts.  That's exactly, I think, one of the problems here.

23    There's nothing about this --

24         THE COURT:  I thought you knew the exact date and you

25    knew some information about the time at which he had downloaded

1    this to his phone.

2           MR. FALKNER:  We know about the date that it was

3    downloaded, but we don't know how it arrived on the phone.  We

4    don't know whether it was downloaded because somebody else sent

5    it to the phone and it was downloaded or a Google search was

6    done and it was downloaded.  We just know that a document by

7    the name of "Quick Facts Felon in Possession of a Firearm.Pdf"

8    was downloaded to the phone at a specific date and time, and

9    that's it.  So, there's no indication of how it came to be on

10   the phone whatsoever.

11          THE COURT:  Tell me why that's important, why that

12   would exclude just the fact that this was found on his phone on

13   the specific date.

14          MR. FALKNER:  Well, again, I guess I will just point

15   out -- so, for instance, your Honor was speculating as to how

16   it came to be on his phone, did he do a search for it and

17   things like that, and my concern is that the jury does exactly

18   that.  There's all kinds of speculation as to how it came to be

19   on the phone, the source of the document, what the document

20   actually is, and without knowing what this document is the jury

21   just knows that a document by that title is on the phone.  They

22   don't even know what it is.  They don't know that he searched

23   for it.  They don't know any of that information.

24          THE COURT:  Right.  There's a limited universe of

25   things, ways in which this could have gotten on his phone.  He

1    could have found it on the Internet, somebody could have sent

2    it to him, but it's on his phone on a certain date.  I've told

3    you that I want to make a decision in the context of the trial,

4    and ultimately some of your arguments may become more

5    persuasive in the context of the trial.  So, that's where I am

6    with regard to that issue.

7            Does the government want to say anything else about

8    that?

9            MS. KRASINSKI:  The only thing is in the context of

10   flight -- obviously, there's not much case law on consciousness

11   of guilt and internet downloads.  In the context of flight what

12   the Court does is instruct the jury that one inference the jury

13   can draw from it is consciousness of guilt, but that there are

14   also other inferences the jury can draw from it.  If the Court

15   allows it in and the defendant requests such a limiting

16   instruction, there are other reasons that this could have been

17   downloaded onto the phone and it is up to the jury to determine

18   whether or not it is the --

19           THE COURT:  That's just making me more concerned about

20   admitting it, frankly.  If it's going to raise concerns,

21   ultimately it's of such minimal, I think, probative value that

22   ultimately I think in the context of the trial I may just

23   decide that it's just not coming in.

24           MS. KRASINSKI:  Yes, your Honor.

25           THE COURT:  All right.  Anything further?

1          MR. FALKNER:  No, your Honor.

2          THE COURT:  All right.  Anything further, Attorney

3     Krasinski?

4          MS. KRASINSKI:  Just give me one minute, your Honor.

5          THE COURT:  And if you want to brief any other issues

6     that we've discussed today in your brief, feel free to do so.

7          MR. FALKNER:  Thanks, your Honor.

8          MS. KRASINSKI:  Nothing, your Honor.  Thank you.

9          THE COURT:  All right.  Thank you, Counsel.  Court is

10    adjourned.

11         THE CLERK:  All rise.

12      (WHEREUPON, the proceedings adjourned at 11:14 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4           I, Brenda K. Hancock, RMR, CRR and Official Court

5     Reporter of the United States District Court, do hereby certify

6     that the foregoing transcript constitutes, to the best of my

7     skill and ability, a true and accurate transcription of my

8     stenotype notes taken in the matter of United States v.

9     Johnathon Irish, No. 19-cr-251-01-LM.

10

11

12

13

14    Date: ___3/27/20              /s/ Brenda K. Hancock
                                    Brenda K. Hancock, RMR, CRR
15                                  Official Court Reporter

16

17

18

19

20

21

22

23

24

25