*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 6/25/20

1                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF NEW HAMPSHIRE
2

3     * * * * * * * * * * * * * * * * *
                                       *
4     UNITED STATES OF AMERICA         *
                                       *
5                                      *  No. 1:19-cr-00251-LM-1
              v.                       *  February 11, 2020
6                                      *  12:18 a.m.
                                       *
7     JOHNATHON IRISH,                 *
                                       *
8                                      *
                   Defendant.          *
9                                      *
      * * * * * * * * * * * * * * * * *
10

11              TRANSCRIPT OF JURY TRIAL DAY THREE

12         BEFORE THE HONORABLE LANDYA B. McCAFFERTY

13

14    APPEARANCES:

15

16    For the Government:      AUSA Anna Z. Kraskinski
                               AUSA Kasey Weiland
17                             United States Attorney's Office

18    For the Defendant:       Benjamin L. Falkner, Esq.
                               Krasnoo Klehm & Falkner LLP
19

20

21    Court Reporter:          Brenda K. Hancock, RMR, CRR
                               Official Court Reporter
22                             United States District Court
                               55 Pleasant Street
23                             Concord, NH 03301
                               (603) 225-1454
24

25

1                             I  N  D  E  X

2      WITNESSES:          DIRECT    CROSS      REDIRECT   RECROSS

3      ELIZEBETH MILLETT
       By Ms. Weiland      5                    31
4      By Mr. Falkner                17                    36

5      DAVID MARCOTTE
       By Ms. Weiland      41
6      By Mr. Falkner                51

7      DYLAN ROOSA
       By Ms. Weiland      55                   91
8      By Mr. Falkner                78                    93

9

10     JOHN FORTE
       By Ms. Krasinski    95                   128
       By Mr. Falkner                121
11
       SHAYNE TONGBUA
12     By Ms. Krasinski    134                  160
       By Mr. Falkner                150                   161

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2                      JURY NOT PRESENT

3             THE CLERK:  All rise for the Honorable Court.

4             THE COURT:  Can counsel briefly approach.

5    (SIDEBAR CONFERENCE AS FOLLOWS):

6             THE COURT:  Okay.  What I believe will happen,

7    hopefully Officer LeBlanc will be able to give you advance

8    notice, but to the extent that the Marshal can have somebody

9    identify her ahead of time -- that might be hard, but if they

10   can they're going to give her a warning not to disrupt

11   anything.  That would not be good for anybody, including her

12   son.  And there will be a Marshal here the entire time, and if

13   there is any issue at all I'm going to excuse the jury and then

14   deal with it and, obviously, seek your advice as to what you

15   want me to do or how you want me to handle it as it happens.

16   So, let's hope that doesn't happen.  Let's hope that's just a

17   threat, a boast.

18            MR. FALKNER:  Right.  I only point it out, your Honor,

19   just in terms of any warning to her that it might not benefit

20   her son.  The nature of what she communicated to me was that

21   she intended her presence not to benefit her son, so I'm not

22   sure that that warning will be sufficient.

23            THE COURT:  Okay.  I'm glad you told me that.  All

24   right.

25            So, the other issue is, the more I think about it, the

1     more concerned I am about Fifth Amendment issues, potentially,

2     and I'm still researching the question.  It would have been

3     very helpful if I had this briefed by counsel ahead of time,

4     but my court reporter (sic) is going to try to find counsel,

5     and then at that point, maybe at the end of the day, you can

6     assist in meeting with counsel, getting counsel up to speed, if

7     we can find somebody, in helping counsel connect with Mr. Roya

8     and then deal with that issue.  So, I wanted to give you a

9     heads-up that that's what I am thinking of doing based on what

10    little I've seen.

11             MR. FALKNER:  Understand.

12             THE COURT:  Okay?

13             MR. FALKNER:  Thank you, your Honor.

14             THE COURT:  All right.

15    (END OF SIDEBAR CONFERENCE)

16             THE CLERK:  All rise for the jury.

17             (The jury entered the courtroom at 12:20 p.m.)

18             THE CLERK:  Please be seated.

19             THE COURT:  All right.  Good morning -- good

20    afternoon.  We will proceed.  The government may call its next

21    witness.

22             MS. WEILAND:  Thank you, your Honor.  The United

23    States calls Elizabeth Millett.

24             THE CLERK:  Ms. Millett, before you take the witness

25    stand, though, please remain standing and raise your right

1    hand.

2          **ELIZABETH MILLETT,** having been duly sworn by the

3    Clerk, was examined and testified as follows:

4          THE CLERK:  Thank you.  Please state your full name

5    and spell your last name for the record.

6          THE WITNESS:  Elizabeth Millett, M-I-l-l-e-t-t.

7          THE CLERK:  Thank you very much.  Now you can take a

8    seat on the witness stand.

9                    DIRECT EXAMINATION

10   BY MS. WEILAND:

11   Q.   Good morning, Ms. Millett.

12   A.   Good morning.

13   Q.   If you wouldn't mind adjusting that microphone just to

14   make sure we can hear everything you're saying.

15   A.   Okay.

16   Q.   Thank you.  Ms. Millett, are you employed?

17   A.   No.

18   Q.   Where do you live?

19   A.   Kittery, Maine.

20   Q.   Do you know Johnathon Irish?

21   A.   Yes.

22   Q.   How do you know him?

23   A.   He's married to my daughter.

24   Q.   Is your daughter's name Stephanie?

25   A.   Yes.

1    Q.    How long have they been married?

2    A.    I'm honestly not sure.  A few years.  They've known each

3    other a long time.

4    Q.    Approximately how many years would you say that you've

5    known Mr. Irish?

6    A.    Eight.  I'm not positive.

7    Q.    Are Mr. Irish and your daughter currently separated?

8    A.    Yes.

9    Q.    I want to direct your attention to December of 2018.

10   Where were Mr. Irish and your daughter Stephanie living at that

11   time?

12   A.    I believe it was Bethlehem, New Hampshire.

13   Q.    Okay.  Who else lived in their home?

14   A.    Pardon?

15   Q.    Did anyone else live in the home with your daughter and

16   Mr. Irish?

17   A.    Three children.

18   Q.    Okay.  Did you visit them at their home sometime around

19   the holidays, in December of 2018?

20   A.    Yes.

21   Q.    And at some point during that visit do you recall ever

22   seeing Mr. Irish with a firearm?

23   A.    Yes.

24   Q.    Could you describe that incident, please?

25   A.    I believe it was the week -- around the week before

1    Christmas.  I had taken gifts up, and I noticed that there was

2    a small gun, pistol, whatever it's called, on like the back of

3    his waistline.

4    Q.   Okay.  Let me just stop you for a moment.  Where were you

5    when you made this observation?

6    A.   I believe it was the living room.

7    Q.   You were inside the living room?

8    A.   Yes.

9    Q.   Okay.  Who else was there?

10   A.   Stephanie, the kids.  I believe his mother and dad were

11   there.

12   Q.   Okay.

13   A.   I think so.

14   Q.   Was this like a holiday get-together of sorts?

15   A.   I was just going to take the gifts up to them, and that

16   was about, you know, the only time I had to see them because I

17   think, you know, they do Christmas together.

18   Q.   Okay.  And so, you said that you were in the living room.

19   Where was Mr. Irish?

20   A.   He was in the living room also.

21   Q.   Okay.  And how did it come to be that you observed, you

22   said it was something in his waistband?

23   A.   He was just walking around in the room.

24   Q.   Okay.  And you said you observed -- you said you believe

25   it was a pistol?

1    A.    Yeah.

2    Q.    Are you familiar with firearms?

3    A.    A little bit, but not that much.  I know I never cared for

4    them, but, I mean, I just know small ones, and I call them

5    "pistols" or whatever, and the big ones I just refer to as

6    "rifles" (indicating).

7    Q.    Okay?

8    A.    That's about all I know.

9    Q.    Do you recall what color it was?

10    A.    No, I don't.

11    Q.    Okay.  And when you say you saw it in his waistband, do

12    you remember was it stuck inside his pants, or was it in a

13    holster of some type?

14    A.    I believe it was stuck in his pants.

15    Q.    Okay.  Did you at any point observe Mr. Irish remove the

16    firearm from his waistband?

17    A.    I saw it on him, and he at some point went into another

18    room, and when he came back it was not on him.

19    Q.    Okay.  Did you see where he put it?

20    A.    I did not.

21    Q.    Did you see what room he went into?

22    A.    I believe it was the room off the dining room.  I think

23    the living room, then dining room, and I think maybe the

24    kitchen was off that way.

25    Q.    Okay.  Did there come a time shortly after that visit when

1  the topic of firearms came up in conversation between you and

2  Mr. Irish?

3  A.   There was a time between Christmas and New Year's, I

4  believe, that my daughter had left him and he called me

5  numerous times, and one of the conversations --

6  Q.   Can I stop you for a moment?  You say he called you

7  numerous times.  Was this numerous times in a single day or

8  over the course of --

9  A.   Like, one evening and the following morning.

10  Q.   Okay.  I'm sorry.  Go ahead.  What was the purpose of his

11  repeated calls?

12  A.   Well, he had been calling, wanting me to pick up the

13  grandchildren, and then in one brief conversation he had also

14  asked me to help him remove the guns.

15  Q.   Did you agree to pick up your grandchildren?

16  A.   I told him I could not come up that night.  It was late,

17  it was dark, it was a long drive, and I had taken a sleeping

18  pill already, and I was not going to do any driving that night.

19  Q.   You take a sleeping aid at night to help you sleep?

20  A.   I do.

21  Q.   And this was after you had taken that for the evening that

22  you received this phone call from Mr. Irish?

23  A.   I had already taken it before the phone call.

24  Q.   Okay.  Did you agree to get the children at a later time?

25  A.   I said I would be up the next morning.

1   Q.   Okay.  And do you recall whether it was the phone call

2   that evening or the following morning where he asked you to

3   also remove the guns from the home?

4   A.   I'm not positive, but I think it was the evening that he

5   had mentioned removing and, again, you know, he only mentioned

6   it one time as far as removing them.

7   Q.   Okay?

8   A.   And the following morning I believe he told me that I

9   would not have to do that, as that had already been taken care

10  of.

11  Q.   Okay.  Did you ask him anything more about what he meant

12  by that, about it had been taken care of?

13  A.   No.

14  Q.   Okay.  Did you understand that to mean that the guns had

15  been removed from the home?

16  A.   That's what I thought it to mean.

17  Q.   Did there come a time when you cut off contact with

18  Mr. Irish?

19  A.   Yes, I had, you know.

20  Q.   Do you recall approximately when that was?

21  A.   I'm not positive.  It might have been March.

22  Q.   Okay.  Did something happen in March?

23  A.   I had just been getting numerous calls from him, this,

24  that, and they weren't nice, and I felt the need for a

25  restraining order.  I talked to my lawyer about what had been

1    going on, and he suggested it, you know.

2    Q.    Okay.  So, if I'm understanding you correctly, is it your

3    testimony, then, that you sought a restraining order against

4    Mr. Irish?

5    A.    Can you repeat that, please?

6    Q.    You got a restraining order against Mr. Irish?

7    A.    I did.

8    Q.    Okay.  And that occurred you think approximately --

9    A.    Mid-March, maybe.

10   Q.    March?  And we're talking March of 2019?

11   A.    '19.

12   Q.    Okay.  After you got that restraining order did your

13   contact with Mr. Irish diminish?

14   A.    Yes.

15   Q.    Did you have any occasion to visit with him or talk with

16   him after that?

17   A.    No.

18   Q.    Okay.  In connection with that restraining order did you

19   have to fill out paperwork with the Court related to that

20   restraining order?

21   A.    In order to get that, yes.

22   Q.    Okay.  And as part of the information that you provided to

23   the Court, do they ask you, and I'm not asking you to tell me

24   your answers to these questions, but do they ask you general

25   information about your interactions with the defendant, your

1    familiarity with him and things of that nature?

2    A.    Can you rephrase it?

3    Q.    Yes.  Do they ask you questions about the defendant in the

4    paperwork?

5    A.    In the paperwork, yes.

6    Q.    Okay.  Does one of those questions relate to firearms?

7    A.    I think so.

8    Q.    You said you "think so."  Do you remember whether the form

9    included a question about firearms?

10   A.    I think it asked if he had firearms at that time.

11   Q.    Okay.  And do you remember how you answered that question?

12          MR. FALKNER:  Objection.  It's hearsay, your Honor.

13          THE COURT:  Sustained.

14   Q.    Ms. Millett, did there come a time when the FBI reached

15   out to ask you some questions regarding Mr. Irish?

16   A.    Yes.

17   Q.    Do you remember approximately when your first contact with

18   the FBI was?

19   A.    I believe it was in January of '19.

20   Q.    Okay.  Would it have been after your visit at

21   Christmastime that you described?

22   A.    After.

23   Q.    Okay.  Was it also after the phone call you described

24   where Mr. Irish asked you to remove guns from his home?

25   A.    Yes.

1   Q.   And during your initial interview with the FBI did you

2   tell them about that visit at Christmastime?

3          MR. FALKNER:  Objection.

4          THE COURT:  Sustained.

5   Q.   At some point did the FBI speak with you about working as

6   a confidential human source?

7   A.   Yes.

8   Q.   What did you understand that to mean?

9   A.   They just basically wanted to know if I happened to see

10  him with weapons or mentioning them.

11  Q.   And as far as your understanding of your role, if you were

12  to come into any information about either seeing Mr. Irish with

13  firearms or having conversations with him about firearms, what

14  was your sort of role supposed to be in terms of assisting the

15  FBI?

16  A.   Letting them know, recording, perhaps taking a picture.

17  Q.   Okay.  Did you ever make any recordings of the defendant?

18  A.   No.  No.

19  Q.   Did you ever take any pictures of the defendant?

20  A.   No.

21  Q.   Did you ever take any pictures of any firearms belonging

22  to the defendant?

23  A.   No.

24  Q.   Okay.  Did you agree to attempt to gather information and

25  to work as a confidential source?

1    A.    Yes.

2    Q.    Why did you do that?

3    A.    Just that I didn't want to feel any danger from any of

4    that or --

5    Q.    Were you -- backing up, did this arrangement between you

6    and the FBI, did that come about during your very first

7    interview with the FBI, or was that at a later time?

8    A.    I'm not positive.  I think later.

9    Q.    Whose idea was it?

10    A.    Whose idea for?

11    Q.    Who first broached the topic of you working in this

12    capacity?  Was that something that you volunteered to do, or

13    was that something that the FBI asked whether you would be

14    willing to do?

15    A.    They asked if I would be willing to.

16    Q.    Okay.  Were you ever paid any money in exchange for your

17    assistance?

18    A.    No.

19    Q.    Did you ever expect to be paid?

20    A.    No.

21    Q.    Were you promised anything of value in exchange for your

22    assistance?

23    A.    Nothing.

24    Q.    Are you receiving anything in exchange for your testimony

25    here today?

1    A.    No.

2    Q.    Ms. Millett, do you know an individual by the name of

3    Peter Duguay?

4    A.    Who?

5    Q.    Peter Duguay?

6    A.    I don't believe so.

7    Q.    What about David Marcotte?

8    A.    I don't think so.

9    Q.    Roscoe Whitney?

10   A.    I don't recognize the last name.

11   Q.    Have you met an individual named Roscoe before?

12   A.    I have.

13   Q.    Where did you meet him?

14   A.    I believe at the campground.

15   Q.    What campground are you referring to?

16   A.    Saddleback.

17   Q.    Do you know this person named Roscoe?  Do you remember how

18   many occasions you might have met him?

19   A.    A few.  Five or six, perhaps.

20   Q.    And did you have any in-depth interactions with him during

21   any of those meetings?

22   A.    Just as, you know, get-togethers, I mean.

23   Q.    Was this -- if I'm understanding you correctly, were these

24   interactions in the context of family --

25   A.    Like a birthday party or, you know, lunch.

1   Q.   Okay.  Would that -- would your interactions with Roscoe,

2   the person you know as "Roscoe," did those interactions take

3   place -- was the defendant also present at those functions?

4   A.   I believe so.

5   Q.   Was the defendant's mother also present at those

6   functions?

7   A.   Yes.

8   Q.   Did you ever talk with Roscoe about firearms?

9   A.   No.

10  Q.   Have you ever had any conversations with Roscoe on the

11  telephone?

12  A.   No.

13  Q.   Do you know an individual named Neil Prive?

14  A.   No.

15  Q.   What about Dylan Roosa?

16  A.   I've heard a name "Dylan."

17  Q.   To your knowledge --

18  A.   I'm not sure.  If I met him, it was very briefly and just

19  didn't recall where.  It might have been briefly at their house

20  at some point.

21  Q.   And by "their house," are you referring to Stephanie and

22  Mr. Irish's house?

23  A.   I'm trying to remember where it might have been.  It might

24  have been at where they're living or were living.

25  Q.   Do you recall ever having any conversations with Mr. Roosa

1    about firearms?

2            MR. FALKNER:  Objection.  Relevance, your Honor.

3            THE COURT:  Overruled.

4    Q.   Do you recall having any conversations with Mr. Roosa

5    about firearms?

6    A.   No.

7    Q.   Do you know an individual named Gary or Gerald Roya?

8    A.   No.

9            MS. WEILAND:  May I have just a moment, your Honor?

10   No further questions, your Honor.

11           THE COURT:  All right.  Attorney Falkner.

12                         CROSS-EXAMINATION

13   BY MR. FALKNER:

14   Q.   Good afternoon, Ms. Millett.

15   A.   Good afternoon.

16   Q.   On direct examination you said you believe that you knew

17   Mr. Irish eight years or so.

18   A.   It might be more.  I'm not positive.  It had to be more,

19   thinking of the granddaughter, yes.

20   Q.   More like 13, right?

21   A.   Yes.  Right.

22   Q.   And fair to say that you don't approve of your daughter's

23   marriage to Johnathon Irish?

24   A.   Pardon?

25   Q.   Fair to say that you don't approve of your daughter's

1    marriage to Johnathon Irish?

2    A.    There were mixed feelings.

3    Q.    Fair to say that you felt that Johnathon and Stephanie

4    were draining you financially?

5    A.    Yes.

6    Q.    In fact, you told that to the FBI, didn't you?

7    A.    Yes.

8    Q.    And, in part, you felt that they were draining you

9    financially because you had recently bought them a home to live

10   in, correct?

11   A.    I did buy a home for them.

12   Q.    And when was that?

13   A.    That was in January of '19.

14   Q.    And that cost you some money, right?

15   A.    Yes.

16   Q.    And you also felt that they were asking you for money a

17   lot, right?

18   A.    Yes.

19   Q.    And you also felt that they were asking for money from an

20   inheritance, correct?

21   A.    Correct.

22   Q.    And you told the FBI that those were some of the reasons

23   why you wanted to cooperate with them; isn't that so?

24   A.    No.

25   Q.    You told the FBI all of those things, though, didn't you?

1   A.   Can you repeat that, please?

2   Q.   You did tell the FBI all of those things that we've just

3   discussed, though, didn't you?

4   A.   I did.

5   Q.   And you told that to them in January of 2019, correct?

6   A.   I think so.

7   Q.   And at the time that you signed up to be a confidential

8   human source; isn't that so?

9   A.   I think it was that time or around then.

10  Q.   Now, you told the FBI that it was right around the time of

11  Christmas that you saw Johnathon with the handgun in his

12  waistband; is that right?

13  A.   Yes.

14  Q.   And the phone call that he made about getting the guns out

15  of the house, that he needed to get rid of them, that was also

16  in December of 2018 as well, correct?

17  A.   Correct.

18  Q.   Other than Johnathon saying he didn't need any more help

19  with that, you didn't have any indication whatsoever as to

20  whether the guns were or were not out of the house at that

21  time, did you?

22  A.   After he said that, I did not know that he had the guns.

23  Q.   In fact, you dropped out of communication with Stephanie

24  and Johnathon in January of 2019, correct?

25  A.   Pretty much.

1    Q.    But even though you dropped out of communication with

2    Johnathon and Stephanie, you continued to meet with the FBI on

3    a fairly regular basis, right?

4    A.    It wasn't a regular basis.

5    Q.    Well --

6    A.    It was now and then.  I'm not sure how often.  It wasn't

7    all that often.

8    Q.    The first time you met with them was January 16th, right?

9    A.    Mm-hmm.

10   Q.    Is that a "Yes"?

11   A.    I believe so, or right around there, yes.

12   Q.    And then the second time you met with them was January

13   24th of 2019, right?

14   A.    Okay.

15   Q.    Is that correct?

16   A.    I think so.

17   Q.    And then the next time you met with them was February 15th

18   of 2019, and that was by telephone, right?

19   A.    I believe so.

20   Q.    And that was right around the time when they moved from

21   Bethlehem into the home in Littleton, correct?

22   A.    Correct.

23   Q.    Were you a party to the move?

24   A.    I helped them monetarily and watching the children while

25   they moved.

1  Q.   You told the FBI that the move occurred on February 1st of
2  '18, correct?
3  A.   I wasn't sure exactly of the actual date moved in.
4  Q.   Okay.  But you testified -- or I'm sorry.  I should take
5  that back.  You did tell the FBI that there was a move in early
6  February of '18, correct?
7  A.   I believe it was early February of '19.
8  Q.   And I'm sorry.  I said "'18," and you responded "'19."  It
9  was 2019, correct?
10  A.   '19.
11  Q.   And you also told the FBI that at that time no firearms or
12  any other items of note were observed; isn't that so?
13  A.   If I did -- can you rephrase that, reword it, say it
14  again?
15  Q.   When you spoke to the FBI on February 15th of 2019, and
16  you described the move, you told the FBI agent on the telephone
17  that at the time of the move no firearms or any other items of
18  note were observed; isn't that so?
19  A.   Correct.  I did not observe any at the time.
20  Q.   And so, were you at the Littleton home during the move?
21  A.   For a short time, yes.
22  Q.   The next time that you spoke with the FBI was on April 3rd
23  of 2019, right?
24  A.   I'm not sure of the date.
25  Q.   Well, it was right around the time that you got the

1   restraining order, right?

2   A.    I'm honestly not sure.

3   Q.    Did you report to the FBI after you got the restraining

4   order?

5   A.    I don't remember, to be honest.

6   Q.    When you got the restraining order against Johnathon

7   Irish, you also at the same time got one against Stephanie

8   Irish, right?

9   A.    I did.

10   Q.    From the time of the move into Littleton up until the time

11   you got that restraining order was there any contact whatsoever

12   between you and Johnathon Irish?

13   A.    After the restraining order, no.

14   Q.    No.  I'm talking about from the move up until the time you

15   got the restraining order.

16   A.    I think there were phone calls.

17   Q.    And what about was there contact with Stephanie Irish

18   during that same time period?

19   A.    Yes.

20   Q.    Other than Johnathon just simply having told you that it

21   was taken care of, up until the date that you got the

22   restraining order did you know what happened to the firearm

23   that you had seen in Johnathon Irish's waistband?

24   A.    No.

25   Q.    As far as you knew, he still had that firearm, correct?

1   A.   I did not know if he had the firearm.

2   Q.   As far as you knew, you didn't have any reason to believe

3   he didn't have it, correct?

