# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

THE UNITED STATES OF AMERICA

v.                                                          No. 19-cr-00251-LM

JOHNATHON IRISH

### SUPPLEMENT TO DEFENDANT'S MOTION FOR NEW TRIAL

The defendant, Johnathan Irish, through counsel, supplements his *pro se* motion for a new trial. He now reasserts his motion for new trial on the grounds that he was denied effective assistance of counsel, as guaranteed by the Sixth Amendment, when his trial counsel failed to object to highly prejudicial and unfair 404(b) evidence, his trial counsel failed to conduct an adequate investigation which would have produced evidence supporting Mr. Irish's theory of defense, his trial counsel failed to subpoena Stephanie Irish to testify under cross-examination at trial, his trial counsel failed to cross-examine other witnesses on the theory that Stephanie Irish "set up" Mr. Irish, and his trial counsel failed to object to repeated leading questions from the government to its own witnesses.

In support of this motion, the defense offers the following:

## PROCEDURAL HISTORY

Jonathon Irish was charged in a one-count indictment with being a prohibited person in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Doc 1.[1] Mr. Irish was detained pretrial and remains in custody. Docs. 6 and 7. The indictment referenced three firearms – a pistol, a shotgun, and a rifle – and ammunition. Prior to trial, the

---

[1] References are to the documents in this court's record by document number and, where appropriate, page number, in the form Doc. #, at #. Trial Exhibits are referenced as Tr. Ex. #. Exhibits to this motion are referenced as Mo. Ex. #.

references to the rifle and ammunition were struck from the charged offense. Doc. 47, at 5; Doc. 51, at 38. Defense counsel filed three motions in limine. Docs. 16, 17, and 18. There were several hearings and conferences held before and during the trial. After jury selection on February 4, 2020, the case was tried over three days on February 10, 11, and 12, 2020. The jury found Mr. Irish guilty at the conclusion of the trial. Doc. 38.

Mr. Irish timely filed a *pro se* motion for a new trial asserting ineffective assistance of his trial counsel. Doc. 42. Trial counsel withdrew from the case. Doc. 41. Undersigned counsel was appointed to represent Mr. Irish and granted leave to file this supplement to Mr. Irish's motion.

**THE EVIDENCE AT TRIAL**

To obtain a conviction, the government was required to prove that Mr. Irish knew he was a felon and that he knowingly possessed two specific firearms which affected interstate commerce. Mr. Irish stipulated that he is a felon. Doc. 51 at 57; Tr. Ex. 36. The government's case for knowing possession of the firearms was based on the testimony of people who claimed that they saw Mr. Irish possess firearms or heard him say that he possessed firearms.

There was no confession from Mr. Irish. No law enforcement officer testified to observing Mr. Irish in possession of a firearm. There was no seizure of firearms from Mr. Irish's person or residence by law enforcement. There was no video or photographic evidence showing Mr. Irish in possession of a firearm. There was no forensic evidence, such as fingerprints or touch DNA, confirming that Mr. Irish had possessed either of the firearms after his felony conviction.

Mr. Irish now asserts that he did not receive effective assistance of counsel in regard to his defense that he did not knowingly possess a firearm. Thus, the substance of the trial evidence relating to whether Mr. Irish knowingly possessed a firearm is summarized below to place Mr. Irish's claims in context.

### Phillip Christiana

Phillip Christiana testified (Day 2, Doc. 51 at 59-91) that he is an FBI agent and an expert in firearms. Prior to this case, he was involved in the seizure of two firearms (the pistol and the rifle) and a large amount of ammunition, including extended magazines, clips, and other items, all of which belonged to Mr. Irish. Doc. 51 at 63-69; Tr. Ex. 1, 2, and 3. Christiana later released the two firearms, the ammunition, and other items to Roscoe Whitney at the direction of Mr. Irish. Doc. 51 at 70-77. A third firearm belonging to Stephanie Irish, Mr. Irish's wife, was delivered to Mr. Whitney at the same time. *Id*. at 76.

On December 26, 2018, Christiana received a tip that Mr. Irish was in possession of some firearms. This accusation came in the form of a message and photos from Mr. Irish's wife, Stephanie Irish. Doc. 54 at 36-38. Christiana passed that tip on to other law enforcement agents. Doc. 51 at 77-80. Although not otherwise involved in the investigation of the charge in this case, Christiana admitted that he received a call from Mr. Irish on October 31, 2019 in which Mr. Irish said there was a plot against him. *Id*. at 87-88. He specifically said that his wife was trying to hire someone to kill him. *Id*. at 89. Christiana admitted that he "had no intention" of investigating Mr. Irish's concerns about the plot and Christiana did nothing more than make a note in the file. *Id*. at 87-88.

Christiana did not give any testimony that he had observed Mr. Irish in the possession of a firearm after Mr. Irish's felony conviction.

### ***Kevin LeBlanc***

Kevin LeBlanc testified (Day 2, Doc. 51 at 91-157) (Day, 4, Doc. 52 at 100-08) that he is a Task Force Officer employed by the New Hampshire State Police but assigned to work with the FBI. Doc. 51 at 90-92. In December of 2018, he began to work on the investigation of the report that Mr. Irish was in possession of firearms. *Id*. at 93. He interviewed Elizabeth Millett, Stephanie Irish's mother and Mr. Irish's mother-in-law, in January of 2019. *Id*. She was treated as a "confidential human source." *Id*. at 94. On cross-examination, LeBlanc stated that Millet agreed to be a CHS because she was concerned for her family, because her daughter and son-in-law were draining her financially, and because she wanted to help law enforcement. *Id*. at 137-140.

