## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| THE UNITED STATES OF AMERICA<br><br>v.<br><br>JOHNATHON IRISH | No. 19-cr-00251-LM |

### DEFENDANT'S SENTENCING MEMORANDUM
### AND MOTIONS FOR DEPARTURE OR VARIANCE

The defense submits this sentencing memorandum and motions for departure or variance in anticipation of the sentencing hearing scheduled for October 14, 2020.

<u>Introduction and Summary</u>

Johnathon Irish should be sentenced to serve one year and one day of incarceration for being convicted of being a prohibited person in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). That is the correct sentence, considering the factors in 18 U.S.C. §3553(a), because:

- Johnathon was the victim of traumatic abuse as a child and he has struggled throughout his adult life with the physical and psychological burdens of that abuse.

- The offense did not involve any violence or threat of violence against any person.

- The Presentence Investigation Report (PSR) incorrectly calculates the guidelines sentencing range because (A) the PSR erroneously considers a firearm which was not the subject of the conviction and which is not properly considered as part of the "relevant conduct," and (B) the PSR incorrectly determines the date of the "commencement of the instant offense" with the result that criminal history points are incorrectly added.

The defense submits the following in support of its requested sentence.

1

Johnathon's "History and Characteristics" Are Mitigating.

As set forth in the PSR, Johnathon is the 34-year-old son of his now divorced parents, John Charles Irish and Nancy Haskell. Johnathon was born in Exeter and lived with his parents until they divorced when he was about 12 years old. Johnathon was then raised by his mother and stepfather, Les Haskell.

Johnathon has lived virtually his entire life in New Hampshire. He has worked as a mechanic and at other jobs. He is married, but his wife, Stephanie, is seeking a divorce. And he has three young children, Cheyenne (9), Gordon (3), and Tony (2). The catalogue of names and events from Johnathon's life need not be detailed further, beyond what is in the PSR, except in one respect: Johnathon's history of childhood trauma.

"Adverse childhood experiences" – or, "ACES" – often lead to terrible consequences later in life. These days, we routinely look to the Centers for Disease Control and Prevention for guidance. This is what the CDC says about adverse childhood experiences and some of the consequences later in life:

- Toxic stress from ACEs can change brain development and affect such things as attention, decision-making, learning, and response to stress.
- Children growing up with toxic stress may have difficulty forming healthy and stable relationships.
- They may also have unstable work histories as adults and struggle with finances, jobs, and depression throughout life.

*See* main page and subpages at https://www.cdc.gov/violenceprevention/aces/index.html and https://www.cdc.gov/violenceprevention/childabuseandneglect/aces/fastfact.html .[1]

Most of us who work in the criminal justice system know this from experience.

---

[1] *See, also,* Reavis, "Adverse Childhood Experiences and Adult Criminality: How Long Must We Live before We Possess Our Own Lives?" Perm J. 2013 Spring; 17(2): 44–48; Wolf and Shi, "Childhood and Adult Trauma Experiences of Incarcerated Persons and Their Relationship to Adult Behavioral Health Problems and Treatment." Int. J. Environ. Re.s Public Health. 2012 May; 9(5): 1908–1926.

Childhood trauma makes it more difficult for a person to be a fully functioning, physically and mentally healthy adult. If we recognize this link, then we cannot fairly judge a person's adult behavior without first looking at the adverse childhood experiences in his life.

In Johnathon's case, the adverse childhood experiences were severe and are demonstrable. They include the following:

- Johnathon was routinely beaten throughout his childhood by his father.

- Johnathon's father beat his mother, Nancy.

- Johnathon's father beat and sexually abused his sister.

- Johnathon was given beer by his father as "treatment" when he was ill as a young child.

- Johnathon was repeatedly seen at the hospital for childhood head injuries and concussions which were explained as accidents.

- Johnathon's eye was destroyed and had to be surgically removed as the result of his father's conduct, which was claimed to be an accident, although that was doubted by others.

- By early adolescence, not surprisingly, Johnathon exhibited a seizure disorder and mental health issues, such that he was taken from his home, put in various placements, and eventually committed to the New Hampshire Hospital.

The defense does not depend on Johnathon's memory to document these circumstances. These are circumstances documented by records created long ago and by a key witness who was there. *See* Exhibits A – F.

