UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 1:19-cr-00251-LM |
| v. | |
| JOHNATHON IRISH, | |
| Defendant. | |

## UNITED STATES' RESPONSE TO DEFENDANT'S
## SENTENCING MEMORANDUM AND MOTION FOR DEPARTURE OR VARIANCE

### I.  Introduction

The Government submits this response to *Defendant's Sentencing Memorandum and Motion for Departure or Variance*, which seeks a significant downward departure or variance. ECF No. 77. Defendant urges the Court to "impose a sentence of one year and one day." *Id.* at 15.   As discussed below, the Government opposes defendant's motion for a downward departure or variance. Moreover, the Government objects to the removal from the PSR of the two-level enhancement under 2K2.1(b)(1)(A) for three or more firearms. The Government recommends a sentence of 77 months of imprisonment, followed by a three-year term of supervised release.

### II.  Offense Conduct

In December of 2014, defendant Johnathon Irish pled guilty to two felony offenses—Aiding and Abetting the Making of a False Statement in Connection with the Acquisition of a Firearm and Making a Material False Statement to a Federal Agent—in *United States v. Irish*, the District of New Hampshire, case no. 13-CR-142-01-PB. PSR ¶ 53; *see also* Gov't Trial Exh. 36 (Stipulation of Fact). He was sentenced to 18-months of imprisonment followed by a three-year term of supervised release.

- 1 -

Before the defendant was convicted, FBI agents took custody of two firearms that previously belonged to him—a Sig Sauer Sig 516, 5.56 caliber, AR-style rifle, and a Sig Sauer .45 caliber 1911 pistol. PSR ¶ 11. In July of 2015, the defendant directed that the FBI release those firearms to Roscoe Whitney—a man the defendant refers to as "grandpa." In October of 2017, the defendant e-mailed Whitney some documentation that convinced Whitney that he could return the firearms. So, in October of 2017, Whitney returned the two firearms to the defendant. ECF No. 48, at 84, ln. 5-12, 20-22; *Id.* at 85, ln. 17-20. Irish was on federal supervised release at the time and remained on supervised release until February 2018. PSR ¶ 53.

At some point, the defendant also took possession of a Catamount Fury shotgun that previously belonged to a friend. PSR ¶ 14; ECF No. 56, at 42, ln. 2-12; *Id.* at 47, ln. 11 – 48, ln. 4; *Id.* at 49, ln. 6 – 50, ln. 5.

Various friends and family members observed the defendant with firearms between 2018 and 2019. Dylan Roosa, a former friend, helped the defendant move a large box containing three firearms – a 1911 pistol, an AR-style rifle, and a Catamount shotgun – from the living room into a bedroom closet. The defendant explained the various after-market components on the AR-style rifle, and shot the 1911 pistol with Roosa in the defendant's backyard. PSR ¶ 13. The defendant's mother-in-law saw the defendant carrying a pistol in his waistband in December of 2018. PSR ¶ 15. A few weeks later, the defendant asked his mother-in-law to hold onto his firearms for him; she declined. *Id.*   In October 2019, after telling his former boss Peter Duguay that he was armed, the defendant cleared a firearm in a car Duguay was driving PSR ¶ 16.

Then, in late October of 2019, the defendant learned that his wife had left him. Afterwards, the defendant asked a friend, David Marcotte, to take the defendant's 1911 pistol so

that the defendant would not kill himself. PSR ¶ 17. Marcotte declined.

The defendant also spoke to his cousin, Neil Prive. The defendant gave Prive a black case containing three firearms, the Sig Sauer AR-style rifle, the 1911 pistol, and the Catamount Fury shotgun, along with ammunition, large capacity magazines, and other miscellaneous items.   PSR ¶ 18. The defendant also gave Prive the key to the case. Later, the defendant asked Prive to purchase the guns or to use them as collateral for a loan. When Prive declined, the defendant's mother – at the defendant's direction – arranged for Prive to transfer the guns to another friend Gerald Roya. Irish asked for the guns back from Roya. Roya refused. ECF No. 51, at 38, ln. 9-19.