4   A.   No.

5   Q.   Let me put it to you another way.  Did you believe him to

6   be the owner of the firearm that was in his waistband?

7   A.   For him to be the owner of the weapon in the waistband?

8   Q.   Right.  Did you believe him to be the owner of that

9   weapon?

10  A.   I did.

11  Q.   And you hadn't received any information that he had sold

12  it or given it away, had you?

13  A.   No.

14  Q.   And, nonetheless, when you applied for the restraining

15  order -- let me put it in a different way.  When you applied

16  for the restraining order, you signed that under oath, correct?

17  A.   I believe so.

18  Q.   The same oath that you gave here to the jury, correct?

19  A.   Pardon?

20  Q.   The same oath that you gave here to the jury, correct?

21  You swore to tell the truth when you signed the application,

22  correct?

23  A.   Yes.  I would only do that.

24  Q.   And in that application you were specifically asked

25  whether Mr. Irish had access to, possessed or had ever used a

1    firearm, muzzle-loading firearm, bow or crossbow in an

2    intimidating, threatening or abusive way, and you answered to

3    all of those questions, "No," correct?

4    A.   I am not sure.

5           MR. FALKNER:  Your Honor, may I approach the witness?

6           THE COURT:  Yes.

7    Q.   Ms. Millett, I've placed a document in front of you.  Can

8    you take a look at it.

9    A.   (Witness complied).

10   Q.   Do you recognize that document?

11   A.   Yes.

12   Q.   Do you recognize that to be the first two pages of the

13   application for restraining order against Johnathon Irish?

14   A.   Yes.

15   Q.   And if you look at Page 2 at the very top -- are you on

16   Page 2?

17   A.   Yes.

18   Q.   And I'm looking at Question 10:  "Does the defendant have

19   access to, possess or ever used a firearm, muzzle-loading

20   firearm, bow or crossbow in an intimidating, threatening or

21   abusive way?"  And your answer was, "No."  Have I got that

22   right?

23   A.   "No" is checked.

24   Q.   And, "If yes, please explain," and you wrote, "Has owned a

25   firearm in the past."

1    A.    Right, and I was not sure --

2    Q.    Is that what you wrote?

3    A.    That is what I wrote.

4    Q.    And is that in your handwriting?

5    A.    Pardon?

6    Q.    Is that your handwriting?

7    A.    No.

8    Q.    Whose handwriting -- do you know whose handwriting it is?

9    A.    Yes.

10   Q.    Whose handwriting is it?

11   A.    It is my daughter-in-law's, because I wasn't in order.  I

12   was told that she could write what I said, that the court --

13   Q.    But ultimately you signed the document, correct?

14   A.    Yes.

15   Q.    And you read that document, correct, before you signed it?

16   A.    I was very highly emotionally at that time, and --

17             MR. FALKNER:  Your Honor, may I approach the witness?

18             THE COURT:  Yes.

19             MR. FALKNER:  Just to take the document back, ma'am.

20   A.    Pardon?

21   Q.    Just to take the document back.  Thank you.

22             You were highly emotional because you were upset at

23   the way Johnathon, you felt that Johnathon and Stephanie were

24   treating you about money and other things, right?

25   A.    That's only part of it.

1    Q.   And you were upset because you felt that Stephanie's

2    relationship with Johnathon was keeping Stephanie away from

3    you, correct?

4    A.   No.  No.

5    Q.   And you felt that you were sick of giving them money,

6    correct?

7    A.   That I will agree to.

8    Q.   And, ultimately, it ended up -- that in the family courts

9    of New Hampshire there ended up being cross-complaints,

10   correct?

11   A.   Can you rephrase that?

12   Q.   Well, at some point Stephanie Irish took out a complaint

13   against your son, and you were involved in those proceedings

14   with the same lawyer, correct?

15   A.   Can you rephrase that?

16   Q.   Your restraining order against Stephanie and your

17   restraining order against Johnathon, at some point -- strike

18   that.

19          At some point there ended up being restraining orders

20   filed by Stephanie against your son; isn't that correct?

21   A.   Right.  Yes.

22   Q.   And there was a hearing on that in the Littleton Probate

23   and Family Court in May, correct?

24   A.   Yes.

25   Q.   And Stephanie had some kind of medical issue during that

1    hearing, correct?

2    A.    Right.

3    Q.    And they had also, Johnathon and Stephanie had brought

4    complaints against you having to do with the care of the home

5    that they were living in, correct?

6    A.    Yes.

7    Q.    Landlord-tenant complaints, essentially, correct?

8    A.    Can you reword that again, say it again, please?

9    Q.    Johnathon and Stephanie brought landlord-tenant complaints

10   against you vis-a-vis the home that you had bought for them;

11   isn't that right?

12   A.    They actually were never landlords.  They never paid any

13   money on that.  I just let them live in my --

14   Q.    Ma'am, listen to my question.  My question was whether

15   Johnathon and Stephanie brought landlord-tenant complaints.

16   A.    I think they did.

17   Q.    And those complaints were heard in the same hearing --

18   A.    Yes.

19   Q.    -- with Stephanie's complaint against your son, correct?

20   A.    Yes.

21   Q.    And all of this was extremely upsetting to you, correct?

22   A.    Yes.

23   Q.    And in that May 4th hearing, again, Stephanie had

24   basically had a seizure in the middle of the courtroom; isn't

25   that so?

```
1    A.    And that was at Littleton?

2    Q.    In May 2019.

3    A.    I think so.

4    Q.    And ultimately that hearing was continued to sometime in

5    September of 2019, correct?

6    A.    I'm not positive, but I think so, yes.

7    Q.    September 4th of 2019, correct?

8    A.    Yes.

9    Q.    Is that right?

10   A.    Yes.

11   Q.    And during that hearing Stephanie continued to press

12   claims that she didn't want to have any contact with her

13   brother, who's your son, correct?

14   A.    Correct.

15   Q.    And he was living with you?

16   A.    Yes.

17   Q.    And --

18          MS. WEILAND:  Your Honor, may we approach?

19          THE COURT:  Yes.

20   (SIDEBAR CONFERENCE AS FOLLOWS):

21          THE COURT:  Where is this going?

22          MR. FALKNER:  I'm almost done with this line of

23   questioning, your Honor.  This is simply establishing bias.

24   She was represented by the same lawyer as the brother at those

25   proceedings and establishing the animosity.
```

1          THE COURT:  The brother and --

2          MR. FALKNER:  Yes, your Honor.  She testified that

3     Stephanie --

4          THE COURT:  Let me just ask you a factual question.

5     She testified in a way that was inculpatory to your client

6     about something she saw in I think 2018, saw a pistol?

7          MR. FALKNER:  Correct.

8          THE COURT:  All of this postdates that.  Am I wrong

9     about that?

10         MR. FALKNER:  That's correct.

11         THE COURT:  So, how is it relevant to her bias with

12    respect to those statements?  That's just an ongoing --

13         MR. FALKNER:  With respect to her bias in this

14    courtroom currently and as a witness currently.

15         THE COURT:  Okay.  What was --

16         MS. WEILAND:  Well, your Honor, we were delving, it

17    seems, into matters in the last series of questions -- I've not

18    heard anything about the defendant, Mr. Irish, at all; it's all

19    about Stephanie and the brother.  And I understand that some of

20    this family history is relevant to show that there may be some

21    bad blood, some possible bias, but to the extent we're getting

22    into allegations regarding animosity between the witness and

23    her daughter and drama that might exist between the daughter

24    and the brother and a lawyer, I'm not sure how that goes to

25    show bias against Mr. Irish.

1          THE COURT:  I might try it differently than he -- I

2     might try it differently than you, but as long as you're

3     closing this very soon, I overrule your objection.  Go ahead.

4          MR. FALKNER:  Thank you.

5     (END OF SIDEBAR CONFERENCE)

6     Q.   So, I just want to quickly -- I'm not going to the merits

7     of any of these complaints.  I just want to establish what the

8     hearing -- who the parties were to the hearing on September 4th

9     of 2019.  There were multiple claims, correct?

10    A.   Yes.

11    Q.   And one of the claims was by Johnathon and Stephanie

12    against you, and that was a landlord-tenant claim, correct?

13    A.   Yes.

14    Q.   And there was a second claim by Stephanie Irish against

15    her brother, your son, correct?

16    A.   Yes.

17    Q.   And at that time you and your son were living together,

18    correct?

19    A.   Yes.

20    Q.   And at that hearing you and your son were represented by

21    the same attorney, correct?

22    A.   Yes.

23    Q.   And at that hearing, in order to make the landlord-tenant

24    claims go away, you agreed to simply deed the property over to

25    Stephanie and Johnathon; isn't that right?

1   A.   Yes.  It was a quitclaim deed.

2   Q.   Did that ever get registered?

3   A.   Pardon?

4   Q.   Did that ever get filed, the quitclaim deed?

5   A.   No.

6   Q.   Do you retain ownership, then, of that home?

7   A.   Yes.

8   Q.   So, I just want to be clear.  You made an agreement to

9   resolve the landlord-tenant claims by deeding the property

10  over, but you never actually deeded the property over, correct?

11  A.   She was given the quitclaim deed in that court.

12  Q.   Now, at some point in late October of 2019 Stephanie left

13  Johnathon, correct?

14  A.   Yes.

15  Q.   And is that when you and Stephanie began having regular

16  contact again?

17  A.   We started having conversations, yes.

18          MR. FALKNER:  Your Honor, may I have a moment?

19          THE COURT:  Yes.

20          MR. FALKNER:  I have nothing further, your Honor.

21          THE COURT:  Anything further, Attorney Weiland?

22          MS. WEILAND:  Yes.

23                    REDIRECT EXAMINATION

24  BY MS. WEILAND:

25  Q.   Ms. Millett, you were asked some questions about

1    statements you made to the FBI, one of them being that

2    Mr. Irish and your daughter were, quote, unquote, draining you

3    financially.  Is that what you told the FBI?

4    A.    It was starting to cause a hardship, yes.

5    Q.    So, you were providing them with some form of financial

6    assistance?

7    A.    Right.

8    Q.    And part of that was buying them a house?

9    A.    I bought the house so that my daughter and her family

10   would have a place to live.

11   Q.    Since your daughter and Mr. Irish have been separated have

12   you continued to provide financial support to your daughter and

13   your grandchildren?

14   A.    I have some.

15   Q.    You were also asked about various contacts that you had

16   with the FBI after the time that you had sort of cut off

17   contact with Mr. Irish, correct?

18   A.    Can you repeat that, please?

19   Q.    Yes.  Attorney Falkner asked you about any conversations,

20   phone calls you might have had with the FBI after you agreed to

21   be a confidential source, correct?

22   A.    Yes.

23   Q.    And some of those took place after the restraining order

24   or after you weren't really in contact, really, with Stephanie

25   or Mr. Irish much at all anymore; is that correct?

1    A.    Yes.

2    Q.    And in any of those conversations did you ever report that

3    you had seen Mr. Irish with firearms apart from the, you know,

4    incident that you described in December of 2018 and the phone

5    call in January?

6    A.    No.

7    Q.    Any other incidents that you ever reported to the FBI?

8    A.    No.

9    Q.    Okay.  Now, Attorney Falkner asked you some questions

10   about the paperwork that you filled out in connection with the

11   restraining order.

12   A.    Mm-hmm.

13          MS. WEILAND:  May I approach, your Honor?

14          THE COURT:  Yes.

15   Q.    And I believe the document that Attorney Falkner was

16   asking you about inquires whether the defendant either has

17   access to or possesses or has ever used in a threatening manner

18   a firearm or a crossbow.  The way this form is structured, how

19   many different options are you given in terms of how to answer

20   that question?

21   A.    There's, like, several questions type of thing, but it's

22   only a "Yes" or a "No."

23   Q.    And is it like a checkbox, you check one box or the other?

24   A.    Yes, checkbox.

25   Q.    And at that time, when you were filling out this

1    paperwork, did you know whether the defendant had access to a

2    firearm?

3    A.    At this time I did not know if he had one or not.

4    Q.    Did you know whether he possessed a firearm at this time?

5    A.    Not at that time.

6    Q.    Okay.  And if I may?  Thank you.

7          With respect to the question about ever used a firearm

8    in a threatening manner, had you ever seen Mr. Irish threaten

9    anyone with a weapon, point a gun at somebody, or use it in a

10   threatening way?

11   A.    Not that I saw him with it.

12   Q.    Okay.  Thank you.  You described a single incident in

13   December of 2018 where you simply saw it in his waistband,

14   correct?

15   A.    Mm-hmm.

16   Q.    And you did not perceive that to be threatening?

17   A.    No.

18   Q.    Okay.  Now, also in this same paperwork, just below that

19   there is -- although you're given only the checkbox "Yes" or

20   "No," there is a line where it gives you an opportunity to

21   explain your response; is that correct?

22   A.    Yes.

23   Q.    And you wrote something on that line, didn't you?

24   A.    Yes.

25   Q.    Do you recall what you wrote on that line?

1    A.    Something to the effect that he had firearms in the past

2    that I had seen.

3    Q.    Okay.  And also in connection with that same paperwork I

4    believe we went over in direct, there was an additional form

5    that you filled out.  Do you recall filling out that form?

6    A.    Yes.

7    Q.    And directing your attention to the highlighted portion,

8    does this portion also ask you about firearms?

9    A.    Yes.

10   Q.    Is this question a check-the-box, yes-or-no question, or

11   is this a question that's structured in a way that just asks

12   you to write in a response?

13   A.    Where I could write something.

14   Q.    Okay.  And the question is, "Does the defendant own

15   firearms?"  Did you write a response to that question?

16   A.    I said, "Not sure."

17   Q.    I'm sorry?

18   A.    I said, "Not sure."

19   Q.    Okay.  Why did you write that you were not sure?

20         MR. FALKNER:  Objection.

21         THE COURT:  Overruled.

22   Q.    Why did you write that you were not sure?

23   A.    Because I don't know whether he did or not.  He may have,

24   I mean, and he may not have.

25   Q.    Okay.  And to be clear on the timeline, you were filling

1   out this form -- this was after the phone call you described

2   where he had asked you with assistance removing guns from the

3   home; is that correct?

4   A.   Yes.

5   Q.   The last thing I'll ask you about very briefly, Attorney

6   Falkner asked you questions about various court proceedings you

7   had involving your daughter, Mr. Irish, things that took place

8   in May of 2019 and then again in September of 2019, and I just

9   want to be clear.  All of those court proceedings took place

10  after the Christmas incident you described where you saw

11  Mr. Irish with the firearm; is that correct?

12  A.   Yes.

13  Q.   And that also occurred after you received the phone call

14  from Mr. Irish asking you to help him remove firearms from the

15  home?

16  A.   Yes.

17  Q.   And that also occurred after you reported both of those

18  incidents to the FBI, correct?

19  A.   Yes.

20          MS. WEILAND:  No further questions, your Honor.

21          THE COURT:  Anything else?

22          MR. FALKNER:  Very briefly, your Honor.

23          THE COURT:  Okay.

24                  RECROSS-EXAMINATION

25  BY MR. FALKNER:

1   Q.   With regard to the form that I asked you about on the

2   cross-examination, where you answered "No" to whether he has

3   access to a firearm, the following line says, "If yes, please

4   explain," and there's room to write in an answer, correct?

5   A.   May I see it again, please?

6        MR. FALKNER:   May I approach, your Honor?

7        THE COURT:   Yes.

8   A.   Okay.  And the question again?

9   Q.   The question is, is there room for you to explain your

10  answer to the checkbox?

11  A.   Yes.

12  Q.   And your answer to the checkbox was, "No"?

13  A.   Correct.

14  Q.   And your answer to explaining further was that, "He has

15  owned a firearm in the past," correct?

16  A.   Correct.

17  Q.   Your answer was not that you were unsure whether he has

18  access to firearms, correct?

19  A.   Correct.

20       MR. FALKNER:   May I approach, your Honor?

21       THE COURT:   Yes.

22  Q.   Now, on your redirect examination you were asked whether

23  in any of your conversations with the FBI after the time of

24  this restraining order you had ever told the FBI about

25  Johnathon ever possessing firearms again, correct?

1    A.    Can you repeat that?  I'm confused.

2    Q.    Let me ask it to you a different way.  Do you recall

3    speaking on the telephone with Agent Shayne Tongbua on April

4    3rd of 2019?

5    A.    I'm not sure exactly the dates I spoke with him.

6              MR. FALKNER:  Your Honor, may I approach the witness?

7              THE COURT:  Yes.

8    Q.    I'm showing you a document -- I'm not asking you whether

9    you recognize it.  I'd like you to take a look at it, and when

10   you've finished reading, let me know.

11   A.    (Witness reviewed document).

12   Q.    Does reading that document refresh your memory as to

13   whether you spoke with Agent Tongbua on the phone on April 3rd,

14   2019?

15   A.    Mm-hmm.

16   Q.    Did you speak with him on that date?

17   A.    Yeah.

18   Q.    And did you tell him, "Without a doubt Johnathon Irish

19   still has his guns in the new house, despite being a felon.  He

20   probably keeps them in a cedar chest in the bedroom"?

21   A.    I do not remember saying, "Without a doubt" that he still

22   had them, but I had been told that that's probably where they

23   were.

24   Q.    You don't remember that, saying that, or do you deny

25   saying that?

1    A.   I do not remember saying "without a doubt" he had them.

2    Q.   Did you say the rest of the statement?

3    A.   I had been told that that's where they thought they were.

4         MR. FALKNER:  Your Honor, may I approach the witness?

5         THE COURT:  Yes.

6    Q.   The first time that you gave Johnathon and Stephanie Irish

7    money was before Christmas in 2018, correct?

8    A.   Mm-hmm.

9    Q.   The first time you started financially supporting them was

10   before Christmas of 2018, correct?

11   A.   Yes, yes.

12   Q.   And the first time that you felt that they were taking

13   advantage of you was before Christmas of 2018, correct?

14   A.   Right.

15   Q.   And the first time that Stephanie had made allegations

16   against her brother was before Christmas of 2018, correct?

17   A.   Yes.

18   Q.   Even though the first time you told the FBI was in January

19   of 2019, all of those issues existed before Christmas of 2018;

20   isn't that so?

21   A.   Yes.

22        MR. FALKNER:  I have nothing further, your Honor.

23        THE COURT:  Anything further?

24        MS. WEILAND:  No, your Honor.

25        THE COURT:  All right.  Ms. Millett, you may be

1    excused and step down.  Thank you.

2                    (Witness stepped down)

3          THE COURT:  And the government may call its next

4    witness, and then if counsel could approach briefly while the

5    witness is coming in.

6          MS. WEILAND:  Yes, your Honor.  The United States

7    calls David Marcotte.

8    (SIDEBAR CONFERENCE AS FOLLOWS):

9          THE COURT:  I can get -- Don Kennedy can come in at

10   2:30, but I have no idea when Roya would be.

11         MS. KRASINSKI:  He should be here by then.

12         THE COURT:  So, should we get Don Kennedy to speak to

13   him?  We'll need to take a break so you can get Kennedy up to

14   speed.

15         MS. KRASINSKI:  If we could take a break also we can

16   get him copies of the documents, which we just can't do in the

17   courtroom.

18         THE COURT:  Right.  I'm planning on taking a break at

19   2:00.  Does that give everybody enough time?  At least tell

20   Kennedy to go ahead and come in.  And then I want to take at

21   least an hour and 20 minutes before the first break, so we'll

22   break at 2:00.

23         THE CLERK:  He can be here at 2:30.

24         MS. KRASINSKI:  We'll need time.  Thank you, your

25   Honor.

1    (END OF SIDEBAR CONFERENCE)

2              THE CLERK:  David Marcotte?

3              THE WITNESS:  Yes.

4              **DAVID MARCOTTE**, having been duly sworn by the Clerk,

5    was examined and testified as follows:

6              THE CLERK:  Thank you.  Please state your full name

7    and spell your last name for the record.

8              THE WITNESS:  David Marcotte.  Spelling of my last

9    name, M-a-r-c-o-t-t-e.

10             THE CLERK:  Thank you very much.  Please be seated.

11                        DIRECT EXAMINATION

12   BY MS. WEILAND:

13   Q.   Good afternoon, Mr. Marcotte.

14   A.   Good afternoon.

15   Q.   Mr. Marcotte, are you employed?

16   A.   No, I'm not.

17   Q.   Were you previously employed?

18   A.   By the United States Army.

19   Q.   Okay.  When did you serve?

20   A.   From '84 to '92.  Then, after 9/11, I went back in until

21   2007, when I was medically discharged -- medically retired.

22   Q.   Thank you for your service.  Are you familiar with

23   firearms?

24   A.   Very familiar.

25   Q.   Do you know Johnathon Irish?

1   A.   Yes.  I don't know him that well, though.

2   Q.   How did you meet Mr. Irish?

3   A.   Through a mutual friend we had, Anthony Costello.

4   Q.   Anthony Costello.  Where is Anthony Costello today?

5   A.   He passed away two years ago this past January.

6   Q.   Okay.  So, that would be January of 2018?

7   A.   Yes, ma'am.

8   Q.   Okay.  Were you close with Tony?

9   A.   Yes.  I was like an Army dad to him.  He was in my unit,

10  and I took him under my wing, a new soldier coming in.

11  Q.   And do you recall when you met Mr. Irish?

12  A.   I think it was right around 2017, once at Tony's house.

13  Q.   Okay.  Did you become friendly?

14  A.   Not really, because I guess he was living down south, in

15  the southern part of the state, and I just met him that one

16  time, then ran into him again after Anthony passed away.

17  Q.   Okay.  Tell me about that.  When after Tony passed away

18  did you bump into Mr. Irish?

19  A.   At Anthony's house, you know, consoling his wife Erica.

20  You know, he came to console her as well.

21  Q.   So, very shortly after Tony passed away?

22  A.   Yes.

23  Q.   Okay.  At that point did you and Mr. Irish establish a

24  friendship?

25  A.   No.  It would be just seeing him every now and then, "Hi,

1    how are you doing?"  That's it.

2    Q.    So, more like acquaintances?

3    A.    Yes, ma'am.

4    Q.    Okay.  Did you ever socialize with Mr. Irish?

5    A.    My wife and I, we started socializing with Mr. Irish and

6    his wife in October.  We ran into them at Walmart.  We were

7    just saying, you know, because they were new up in the area,

8    "Maybe you guys can come over for Thanksgiving," and they were

9    like, "That would be great."  They invited us over for their --

10   I had them come over to give me a hand to my house with my plow

11   to change the fluid in it, because I'd just finished having

12   back surgery in July, and we had a little cookout.  They

13   invited us to their daughter's birthday party.  We went to it,

14   we came back to my house, we had Chinese food, and that was the

15   last time we ever got together with them.

16   Q.    Okay.  So, this was in the fall of 2019?

17   A.    Yes, ma'am.

18   Q.    Okay.  And so, the social occasions that you've described,

19   did they all take place within a relatively short time frame?

20   A.    Yes.

21   Q.    Okay.  And you think that was around October of 2019?

22   A.    Yes, ma'am.

23   Q.    Okay.  Now, directing your attention to October 25th of

24   2019, did you receive a phone call from Mr. Irish that day?