LeBlanc said the case was "stale" from January 2019 until October 25, 2019. *Id*. at 96. On that date, the FBI received information that Stephanie Irish had left Mr. Irish. *Id*. The split of the couple "invigorated" the investigation and led to LeBlanc interviewing additional witnesses, including Peter Duguay – a neighbor of and sometime employer of Mr. Irish, David Marcotte – an acquaintance of the Irishes, and Dylan Roosa – another acquaintance of the Irishes. *Id*. at 96-97. Roosa became a confidential human source, like Millett. *Id*. at 97. Roosa was paid $250. *Id*. at 99.

The new round of witness interviews also led LeBlanc to interview Gary Roya. *Id*. at 101. Roya was found to be in possession of a crate which was secured with a keyed padlock. LeBlanc testified that the crate contained a BB gun, an AR style rifle, a shotgun, a handgun, blankets, a tactical vest, a gas mask, a holster, ammunition cans, ammunition,

and gun magazines. *Id*. at 104. In addition to seizing these items, LeBlanc examined Roya's phone and took screenshots of messages on the phone. *Id*. at 113-115.

The government introduced into evidence the guns, ammunition, and other items seized from Roya, Exhibits 5 through 27, as well as photographs of those items, Exhibits 28A-28Q and 35A-K. Under questioning from the government, LeBlanc described Exhibits 10-34 in detail. Doc. 51 at 103-112. In addition to identifying the firearms, LeBlanc testified, without objection, that the items from the crate included "eight" "30 aught magazines for the AR-Style rifle," meaning that each magazine would hold thirty rounds of ammunition. *Id*. at 106-07. Some of the clips were loaded, some not. *Id*. He also identified "loaded magazines" each with an "eight round capacity" for the pistol. *Id*. at 108-09. There were additional bags which contained more rounds of ammunition. *Id*. at 109. And there were also "magazines for the automatic shotgun." *Id*. at 110.

The government was careful to emphasize not just the many rounds of ammunition for the firearms, but also that the magazines or clips were "extended," such that they would hold more rounds than standard capacity, *Id*. at 107-11, and that most of the rounds were "live." *Id*. Finally, the government also had LeBlanc testify that he found a biohazard suit and a camouflage tactical vest in the crate. *Id*. at 112, Exhibits 28I and 28Q. LeBlanc did not testify to any forensic testing or other evidence which would link the many rounds of ammunition, the extended clips, or the other items to the firearms at issue in this case.

LeBlanc testified that he also interviewed witnesses Neil Prive and Roscoe Whitney. *Id* at 115-118.  Lastly, LeBlanc testified that he listened to recordings of jail calls and monitored jail visits with Mr. Irish. *Id*. at 118-125. One recording, from

February 8, 2020, was played for the jury later in the trial and contained statements by Mr. Irish to his mother, Nancy Haskell, that her text messages to Gary Roya made it look like she "conspired with" Mr. Irish to "hide the guns." *Id*. at 125-127; Exhibit 37. In the same call, Mr. Irish said that he told his mother to call Roya, not text him. Exhibit 37.

Leblanc did not give any testimony that he had personally observed Mr. Irish in the possession of a firearm.

### *Peter Duguay*

Peter Duguay testified (Day 2, Doc. 48 at 4-35) that he was a neighbor of Mr. Irish and Stephanie Irish. Doc. 48 at 5. He became acquainted with them after his dog escaped and Mr. Irish helped retrieve the pet. *Id*. at 6. Mr. Irish worked for Duguay occasionally. Duguay said Mr. Irish was conscientious and a very hard worker. *Id*. at 7, 15. Duguay claimed that Mr. Irish was very "pro-gun" and that he referred to a "1911 pistol," which Mr. Irish described as "legally" his wife's gun. *Id*. at 7-8, 11, 24.

The FBI only interviewed Duguay in person one time. *Id*. at 26. In that interview, he did not provide any information about Mr. Irish possessing a firearm or saying he possessed a firearm. *Id*. However, in later phone interviews, Duguay claimed that, on one occasion, he and Mr. Irish were driving together to Duguay's camp. *Id*. 8-10. According to Duguay, Mr. Irish asked if Duguay had brought a firearm with him. *Id*. Duguay testified that Irish said he brought his own firearm which Duguay assumed was a handgun because Duguay did not ever see it. *Id*. Duguay said that, during the drive, he heard sound of a handgun being racked, which he described as a "magazine being ejected" and "the weapon being cocked back to remove a round from the chamber." *Id*. at 12-13. This upset Duguay, who said he yelled at Irish. *Id*. at 13. Although Duguay said he

recognized and could identify the sound from his prior familiarity with firearms, the government recreated the sound in front of the jury by racking the slide of Exhibit 5. *Id*. at 14. Duguay said "yes, possibly," the sound he heard in the car with Irish was the same as the sound the government demonstrated in front of the jury, but slower so as to not eject the round to great a distance. *Id*.