The best evidence of Johnathon's childhood trauma comes from Corey MacDonald, a veteran law enforcement officer, now attorney, who knew Johnathon throughout his childhood. MacDonald started as a police officer at age 20. He worked his way up in law enforcement to eventually become the Captain of Detectives for the Portsmouth Police Department. He then went to law school, after which he became a

police prosecutor. He is now an attorney practicing in Portsmouth. Considering this background, defense counsel asked MacDonald to write a letter to the court for Johnathon's sentencing hearing. *See* Exhibit A.

MacDonald's letter describes how, early in his career, he was working part-time at a farm where he met a young boy and his mother – Johnathon and Nancy. Although Johnathon never mentioned any abuse, MacDonald said that he learned over time "Johnathon had been the victim of terrible domestic violence at the hands of his father." He noted that at, some point, "Johnathon's father put his eye out, whether accidental or otherwise," adding that "this appeared to be only one of the many injuries he suffered at his father's hands."

Later, after "counting down the days" to his eligibility, Johnathon joined MacDonald's Explorer Cadet Program at the Portsmouth Police Department. MacDonald describes young Johnathon as a very active cadet with a passion for service. However, MacDonald also saw the physical and mental issues which would forever preclude Johnathon from having a career in law enforcement or the military, no matter how hard he worked. Not only was Jonathan missing an eye, but there were "challenges" in Johnathon's behavior which would grow worse over time.

While not a mental health expert, MacDonald's opinion should be given substantial weight, considering his law enforcement background and personal experience with Johnathon. MacDonald notes that he was "in law enforcement for 18 years," "made over 1000 arrests," spent three years as a prosecutor, and has been an attorney for 15 years. MacDonald says he makes "no excuses for Johnathon" because "he is old enough to make good decisions." However, MacDonald also suggests the court should consider

that "Johnathon had a seizure disorder by his teens, lost his eye, and suffers from the remnants of abuse which … have led to mental health issues and residual trauma." MacDonald concludes, "I put all of that squarely at the feet of his father and a system that did not protect the child."

There is no doubt that MacDonald is correct in his belief that Johnathon was abused by his father. Twenty-year-old criminal and juvenile court records obtained from the Hampton Falls Police, *see* Exhibit D, confirm the abuse. Most significantly, the records contain letters which John Charles Irish wrote to Johnathon and to the judge in his own court case. Those letters, include, the following statements:

Letter from John Charles Irish to Johnathon (when Johnathon was 13)

- I have been so wrong in the way I have treated you and your mother that I can only beg you to forgive me.
- For all the times I was overly harsh or strict towards you.
- For those times when I hit you, because I didn't understand what you were going through and I let my anger and frustration take over my common sense and self control.
- I apologize from the bottom of my heart for ever hurting you, for ever hitting you, and especially for the accident that hurt you so badly.

Letter from John Charles Irish to "Your Honor."

- I am so very ashamed to say that I AM guilty in this court. Guilty of being unable to control my frustration and anger, and guilty of letting that lack of personal control turn to violence.
- I have, in fact, struck not only Nancy but my son, Johnathon, as well. And I have never felt more ashamed of myself for anything I have ever done.
- I am guilty of being verbally destructive towards them by name calling, yelling, and insulting, but more seriously, of not being able to tell them that I Love them.

In addition to this confession by Johnathon's father, Johnathon's mother confirms the abuse in her letter to this court. *See* Exhibit B.

The effects of the abuse are also seen in the records. A Family Strength Assessment in the juvenile court records contains a report from Dr. Keith Karstens who diagnosed Johnathon with ADHD, OCD, Cough Variant Asthma, Epilepsy/Seizure Disorder, and Bipolar Disorder. Dr. Brian Kossak diagnosed Johnathon with a left front/temporal seizure disorder.

Likewise, Exeter Hospital records, Exhibit E, point in the same direction. The hospital records describe John Charles Irish giving beer to Johnathon as a toddler. The records also describe four serious head injuries before age 11, including the loss of his left eye. They also confirm the seizure disorder.

Of course, correlation does not always mean causation, but in this instance the evidence establishes a very strong link between Johnathon's childhood trauma and his adult history of poor decision-making, poor responses to stress, unstable relationships, and mental health issues. The point here, as Corey MacDonald said, is not that Johnathon is not responsible for his conduct as an adult. The point is that the history of childhood trauma is not Jonathan's fault and that incarceration is not an effective way to address the root of the problem.

The Nature and Circumstances of the Offense Are Mitigating.