After Prive gave the firearms to Roya, the defendant called Prive and asked if he had wiped the guns down. When Prive asked why, the defendant said he was asking because of "the feds." PSR ¶ 21.

 In an attempt to obfuscate the fact that he had the guns, Irish, with the help of his mother,[1] got Whitney and Roya to sign a transfer note indicating that Whitney gave these items to Roya in October of 2019. Exh. 29D; Exh. 29F; Exh. 30. The note was false—Whitney had relinquished the firearms to the defendant years before Roya obtained them from Irish's cousin. *See* ECF No. 48, at 84, ln. 5-12, 20-22; *Id.* at 85, ln. 17-20.

After hearing all the evidence, the jury found Irish guilty of the unlawful possession of two firearms.

### III.    The Presentence Investigation Report

---

1 Irish's mother arranged the transfer of the firearms and arranged for Roya to sign the falsified transfer document by text message. In a recorded jail visit, Irish said that the text messages made it look like she conspired with him to hide the guns. When she rhetorically asks "who told me to write the text messages?", Irish responds "I told you not to f*cking text anybody…I told you to f*cking call." Exh. 37.

The PSR determined that the base offense level is 20 under USSG § 2K2.1(a)(4)(B) because the offense involved a semiautomatic firearm capable of accepting a large capacity magazine. The PSR also includes a two-level enhancement for obstruction of justice. The government agrees with the base offense level and obstruction enhancement, but objects to the removal of the two-level enhancement under 2K2.1(b)(1)(A) because the offense involved three firearms.

Finally, the PSR calculates the defendant's criminal history category to be IV, and includes two points because the defendant committed the offense while on supervised release. The government agrees with the criminal history calculation.

### a. The PSR properly identifies the base offense level as 20 under 2K2.1(a)(4)(B) and the two-level enhancement under 2K2.1(b)(1)(A) applies here because the offense involved three firearms.

The Guidelines establish a base offense level of 20 if the offense involved a semiautomatic firearm that is capable of accepting a large capacity magazine. USSG § 2K2.1(a)(4)(B). There is no dispute that the Sig Sauer 516, 5.56 caliber rifle, as fully assembled, is a firearm, and there is similarly no dispute that it is capable of accepting a large capacity magazine. *See* ECF No. 77, at 8. Instead, the defendant contends that the rifle cannot be considered relevant conduct under Guideline 1B1.1 because the Government has not presented evidence that the defendant's possession of the rifle was itself unlawful. This, in turn, hinges on defendant's claim that the Government cannot demonstrate that the firearm traveled in or affected interstate commerce. Defendant's argument fails – the Government will establish by a preponderance of the evidence that the firearm affected interstate commerce and, thus, his possession of the Sig Sauer 516, 5.56 caliber rifle was illegal. As such, a base offense level of 20

is appropriate. Moreover, a two-level enhancement under 2K2.1(b)(1)(A) applies because the offense involved three firearms.

Under federal law, it is unlawful for any person who has been convicted of a felony to "possess in or affecting commerce, any firearm or ammunition" or to "receive any firearm…which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(g)(1).

Satisfying the jurisdictional nexus requirement is typically accomplished by introducing evidence that the firearm was imported into the United States (and therefore has been shipped or transported in interstate commerce) or was manufactured in a State different from that which the firearm was possessed by the prohibited person (and therefore it had previously been shipped or transported in interstate commerce). *See, e.g., Scarborough v. United States*, 431 U.S. 563 (1977).