25   A.    Yes.

1    Q.   Could you tell me about that?

2    A.   He called me.  He was worried because he hadn't heard from

3    his wife Stephanie.  He asked me to take a ride over to his

4    house to see if they were home.

5    Q.   Could I stop you for just a moment?  So, if I'm

6    understanding you correctly, he was not at home when he called

7    you?

8    A.   No.

9    Q.   Okay.

10   A.   I guess he was on his way home from work, and he was up in

11   Lancaster, somewhere in that area.

12   Q.   All right.  And he asked you to go to his home?

13   A.   Just to check to see if they were there, anyone was home.

14   Q.   Okay.  Did you do that?

15   A.   Yes, I did, and there was no one there, so I went back

16   home.

17   Q.   Okay.  Did you have any further contact with him that day?

18   A.   Yes.  He called me later on that evening, and he was

19   completely distraught, you know.

20   Q.   If I could stop you for a moment, was he home at this

21   point?

22   A.   Yes, he was.

23   Q.   And you mentioned he was distraught.  Was this because of

24   the situation with his wife?

25   A.   Yeah, his wife and kids.  You know, she left with the

1    kids.  I went over to see what I can do.  He's outside in his

2    driveway screaming, no shirt on.

3    Q.   So, he was distraught?

4    A.   Yes.

5    Q.   Okay.  Did the subject of a firearm come up that day?

6    A.   He was saying, you know, he was thinking about hurting

7    himself.  I says, "You're not going to do that.  You're only

8    going to hurt the kids."  I said, "Do you have a firearm in the

9    house?"  He said, "Yeah, a 1911."  In the military that's a .45

10   caliber pistol.

11   Q.   So, you're familiar with that weapon?

12   A.   That was one of my issued weapons in the Army.

13   Q.   Okay.  Did you see the firearm that day?

14   A.   No, I didn't.

15   Q.   Okay.  Did he ask you to take the firearm?

16   A.   No.

17   Q.   Did you ever see any firearms in Mr. Irish's possession?

18   A.   No.

19   Q.   I'd like to show you what's been previously admitted as

20   Government's Exhibits 7 and 7A.

21          MR. FALKNER:  Objection.

22          THE COURT:  Approach.

23   (SIDEBAR CONFERENCE AS FOLLOWS):

24          MR. FALKNER:  He said he's never seen Mr. Irish with

25   weapons, and now she's going to approach him with the weapons

1    that were found in the box.

2              THE COURT:  He seems like he knows a lot about

3    weapons.  Are you going to ask him to identify --

4              MS. WEILAND:  I believe he will be able to identify

5    it.  It doesn't change his testimony.  I believe he knows the

6    origin of this firearm, that he has seen it before, this

7    specific firearm --

8              THE COURT:  Okay.

9              MS. WEILAND:  -- and is going to offer testimony about

10   that.

11             MR. FALKNER:  Well, your Honor, it's not in his 302

12   report, it's not in any discovery, so I would inquire what the

13   good-faith basis of his belief is.

14             THE COURT:  I didn't hear any testimony, it was just

15   in openings, that this person died and left him a gun, and this

16   guy is close to a person who I've just heard testimony about

17   dying.  So, that's the connection I'm making, so he's

18   identifying I think --

19             MS. WEILAND:  I would proffer that the witness knew

20   that as Tony's gun.

21             THE COURT:  That seems --

22             MR. FALKNER:  Okay.  We're talking about the shotgun

23   now?

24             MS. WEILAND:  Yes.

25             THE COURT:  All right.

```
 1                          (Pause)
 2              MR. FALKNER:  Sorry.
 3              THE COURT:  I was just going to say, for the record,
 4    overruled.
 5    (END OF SIDEBAR CONFERENCE)
 6    BY MS. WEILAND:
 7    Q.   Mr. Marcotte, approaching you now with what's been
 8    previously admitted as Government's Exhibits 7 and 7A -- now,
 9    you mentioned that you're familiar with firearms?
10    A.   Yes, ma'am.
11    Q.   Do you recognize that firearm?
12    A.   Yes, I do.  It's an AK-style shotgun, 12-gauge shotgun,
13    and Anthony Costello had one exactly like this one that I
14    repaired for Anthony.
15    Q.   You say you repaired it.  You believe you repaired that
16    specific firearm?
17    A.   Yes.
18    Q.   How do you know it to be the same firearm?
19    A.   Just the way it looks, the way the stock is.
20    Q.   Talk to me about the stock.
21    A.   This is a stock that's different from the one that was
22    originally with it.  The original one had a wooden stock, and
23    this is a carbon fiber stock.
24    Q.   Okay.  And you said that you -- did you testify a moment
25    ago that you repaired that firearm for Tony?
```

1   A.   Yes.  Tony had the trigger assembly messed up and the

2   spring system inside, and I repaired it for him, because in the

3   Army I learned about AK-style firearms, which was our biggest

4   threat against us, personally, in the military.

5   Q.   Okay.  When you repaired the firearm for Tony, do you

6   recall the butt stock being separated from the other part of

7   the firearm like that?

8   A.   No.

9   Q.   Okay.

10  A.   Only -- only when I repaired the spring.

11  Q.   Can you explain?

12  A.   There's a spring system that goes in here for the bolt

13  assembly (indicating).

14  Q.   Okay.

15  A.   And that can come out.  Without that properly in there the

16  firearm will not work.

17  Q.   Okay.

18  A.   Because it --

19  Q.   If I'm understanding you correctly, are you saying that

20  when you repaired the firearm you had to remove the butt stock

21  in order to access that trigger assembly?

22  A.   Yes.

23  Q.   Okay.  And so, it was in two pieces, then, at some point,

24  when you were repairing it?

25  A.   When I was repairing it, yes.

1    Q.   Okay.

2    A.   Because Tony said, you know, he can't get it working

3    again.

4    Q.   Okay.

5    A.   And I went over and looked at it.

6    Q.   Now, you testified that Tony died in 2018?

7    A.   Yes.

8    Q.   Do you know what happened to Tony's firearm when he died?

9    A.   No, I don't.

10   Q.   Okay.  Before he died did Tony own any vehicles?

11   A.   Yes.  He owned a Ford F-250, an older model F-250.  It was

12   red, automatic transmission.  They always called it "Big Red."

13   And Johnathon had that vehicle.

14   Q.   You said, "Johnathon had that vehicle."  Are you referring

15   to Mr. Irish?

16   A.   Mr. Irish had that vehicle.  I believe Erica Costello gave

17   it to him because the motor was blown.

18   Q.   So, was this after Tony died?

19   A.   Yes, ma'am.

20   Q.   So, after Tony died Erica, Tony's wife, gave Mr. Irish

21   Tony's pickup truck?

22   A.   Yes.

23   Q.   Big Red?

24   A.   Yes.

25   Q.   And you saw Mr. Irish with that truck after Tony died?

1    A.    Yes, ma'am, after I guess he replaced the engine, did the

2    work on it, and every now and then I'd see him around, just

3    around, because it's a small area, Bethlehem and Littleton.  I

4    saw him in Irving Gas Station.  I said, "How's the truck

5    running?"  Things like that.

6    Q.    Okay.  Mr. Marcotte, do you know an individual named

7    Roscoe Whitney?

8    A.    No.

9    Q.    Do you know Neil Prive?

10   A.    No.

11   Q.    Gary Roya?

12   A.    No.

13   Q.    Dylan Roosa?

14   A.    I met him today.

15   Q.    How about Elizabeth Millett?

16   A.    No.

17   Q.    Peter Duguay?

18   A.    No.

19            MS. WEILAND:  May I have a moment, your Honor?

20            THE COURT:  Yes.

21            MS. WEILAND:  Permission to approach, your Honor, to

22   retrieve the firearm?

23            THE COURT:  Yes.

24            MS. WEILAND:  I have no further questions.

25            THE COURT:  Go ahead, Attorney Falkner.

1            CROSS-EXAMINATION

2    BY MR. FALKNER:

3    Q.   Mr. Marcotte, I think you testified on direct you're very

4    familiar with the 1911 pistol as well?

5    A.   It's a .45 caliber that was produced in 1911 by Colt

6    Firearms.

7    Q.   Are you familiar with the procedure to safely clear it at

8    a clearing berm?

9    A.   Yes, I do.

10   Q.   Could you demonstrate that for the jury, if I approached

11   you with one?

12   A.   Pardon?

13   Q.   If I approached you with a 1911 firearm, could you

14   demonstrate that?

15   A.   Yes, I could.

16            MS. WEILAND:  May we approach, your Honor?

17            THE COURT:  Yes.

18   (SIDEBAR CONFERENCE AS FOLLOWS):

19            MS. WEILAND:  I just question the relevance of this.

20            THE COURT:  I do, too.  What is the reason for it?

21            MR. FALKNER:  When Peter Duguay was testifying, he

22   testified that, by implication at the very least, that what

23   Mr. Irish had done in his car was basically what would be the

24   procedure for safely clearing a 1911 firearm during --

25   basically at a clearing berm, but that he had done it in his

1    truck.  Then AUSA Krasinski made a demonstration for the jury

2    and asked whether that was what had happened.

3              THE COURT:  Whether that was the sound he heard.

4              MR. FALKNER:  Whether that was the sound, and he

5    testified that it was not, and that it was a much slower

6    process, and I would like for the jury to hear the correct

7    sound.  And this is somebody who can demonstrate to the jury

8    what that sound would actually be.

9              MS. KRASINSKI:  Wouldn't the proper way to have done

10   that been through the witness who testified about that, through

11   Mr. Duguay?

12             MR. FALKNER:  This witness is familiar with that

13   process, can demonstrate it.

14             THE COURT:  And you're suggesting to me that the sound

15   is going to be different?

16             MR. FALKNER:  That's essentially what Peter Duguay

17   said.

18             THE COURT:  He said it was slower, I think is what --

19   he recognized it when she did it and he said, "Yes, I recognize

20   it," but he said he did it more slowly, and he was testifying

21   that that was a safer way to clean the gun out, clear the gun.

22   So, are you suggesting somehow that the sound is going to be

23   different?

24             MR. FALKNER:  There's a couple of pieces of relevance.

25   One, the sound may well be different.  It may well, one, not be

1    nearly as loud, and, two, it also -- an issue is he says that

2    he wasn't able to see it happen, that it was done without his

3    knowledge.  The jury will be able to witness the actual motions

4    that are involved and assess the believability of whether one

5    could actually do that without somebody else in the car

6    noticing other than by the sound.  So, I think there's a lot

7    of -- I think it's --

8            THE COURT:  Is there any risk at all with this gun?

9    There's no risk, right?  I mean, it's completely --

10           MS. KRASINSKI:  I mean, I think there's always risk

11   with putting a firearm in someone's hands that you don't -- but

12   the firearm is currently rendered safe.

13           THE COURT:  I'm just confirming what you told me.

14           MS. KRASINSKI:  It is rendered safe.  The firearm is

15   rendered safe.

16           THE COURT:  So, you're essentially going to ask him to

17   demonstrate how that would be done?

18           MR. FALKNER:  Correct.

19           THE COURT:  It's so minimally relevant, but go ahead.

20           MR. FALKNER:  Thank you, your Honor.

21           THE COURT:  I'm going to allow it.

22   (END OF SIDEBAR CONFERENCE)

23           THE COURT:  Go ahead, Attorney Falkner.

24   Q.   Sir, I'm approaching you with Government's Exhibit 5, and

25   it has been made safe.  Do you recognize what kind of weapon

1    that is?

2    A.    Yes.  It's a .45 caliber 1911.

3    Q.    Can you demonstrate for the jury the procedure for safely

4    clearing the weapon?

5    A.    There's no magazine in it.  You would drop the magazine

6    with the magazine release, pull back the slide, eject any ammo

7    that's in it, and leave it like in this position (indicating),

8    a safe position.

9    Q.    Can you demonstrate how you would pull back the slide?

10   A.    (Indicating).  You've got a latch right here (indicating)

11   which will hold the slide completely back.  And it's two-piece

12   safety.  Right here is a safety (indicating) before you pull

13   the trigger.  You cannot pull the trigger without touching this

14   safety and the safety itself (indicating).  There's two

15   safeties on this.

16              MR. FALKNER:  May I have a moment, your Honor?

17              THE COURT:  Yes.

18              MR. FALKNER:  I have nothing further, your Honor.

19              MS. WEILAND:  Nothing, your Honor.

20              THE COURT:  All right.  Mr. Marcotte, you may be

21   excused, sir.  Thank you.

22              THE WITNESS:  Okay.  I'm going to put this right back

23   up here for him.

24                     (Witness stepped down)

25              MR. FALKNER:  Your Honor, may I approach to put the

1    firearm back on the table?

2            THE COURT:  Yes.  We're going to probably take a break

3    at 2:00, unless the jury needs one now.  I was thinking we

4    would go till 2:00.  Is that good?  All right.

5            So, government, go ahead and call your next witness.

6            MS. WEILAND:  The United States calls Dylan Roosa.

7            **DYLAN ROOSA**, having been duly sworn by the Clerk, was

8    examined and testified as follows:

9            THE CLERK:  Thank you.  Please state your full name

10   and spell your last name for the record.

11           THE WITNESS:  Dylan Roosa, R-o-o-s-a.

12           THE CLERK:  Thank you very much.  Please be seated.

13                      DIRECT EXAMINATION

14   BY MS. WEILAND:

15   Q.   Good afternoon, Mr. Roosa.

16   A.   Good afternoon.

17   Q.   How old are you?

18   A.   Twenty-eight.

19   Q.   Are you employed?

20   A.   Yup.

21   Q.   What type of work do you do?

22   A.   Mechanic.

23   Q.   Do you work full time?

24   A.   Yup.

25   Q.   What town do you work in?

1   A.   Littleton.

2   Q.   And what town do you live in?

3   A.   North Stratford.

4   Q.   Do you know Johnathon Irish?

5   A.   Yup.

6   Q.   How do you know him?

7   A.   I met him through my wife a long time ago.

8   Q.   When you say "a long time ago," do you remember when?

9   A.   Five, six years.

10  Q.   And did you have regular contact with him from all the way

11  back when you first met him?

12  A.   Mm-hmm.

13  Q.   Did you work together at one time?

14  A.   Yup.

15  Q.   When was that?

16  A.   2016 to '17, '18.  Pat's Towing in Seabrook, New

17  Hampshire.

18  Q.   Okay.  If you wouldn't mind just maybe scooting a little

19  bit closer to the microphone so the court reporter can hear

20  you.

21        Were you friendly with Mr. Irish outside of work?

22  A.   Yup.

23  Q.   Would you all socialize?

24  A.   Yes.

25  Q.   Do you know his wife Stephanie?

1    A.    Yup.

2    Q.    Did there come a point where you fell out of contact with

3    Mr. Irish for a while?

4    A.    Yup.

5    Q.    Do you remember when that was?

6    A.    Shortly after working together for quite a while, yeah.

7    Q.    If I'm understanding you correctly, you worked together,

8    you said, at a towing company?

9    A.    Yeah.

10   Q.    Did you leave that towing company, or did Mr. Irish leave

11   that towing company?

12   A.    Right around the same time we both left the company.  He

13   went to another one, and so did I.

14   Q.    And at that point you sort of lost contact for a while?

15   A.    Yup.

16   Q.    Did there come a point where you reestablished contact?

17   A.    Yup.

18   Q.    And do you remember when that was?

19   A.    Last winter.

20   Q.    Okay.  Tell me about when you first saw him last winter.

21   A.    I was at Walmart cashing a paycheck, and him and his wife

22   and kids were in line.  I hadn't seen him in a while.  Walked

23   over, you know, bumped in passing.

24   Q.    And after bumping into him at Walmart that day, did you

25   see him again after that?

1    A.    Yeah.  It was within a few days.

2    Q.    And tell me about that.

3    A.    Him and his wife and kids were moving into a new house

4    there in town.

5    Q.    Okay.  And how did it come about that you saw him?

6    A.    He came out and asked me to help him move a washer and

7    dryer, some of the bigger stuff around.

8    Q.    Okay.  He asked you for some help moving?

9    A.    Yeah.

10   Q.    Okay.  And this was into a home -- he was moving into a

11   home in Littleton?

12   A.    Yup.

13   Q.    Okay.  Do you remember when this was?  You said it was

14   wintertime?

15   A.    Yeah.  I couldn't say exactly.  I mean, I know it was like

16   30 below outside.  It was cold.

17   Q.    So, are we talking about --

18   A.    It was late wintertime, anyway.

19   Q.    2019?

20   A.    Yes.

21   Q.    Okay.  So, did you agree to help him move?

22   A.    Yeah.

23   Q.    All right.  And when did you go to his house?

24   A.    It was, like, the next day after work, I stopped by and

25   helped him move some of the bigger stuff around.

1   Q.   Okay.  You said you helped him move some of the bigger

2   things.  Do you remember specifically any items that you helped

3   him move?

4   A.   There was a washer and dryer that we threw outside in the

5   dumpster and something else we brought in the house, a big

6   table.  I forget what it was.

7   Q.   Okay.  Directing your attention to an item here that's

8   marked as Government's Exhibit 33, do you recognize that box?

9   A.   Yup.

10   Q.   Have you seen it before?

11   A.   Yup.

12   Q.   When did you first see it?

13   A.   Shortly after Johnathon had moved in the house.  It was

14   out in the living room.

15   Q.   Okay.  You saw that in the living room?

16   A.   (Witness nodded).

17   Q.   When you saw it in the living room was it opened or

18   closed?

19   A.   Closed.

20   Q.   And did it have that lock on it?

21   A.   Nope.

22   Q.   Okay.  Did there come a point when it was opened?

23   A.   Yup.

24   Q.   Was it that same day?

25   A.   No.

1    Q.    Tell me about when you saw it -- well, you said you saw it

2    in the living room.  You just saw it and took note of it?

3    A.    Yeah.  It was just out.

4    Q.    Did he ever ask you for any help moving it?

5    A.    Yeah.  We had moved it from the living room to the

6    bedroom.

7    Q.    When you say "the bedroom," are you talking about

8    Mr. Irish's bedroom?

9    A.    Yup.

10   Q.    And, again, was it closed or opened at that time?

11   A.    It was closed when we moved it, but it had been opened

12   that day, yeah.

13   Q.    So, you said it had been opened that day.  Was it opened

14   before you moved it, or was it opened after you moved it?

15   A.    We brought it in the bedroom, and he opened it and was

16   talking about the guns and put it away.

17   Q.    I'm sorry.  You moved the case into his bedroom.  I

18   apologize if I already asked you this.  Did it have that lock

19   on it when you moved it?

20   A.    No, it didn't.

21   Q.    Okay.  So, how did it come about that he opened the case?

22   A.    Just talking about it.

23   Q.    He opened the case, and what was inside?

24   A.    Guns.

25   Q.    How many guns did you see?

1    A.    Three.

2    Q.    Do you remember what kind of guns they were?

3    A.    The 1911, an AR, and a Catamount Fury 12-gauge.

4    Q.    Are you familiar with firearms?

5    A.    A little bit.

6    Q.    Okay.  Directing your attention -- you mentioned a 1911.

7    What type of gun is that?

8    A.    .45 caliber handgun.

9    Q.    Okay.  And what did it look like?

10   A.    Black.

11   Q.    Okay.  And then you mentioned that there was an AR.  Do

12   you remember anything about the way that firearm looked?

13   A.    Yeah.  That was a full-dressed, two sets of sights, grip,

14   flashlight, laser.

15   Q.    You say "full-dressed."  What does that mean?

16   A.    All the extra gadgets one could put on a gun, I guess.

17   Q.    Okay.  And the third firearm you said was?

18   A.    A 12-gauge shotgun.  It's a semiautomatic 12-gauge.

19   Q.    Showing you what's been previously admitted as

20   Government's Exhibit 5, do you recognize this?

21   A.    Yup.

22   Q.    Is this one of the firearms you saw in the box that day?

23   A.    Yup.

24   Q.    Okay.  And holding up Government's Exhibit 6, do you

25   recognize this?

```
1    A.   Yup.

2    Q.   Is this one of the firearms you saw that day?

3    A.   Yup.

4         MS. WEILAND:  Now, permission to approach, your Honor?

5         THE COURT:  Yes.

6    Q.   In your description of this gun you mentioned it was fully

7    dressed.  I believe you mentioned there were two sets of sights

8    on that firearm.  Is that common?

9    A.   I mean, I suppose it could be, if that's what you were

10   looking for, but not necessarily.

11   Q.   Did you ever have any conversations with Mr. Irish about

12   the two sets of sights on that firearm?

13   A.   Yeah.

14   Q.   Do you know why there were two sets of sights on the

15   firearm?

16   A.   Different ranges.

17   Q.   What does that mean?

18   A.   Like shooting at different ranges, like 50 yards away, 100

19   yards away.

20   Q.   Okay.  And you mentioned that there's also, I believe, a

21   light of some sort on that?

22   A.   Yeah.  It's part of the grip on the -- under the barrel

23   there.  It's a laser sight and a flashlight.

24   Q.   Okay.  All of those items were on the firearm when you saw

25   them that day?
```

1    A.    Mm-hmm.

2    Q.    Holding up for you now what's marked and admitted as

3    Government's Exhibits 7 and 7A, do you recognize these?

4    A.    Mm-hmm.

5    Q.    What is this?

6    A.    That's the semiautomatic 12-gauge shotgun.

7    Q.    Okay.

8    A.    It's a Catamount Fury.

9    Q.    This is the same firearm you saw in this case?

10   A.    Yup.

11   Q.    Now, on that day you said you opened the case, you saw

12   three firearms.  Did he remove the firearms from the case?

13   A.    Picking up and showing them but not like -- yeah.

14   Q.    So, he did handle each of them that day and show them to

15   you?

16   A.    Yeah.

17   Q.    Okay.  Do you remember having any other conversations

18   about any of those firearms?

19   A.    No.  I mean, it was pretty usual for them to be around,

20   so, no, not really.

21   Q.    I'm sorry.  You said what?

22   A.    I said it was usual for them to be around, so --

23   Q.    What do you mean by that?

24   A.    He was proud of them.  They were always, you know --

25   Q.    When you say, "He was proud of them," did he talk about

1   them?

2   A.   Yeah, show them off, talk about them.

3   Q.   Okay.  Did you ever -- aside from this day -- so, I just

4   want to back up a little bit.  This specific incident we're

5   talking about, where you helped Mr. Irish move that black case

6   into the bedroom, you said you put it into his closet?

7   A.   Yup.

8   Q.   What else did you -- did you remember anything you saw in

9   the closet besides that case?

10   A.   Clothes.

11   Q.   Men's clothing?

12   A.   Yes.  It was a combination of him and his wife's clothes,

13   I suppose.

14   Q.   Okay.  And was Stephanie there that day?

15   A.   Yeah.

16   Q.   Was she there when you were going through the case and

17   looking at the firearms?

18   A.   Not directly in the room, no.

19   Q.   Okay.  Now, the Catamount Fury shotgun that I just held

20   up, it's in two pieces.  Is that how you remember seeing it

21   when he removed it from the case?