Duguay further testified that Mr. Irish had become upset on October 25, 2019 after a phone conversation with his wife. *Id*. 15-16. Mr. Irish asked to leave work, which Duguay was not happy about. *Id*. at 16. Later, after the FBI investigation began and after Duguay learned that Mr. Irish was a felon, Duguay stated that he felt Mr. Irish was not somebody he could trust, noting that he felt Mr. Irish had lied to him "on several occasions" *Id*. at 17, apparently referring to Irish's expressed belief that he was not legally a felon. *Id.* at 17, 21. Duguay then made the claims to the FBI that he believed Mr. Irish had a firearm with him during the trip to the camp. *Id*. at 26-29. Duguay explained the discrepancy and his changed story by stating that he was initially upset that law enforcement had showed at his business. *Id*. at 31. A further explanation for the new claim is seen in his admission that "the FBI told me that he [Irish] was dangerous and that he was a felon." *Id*. at 23. Duguay said he was so worried by the information from the FBI that he moved his family out of their house. *Id*.

### Neil Prive

Neil Prive testified (Day 2, Doc. 48 at 34-70) that he is Mr. Irish's cousin and that Mr. Irish's mother, Nancy Haskell, is his aunt. *Id*. at 41. He had lost touch with Mr. Irish but then they became reacquainted in the summer of 2019. *Id*. at 41-42.

In October of 2019, the day that Mr. Irish and Stephanie Irish split up, Nancy Haskell called Prive and asked him to check on Mr. Irish because he was very upset. *Id*. at 42. Stephanie Irish had just left the home with the children. *Id*. While at the Irish home, Prive stepped outside and called Haskell who asked him to take guns out of the house. *Id*. at 58. When he went back inside, Mr. Irish raised the issue of taking guns. *Id*. Mr. Irish did not have a key for the padlocked crate containing the guns on his person, but he was able to find a key in the house. *Id.* at 61. According to Prive, Mr. Irish showed him the three firearms and other items, and then they carried the box out so Prive could take the guns away. *Id*. at 44-49, 61. Prive stored the guns in the gun safe of the friend he lived with. *Id*. 48-49. Prive's understanding was that the guns belonged to Johnathon. *Id*. at 49.

Prive said he later decided that he did not want to be in possession of the guns. *Id*. at 50. Nancy Haskell made arrangements for Prive to turn the guns over to another acquaintance, Gary Roya. *Id*. Prive and Roya met at the McDonald's in Epsom for Roya to take possession of the crate, the guns, and other contents. *Id*. at 50-51. A few weeks later, Prive talked to Mr. Irish who said "the feds were after him" and asked if Prive "wiped the guns down." *Id*. at 53-54. Prive also said that Nancy Haskell later coached him to say that he got the guns from Roscoe Whitney, not from the Irish home. *Id*. at 54.

Prive was not asked whether Mr. Irish said he was worried that Stephanie was trying to set him up, by deliberately leaving the guns in the home, so she could get out of the marriage and keep Mr. Irish away from the children. Nor was he asked if he learned that Stephanie had being trying for a year to get the FBI to arrest Mr. Irish.

### *Roscoe Whitney*

Roscoe Whitney testified (Day 2, Doc. 48 at 70-113) that he is an 80-year-old former truck driver. Doc. 48 at 70. He was a family friend of Mr. Irish's mother, Nancy Haskell. *Id*. at 74. He confirmed that he received Johnathon Irish's firearms from FBI Agent Christiana in 2015. *Id*. at 75. At the same time, he received magazines, shells, and other items. *Id*. at 77.

Whitney testified pursuant to a grant of immunity by the government. *Id*. at 71-73. He said that he returned the firearms to Mr. Irish in 2017 because there was paperwork which seemed to show that Mr. Irish did not have a felony record. *Id*. at 80-81. When first contacted by the FBI, he said that Stephanie Irish gave the firearms back to him in 2019, after which he gave the firearms to "Neil" and "transferred" them to Gary Roya, by signing a document he said was prepared by Haskell. *Id*. 86-88; Exhibit 30.  However, Whitney later denied this version of events and said that he was coached by Haskell to lie. *Id*. at 72. Whitney testified that the truth was that he gave the firearms to Mr. Irish in 2017 and never got them back. *Id*. 85-86.

Considering that his testimony was self-incriminating, since both versions could not be true, Whitney was granted immunity so that he could not refuse to testify based on his Fifth Amendment privilege. *Id*. at 71-73. He stated that, as a witness for the government, he understood he would not be prosecuted by the government unless they believed he was not telling the truth. *Id*. at 72.

### *Elizabeth Millett*

Elizabeth Millett testified (Day 3, Doc. 56 at 5-41) that she is Stephanie Irish's mother and Mr. Irish's mother-in-law. Doc. 56 at 5. She said she saw Mr. Irish with a

handgun in his waistband at the Irish home during the holidays in December of 2018. *Id*. at 6-8. She was contacted by the FBI in January of 2019 and began working for them at that time as a "confidential human source." *Id*. at 12-13.

Millett admitted to a variety of disputes with Mr. Irish and Stephanie Irish over money, the house where the Irishes lived, Stephanie's refusal to have contact with her brother, and, in general, the relationship between Stephanie Irish and Mr. Irish. *Id*. at 23-31. She also acknowledged that she told the FBI, when she became a CHS, that her daughter and Mr. Irish were "draining her financially." *Id*. at 18. Most significantly, although she had told the FBI that Mr. Irish had firearms in his home, *Id*. at 38, Millet admitted that, in court documents seeking a restraining order against Mr. Irish, she denied under oath that Mr. Irish had access to, possessed, or used a firearm in a threatening way in the past, noting only that he had owned a firearm in the past. *Id*. at 24-25.

### *David Marcotte*

David Marcotte testified (Day 3, Doc. 56 at 41-55) that he was an acquaintance of Johnathon Irish. Doc. 56, at 42. They met through a mutual friend and their families socialized together on a few occasions. *Id*. at 42-43.