In contrast with the violence perpetrated against Johnathon as a child, the offense in this case did not involve violence. There is no evidence that Johnathon used the firearms to harm or threaten another person. Nor is there any evidence that he used the firearms to commit some other crime. Rather, the evidence at trial was that, at most, Johnathon simply possessed the firearms. Even in that respect, the evidence was minimal

in that the government based its case in significant part on claims of constructive possession rather than actual possession.

Also, as the PSR rightly recognizes, there is no identifiable victim in a case like this. That is not to say that the crime is not serious. However, when there is no violence, when there is no victim, and when the firearms were not used to commit any other offense, the court should find that the nature and circumstances of the offense weigh in favor of a lesser sentence.

The PSR Calculates the Sentencing Guidelines Range Incorrectly.

The court must sentence Johnathon based on the factors in 18 U.S.C. §3553(a) by making an individualized assessment of the facts before imposing a sentence which is "sufficient, but not greater than necessary," to achieve the purposes of the statute. As part of that process, the court must also consider the sentencing guidelines even though the court is not bound by the guidelines and may not mechanically presume they determine a reasonable sentencing range. *United States v. Booker*, 543 U.S. 220, 259-62 (2005); *Gall v. United States*, 552 U.S. 38, 49-50, (2007); *United States v. Martin*, 520 F.3d 87, 91 (1st Cir. 2008).

Since the court will calculate the guidelines and since the calculations in the PSR are incorrect, the defense addresses those errors and states the correct sentencing guidelines range. According to the PSR, the total offense level is 22 and the criminal history category is IV, producing a guidelines range of 63-78 months of incarceration. As explained below, the PSR errs in several respects. When those errors are corrected, the correct total offense level is 14 and the correct criminal history category is II. Thus, the correct guidelines range is 18 to 24 months.

<u>The PSR Incorrectly Finds that the Offense Involved a Semiautomatic Firearm Capable of Accepting a Large Capacity Magazine.</u>

The PSR, at ¶28, incorrectly sets the base offense level at 20, under USSG §2K2.1(a)(4)(B), based on the mistaken finding that the offense involved a semi-automatic firearm capable of accepting a large capacity magazine. The base offense level should be 14, under USSG §2K2.1(a)(6).

USSG §2K2.1 provides different base offense levels depending on the circumstances of the offense. USSG §2K2.1(a)(4)(B) says the base offense level is 20 if the "offense involved a semiautomatic firearm that is capable of accepting a large capacity magazine." However, the firearms "involved" in "the offense" in this case were not "capable of accepting a large capacity magazine." Although the government recovered three firearms – a shotgun, a pistol, and a rifle – this case was tried on the charge that Johnathon possessed the shotgun and the pistol, not the rifle. At the time of the offense, neither the shotgun nor the pistol had attached to it a magazine that would accept more than 15 rounds of ammunition nor was there such a magazine in close proximity to either of those firearms. *See* USSG § 2K2.1(a)(4) and Application Note 2. Thus, neither of those firearms qualifies as "capable of accepting a large capacity magazine" under USSG §2K2.1(a)(4)(B).

The PSR attempts to overcome this objection from the defense by describing alleged possession of the rifle as "relevant conduct." *See* USSG §1B1.1, comment (n.1[H]). However, the flaw in this reasoning lies in the PSR's acknowledgment that the government has presented no evidence that possession of the rifle would itself be unlawful conduct. To the contrary, the PSR Addendum agrees with the defense that "the possession of the rifle by the defendant was not a violation of federal law because there

was no proof that it traveled in interstate commerce or New Hampshire state law since he neither was convicted of a felony drug crime nor a felony against a person or property."

Since it was lawful for Johnathon to possess the rifle, that act of possession cannot be deemed "relevant conduct" such that it enhances the base level offense. "Relevant conduct" must be criminal in nature before it may be considered as part of the offense for which a sentencing guidelines range is being calculated. *See* USSG § 1B1.3; *United States v. Henry*, 819 F.3d 856, 865 (6th Cir. 2016)("Although 'relevant conduct' is not limited to actions that form the basis for a charge or a conviction, the conduct must nevertheless amount to an offense for which a criminal defendant could potentially be incarcerated. . . . Phrased differently, only conduct that is criminal in nature qualifies as relevant conduct under § 1B1.3." (citations and quotations omitted)); *United States v. Catchings*, 708 F.3d 710, 720 (6th Cir. 2013)(relevant conduct "must be criminal conduct"); *United States v. Schaefer*, 291 F.3d 932, 939 (7th Cir. 2002)(recognizing "the fundamental rule that relevant conduct must be criminal in nature"); *United States v. Dove*, 247 F.3d 152, 155 (4th Cir. 2001)(concluding that "relevant conduct under the Guidelines must be criminal conduct").