The statute, however, does not limit the jurisdictional element to a firearm that previously traveled in interstate commerce. *See, e.g., United States v. Roszkowski*, 700 F.3d 50, 58 (1st Cir. 2012) ("Section 922(g)(1) forbids convicted felons from possessing a firearm 'in or affecting commerce," which includes the possession of a gun that previously traveled interstate."). Rather, the statute also authorizes that this jurisdictional element can be satisfied by demonstrating that the possession of the firearm was "in or affecting commerce." 18 U.S.C. § 922(g)(1). Here, defendant's possession of the firearm was "in or affecting commerce" for two distinct reasons: (1) because the manufacture of any firearm is an economic activity involving a pervasively regulated commodity, which in the aggregate affects interstate commerce, and (2) because this firearm affected interstate commerce as at least one component of the firearm was manufactured in Florida by another company.

In *United States v. Stewart*, 451 F.3d 1071 (9th Cir. 2006), the defendant challenged his conviction for the unlawful possession of a homemade machinegun which had not traveled in interstate commerce, under 18 U.S.C. § 922(o), arguing that that the provision was not a valid exercise of Congress's power under the Commerce Clause because § 922(o) lacks a jurisdictional element as part of the offense. The Ninth Circuit concluded that "[g]uns, like drugs, are regulated by a detailed and comprehensive statutory scheme designed to protect individual firearm ownership while supporting Federal, State, and local law enforcement officials in their fight against crime and violence." *Stewart*, 451 F.3d at 1076 (internal citations omitted).   The court found that, in light of the Supreme Court's opinion in *United States v. Raich*, 545 U.S. 1 (2005), "the proper focus is not [the defendant] and his homemade machineguns, but all homemade machineguns manufactured intrastate…The market for machineguns is established and lucrative, like the market for marijuana." *Id.*

Similarly, in *Montana Shooting Sports Association v. Holder*, 727 F.3d 975, (9th Cir. 2013), the plaintiffs sought injunctive relief and a declaratory judgment against enforcement of the Gun Control Act's licensing provisions after Montana enacted a law purporting to exempt firearms and ammunition manufactured in Montana from Federal law and regulation if the firearms were made and sold only in Montana. On the basis of the Montana law, plaintiffs alleged that the in-state manufacturing of a firearm is "outside the scope of the Commerce Clause, and that Federal licensing laws do not apply as a result."  *Id.* at 981.   The Ninth Circuit rejected plaintiff's arguments and held that the Montana statute was preempted by Federal law.  *Id.* at 982.   The Court found that "Congress could have rationally concluded that the manufacture of unlicensed firearms, even if initially sold only within the State of Montana,

would in the aggregate substantially affect the interstate market for firearms.   Under *Raich* and

*Stewart*, [this is] within the reach of the long arm of federal law." *Id.*

In *Taylor v. United States*, 136 S. Ct. 2074 (2016), the Supreme Court reviewed the

conviction of a defendant convicted of two Hobbs Act robberies in which the lower court

precluded the defendant from offering evidence that the drug dealers targeted by the defendant

sold only locally-grown marijuana.   The Court held "[u]nder *Raich*, the market for marijuana,

including its intrastate aspects, is commerce over which the United States has jurisdiction."   It

therefore follows as a simple matter of logic that a robber who affects or attempts to affect even

the intrastate sale of marijuana grown within the State affects or attempts to affect commerce

over which the United States has jurisdiction." *Id*. at 2080.   Rejecting the defendant's attempt to

distinguish the CSA from the Hobbs Act on the basis of the Hobbs Act's jurisdictional element,

the Court found "[t]here is no question that the Government ... must prove that the defendant

engaged in conduct that satisfies the Act's commerce element, but the meaning of that element is

a question of law.   And, as noted, *Raich* established that the purely intrastate production and sale

of marijuana is commerce over which the Federal government has jurisdiction." *Id*.