22   A.   Yeah.

23   Q.   Did you ever have any conversations about why it was in

24   two pieces?

25   A.   The bolt for the stock had broken and went missing.

1    Q.    Did you ever see that firearm together in one piece?

2    A.    No.

3    Q.    And, again, this all happened within, I believe you said,

4    a week or so of when you bumped into him at Walmart and he

5    asked you for help moving?

6    A.    Yeah.  Give or take, yeah.

7    Q.    Okay.  So, before that day you hadn't seen him for a

8    while, correct?

9    A.    Yeah.  It had been quite some time.

10   Q.    Okay.  After that day did you guys begin hanging out more

11   frequently?

12   A.    Yup.

13   Q.    How frequently would you say you started hanging out?

14   A.    A couple of times a week.

15   Q.    Okay.  And what types of things would you do together?

16   Would you just hang out at one another's home, or would you go

17   out and do things?

18   A.    Yeah, just hang around the house, because him and his wife

19   would babysit our kids from time to time, and the kids would

20   hang out together.

21   Q.    Okay.  During any of those activities did you ever see any

22   of those firearms again while hanging out at Mr. Irish's house?

23   A.    Yeah.

24   Q.    Any specific incidents that stick in your mind?

25   A.    Shooting out behind his house one day.

1   Q.   Tell me about that.

2   A.   Uh, we shot the 1911 out in the backyard.

3   Q.   Do you remember when that was?

4   A.   Summertime.  I don't exactly remember like the day, no.

5   Q.   Sometime in the summer of 2019?

6   A.   Yeah.

7   Q.   Was anybody else there?

8   A.   It was just me and him in the yard.  The kids and my wife

9   and his wife were in the house.

10  Q.   Okay.  And you said you were shooting it.  Was this sort

11  of like target practice?

12  A.   Yeah.

13  Q.   What were you shooting at?

14  A.   A tree.

15  Q.   Okay.

16  A.   Nothing --

17  Q.   Not cans or something like that?

18  A.   No.

19  Q.   Did you ever see Mr. Irish carrying the 1911?

20  A.   Around the house and the property, yeah.

21  Q.   When you say, "Around the property," what do you mean?

22  A.   Out in like -- we had gone out and built like a deer stand

23  and what not out in the woods.  He would carry it out, and it

24  wasn't unusual for him to have it on him.

25  Q.   And when you say he had it on him, where did he carry it

1    on his person?

2    A.    On a holster on his belt line.

3    Q.    Showing you now what's been admitted as Government's

4    Exhibit 18, did the holster look like this?

5    A.    Mm-hmm.

6    Q.    Did there ever come a time where Mr. Irish asked you to

7    hold his firearms?

8    A.    Mm-hmm.

9    Q.    Do you remember when that was?

10   A.    Me and my wife had babysat his kids.  Him and his wife had

11   gone to court for something to do with the house, and her

12   mother had gotten a restraining order against him.

13   Q.    Okay.  So, do you remember approximately when that was?

14   A.    Again, it was probably late in the summertime.

15   Q.    Okay.

16   A.    Approaching fall time.  I don't know exactly when, though.

17   Q.    You remember that -- you said you were babysitting his

18   children?

19   A.    Yeah.

20   Q.    Were you at his house?

21   A.    Yup.

22   Q.    Okay.  And they were actually in court on the day that you

23   were there babysitting?

24   A.    Yes.

25   Q.    Was that the day that they were in court related to, you

1    mentioned that his mother-in-law had taken out a restraining

2    order.  Was that the reason they were in court, was something

3    to do with the restraining order?

4    A.   I'm not sure if it was for the restraining order or not.

5    I want to believe -- I believe it had something to do with the

6    house.

7    Q.   Okay.  And was it that same day that Mr. Irish asked you

8    to hold onto the firearms?

9    A.   Mm-hmm.

10   Q.   How did that come about?

11   A.   He had just asked me with the restraining order -- when he

12   come home and told me about the restraining order, he asked me

13   if I would take the guns home.

14   Q.   So, this was then, your testimony is now that --

15   A.   That day.

16   Q.   Okay.  That whatever happened in court did have something

17   to do with the restraining order, is your understanding?

18   A.   I believe he was issued -- the restraining order was

19   issued that day while they were in court.

20   Q.   I see.  And so, in light of that, he said to you he wasn't

21   sure he should have the firearms?

22   A.   Yeah.

23   Q.   And he asked you to hold them?

24   A.   Yup.

25   Q.   What did you say?

1    A.    No.

2    Q.    Why did you say, "No"?

3    A.    I was a Mass. resident at the time, and I just didn't want

4    them.

5    Q.    You said you were a Mass. resident at the time.  Were you

6    living in Massachusetts, or were you living in New Hampshire?

7    A.    No.  We had just moved up into New Hampshire earlier that

8    year, and I just hadn't transferred, like, full residency and

9    all that, so --

10   Q.    So, like your driver's license, for instance, was a

11   Massachusetts license?

12   A.    Yeah.  It was a Massachusetts driver's license, yeah.

13   Q.    And so, if I'm understanding you correctly, is it your

14   testimony you weren't sure if you were allowed to have firearms

15   or --

16   A.    Yup.

17   Q.    Okay.  And that was because of your residency you weren't

18   sure, as a Massachusetts resident?

19   A.    Yeah, yeah.

20   Q.    Okay.  So, you declined to take the guns.  Do you know

21   what happened to the guns?

22   A.    No.

23   Q.    Did he say anything more about them?

24   A.    No.

25   Q.    After that day did you see the defendant carrying

1   firearms?

2   A.   No.

3   Q.   Did you see him carrying firearms ever again or just for a

4   period of time?

5   A.   No.

6   Q.   Did you ever see Stephanie carrying a firearm?

7   A.   No.

8   Q.   At some point you had a falling out with Mr. Irish; is

9   that right?

10  A.   Yeah.

11  Q.   When did that happen?

12  A.   More recently, within the past couple of -- a month and a

13  half, two months.

14  Q.   Okay.  So, somewhat recently?

15  A.   Yeah.

16  Q.   What was the general nature of the disagreement?

17  A.   It started with some money, and he just became kind of

18  irate and was calling and yelling at my wife and screaming and

19  hollering.

20  Q.   You said it started over some money.  Can you be a little

21  more specific?

22  A.   Yeah.  We had borrowed, like, I don't remember exactly, I

23  think it is like 20 or $30 or something, and I had been out of

24  work sick for most of that week and didn't pay him, and he got

25  all pissed about it and was calling my wife yelling and

1    screaming, and we had a big argument, and that was pretty much

2    the end of the --

3    Q.   Okay.  And after this back and forth over the money and

4    the argument on the phone did you have any more contact with

5    Mr. Irish?

6    A.   No.

7    Q.   Okay.  Do you recall at some point the FBI reaching out to

8    you to ask you some questions about Mr. Irish?

9    A.   Yup.

10   Q.   Did you agree to speak with them?

11   A.   Yeah.

12   Q.   Do you remember roughly when that was?

13   A.   I mean, they had come by my work a few times.  I don't

14   remember like exactly, no.

15   Q.   Do you remember if it was before or after your falling out

16   with Mr. Irish?

17   A.   After.

18   Q.   Okay.  And do you remember your first interview with them?

19   A.   Yeah.

20   Q.   Do you remember whether you told them about any of the

21   same instances you've testified about today?

22        MR. FALKNER:  Objection.  Hearsay.

23        THE COURT:  Overruled.

24   A.   He had asked me some stuff, but, I mean, not in a great

25   detail the first time I had met him, no.

1   Q.   Okay.  Did you talk about -- do you remember whether or

2   not the subject of shooting the gun in Johnathon's yard came up

3   during that first interview?

4   A.   Yeah.

5   Q.   Okay.  And what about Johnathon asking you to hold onto

6   his firearms?  Do you remember whether that came up in your

7   first interview?

8   A.   Yup.

9   Q.   Now, you said you weren't quite sure when that first

10  interview took place.  Would seeing the agent's summary of that

11  interview refresh your recollection about when the interview

12  took place?

13  A.   Possibly, yeah.

14          MS. WEILAND:  Permission to approach, your Honor?

15          THE COURT:  Yes.

16  Q.   If you would take a moment to just review that and

17  directing your attention specifically to the highlighted

18  portion at the bottom.  After you have had a chance to review

19  it, if you wouldn't mind handing it back to me.

20  A.   (Witness reviewed document).

21  Q.   Having reviewed that report, does that refresh your

22  recollection about when that first interview took place?

23  A.   I mean, a little bit, yeah.

24  Q.   Okay.

25  A.   It was before Christmastime, late fall.

```
1    Q.   Late fall.  During that initial interview did the FBI

2    enlist you to work for the FBI as a confidential human source?

3    A.   Mm-hmm.

4    Q.   Was it during that same interview?

5    A.   No.

6    Q.   Did it happen at a later time?

7    A.   Yes.

8    Q.   Do you remember how much later?

9    A.   It was a few weeks.

10   Q.   Okay.  Was that something that they approached you about,

11   or was it your idea that you approach the FBI about working as

12   a confidential source?

13   A.   They approached me.

14   Q.   Okay.  Now, at this point -- I just want to make sure I

15   understand the timeline -- this was after your falling out with

16   Mr. Irish?

17   A.   Yup.

18   Q.   And so, you weren't in regular contact with him at this

19   point?

20   A.   No.

21   Q.   Okay.  Did you agree to work as a confidential source for

22   the FBI?

23   A.   Yup.

24   Q.   What did you understand that to mean?

25   A.   How do you mean?
```

1    Q.   What was your understanding about what that would entail?

2    A.   I mean, they just -- they came by, asked me what I know,

3    and at one point they had wanted me to reach out to them, but

4    it never happened.

5    Q.   Okay.  When you agreed to work as a confidential source,

6    did the agents go over with you any type of ground rules that

7    would apply to your working in that capacity?

8    A.   A little bit, yeah.

9    Q.   Do you remember what any of those were?

10   A.   Like, not to, like, pose as any kind of FBI agent or do

11   anything, like, unsanctioned, I guess, that was unapproved of

12   or without their say-so.

13   Q.   Okay.  And what about in terms of any information you

14   provided to the FBI?  Were you given any instructions about

15   that?

16   A.   No.

17   Q.   Did you receive anything of value in exchange for your

18   assistance?

19   A.   At one point they had given me $250.

20   Q.   Okay.  Do you remember when that was?

21   A.   Right around Christmastime or --

22   Q.   Okay.

23   A.   -- shortly after.

24   Q.   So, would this have been after the initial agreement to

25   work as a confidential source?

1    A.    Yeah.

2    Q.    Did you ask them for money?

3    A.    No.

4    Q.    Was your agreement to work as a source contingent on

5    receiving any type of payment from the FBI?

6    A.    No.

7    Q.    Other than that one-time payment of $250, did you receive

8    anything else of value from the FBI?

9    A.    Nope.

10    Q.    Are you receiving or do you expect to receive anything of

11    value in exchange for your testimony here today?

12    A.    No.

13    Q.    Do you know a person named Roscoe Whitney?

14    A.    I know of.

15    Q.    When you say you "know of," does that mean you recognize

16    the name?

17    A.    Yeah.

18    Q.    What about Gerald Roya?

19    A.    No.

20    Q.    David Marcotte?

21    A.    No.

22    Q.    Elizabeth Millett?

23    A.    I'm familiar, but not personally, no.  Know of.

24    Q.    "Know of."  Do you know who she is in relation to

25    Mr. Irish?

1   A.   I believe it's Stephanie's mom.

2   Q.   What about Neil Prive?

3   A.   No.

4   Q.   Peter Duguay?

5   A.   I know of.

6   Q.   Okay.  Now, what is your understanding about the current

7   relationship between Mr. Irish and Stephanie?

8   A.   They're getting a divorce.

9   Q.   Okay.  Have you remained in contact with Stephanie since

10  she and Mr. Irish split up?

11  A.   Yup.

12  Q.   Would you say that you're friends?

13  A.   Yeah.

14          MS. WEILAND:  May I have a moment, your Honor?

15                     (Pause)

16  Q.   Going back a moment ago, Mr. Roosa, I asked you about

17  Government's Exhibit 18, a holster.  Do you recognize this

18  holster?

19  A.   Yes.

20  Q.   Yes.  Okay.  Thank you?

21          MS. WEILAND:  I have no further questions, your Honor.

22          THE COURT:  All right.  We're going to take a 10,

23  15-minute break before Mr. Falkner asks you some questions,

24  sir.  So, we'll take a break.  We'll reconvene at about 2:15,

25  2:20.  All right?

1        THE CLERK:  All rise for the jury.

2        (The jury exited the courtroom at 2:08 p.m.)

3                    JURY NOT PRESENT

4        THE COURT:  Mr. Roosa, you may step down during the

5   break.

6        I just want to make sure that the government is able

7   to get the documents ready so that we can turn those over to

8   the attorney when he arrives, and that way he can get prepared

9   while we're still in trial.  At some point he'll probably need

10  to speak with counsel.  And who else is on the list?  What's

11  next?

12       MS. KRASINSKI:  There are three witnesses remaining:

13  Mr. Roya, Special Agent Forte and Special Agent Tongbua.

14       THE COURT:  So, Roya is -- we'll move him to the last.

15  He would be next.

16       MS. KRASINSKI:  He would be next, but if we need to

17  adjust the order, we will, your Honor.

18       THE COURT:  Okay.  And tell me the two agents again.

19       MS. KRASINSKI:  Special Agent Forte and Special Agent

20  Tongbua.  It's T-o-n-g-b-u-a.

21       THE COURT:  All right.  And do you think those two

22  will take the remainder of today, so we could move Roya into

23  tomorrow, possibly?

24       MS. KRASINSKI:  I anticipate that there may be a

25  lengthy cross of Agent Forte, your Honor.

1          THE COURT:  Okay.  All right.  That being the case, it

2     may be easiest to give counsel the time to meet with Mr. Roya,

3     and somebody can, obviously, speak to him so he is aware, and

4     I'll let you handle that, and we'll all take an afternoon break

5     now.  All right.

6          THE CLERK:  All rise.

7           (Recess taken from 2:10 p.m. to 2:30 p.m.)

8          THE CLERK:  All rise for the Honorable Court.  Please

9     remain standing for the jury.

10          (The jury entered the courtroom at 2:30 p.m.)

11          THE CLERK:  Please be seated.

12          THE COURT:  Attorney Falkner, go ahead.

13                          CROSS-EXAMINATION

14     BY MR. FALKNER:

15     Q.   Good afternoon, Mr. Roosa.

16     A.   Good afternoon.

17     Q.   The first time that you met with the FBI on this case was

18     November 14th of 2019, right?

19     A.   I don't recall the specific date, but that's around the

20     right time frame, yeah.

21     Q.   And on that occasion you met with Agent LeBlanc, right?

22     A.   Yes.

23     Q.   And was he the only agent that you met with on that day?

24     A.   Yeah.

25     Q.   At any point during your conversation with Agent LeBlanc

1   did the idea of becoming a confidential human source come up?

2   A.   No.

3   Q.   How long did you meet with Mr. LeBlanc?

4   A.   Off and on over a course of, like, a month and a half or

5   so, give or take.

6   Q.   Let me ask it another way.  During your first meeting with

7   him where did that meeting take place?

8   A.   My work.

9   Q.   And I think you said he had been coming around to your

10  workplace before then.

11  A.   No.

12  Q.   How did it come to be that he was at your workplace?  Did

13  he just show up?  Did you have phone conversations with him

14  beforehand?

15  A.   He just showed up.

16  Q.   You had no idea he was coming, right?

17  A.   No.

18  Q.   And did he identify himself as an FBI agent?

19  A.   Yeah.

20  Q.   Did he tell you what he was there to talk to you about?

21  A.   Yeah.

22  Q.   Were you surprised that an FBI agent had come to your

23  workplace to talk to you?

24  A.   A little bit at first, yeah.

25  Q.   Where did you talk?  Was it out on the floor?

1    A.    No.  In the back storage room where we keep all our tires.

2    Q.    And you work at VIP Tires and Services, right?

3    A.    Yup.

4    Q.    So, he took you back to some kind of private room?

5    A.    Yeah.

6    Q.    Did you have any conversation before you went back to the

7    private room?

8    A.    Nope.

9    Q.    He just said, "I'm here as an FBI agent; I'd like to come

10   talk to you"?

11   A.    Yeah.

12   Q.    And then the two of you walked out back?

13   A.    Yeah.

14   Q.    Did you have any conversation as you were walking to the

15   back?

16   A.    No.

17   Q.    And you met for 10 or 15 minutes, you said?

18   A.    Roughly.

19   Q.    And were you surprised that you were being asked questions

20   about Johnathon Irish?

21   A.    I was surprised to see them, but, no, not really.

22   Q.    Had you expected then to be asked questions about

23   Johnathon Irish and his firearms?

24   A.    After he introduced himself and told me why he was there,

25   yeah.

1    Q.   Let me put it to you another way.  During your

2    testimony -- according to your testimony on direct examination

3    you saw firearms at Johnathon's house a lot, right?

4    A.   Yeah.

5    Q.   You went out -- you went through the box in the wintertime

6    of 2019, right?

7    A.   I went where?

8    Q.   You went through the box with Johnathon.  He showed you

9    the different firearms in the box, right?

10   A.   Yeah.

11   Q.   And that was in the winter of 2019?

12   A.   Yeah.

13   Q.   And you still brought your kids around?  You didn't think

14   there was anything wrong with that, right?

15   A.   No.

16   Q.   And you went over to his house repeatedly, right?

17   A.   Yeah.

18   Q.   You didn't find anything wrong with the fact that there

19   were firearms in that house, right?

20   A.   No.

21   Q.   And at one point you were out shooting in the backyard?

22   A.   Yeah.

23   Q.   You didn't find anything wrong with possessing the firearm

24   yourself, right?

25   A.   No.

1    Q.    And you didn't find anything wrong with Johnathon

2    possessing the firearm, right?

3    A.    No.

4    Q.    And your family was around and everything else, right?

5    A.    (Witness nodded).

6    Q.    So, when the FBI was suddenly asking you questions about

7    Johnathon Irish and his possession of firearms, was that

8    surprising to you?

9    A.    A little bit, yeah.

10   Q.    Because you didn't think there was anything wrong with

11   Johnathon Irish having firearms, right?

12   A.    (Witness nodded).

13   Q.    And he had been a good friend to you, right?

14   A.    More or less.

15   Q.    Now, it was at that meeting in November of 2019 that you

16   told the FBI that you and Johnathon had stopped talking one to

17   two months prior to that, right?

18   A.    Yeah.

19   Q.    So, sometime between the middle of September and the

20   middle of October is when you and Johnathon stopped talking,

21   correct?

22   A.    Yeah.

23   Q.    So, it wasn't, as you said on your direct, one or two

24   months prior to today; it was one or two months prior to

25   November, right?

1    A.    Yeah.

2    Q.    And you and your wife were both friendly with Johnathon

3    and Johnathon's wife, right?

4    A.    Yeah.

5    Q.    And the kids played together, right?

6    A.    Yeah.

7    Q.    And you watched his kids, he watched your kids, right?

8    A.    Yeah.

9    Q.    And you told the FBI that the falling out that you had had

10   with Johnathon Irish was over allegations that Stephanie Irish

11   had been cheating on Johnathon, correct?

12   A.    That and money, yeah.

13   Q.    And you told the FBI that Johnathon had believed that your

14   wife had made those accusations to Stephanie, right?

15   A.    Yeah.

16   Q.    That was what you said the fight with Johnathon Irish was

17   all about, right?

18   A.    That's how it started, yeah.

19   Q.    You didn't say anything in that first interview with Agent

20   LeBlanc about Johnathon lending you money, did you?

21   A.    I don't recall.

22   Q.    Do you deny saying that, or do you not remember whether

23   you said it?

24   A.    I do not remember.

25   Q.    At some point during that interview, though, you had a

1    conversation about the fact that your finances were low, didn't

2    you?

3    A.   No.

4    Q.   Did you ever talk to the FBI about your finances?

5    A.   A little bit, yeah.

6    Q.   Oh, you did?  Was it during the first interview?

7    A.   No.

8    Q.   When did you talk to them about your finances?

9    A.   I don't recall the specific date.  I mean, I had talked to

10   them off and on for weeks at a time, so --

11   Q.   All right.  Well --

12   A.   It was fairly early on.

13   Q.   What did you say about your finances?

14   A.   Not much.  Just I was hard up, like, times are tough all

15   around.

16   Q.   So, in the late fall of 2019 is it fair to say that you

17   were complaining to the FBI that you didn't have much money?

18   A.   No.

19   Q.   Then, you tell me what you exactly said to them.

20   A.   Like I said, I don't really recall the word-for-word

21   conversation, but --

22   Q.   But you told them that you were hard up, times were tough?

23   A.   Yes, yes.

24   Q.   Why would you tell an FBI agent who is investigating

25   Johnathon Irish's firearms that you were hard up for cash?

1  A.   It was a conversation that revolved around me driving to

2  meet them at places and what not and I couldn't afford to be

3  driving around.

4  Q.   So, you were asked to go meet Johnathon at one point; is

5  that right?

6  A.   Yeah.

7  Q.   And you told the FBI you couldn't afford to go drive to

8  meet him?  That's how that came up?

9  A.   No.  They had asked me if I could come meet them on my day

10  off somewhere, and I just told them I couldn't afford on my day

11  off to be driving 60 miles out of my way to have a

12  conversation.

13  Q.   Where did they want to meet you?

14  A.   In Littleton.

15  Q.   Where were you living at the time?

16  A.   North Stratford.

17  Q.   And so, the round trip is how long?

18  A.   About 60-something miles.

19  Q.   Where is North Stratford in relation to Littleton?

20  A.   About an hour north.

21  Q.   Okay.  How many times -- was it only -- I should say

22  agent.  Was it only Agent LeBlanc, or did you meet with anybody

23  else from the FBI?

24  A.   I met with his partner who had come with him a couple of

25  times.

1   Q.   Was that Agent Tongbua?

2   A.   Yes.

3   Q.   Is he in the courtroom here?

4   A.   Yeah.

5   Q.   Where is he?

6   A.   Over there in the corner (indicating) and -- yeah.

7   Q.   Okay.  He's not over there (indicating)?

8   A.   No.

9   Q.   Okay.  And how many times did you meet with Agent Tongbua?

10  A.   He had come with Kevin a couple of times.  I don't know.

11  Q.   They signed you up as a confidential informant on November

12  25th of 2019, correct?

13  A.   Yeah.

14  Q.   Where were you when they signed you up?

15  A.   Work.

16  Q.   They met with you at the VIP Tires?

17  A.   Yeah.

18  Q.   Who made the arrangements for them to meet you?  Who

19  arranged the meeting?

20  A.   Kevin.

21  Q.   This time you knew they were coming, right?

22  A.   Yeah.

23  Q.   Now, the first meeting you had with them on November 14th,

24  were there any meetings between the November 14th meeting and

25  the November 25th meeting, when you were signed up as a

1   confidential informant?

2   A.   I don't recall specific dates, so I'm not sure if there

3   was or wasn't in between.  I have no idea.