On October 25, 2019, Marcotte got a call from Mr. Irish who was away from home and was worried about his wife. *Id*. at 43-44. Marcotte checked at the home and reported that no one was there. *Id*. at 44. In a later phone call, Irish was "completely distraught," *Id*. at 44, so Marcotte went to the home to check on him. *Id*. at 45. Marcotte said Irish was talking about hurting himself, which led to Marcotte asking if there was a firearm in the house. *Id*. According to Marcotte, Mr. Irish said, yes, there's "a 1911," "a .45 caliber pistol," but Marcotte never saw the gun. *Id*.

Marcotte also testified regarding a deceased friend, Anthony Costello. Marcotte examined the shotgun charged in the indictment, Tr. Ex. 7 and 7A, and testified that Costello "had one exactly like this one." *Id*. at 47. Marcotte also said that Costello had a red pickup truck which Costello's widow gave to Mr. Irish. *Id*. at 49.

### Dylan Roosa

Dylan Roosa testified (Day 3, Doc. 56 at 55-95) that he is a 28-year-old mechanic who works in Littleton and lives in North Stratford. Doc. 56 at 56. He had previously worked with Johnathon Irish at a towing company in Seabrook. *Id*. After being out of contact for a while, they became reacquainted after seeing each other at Walmart in Littleton. *Id*. at 57.

According to Roosa, shortly after the contact at Walmart, Mr. Irish asked Roosa for help moving the Irish family into a new home. *Id*. at 58. One of the items being moved was the crate containing the firearms, which Roosa said they moved from the living room to the bedroom. Tr. Ex. 33. *Id*. at 59-60. Roosa said Mr. Irish opened the crate which contained a 1911 .45 handgun, an AR Rifle, and a shotgun which was in two pieces. *Id*. at 61. He said Mr. Irish was "proud" of the guns and would carry the 1911 around the house. *Id*. at 63, 66. Roosa also said that, in the summer of 2019, he and Mr. Irish shot the 1911 handgun in the backyard of the Irish home. *Id*. at 66. He claimed that Mr. Irish asked him to take possession of the firearms at one point because Stephanie's mother had gotten a restraining order against him, but he refused. *Id*. at 67-69. Roosa denied knowing that Mr. Irish was a felon. *Id*. at 91-92.

Roosa admitted that he was working for the government as a confidential human source during the investigation of Mr. Irish. *Id*. at 73. Roosa said he was paid $250. *Id*. at

74. He also admitted that he had a "falling out" with Mr. Irish. *Id*. at 70. On direct examination, he tried to claim that the basis of the dispute was money, *id*., but he then admitted that falling out was over allegations either that Stephanie Irish had been cheating on Mr. Irish, *id*. at 83, or that Mr. Irish was cheating on Stephanie. *Id*. at 93. In any event, Roosa admitted that he remained friends with Stephanie, *id*. at 76, 87, and that he is friends with Donnie Trent, the man with whom Stephanie had been having, and continued to have, a relationship. *Id*. at 89. Roosa said that he and his wife continue to socialize with Stephanie Irish and Donnie Trent. *Id*.

### John Forte

John Forte testified (Day 3, Doc. 56 at 95-134) that he is a special agent with the ATF. He described his training and expertise in determining whether firearms and ammunition have traveled in or affected interstate commerce. He then testified to the interstate nexus of the two firearms charged in the indictment in this case.

### Shayne Tongbua

Shayne Tongbua, (Day 3, Doc. 56 at 134-162) testified that he is an FBI Special Agent. Doc. 56, at 134. He confirmed that he did the confidential human source paperwork for both Millett and Roosa. *Id*. at 137-140. He said that the firearms involved in this case were not sent out for fingerprints because, "We didn't deem it pertinent to this investigation." *Id*. at 140. He further explained that fingerprinting was not requested because the firearms had changed hands so many times. *Id*. at 146 and because Mr. Irish's fingerprints would likely be on two of the firearms since Mr. Irish was a prior owner. *Id*. at 147.

During Tongbua's testimony, the government provided transcripts and played the jail recording of Mr. Irish which Kevin LeBlanc had identified, Tr. Ex. 37; Doc. 56 at 148-149.

On cross-examination Tongbua acknowledged that after Stephanie Irish and Mr. Irish split up in October of 2019, Tongbua talked with Stephanie many times about the investigation of Mr. Irish. *Id*. at 150-51. Tongbua admitted that there was "constant contact." *Id*. at 151.

### *Gary Roya*

Gary Roya (Day 4, Doc. 52 at 30-100) testified that he is from Exeter, has known Mr. Irish since high school, and also knows Mr. Irish's mother, Nancy Haskell. Doc. 52 at 30-31. Roya said that in November of 2019, Mr. Irish borrowed $300. *Id*. at 32-33. He also said that Mr. Irish offered "guns or a dirt bike or a four-wheeler" as collateral. *Id*. Regarding the guns, Roya quoted Mr. Irish as saying, "why don't you take the guns, I can't have them anyway. *Id*. at 33, 93. Roya explained that as he understood it, Mr. Irish had no control over the guns and Roya "had to go through Nancy." *Id*. at 34. Mr. Irish had expressly said he could not have any weapons. *Id*. at 64.