In addition, counting the rifle in determining the base offense level would lead to an unjust result. The government chose to exclude the rifle from its accusation. It is not part of the crime of which Johnathon is convicted. And the PSR concedes that possession of the rifle was lawful conduct. Yet, to now consider that uncharged, lawful conduct as "relevant conduct" would add six levels to the base offense level and effectively double the period of incarceration. *Compare* §2K2.1(a)(4)(B) with USSG §2K2.1(a)(6). A reasonable interpretation of the guidelines would not permit the consideration of

9

uncharged, lawful conduct to double a defendant's sentence of incarceration. Thus, the PSR is incorrect in this calculation and the base offense level should be reduced from 20 to 14.

The PSR Incorrectly Adds Two Levels for Obstruction

At ¶22 and ¶25, the PSR adds an additional two levels for obstruction of justice, pursuant to USSG §3C1.1, based on the allegation that Johnathon attempted to influence the testimony of a trial witness. The evidence of the supposed obstruction is the recorded jail conversation between Johnathon and his mother. Johnathon maintains, as he did at trial, that the recorded statements do not evidence an intent to influence the testimony of any witness or to obstruct justice. The defense submits that the evidence at trial is insufficient to show obstruction of justice by a preponderance of the evidence.

The PSR Incorrectly Determines the Criminal History Category.

With regard to Johnathon's criminal history category, the PSR uses the wrong date for the "commencement of the instant offense" such that the PSR mistakenly finds that the instant offense was committed while the defendant was on supervised release and mistakenly adds points for offenses which should not be counted.

Under USSG §4A1.1(d), two criminal history points are added if the instant offense was committed while the defendant was under a criminal justice sentence. However, Johnathon was not under a criminal justice sentence at the commencement of the instant offense. Johnathon was on supervised release following his prior conviction, but he came off of supervised release on February 18, 2018. The government did not prove at trial and cannot now prove that the offense in this case was committed before Mr. Irish was released from supervision on February 18, 2018. To the contrary, the

claims by the witnesses at trial put the alleged instances of possession or constructive possession of a firearm after that date:

- Peter Duguay testified (Day 2, Doc. 48 at 4-35) to relevant observations from the Spring of 2019 forward.

- Neil Prive testified (Day 2, Doc. 48 at 34-70) to relevant observations from October 2019 forward.

- Elizabeth Millett testified (Day 3, Doc. 56 at 5-41) and claimed that she saw Johnathon with a handgun in his waistband at the Irish home during the holidays in December of 2018.

- David Marcotte testified (Day 3, Doc. 56 at 41-55) to relevant observations from October of 2019 forward.

- Dylan Roosa testified (Day 3, Doc. 56 at 55-95) to relevant observations from the Winter of 2018-2019 forward.

- Gary Roya testified (Day 4, Doc. 52 at 30-100) to relevant observations from November 2019 forward.

None of those witnesses testified to actual or constructive possession of a firearm prior to December 2018 (the earliest possible dates for Roosa and Millett).

The only witness whose testimony possibly supports a claim that the offense started before February 18, 2018 is Roscoe Whitney. He said he returned the firearms to Johnathon in 2017. Yet, Whitney was the weakest witness at the trial. He admitted he gave the FBI contradictory statements. The statements were so contradictory and demonstrably false that he had to be given a grant of immunity before he would testify. Moreover, no other witness or evidence corroborated his testimony, especially in regard to timing. In short, Whitney's testimony alone cannot establish by a preponderance of the evidence that the offense commenced before February 18, 2018.

For the same reason, the four criminal history points based on the convictions with sentences imposed in January, April, and July of 2008, should not be counted

because those sentences were imposed more than ten years prior to the commencement of the offense in this case. *See* USSG §4A.1.2(e). As set forth above, the government has virtually no evidence that the offense started before the end of 2018, at the earliest. That would be well more than ten years after the imposition of those 2008 sentences. Here again, the witnesses simply do not establish by a preponderance of the evidence that the offense commenced at an earlier date.

If the above corrections are made, Johnathon has 3 criminal history points and his criminal history category is II.