A challenge to the position that the manufacture of any firearm substantially affects

interstate commerce is likely to be based on *United States v. Lopez*, 514 U.S. 549 (1995). *Lopez*

involved a student convicted under the Gun Free School Zones Act, 18 U.S.C. § 922(q)[2] for

possession a firearm in a school zone. At the time, 922(q) did not have an overt commerce

element. Section 922(q) now requires as an element that the offense involves a firearm "that has

moved in or that otherwise affects interstate or foreign commerce." In *Lopez*, the Court found

---

2  § 922(q) has since been amended, and has, as amended, been found to be constitutional.  *See e.g.*, *United States v. Dorsey*, 418 F.3d 1038, 1045-1046 (9th Cir, 2005).

that possessing a firearm in a school zone did not substantially affect interstate commerce, and, as such, Congress had exceeded its powers under the Commerce Clause. *Id*. at 561-68.

However, *Lopez* has only a limited application to the current analysis of section 922(g). The case must be understood in the context of subsequent Supreme Court decisions on the Commerce Clause, cited above, which repeatedly found that certain seemingly intrastate activities substantially affect interstate commerce when considered in the aggregate. *Lopez* dealt with an activity, the otherwise lawful possession of a firearm by a student without a criminal history in a school zone, which did not affect interstate commerce in any apparent way and involved the regulation of local schools which was traditionally regulated by state authorities. The possession of firearms by felons and other potentially dangerous prohibited persons not only clearly affects commerce, but is the central component of the Federal interstate regulation of firearms, the Gun Control Act.

The Fourth Circuit recently upheld a conviction under the Hate Crimes Prevention Act of 2009, 18 U.S.C. § 249(a)(2), against challenges based on *Lopez* by following the reasoning of *Raich* and *Taylor*. *United States v. Hill*, 927 F.3d 188 (4th Cir. 2019). The Court found that the defendant's unarmed assault of a co-worker who was packaging and shipping products at an Amazon fulfillment center substantially affected interstate commerce in the aggregate. The assault interfered with the victims packaging and shipping of products, an activity which the Supreme Court had already decided affected interstate commerce in *United States v. Darby*, 3212 U.S. 100 (1941). The Court concluded:

> Accordingly, that Defendant's assault of Tibbs may have "minimal[ly]" impacted Amazon's business—and interstate commerce generally—does not render Defendant's prosecution unconstitutional. *Id.* Rather, it is sufficient that Congress could reasonably determine that the aggregate effect of assaults on individuals

engaged in ongoing economic or commercial activity—like Defendant's assault of Tibbs while he was preparing packages for interstate sale   and shipment—amounts to a "substantial effect" on interstate commerce.

*Id.* at 202-203. *See also United States v. Cheng Le*, 902 F.3d 104, 118-19 (2d. Cir. 2018)

(rejecting *Lopez* Commerce Clause challenge to biological weapons act).

Multiple other constitutional challenges to the Gun Control Act have been made on the basis of *Lopez*.   Notwithstanding those challenges, the post-*Lopez* jurisprudence has reaffirmed the validity of the Supreme Court's original analysis of 922(g)'s jurisdictional element under *Scarborough*.   *See e.g.*, *United States v. Smoot*, 690 F.3d 215, 223 (4th Cir. 2012); *United States v. Chesney*, 86 F.3d 564, (6th Cir. 1996) ("All of the courts of appeals to consider [922(g)'s jurisdictional element] since *Lopez* have concluded that § 922(g)(1), as construed to require only the minimum nexus to commerce approved in *Scarborough*, is constitutional."); *United States v. Sorrentino*, 72 F.3d 294, 296 (2d Cir. 1995) ("The statute invalidated in *Lopez* lacked [a jurisdictional element]; the statute at issue here clearly contains one.   *Lopez* is thus entirely compatible with the Supreme Court's earlier decision in *Scarborough*.").   Accordingly, a minimal nexus to interstate commerce is all that is required under 922(g), even after *Lopez*.