4   Q.   You also expressed to those agents concern for the welfare

5   of Johnathon's children; is that right?

6   A.   A little bit.

7   Q.   After you and Johnathon Irish had broken off your

8   relationship, you continued to be friendly with Stephanie

9   Irish, correct?

10  A.   Not at first, no.  I kind of cut ties with all of them.

11  Q.   Well, at some point you reestablished ties with Stephanie

12  Irish, correct?

13  A.   Mm-hmm.

14  Q.   When was that?

15  A.   Again, I don't recall a specific date, but it revolved

16  around the Child Services coming to the house and them filing

17  for divorce, and she had reached out to us.

18  Q.   "She had reached out to us."  You mean she had reached

19  out --

20  A.   To me and my wife.

21  Q.   You and your wife?

22  A.   Yup.

23  Q.   Did she move in with you?

24  A.   No.

25  Q.   Did she ask for care of the children?

1    A.    No.

2    Q.    Did you ever tell her you were going to help take care of

3    the kids after Johnathon was arrested?

4    A.    It had nothing to do with his arrest, but me and my wife

5    had told her that we would do anything we could to help her.

6    Yeah.

7    Q.    Fair to say in the weeks leading up to Johnathon's arrest

8    Stephanie had expressed that she expected Johnathon to be

9    arrested?

10   A.    No.

11   Q.    Were you talking to Stephanie during that period of time

12   about your conversations with the FBI?

13   A.    No.

14   Q.    On December 4th you received $250 from the FBI, right?

15   A.    I don't recall the date, but, yeah.

16   Q.    Early December sound about right?

17   A.    Yeah.

18   Q.    Helping to pay for some Christmas gifts for the kids?

19   A.    I suppose.

20   Q.    Well, times were so tough that it was difficult to be able

21   to drive 60 miles, so $250 probably went a long way, right?

22   A.    Not really.

23   Q.    Put a full tank of gas in your truck, right?

24   A.    I use about four full tanks of gas a week just driving to

25   and from work, so --

1    Q.   So, you got your transportation for a week paid for?

2    A.   I could have.  I don't recall everything I spend on gas,

3    cigarettes day to day.

4    Q.   Now, when they signed you up as a confidential informant,

5    they didn't promise they were going to give you money, right?

6    A.   No.

7    Q.   But they did talk about the fact that it was possible that

8    you were going to get money, right?

9    A.   Not at the first one, no.

10   Q.   When did they first tell you it's possible you were going

11   to get money?

12   A.   Within the next meeting or two.

13   Q.   Before you actually got the money, right?

14   A.   Yeah.

15   Q.   And you continued to work with them?

16   A.   Yeah.

17   Q.   Was it the first time you had ever done this work as a

18   confidential informant?

19   A.   Yeah.

20   Q.   Is Stephanie together with Donny Trent now?

21   A.   Yeah.

22   Q.   Is that somebody you're friendly with as well?

23   A.   Yeah.

24   Q.   Are the four of you socializing these days?

25   A.   Yeah.

1    Q.   Are the kids playing together?

2    A.   No.

3    Q.   Do you watch Stephanie's kids from time to time?

4    A.   Not right now, no.

5    Q.   Did you watch Stephanie's kids from time to time after she

6    left Johnathon?

7    A.   No.

8    Q.   How come you didn't tell the FBI during the first

9    interview that the fight that you had with Johnathon Irish was

10   about money?

11   A.   Because it wasn't relevant in the conversation.

12   Q.   In fact, you didn't tell them the fight was about money

13   until shortly before this trial, correct?

14   A.   Yeah.

15   Q.   You knew it would be a crime to mislead them, correct?

16   A.   I wasn't misleading anybody.  It just wasn't a topic of

17   conversation.

18   Q.   You just didn't give them the whole truth, right?

19   A.   No.

20   Q.   Well, you told them about a fight with Johnathon Irish,

21   right?

22   A.   Yeah.

23   Q.   And you told them what the fight was about, right?

24   A.   Yeah.

25   Q.   And you didn't tell them the fight was about money, right?

1    A.    I suppose no, no, I didn't.

2    Q.    But the fight was about money?

3    A.    I guess it could have started that way, yeah.

4    Q.    You guess it could have started that way?  You told the

5    jury here this morning or before on direct examination that the

6    fight started about money, right?

7    A.    Yes.

8    Q.    You don't know for sure whether you're going to get paid

9    for your testimony here today, do you?

10   A.    Absolutely not.

11   Q.    But you think you might be, right?

12   A.    No.

13              MR. FALKNER:  May I have a moment, your Honor?

14              THE COURT:  Yes.

15                          (Pause)

16              MR. FALKNER:  I have nothing further, your Honor.

17              THE COURT:  Anything further from the government?

18              MS. WEILAND:  Just a couple of quick questions, your

19   Honor.

20                     REDIRECT EXAMINATION

21   BY MS. WEILAND:

22   Q.   Mr. Roosa, I believe you covered this, but I just want to

23   make sure it's clear to the jury.  During the time when you

24   sort of started socializing with Mr. Irish, beginning in last

25   winter, you did not know that he was a convicted felon; is that

1    correct?

2    A.    No.

3    Q.    So, as far as you knew, at that time Mr. Irish's

4    possession of those guns was totally legal?

5    A.    Yeah.

6    Q.    You mentioned that your place of work is in Littleton?

7    A.    Yup.

8    Q.    And you live in North Stratford?

9    A.    (Witness nodded).

10   Q.    I believe Attorney Falkner asked you whether that was 60

11   miles round trip, and I just want to make sure I'm clear.   Is

12   it 60 miles round trip, or is that one way 60 miles?

13   A.    It's round trip give or take 60 miles.

14   Q.    But it takes you about an hour to get to work --

15   A.    Yeah.

16   Q.    -- from your home and about an hour to get back?

17   A.    Yup.

18   Q.    How many days a week do you work?

19   A.    Five.

20   Q.    In regards to your falling out with Johnathon, you said

21   initially the disagreement about the money didn't seem

22   particularly relevant?

23   A.    No.

24   Q.    And I believe you said that it might have started that

25   way.  Did the disagreement eventually become about something

1    larger than $20?

2    A.    Yeah.

3    Q.    And what was that?

4    A.    Him getting caught cheating on his wife.

5    Q.    Okay.

6    A.    Him accusing me and my wife of being the ones to spread

7    rumors and what not about it.

8    Q.    Okay.  So, in cross-examination Attorney Falkner asked you

9    some questions about that.  I believe his question to you was

10   whether there was an accusation that Stephanie was cheating on

11   Johnathon.  If I'm understanding you correctly now, you're

12   saying that the accusation was actually that Johnathon was

13   cheating on his wife?

14   A.    Yes.

15   Q.    And there was a blowup about that?

16   A.    Oh, yeah.

17   Q.    Did it get pretty heated?

18   A.    Oh, yeah.

19   Q.    And after that blowup did you sever ties at that point?

20   A.    Yeah.

21          MS. WEILAND:  I have nothing further, your Honor.

22          THE COURT:  All right.  Anything further?

23          MR. FALKNER:  Very briefly.

24                          RECROSS-EXAMINATION

25   BY MR. FALKNER:

1    Q.   I just want to be clear.  You told the jury first, right,

2    that the fight was about 20 or $30?  Have I got that right?

3    A.   Yes.

4    Q.   And then now you're saying that the main object of the

5    fight was an accusation that Johnathon Irish had been cheating,

6    correct?

7    A.   I'm saying the topic of the conversation of him and I

8    having an argument started with how I owed him money, but it

9    always reverted back to how we were scum bags and --

10   Q.   Was this one conversation, or was this an ongoing series

11   of conversations now that you're talking about?

12   A.   It was all one incident, but it was several phone calls

13   over the course of an hour or so.  He kept calling and yelling

14   and screaming and hollering.  So, it was multiple

15   conversations, but it was one argument in the same day.

16              MR. FALKNER:  I have nothing further, your Honor.

17              THE COURT:  Anything further from the government?

18              MS. WEILAND:  No, your Honor.

19              THE COURT:  All right.  Mr. Roosa, you may step down.

20   Thank you, sir.

21                    (Witness stepped down)

22              THE COURT:  The government may call its next witness.

23              MS. KRASINSKI:  The United States calls Special Agent

24   Forte.

25              THE CLERK:  Agent Forte, please remain standing and

1    raise your right hand.

2            **JOHN FORTE,** having been duly sworn by the Clerk, was

3    examined and testified as follows:

4            THE CLERK:  Thank you.  Please state your full name

5    and spell your last name for the record.

6            THE WITNESS:  John Forte, F-o-r-t-e.

7            THE CLERK:  Thank you very much.

8                       <u>DIRECT EXAMINATION</u>

9    BY MS. KRASINSKI:

10   Q.    Agent Forte, where do you work?

11   A.    I am a Special Agent with the Bureau of Alcohol, Tobacco,

12   Firearms and Explosives.

13   Q.    How long have you worked there?

14   A.    Over 17 years.

15   Q.    What's your title?

16   A.    Special Agent.

17   Q.    And what are the duties and responsibilities of a Special

18   Agent with ATF?

19   A.    We primarily have jurisdiction over the federal firearms,

20   explosives, alcohol, tobacco and arson statutes.

21   Q.    Are you assigned to a particular office?

22   A.    Yes.  The Manchester, New Hampshire Field Office.

23   Q.    And can you generally tell the jury what type of training

24   you've received to become a Special Agent with the ATF,

25   specifically regarding firearms?

1   A.   Sure.  Initially, you go to two schools.  Both of them are

2   held at the Federal Law Enforcement Training Center, which is

3   Georgia in Glynn County in Brunswick, Georgia, which is Glynn

4   County, which is often called "Glynco," which is an

5   abbreviation of Glynn County.  The schools are approximately

6   six to seven months total for both schools.  The first one is

7   called the Criminal Investigator Training Program, and then

8   ATF's add-on school afterwards when I went was called New

9   Professional Training.

10  Q.   And do you have any specialty assignments?

11  A.   I do.  I'm a firearms instructor for my office, and I also

12  do interstate nexus examinations.

13  Q.   So, let's first talk about your role as a firearms

14  instructor.  What does it mean to be an ATF firearms

15  instructor?

16  A.   For me it meant I had to go to a two-week school that was

17  actually put on by the Federal Law Enforcement Training Center

18  in Cheltonham, Maryland, and that school primarily teaches you

19  -- for us it would be a review of much of what we know about

20  firearms and nomenclature and what not; but for other people

21  who are not ATF agents that go to that same school it's kind of

22  new for them.  But the rest is really designed on how to teach

23  individuals how to shoot, what the qualification standards are

24  and why there are qualification standards, as well as teaching

25  individuals that have trouble with qualifications how to

1    correct that and become better shooters.

2    Q.   Now, you also mentioned that you're an interstate nexus

3    examiner.  First, what is an interstate nexus determination?

4    A.   It determines whether a firearm or ammunition has traveled

5    in or affected interstate or foreign commerce.

6    Q.   And what's the training that you received to become an

7    interstate nexus examiner?

8    A.   The initial training that I went to was a week-long, and

9    it was held at the National Tracing Center, ATF's National

10   Tracing Center, which is in Martinsburg, West Virginia.

11   Q.   And is there anything that happens before you attend that

12   training?

13   A.   They do provide you with a precourse material.  You're

14   required to review and know that precourse material.  When you

15   arrive, the first thing they have you do is take a test.  If

16   you do not pass that test you are not allowed to continue with

17   the program.  They'll send you home.

18   Q.   So, did you get those materials?

19   A.   I did.

20   Q.   Did you take the test?

21   A.   I did.

22   Q.   Did you pass the test?

23   A.   I did.

24   Q.   What happens next?

25   A.   You then participate in the course for the rest of the

1    week, and they basically go over what an interstate nexus

2    determination is comprised of, markings and all of that type of

3    stuff, and then at the end of it there's another test, and you

4    pass that, and you become certified with ATF as an Interstate

5    Nexus Examiner.

6    Q.   And you did all of that?

7    A.   I did.

8    Q.   Now, I want to talk about something else that is at ATF's

9    National Tracing Center in West Virginia.  Does ATF have, I'll

10   call it a library or catalog of firearms?

11   A.   Yes.

12   Q.   Can you describe that?

13   A.   It's a vault, and it contains over 10,000 different

14   firearms, and I've spent over -- because I did go to an

15   additional follow-up training there a couple -- four years

16   later from my initial training.  So, between those two

17   trainings I've spent at least two full days in that vault

18   reviewing and looking at firearms and comparing models,

19   different variations of the same models and mostly just looking

20   over the nuances and differences between the firearms.

21   Q.   And does the library at least or catalog at least attempt

22   to have one of every firearm recently manufactured?

23   A.   They do.  They have quite a few.  I can't say that they

24   have every single one, but they have a lot of them.

25   Q.   They certainly try to?

1    A.    Yes.

2    Q.    Has historic firearms?

3    A.    Yes.

4    Q.    And so, you've had a chance to analyze all of those

5    firearms?

6    A.    I did.

7    Q.    And you also mentioned some follow-up training.  What was

8    that?

9    A.    There was a secondary school, which was an advanced

10   firearms interstate nexus school.  It was held, again, at the

11   National Tracing Center in Martinsburg, West Virginia.  That

12   particular school was in addition -- they went over additional

13   information regarding markings; they provide us with some

14   additional reference materials, books; and then there was some

15   additional training where they wanted us to be able to

16   recognize if I look at a firearm that may have been altered to

17   be, for instance, let's say may have been altered to function

18   as a machine gun, things to look for that might be indicative

19   of that type of thing.

20   Q.    Now, during your career have you visited firearms

21   manufacturing plants?

22   A.    I have.

23   Q.    Which plants?

24   A.    Within the State of New Hampshire I've visited Sig Sauer

25   and Ruger.  I've also visited O.F. Mossberg & Sons, Kahr Arms,

1    Smith & Wesson, and Colt and Colt Defense.

2    Q.    Have you also visited ammunition manufacturing plants?

3    A.    I have.

4    Q.    And which plants?

5    A.    I visited Winchester, Remington and Sig Sauer.

6    Q.    Now, in addition to the experience and training that you

7    just described, do you have access to periodicals or reference

8    materials that you use in conducting your analysis?

9    A.    I do.

10   Q.    Can you describe that?

11   A.    I have ATF databases that I can look at, I have reference

12   material that either I've personally bought -- and these are

13   books or periodicals -- or that they've been provided to me

14   through the agency.  There are -- I look at -- sometimes I'll

15   look at the manufacturer's website.  I talk to manufacturer

16   employees.  Manuals oftentimes, too, are things that I will

17   look at of a firearm.

18   Q.    And the ATF databases, one of the items in the ATF

19   databases, would that be a trace?

20   A.    That is correct.

21   Q.    What's a "trace"?

22   A.    So, we are not allowed to have a database of everything

23   that's ever been purchased by people.  That's against the law.

24   So, in order for an individual -- for an agent, I should say,

25   to find out the original purchaser on a firearm that's

1  recovered, we would fill out a form, either a written form or

2  go online to the database, and make a request for a trace.  So,

3  we have to put all the firearm information in, and we submit it

4  to the tracing center, and they then contact the manufacturer.

5  Sometimes that's phone calls, sometimes that's materials that

6  they have on hand, and sometimes it's databases that allow them

7  to, as I understand it -- I've never done it personally -- but

8  allow them to have access to something that the manufacturer

9  allows them to have access to so they don't actually have to

10  bother an employee, so to speak, at the manufacturer to get the

11  information.  That way it's less time and money for the

12  manufacturer.

13  Q.   And so, if I'm understanding you correctly, ATF has access

14  to some manufacturer records?

15  A.   Yes.

16  Q.   And does -- can it also include, for example, tracking

17  down what's known as 4473?

18  A.   That is correct.

19  Q.   What's a 4473?

20  A.   That is a form that an individual completes when they're

21  going to purchase a firearm.  It will have all their

22  biographical information on it, and it's required to be

23  completed when they buy a firearm from a licensed dealer.

24  Q.   And are all of those things you mentioned, the electronic

25  databases, the periodicals, discussions with manufacturers,

1  e-traces, are all of those materials reasonably relied upon by

2  experts in the field?

3  A.   They are.

4  Q.   Now, how long have you been an Interstate Nexus Examiner?

5  A.   I went to that school in April of 2014, the initial one.

6  Q.   In your career how many nexus determinations have you

7  made?

8  A.   I've made over 50.

9  Q.   Now, one determination, does that correlate to a single

10  firearm?

11  A.   It does not.

12  Q.   Can you explain that?

13  A.   So, a lot of times they'll be on a case basis, and if

14  multiple firearms and sometimes hundreds, maybe even thousands

15  of rounds, were recovered in one single case, then a lot of the

16  time all that ammunition and all the firearms that are

17  recovered will be on one single nexus determination that I

18  make.

19  Q.   So, for example, in this case were you asked to analyze

20  three firearms for nexus?

21  A.   I was.

22  Q.   And even though it's three firearms, it's one single

23  determination?

24  A.   That is correct.

25  Q.   So, over 50 determinations, how many individual firearms

1    do you think you've analyzed for nexus?

2    A.    At least over 100.

3    Q.    And what about rounds of ammunition?

4    A.    Hundreds to thousands.

5    Q.    Do you only provide nexus examinations for ATF

6    investigations?

7    A.    No.

8    Q.    Who else do you provide nexus determinations for?

9    A.    I've provided them to Drug Enforcement Agency, DEA, to the

10   FBI, to the United States Postal Service, and then I've

11   provided them as well to local and state law enforcement when

12   they're bringing a case to be prosecuted at the United States

13   Attorney's Office.

14   Q.    In the State of New Hampshire are there any other

15   interstate nexus examiners?

16   A.    No.

17   Q.    So, if there is any firearm that requires an interstate

18   nexus examination recovered in the State of New Hampshire do

19   you do that examination?

20   A.    I do.

21   Q.    So, you said you've been an Interstate Nexus Examiner

22   since 2014.  Despite that, have you ever been called upon to

23   provide trial testimony as to nexus?

24   A.    No.

25   Q.    First time?

1    A.    Yes.

2          MS. KRASINSKI:  Your Honor, at this time I move to

3    qualify Agent Forte an expert in interstate nexus

4    determination.

5          THE COURT:  Any objection?

6          MR. FALKNER:  Not as to the generalized finding that

7    he is an expert.

8          THE COURT:  All right.  The record will so reflect.

9    Q.    Now, Agent Forte, as it relates to firearms that are

10   produced after 1968, are they required to have certain

11   markings?

12   A.    Yes.

13   Q.    And what are they?

14   A.    If the firearm was made within the United States, it's

15   required to have the manufacturer name on there as well as the

16   city, state that they operate out of.  They are supposed put to

17   the model, if they've designated one, the caliber of the gauge,

18   and then the serial number.

19   Q.    And if a firearm is manufactured out of the country and

20   imported into the United States are there markings required to

21   be on that firearm?

22   A.    Yes.

23   Q.    Can you explain those, please?

24   A.    So, it is roughly the same, except there's a few

25   variations.  You need to have the manufacturer's name, so the

1    original manufacturer that made it, the country of origin of

2    where that was manufactured.  You then still have to have the

3    model, if it's designated, the caliber and the gauge -- or the

4    caliber or the gauge, I should say -- the serial number, and

5    then the importer, the person that imported it into the United

6    States for sale, that company's name needs to be on there as

7    well as their city, state.

8    Q.   Now, let's talk about nexus examinations generally.  So,

9    let's talk about the practical application.  Someone gives you

10   a firearm.

11   A.   Mm-hmm.

12   Q.   What's the first step?

13   A.   The first step is looking at the firearm from all -- you

14   know, left, right, top, bottom, the back, back strap, the

15   front, looking the firearm over and marking down all of the

16   information that I see and all the markings that are on the

17   firearm.

18   Q.   And you mentioned you visited some firearm manufacturing

19   plants here in New Hampshire.  So, what firearms manufacturers

20   are here in New Hampshire?

21   A.   The large-scale commercial manufacturers that are here are

22   Ruger and Sig Sauer.

23   Q.   So, let's say you've got a firearm, and, by looking at the

24   initial markings, it appears that the firearm may have been

25   manufactured here in New Hampshire.  Are there additional steps

1   that you can take to determine whether or not the firearm

2   traveled in interstate or foreign commerce?

3   A.    Yes.

4   Q.    What can you do?

5   A.    So, I can look at the ATF tracing database, as well as I

6   can speak with members or I should say employees of the

7   manufacturer.

8   Q.    Now, were you asked to make a nexus determination for

9   certain firearms in this case?

10  A.    I was.

11        MS. KRASINSKI:  Permission to approach, your Honor?

12        THE COURT:  Yes.

13  Q.    Handing you Government's Exhibit 5, do you recognize that

14  firearm?

15  A.    I do.

16  Q.    Is that one of the firearms that you analyzed in this

17  case?

18  A.    It is.

19  Q.    Did you also function test the firearm?

20  A.    I did.

21  Q.    Did it work?

22  A.    It did.

23  Q.    Is it a firearm?

24  A.    It is.

25  Q.    Designed to expel a projectile by means of an explosive?

1  A.   Yes.

2  Q.   Now, if you take a look at that, were you able to

3  determine the manufacturer of that firearm?

4  A.   Yes.  It's Sig Sauer, Incorporated, and that's located in

5  Exeter, New Hampshire.

6  Q.   And because this firearm was manufactured in New

7  Hampshire, did you take additional steps to determine whether

8  or not it had, in fact, traveled in interstate commerce?

9  A.   I did.

10  Q.   What did you do?

11  A.   I reviewed tracing information, and I contacted the

12  manufacturer.

13  Q.   And, based on that, what did you learn?

14  A.   That it was manufactured here in the State of New

15  Hampshire, in Exeter.

16  Q.   And did it travel in interstate commerce?

17           MR. FALKNER:  Objection.

18  A.   It did.

19           MR. FALKNER:  Can we be seen at sidebar?

20           THE COURT:  Yeah.

21           MR. FALKNER:  I move to strike the answer pending the

22  sidebar.

23           THE COURT:  Approach.

24  (SIDEBAR CONFERENCE AS FOLLOWS):

25           MR. FALKNER:  Your Honor, the First Circuit law is

1    clear that he can rely on hearsay, but in this case, first of

2    all, there's been -- from what I can see, what we have here in

3    his determination is the mere repetition of out-of-court

4    statements of others.  That's <u>Cormier</u> 468 F.3d --

5           THE COURT:  Am I going to need to take a break to

6    decide this issue?  This could have been briefed ahead of time.

7    This is an expert witness.  I don't think I have an expert

8    instruction even in my instructions at this point.  So, this is

9    an issue that could have been brought to my attention.  Go

10   ahead.

11          MS. KRASINSKI:  I don't have it with me.  The First

12   Circuit has clearly held that nexus experts can both rely on

13   manufacturer statements and tracing records, that they need not

14   be admissible at trial to be a basis of their opinion, and so,

15   his testimony is that he both spoke to the manufacturer and

16   looked at tracing records.  Both of those are well within what

17   the First Circuit authorizes.