Although Nancy Haskell referred to "Roscoe," the person Roya dealt with regarding the guns was "Neil." *Id*. at 35.  Roya made arrangements with Neil and picked up the guns at the McDonald's at the Epsom traffic circle. *Id*. Roya confirmed that all three guns – the 1911 pistol, the shotgun, the rifle, and other items – were all in the crate. *Id*. at 35-38. When he got home, Roya took pictures to create an inventory. *Id*. at 37. The FBI showed up a few days later, at which time Roya gave them the guns, his inventory photos, and screenshots from his phone of the messages with Nancy Haskell.

13

Roya was clear that Mr. Irish never told him what to do with the guns. *Id.* at 89-90. He also confirmed that Mr. Irish "never told him what to say to anyone." *Id.* at 90. Roya did say that, at one point, Mr. Irish reported being threatened and asked for one of the guns back, *id.* at 39, but Roya declined because Mr. Irish was not supposed to have firearms. *Id.* at 39-40.

Roya identified and described the screenshots from his phone, Exhibits 29A-29F, which showed various messages purportedly from Mr. Irish and Nancy Haskell, including the messages in which Nancy Haskell arranged for the transfer of the firearms. *Id.* at 40-54. The same messages reference a document regarding the transfer. Roya was shown Trial Exhibit 30, the "Transfer of Weapons" document. *Id.* at 58. Roya stated that although he signed the document, it wrongly stated that he took custody of the firearms on October 20, 2019 when in fact he had not received them until November 17, 2010. *Id.* at 58-59. Roya also noted that the document refers to the pistol and the rifle but not the shotgun. *Id.* at 59-60.

## INEFFECTIVE ASSISTANCE OF COUNSEL

Mr. Irish's trial counsel was constitutionally ineffective because he failed to object to the admissibility of the ammunition and other "extra" items in the black crate which contained the firearms, because he failed to conduct an adequate investigation, because he failed to call Stephanie Irish as a witness so she could be cross-examined, because he failed to cross-examine other witnesses on theory that Stephanie "set up" Mr. Irish, and because he repeatedly failed to object to leading questions from the prosecution.

A District Court may "grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). When a motion for a new trial is premised on a claim of ineffective assistance of trial counsel, the two-part test of *Strickland v. Washington*, 466 U.S. 668 (1984), applies. *United States v. Wilkerson*, 251 F.3d 273, 279 (1st Cir. 2001). Under that test, Mr. Irish must show that: (1) his "counsel's performance fell below an objective standard of reasonableness," *id*. (citing *Strickland*, 466 U.S. at 687); and (2) that the deficient performance prejudiced the defense such that "there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id*. (*quoting Strickland*, 466 U.S. at 693-94).

Although claims of ineffective assistance of counsel are typically reserved for a motion under 28 U.S.C. § 2255, *see United States v. Miller*, 911 F.3d 638, 642 (1st Cir. 2018), consideration of such claims by the District Court and later by the Court of Appeal is appropriate where the District Court has taken steps "to marshal and evaluate evidentiary facts required to place the adequacy of a defendant's representation into proper perspective." *United States v. Natanel*, 938 F.2d 302, 309 (1st Cir. 1991); *see also United States v. Colón-Torres*, 382 F.3d 76, 85 (1st Cir. 2004) (explaining that the Court of Appeals can hear ineffective assistance of counsel claims on direct appeal "where the critical facts are not genuinely in dispute and the record is sufficiently developed to allow reasoned consideration" of the claim (*quoting Natanel*, 938 F.2d at 309)).

Mr. Irish's claims are substantially based on the record in this case. Insofar as the claims go beyond the record, the defense has developed factual information which would be presented at an evidentiary hearing such that the record would be sufficient for the Court to consider the claims.

## FAILURE TO OBJECT TO AMMUNITION AND OTHER EVIDENCE FROM THE CRATE

As detailed in the summary of the trial, the government introduced into evidence all of the items which were in the crate with the firearms. This additional evidence included a large volume of ammunition, extended magazines which held many more rounds than standard capacity, a camouflage tactical vest (a form of body armor), and a biohazard suit. There were eight thirty-round magazines for the rifle, multiple eight-round clips for the handgun, additional magazines for the shotgun, and a lot of ammunition loose in bags. The government not only introduced these physical items but also introduced photographs so that the jury would see the items throughout deliberations. Trial Exhibits 28I, 28J, 28K, 28L, 28M, 28N, 28O, and 28P, are all photographs of the ammunition. Trial Exhibit 28Q is the tactical vest and the biohazard suit.

This evidence created the impression of someone who was accused of not only possessing a firearm, but also of hoarding a large amount of ammunition and "battle gear." This effect was not lost on the government. The government was careful to emphasize the large volume of ammunition, that the clips were "extended" to hold more than normal capacity, that most of the clips were loaded, and that most of the rounds were "live."

The Court itself appeared to take note of the impression made by the ammunition. Before the trial started, the Court questioned why the ammunition was being offered into evidence since it had been removed from the charge. Doc. 55 at 9. The government responded that it had included those items in its 404(b) notice but also argued that the evidence was *res gestae*. Trial counsel responded that he could not "come up with a good

16

basis to" object and did not see the items as unfairly prejudicial. *Id*. at 10. Based on that

response, the Court concluded that the issue of admissibility of those items was resolved.

*Id*.

However, at the start of the trial, the Court paused again when it saw the volume

of ammunition on display for the jury. The Court commented to defense counsel, "You're

okay with all of that ammunition sitting out there?" Doc. 51 at 21. Defense counsel

responded that he agreed to admissibility, but the evidence did not need to be on display

for opening statements. The Court then remarked, "And you're not objecting to the

ammunition. I'm just raising it as a trial judge." *Id*. at 22. The Court added that the

ammunition was part of the government's "story" and the defense doesn't object. *Id*. At

that point, the government agreed to put the ammunition away during opening statements.