In the alternative that the court disagrees with the defense regarding the determination of the criminal history category, the defense requests a departure under USSG §4A1.3(b)(1), such that the criminal history category is II rather than IV. That guideline authorizes a downward departure to a lower criminal history category when "reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." According to the commentary, this provision recognizes that a "criminal history score is unlikely to take into account all the variations in the seriousness of criminal history that may occur." The departure is appropriate here where the offenses are 1-point offenses from 2008, now more than twelve years old.

<u>The Court Should Grant a Departure or Variance Based on Johnathon's Traumatic Childhood and Mental Health History.</u>

The guidelines do play a role with regard to Johnathon's history of childhood trauma. Johnathon's mental, emotional, and physical conditions, as detailed above, warrant a departure under the guidelines. USSG §5H1.3 provides that:

> Mental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines.

The Sentencing Commission changed this guideline in 2010. The guideline previously provided that mental conditions "are not ordinarily relevant in determining whether a departure is warranted." However, under the amended guideline, mental conditions are a valid basis for a departure if the terms of USSG §5H1.3 are met. Amendments Submitted to Congress April 29, 2010 (Effective November 1, 2010). Thus, this court has the discretion to grant a departure under this section. *United States v. Lee*, 790 F.3d 12, 19 (1st Cir. 2015).

This is not a "typical case." It's not another claim of, "he had a rough childhood." A typical case does not involve the repeated beating of a child, multiple concussions, a seizure disorder, the loss of an eye, institutionalization as a teenager, and a confession by the father who caused it all. Those are unusual and distinguishing circumstances which are "present to an unusual degree" in this case. This is the kind of situation envisioned by USSG §5H1.3 and its authorization of a departure.

If the court does not grant a departure based on Johnathon's history of childhood abuse, then a variance is warranted. There is little doubt that Johnathon's traumatic childhood has interfered with his development and has impaired him mentally and physically. Corey MacDonald certainly recognized as much.

Impaired mental functioning is "inherently mitigating," *see Tennard v. Dretke*, 542 U.S. 274, 285-88 (2004). Mental health conditions are so significant in the sentencing context that in death penalty cases consideration of mitigating mental health evidence is constitutionally required. *See Payne v. Tennessee*, 501 U.S. 808, 822 (1991).

For the same reason, an attorney's failure to investigate and present mitigating mental health evidence constitutes ineffective assistance of counsel. *See Porter v. McCollum*, 558 U.S. 30, 40 (2009)(failure to investigate and present defendant's post-traumatic stress disorder stemming from his military service in Korea).

In the noncapital context, courts have recognized that a sentence of imprisonment for a defendant with a mental illness can be counterproductive to achieving the purposes of sentencing. *See United States v. Crespo-Rios,* 2015 U.S. Dist. LEXIS 144498, *13 (D.P.R. Oct. 19, 2015)(giving substantial consideration to the defendant's anxiety and depression as a sentencing factor in a child pornography case; collecting First Circuit district court cases).

The PSR, at ¶¶83-85, confirms that Johnathon has suffered from severe mental health issues as an adult and that those issues have been attributed to his childhood trauma. The records and letters submitted with this memorandum confirm the nature and severity of the trauma. Johnathon is responsible for his behavior as an adult, but he did not ask for what happened to him as a child or for his adult life to be so difficult as a result. A variance to reach the appropriate sentence is entirely appropriate in this situation.

Conclusion

For all of the foregoing reasons, a lengthy prison sentence is not justified in this case. A short prison sentence is the appropriate sentence because there are extremely mitigating circumstances, because the offense was a nonviolent, victimless offense, and because the guidelines calculation in the PSR are either wrong or simply out of line with reason, fairness, and 18 U.S.C. §3553(a).

The court should impose a sentence of one year and one day.

No further memorandum of law is submitted because the authority to grant the requested relief is stated herein.

WHEREFORE the defense requests that the court impose a sentence of incarceration for one year and one day, with credit for time served.

Date: October 6, 2020.                                  Respectfully submitted,

                                                        */s/ Richard Guerriero*
                                                        Richard Guerriero, Esq.
                                                        N.H. Bar ID. 10530
                                                        Lothstein Guerriero, PLLC
                                                        Chamberlain Block Building
                                                        39 Central Square, Suite 202
                                                        Keene, NH 03431
                                                        Telephone: (603) 352-5000
                                                        richard@nhdefender.com

## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to registered participants identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to the nonregistered participants on the date the document was signed by me.

                                                        */s/ Richard Guerriero*