Taken in conjunction with each other, these cases stand for the proposition that the possession of even a single firearm affects commerce, and, moreover, that the effect on commerce is substantial (because it is an economic activity) such that Congress may appropriately regulate even intrastate activity under the Commerce Clause.   *See Wickard v. Fillburn,* 317 U.S. 111, 125 (1942) (even if person's activity in growing a small amount of wheat is local in nature and though it may not be regarded as traditional commerce it may be regulated if this type of activity in general has a substantial effect on interstate commerce). Further,

keeping in mind that Congress sought to regulate firearm possession broadly, it would make little

sense for convicted felons, drug addicts, illegal aliens, and domestic abusers to be able to easily

circumvent a robust and long-standing statutory and regulatory by self-making firearms.

The extent of this marketplace is easily demonstrated through published statistics.   In

2017, 8,327,792 firearms are known to have been manufactured in the United States.   *See*

*Firearms Commerce in the United States*, https://www.atf.gov/firearms/docs/report/2019-

firearms-commerce-report/download.   A further 488,300 firearms were exported and 4,305,851

firearms were imported.   *Id*.   Additionally, there were 136,081 licensed individuals and entities,

including, among others, 56,638 dealers, 7,871 pawnbrokers, 11,946 manufacturers, and 1,110

importers.   *Id*.   If intra state firearms were exempt from regulation, they could easily disrupt

this marketplace, with possessors generally paying a premium for the privilege of avoiding

licensing and background check requirements.

Moreover, firearms are a highly moveable and transferable commodity.   The potential

and ease of interstate movement of firearms was one of the factors considered by the Ninth

Circuit in both *Montana Shooting Sports* and *Stewart*.   *See Montana Shooting Sports*, 727 F.3d

at 982 ("Congress could rationally conclude that unlicensed firearms would make their way into

the interstate market.... Congress might reasonably determine that a 'Made in Montana' stamp

will not deter those seeking to purchase unregistered firearms in the interstate black market.");

*Stewart*, 451 F.3d at 1078 ("Homemade guns, even those with a unique design, can enter the

interstate market and affect supply and demand").   The potential and ease of interstate transfer of

a commodity was also considered by the Supreme Court with respect to marijuana in *Raich*.

*Gonzalez v. Raich*, 545 U.S. 1, 28 (2005) ("One need not have a degree in economics to

understand why a nationwide exemption for the vast quantity of marijuana (or other drugs) locally cultivated for personal use (which presumably would include use by friends, neighbors, and family members) may have a substantial impact on the interstate market for this extraordinarily popular substance.").

Here, the firearm was manufactured by Sig Sauer. Sig Sauer is a company with over 1,200 employees and is "the largest member of a worldwide business group of firearms manufacturers." *See* History, Sig Sauer, *available at* https://www.sigsauer.com/company/history/ (last visited October 6, 2020). This network allows Sig Sauer "to respond quickly and effectively to changing market conditions and the needs of its military, law enforcement, and commercial markets worldwide." *Id.* Indeed, there is a "vast worldwide growth in demand for SIG SAUER products." *Id.*

Moreover, the manufacture of the firearm at issue here – the Sig Sauer 516, 5.56 caliber rifle – affected interstate commerce, despite the fact that it was fully assembled here in New Hampshire. The receiver for the firearm was manufactured by AO Precision Manufacturing LLC in Daytona Beach, Florida, on behalf of Sig Sauer. Exhibit A, Interstate Nexus Determination. Here, the only question is whether the firearm meets the nexus requirement—the government has established by a preponderance of the evidence that this firearm affected interstate commerce. In light of this, the defendant's possession of the Sig Sauer 516, 5.56 caliber rifle was illegal. Therefore, the base offense level is properly 20 and the two-level enhancement for the offense involving three firearms under 2K2.1(b)(1)(A) applies.

**b.  An enhancement for obstruction of justice is appropriate.**

- 11 -

The defendant objects to the two-level enhancement for obstructing or impeding the administration of justice under Guideline 3C1.1.   That guideline provides:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (b) a closely related offense, increase the offense level by 2 levels.

The application notes explain that this enhancement is warranted where a defendant attempts to unlawfully influence a witness, attempting to suborn perjury, and producing or attempting to produce a false, altered or counterfeit document.   USSG § 3C1.1, Application Note 4.