18          THE COURT:  Give me the case name.

19          MS. KRASINSKI:  May I go grab my --

20          THE COURT:  Go ahead.

21                       (Pause)

22          MS. KRASINSKI:  So, <u>United States versus Cormier</u>, 468

23   F.3d. 63, says that an ATF examiner may rely, in part, on

24   public and nonpublic ATF records, trace records, for example.

25   <u>United States versus Corey</u>, 207 F.3d. 84:  Interstate nexus may

1    be proved with ATF expert testimony, and that the ATF examiner

2    may rely, in part, on information received from manufacturers

3    under Rule 703 as the type of information reasonably relied

4    upon by experts in the field.  And Luna 649 F.3d. 91 on the

5    interstate nexus element, that talks about that experts may

6    rely on technical manuals, conversations with manufacturers,

7    ATF manufacturing records and prior experience.

8              THE COURT:  Okay.

9         MS. KRASINSKI:  And Rule 703 states that facts or data

10   need not be admissible if they are the type reasonably relied

11   upon by experts in the particular field.

12        MR. FALKNER:  I agree with all of that, your Honor.

13   My point is, nonetheless, Cormier says that the mere repetition

14   of the out-of-court statements of others is not enough, and in

15   this case he hasn't indicated whether he's relying on records

16   or the statement.  He hasn't designated -- he hasn't even said

17   who he spoke to, and there's no way that your Honor can

18   determine whether he's simply repeating hearsay or actually

19   making an opinion based on the testimony that's been admitted.

20   There was absolutely no foundation laid to it.  She just simply

21   asked, "Did you speak to the manufacturer?", and then, "In your

22   opinion did it travel in interstate commerce?"

23        MS. KRASINSKI:  I believe I asked if he did both speak

24   to the manufacturer and review tracing records, but I can

25   certainly re-ask that if --

1          THE COURT:  Okay.  And if she inquires with respect to

2     the records he relied on, the statements he relied on, are you

3     saying that that is not enough under Cormier?

4          MR. FALKNER:  It depends on the specific basis.  I

5     just ask, if your Honor is going to admit it, that it be

6     admitted de bene and allow me to cross-examine him and then

7     either strike the evidence or let it stand at that time.

8          THE COURT:  Okay.  And can you ask him more questions

9     about how he developed the opinion and what his opinion is

10    precisely based on?

11         MS. KRASINSKI:  I certainly can.  What I can tell your

12    Honor is that the way that this is done is nexus experts look

13    at tracing records and speak to manufacturers.  Sometimes they

14    can look at periodicals.  He will say that he did that.  Nexus

15    experts themselves do not run the trace records, and that's not

16    required.  So, I just, to the extent that there's a question on

17    the underlying steps of the tracing, he won't have the answer

18    to that, but no nexus expert testifies to that.

19         THE COURT:  So, you're telling me that the Circuit

20    case law, the established case law allows a person to simply

21    say, "I did X, I did Y," and not give details with respect to X

22    and Y to form his opinion?

23         MS. KRASINSKI:  No.  He can certainly give details as

24    to X and Y.  What I'm saying is that nexus experts themselves

25    are not the ones that perform the trace at the National Tracing

1   Center.  So, he can say, "I reviewed tracing records related to

2   this particular firearm."  He cannot say, "I was the person

3   sitting in West Virginia that ran the trace."

4           THE COURT:  Oh, but he reviewed the trace records.

5           MS. KRASINSKI:  Yes.

6           THE COURT:  He can talk about the trace records.

7           MS. KRASINSKI:  Yes.

8           THE COURT:  Well, then, perhaps establish more of a

9   foundation for that opinion.

10          And then you cross him, and then you approach at the

11  end and make your argument that I should tell the jury to

12  disregard his expert opinion.

13          MR. FALKNER:  So, it's admitted de bene for now

14  pending a further objection at the completion of his testimony?

15          THE COURT:  Is that what you're asking for, because if

16  you're not asking for that, and I assumed you were --

17          MR. FALKNER:  Yes.

18          THE COURT:  -- but if you are not asking for that I'm

19  taking a break and I'm going to research the question.

20          MR. FALKNER:  No, I think that's fine.  That's what

21  I'm asking for.

22          THE COURT:  All right.  Then, that is granted.

23          MR. FALKNER:  Thank you.

24          THE COURT:  Okay.

25  (END OF SIDEBAR CONFERENCE)

1          THE COURT:  Go ahead, Attorney Krasinski.

2     Q.    Now, with respect to Government's Exhibit 5, the Sig Sauer

3     1911 pistol --

4     A.    Yes.

5     Q.    -- you mentioned that you took additional steps to

6     determine whether or not it was ever shipped out of the State

7     of New Hampshire?

8     A.    I did.

9     Q.    And what were those steps again?

10    A.    So, I looked at the tracing results in this particular

11    case.  I don't believe I was the one that initially traced this

12    particular firearm, but I went into the database and retrieved

13    the trace results.

14    Q.    And you reviewed those trace results?

15    A.    I did.

16    Q.    And, in addition to that, did you speak to the

17    manufacturer?

18    A.    I did.

19    Q.    And what do the trace results themselves indicate?

20    A.    That, upon final completion and final assembly, the

21    completed firearm was shipped to a retailer or distributor in

22    the State of Minnesota.

23    Q.    And do you recall the name of that distributor?

24    A.    I believe it's Reeds Sporting Goods.

25    Q.    So, the final -- after final assembly, according to the

1    trace records, that firearm was shipped from New Hampshire to

2    Reeds Sporting Goods in Minnesota?

3    A.    That is correct.

4    Q.    And following its initial shipment from New Hampshire to

5    Reeds Sporting Goods in Minnesota, did the tracing records

6    indicate where it went after that?

7    A.    My memory is that it went back to a dealer here in New

8    Hampshire.

9    Q.    Do you recall the dealer?

10   A.    Bravo Company, I think it's Army Navy Surplus, but I don't

11   know if I remember the exact name.

12   Q.    Would looking at the trace record refresh your

13   recollection?

14   A.    It would.

15   Q.    Take a look at that, and when you're done let me know.

16   A.    Yes.  It's Charlie Company Army Navy Surplus, and that's

17   here -- actually, they've been in at least two locations, but

18   here in New Hampshire.

19   Q.    Is it in New Hampshire?

20   A.    Yes.

21   Q.    So, the tracing records indicate that it traveled from Sig

22   Sauer in New Hampshire to Reeds Sporting Goods in Minnesota?

23   A.    Correct.

24   Q.    And back to Charlie Company Army Navy Surplus in Epsom,

25   New Hampshire?

1    A.    Correct.

2    Q.    And you also spoke to the manufacturer in this case?

3    A.    Yes.

4    Q.    Related to Government's Exhibit 5?

5    A.    Yes.

6    Q.    And what was that conversation?

7    A.    It was basically to confirm information that I had at the

8    time I was in the process of retrieving those.  Usually,

9    anything that's made by Sig Sauer, I always go straight to

10   them, because the manufacturer is here in the state.  Despite

11   what the trace results say, I always go to them and ask them

12   what their documents say.

13   Q.    So, you both speak to the manufacturer and look at the

14   trace records?

15   A.    Yes, to make sure it corroborates.

16   Q.    And were you able to corroborate that this firearm

17   traveled from New Hampshire to Minnesota?

18   A.    Correct.

19   Q.    And the firearm, when it traveled from New Hampshire to

20   Minnesota, was it the fully assembled firearm?

21   A.    At the time it was a fully assembled firearm.  This

22   particular firearm has this compensator on the end.  I don't

23   know if that was part of it at the time or not.

24   Q.    So, based on your training and experience --

25   A.    Mm-hmm.

1    Q.   -- based on your conversation with the manufacturer, your

2    review of the tracing records that ATF conducts, did you form

3    an opinion as to whether or not Government's Exhibit 5, that

4    Sig Sauer model 1911 pistol, traveled in or affected interstate

5    commerce?

6    A.   I have.

7    Q.   And what is your opinion?

8    A.   It has traveled in or affected interstate commerce.

9              MR. FALKNER:  Objection.

10             THE COURT:  Your objection is noted and preserved.

11             MR. FALKNER:  Thank you.

12   Q.   Handing you Government's Exhibit 6 --

13             MR. FALKNER:  Your Honor, may we be seen at sidebar?

14             THE COURT:  Yes.

15   (SIDEBAR CONFERENCE AS FOLLOWS):

16             MR. FALKNER:  If this is testimony about the

17   interstate nexus of this firearm, I just object to that insofar

18   as that it's been struck from the indictment.  If it's just

19   that he test fired it and it works, then I don't necessarily

20   have a problem.  I just, given that we're bringing this firearm

21   forward, I want to make sure --

22             MS. KRASINSKI:  He's going to testify that he examined

23   it, that he test fired it, that he could not determine after

24   final assembly whether or not it traveled in interstate

25   commerce.

1              THE COURT:  Okay.

2              MR. FALKNER:  That's fine.

3              THE COURT:  The cases do not deal with trace records.

4    So, he's spoken to the manufacturer and he's used trace

5    records.  That's what I've heard so far about the 1911.  Do you

6    have case law on trace records as --

7              MS. KRASINSKI:  Trace records are considered within

8    ATF electronic databases.  ATF maintains nonpublic data, so the

9    cases do deal with ATF nonpublic data.  I can confirm with him

10   that e-trace records are ATF nonpublic materials.

11             THE COURT:  Okay.

12             MS. KRASINSKI:  And I believe he testified that

13   e-trace records are records reasonably relied upon by experts

14   in the field.

15             THE COURT:  Yes.  Yes, he did.  And so, the issue

16   remains whether trace records are hearsay he's repeating,

17   essentially, or whether it's his own independent source,

18   knowledge, and I think in <u>Luna</u> there were ATF records, the

19   database, there were conversations with the manufacturer, there

20   were also markings on the gun itself that the ATF agent

21   testified about.  So, the Court held that that was sufficient.

22   But the Court in <u>Cormier</u> definitely said, "I cannot find him an

23   expert based on just repetition of hearsay."

24             MS. KRASINSKI:  I think if he was exclusively relying

25   on his conversations with manufacturers, that I don't think he

1        can do that.  I don't think he can say, "I spoke to the

2        manufacturer.  That in and of itself led me to conclude that

3        this traveled in interstate commerce."  If that was his

4        testimony, I would agree.

5               THE COURT:  You say trace records, though, are not

6        considered hearsay?  They would be independent sources for

7        him --

8               MS. KRASINSKI:  Correct.

9               THE COURT:  -- to draw his opinion from?

10              MS. KRASINSKI:  Yes.

11              THE COURT:  Okay.  And are you disagreeing with that?

12              MR. FALKNER:  I do disagree.  What I'm saying is that

13       they are hearsay.  An expert can review hearsay and apply some

14       reliable methodology after reviewing the hearsay to render an

15       opinion.  What he's doing here is simply saying, "I read these

16       documents.  They say this.  That's my opinion."

17              THE COURT:  I think he's doing more than that.  He's

18       looking at the trace records.  They say one thing.  He is also

19       speaking to the manufacturer, and that's corroborating his

20       opinion that he develops from the trace records.  So,

21       ultimately --

22              MR. FALKNER:  I intend to cross-examine him about

23       those conversations as well.

24              THE COURT:  All right.  Okay.  So, now you're going to

25       ask him about the -- I forget which exhibit.

1          MS. KRASINSKI:  Exhibit 6.

2          THE COURT:  Exhibit 6.  All right.  Go ahead.

3    (END OF SIDEBAR CONFERENCE)

4    Q.   Agent Forte, as I was saying, you're looking at

5    Government's Exhibit 6.  Is that a firearm that you were asked

6    to review in this case?

7    A.   Yes.

8    Q.   And did you also test fire that firearm?

9    A.   I did.

10   Q.   Did it work?

11   A.   It did.

12   Q.   Is it, in fact, a firearm?

13   A.   It is.

14   Q.   Designed to expel a projectile by means of an explosive?

15   A.   Yes.

16   Q.   Now, if you look at that firearm, were you able to

17   identify markings that indicate where it was manufactured?

18   A.   Yes.

19   Q.   And, based on those markings, can you identify where this

20   firearm was manufactured?

21   A.   In Exeter, New Hampshire.

22   Q.   Now, because those markings indicate that it was

23   manufactured in Exeter, New Hampshire, did you take additional

24   steps to determine whether or not that fully assembled firearm

25   had ever traveled in interstate commerce?

1    A.    I did.

2    Q.    And what steps did you take?

3    A.    The tracing and speaking with Sig Sauer.

4    Q.    And were you able to conclusively determine whether or not

5    that fully assembled firearm ever crossed state lines?

6    A.    I was not able to determine that it had crossed state

7    lines fully assembled.

8    Q.    I'm handing you what's been marked as Government's Exhibit

9    7 and 7A.

10   A.    Thank you.

11   Q.    Government Exhibit's 7, is that one of the firearms you

12   were asked to examine in this case?

13   A.    It is.

14   Q.    You've got 7 and 7A.  It appears to be in two pieces.  Is

15   it broken?

16   A.    No.

17   Q.    Can you explain?

18   A.    It appears that the shoulder stock has been separated from

19   the frame.  It appears that one bolt would reattach it.

20   Q.    Now, did you function test that firearm?

21   A.    I did.

22   Q.    Did you reattach them before you function tested it?

23   A.    I did not.

24   Q.    So, Government's Exhibit 7 that you're holding in your

25   hands now --

1    A.    Mm-hmm.

2    Q.    -- you function tested it just like that?

3    A.    I did.

4    Q.    Did it work?

5    A.    It did.

6    Q.    Is it a firearm?

7    A.    It is.

8    Q.    Designed to expel a projectile by means of an explosive?

9    A.    Yes.

10   Q.    Now, are there markings on that firearm?

11   A.    There are.

12   Q.    And what are those markings?

13   A.    Well, it indicates on the right side of the firearm here

14   that it was manufactured by Zijiang Machinery Company in China.

15   Q.    And were you able to determine, looking at those markings,

16   how that firearm was imported into the United States?

17   A.    Yes.   There's additional markings on the left side, which

18   indicate that it was CAI in Georgia Vermont, which is an

19   abbreviation for Century Arms, Incorporated in Georgia,

20   Vermont.

21   Q.    And do you also independently know CAI, Century Arms,

22   Incorporated, to be located in Vermont?

23   A.    Yes.

24   Q.    So, if that firearm was recovered in New Hampshire, it

25   would have gone from China to Vermont to New Hampshire?

1    A.   Yes.

2    Q.   And based on your review of those markings, your training

3    and experience, did that firearm, Government's Exhibit 7, the

4    Zijiang Machinery Company model Catamount Fury 12-gauge

5    shotgun, travel in or affect interstate commerce?

6    A.   Yes, it has.

7         MS. KRASINSKI:  One moment, your Honor.

8                        (Pause)

9         MS. KRASINSKI:  Nothing further, your Honor.

10                     CROSS-EXAMINATION

11   BY MR. FALKNER:

12   Q.   Sir, with regard to the 1911 pistol --

13   A.   Yes.

14   Q.   -- I just want to be clear exactly what it was that you

15   did.

16   A.   Mm-hmm.

17   Q.   You looked at the firearm?

18   A.   Correct.

19   Q.   You read the markings on it?

20   A.   Correct.

21   Q.   And those markings demonstrated that it was manufactured

22   at Sig Sauer, correct?

23   A.   Correct.

24   Q.   And you determined that it was manufactured at the Sig

25   Sauer plant in New Hampshire, correct?

1   A.   It stated that on there, but I followed up to make sure

2   that it was.

3   Q.   And then you reviewed a trace document, correct?

4   A.   Correct.

5   Q.   And that trace document said that it had been shipped to a

6   wholesaler outside of the State of New Hampshire and that it

7   had been shipped back, correct?

8   A.   Correct.

9   Q.   And so, that's what a document told you, correct?

10  A.   I don't know which one I did first, whether I got the

11  email or I reviewed the trace, but I did review both.

12  Q.   When you say you reviewed an email, what are you talking

13  about?

14  A.   So, my contact with Sig Sauer was via email.

15  Q.   So, when you said you had a conversation, you didn't

16  actually talk to anybody?

17  A.   We had been back and forth.  I requested, he came back.  I

18  often refer to email conversations as "conversations."

19  Q.   Who did you speak with?

20  A.   Jeff Anderson.  He's their senior compliance, ATF

21  compliance.

22  Q.   And so, you emailed Jeff Anderson?

23  A.   Correct.

24  Q.   And you said something along the lines of, "I have some

25  records that say this firearm was shipped from New Hampshire to

1    a sporting goods facility out of state and then shipped back.

2    Do you have the same records"?

3    A.   I don't even believe I said that.  I just said, "I have

4    these two firearms.  I'm looking for assistance in determining

5    whether they've traveled interstate.  Could you please tell me

6    if they were manufactured in Exeter?"  I obviously now have

7    other facilities within New Hampshire.  "Was it at Exeter?"

8            And he knows from previous contacts that I'm looking

9    for an exact location of where it was manufactured, and then

10   I'm looking to see if it's left the state.  I believe I asked

11   for that, the 1911, and the SIG516 rifle in the same email.

12   Q.   And you asked him if it had left the state?

13   A.   Correct.

14   Q.   And he told you, "Yes, it left the state"?

15   A.   The 1911 had left the state, yes, and it had gone to Reeds

16   Sporting Goods.

17   Q.   And did he tell you what documents, if any, he had relied

18   upon to tell you that statement?

19   A.   Their records.

20   Q.   Okay.  So, a representative from Sig Sauer told you the

21   records of Sig Sauer demonstrated that this weapon traveled to

22   Minnesota?

23   A.   Correct.

24   Q.   And you independently reviewed other weapons -- sorry.

25   You independently reviewed records within ATF that told you

1    this weapon traveled to Minnesota, correct?

2    A.    Correct.

3    Q.    And what did you do with those two pieces of information?

4    A.    I used them to generate my nexus.

5    Q.    And when you say you used them to generate your nexus,

6    right here in this courtroom you're just simply repeating what

7    you read, right?

8    A.    What I read.  So, what I requested and then what I

9    corroborated and what I was given by the manufacturer and what

10   I found in the trace results, I then, yes, used that to create

11   my nexus, in this case a memo.

12   Q.    Let me ask you this in a different way.  You had two

13   pieces of information to tell you that this firearm had

14   traveled in interstate commerce, correct?

15   A.    What two pieces are you referring to?

16   Q.    The trace record.

17   A.    Mm-hmm.

18   Q.    And the email from the gentleman at Sig Sauer, correct?

19   A.    That's correct.

20   Q.    And each of those two pieces of information told you that

21   this firearm traveled in interstate commerce, correct?

22   A.    Correct.

23   Q.    And when you received those two pieces of information,

24   what you're telling the jury here today is, essentially,

25   "That's what those two pieces of information told me"?

1    A.    They did tell me that, yes.

2    Q.    Did you do anything to determine whether that information

3    was accurate other than receiving those two pieces of

4    information?

5    A.    No.

6    Q.    Did you use any particular expertise other than simply

7    reading those documents which told you what you're telling the

8    jury here today?

9    A.    It's been my experience that you're not doing any better

10   than straight from the manufacturer when you're dealing with a

11   manufacturer within your state.

12   Q.    Let me ask it to you a different way.  Is there any

13   information that you're telling the jury here today that isn't

14   available from simply looking at those two pieces of -- those

15   two documents that you reviewed?

16   A.    No.  The information I gave is from those documents.

17   Q.    You're simply repeating the information from those

18   documents here for this jury?

19   A.    In this particular case, yes.

20             MR. FALKNER:  Your Honor, may we be seen at sidebar?

21             THE COURT:  Yes.

22   (SIDEBAR CONFERENCE AS FOLLOWS):

23             MR. FALKNER:  At this time I would move to strike his

24   opinion as to interstate nexus.

25             MS. KRASINSKI:  Your Honor, he is allowed to rely on

1    ATF records.  The ATF record is the e-trace.  The e-trace

2    detailed that the firearm traveled from New Hampshire to

3    Minnesota.  He testified that those records are sometimes

4    created by access to manufacturing records.  He testified that

5    sometimes they are 4473s.  This is the way in which nexus is

6    done.  But Attorney Falkner is essentially asking for a witness

7    with personal knowledge who traveled with the firearm to

8    Minnesota to say, "Oh, yes, that's how this was done."

9         Nexus -- interstate nexus doesn't work like that.  The

10   First Circuit has held that interstate nexus examiners can rely

11   on ATF records in conjunction with manufacturer statements and

12   communications.  That is what he did here.  He obtained the

13   records, he reviewed them, he contacted his sources within the

14   manufacturer to confirm that that was accurate.  He made sure

15   that they matched up, and they did.  Once that happens, he

16   doesn't need to take any additional steps.

17        MR. FALKNER:  Your Honor -- I'm sorry.

18        THE COURT:  Go ahead.

19        MR. FALKNER:  There's nothing expert about it.  He

20   just simply read two documents and repeated it for the jury,

21   and that's exactly what he just testified to.

22        THE COURT:  You're just making this objection with

23   respect to the 1911 --

24        MR. FALKNER:  Correct.

25        THE COURT:  -- Exhibit 5?

1          MR. FALKNER:  Yes, because, your Honor, the difference

2     is the other firearm has markings that demonstrate that it came

3     from China.  There's a difference.  This is not -- he didn't

4     contact the manufacturer to find out -- it's one thing if he

5     contacts the manufacturer and they say, "Our factory is in

6     Georgia," and he knows the factory is in Georgia.  That's

7     specialized knowledge that he has that's coupled with it.  Here

8     Sig Sauer isn't telling him something that he's adding onto.

9     They're telling him -- it's just simply hearsay.  A business

10    record of Sig Sauer theoretically could be admissible hearsay.

11    It's not on the government's exhibit list.

12          THE COURT:  If it were just the statements of the Sig

13    Sauer manufacturer, I would rule in your favor, but the case

14    law shows that reliance on the ATF records, the trace

15    documents, in addition to everything else -- he looked at the

16    markings, he studied the gun, he then ran the trace through the

17    nonpublic ATF database.  He then corroborated that with the

18    hearsay statements, and then, based on his training and

19    experience, he concluded that this was shipped interstate, and

20    703 allows an expert to base his opinion on facts or data in

21    the case the expert's been made aware of or personally

22    observed.  If experts in the particular field would reasonably

23    rely on those kinds of facts or data to form an opinion on the

24    subject, which we've heard testimony they would, they need not

25    be admissible for the opinion to be admitted.  So, I am

1    overruling your objection, and the evidence stands.

2    (END OF SIDEBAR CONFERENCE)

3    Q.   One last question.  Did you have any contact with Reeds

4    Sporting Goods?

5    A.   No.

6    Q.   Did you ever confirm whether they actually received this

7    firearm?

8    A.   No.

9         MR. FALKNER:  I have nothing further, your Honor.

10         THE COURT:  All right.  Anything further?

11         MS. KRASINSKI:  Just a brief question.

12                      REDIRECT EXAMINATION

13    BY MS. KRASINSKI:

14    Q.   Government's Exhibit 5, this 1911 pistol, did it travel in

15    interstate commerce?