These items added little probative value to the government's case because the

government's witnesses identified the specific firearms at issue. Moreover, the items

were highly and unfairly prejudicial to the defense. Although Mr. Irish was not accused

of any violence, these items created the impression that he was preparing for and likely to

engage in some form of violence. The government exacerbated that fear by taking care to

note that the extended magazines held more than a normal capacity and that the rounds

were "live."

The First Circuit Court of Appeals has established standards regarding the

prohibition of evidence of other crimes, wrongs, or acts, and the exceptions to that

prohibition, in Rule of Evidence 404(b). *See generally United States v. Martínez-*

*Mercado*, 919 F.3d 91, 100-01 (1st Cir. 2019). Rule 404(b) provides that "[e]vidence of a

crime, wrong, or other act is not admissible to prove a person's character in order to show

that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). However, the rule provides exceptions such that evidence of prior acts may be admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2).

A two-part test determines the admissibility of Rule 404(b) evidence pursuant to one of the exceptions. First, a court must determine whether the evidence has some "special relevance" independent of its tendency to show criminal propensity. *United States v. Rodriguez-Barrios*, 573 F.3d 55, 64 (1st Cir. 2009) (*citing United States v. Aguilar-Aranceta*, 58 F.3d 796, 798 (1st Cir. 1995)). Second, if the evidence has some such relevance, the court must then decide whether its probative value is substantially outweighed by the danger of unfair prejudice. *Id*. And probative value "must be considered in light of the remoteness in time of the other act and the degree of resemblance to the crime charged." *United States v. Frankhauser*, 80 F.3d 641, 648 (1st Cir. 1996) (*quoting United States v. Fields*, 871 F.2d 188, 197 (1st Cir. 1989)).

The probative value of the ammunition and other items was minimal. The witnesses largely identified the firearms by make and model, even going so far as to note the repairs on the shotgun. The continuing presence of the ammunition through the series of transactions added no legitimate weight to the government's case. However, the evidence did add unfair prejudice. It made Mr. Irish look like, for lack of a better description, a weapons hoarding extremist. The tactical vest and the biohazard suit added to this impression. Thus, there should have been an objection and evidence should have been excluded under Rule of Evidence 404(b) because it was inadmissible character evidence.

The government does not avoid this issue by arguing that the evidence is *res gestae* or intrinsically intertwined with other evidence. Rule of Evidence 403, which excludes evidence where the probative value is substantially outweighed by the danger of unfair prejudice still applies and the defense point remains. The evidence added little to the prosecution's case but unfairly prejudiced Mr. Irish by implying that he was a violent and dangerous person.

The prejudice from the failure to make this objection is obvious. The Court noted the impression made by the pile of ammunition in the courtroom and asked defense counsel, "You're okay with that?" No doubt the impression on the Court at that moment was the same as the impression on many of the jurors when they saw the ammunition during trial and when they looked at the photographs in the jury room. In a case lacking a confession and direct physical evidence, where the jury's decision rested on credibility determinations, this impression surely had an impact on the jurors. The jurors already knew, because of the nature of the case, that Mr. Irish was a felon. Adding to that evidence that he hoarded large amounts of ammunition, extended clips, and body armor surely made the jurors fearful of returning anything other than a guilty verdict.

Therefore, considering the failure to object to this evidence and the prejudice, the Court should find that Mr. Irish was denied effective assistance of counsel and order a new trial.

## FAILURE TO INVESTIGATE

Mr. Irish's defense was that the evidence did not show he was ever in possession of the firearms. Even assuming one or more of the firearms may have been in the Irish home at times, they were only accessible to Stephanie who had obtained them from

Roscoe Whitney. The explanation for the evidence against Mr. Irish could have been attacked on the theory that Stephanie "set up" Mr. Irish.

Stephanie had been planning to leave Mr. Irish for a long time. She had contacted the FBI in December of 2018 and tried to convince them that Mr. Irish was in possession of firearms. She even sent pictures of the pistol to attempt to convince them. At the same time, her mother was also working with the FBI to develop evidence against Mr. Irish. When things finally fell apart between Stephanie and Mr. Irish, Stephanie left the home, leaving one or more firearms behind, knowing that she could expose Mr. Irish to criminal liability.

Trial counsel alluded to some of these facts during the trial but did not develop supporting evidence through independent investigation. The defense has conducted investigation through a private investigator which produced the following evidence:

1. A witness not interviewed by trial counsel, "VW" [the name and contact information will be provided to the government], provided details establishing that Stephanie was making efforts to get out of the marriage and get Mr. Irish out of the house by whatever means. The interview with VW confirmed the following information:

   a. Stephanie was in a relationship with Donnie Trent while married to Mr. Irish and while VW was married to Trent.

   b. Stephanie and Trent communicated frequently and used various means to conceal their communications.

   c. VW remembers messages from about two years ago, which include the following: "[Stephanie] had messaged Donnie that she was tired of John supposedly cheating on her. **She needed him put away so her and her kids could be free of him** because, even if she tried to move to her mom's, he'd follow her.  So, Donnie said something along lines of, 'I can make that happen.  I know a few people.'  [Emphasis added.]

   d. VW stated that "I know [Donnie] used to have affiliates with the Hells Angels and Outlaws from the Laconia/Meredith area all the way down to Rochester."