The defendant engaged in a wide array of conduct aimed at attempting to obstruct justice. With the assistance of his mother, the defendant directed the creation of a false transfer document purporting to show that the firearms were transferred from Whitney to Roya when, in fact, the defendant gave the firearms to his cousin Prive.   Both Whitney and Roya testified that the note was false and that they received the false transfer note from the defendant's mother. The defendant himself berated his mother for texting them about the false transfer note rather than calling. PSR ¶ 22. Upon his arrest, the defendant said that he did not have the firearms and told investigators that he had documentation of the weapons transfer from Whitney to Roya in his e-mail. Exhibit B, Recorded Interview, at 5:19-6:05 (stating that Whitney transferred the weapons to someone they used to know from the campground and that he had documentation of this transfer in his e-mail).

His intent is clear based on his statements to Prive – Prive testified that after he transferred the firearms to Roya, the defendant called Prive and asked if he had wiped the guns down. When Prive asked why, the defendant said he was asking because of "the feds." PSR ¶ 21.

And, in jail call the defendant made on January 20, 2020, the defendant attempted to have his aunt conference Prive into the recorded jail call. The defendant's aunt did not, citing technological issues. Instead, she said she would ask Prive if she could give the defendant Prive's number. The defendant then asked his aunt to pass a message to Prive – "Duke Brothers need to talk ASAP. Boss Hogg's been creeping around." Exhibit C at 9:05-9:13, January 20, 2020 Jail Call. All of this establishes, by a preponderance of the evidence, that the enhancement for obstruction of justice applies.

### c. The defendant committed the offense while on supervised release.

The defendant objects to his criminal history category arguing that there is insufficient evidence to establish that he took possession of the Sig Sauer .45 caliber 1911 pistol (and the Sig Sauer Sig 516, 5.56 caliber, AR-style rifle) in 2017. He is wrong.

During trial, Whitney testified that he returned those firearms to the defendant in October of 2017:

Q. Did there come a time when you gave the firearms back to Mr. Irish?

A. Yes, there was.

Q. Do you remember when that was?

A. I believe it was about the middle of October in 2017.

ECF No. 48, at 80, ln. 7-12; *see also id.* at 84, ln. 2-19; *see also id.*, at 109, ln. 8 – 110, ln. 3.

On cross-examination, Whitney was again asked about the date he returned the firearms to the defendant:

Q. So the firearms were returned in 2018, not 2017, correct?

A. I say it was in '17.

ECF No. 48, at 101, ln. 1-3. Whitney testified that he returned the firearms shortly after the defendant provided some paperwork that purported to show that he was no longer prohibited from possessing firearms. Consistent with Whitney's testimony, that paperwork is a Criminal History Record Information Request Form prepared and signed by the defendant on September 26, 2017. Exhibit D, Criminal History Record Information Request Form.

Defendant claims that the Court should disregard this testimony because Whitney made contradictory statements to the FBI. Indeed, Whitney admitted to lying to the FBI initially because he had been coached to do so by the defendant's mother. He testified that though he initially told the FBI that the defendant's wife gave him the guns back in October of 2019, the statement was not true. ECF No. 48, at 86, ln. 10-23. Whitney's testimony was clear –he returned the firearms to the defendant in October of 2017. ECF No. 48, at 86, ln. 4 -87, ln. 6.

Whitney's uncontroverted testimony, corroborated by the date of the paperwork the defendant used to dupe Whitney into returning the firearms, establishes that the defendant committed the instant offense in October of 2017, while he was still on supervised release. As such, the PSR properly included two points to the defendant's criminal history category under Guideline 4A1.1(d) and properly included criminal history points for sentences imposed in January, April, and July of 2008.