16    A.   It did.

17         MS. KRASINSKI:  Thank you.  No further questions, your

18    Honor.

19         MR. FALKNER:  And, your Honor, I move to strike.

20         THE COURT:  Objection noted.  Overruled.

21         Agent Forte may step down.  Thank you, sir.

22         THE WITNESS:  Thank you, your Honor.

23                  (Witness stepped down)

24         MS. KRASINSKI:  May we approach briefly?

25         THE COURT:  Yes.  Why don't we let the jury not have

1    to sit through that.  We'll let you take a break now, and then

2    we'll come back for the next witness.

3            THE CLERK:  All rise for the jury.

4            (The jury exited the courtroom at 3:43 p.m.)

5                          JURY NOT PRESENT

6            THE COURT:  Please be seated.  All right.  We'll take

7    a break in a moment.  I just want to check in with counsel.  Go

8    ahead, Attorney Krasinski.

9            MS. KRASINSKI:  Yeah.  I just wanted to address sort

10   of a timing and scheduling issue.  Obviously, we will need to

11   meet with Attorney Kennedy before Mr. Roya can testify.  We

12   have him and one other witness.  Given that we know now that

13   we're going to go into tomorrow, and the way that the evidence

14   will make the most sense to the jury, I was going to ask that

15   maybe we be allowed to end the day early today so that we can

16   have time to meet with Mr. Kennedy to sort of figure out how

17   that -- what's going to happen with that, and then begin with

18   him, followed by Agent Tongbua, tomorrow morning.

19           THE COURT:  I am going to have you meet with

20   Mr. Kennedy.  I think, based on the argument, it will take five

21   or ten minutes max for him to understand what the issue is,

22   based on that exhibit, explain to Attorney Kennedy what the

23   issue is so he can properly advise his client, and then we can

24   move right into his client, potentially.

25           MS. KRASINSKI:  Okay.

1           THE COURT:  So, I would rather take a little bit

2    longer break now than send the jury home early, where they came

3    in at noon.  So, let's see if you can't get Mr. Kennedy up to

4    speed fairly quickly, and then hopefully we can perhaps -- I

5    don't know if you could go ahead with Agent Tongbua at 4:00 and

6    let Attorney Kennedy actually speak to his client.

7           MS. KRASINSKI:  We can.  My concern is that the jury

8    might not understand some of his testimony without first having

9    heard Gary Roya's, but if the Court wants us to do it that way,

10   we will do it that way.

11          THE COURT:  Okay.  All right.  Well, we will check

12   back in.  Let's go till 4:00.  See if you can't get Attorney

13   Kennedy up to speed.

14          Thank you, Attorney Kennedy, for coming in on short

15   notice.  Hopefully, this will be a fairly discrete issue and

16   one both counsel can explain to you so that you can just

17   inquire with your client and find out if he's going to have a

18   Fifth Amendment issue or not.  The government is convinced he

19   will not.  Defense counsel has raised the possibility of one.

20   I think they can explain that to you.  And if you would play

21   that role for the Court, the Court would appreciate it.

22          MR. KENNEDY:  Thank you, your Honor.  I will.

23          THE COURT:  All right.  Thank you very much.

24          THE CLERK:  All rise.

25               (Recess taken from 3:47 p.m. to 4:11 p.m.)

1          THE CLERK:  All rise for the Honorable Court.

2          THE COURT:  Before I bring in the jury, I want to

3     check in about Mr. Roya and Attorney Kennedy.  Do you need more

4     time to speak to him, sir?  Because, if you do, I will

5     certainly allow it.

6          MR. KENNEDY:  No.  I spent a good hour with him prior

7     to coming into this court, and I spoke with the counsel, the

8     lawyers, and I had asked him the questions I needed to ask him

9     with regards to his testimony and what he was going to say and

10    what his thoughts were and what his intentions were with

11    regards to why this all went down.  I'm comfortable.

12         THE COURT:  Okay.  I missed the last part.

13         MR. KENNEDY:  I'm comfortable that we've had enough

14    time to talk about it.

15         THE COURT:  Okay.  And is this going to be a situation

16    where he would need immunity to testify?

17         MR. KENNEDY:  No.

18         THE COURT:  Okay.  All right.  And you've explained to

19    him the whole issue with respect to the texting and the

20    knowledge that Attorney Falkner was concerned about?  There are

21    texts in the record.  Did you get a chance to see those?

22         MR. KENNEDY:  I did look at the texts.  I did not

23    discuss with him specifically about the texts and the knowledge

24    issue that the Court -- I mean, I looked --

25         THE COURT:  Did you explain to Attorney Kennedy what

1    the issue was?

2              MR. FALKNER:  Your Honor --

3              THE COURT:  You didn't have time?

4              MR. FALKNER:  No.  I started to speak to Attorney

5    Kennedy, and I started to explain to him about the text

6    messages, and he said that he had them.

7              MR. KENNEDY:  I said I have the texts, and I

8    understand the -- I guess I was wrong, and I should have given

9    him more time to explain to me the text messages.

10             THE COURT:  That's the whole issue.

11             MR. KENNEDY:  Let me spend a few minutes with Attorney

12   Falkner, if that's okay.

13             THE COURT:  All right.  I will give you that time.

14   We've, obviously, got the jury waiting.  So, I'm just going to

15   stay on the bench and hopefully the two of you -- you can

16   explain to him what the issue is, and perhaps he can consult

17   with his client.  And give me a signal, because we're going to

18   put the government's last agent on in his place and keep the

19   trial moving.

20             MR. KENNEDY:  I understand.

21             THE COURT:  And, then, that will give you more time,

22   if you need it.  So, just signal me after you've had a chance

23   to consult with Attorney Falkner.

24             MR. KENNEDY:  Okay.

25             THE COURT:  I'll give you leave, Attorney Falkner.

1          MR. FALKNER:  Thank you, your Honor.

2          THE COURT:  I'm just going to stay here, though.  So,

3     Donna, it might be good to let the jury know just a few

4     minutes.

5                         (Pause)

6          MR. KENNEDY:  If I could have a copy of Exhibit 30,

7     and then I'll take some more time to talk to my client just to

8     make sure you can go on with your other witness, and I can be

9     back tomorrow morning, or I can hang around as long as this

10    Court wants me to hang around.

11         THE COURT:  I think what we'll do is finish up, if we

12    can, with the agent today, maybe part of tomorrow morning, and

13    then put Mr. Roya on.  So, if you're here tomorrow morning that

14    would be ideal.

15         MR. KENNEDY:  I'll do whatever the Court wants me to

16    do.

17         THE COURT:  If you can meet with him and confirm that

18    there either are Fifth Amendment issues or there are not, and

19    if there are Fifth Amendment issues, obviously, the government

20    would need to know that and make decisions about the case and

21    whether or not they're going to give him immunity.  But,

22    obviously, these are all issues you would want to discuss with

23    him.

24         MR. KENNEDY:  Right.

25         THE COURT:  Thank you, sir.  Thanks very much.

1          THE CLERK:  All rise for the jury.

2          (The jury entered the courtroom at 4:20 p.m.)

3          THE CLERK:  Please be seated.

4          THE COURT:  All right.  The government may call its

5   next witness.

6          MS. KRASINSKI:  Your Honor, the government calls

7   Special Agent Tongbua.

8          **SHAYNE TONGBUA**, having been duly sworn by the Clerk,

9   was examined and testified as follows:

10          THE CLERK:  Thank you.  Please state your full name,

11   spell your last name for the record.

12          THE WITNESS:  Shayne Tongbua.  T-o-n-g-b-u-a.

13          THE CLERK:  Thank you very much.  Be seated.

14                          DIRECT EXAMINATION

15   BY MS. KRASINSKI:

16   Q.   Good afternoon, Agent Tongbua.

17   A.   Good afternoon.

18   Q.   Where are you employed?

19   A.   With the Federal Bureau of Investigation.

20   Q.   How long have you been with the FBI?

21   A.   Since 2009.

22   Q.   What's your current title?

23   A.   I am a Special Agent and, more specifically, I'm also a

24   Special Agent Bomb Technician.

25   Q.   So, how long have you been a Special Agent?

1   A.    Since 2016.

2   Q.    Now, you've been with the FBI 11 years.  So, you've been a

3   special agent for approximately four years?

4   A.    Correct.

5   Q.    What did you do before you became a special agent?

6   A.    I've been a Certified Bomb Technician for my entire

7   duration with the Bureau, and I also spent two years as a

8   digital forensic examiner prior to becoming an agent.

9   Q.    Can you briefly describe the training that you received in

10  order to become a special agent?

11  A.    I attended the FBI Academy at Quantico, Virginia, which

12  now is approximately 20 to 21 weeks.

13  Q.    And before the FBI what did you do?

14  A.    I also served in the United States Army for approximately

15  six years.

16  Q.    Now, I want to generally talk a little bit about the

17  procedure for signing up a confidential source.  Is there a

18  particular procedure that you are required to follow?

19  A.    Yes.

20  Q.    Can you describe that?

21  A.    Well, for starters, it's FBI policy that confidential

22  human sources, their admin. file is managed by a special agent.

23  So, they can be tasked, they can meet with task force officers

24  and other personnel, but the admin. file is opened and

25  maintained by the special agent.

1   Q.   And so, just so that we're clear in context, you mentioned

2   "task force officer."  Was there a task force officer that

3   assisted in the investigation of Johnathon Irish?

4   A.   Yes.  There were a couple.

5   Q.   And who were those?

6   A.   Primarily, Task Force Officer Kevin LeBlanc of New

7   Hampshire State Police and also Task Force Officer Brett

8   Fernald of Manchester Police.

9   Q.   And we heard sort of a lot, generally, about motivation to

10  become a CHS or a confidential human source.  When you're

11  opening this file, documenting this file, who is the person

12  that identifies the motivation of someone to become a CHS?

13  A.   The individuals opening that file.  So, primarily the

14  agent, but if a task force officer or another person has more

15  contact with that person they would do that in consultation.

16  Q.   So, in this case that would be you?

17  A.   Correct.

18  Q.   And I just want to be clear.  So, the source itself, for

19  example, Ms. Millett, she wouldn't say, "Well, my motivations

20  for becoming a confidential human source are," and then

21  describe.  You would analyze your discussions with her and sort

22  of complete that on your own?

23  A.   Correct.  Perform that assessment.

24  Q.   And what do you base that assessment on?

25  A.   Just interactions with that individual.

1   Q.   Now, I should ask were you involved in the investigation

2   into the defendant Johnathon Irish?

3   A.   Yes.

4   Q.   And, as part of that involvement, did you do the paperwork

5   to make Ms. Millett a confidential human source?

6   A.   I did.

7   Q.   And was that paperwork prepared on or about January 24th,

8   2019?

9   A.   I believe so.

10  Q.   Fair to say that Ms. Millett provided information that the

11  defendant had carried a pistol in his waistband and that the

12  defendant had at one point asked her to take custody of some

13  firearms?

14  A.   I believe so, but I would have to check the dates on those

15  reports.

16          MS. KRASINSKI:  One second.

17                  (Pause)

18          MR. FALKNER:  Your Honor, may we be seen at sidebar?

19          THE COURT:  Yes.

20  (SIDEBAR CONFERENCE AS FOLLOWS):

21          MR. FALKNER:  I didn't object based on hearsay, but I

22  think, if this is going to be extended discussions of

23  information that she provided at various points, that's clearly

24  hearsay, and we can't -- I don't think this witness can get

25  into that.

1        THE COURT:  I don't know that she provided much more.

2        MS. KRASINSKI:  All I'm intending to ask is the date

3   she provided that information as compared to the date she was

4   signed up as a CHS.  That's it.

5        MR. FALKNER:  That's fine, your Honor.

6   (END OF SIDEBAR CONFERENCE)

7   Q.   So, we just talked about some information that Ms. Millett

8   provided, and do you recall the date that she provided that

9   information?

10  A.   Not off the top of my head.

11  Q.   Would looking at the 302 related to that interview help

12  you remember the date that she provided that information?

13  A.   Yes, it would.

14  Q.   Take a look at that, Agent Tongbua, and then, after you've

15  had a chance to review it, let me know.

16  A.   Okay.

17  Q.   Does that refresh your memory as to the date that she

18  provided that information?

19  A.   Yes.

20  Q.   What was the date that she provided that information?

21  A.   It should have been January 16th, 2019.

22  Q.   And that's before she became a confidential source,

23  correct?

24  A.   That's correct.

25  Q.   So, you also -- or did you also prepare the CHS paperwork

1   for Mr. Roosa?

2   A.   Yes.

3   Q.   And is the date of that paperwork November 25th, 2019?

4   A.   I don't recall the specific date.  The time frame sounds

5   right.

6   Q.   If I showed you that paperwork, would that help refresh

7   your recollection as to the date?

8   A.   Yes.

9   Q.   Again, take a look at that and let me know when you've had

10   a chance to complete your review.

11   A.   Okay.

12   Q.   And does that help refresh your memory as to when the CHS

13   paperwork for Dylan Roosa was filled out?

14   A.   Yes.  That was the date it was initiated.

15   Q.   And that was November 25th, 2019?

16   A.   Correct.

17   Q.   Now, Dylan Roosa, is it fair to say, provided information

18   to the FBI that he had seen a black footlocker box and that he

19   had seen the defendant with -- shoot the 1911 firearm and that

20   he had seen three firearms in that box?  Do you recall the date

21   that he provided that information to the FBI?

22   A.   I do not, because I was not present then.

23   Q.   Would looking at the 302 prepared by the officer help

24   refresh your recollection as to that date?

25   A.   Yes, it would.

1      MR. FALKNER:  Objection, your Honor.

2      THE COURT:  Sustained.

3  Q.   Were you made aware of that information through the course

4  of this investigation?

5  A.   Yes, I was.

6  Q.   And did you learn of that information before you prepared

7  the confidential source document?

8  A.   I believe I did.

9  Q.   So, to the best of your recollection, that information was

10 provided to the FBI before he became a CHS?

11 A.   Correct.

12 Q.   Now, there's been a lot of physical evidence in this case;

13 is that fair to say?

14 A.   Yes, there's been a good amount.

15 Q.   Including three firearms?

16 A.   Correct.

17 Q.   Were any of the firearms sent out for fingerprint testing?

18 A.   No.

19 Q.   How come?

20 A.   We didn't deem it pertinent to this investigation.

21 Q.   Why not?

22 A.   Because at the point we came into possession of those

23 firearms the information we had is that they had --

24     MR. FALKNER:  Objection.

25     THE COURT:  Overruled.

1    A.   At the point at which we acquired those weapons the

2    information we had is that they had changed hands many times,

3    so it seemed that there was no point to try to connect those

4    weapons to the defendant via fingerprints.

5    Q.   And is that because the investigation revealed that they

6    had been in the hands of Neil Prive?

7    A.   Yes.

8    Q.   And Gary Roya?

9    A.   Yes.

10   Q.   And that other people had touched and handled those

11   firearms?

12            MR. FALKNER:  Objection.

13   A.   Yes.

14            MR. FALKNER:  Objection and motion to strike, your

15   Honor.

16            THE COURT:  Approach, please.

17   (SIDEBAR CONFERENCE AS FOLLOWS):

18            THE COURT:  You are asking him to essentially affirm

19   statements and information that have come from other witnesses.

20   I understand what you're doing.  It's by way of summary.

21            MS. KRASINSKI:  Your Honor, that's not what I'm

22   attempting to do.  I'm attempting to have him explain why they

23   didn't fingerprint test the gun --

24            THE COURT:  I understand that, but you asked him --

25   and, frankly, you didn't stand up and object -- but you asked

1    him, essentially, what was the testimony of one of the other

2    witnesses in the case, and you literally repeated it verbatim.

3    That is objectionable, that can't be done, and asking him to

4    affirm other evidence in the case that he doesn't have personal

5    knowledge of, he didn't sit in on one of the interviews that

6    you asked him about content, information about.  And I think

7    the fact that there were other people who may have touched the

8    guns is an appropriate thing to ask, but asking for specific

9    information, I don't think that is appropriate.  So, I sustain

10   that objection.

11        MS. KRASINSKI:  I wasn't attempting to ask what those

12   other individuals had said, just that it impacted his decision

13   as to whether or not to send the guns off for fingerprint --

14        THE COURT:  And I think, "Other witnesses touched the

15   guns," is sufficient to explain why they didn't do

16   fingerprints.  Go ahead.

17        MR. FALKNER:  In particular, my concern is there's no

18   dispute, I don't think, in this case that Neil Prive and Gary

19   Roya may have touched the guns, but there was some evidence

20   from Neil Prive that other people may have touched the guns,

21   but there's no evidence that the FBI had that information at

22   the time, and this line of -- that's my principal objection,

23   and that's why I'm moving to strike, and I'm concerned even

24   that the jury may need to be further instructed to disregard

25   that, because it's misleading to suggest that that

1   particularly, somehow that bolsters Neil Prive's testimony

2   because it suggests that he had given that information to the

3   FBI earlier, when there's no evidence that he had.

4         MS. KRASINSKI:  Your Honor, can I just clean it up by

5   simply asking, just to make sure we're all clear, "The way I

6   understand it is you chose not to send these out for

7   fingerprinting because you understood multiple people have

8   touched the firearms"?

9         THE COURT:  And what are you asking for?

10        MR. FALKNER:  I'm asking --

11        THE COURT:  Because you just told me there's no

12   dispute that Roya and --

13        MR. FALKNER:  That Roya and Prive touched them, but

14   Prive testified that there were other people, and the way that

15   she asked that question was, "You didn't do it because Roya

16   touched them, and you didn't do it because Prive touched them,

17   and you didn't do it because other people touched them," and

18   there's no indication that they had that information, and

19   that's my concern.

20        THE COURT:  Why can't you cross him on that at this

21   point?

22        MS. KRASINSKI:  Also Dylan Roosa.  At that point they

23   had that information that Dylan Roosa had shot the 1911.

24        THE COURT:  I'm going to let you cure the issue with

25   further questioning of him, and I would suggest that you not

1   ask him to also say --

2          MS. KRASINSKI:  Yes, your Honor.

3          MR. FALKNER:  And may you instruct the jury at least

4   that his answer to that question is stricken?

5          THE COURT:  I'm just not clear on why I need to do

6   that.  Maybe I'm just --

7          MR. FALKNER:  Because it was an objectionable question

8   that you're sustaining the answer to, and he answered the

9   question.

10         THE COURT:  The government is suggesting that the

11  government can cure the issue.  Tell me why I would need to

12  strike something from -- what exactly are you asking me to

13  strike?

14         MR. FALKNER:  I didn't even hear his whole answer, but

15  he just gave an answer I think to the effect of yes or no.

16  Whatever it was, he started to answer that question, and I'm

17  just asking you to strike that answer, that the jury disregard

18  what he said.

19                        (Pause)

20         THE COURT:  Other people had touched the firearm, but

21  didn't Prive and others testify that friends put them into

22  safes and that kind of thing?

23         MR. FALKNER:  That's what I'm saying.  That's what

24  Prive testified to.

25         THE COURT:  Okay.

1          MR. FALKNER:  But there's no indication that Prive

2     told that to the FBI, and because there's no evidence that

3     Prive told that to the FBI this is essentially bolstering

4     Prive's testimony, because it suggests that Prive had given

5     that information to the FBI.

6          THE COURT:  I just don't see that, that direct link.

7     So, I do see a problem with essentially bolstering testimony

8     and repeating hearsay testimony, but I don't think the jury is

9     going to draw that inference, and I'm going to overrule that

10    specific objection.

11         MS. KRASINSKI:  And just so my clarification will be,

12    just to make sure I understand, "Your decision not to send the

13    firearms out for testing was because you had information that

14    multiple people had touched the firearms?"  Is that fair?

15         MR. FALKNER:  I mean, I think the only thing that is

16    undisputed is that Neil Prive and Gary Roya touched the

17    firearm, so I think if she's saying, "You didn't send it out

18    because those two individuals touched the firearms," then

19    that's fine.  I'm not sure that -- well, it opens up a line of

20    cross-examination, but I think that's okay, but I'm concerned

21    with the fact that they say that there were multiple -- they

22    don't know that multiple people touched the -- -

23         THE COURT:  You know the case facts way better than

24    the judge and the jury, and I can tell you that they are not

25    sitting there keeping in their minds that the FBI didn't know

1    from Prive that the roommate had put the guns into the safe at

2    a specific time.  I just don't think the jury is making that

3    connection.  I'm not making that connection.  So, it seems to

4    me overkill.  I just don't think there's any problem with it,

5    so I'm going to overrule that.

6          MS. KRASINSKI:  Would you prefer for me to just move

7    on rather than -- I want to do this in a way that --

8          THE COURT:  Why can't -- I mean, why can't you, as a

9    line of cross, "You just told the jury that you knew other

10   people had touched those firearms, Roya and Prive," and then

11   you can clarify the issue, because it really is a question of

12   fact that I'm just not clear on.  I don't think the jury is.

13         MR. FALKNER:  Well, I intend to address it in cross.

14   I do object to your failure to strike it.  I think it's

15   objectionable and the answer should be stricken, and I don't

16   understand why it wouldn't be.

17         THE COURT:  Okay.  Overruled.

18   (END OF SIDEBAR CONFERENCE)

19   Q.   Okay.  Agent Tongbua, we were talking about your decision

20   not to send any of the firearms off for fingerprinting, and,

21   just generally, can you tell us why again?

22   A.   Because at the point when we acquired those firearms,

23   based on the information we had, we understood that they had

24   changed hands many times up to that point.

25         MR. FALKNER:  Objection and motion to strike.

1          THE COURT:  Objection noted.  Overruled.  Go ahead.

2     Q.   And were you aware at that point that two of the firearms

3     had previously belonged to the defendant?

4          MR. FALKNER:  Objection.

5     A.   Yes.

6          THE COURT:  On what basis?

7          MR. FALKNER:  Your Honor, that's hearsay, and it's not

8     within his personal knowledge.

9          THE COURT:  Overruled.

10    Q.   Were you aware at that point that two of the firearms had

11    previously belonged to the defendant?

12    A.   Yes.

13    Q.   Did that also play into the decision not to send them for

14    fingerprinting?

15    A.   Yes, as it would be logical that they would have his

16    fingerprints on them.

17    Q.   If his fingerprints were found on either of those two

18    firearms would you be able to tell a date, a year that those

19    fingerprints were from?

20    A.   No.

21    Q.   So, if, for example, a fingerprint were found on the

22    pistol, you wouldn't be able to tell if that fingerprint was

23    from 2013 or 2019?

24    A.   That's correct.

25          MS. KRASINSKI:  Your Honor, can I ask that the Court

1    instruct -- actually, let me just back up a little bit.

2    Q.    I want to turn your attention to Government's Exhibit 37

3    that was previously admitted through Officer LeBlanc's

4    testimony, and before I ask to publish it, this is essentially

5    a recorded communication between the defendant?

6    A.    Yes.  If it's the recording I'm thinking of, yes.

7    Q.    And showing you what has been marked for identification

8    purposes as Government's Exhibit 37a, is that a transcript that

9    was prepared of that jail clip?