2. At one point during Littleton Police interactions with Stephanie and Mr. Irish, Mr. Irish provided the Littleton Police with a security video which showed

Stephanie Irish repeatedly, and without provocation, assaulting Mr. Irish. This video was from early December of 2019. Defense counsel's investigator was able to make a 91-A (public records) request for this video and obtained a copy.

3. It was also determined that during Littleton Police interactions with Stephanie and Mr. Irish from October to December of 2019, conversations with Stephanie were captured on the police bodycams. Mr. Irish believes that Trial counsel did not obtain these bodycam recordings prior to trial. When current defense counsel's investigator made an inquiry, she was informed that the video was "purged after 90 days" and is no longer available.

Exhibit A, Affidavit of Jillian Kalosky.

Regarding the lost bodycam video, the defense believes that the video was recorded when a Littleton officer came to the home on October 28, 2019, as the result of an emergency petition filed by Johnathon, that Mr. Irish and Stephanie were both present, that the video would show Stephanie Irish claiming there were guns in the house but the police then searching and finding no guns.

If this evidence had been presented at trial, especially in a cross-examination of Stephanie Irish, it would have been significant. The government admitted to working for a year with Stephanie Irish and her mother, Elizabeth Millett, to develop evidence against Mr. Irish. Millett was a confidential human source. An agent described his contact with Stephanie at one point as "constant." In addition, Dylan Roosa, a paid informant, acknowledged that he was on Stephanie's side as well. Weighed against all of this evidence would be the FBI's failure to conduct an investigation when Mr. Irish expressed that there was a plot against him. The information about Stephanie's motives certainly would have supported an argument that Stephanie had orchestrated some or all of the evidence against Mr. Irish and would have dramatically undermined the credibility of Millett and Roosa, if not others.

Reasonable investigations fall within the scope of effective representation. When analyzing the reasonableness of an attorney's investigation, the court "must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins v. Smith*, 539 U.S. 510, 527 (2003) (*see also Williams v. Washington*, 59 F.3d 673, 680 (7th Cir. 1995)("we must proceed as an evaluation of counsel's conduct from his perspective at the time he decided to forgo these stages of pretrial preparation.")) Further, ineffective counsel results in prejudice when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland*, 466 U.S. at 694. The Supreme Court of the United States has further held that prejudice may be shown when the defendant demonstrates that had counsel been effective, "at least one juror would have harbored reasonable doubt about" the defendant's guilt. *Buck v. Davis*, 137 S. Ct. 759, 776 (2017).

The depth of investigation necessary to be effective counsel can be unique to the case. *Dugas v. Coplan*, 428 F.3d 317 (1st Cir. 2005). In *Dugas*, defense counsel was an experienced criminal defense attorney, but was not experienced with arson cases. *Id.* at 322. Counsel made the decision to pursue a "not arson" defense theory. *Id.* at 323. Even though counsel recalled stating "[he was] going to need somebody . . . who was at least as well qualified" as the prosecution's expert witnesses, he did not hire an expert to testify or consult an expert in his trial preparation. *Id.* Defense counsel's investigation merely "consisted of his interviews with the state's experts, reading of 'some materials' about arson, his assessment of the experts' testimony and the fire scene based on his own inadequate understanding of arson forensics, and the advice about cross-examination he

gleaned from his 'casual discussions' with other defense attorneys." *Id.* On cross-examination of the expert witnesses, defense counsel left many of their scientific conclusions unchallenged. *Id.* at 324. In support of his habeas claim, the defendant submitted a report from a forensic expert identifying several issues that a forensic consultant could have identified in pretrial investigation. *Id.* at 325. In its analysis, the court stated that defense counsel's failure to "thoroughly investigate the 'not arson' defense in this case was constitutionally deficient." *Id.* at 329. The court determined that the case for prejudice was close, but that they only need to determine whether the defendant has raised sufficient doubts about the outcome to avoid summary judgment in the habeas context. *Id.* at 343.

The Second Circuit noted the United States Supreme Court's ruling in *Strickland* that "[c]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Lindstadt v. Keane*, 239 F.3d 191, 200 (2nd Cir. 2001). In *Lindstadt*, the defendant was convicted on one count of first-degree rape and two counts of first-degree sodomy on his daughter. *Id.* at 197. The crimes allegedly occurred in December 1985. *Id.* at 194. An adequate investigation would have shown that the defendant did not live with his daughter in December 1985, in contrast with his daughter and wife's testimony. *Id.* at 194, 195. Additionally, defense counsel did not challenge the only physical evidence of sexual abuse, which could have been "controverted by other easily available, published studies." *Id.* at 194. Regarding the prejudice factor, the court recognized "'reasonable probability' as one that 'undermines confidence in the outcome.'" *Id.* (citing *Strickland*, 446 U.S. at 694.) The court further recognized that "[e]ven serious errors by counsel do not warrant granting habeas relief

where the conviction is supported by overwhelming evidence of guilt." *Id.* Even so, the court determined that counsel's errors of not investigating the credibility of the witnesses undermined the confidence in the outcome. *Id.* at 204-205. The matter was remanded for a new trial. *Id.* at 206.