### d.  The guideline calculation and the Government's sentencing recommendation

Based on the above, the guideline calculation should be as follows:

| Description | Offense Level | Citation |
|---|---|---|
| Base offense level | 20 | 2K2.1(a)(4)(B) |
| Offense involving 3 firearms | +2 | 2K2.1(b)(1)(A) |
| Obstruction of justice | +2 | 3C1.1 |
| **Total:** | **24** | |

Based upon a total offense level of 24 and a criminal history category of IV, the guideline imprisonment range is 77-96 months. The Government recommends a sentence of 77 months of imprisonment, followed by a three-year term of supervised release.

### IV.    A downward departure is unwarranted under Guideline 4A1.3

The defendant argues that, even if his criminal history is properly calculated as IV, the Court should depart to a criminal history category of II. To support this request, defendant relies on Guideline 4A1.3(b)(1). That provision authorizes a downward departure "[i]f reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes."   The commentary to that section provides:

> A downward departure from the defendant's criminal history category may be warranted if, for example, the defendant had two minor misdemeanor convictions close to ten years prior to the instant offense and no other evidence of prior criminal behavior in the intervening period.

USSG § 4A1.3 application note 3.

A departure under this provision is not warranted here—the defendant has exhibited a pattern of engaging in criminal behavior throughout his adult life. In 2008, the defendant was convicted of theft by unauthorized taking, criminal threatening, possession of marijuana, and for being a habitual offender after driving without a valid license on multiple occasions. PSR ¶¶ 47, 48, 49, 50. In 2009, he was convicted of criminal threatening. PSR ¶ 51. In 2013, he was convicted of two felonies – aiding and abetting the making of a material false statement in connection with the acquisition of a firearm and making a material false statement to a federal agent.   PSR ¶ 53. He also committed the instant offense while on supervised release. Moreover, the defendant was arrested on September 20, 2020 by the Littleton Police Department

while at Merrimack County Jail for violation of a protective order.

The defendant's conduct in this case – duping a friend into returning firearms – coupled with his demonstrated contempt for the law indicate that the defendant has a high risk of recidivism and is a danger to the community. A departure under Guideline 4A1.3(b)(1) to a criminal history category II is not appropriate here.

## V.     A downward departure under Guideline 5H1.4 is not appropriate here.

The defendant asks the Court to grant a downward departure under Guideline 5H1.4 based on the defendant's history of childhood trauma and mental health history. A review of that provision, however, demonstrates that it is inapplicable here.

Guideline 5H1.4 provides:

In certain cases a downward departure may be appropriate to accomplish a specific treatment purpose. *See* § 5C1.1, Application Note 7.

Application Note 7 to Guideline 5C1.1, in turn, provides:

There may be cases in which a departure from the sentencing options authorized for one C of the Sentencing Table (under which at least half the minimum term must be satisfied by imprisonment) to the sentencing options authorized for Zone B of the Sentencing Table (under which all or most of the minimum term may be satisfied by intermittent confinement, community confinement, or home detention instead of imprisonment) is appropriate to accomplish a specific treatment purpose. Such a departure should be considered only in cases where the court finds that (A) the defendant is an abuser of narcotics, other controlled substances, or alcohol, or suffers from a significant mental illness, and (B) the defendant's criminality is related to the treatment problem to be addressed.

Here, the defendant has not offered or identified any type of treatment aimed at addressing his past mental, emotional, and physical conditions. Guideline 5H1.3 is inapplicable and the Court should decline to grant a downward departure. *See United States v. Lee*, 790 F.3d 12, 19 (1st Cir. 2015) (affirming district court's denial of a downward departure under Guideline 5H1.2 where

- 16 -

the district court noted that it declined to do so because the defendant failed to recognized the seriousness of his conduct).

**VI.     A downward variant sentence is unwarranted under the 3553(a) factors.**

A sentence within the Guidelines range "significantly increases the likelihood that the sentence is a reasonable one." *Rita v. United States*, 127 S.Ct. 2456, 2463 (2007). Because the defendant seeks a significant variance, it is important to keep in mind that, as the amount of any variance increases, "the more compelling the sentencing court's justification must be." *United States v. Smith*, 445 F.3d 1, 4 (1st Cir. 2006); *see also Gall v. United States*, 552 U.S. 28, 50 (2007). Hence, in considering the defendant's request for such a substantial variance, it is important for the Court to focus in on exactly what the defendant's justifications for it are. As discussed below, the defendant's justifications are inadequate to support the extreme variance he seeks.