10   A.    Yes, it is.

11   Q.    And this was prepared by a transcriptionist at FBI?

12   A.    Yes.

13          MS. KRASINSKI:  Your Honor, permission to publish

14   Government's Exhibit 37, and before we play it I would ask to

15   pass out the agreed-upon transcript to the jurors and have the

16   Court instruct the jurors as to the proper use of the

17   transcript.

18          THE COURT:  And so, Attorney Falkner, no objection to

19   the transcript?

20          MR. FALKNER:  Only the objection to the exhibit.

21          THE COURT:  All right.  Okay.  So, while that's being

22   handed out, I'll just explain to the jury what's happening.

23          You are about to listen to a recorded call.  It's been

24   received in evidence.  Please listen to this recorded call very

25   carefully.  You are also being given a written transcript of

1    that recorded call to help you identify speakers and listen to

2    the call.  This transcript that you're handing out right now

3    and that you will have in your hands is not evidence.  The

4    tape, the recorded call itself, is evidence of its own

5    contents.

6            Now, where there is a difference between the

7    transcript and the recorded call, you must rely on what you

8    hear rather than what you are reading.  Transcripts of any sort

9    of recorded conversations can be difficult to make.  Whether

10   the typewritten transcript correctly or incorrectly reflects

11   the conversation or the identity of the speaker is entirely for

12   you to decide based upon what you hear on this recorded call,

13   what you hear about this preparation of the transcript and your

14   own examination of the transcript.  If you decide the

15   transcript is incorrect or unreliable, you should disregard it

16   to that extent.  You will have the actual recorded call in the

17   jury deliberation room as a piece of evidence.

18           So, again, go ahead and lay a foundation for playing

19   that to the jury.

20                     (Audio recording played)

21           MS. KRASINSKI:  Nothing further, your Honor.

22           THE COURT:  All right.

23           MS. KRASINSKI:  May I collect the transcripts, your

24   Honor?

25           THE COURT:  Yes.

CROSS-EXAMINATION

BY MR. FALKNER:

Q.   Good afternoon, Agent Tongbua.

A.   Good afternoon.

Q.   Is there any other kind of agent at the FBI other than Special Agent?

A.   How do you mean?

Q.   If you're an agent at the FBI you are a Special Agent, correct?

A.   Correct.

Q.   That's the only kind of agent that there is, correct?

A.   Correct.

Q.   Now, in the course of your investigation you became aware that Stephanie Irish left Johnathon Irish on or about October 25th, 2019, correct?

A.   Correct.

Q.   And from October 26th of 2019 to the present you've spoken with her in person or on the phone on at least 12 different occasions, correct?

A.   Correct.

Q.   That would be October 26th of 2019, right?

A.   That was one date, yes.

Q.   October 28th?

A.   Besides that one date I can't verify any others without reviewing those reports.

1    Q.   Fair to say that throughout the months the last week in

2    October throughout the month of November in December and in

3    January you met on multiple occasions with Stephanie Irish,

4    correct?

5    A.   I believe I've only met her in person twice.  I've spoken

6    with her on the phone many times.

7    Q.   Constant contact, right?

8    A.   Correct.

9    Q.   And she's now divorcing Johnathon Irish, correct?

10   A.   That's my understanding.

11   Q.   And, in your opinion, she gave information pertinent to

12   this case, correct?

13   A.   I don't know that I have an opinion on the matter, but

14   much of her information has been corroborated.

15   Q.   She gave you information that you found helpful?

16   A.   That I found true.

17   Q.   And you found helpful, too, as well, right?

18   A.   It furthered our investigation, if that's what you're

19   asking.

20   Q.   And when was the most recent time that you met with her?

21   A.   Probably the recorded call with Roscoe Whitney.

22   Q.   Didn't you meet with her in January of 2020?

23   A.   Not that I recall.  Can you refresh my memory?

24            MR. FALKNER:  May I have a moment, your Honor?

25                          (Pause)

1        MR. FALKNER:  You know what?  I'll move along.

2   Q.   But it was at least 12 times, correct?

3   A.   I had at least 12 times contact with her, yes.

4   Q.   You had more contact with her than any other civilian

5   witness, correct?

6   A.   In this investigation, yes.

7   Q.   And, finally, fair to say, given the divorce and your

8   communications with her, that at this point there's no love

9   lost between the two?

10  A.   I can't speculate on that.

11  Q.   There's some animosity there, correct?

12  A.   That's for those two parties to testify to, not myself.

13  Q.   You weren't able to detect any animosity whatsoever of

14  Stephanie Irish towards Johnathon Irish?

15  A.   They appear to have a rocky relationship.

16  Q.   Now, were you part of the seizure of the firearms at Gary

17  Roya's home?

18  A.   Yes.

19  Q.   And you and Kevin LeBlanc traveled together to that,

20  correct?

21  A.   Correct.

22  Q.   And what time of the morning was that?

23  A.   It was roughly -- it was probably 8:00 to 9:00 a.m.  We

24  did not want to knock too early, it was not before dark, and we

25  were trying to catch him on his way to work.

1    Q.   He wasn't happy to have a couple of FBI agents showing up

2    at his home just before work on the day before Thanksgiving,

3    was he?

4    A.   He didn't seem unhappy.  He certainly was surprised.

5    Q.   Now, when you assessed the motives of the confidential

6    sources that you were working with, among other things with

7    regard to Elizabeth Millett was financial motivations, correct?

8    She felt that she was being financially drained by Johnathon

9    and Stephanie Irish?

10   A.   I know she made remarks similar to that.  I don't remember

11   if that was listed as a motivation for her.

12   Q.   Do you not remember, or you don't believe that it's true?

13   A.   I do not remember.

14   Q.   Would reviewing your source opening information assist

15   you?

16   A.   Yes, it would.

17            MR. FALKNER:  May I approach the witness, your Honor?

18            THE COURT:  Yes.

19   Q.   Sir, is this a page of the opening document for her as a

20   confidential informant?

21   A.   It appears to be.

22   Q.   And could I just point you to a part of that document?

23   A.   Sure.

24   Q.   (Indicating).  Did you identify as one of her motivations

25   that her father and daughter -- I'm sorry -- her daughter and

1   son-in-law are draining her financially?

2   A.    I did.

3   Q.    And what was the source of that information?  Why did you

4   believe that that was a motive?

5   A.    That was information she conveyed to me.

6   Q.    Dylan Roosa also expressed a desire that he could benefit

7   from monetary compensation, correct?

8   A.    Correct.  I wouldn't say "desire," but his situation

9   did -- alluded to that.

10   Q.    Well, let me ask it to you this way:  When you put in your

11   opening document did you write that he could benefit from

12   monetary compensation?

13   A.    I believe I probably wrote something similar.  I wouldn't

14   say verbatim unless I reviewed it.

15   Q.    Would you like to see the document?

16   A.    Please.

17   Q.    Is this the document that you wrote?

18   A.    It appears to be.

19   Q.    Vis-a-vis Dylan Roosa?

20   A.    It appears to be, but there are no clear -- yes, it

21   appears to be.

22   Q.    And do the words "Could benefit from monetary

23   compensation" appear on that document?

24   A.    They do.

25   Q.    May I have that document back?  And he was signed up as an

1    informant on November 25th, correct?

2    A.    I believe that date sounds right.

3    Q.    And on October 5th a $250 payment was authorized, correct?

4    A.    On October 5th?

5    Q.    I'm sorry.  December 5th.

6    A.    I don't recall the exact date, but that would make sense

7    after he was opened.

8    Q.    Early December, correct?

9    A.    That sounds about right.

10   Q.    And that money was paid to him, correct?

11   A.    What was the amount again?

12   Q.    $250.

13   A.    I believe it was, yes.

14   Q.    And there was another $150 that was authorized for his use

15   of a phone, correct?

16   A.    That's correct.

17   Q.    Was that money paid to him?

18   A.    No, it was not.

19   Q.    And you haven't told him one way or the other as to

20   whether he'll be paid for the information he provided here at

21   this testimony, correct?

22   A.    No, not to my knowledge.

23   Q.    So, he doesn't know yet whether he's going to get paid?

24   A.    I don't believe so.

25   Q.    Do you know whether he's going to get paid?

1    A.    I do not.

2    Q.    How are you going to decide whether he gets paid?

3    A.    I don't make that decision.  I can only make a

4    recommendation.

5    Q.    How are you going to decide whether to recommend he gets

6    paid for his testimony?

7    A.    In consultation with everyone involved in the case.

8    Q.    Would that be Agent LeBlanc?

9    A.    Yes, as well as supervisors up my chain of command.

10   Q.    And the U.S. Attorney's Office?

11   A.    Correct.

12   Q.    Who is prosecuting the case, correct?

13   A.    Correct.  I believe, yes.

14   Q.    So, they also have some input as to whether Dylan Roosa

15   gets paid for his testimony here today?

16   A.    I believe that's correct.

17   Q.    Fingerprints -- a fingerprint on a firearm can last

18   forever, right?

19   A.    I'm not a fingerprint expert, but hypothetically.

20   Q.    Depending on how the firearm is stored, correct?

21   A.    Sure.

22   Q.    So, if I touched that firearm earlier today my

23   fingerprints might be on it, correct?

24   A.    Quite possibly.

25   Q.    And if it weren't cleaned and it were left for a very long

1 time my fingerprint would stay on there, right?

2 A. Hypothetically, yes.

3 Q. Fair to say when the U.S. Attorney's Office was asking you

4 questions about the fingerprinting you didn't express any

5 reservations about not being a fingerprint expert?

6 A. I was not asked.

7 Q. You were asked why you didn't take the fingerprints,

8 right?

9 A. Yes.

10 Q. And you said that the reason you didn't take the

11 fingerprints was because you believe they had changed hands

12 multiple times, right?

13 A. Yes.

14 Q. Now, as far as your investigation related to you from the

15 time the firearms left Mr. Irish's hands to the time that you

16 seized them, what you knew at the time you seized them was that

17 they had gone to Neil Prive and Gary Roya and to you, correct?

18 A. At least.  That is correct.

19 Q. And you didn't know whether they had come out of the box

20 during that time, did you?

21 A. No.

22 Q. You didn't know whether Neil Prive touched the firearms?

23 A. I would have to review -- let me think about that.

24 Q. Let me ask it to you a different way.  No matter what your

25 information was, you didn't actually know whether Neil Prive

1    touched the firearms, did you?

2    A.    That is correct.  That is correct.

3    Q.    And you didn't know whether Gary Roya had touched the

4    firearms, did you?

5    A.    I believe Gary had told us he had handled them, but I'm

6    not -- I would have to review that report.

7    Q.    If more than one person handles a firearm there might be

8    more than one fingerprint on that firearm, right?

9    A.    Sure.

10   Q.    And you don't know whether the firearms were fingerprinted

11   the first time they were seized, do you?

12   A.    I do not.

13   Q.    And you don't know whether the firearms were cleaned

14   before they were returned to Roscoe Whitney?

15   A.    Nope, I do not.

16   Q.    Fair to say that if Johnathon Irish's fingerprints were on

17   that firearm it would be helpful for you to know?

18   A.    I wouldn't say it's fair.  Again, I would expect them to

19   be on there, but it wouldn't have proved at what point he had

20   handled them or possessed them.  So, it would have benefited us

21   in no way.

22   Q.    And you wouldn't have liked to have known whether

23   Stephanie Irish's fingerprints were on one or all or some of

24   those firearms?

25   A.    I don't know how that would benefit.

1    Q.   Well, one of the firearms that he's charged with

2    possession -- possessing in this case is the shotgun, right?

3    A.   Correct.

4    Q.   And the FBI didn't have knowledge that he had previously

5    owned that firearm, correct?

6    A.   Correct.

7    Q.   And so, if his fingerprints were on the shotgun that would

8    be of some assistance, wouldn't it?

9    A.   I could say so.

10   Q.   But you didn't fingerprint test that firearm, did you?

11   A.   We did not.

12   Q.   And if Stephanie Irish's fingerprints were on that, that

13   would be something that would be of interest, would it not?

14   A.   I don't know how that would have helped us.

15   Q.   Are you saying that it wouldn't help you at all in any way

16   to know if Johnathon Irish's fingerprints were on all three of

17   those firearms?

18   A.   You asked about Stephanie's fingerprints, not Johnathon's.

19   Q.   What if you tested all three of the firearms and all three

20   of the firearms had only Stephanie Irish's fingerprints?  Are

21   you saying that wouldn't be of any assistance to you?

22   A.   That wouldn't mean they weren't handled by other people.

23   You could still handle firearms with gloves on and not leave

24   fingerprints.

25   Q.   I understand that.  Are you saying that that information

1    would be meaningless to you?

2    A.   It would indicate that she had handled them at some point

3    in the past.

4    Q.   And --

5           MR. FALKNER:  May I have a moment, your Honor?

6           THE COURT:  You're almost done?  Because it's close to

7    time to go.

8    Q.   You authorized the payment to Dylan Roosa after Stephanie

9    Irish had returned home to be friends with Dylan Roosa,

10   correct?

11   A.   I believe it was after she had returned home to see her

12   children, is what she told me.

13   Q.   And at that point she had reestablished relations with

14   Dylan Roosa, correct?

15   A.   At that point I understood she was living back at home

16   with Johnathon.

17          MR. FALKNER:  Your Honor, I have nothing further.

18          THE COURT:  All right.  Does the government have

19   anything further?  It's 5:03, I think.

20          MS. KRASINSKI:  Very brief, your Honor.

21          THE COURT:  All right.

22                    REDIRECT EXAMINATION

23   BY MS. KRASINSKI:

24   Q.   The CHS paperwork indicated that Ms. Millett felt

25   financially drained by the defendant and her daughter.  Fair?

1    A.    Yes.

2    Q.    But she has not been offered or received any payment,

3    correct?

4    A.    That is correct.

5    Q.    And as for Dylan Roosa, he did receive a $250 payment,

6    correct?

7    A.    Correct.

8    Q.    But you haven't submitted any authorization of funds

9    relating to his testimony, correct?

10   A.    Correct.

11   Q.    And we haven't had any conversations about authorizing

12   payment for his testimony, right?

13   A.    No, we have not.

14   Q.    Or any lay witness, right?

15   A.    Correct.

16          MS. KRASINSKI:  Nothing further.

17          THE COURT:  All right.  Anything further?

18                    RECROSS-EXAMINATION

19   BY MR. FALKNER:

20   Q.    Any conversations that you're going to have about payments

21   for Dylan Roosa will occur after the trial is completed,

22   correct?

23   A.    If they occur, correct.

24          MR. FALKNER:  Nothing further.

25          THE COURT:  All right.  Thank you.

1          Agent Tongbua, you may step down.  Thank you, sir.

2                    (Witness stepped down)

3          THE COURT:  And we are going to break for the day.  We

4     will be back tomorrow at 9:00 a.m., and my Courtroom Deputy

5     will speak to you about plans with respect to tomorrow.  We

6     will go till 4:00 p.m. tomorrow.  So, 9:00 a.m. to 4:00 p.m.

7          Follow all my instructions as you return home tonight.

8     Don't talk about the case with each other or with anyone else,

9     and follow the instructions with respect to not researching or

10    otherwise communicating about this case at all, and, of course,

11    don't read anything or look for anything about it in any sort

12    of media, blog, news, anything.  If you happen to hear anything

13    or see something, completely walk away.  Do not at all engage

14    with anyone about a conversation about the case.  And if you do

15    see anything, alert me, let me know in the morning.  Otherwise,

16    we'll see you tomorrow morning at 9:00 a.m.

17          THE CLERK:  All rise for the jury.

18                    (The jury exited the courtroom at 5:06 p.m.)

19                         JURY NOT PRESENT

20          MR. FALKNER:  May we be seen briefly at sidebar, your

21    Honor?

22          THE COURT:  Yes.

23    (SIDEBAR CONFERENCE AS FOLLOWS):

24          MR. FALKNER:  Out of an abundance -- just out of an

25    abundance of caution, your Honor, Gary Roya, Sr. was in the

1  courtroom observing some testimony, and I just want to make

2  sure that Gary Roya, Jr, witness, is just made aware as a

3  result of the sequestration order he shouldn't be speaking with

4  his father about any testimony he may have heard.

5          THE COURT:  Okay.  All right.  And the government, you

6  can obviously -- Gary Roya would be your witness; is that

7  right?

8          MS. KRASINSKI:  Yes.

9          MR. FALKNER:  I think Attorney Kennedy would have

10  to --

11          THE COURT:  If you can alert him.

12          MS. KRASINSKI:  We can alert Attorney Kennedy, yes.

13          THE COURT:  And then let me know if there are any

14  follow-up issues at all.

15          MR. FALKNER:  I'm not that concerned about it.  Just

16  out of an abundance of caution.

17          THE COURT:  Anything else at sidebar?  We're obviously

18  going to talk about other issues, but there's no reason that

19  Mr. Irish should not be included in that.  He doesn't have the

20  headphones on right now.

21          MS. WEILAND:  This is strictly a scheduling thing.  I

22  know that we'll have some matters to address.  I may need to

23  excuse myself at about 5:30 due to a child care issue, so if I

24  quietly get up and excuse myself and Attorney Krasinski

25  remains, I didn't want the Court to think I was being

1    disrespectful.

2            THE COURT:  No problem.  Hopefully, we'll all be out

3    of here before that.

4    (END OF SIDEBAR CONFERENCE)

5            THE COURT:  All right.  Let me just start by asking

6    Attorney Kennedy with respect to Mr. Roya any further

7    information that would cause you concern?

8            MR. KENNEDY:  Not really.  I want to talk to the

9    prosecutors quickly one more time before, but I don't think --

10   I think it will be fine.  I've talked with him.  I went over it

11   with him.  I discussed it with him on a regular basis.  I asked

12   him all sorts of questions with regards to all sorts of things.

13           THE COURT:  All right.  I'm going to let you do that,

14   but I'm going to stay on the bench for that, because I don't

15   want to be hit with this in the morning, if there are issues,

16   and I don't want to have the jury delayed.  So, I'm going to

17   let you have a moment with Attorney Kennedy.  Go ahead and

18   handle that right now.

19           MS. KRASINSKI:  Thank you, your Honor.

20           MR. KENNEDY:  I really love the way the Federal Court

21   pushes through a jury trial.

22                            (Pause)

23           THE COURT:  All right.  You can be here tomorrow for

24   Mr. Roya's testimony?

25           MR. KENNEDY:  What time do you want me here?

1          THE COURT:  I think he's going to go on at 9:00 a.m.,

2     hopefully.

3          MR. KENNEDY:  Tell him to be here at quarter of 9:00?

4          THE COURT:  Okay, that would be great.  And any Fifth

5     Amendment issues?

6          MR. KENNEDY:  We're not raising any Fifth Amendment

7     issues.

8          THE COURT:  Okay.  So, you don't see any Fifth

9     Amendment issues or concerns.  If there were Fifth Amendment

10    issues, if somehow something comes up, is the government

11    prepared to provide immunity for those?

12         MS. KRASINSKI:  I think if something came up we would

13    ask that he be voir dired outside of the presence of the jury.

14    Whether or not, just generally, we are authorized to grant

15    immunity is a broader discussion we have to have with

16    management.  So, I think it would have to take two steps:  one,

17    our discussion with management this evening and also

18    potentially voir diring him outside of the presence of the

19    jury.

20         THE COURT:  All right.  But you don't see any concerns

21    along those lines?

22         MR. KENNEDY:  No.  I advised him of the arguments that

23    would be made, but I don't think there's a Fifth Amendment

24    issue with him.

25         THE COURT:  All right.  Good.  Thank you very much.

1    The Court appreciates your willingness to step in in the middle

2    of the trial on short notice.  Thank you very much.  And we

3    appreciate you coming tomorrow as well just to be here for his

4    testimony.

5              MR. KENNEDY:  And I will be.  Can I go now?

6              THE COURT:  You may go now, yes.  We will all go very

7    shortly.  Okay.  All right.

8              Expert witness instruction, I don't believe one was

9    requested.  We're going to just use the model instruction.

10   Everybody okay with that?  It's very bland.

11             MS. KRASINSKI:  Yes, your Honor.  Thank you.

12             THE COURT:  You're okay with that?

13             MR. FALKNER:  I don't know that I recall the specific

14   language of it, but --

15             THE COURT:  "You've heard testimony from persons

16   described as experts.  An expert witness has special knowledge

17   or experience that allows the witness to give an opinion.  You

18   may accept or reject such testimony.  In weighing the

19   testimony, you should consider the factors that generally bear

20   upon the credibility of a witness as well as the expert

21   witness's education, experience, the soundness of the reasons

22   given for the opinion and all other evidence in the case.

23   Remember that you, alone, decide how much of a witness's

24   testimony to believe and how much weight it should be given."

25             I can't believe the court reporter didn't just look at

1    me and tell me to slow down.  You're just tired, right?  I was

2    tired and just literally was speed reading that.  I apologize.

3    So, that's --

4          MR. FALKNER:  That's fine, your Honor.

5          THE COURT:  Okay.  We will add that to the jury

6    instructions.  You will have a copy of them.  I'm still

7    inclined to give the unanimity instruction.  So, what we'll do

8    is we will meet tomorrow at 8:00 a.m. here.  I'm not going to

9    leave any room for any lateness in terms of the jury trial

10   starting at 9:00.  So, let's meet at 8:00 a.m. to go over the

11   jury instructions, and let's see if there are any other issues.

12   I do not think there are any other issues.

13         Anything else, Attorney --

14         MR. FALKNER:  Looking forward in terms of scheduling,

15   just in terms of tomorrow the one more witness from the

16   government that I understand, and then --

17         THE COURT:  Officer LeBlanc?

18         MR. FALKNER:  After your Honor presumably denies my

19   motion for judgment of acquittal, Officer LeBlanc.  If the

20   defendant were not to testify, would we just go straight into

21   arguments and charge at that point?

22         THE COURT:  I think so, and that's why I do want to

23   make sure we have the jury instructions and our last charging

24   conference at 8:00 a.m.  So, carefully review these one last

25   time, and we'll make any final edits before we begin.  How long

1    will Mr. Roya be?  Maybe an hour?

2              MS. KRASINSKI:  I assume about an hour, your Honor.

3              THE COURT:  About an hour.  Okay.

4              MR. FALKNER:  Perhaps less.

5              THE COURT:  All right.  I think that that covers it.

6    There is snow in the forecast for Thursday morning, and so

7    build that into your planning.  If the case does go into

8    Thursday morning there will be snow, so I just alert you to

9    that.  That's what I'm being told.

10             So, I will see counsel and Mr. Irish at 8:00 a.m.

11   tomorrow.  Thank you.

12             THE CLERK:  All rise.

13         (WHEREUPON, the proceedings adjourned at 5:18 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4          I, Brenda K. Hancock, RMR, CRR and Official Court

5    Reporter of the United States District Court, do hereby certify

6    that the foregoing transcript constitutes, to the best of my

7    skill and ability, a true and accurate transcription of my

8    stenotype notes taken in the matter of United States v.

9    Johnathon Irish, No. 19-cr-251-01-LM.

10

11

12

13

14   Date:    3/27/20              /s/ Brenda K. Hancock
                                   Brenda K. Hancock, RMR, CRR
15                                 Official Court Reporter

16

17

18

19

20

21

22

23

24

25