Although many decisions of a trial attorney fall into the category of "strategic decisions," "[c]ounsel cannot justify a failure to investigate simply by invoking strategy . . . ." *Browning v. Baker*, 875 F.3d 444, 472-73 (9th Cir 2017)(citing *Weeden v. Johnson,* 854 F.3d 1063, 1070 (9th Cir. 2017). In *Browning*, the defendant claimed that his counsel was ineffective for failing to perform an adequate investigation. *Id.* at 455. In its analysis, the court recognized defense counsel's failure to investigate the source of a bloody shoeprint at the scene of the crime, the credibility of witnesses, and the actual description of the assailant to an officer. *Id.* at 471. The court stated that in order for the defendant to succeed on his claim, he had to show that counsel "violated his 'duty to make reasonable investigations or to make a reasonable decision that makes particular investigation unnecessary." *Id.* at 471-72 (citing *Strickland*, 466 U.S. at 691.) In its analysis of the claims, the court determined that counsel's reasoning for not investigating the bloody shoeprint was insufficient. *Id.* at 472. The court also discussed defense counsel's failure to interview witnesses. *Id.* at 473-74. While the court recognized that counsel's choice to not personally interview witnesses was reasonable, the court did not find the failure to use an investigator to conduct interviews reasonable. *Id.* at 474. *Browning*, 875 f.3d at 475. The Court determined that had the attorney done an adequate investigation and presented the exculpatory evidence, there was a strong possibility at least one juror would have harbored reasonable doubt. *Id.* at 475-476.

This is a case in which a reasonable investigation would have made a difference. The defense found evidence which supports Mr. Irish's claim that he was set up. That evidence may not conclusively prove Mr. Irish's belief, but it was enough to give jurors pause, especially when considered in the light of how the FBI handled the investigation by consistently crediting Stephanie Irish and her supporters while ignoring Mr. Irish's concerns.

Therefore, considering the failure to investigate and the prejudice, the Court should find that Mr. Irish was denied effective assistance of counsel and order a new trial.

## FAILURE TO SUBPOENA AND CALL STEPHANIE IRISH AS A WITNESS; FAILURE TO CONDUCT ADEQUATE CROSS-EXAMINATION

The failure to investigate led to related instances of ineffective assistance. Just as it was unreasonable to not investigate Stephanie Irish, it was unreasonable for the defense to not call her as a witness. By all accounts she was the genesis of the investigation against Mr. Irish. Yet, also by all accounts, she was obviously strongly motivated against Mr. Irish and had the sympathies of other government witnesses. Showing that she had expressly stated that she was trying to "put [Mr. Irish] away so her and her kids could be free of him" would have placed the entire investigation in a different light.

If Stephanie Irish had been called to testify, the defense would have been able to cross-examine her as an adverse witness, see Fed. R. Evi. 611(c)(2), and ask her to detail her many discussions with the FBI, her motives to get rid of Mr. Irish as expressed in the messages observed by VW, and the fact she is the one who started the investigation with her messages to the FBI in December of 2018. The defense could then have questioned other witnesses about the same issues. Since the government lacked a confession, forensic evidence, or law enforcement observations that Mr. Irish possessed firearms, the

cross-examination of Stephanie Irish would likely have raised a doubt in the minds of some jurors.

Stephanie Irish was obviously available to testify, so available that the Court noted that trial counsel had the option of subpoenaing her and thus denied the defense request for a missing witness instruction. Doc. 52 at 4-9.

Therefore, considering the failure to call Stephanie Irish as a witness, the failure to cross-examine her, and the resulting prejudice, the Court should find that Mr. Irish was denied effective assistance of counsel and order a new trial.

**FAILURE TO OBJECT TO LEADING QUESTIONS**

Finally, while it may not be dispositive on its own, the defense notes that there was ineffective assistance counsel when trial counsel repeatedly failed to object to leading questions, especially on redirect by the government. The effect of the government's leading its own witnesses on these points was to cure any damage done to the witnesses during cross-examination and to allow the government lawyers to, in essence, testify to the government's case.

Examples of the government leading its own witnesses include the following: Kevin LeBlanc, Doc. 51 at 155-56 (the government was asking leading questions, answered with "yes" or "correct," and even asked at one point, "is that correct?"); Peter Duguay, Doc. 48 at 30-32 (same, witness answering "correct" multiple times to plainly leading questions); Roscoe Whitney, Doc. 48 at 108-112 (same, the first question was a leading question which actually ends, "…correct?").

These failures to object compounded the wrongful admission of 404(b) evidence, the failure to investigate, and the failure to develop the theory of the defense by calling

Stephanie Irish to testify, and then cross-examining her and other witnesses on the theory of the defense. Therefore, because of trial counsel's mistake and the resulting prejudice, the Court should order a new trial.

## **CONCLUSION**

Trial counsel's failures, considered independently and together, were unreasonable and resulted in prejudice to Mr. Irish such that justice was not served. The Court should, therefore, order a new trial.

The government, through Assistant United States Attorney Anna Krasinski, objects to the motion for new trial, as noted in the most recent status conference.

No additional memorandum is submitted because all legal authority needed to act on this request is contained herein.

WHEREFORE, the defense respectfully requests that the Court schedule a hearing on this motion, vacate Mr. Irish's conviction, and order a new trial.

Date: July 6, 2020                                        Respectfully submitted,

                                                          */s/ Richard Guerriero*
                                                          Richard Guerriero, Esq.
                                                          N.H. Bar ID. 10530
                                                          Lothstein Guerriero, PLLC
                                                          Chamberlain Block Building
                                                          39 Central Square, Suite 202
                                                          Keene, NH 03431
                                                          Telephone: (603) 352-5000

### CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered Participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as nonregistered participants on the date the document was signed by me.

                                                          */s/ Richard Guerriero*