The defendant's basic rationale is that this Court should vary because of his mental health history and the childhood trauma he suffered. The government does not question the defendant's history of trauma. According to the PSR, the defendant reported that his father and, later, his step-father, were physically abusive. PSR ¶ 71. The PSR also details emotional and mental health problems. PSR ¶¶ 83, 84, 85. Indeed, the defendant suffers from Post Traumatic Stress Disorder, Antisocial Personality Disorder, and Attention-Deficit/Hyperactivity Disorder. PSR ¶ 85. But even when participating in mental health counseling, the defendant's supervising federal probation officer continued to receive multiple complaints from third parties, including schools, and doctor's offices, regarding conflicts they had with the defendant in the community. PSR ¶ 87.

People who suffer from childhood trauma and associated mental and emotional trauma deserve our sympathy and support—provided we can simultaneously protect the public from

further crimes of the defendant and afford adequate deterrence to criminal conduct. At bottom, the defendant's childhood trauma and associated mental health issues cannot explain away this defendant's criminal record. There will always be sentencings in which criminal history issues must predominate even in the face of past trauma. Where the defendant has an extensive criminal history and demonstrates persistent recidivism, the potential for future crime and protecting public safety must drive the sentence. *See* 18 U.S.C. § 3553(a)(2)(c); *United States v. Jones*, 762 F.Supp.2d 270, 281 (D. Mass. 2010) (Young, J.) ("Incarceration is a blunt tool at best. First-time non-violent offenders ought receive the benefit of every rehabilitative program a court can devise. Thirty-three years of judicial experience, however, convinces me that higher sentences for repeat offenders are both appropriate and necessary. Regrettably, some offenders 'simply don't get it.'").

This is such a case. When the defendant committed the offense here, he was on federal supervised release for two felony convictions, one of which related to firearms. The defendant has exhibited a love of firearms (see PSR ¶ 88) that he prioritizes above the law and conditions of supervised release. Indeed he duped a friend into returning firearms to him, despite being legally prohibited from possessing them. He has continued to commit crimes even while incarcerated. The defendant's childhood trauma and mental health history do not outweigh the other sentencing factors this Court must consider.

The defendant's history should be viewed as a mitigating factor only if there is a real basis to believe that the sentence of this Court will somehow produce a different result than his prior convictions. While the government would like to hope that the past is not the best predictor of the defendant's future, the government cannot turn a blind eye to the profound difficulties the defendant has had in leading a law-abiding lifestyle. Although his history surely warrants making

every treatment option available to him while he is in prison and when he goes on supervised release, it does not warrant a downward variance.

### VII.    Conclusion

The government respectfully submits that, for all these reasons, the Court should not vary downward from the otherwise applicable sentencing guideline range. In light of all the factors set forth in Title 18, United States Code, Section 3553(a), the policies set forth in the advisory Sentencing Guidelines, the facts set forth in the PSR, and the arguments above, a sentence of 77 months imprisonment, followed by a three-year term of supervised release, would be sufficient but not greater than necessary to comply with the legitimate purposes of sentencing set forth in Title 18, United States Code, Section 3553(a)(2).

Dated:   October 7, 2020                                  Respectfully submitted,

                                                          SCOTT W. MURRAY
                                                          United States Attorney


                                                          By: */s/ Anna Z. Krasinski*
                                                          Anna Z. Krasinski
                                                          Assistant U.S. Attorney
                                                          W.V. Bar # 12762
                                                          53 Pleasant Street, 4th Floor
                                                          Concord, NH 03301
                                                          (603) 225-1552
                                                          anna.krasinski@usdoj.gov